# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC, | ) ) ) ) | Civil Action No. 2:23-cv-22291-MCA-JRA |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| The City of Jersey City and the City of Jersey City Rent Leveling Board, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## INTERVENORS' ORDER TO SHOW CAUSE

Mollie Hartman Lustig, Esq.
McLaughlin & Stern, LLP
1 Elm Street, Suite 2
Westfield, New Jersey 07090
Tel: (212) 448–1100
mlustig@mclaughlinstern.com

Eric J. Nemeth, Esq.
Eric J. Nemeth, P.C.
55 Madison Avenue, Suite 400
Morristown, New Jersey 07960
Tel: (973) 539–2122
enemeth@ejcounsel.com

*Attorneys for Portside Towers
East Tenant Association,
Portside Towers West Tenant
Association, Kevin Weller,
Jessica Brann, Joel Rothfus
and Michele Hirsch.*

{N0709477.1}

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..............................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...............................3

    155 Washington Street, Unit 504 .................................................................8

    155 Washington Street, Unit 202 .................................................................9

    155 Washington Street, Unit 1910 .............................................................10

    100 Warren Street, Unit 317........................................................................11

ARGUMENT & AUTHORITIES .......................................................................13

    1.  Intervenors Have Established a Probability of Success on the Merits ......14

    2.  The Tenants Are Suffering Irreparable Harm and Will Continue to Suffer Those Harms ................................................................................16

    3.  Neither the Landlords or the City Will Suffer Harm From a TRO ...........19

    4.  Issuance of a TRO is in the Public Interest ..............................................19

    5.  A Bond is Not Necessary...........................................................................20

CONCLUSION................................................................................................21

## TABLE OF AUTHORITIES

**Cases**

Acierno v. New Castle County,
  40 F.3d 645 (3d Cir. 1994) .................................................................................17

Anderson v. Davila,
  125 F.3d 148 (3d. Cir, 1997) .............................................................................14

Campbell Soup, Inc. v. ConAgra, Inc.,
  977 F.2d 86 (3d Cir. 1992) ................................................................................14

Corby v. Scranton Housing Auth.,
  Civil Action No. 3:04-CV-2523, 2005 U.S. Dist. LEXIS 48053
  (M.D. Pa. June 7, 2005) .....................................................................................20

ECRI v. McGraw-Hill, Inc.,
  809 F.2d 223 (3d Cir.1987) ...............................................................................17

Health Prof'l & Allied Emples. Aft/AFL-CIO V. MHA, LLC,
  2017 U.S. Dist. LEXIS 210706 (D.N.J. Dec. 21, 2017).....................................18

Hope v. Warden York Cty. Prison,
  956 F.3d 156 (3d. Cir. 2020) .............................................................................14

Hoxworth v. Blinder, Robinson & Co.,
  903 F.2d 186 (3d Cir. 1990) ..............................................................................17

In re Arthur Treacher's Franchise Litig.,
  689 F.2d 1137 (3d Cir.1982) .............................................................................17

Instant Air Freight Co. v. C.F. Air Freight, Inc.,
  882 F.2d 797 (3d Cir. 1989) ..............................................................................17

International Contracts Co. v. Vesco,
  490 F.2d 1334 (2d Cir. 1974), cert. denied, 417 U.S. 932 (1974)......................20

King Pharm. Inc. v. Sandoz, Inc.,
  Civ. No. 08-5974, 2010 U.S. Dist. LEXIS 48385, 2010 WL 1957640
  (D.N.J. May 17, 2010) ........................................................................................17

Nutrasweet Co. v. Wit-Mar Enters.,
  176 F.3d 151 (3d Cir. 1999) ...............................................................................17

Propac Inc. v. $5,219,224.20 U.S. Dollars Deposited to Account of Medical
  Biowaste Solutions, Inc.,
  2020 WL 6707608 (D.S.C. November 16, 2020)...............................................20

Winter v. NRDC, Inc.,
  555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ......................................17

Worthington v. Fauver,
  88 N.J. 183 (1982) .............................................................................................15

**Statutes**

Fed. R. Civ. P. 65 ....................................................................................................13

N.J.S.A. 2A:42-84.4.................................................................................................15

**Rules**

Local Civil Rule 65.1 ...............................................................................................13

**Local Ordinances**

City of Jersey City's Rent Control Ordinance ............................................... passim

City of Jersey City's Rent Control Ordinance §260-1.............................. 2, 6, 19, 21

City of Jersey City's Rent Control Ordinance §260-12...........................................15

City of Jersey City's Rent Control Ordinance §260-17...........................................12

City of Jersey City's Rent Control Ordinance §260-2(B) ............................... 2, 6, 21

City of Jersey City's Rent Control Ordinance §260-2(C) .................................2, 21

City of Jersey City's Rent Control Ordinance §260-2(D)............................. 2, 6, 21

City of Jersey City's Rent Control Ordinance §260-3..........................................2, 6

City of Jersey City's Rent Control Ordinance §260-3(A)........................................8

City of Jersey City's Rent Control Ordinance §260-3(D) ............................... passim

City of Jersey City's Rent Control Ordinance §260-3(H) ............................... passim

City of Jersey City's Rent Control Ordinance §260-3(I) ................................ passim

City of Jersey City's Rent Control Ordinance §260-3(J) ............................... passim

City of Jersey City's Rent Control Ordinance §260-6(A) ........................................5

City of Jersey City's Rent Control Ordinance §260-6(C) ......................................15

City of Jersey City's Rent Control Ordinance §260-7(E) .....................................1, 7

City of Jersey City's Rent Control Ordinance §260-9 ...........................................19

City of Jersey City's Rent Control Ordinance §260-9(E) ............................. 2, 5, 21

## PRELIMINARY STATEMENT

On November 3, 2023, the City of Jersey City's Rent Leveling Board ("RLB") determined that two buildings owned by The Towers at Portside Urban Renewal Company, LLC "are and have been for the duration of their occupancies subject to" the City of Jersey City's Rent Control Ordinance (the "Ordinance").  In making its decision, the Board directed the Rent Leveling Bureau ("Bureau") to recalculate the legal rents for the units at the Towers, looking back six years before the first illegal rent petition was filed for each Building. However, the Bureau has yet to calculate the rents and has not provided any insight as to when that calculation will be finalized. Moreover, because Portside "disagrees" with the Board's determination, they have elected to ignore the  decision in its entirety, along with the Ordinance, and have instead continued issuance of unconscionable and illegal rent increases to hundreds of tenants residing in their buildings, have refused to permit month-to-month tenancies despite provisions in the leases and the Ordinance expressly allowing for it, and initiated eviction proceedings against tenants who have questioned or refused to pay the illegal rent increases, even though these same tenants are owed more money than the Landlords claim is due, and are fully within their rights to withhold rent under Ordinance §260-7(E). As a result, the rights of hundreds of tenants are being substantially impaired, thereby necessitating Court intervention.

{N0709477.1}                                             1

This is a disturbing pattern of conduct, implemented by a company whose email signature line is "live remarkably." The tenants of Portside Towers are not "living remarkably", not only due to the continued and systematic actions of their Landlord aimed at driving them from their homes, but also due to the City's countenancing of this type of conduct without enforcement or repercussion. The tenants request that this Court issue a Temporary Restraining Order ("TRO"), which, after a hearing, be converted to a Preliminary Injunction ("PI") for the remainder of the litigation. The tenants are merely seeking to preserve the status quo so that the parties' arguments may be adequately adjudicated by the Court, without further harm occurring. The Intervenors' respectfully request that the Court issue a temporary restraining order (a) freezing all rents at the rates that existed as of the RLB's decision on October 19, 2023  until the recalculations are completed in accordance with §260-1, §260-2(B), §260-2(C), §260-2(D), and §260-3; (b) prohibiting Portside and Equity from filing any actions for evictions against the existing tenants of the property for reasons related to rent payments, given that the tenants are owed money back, until a decision is made on the TRO; and (c) enjoining the Bureau to recalculate the rents within a thirty (30) day period from entry of the Order, in accordance with the definition of "base rent" in §260-1 and the provisions of §260-2(B), §260-2(C), §260-2(D), §260-3(D), §260-3(I), §260-3(H), §260-9(E), and §260-3(J), which collectively establish that any rent increases imposed in excess of

{N0709477.1}                                    2

what is permitted by the Ordinance are void, null, and must be refunded or credited by the landlord forthwith; and, (d) order Portside, Equity and the City to show cause as to why a PI should not issue upon expiration of the TRO for the remainder of this litigation; and (e) any and all further relief the Court deems appropriate.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Beginning as early as May, 2022, after receiving numerous petitions from tenants residing at the buildings located at 100 Warren Street ("100 Warren") and 155 Washington Street ("155 Washington") in Jersey City (collectively, the "Buildings") challenging their rents as illegal, Jersey City's ("the City") Rent Leveling Administrator ("Administrator") incorrectly decided on September 19, 2022, that the Buildings were exempt from the City of Jersey City Rent Control Ordinance, Chapter 260 ("Ordinance"). *See* Dkt. 1-1 and 1-2 at ¶¶ 51-53. The tenants appealed the Administrator's decision to the City's Rent Leveling Board (the "RLB") which, on November 3, 2023, correctly overturned the Administrator's decision via a unanimous 6-0 determination that found that the Buildings are and have always been subject to Rent Control (the "RLB Decision") consistent with the incontrovertible evidence that exists in this case. *See* Dkt. 1-3 (PageID 54-63).

In response, The Towers at Portside Urban Renewal Company L.L.C. ("Portside") and Equity Residential Management, LLC ("Equity") (collectively,

"Landlords") commenced this action challenging the RLB Decision.[1] *See* Dkt. 1 (PageID 1-33). Despite the Landlords challenge to the RLB Decision, it is factually uncontroverted that at the very least, for the years 2020-2022, there was no exemption from the Ordinance at Portside. This is based on Certifications submitted by the Landlords that the buildings are not exempt from the Ordinance. For three (3) years, from 2020 to 2022, Equity submitted its Annual Landlord Registration Statements for both Buildings to the Bureau. For each year, they were asked to certify their answers under oath. When posed with the question: **Is the property you are registering currently under rent control?** The *Landlords* certified, "**Yes**" during each such year. Had they selected "no" – that the building was not under rent control, they would have been forced to upload proof of the exemption – proof that simply does not exist.  See Certification of Counsel, Mollie Hartman Lustig, Esq. ("Lustig OTSC Cert."), Ex. A: 2020-2023 Rent Registration Records for 100 Warren Street[2] and 155 Washington Street.

---

[1] Intervenors Portside Towers West Tenant Association ("PTWTA"), Portside Towers East Tenant Association ("PTETA"), Jessica Brann ("Brann"), and Joel Rothfus ("Rothfus") also challenged certain aspects of the RLB Decision through their state action filed in the Superior Court of New Jersey, Hudson County. *See* Portside Towers West Tenant Association et al. v. Jersey City Rent Leveling Board, Docket No. HUD-L-4447-23 (the "Tenant PW Action"). These Intervenors, in addition to Kevin Weller ("Weller") and Michele Hirsch ("Hirsch") also challenge the RLB Decision through their Crossclaims and Counterclaims in the instant action.
[2] The 2020 and 2021 rent registrations list 155 Washington Street as the address, but the number of units (527) is indicative that these registrations were intended to cover both 100 Warren Street and 155 Washington Street for the years 2020 and 2021.

A few months after the 2022 Annual Landlord Registration Statement was submitted, in May 2022, the City correctly advised tenants at 100 Warren that the building was subject to rent control. Lustig OTSC Cert., Ex. B: May 18, 2022 email from Hendon to Roberts; Ex. C: May 18, 2022 email from Hendon to Karthas.

The Ordinance is clear, §260-3(H) states that:

> "[t]he landlord shall register the rent roll with the Rent Leveling Bureau in order to qualify for any rental increase," and § 260-9E clarifies that "[n]o…rent roll registration will be deemed filed with the Board unless and until submitted on the Board's official forms and accompanied by all appropriate supporting documents and information and the required filing fees."

The Landlords' failure to file rent rolls for the years 1995 for 100 Warren Street and 1997 for 155 Washington Street through 2024, as required by §260-3(H) and §260-9(E), disqualifies them from imposing any rent increases during those years. As per §260-6(A), the owner of a newly constructed dwelling shall not be restricted in the initial rent charged, provided that the owner has registered the rent with the Bureau of Rent Leveling. However, the Landlords failed to register the initial rents for either building, further demonstrating their non-compliance with the Ordinance from the inception of the tenancies. Moreover, the Landlords' non-compliance with other prerequisites for rent increases, such as notifying new tenants of prior tenants' rents (§260-3(D) and §260-3(I)) and adhering to the landlord identity disclosure requirements (§260-3(J)), renders any increases imposed during

this period void and subject to refund or credit per §260-2(B) and §260-2(D). The RLB's directive to collect leases dating back to 2016 is for the purpose of calculating damages once the legal base rent is established, not to suggest that the 2016 lease rates themselves constitute the appropriate base rent (the "Lookback Period").

The RLB Decision directed that the City's Rent Leveling Bureau (the "Bureau") *recalculate* the rents charged at the Buildings to what the legal rate should have been as of 2016. *See* Dkt. 1-3 (PageID 54-63). It has been nearly 6 months since the RLB Decision and the Bureau has yet to complete the recalculations. *See* Lustig OTSC Cert., Ex. D: April 18, 2024 correspondence from Lustig to Bernstein. The failure to recalculate, in the face of continued increases by the Landlords, has left tenants in limbo and has permitted Portside/Equity to take advantage of the delay. *See generally* Lustig OTSC Cert. As an example of this delay, just a few weeks ago, on March 27, 2024, the Bureau finally requested leases dating back to 2016, as it had previously only requested them from 2018 forward. It is important to note that obtaining leases from 2016 forward allow for the calculation of damages, but not what the legal Base Rate should have been in 2016, as that task requires either the initial leases such that, per 260-1, the legal Base Rate can be established, plus any permitted increases per 260-3, or via the use of an alternative method to establish the initial Base Rate as permitted by 260-1, such as via Equity's own 1998 SEC 10k filing, or via the posted rates in multiple newspapers at the time of initial

occupancy, both of which are part of the record. The City did not offer any estimate as to when its calculations would be completed. *See Id.*

If this were just about the recalculations of rent, the tenants would not be entitled to the injunctive relief they are requesting because their woes could be cured by money damages. Here, during the "downtime" the Landlords have not only issued outrageous rent increases to several tenants (in violation of both the Ordinance and the RLB Decision) but have gone so far as to initiate eviction proceedings against tenants who have refused to pay those unlawful rent increases following the RLB Decision, despite the fact those tenants continue to pay rent. In Portside's most recent response to the tenants' motion to intervene, Portside avers that:

> [I]t has not "drastically increas[ed] rents" rents at Portside Towers since it filed its complaint in November 2023. (Dkt. 32 at 8.) However, Portside tenants have wrongfully withheld rent, paid only partial rent, or claimed refunds of rents paid years prior since this litigation has been ongoing. Id. at 9.

That is just not true. The tenants are fully within their rights to withhold rent under §260-7(E) of the Ordinance, as they are owed refunds for the Landlords' illegal rent increases and fees. §260-7(E) provides:

> If at any time after 30 days of a determination by the Rent Leveling Board or Administrator resulting in a refund of moneys to the tenant the landlord has not paid the refund to the tenant, the tenant may deduct the refund from the next rental payment.

Some of the most outrageous examples of conduct are detailed below:

{N0709477.1}                                    7

**155 Washington Street, Unit 504**

The tenant, DaShawn Peyton, moved into this Unit on October 13, 2020. At that time, the rent was $3,083.00. In November 2021, the rent increased to $3,383.00. That was a 9.7% increase in violation of the Ordinance's 4% limit under §260-3(A) (as if the Landlords has the authority to increase her rent at all which they did not per 260-3(D), 260-3(I), 260-3(H) and 260-3(J)). In November 2022, the rent increased to $3,734.00. This was a 10.4% increase, again exceeding the Ordinance's 4% limit, (setting aside, again, the Landlord had no authority to increase her rent at all). 5 days AFTER the verbal decision from the RLB on October 19, 2023, and just two days before the RLB Decision was issued, on November 1, 2023 the Landlords increased the rent AGAIN, this time to a whopping $5,335.00. This is an utterly outrageous 42.87% increase in blatant disregard of both the Ordinance and the RLB Decision. Lustig OTSC Cert., Ex. E: 155 Washington Street, Unit 504 Complaint for Eviction against DaShawn Peyton. The Landlords filed an eviction action on April 4, 2024 alleging that 5 months of rent had not been paid, dating back to November 2023, seeking a total of $8,387.63. The current illegal rent demanded for the Unit is $5,335.00. Id. Despite this tenant undoubtedly being owed money by the Landlords, for the unlawful rent increases in her unit, the Landlords sought to evict her for what amounts to one month of the illegal rent, coupled with illegal fees, and an exorbitant amount of late fees. Id. The Eviction Complaint was dismissed without

prejudice on April 18, 2024. See Lustig OTSC Cert., Ex. F: Reed Dismissal Letter for 155 Washington Street, Unit 504. Shortly after the dismissal letter was sent, the tenant received an email from the Landlord with the subject line: "Renters Insurance Balance", indicating that there was a $10,318.77 balance on her account. Lustig OTSC Cert., Ex. L: Correspondence from Equity to Unit 504, dated April 18, 2024. This balance includes the illegal rent increases and fees, demonstrating the Landlords' ongoing attempts to collect unlawful amounts even after the eviction complaint was dismissed.

**155 Washington Street, Unit 202**

Brookelyn Murphy moved into unit 202 at 155 Washington Street in February 2019, and has been subject to illegal rent increases every year since. In March 2019 the rent was $3,365.00; in March 2020, the rent was increased to $3,634.00 (an 8% increase in violation of the Ordinance's 4% limit); in 2021, during COVID, it was decreased to $3250.00; in May 2022[3] it was increased to $3,979.00 (a 22.43% increase from the COVID reduced rent, and a 9.5% increase from the pre-COVID rent – both far exceeding the Ordinance's 4% limit); in February 2023, it was increased to $4,373.00 (a 9.9% increase – again, well above the 4% limit and the

---

[3] The lease for unit 202 was supposed to be renewed in March, however Equity incorrectly changed the month during the 2022 lease renewal. Despite requests to correct it from the tenants, it was not corrected and now the lease renews each year in May, not March.

certified legal rent); and recently, on or about March 18, 2024, the Landlords offered her a renewal with a rent of $4,500.00 (a 2.9% increase from 2023, so while falling under 4%, still unlawful because it is not based on the correct base rent as per the Ordinance and the RLB Decision). On April 1, 2024, she wrote to Ray Colon, the Resident Experience Coordinator indicating that she would be lodging a complaint about the illegal renewals unless the rent was adjusted. *See* Certification of Brookelyn Murphy, Exhibit A: April 1 – April 15, 2024 correspondence. On April 3, 2024, she was told to contact Equity's attorney Derek Reed, and was provided with his email address. Id. On April 8, 2024, Equity asked again if she was renewing her Lease and told her that if she was planning on moving from the community that she would now be responsible for insufficient notice fees because she was beyond the 60 day notice to vacate window. Id. This conduct demonstrates the Landlords' persistent attempts to impose illegal rent increases and fees, and to intimidate tenants who challenge these unlawful practices, even after the RLB Decision.

## 155 Washington Street, Unit 1910

The tenant moved in on September 30, 2020. The rent for unit 1910 was $4,338.00 at that time. In October 2021, the rent increased to $4,627.00. In October 2022, it increased to $5,300.00, and to $5,774.19 on October 1, 2023, with an inexplicable increase thereafter to $5,825.00 AFTER the RLB hearing where the Board issued its oral determination that the building was rent controlled. The 2022-

2023 increase was 14.54% and the 2023-2024 increase was 9.9%, far exceeding the Ordinance's 4% limit. On April 9, 2024, the Landlords filed an Eviction Complaint for the non-payment of one month of rent for the month of February, 2024. This is despite the tenant being owed money by the Landlords, pursuant to the RLB Decision, and despite March rent having been paid. See Lustig OTSC Cert., Ex. I: Eviction Complaint for 155 Washington Street, Unit 1910. The Eviction Complaint was voluntarily dismissed by Equity, without prejudice on April 18, 2024. Lustig OTSC Cert., Ex. J: Reed Dismissal Letter for 155 Washington Street, Unit 1910. The Landlords' attempt to evict this tenant for non-payment of the illegal rent, while simultaneously owing the tenant money for the unlawful increases, demonstrates their brazen disregard for the Ordinance and the RLB Decision.

**100 Warren Street, Unit 317**

The rent for this Unit for 2021-2022 was $2,980.00. It increased to $3,699.00 for the 2022-2203 term. This is a 24.13% increase. The illegal rent as of January 2024 for this Unit is $3,836.00, not inclusive of additional illegal fees. The Landlords filed a Complaint for Eviction on April 9, 2024. *See* Lustig OTSC Cert., Ex. G: Eviction Complaint for 100 Warren Street, Unit 317. The Landlords allege here that rent has been unpaid for 3 months, beginning in January 2024, for a total amount due and owing of $4,736.70. Contrary to these allegations, the Landlords own records show that February's rent was paid in the amount of $3,981.52 on

{N0709477.1}                                              11

February 2, 2024, and March's rent was paid in the amount of $3,700. Id. The Eviction Complaint was voluntarily dismissed by Equity, without prejudice on April 18, 2024. Lustig OTSC Cert., Ex. H: Reed Dismissal Letter for 100 Warren Street, Unit 317. This case further illustrates the Landlords' pattern of imposing illegal rent increases, demanding payment of unlawful amounts, and then filing eviction complaints against tenants who refuse to pay the illegal rent, even when they continue to pay rent at the rates far in excess of what is permitted.

It bears reminding the Court that some of this conduct occurred even after the City's current Administrator, Shyrone Richardson, stated in a March 19, 2024, letter to Plaintiffs' counsel that:

> As such, since the requested proofs are currently being reviewed and the appropriate base rents have yet to be established, **the rents imposed on the tenants during the 2023 (or earlier) lease term are no longer the legal base rents upon which Equity Residential is permitted to apply an increase** to in accordance with the provisions of the Ordinance. Therefore, **any increase in rent applied to [sic] that of which was paid by the tenant from 2023 (or earlier) may violate Chapter 260** of the Jersey City Municipal Code.
>
> Please be reminded that pursuant to § 260-17, a violation of any provisions of Chapter 260 is punishable by a fine of up to two thousand dollars ($2,000.00) and/or imprisonment for a period of up to ninety (90) days and/or a period of community service not exceeding ninety (90) days. A violation affecting more than one tenant shall be considered a separate violation as to each tenant.

*See* Lustig OTSC Cert., Ex. K: Richardson Letter, dated March 19, 2024.

{N0709477.1}                                                    12

Despite this correspondence, and with full knowledge that the Landlords have continued to raise rents, in violation of the Ordinance and the RLB Decision, and in some circumstances, by an unconscionable amount, the City has done absolutely nothing. The Landlords have acted, and will continue to act, in a manner that will irreparably harm the hundreds of tenants residing at the Buildings. Moreover, the Bureau's continued delay in calculating the legal rents in accordance with the Ordinance and the RLB Decision, and their refusal to enforce the Ordinance cannot be countenanced any longer. This Court must act to curtail the abuses that continue day by day.

As a further means of causing unnecessary annoyance and disturbance for the tenants, the Landlords have abruptly decided that they are no longer offering month to month tenancies in lieu of an annual renewal, despite the Ordinance and the leases expressly allowing for such tenancies. They have, despite recently dismissing some pending evictions, continued to harass, annoy, and send conflicting correspondence to the tenants.

## **ARGUMENT & AUTHORITIES**

Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1 give this Court authority to issue Temporary Restraining Orders ("TRO") to halt ongoing and continuing harm. The test for granting a TRO is: (1) reasonable probability of success on the merits; (2) Tenants will suffer irreparable injury if the TRO is denied;

(3) that the Landlords and the City will not suffer greater harm if the TRO is issued; and (4) the TRO is in the public interest. *See* <u>Campbell Soup, Inc. v. ConAgra, Inc.,</u> 977 F.2d 86, 90-91 (3d Cir. 1992). A TRO primarily serves to preserve the status quo. <u>Hope v. Warden York Cty. Prison</u>, 956 F.3d 156, 160 (3d. Cir. 2020); <u>Anderson v. Davila</u>, 125 F.3d 148, 156 (3d. Cir, 1997). The instant facts and circumstances show the requirements for a TRO and PI have been satisfied. Such relief is appropriate because money damages alone will not remedy the injuries that thousands of tenants will suffer due to the continuing and ongoing nature of Plaintiffs' and Defendants' conduct.

1. *Intervenors Have Established a Probability of Success on the Merits*

On November 3, 2023, the RLB via a 6-0 unanimous vote, determined that the Buildings have always been subject to rent control. This is consistent with the Landlords' own certifications in their Annual Landlord Registration Statements from 2020 through 2022, affirming that the Buildings are subject to rent control. Consequently, the Landlords are bound by various provisions of the Ordinance, including those setting forth the conditions which they must satisfy to effectuate rent increases. *See e.g.* Ordinance §§ 260-3(D), 260-3(I), 260-3(H) and 260-3(J). As the City's Administrator recently made clear, because of its failure to properly abide by the Ordinance, Plaintiffs' attempts to increase rents are prohibited. Lustig OTSC Cert., Ex. K. And it bears emphasizing that without the recalculations being

{N0709477.1}                                                    14

completed, every single increase in rent imposed by the Landlords since the RLB Decision, is a continuing violation of the Ordinance and the RLB Decision.

Moreover, the Landlords' failure to comply with the notice requirements under N.J.S.A. 2A:42-84.4 and §260-6(C) of the Ordinance, which mandate filing a written statement with the municipal construction official and serving a written statement upon the tenant regarding the claimed exemption, renders any purported exemption invalid. The RLB Decision specifically found that the Landlords failed to satisfy these mandatory notice requirements, further solidifying the Intervenors' likelihood of success on the merits.

The RLB's decision was issued pursuant to those powers granted to it under the Ordinance and, accordingly, has the effect of law until a court of competent jurisdiction overturns it. *See* Ordinance §260-12 (outlining the RLB's powers); Worthington v. Fauver, 88 N.J. 183, 204-05 (1982) (explaining the presumption of validity municipal decisions enjoy until overturned by a reviewing court). As such, Portside is subject to the Ordinance, and cannot disregard its obligations thereunder simply because, as its representatives have stated, they "disagree" with the RLB Decision.

Even if the Intervenors are ultimately unsuccessful on their claims relating to the six-year lookback being a manufactured, and therefore arbitrary limitation period for calculating damages, and even if this Court remands the RLB Decision to the

{N0709477.1}                                    15

City, there is no universe in which the RLB could decide, in the face of the Landlord's own certifications in their Annual Landlord Registration Statements, that an exemption existed for the years 2020-2023. The likelihood of success on the merits of this argument, in the Intervenors' favor is unassailable. Relying on this three-year period alone, the Intervenors' satisfy this prong of the test.

2. *The Tenants Are Suffering Irreparable Harm and Will Continue to Suffer Those Harms*

At stake is a basic human need for the hundreds of tenants currently residing at the Buildings – their right to housing. This is not a speculative harm. As this application is being filed, there are tenants vacillating on whether they can afford to continue their tenancies because of rent hikes they know are unlawful, those same tenants are being told that the Landlords will not honor legally required month-to-month tenancies under the Ordinance and the leases, and if the tenants choose to leave they will be subject to fees and penalties.

In some of those cases, the Landlord sought to evict them for not paying what they know to be unlawful increases. Every day that these violations are permitted to continue, the tenants face additional and mounting harms. Without restraints implemented by the Court on the rent increases and an order compelling the recalculation efforts of the City, the tenants will be priced out of their units or evicted. As to irreparable harm, because "[in] the **absence of irreparable injury, no preliminary injunction would lie**, even if the other three elements . . . were

found." <u>Nutrasweet Co. v. Wit-Mar Enters.</u>, 176 F.3d 151, 153 (3d Cir. 1999). "Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of **immediate** irreparable harm "absent injunctive relief." <u>Hoxworth v. Blinder, Robinson & Co.</u>, 903 F.2d 186, 205 (3d Cir. 1990) (citing <u>ECRI v. McGraw-Hill, Inc.</u>, 809 F.2d 223, 225 (3d Cir.1987)). Irreparable harm cannot be presumed, and "must be established as a separate element, independent of any showing of likelihood of success." <u>King Pharm. Inc. v. Sandoz, Inc.</u>, Civ. No. 08-5974, 2010 U.S. Dist. LEXIS 48385, 2010 WL 1957640, at *5 (D.N.J. May 17, 2010) (citing <u>Winter v. NRDC, Inc.</u>, 555 U.S. 7, 21-22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)).

"In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." <u>Instant Air Freight Co. v. C.F. Air Freight, Inc.</u>, 882 F.2d 797, 801 (3d Cir. 1989). Thus, the "preliminary injunction must be the only way of protecting the plaintiff from harm." Id. (emphasis added); <u>see also Acierno v. New Castle County</u>, 40 F.3d 645, 653 (3d Cir. 1994). Irreparable injury **occurs when money damages are difficult to ascertain or would be inadequate**. <u>In re Arthur Treacher's Franchise Litig.</u>, 689 F.2d 1137, 1146 (3d Cir.1982) [Emphasis added]. Here, the injunctive relief the tenants seek is the only way to protect them from further harm. Money damages would be inadequate to restore a tenant to their home

that they were forced to leave or from which they were evicted because of the Landlords unlawful conduct.

In Health Prof'l & Allied Emples. Aft/AFL-CIO V. MHA, LLC, 2017 U.S. Dist. LEXIS 210706 (D.N.J. Dec. 21, 2017) the Court granted a request for a TRO where the defendant was not complying with an arbitrator's decision. Id. at *6. In doing so, the Court found that plaintiff showed irreparable harm where defendant's failure to follow the arbitration decision would render it "futile and frustrate the arbitration process." The Landlord's failure to follow the RLB's directives so far have effectively rendered the RLB Decision "futile" and "frustrated the [rent control] process." And, the City's failure to act in the face of being handed the basis to do so, is incomprehensible.

The tenants need this Court to restrain the Landlords from increasing rents and ordering them frozen at the rates that existed as of October 19, 2023, enjoin them from not permitting month-to-month tenancies, as provided for in the Ordinance and the leases, and stop them from initiating eviction proceedings against tenants who refuse to pay those illegal rent increases, as is their right under the Ordinance, until the Bureau completes the legally mandated recalculations in accordance with the Ordinance and the RLB Decision. Relatedly, the Bureau cannot continue to delay recalculating the legal rents or fail to enforce the City's own laws, as its inaction has simply emboldened the Landlords to continue their unlawful conduct unchecked.

{N0709477.1}                                      18

3. *Neither the Landlords or the City Will Suffer Harm From a TRO*

The Landlords will suffer no harm if a TRO is granted in this instance. A TRO will not prevent them from conducting legitimate business activities and continuing to collect rent at the Buildings, at the rates in place as of October 19, 2023. Despite the fact that nearly every tenant is owed money by the Landlords for the illegal rent increases and fees imposed since the RLB Decision, no one is asking for a free stay, or even that the Landlords start refunding the Tenants immediately. The Intervenors merely seek this Court to stop the continuous bleeding of the tenants that occurs day by day, as the Landlord continues to raise rents in violation of the RLB Decision and the Ordinance and seek to push people from their homes.

Similarly, Defendants will not suffer any harm if a TRO is granted in this instance. Specifically, with respect to the City, Intervenors are only asking for a date certain by which the Bureau performs the task it is obligated to perform under the Ordinance:, i.e., recalculate the rents in accordance with the definition of "base rent" in §260-1 and the provisions of the Ordinance. *See* Ordinance §260-9 (setting forth the Bureau's powers, including to "remedy violations of this chapter by adjusting rentals.").

4. *Issuance of a TRO is in the Public Interest*

Through their claims, Intervenors seek to ensure that landlords abide by local regulations governing fair access to housing. Intervenors also seek to ensure that the

{N0709477.1}                                    19

agencies trusted with enforcing those very regulations abide by their legal duties in a timely manner. In <u>Corby v. Scranton Housing Auth.</u>, Civil Action No. 3:04-CV-2523, 2005 U.S. Dist. LEXIS 48053 at *12 (M.D. Pa. June 7, 2005) the Court granted plaintiffs' request for a preliminary injunction and specifically found that "the public interest is always served when parties are required to comply with the laws" and, additionally, that "there is a strong public interest i[n] providing protection against relocation from one's home, particularly when the affected population is composed of low-income individuals who rely upon government services to provide affordable, safe housing.").

This matter touches on two matters of public import – fair access to housing and governmental accountability. For these reasons, this factor weighs heavily in favor of granting Intervenors' request for a TRO.

5. *A Bond is Not Necessary*

The posting of a bond is not a prerequisite to the issuance of a TRO because Plaintiffs and Defendants cannot demonstrate any economic harm that will be incurred as a result of the TRO being granted. *See* <u>Propac Inc. v. $5,219,224.20 U.S. Dollars Deposited to Account of Medical Biowaste Solutions, Inc.</u>, 2020 WL 6707608, at *3 (D.S.C. November 16, 2020) (citing <u>International Contracts Co. v. Vesco</u>, 490 F.2d 1334, 1356 (2d Cir. 1974), cert. denied, 417 U.S. 932 (1974) (approving district court's fixing bond amount at zero in the absence of evidence

regarding likelihood of harm)). The relief requested is not monetary in nature and cannot possibly cause economic harm to the Landlords, as rents, at the rates that existed as of October 19, 2023 will continue to be paid.

## CONCLUSION

For the foregoing reasons, Intervenors respectfully request that this Court: (1) grant Intervenors' application for a temporary restraining order (a) freezing all rents at Portside Towers at the rates that existed as of the Board's oral decision on October 19, 2023, (b) prohibiting Portside and Equity from filing any actions for evictions against existing tenants of the Buildings for reasons related to rent payments, given that the tenants are owed money for the Landlords' illegal rent increases and fees, until a decision is made on the PI; and (c) enjoining the Bureau to recalculate the legal rents for all units in the Buildings within thirty (30) days from entry of the Order, in accordance with the definition of "base rent" in §260-1 and the provisions of §260-2(B), §260-2(C), §260-2(D), §260-3(D), §260-3(I), §260-3(H), §260-9(E), and §260-3(J) of the Ordinance, which collectively establish that any rent increases imposed in excess of what is permitted by the Ordinance are void, null, and must be refunded or credited by the landlord forthwith; and, (e) ordering Portside, Equity and the City to show cause on a date to be set by the Court as to why a preliminary injunction should not issue upon expiration of the temporary restraining order; and (f) granting such other and further relief as the Court deems just and appropriate.

{N0709477.1}                                                21

Respectfully submitted,

/s/ *Mollie Hartman Lustig*
Mollie Hartman Lustig, Esq.
McLaughlin & Stern, LLP
1 Elm Street, Suite 2
Westfield, New Jersey 07090
Tel: (212) 448-1100
mlustig@mclaughlinstern.com

/s/ *Eric J. Nemeth*
Eric J. Nemeth, Esq.
Eric J. Nemeth, P.C.
55 Madison Avenue, Suite 400
Morristown, New Jersey 07960
Tel: (973) 539-2122
enemeth@ejcounsel.com

*Attorneys for Portside Towers East Tenant Association, Portside Towers West Tenant Association, Kevin Weller, Jessica Brann, Joel Rothfus and Michele Hirsch.*

{N0709477.1}                    22