**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY, NEWARK DIVISION**

| | |
|---|---|
| The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC, <br><br> Plaintiffs, <br><br> v. <br><br><br><br> The City of Jersey City and the City of Jersey City Rent Leveling Board, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 2:23-cv-22291-MCA-JRA

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... i

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 3

    A.    New Jersey Exempts Buildings Constructed After 1987 From Rent Control. ....................3

    B.    Portside Towers Was Treated As Exempt From Rent Control For Decades........................5

    C.    The Jersey City Bureau Determined That Portside Towers Was Indeed Exempt. ..............6

    D.    The Rent Leveling Board Reverses The Bureau's Finding. ................................................8

    E.    Portside Initiates This Action, Challenging The Board's Order.........................................9

    F.    Jersey City Is Threatening To Prosecute Portside Despite Having Yet To Determine What The Base Rent Is. ....................................................................................................9

    G.    The Tenants Move For Injunctive Relief; Portside Agrees That An Injunction Preserving The Status Quo Is Appropriate, But Disagrees With The Tenants' Requested Relief. ...........................................................................................................................10

    H.    Portside Attempts To Reach Agreement With The Tenants and City To Preserve The Status Quo.....................................................................................................................12

LEGAL STANDARD............................................................................................................ 12

ARGUMENT......................................................................................................................... 12

    I.    The Court Should Enjoin Enforcement Of The Board's Order Because Portside Is Likely To Establish It Is Unlawful. .................................................................................13

        A.    New Jersey State Law Prohibits Jersey City From Stripping Portside Of A Rent-Control Exemption To Which It Is Entitled Under State Law. ............................................ 13

        B.    The Board's Action Violated State Law Because Substantial Compliance, not Strict Compliance, is Required. ......................................................................................... 21

    II.    The Board's Order Violates The Due Process Clause And So Do Jersey City's Recent Actions.......................................................................................................................... 26

    III.    Portside Satisfies The Remaining Preliminary-Injunction Factors...................................28

    IV.    The Court Should Enjoin Enforcement Of The Order, Or, Alternatively, Order An Injunctive Framework That Preserves The Status Quo. ..........................................................32

    V.    The Court Should Determine Whether to Exercise Its Discretion Under Rule 65 So As To Further Streamline Any Additional Proceedings............................................................34

CONCLUSION..................................................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Primerica Holdings*,
811 F. Supp. 1025 (D.N.J. 1993) ...............................................................................................33

*Am. Exp. Travel Related Servs. Co. v. Sidamon-Eristoff*,
755 F. Supp. 2d 556 (D.N.J. 2010) ...........................................................................................30

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt.*,
793 F.3d 313 (3d Cir 2015)........................................................................................................12

*Bernstein v. Bd. of Trs. of Teachers' Pension & Annuity Fund*,
376 A.2d 563 (N.J. Super. Ct. App. Div. 1977).......................................................................22

*Block 268 v. City of Hoboken Rent Leveling and Stabilization Board*,
952 A.2d 473 (N.J. Sup. Ct., App. Div. 2008)...........................................................................22

*Carcol Enters. v. Central License Bureau of City of Elizabeth*,
2018 WL 3447512 (N.J. Super. Ct. App. Div. July 18, 2018)...................................................20

*Catlett v. New Jersey State Police*,
2012 WL 3757005 (D.N.J. Aug. 28, 2012) ...............................................................................22

*Cigar Assoc. of Am. v. City of Philadelphia*,
2021 WL 5505406 (3d Cir. Nov. 24, 2021)...............................................................................28

*Petition of Elizabethtown Water Co.*,
527 A.2d 354 (N.J. 1987)...........................................................................................................20

*Galik v. Clara Maass Med. Ctr.*,
771 A.2d 1141 (N.J. 2001).....................................................................................................21, 23

*Healthcare Servs. Grp., Inc. v. Fay*,
977 Fed. App'x 102 (3d Cir. 2015)............................................................................................29

*Islamic Soc'y of Basking Ridge v. Twp. of Bernards*,
226 F. Supp. 3d 320 (D.N.J. 2016) ...........................................................................................27

*Jersey Cent. Power & Light Co. v. Melcar Util. Co.*,
59 A.3d 561 (D.N.J. 2013)..........................................................................................................15

*Johnson v. United States*,
576 U.S. 591 (2015).....................................................................................................................27

*Kindig v. Gooberman*,
   149 F. Supp.2d 159 (D.N.J. 2001) ...................................................................21–22

*Kos Pharms. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004).................................................................................12

*Kraft v. Wells Fargo & Co.*,
   2016 WL 6841076 (D.N.J. Nov. 21, 2016) ..........................................................31

*Kyocera Document Sols. Am., Inc. v. Div. of Admin.*,
   2023 WL 8868837 (D.N.J. Dec. 22, 2023).............................................................12

*Lamplighter Village Apartments LLP v. City of St. Paul*,
   534 F. Supp. 3d 1029 (D. Minn. 2021).................................................................30

*Money Marketing v. Silver Aspen, Inc.*,
   2006 WL 8457663 (D.N.J. June 8, 2006) ..............................................................29

*Oorah v. Twp. of Lakewood*,
   2017 WL 6421062 (N.J. Tax Ct. Dec. 15, 2017)...................................................16

*Schrader v. Dist. Att'y of York Cnty.*,
   74 F.4th 120 (3d Cir. 2023) ..................................................................................31

*United States v. L. Cohen Grocery Co.*,
   255 U.S. 81 (1921)................................................................................................27

*Villas at Parkside Partners v. City of Farmers Branch*,
   496 F. Supp. 2d 757 (N.D. Tex. 2007) .................................................................30

*W. Orange Twp. v. Joseph Kushner Hebrew Acad.*,
   13 N.J. Tax 48 (1993) ...........................................................................................16

*Wessie Corp. v. Sea Isle City Zoning Bd. of Adjustment*,
   2007 WL 1892473 (D.N.J. June 29, 2007)............................................................28

*Willow Ridge Apartments, LLC v. Union City Rent Stabilization Bd.*,
   2022 WL 2525243 (N.J. Super. Ct. App. Div. July 7, 2022)...........................17, 23

**Statutes**

Jersey City Ord. §260-3 ...................................................................................5, 33

Jersey City Ord. §260-6(c)...........................................................................4, 5, 14, 17

N.J.S.A. §2A:42-6.....................................................................................................17

N.J.S.A. §2A:42-84.1....................................................................................................3, 14

N.J.S.A. §2A:42-84.2......................................................................................4, 13, 15, 16

N.J.S.A. §2A:42-84.3.......................................................................................................4, 19

N.J.S.A. §2A:42-84.4 ..................................................................................... *passim*

N.J.S.A. §2A:42-84.5 ..................................................................................... *passim*

N.J.S.A. §2A:42-84.5(b) .................................................................................................32

N.J.S.A §54:4-4.4..............................................................................................................16

**Other Authorities**

Jersey City Rent Leveling Bd. Mtg. Oct. 19, 2023 at
    https://www.youtube.com/watch?v=oCgWfCSfJN4.........................................................8, 27

Jersey City TV, City Council Mtg. Apr. 9, 2024 at https://youtu.be/ZsMZQbogb-
    8?t=12975 ...............................................................................................................32

Plaintiffs ("Portside") respectfully submit this memorandum in support of their motion for a preliminary injunction.

## INTRODUCTION

Although the Tenants' recent motion for preliminary injunctive relief was terminated administratively, Portside agrees with the premise that a "status quo" order is both necessary and appropriate pending the resolution of this case. The order of the Jersey City Rent Leveling Board (the "Board") at issue in this case not only violates the law, it has created untenable confusion and uncertainty for both Portside and its residents. That confusion, and the attendant likelihood of irreparable harm, has been compounded by recent threats made by Jersey City that it may seek criminal penalties against Portside unless it retroactively reduces rents to an amount that the City has thus far failed to identify. To avoid irreparable harm, the Court should enjoin the enforcement of the Board's order while it considers the issues in this case, or, alternatively, should enter a status quo order as detailed below that preserves all parties' rights, including by authorizing Portside to deposit disputed rents in escrow, pending the resolution of this case.

In its November 2, 2023, order (the "Order"), the Board purported to strip Portside of its state-law rent control exemption, which has been in effect and recognized by Jersey City and Portside's tenants for nearly thirty years. The Board's sole basis for that action was its finding that Portside could not prove that it sent an administrative notice to a local construction official more than 25 years ago. The Board identified no harm from this alleged paperwork deficiency—nobody disputes that Portside Towers otherwise qualifies for the state-law exemption, the City and tenants understood that Portside Towers was a market-rent property, and all Portside residents chose to live in Portside Towers, enjoy its amenities, and pay market rent in return, for decades. The Board nonetheless ordered that, because of the purported administrative notice deficiency in the 1990s,

1

Portside is retroactively subject to rent control, and the bargained-for rents contained in leases voluntarily executed by its tenants must be retroactively recalculated and capped.

The Board's Order is unlawful. As detailed below, the controlling state law prohibits local officials from taking any action to "limit, diminish, alter or impair" the rent control exemption, which is exactly what the Board has done here. *See* N.J.S.A. §2A:42-84.5. The Board's Order and its related conduct also violates the United States Constitution, including the Due Process Clause. For those reasons and others, Portside will establish that the Board's Order must be vacated.

In the meantime, Portside faces irreparable injury from the Board's Order and its related and unfounded threat of *criminal prosecution* if Portside charges rents that are "too high," when the Board has not even told Portside what it will assert the rent should be. Further, while its challenges to the Order are pending, Portside faces the prospect of potentially irreparable disruption to long-term tenant relationships. For example, if Portside is required to charge less than the rent specified in its leases during the pendency of this action, but the Board's Order is subsequently invalidated, tenants are likely to be angered when Portside reverts to charging the lawful rent the tenants agreed to pay in the first place. Portside is also unlikely to be able to recover from tenants any lost rent Portside incurs as a result of the Board's Order, resulting in further irreparable loss. Meanwhile, some tenants are arguing that they need not pay *any* rent because of the Board's Order, or that they may calculate their own "self-help" rent reductions. All the while, Portside must operate the luxury apartment buildings pursuant to its leases that tenants now assert are not binding, even as the City threatens criminal prosecution and civil penalties.

Portside thus agrees with the Tenants' recent request that the Court preserve the status quo during the pendency of this action, but disagrees that the relief sought in the Tenants' now administratively terminated motion would be lawful or appropriate. Instead, as further detailed

2

below, the Court should preserve the pre-dispute status quo by enjoining implementation of the Board's Order while it conducts its review. Portside residents should pay the rents set out in their voluntarily executed leases, subject to a refund in the unlikely event the Board's Order is upheld.

Alternatively, if the Court deems it necessary, during the pendency of these proceedings, Portside is willing to agree to a broader injunctive framework to preserve the status quo, without any admission or prejudice to its position in this action. Specifically:

1. Portside would freeze all rents at the agreed-to rate that applied on November 2, 2023 (immediately before the Board's Order), subject only to the potential annual increase allowed for rent-controlled properties in Jersey City (the lesser of 4% or the relevant CPI number). If required, going forward, Portside would escrow any rental increase.

2. Portside would not pursue any evictions for the nonpayment of rent for residents that pay the rent as specified in the first condition.

3. Even though Portside is entitled to institute larger increases under its leases and the law, Portside will forego seeking from the residents any other rent increases until the matter is resolved by the Court, but reserves the right to seek lost rent as damages from the City.

4. Enforcement of the Board's November 3, 2023 Order and any follow-on order by the Board or other Jersey City agency would be enjoined, except that, if the Board or Rent Leveling Bureau issue recalculated rents for Portside, the Tenants may request that Portside pay into escrow the difference between those recalculated rents and the rents charged going forward under the first condition.

Portside respectfully requests that the Court enter an order preserving the status quo and providing for orderly relations among Portside, its residents, and the City during the pendency of this case.

## STATEMENT OF FACTS

### A.    New Jersey Exempts Buildings Constructed After 1987 From Rent Control.

Since 1987, New Jersey has provided by statute that apartment buildings constructed in that year or thereafter shall be exempt from local rent control ordinances for up to thirty years (the

"Exemption"). N.J.S.A. §2A:42-84.1 et seq. (the "Exemption Statute"). The Exemption Statute

provides:

> In any municipality which has enacted or which hereafter enacts a rent control or rent leveling ordinance . . . those provisions of the ordinance which limit the periodic or regular increases in base rentals of dwelling units shall not apply to multiple dwellings constructed after [June 25, 1987], for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less.

N.J.S.A. §2A:42-84.2 (emphasis added).

The Exemption Statute also contains provisions that describe administrative notices to be

sent concerning the Exemption it provides. As relevant here, a building owner is to provide a notice

of the exemption to a "municipal construction official" 30 days before the "issuance of a certificate

of occupancy for the newly constructed multiple dwelling." *Id*. §84.4. The owner must also notify

tenants of the Exemption. *Id.* §84.3. Importantly, the statute does not provide that the municipal

construction official (or any other municipal authority) will have any role in assessing the

application of the Exemption or applying the Exemption Statute.

The Exemption Statute also provides that local governments will not undermine owners'

entitlement to the statutory Exemption. It explicitly provides: "No municipality, county or other

political subdivision of the State, or agency or instrumentality thereof, shall adopt any ordinance,

resolution, or rule or regulation, or take any other action, to limit, diminish, alter or impair any

exemption afforded pursuant to [the statute]." *Id.* §84.5.

Jersey City has a separate rent control ordinance. Jersey Cty. Cod. Ord. §260-6(c) (the

"Ordinance"). As further detailed below, the Jersey City Ordinance departs from the state

Exemption Statute in a critical way—it provides that the administrative notice described in Section

4

84.4 is a required condition precedent to enjoying the state-law exemption, a requirement found nowhere in the Exemption Statute.  The Ordinance provides in relevant part:

> In accordance with N.J.S.A. 2A:42-84.1 et seq., L. 1987, c. 153, the [rent control] provisions of this chapter shall not apply to a new dwelling which is constructed between June 25, 1987, through June 25, 1992, and which is not constructed for occupation by senior citizens, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the dwelling, or for 30 years following completion of construction, whichever is less. This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4 and the service of a written statement upon the tenant required by N.J.S.A. 2A:42-84.3.

*Id.* Landlords subject to rent control under the Ordinance may not increase rent "greater than four percent or the percentage difference between the consumer price index three months prior to the expiration or termination of the lease and three months prior to the commencement of the lease term, whichever is less." *Id.* §260-3(c).

**B.      Portside Towers Was Treated As Exempt From Rent Control For Decades.**

Portside Towers consists of two connected apartment buildings. The buildings are located at 100 Warren Street ("100 Warren") and 155 Washington Street ("155 Washington"). Construction on 100 Warren was completed on August 25, 1992, and it was converted to a multifamily building shortly thereafter. Ex. A, Sept. 19, 2022 Notice of Decision re 100 Warren, at 3. Construction on 155 Washington was completed on December 31, 1997. Ex. B, Sept. 19, 2022 Notice of Decision re 155 Washington, at 4. The two towers are part of the same complex on a single block on the Jersey City waterfront. *Id.* at 5. They are part of the same tax block and were constructed under the same development plan and developer's agreement with the City. *Id.*

A certificate of occupancy for 100 Warren was initially issued on August 25, 1992. Ex. A at 3. At that time, the building was not open to residents and was planned as a condominium development. *Id.* A predecessor to Portside acquired the property in a foreclosure sale on

5

November 23, 1994. *Id.* at 3-4. It remained unoccupied. *Id.* at 4. That same day, November 23, 1994, Portside's predecessor sent a notice of exemption to Jersey City's Construction Code Official, Michael Regan, as the Exemption Statute provides. *Id.* But Mr. Regan did not accept the notice. He responded on December 6, 1994, writing, "Please be advised that the Office of Construction Official has no jurisdiction over rent controls and I would suggest that you contact the proper agency charged with that responsibility." *Id.*

On January 24, 1995, Jersey City issued a certificate of continued occupancy for 100 Warren. *Id.* 100 Warren thereafter opened for market rate residential rental occupancy and operated accordingly for nearly 30 years. Jersey City issued the Certificate of Occupancy for 155 Washington on December 31, 1997, and it, similarly, operated at market rate rental for approximately 25 years. Ex. B at 2. Although the City was able to locate the 1994 notice letter to Mr. Regan for 100 Warren, neither Portside nor the City has located a letter of exemption sent to Mr. Regan that specifically references 155 Washington. *Id.* at 4.

### C.    The Jersey City Bureau Determined That Portside Towers Was Indeed Exempt.

About 25 years later, beginning in June 2022, tenants filed petitions with the Jersey City Office of Landlord/Tenant Relations Bureau of Rent Leveling (the "Bureau") contending Portside Towers is not exempt from Jersey City's rent control Ordinance. *See* Ex. C, Nov. 3, 2023 Order. Among other arguments, the tenants maintained that Portside could not establish that its predecessor had, more than two decades earlier, sent an appropriate administrative notice to the city construction official. *See id.* at 3.

On September 19, 2022, after receiving briefing and evidence, the Bureau found that Portside Towers properly qualified for the exemption. *Id.* at 2. With respect to the notice to tenants described in Section 84.3, the Bureau found that it was "undisputed that the Landlord has met

6

[that] criteria" by sending tenants a "Rent Control addendum," notifying the tenants that the buildings are exempt from rent control. Ex. B at 3.

With respect to the notice to the "city construction official" described in Section 84.4, the Bureau found that Portside's predecessor had provided the notice for 100 Warren by sending the November 23, 1994, letter to Mr. Regan, the Jersey City Construction Code Official. Ex. A at 3. The tenants argued that the November 23, 1994, letter was too late, because the Exemption Statute calls for a notice "at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling." *Id.* at 2-3; *see also* N.J.S.A. §2A:42-84.4. As noted, the initial certificate of occupancy for Portside Towers was issued on August 25, 1992. Ex. A at 3. However, as the Bureau found, Portside Towers was not occupied at that time. *Id.* It was not until January 24, 1995, after Portside's predecessor purchased the building and adapted it to a rental property, that Portside obtained a certificate of continued occupancy for 100 Warren. *Id.* at 4. The Bureau found that the November 23, 1994, notice, delivered more than 30 days before the certificate of continued occupancy, was sufficient. *Id.* at 3.

With respect to 155 Washington, the Bureau found that "no letter to the Construction Code Official . . . has been located but that does not mean that one was not sent." Ex. B at 4. Rather, given the passage of more than twenty years since the construction of the building and "in light of Mr. Regan's December 6, 1994 letter" refusing to accept the 100 Warren notice, it was at least "as likely as not" that a notice was sent but not filed or retained. *Id.* Moreover, the Bureau found that Jersey City had actual notice of the exemption in relation to 155 Washington and there was thus no doubt that "the City was aware of this development and the Landlord's claim of exemption." *Id.* at 5. Further, "[f]rom the start, the Tenants residing at 155 Washington have been advised that the building is not subject to rent control." *Id.*

7

Thus, the Bureau held that both Portside Towers buildings were exempt from rent control. Regarding 155 Washington, the Bureau held that the Exemption applies from December 31, 1997 (the completion of construction) through December 30, 2027. *Id.* at 7. Regarding 100 Warren, it held that the Exemption applies from August 25, 1992 (the completion of construction) through August 24, 2022. Ex. A at 4.

**D.      The Rent Leveling Board Reverses The Bureau's Finding.**

The tenants sought review of the Bureau's decision by the Board. Ex. C, Order. The Board received written submissions and conducted a non-substantive hearing on May 31, 2023, and a final, substantive hearing on October 19, 2023. *Id.*

In the words of the Board's chairman, the October 19, 2023, hearing was held before a "sold out crowd" with "standing-room only box seats." *See* Jersey City Rent Leveling Brd. Mtg. Oct. 19, 2023 at https://www.youtube.com/watch?v=oCgWfCSfJN4. The hearing lasted approximately 17 minutes and mainly consisted of individual commissioners, all politically appointed by the City's mayor, announcing how they intended to vote. *Id.* One commissioner stated in his first remarks: "This is happening all over the country; this is happening too much in Jersey City . . . owners are not doing what they are supposed to do to allow the tenant to get their due." *Id*. After the Board announced its decision to "side with the tenants," the "sold-out" crowd applauded. *Id.*

The Board issued its Order on November 3, 2023, finding that "both 100 Warren and 155 Washington are subject to Jersey City rent control regulations." Ex. C, Order at 10. The sole basis for that holding was the Board's conclusion that Portside had not established that timely notices were provided to the construction official in the 1990s. *Id.* The Board held such a notice "is a mandatory condition precedent to receipt of th[e] rent control exemption[,] requiring strict

8

compliance with its terms." *Id.* at 8. The Board acknowledged that the Exemption Statute "does not expressly provide for a remedy" to strip a building of its rent control exemption, but nevertheless found "there was no valid exemption from the beginning of the occupancy of the units." *Id.* at 9.

The Board additionally directed the Bureau to "adjust the rent on all units within the buildings dating back six years from the filing of the first [petition] at issue in the instant matters for each building." *Id.* at 10. At present, the Bureau has not yet calculated the adjustment.

**E.      Portside Initiates This Action, Challenging The Board's Order.**

Portside sued Jersey City and the Board in this Court. Dkt. 1. Among other claims, Portside alleged in its complaint that the Board's Order violates the New Jersey Exemption Statute and the Due Process Clause of the U.S. Constitution. *Id.* at 22-23, 26-28.

On April 1, 2024, certain Portside tenants and associations of tenants (the "Tenants") moved to intervene. Dkt. 30. In their proposed complaint, the Tenants allege only claims for declaratory relief, generally contending that the Board did not go far enough and should have found that all of Portside's rent, going back to the 1990s, must be recalculated at rent-control levels. Dkt. 29-2 at 61-64. The Tenants' motion to intervene is pending.

**F.      Jersey City Is Threatening To Prosecute Portside Despite Having Yet To Determine What The Base Rent Is.**

On March 19, 2024, even though the Board has not yet recalculated Portside's permissible rents (and the Corporation Counsel and a City Council member had publicly stated that Portside could increase rent 4%) the City threatened to impose criminal penalties against Portside and its employees if they were found to have charged rent more than that authorized by the City's

9

Ordinance. *See* Ex. D Marchewka Decl. at Ex. 4, Mar. 19, 2024 Ltr. from Jersey City to Portside, at 3. The City stated:

> Please be reminded that pursuant to § 260-17, a violation of any provisions of Chapter 260 is punishable by a fine of up to two thousand dollars ($2,000.00) and/or imprisonment for a period of up to ninety (90) days and/or a period of community service not exceeding ninety (90) days. A violation affecting more than one tenant shall be considered a separate violation as to each tenant.

*Id.* But as the City conceded, it is still "currently reviewing [the proof] in order to perform the necessary calculations" of the permitted rent. *Id.* at 1.

On March 27, 2024, Portside wrote to the City to ask it to withdraw its threat, but the City only doubled-down in another letter on April 17, 2024—confirming that it would pursue possible civil and criminal penalties against Portside and individual employees even though it has not disclosed any calculation of permitted rent. *See* Ex. D at Ex. 6, Mar. 27, 2024 Ltr. from Portside to Jersey City; Ex. D at Ex. 9, Apr. 17, 2024 Ltr. from Jersey City to Portside.

### G. The Tenants Move For Injunctive Relief; Portside Agrees That An Injunction Preserving The Status Quo Is Appropriate, But Disagrees With The Tenants' Requested Relief.

On April 19, 2024, the Tenants filed their motion seeking an injunction. Dkt. 34-1.[1] Although that motion has now been administratively terminated (Dkt. 36), its filing reflects the Tenants' agreement that there is a need for judicial intercession to preserve the status quo and provide the parties with clarity about their rights and obligations during the pendency of this case.

Portside submits that the necessary clarity should be provided by preserving the pre-dispute status quo, preliminarily enjoining the Board's unlawful Order while the Court resolves the issues in the case. With that temporary relief, tenants will merely have to adhere to the lease agreements

---

[1] At the time the Tenants filed their motion, the Court had not yet ruled on their pending motion to intervene. Dkt. 30.

they voluntarily signed, subject to a refund in the unlikely event that the Board's Order is upheld. Alternatively, if the Court grants Portside's alternative proposed injunction, the Tenants would merely pay the rent they were *already* paying prior to the Board's Order, plus rent increases authorized by the City's Ordinance, which increases could be retained in escrow pending resolution of this matter.

That alternative framework tracks the way that Portside is handling rent increases since the issuance of the Board's Order. Since the Board's Order, Portside has limited rent increases consistent with the City's Ordinance, even though Portside would be permitted a greater increase under its market-rent leases. Ex. D at Ex. 2, Jan. 19, 2024 Ltr. from Portside to Jersey City. For 100 Warren, Portside has limited annual rent increases in line with the Ordinance at all times since September 19, 2022. Ex. D at Ex. 3, Feb. 7, 2024 Ltr. from Portside to Jersey City. For 155 Washington, Portside has agreed to limit annual increases consistent with the City's Ordinance (*i.e.*, 4% or CPI), and has provided credit for any payment in excess of that amount since the November Board decision. *Id*.

Additionally, under the framework that Portside proposes, tenants would not be subject to eviction based on disagreements about the applicable rent, so long as the rent required under the status quo order is paid. Again, that scenario would track how Portside is voluntarily handling evictions while this matter has been pending. Portside has elected during the pendency of this case not to pursue evictions of any tenant at Portside based on a dispute over the amount of rent and has voluntarily dismissed any such eviction proceeding. Ex. D at Ex. 10, Apr. 26, 2024 Ltr. from Portside to Tenants. Of course, if a tenant refuses altogether to pay the rent in effect in accordance with this Court's order or is subject to eviction for reasons unrelated to rent, Portside should not be precluded from seeking appropriate remedies.

11

In short, Portside seeks to preserve a status quo that will fully protect legitimate tenant interests and reduce disruption to Portside's tenant relationships during the pendency of this case.

**H.      Portside Attempts To Reach Agreement With The Tenants and City To Preserve The Status Quo.**

After the Tenants filed their motion for injunctive relief, Dkt. 34-1, Portside contacted the Tenants and the City, attempting to reach an agreement on a status quo order. Ex. D at Ex. 10. Portside also submitted a proposal consistent with that letter to the Court. Dkt. 35. To date, neither the Tenants nor the City has responded to Portside's attempts to reach an agreement.

## LEGAL STANDARD

To obtain a preliminary injunction, a litigant must show (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. *See Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt.*, 793 F.3d 313, 318-19 (3d Cir 2015); *Kos Pharms. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The Court has broad discretion to craft an order that preserves the status quo and avoids irreparable harm to all stakeholders. *Kyocera Document Sols. Am., Inc. v. Div. of Admin.*, 2023 WL 8868837, at *8 (D.N.J. Dec. 22, 2023).

## ARGUMENT

The Court should preserve the status quo ante by enjoining enforcement of the Board's Order pending the Court's review. Portside meets all requirements for a preliminary injunction— it is likely to show that the Board's Order is unlawful, it is threatened with irreparable harm, and the balance of equities and public interest favor Portside. Alternatively, Portside is willing to agree to a framework that restricts its ability to raise rents or initiate evictions during the pendency of this case, so long as Portside is protected from unlawful enforcement of the Board's Order.

12

I.     **The Court Should Enjoin Enforcement Of The Board's Order Because Portside Is Likely To Establish It Is Unlawful.**

The Court should enter an injunction because Portside is likely to prevail on its claim that the Board's Order is unlawful. Portside's complaint lays out several defects in the Order, but at least three are largely questions of law and alone sufficient to support injunctive relief. *First*, the Board's Order violates the New Jersey Exemption Statute because it conditions entitlement to a rent-control exemption on compliance with an administrative notice requirement, even though New Jersey law imposes no such condition. *Second*, to the extent such a notice requirement exists, Portside substantially complied with it. *Third*, the Defendants' actions violate the Due Process Clause.

A.     **New Jersey State Law Prohibits Jersey City From Stripping Portside Of A Rent-Control Exemption To Which It Is Entitled Under State Law.**

As reviewed above, New Jersey law exempts newly-constructed buildings from municipal rent-control ordinances for 30 years. N.J.S.A. §2A:42-84.2. This law reflects the Legislature's determination that it is "necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey." *Id.* §84.5(a). To ensure that local governments do not undermine that objective, the Legislature provided that a local government may not "adopt any ordinance, resolution, or rule or regulation, or take any other action, to limit, diminish, alter or impair any exemption afforded pursuant to [the statute]." *Id.* §84.5(b).

In a separate subsection, the Legislature required property owners claiming an exemption under Section 84.2 to file certain notices with a local construction official. Specifically:

> The owner of any multiple dwelling claiming an exemption from a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of

13

exemption from an ordinance under this act, including therein a statement of the date upon which the exemption period so claimed shall commence, such information as may be necessary to effectively locate and identify the multiple dwelling for which the exemption is claimed, and a statement of the number of rental dwelling units in the multiple dwelling for which the exemption is claimed. The owner shall, at least 30 days prior to the date of the termination of the exemption period afforded pursuant to this act, file with the municipal construction official a notice of the date of termination of the exemption period for the affected multiple dwelling.

*Id.* §2A:42-84.4. Section 84.4 simply requires a notice to be sent to the municipal construction official; it does not authorize the construction official (or any other municipal official) to make any determination about the notice requirement or the application of the Exemption.

Jersey City's rent-control Ordinance departs from the state Exemption Statute in a crucial respect. Although the Ordinance incorporates the 30-year exemption for new construction, it provides that the exemption "applies *only* where an owner complied with all requirements contained in N.J.S.A. §2A:42-84.1 *et seq.*, including the filing with the municipal construction official required by N.J.S.A. §2A:42-84.4." Jersey City Ord. §260-6(c) (emphasis added). In other words, Jersey City's ordinance expressly characterizes compliance with the notice provision of the state Exemption Statute as a mandatory prerequisite to obtaining the benefit of the state law Exemption. No such language appears in the Exemption Statute.

In this case, the Board applied the Ordinance and concluded that strict compliance with the notice provision was a mandatory condition precedent for the rent-control exemption. According to the Board, because Portside submitted notice regarding 100 Warren to the municipal construction official in 1994, even though (according to the Board) it was supposed to do so in 1992, Portside is stripped of its entitlement to the rent-control Exemption for 100 Warren. Ex. C, Order at 8. And because no notice was located regarding 155 Washington, the Board decided Portside is stripped of the rent-control exemption for that building as well. *Id.* In the Board's view,

14

it was wholly irrelevant whether this purported notice violation caused any harm: "the Statute's notice requirement is a mandatory condition precedent to receipt of this rent control exemption requiring strict compliance with its terms." *Id*.

The Board's action violates and is preempted by state law. As further detailed below, under New Jersey law, providing notice pursuant to Section 84.4 is *not* a mandatory condition precedent to a building owner's entitlement to the rent control Exemption. Jersey City has therefore done precisely what state law prohibits: it has taken "action[] to limit, diminish, alter or impair any exemption afforded pursuant to [the statute]." N.J.S.A. §2A:42-84.5.

1. Under the plain text of New Jersey law, compliance with the notice requirement is not a prerequisite to obtaining the rent-control Exemption.

The plain text of the Exemption Statute demonstrates that compliance with the notice provision is not a mandatory prerequisite to the exemption from rent control. Section 84.2 provides that, for newly-constructed buildings, a rent-control ordinance "shall not apply to multiple dwellings constructed after the effective date of this act [June 26, 1987]." Portside's buildings are undisputedly "multiple dwellings constructed after" that date. *See* §2A:42-84.2. Therefore, Jersey City's rent-control ordinance "*shall* not apply." *Id.* (emphasis added).

"[T]he Legislature's choice of the word 'shall' . . . is ordinarily intended to be mandatory, not permissive." *Jersey Cent. Power & Light Co. v. Melcar Util. Co.*, 59 A.3d 561, 567 (D.N.J. 2013). The statute does not recite any exceptions to that mandatory language. Nor does the statute vest authority in any official to determine whether the rent control exemption applies based on a notice or otherwise. The exemption "*shall*" apply based upon only the date of construction. Therefore, Portside Towers is exempt from rent control. N.J.S.A. §2A:42-84.4 (emphasis added).

The notice provision in Section 84.4 does not implicitly repeal that unconditional and mandatory language. It states: "The owner of any multiple dwelling claiming an exemption from

15

a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of exemption from an ordinance under this act." *Id.* Nothing in this provision states that a notice to a local official is a *prerequisite* to obtaining the Exemption in Section 84.2. Nor does this provision confer any authority on the municipal construction official (or any other local official) to make any assessment or do anything else with the notice that relates to deciding whether the Exemption applies. Instead, the notice is described in a separate statutory subsection providing that *if* an owner claims the exemption, *then* the owner is subject to this notice requirement. But regardless whether notice is supplied, the exemption "*shall*" apply. *Id.* §2A:42-84.2 (emphasis added).

In that way, Section 84.4 is analogous to the state law requiring property owners that are exempt from property taxes to file a notice with tax assessors declaring their entitlement to an exemption. *See* N.J.S.A §54:4-4.4. New Jersey courts have consistently held that a failure to comply with that notice requirement does not strip the property owner of the tax exemption. *See, e.g.*, *Oorah v. Twp. of Lakewood*, 2017 WL 6421062, at *6 (N.J. Tax Ct. Dec. 15, 2017) (holding that it is "well established" that "a parcel's exempt status is determined by its ownership and use, and not by the property owner's compliance with exemption claim procedures"); *W. Orange Twp. v. Joseph Kushner Hebrew Acad.*, 13 N.J. Tax 48, 54 (1993) ("[T]he failure to file the triennial statement has no effect upon the claimant's entitlement to exemption."). The same reasoning applies here.

The New Jersey legislature easily could have written Section 84.2 to render compliance with Section 84.4 to be a prerequisite to the rent-control exemption. Most obviously, the legislature could have used the language appearing in Jersey City's Ordinance, which departs from state law

16

and makes notice a *mandatory prerequisite* to obtaining the exemption. *See* Jersey City Ord. §260-6(c) (exemption "applies only where an owner complied with all requirements . . . including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4"). Alternatively, the Legislature could have borrowed from the myriad of state statutes stating that compliance with a notice requirement is a *prerequisite* for the exercise of a statutory right. *E.g.*, N.J.S.A. §2A:42-6 (if a tenant holds over "after demand made and notice in writing for delivering the possession thereof," the landlord may charge double rent). Here, the Legislature did not frame Section 84.4's notice requirements as prerequisites for the statutory Exemption, but instead as regulatory requirements imposed on building owners who are *already* subject to the Exemption. The Court should take the Legislature at its word.

> 2. <u>The notice provision is not "surplusage," but local officials are not permitted to limit, diminish, alter, or impair the state law Exemption.</u>

In holding that a failure to satisfy the notice provision results in loss of the rent-control exemption, the Board theorized: "Any interpretation to the contrary would render the notice provisions voluntary or mere surplusage, whereas the Statute provides that the property owner 'shall' provide the required notice." Ex. C, Order at 9. An unpublished decision applied the same reasoning. *Willow Ridge Apartments, LLC v. Union City Rent Stabilization Bd.*, 2022 WL 2525243, at *8 (N.J. Super. Ct. App. Div. July 7, 2022).

The Board and *Willow Ridge* are wrong. It is not the case that a regulatory requirement is "voluntary" or "surplusage," unless it is enforced with an extreme penalty like the *total loss* of a legal right. Officials have many methods to enforce compliance with regulatory requirements, including deficiency notices, fines, and civil suits. What local governments may *not* do, however, is "limit, diminish, alter or impair any *exemption* afforded pursuant to [the statute]." N.J.S.A. §2A:42-84.5 (emphasis added). Thus, although New Jersey law would have permitted Jersey City

17

to enact a rent-control ordinance that, for example, imposed fines to encourage compliance with the notice requirement, Jersey City may not "impair" the statutory Exemption itself.

Indeed, it is the Board's interpretation, not Portside's, that would yield surplusage. Section 84.4 includes a second notice requirement: "The owner shall, at least 30 days prior to the date of the termination of the exemption period afforded pursuant to this act, file with the municipal construction official a notice of the date of termination of the exemption period for the affected multiple dwelling." Plainly, this notice requirement is not a prerequisite to the Exemption: the owner could not even theoretically comply with it until *after* it has already obtained the benefits of the Exemption. If stripping an owner of the Exemption is the sole way of enforcing Section 84.4's notice requirement, then there would be no way of enforcing Section 84.4's second notice requirement, rendering it pure surplusage. By contrast, if the notice requirements are enforced in the typical manner for administrative requirements—*e.g.,* graduated penalties in the event of non-compliance—then both requirements can be given effect.

3.  <u>Portside's interpretation advances the purpose of the notice requirement.</u>

Enforcing the notice requirement by retroactively stripping a building owner of its rent-control Exemption would also conflict with the purpose of the notice requirement. The Board emphasized that the purpose of notifying the City is "to allow the municipality's construction official to inspect the subject property and to evaluate whether it qualifies for the exemption." Ex. C, Order. But, here, no one has ever suggested that the City was unaware that Portside Towers was operating pursuant to the Exemption, and there is no dispute whether Portside Towers qualifies for the exemption other than with respect to the notice issue. Nor has the City offered an explanation of *how* an inspection of the property would be relevant to Portside's eligibility for the Exemption—the Exemption applies to any multiple dwelling constructed after the statute's effective date.

18

Underscoring the point, when Portside submitted notice of the rent-control exemption regarding 100 Warren to the relevant city official, he said he did not know what to do with it. Ex. A at 4 n.5.

Further, it is undisputed that Portside complied with the requirement to give advance notice to the tenants that their property is not rent-controlled. *See* N.J.S.A. §2A:42-84.3. The tenants were not harmed by Portside's purported failure to submit a timely notice *to the City*, and it makes no sense that they should receive windfall retroactive rent decreases as a result. It would make far more sense to enforce the notice requirement the way filing requirements are traditionally enforced—*i.e.*, a penalty that fits the violation and ensures prospective compliance. For example, Jersey City could impose smaller penalties for small or inadvertent delays in satisfying the notice requirement, and large penalties for long delays or willful misconduct. A local government could also *keep* such a penalty, which makes sense because it is the local government (not the tenants) that failed to receive the notice. This mode of enforcement would avoid the remarkable scenario in this case, where Portside faces the disproportionate penalty of being stripped of its right to charge market rents even though the tenants were always aware of the rent-control exemption.

Moreover, because actions for penalties are typically subject to statutes of limitations, owners would be protected from stale claims. A statute of limitations would avoid the extreme unfairness in this case, in which Portside was stripped of its rent-control exemption for 155 Washington because there was no definitive proof that a document was mailed *30 years ago*— even though, as the Bureau found, there was significant circumstantial evidence that the document *was in fact* sent. Ex. B at 4.

    4.  <u>The Landlord Registration Statements are irrelevant.</u>

In their now-terminated motion, the Tenants pointed to Annual Landlord Registration Statements submitted from 2020 to 2022 in which Portside purportedly represented that the

19

properties at issue were rent-controlled. Dkt. 34-1 at 4. Those statements are no basis for upholding the Board's Order, because the Board did not rely on them. Similar to federal administrative law, New Jersey law provides that judicial review of local government decisions is based "solely on the agency record." *Carcol Enters. v. Central License Bureau of City of Elizabeth*, 2018 WL 3447512, at *5 (N.J. Super. Ct. App. Div. July 18, 2018); *see also Petition of Elizabethtown Water Co.*, 527 A.2d 354, 364 (N.J. 1987) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that the action was based") (quotation marks and citation omitted). The Board's Order cannot be upheld based on a rationale the Board did not offer.

Moreover, the Bureau correctly *rejected* the Tenants' reliance on the Annual Landlord Registration Statements, explaining that Portside's statements may have reflected "a misreading of the form associated with the change in format that resulted in these answers." Ex. B at 7. "[B]ut whatever the reason," the Bureau concluded, "the Landlord's response in the Registration is not dispositive of whether the Property is exempt from rent control. What is relevant is whether the Property meets the criteria and the requirements of the Ordinance and the Statute." *Id.* Although the Board reversed the Bureau on other grounds, it did not disturb this aspect of the Board's analysis. And this analysis is correct—nothing in state law suggests that a local government may withdraw the statutory exemption for including incorrect information on a form not contemplated by state law.

5.   The Board's Order violated state law.

For each reason, the Board's Order stripping Portside of its rent control exemption violated the state Exemption Statute. The Board relied on Jersey City Ordinance 260-6(c), which impermissibly departs from state law by providing that the administrative notices described in N.J.S.A. 2A:42-84-4 are a mandatory condition precedent to the rent control Exemption, when

20

they are not. Ex. C, Order at 8. Thus, the Board has taken action "to limit, diminish, alter or impair any exemption afforded pursuant to [the statute]," in violation of state law. N.J.S.A. §2A:42-84.5. Portside is likely to succeed on the merits that the Board's Order violates state law.

**B.     The Board's Action Violated State Law Because Substantial Compliance, not Strict Compliance, is Required.**

The Board's Order is unlawful for the additional reason that, even if the notices described in Section 84.4 were a condition precedent to obtaining the Exemption, New Jersey law would require only *substantial compliance* with the notice provisions, not strict compliance. As the Bureau's findings make clear, Portside substantially complied with state law. In overturning the Bureau's decision, the Board departed from state law, applying a strict-compliance standard that is far more stringent than the state-law standard. For this reason, too, the Board impermissibly took action "to limit, diminish, alter or impair any exemption afforded pursuant to [the statute]," in violation of state law. *Id.*

1.  Under New Jersey law, substantial compliance is sufficient to satisfy the notice provision in Section 84.4.

The New Jersey Supreme Court has recognized the "substantial compliance doctrine," which is "designed to avoid technical rejection of legitimate claims." *Galik v. Clara Maass Med. Ctr.*, 771 A.2d 1141, 1148 (N.J. 2001). A court deciding a substantial compliance claim considers the following factors: "(1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute." *Id.* This doctrine "has deep roots" in the law and applies in "a wide array of contexts." *Id.* (collecting cases). Federal courts routinely apply the doctrine in disputes arising under New Jersey law. *See, e.g.*, *Kindig v. Gooberman*, 149 F. Supp.2d 159, 163-

21

64 (D.N.J. 2001); *Catlett v. New Jersey State Police*, 2012 WL 3757005, at \*5-6 (D.N.J. Aug. 28, 2012).

The sole published New Jersey appellate decision addressing Section 84.4 has held that substantial compliance is sufficient to satisfy its notice requirement. In *Block 268 v. City of Hoboken Rent Leveling and Stabilization Board*, 952 A.2d 473 (N.J. Super. Ct. App. Div. 2008), the tenants argued that the building owner should be stripped of its rent-control exemption because it did not strictly comply with the filing requirement in Section 84.4. Specifically, Section 84.4 requires that notice to the municipal construction official be sent by the "owner," whereas the tenants alleged that the notice was not technically sent by the "owner." *Id.* at 477. Without deciding whether compliance with the notice requirement is a condition precedent, the court ruled in the owner's favor on the ground that "[a]ny technical non-conformity [in the notice] is excusable under the equitable doctrine of substantial compliance." *Id.* (citing *Bernstein v. Bd. of Trs. of Teachers' Pension & Annuity Fund*, 376 A.2d 563 (N.J. Super. Ct. App. Div. 1977)); *see Bernstein*, 376 A.3d at 566 (applying 5-factor substantial compliance test).

Given that New Jersey courts have applied the substantial-compliance test to a wide array of statutes, including the specific statute at issue in this case, the Court should hold that substantial compliance—not strict compliance—is required to satisfy Section 84.4.

2. Portside substantially complied with respect to 100 Warren.

The Bureau's decision makes clear that Portside substantially complied with the notice requirement with respect to 100 Warren. As the Bureau explained, Portside sent notice to the City construction official on November 23, 1994. Ex. A at 3-4. Although the initial certificate of occupancy for 100 Warren was issued in 1992, the Bureau explained that Portside had good reason for waiting until 1994 to send the notice: "At the time of the issuance of the [certificate of

22

occupancy] for 100 Warren, the building was not open to residents. The development was intended as a condominium development but evidently because of economic difficulties, the Property went through foreclosure." *Id.* at 3. The building sat unoccupied until November 1994, when it was purchased in a foreclosure sale by a predecessor to Portside.

Immediately upon purchasing the building in November 1994, the new owner sent a notice to the Jersey City construction official indicating that the building would be rented as apartments and would be exempt from rent control pursuant to the state Exemption Statute. As the Bureau found, "[t]he developer's letter identifies the Property by address and block and lot, references the statutory exemption, the number of units, and the commencement date of initial occupancy, January 1, 1995," and thus "satisfies the notification requirement of the Statute." *Id.* at 4. The Bureau also pointed out that "the Construction Code Official at the time of Portside's letter, Michael Regan, was unaware of the requirements of the Statute"; he sent a response letter stating he "has no jurisdiction over rent controls." *Id.* at 4 n.5.[2]

Although the Bureau did not use the words "substantial compliance," it is plain in context that it found the substantial-compliance requirement to be satisfied. That determination was correct. All five factors of the New Jersey substantial compliance test (set out above) favor Portside. *See Galik*, 771 A.2d at 1148. *First*, there was no prejudice to the City, which received the notice before the building was ever occupied (and whose construction official rejected the

---

[2] The Bureau distinguished *Willow Ridge Apartments v. Union City Rent Stabilization Bd.*, 2022 WL 2525243, at *8 (N.J. Super. Ct. App. Div. July 7, 2022), pointing out that in *Willow Ridge*, "there was no evidence that the owner ever applied for the statutory rent control exemption nor was there ever any notice to the tenants of the owner's claim that the building was exempt." Ex. A at 6. "The circumstances are very different here where the owner of the Property notified the Construction Code Official of its claimed exemption over 30 days prior to the initial occupancy of 100 Warren and, more importantly, has notified the Tenants in every lease and lease renewal of the claimed exemption." *Id.*

notice anyway). Nor was there prejudice to the tenants, who were notified of the rent-control exemption. *Second*, Portside *did* take appropriate steps to comply with the statute in 1994, before the building's occupancy and before any rental charges. *Third*, Portside's action *did* comply with the purpose of the statute—Portside provided notice and there was never a contention that the City was unaware of Portside's claim of exemption. *Fourth*, as already explained, both the City and the tenants had reasonable notice. And *fifth*, Portside had a reasonable explanation—the unoccupied property (at the time not a rental property) went through foreclosure, passed to a new owner, and the new owner immediately sent the notice before the building was occupied.

3. <u>Portside substantially complied with respect to 155 Washington.</u>

As to 155 Washington, the Bureau determined that the notice was likely sent, but could not be located nearly three decades after the fact. Ex. B at 4-5. The Board's view that a property owner must locate a thirty-year-old notice upon pain of losing a statutory entitlement is unsupported by anything in the Exemption Statute. But even if there was no notice specific to 155 Washington, Portside's notice with respect to 100 Warren substantially complied with any requirement for 155 Washington. As the Bureau found:

- "155 Washington was owned by the same owner as 100 Warren and these Towers were managed as one development." *Id.* at 3-4. "It is clear that Portside Towers, owned by the same entity, is treated and managed as one property." *Id.* at 5.

- "The Tenants were aware that this was one development." *Id.* at 4-5. Moreover, "[f]rom the start, the Tenants residing at 155 Washington have been advised that the building is not subject to rent control." *Id.* at 5.

- "[T]he City was aware that this was one development comprised of two newly constructed multiple dwellings." *Id.* at 4-5. In particular, "[t]he City was aware of the

24

construction of the two Towers of Portside Towers, 100 Warren and 155 Washington, which are on the same tax block and lot and are part of the same development plan, owned and managed by the same owner." *Id.* at 5.

The Bureau concluded: "Given all of these circumstances, the fact that 155 Washington meets the statutory criteria of a newly constructed multiple dwelling, that the City was aware of this development and the Landlord's claim of exemption, and that the Tenants have been properly notified of the exemption . . . 155 Washington is exempt from the rent restrictions of the Ordinance for 30 years from the issuance of the CO." *Id.*

Again, the Bureau's determination was tantamount to a finding that the substantial-compliance requirement was satisfied. And again, that determination was correct. If the notice with respect to 100 Warren was substantially compliant, then that notice was substantially compliant with respect to 155 Washington as well. *First*, as the Bureau explained, there was no prejudice to Jersey City or the tenants from the failure to send a second notice, particularly where the tenants received notice and the City construction official rejected the 1994 notice. Ex. B at 3-4. *Second*, Portside complied with the statute with respect to 100 Warren, which was part of the same complex. *Third*, as the Bureau explained, the notice with respect to 100 Warren satisfied the statutory purpose with respect to both buildings. Ex. A at 4. *Fourth*, the City had reasonable notice of the exemption as applied to both buildings and never contended that it was unaware of the claim of exemption. And *fifth*, even assuming Portside did not send a separate notice with respect to 155 Washington, that decision was reasonable because the City knew these two buildings operated as a single unit.

25

4. <u>The Board violated state law by applying a strict-compliance, rather than substantial-compliance, requirement.</u>

Because Portside substantially complied with the notice requirement with respect to both 100 Warren and 155 Washington, it is exempt from rent control under state law. The Board, however, did not apply the New Jersey substantial compliance standard. In the Board's view, the notice requirement "is a mandatory condition precedent to receipt of this rent control exemption requiring *strict compliance* with its terms." Ex. C, Order at 8 (emphasis added).

Thus, Jersey City's rent-control exemption—which applies only if landlords satisfy a strict-compliance requirement—is narrower than the rent-control exemption under state law—which incorporates a substantial-compliance standard. For this reason, too, the Board's Order impermissibly "limit[ed], diminish[ed], alter[ed], or impair[ed] any exemption afforded pursuant to [state law]." N.J.S.A. §2A:42-84.5.

## II.      The Board's Order Violates The Due Process Clause And So Do Jersey City's Recent Actions.

In addition to violating state law, the Board's Order violates Due Process. The Board's proceedings were gravely unfair. With respect to 155 Washington, the Board punished Portside for its failure to locate a document that Portside was ostensibly required to send 27 years ago. For more than two decades, no one from the Board ever doubted that Portside was exempt from rent control or expressed any interest in seeing this document. As for 100 Warren, the Board has been on notice for three decades that Portside sent its notice in 1994, rather than 1992, and sat by silently as Portside maintained and improved the property and contributed to the tax base. To hold Portside retroactively liable at this point—and effectively retroactively impose rent control—would be an extreme bait-and-switch raising profound Due Process concerns. Those concerns are heightened by the circus-like atmosphere in which the Board reversed the Bureau's reasoned decision, where

26

the Commissioners declared to a "sold-out crowd" that they would impose rent control on Portside in view of what was "happening all over the country." Jersey City Rent Leveling Brd. Mtg. Oct. 19, 2023 at https://www.youtube.com/watch?v=oCgWfCSfJN4.

Jersey City has only compounded its Due Process violations following the Board's decision. The City is now threatening to seek *criminal* sanctions against Portside and its employees for allegedly violating the City's rent control Ordinance—even though the City has not told Portside what it contends Portside should be charging. Ex. D at Ex. 4 and Ex. 9.

Enforcement of the Ordinance in this manner would be a textbook Due Process violation and warrants injunctive relief. Ex. D at Ex. 6, Mar. 27, 2024 Ltr. from Portside to Jersey City. The government violates the Due Process Clause "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). For example, a criminal statute that prohibits "unjust or unreasonable rates" is void when the government does not tell the regulated entity what that rate is. *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921).

This case is *L. Cohen* all over again. Jersey City's Ordinance says that Portside cannot charge rents that are too high—yet the Board has not decided what "too high" is. Portside cannot be punished for charging rents in excess of a ceiling that the Board has not yet determined. *See also, e.g.*, *Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F. Supp. 3d 320, 355 (D.N.J. 2016) (holding that local parking ordinance was void for vagueness when it "fail[ed] to provide sufficient objective guidelines for determining how many parking spaces the Board may require for any given applicant").

Nor will these Due Process deficiencies be cured if or when the City tells Portside what it thinks the rents should be. In addition to the Due Process violations arising from the underlying Order, the City has threatened to prosecute Portside for purported violations *predating* the Board's calculation. Thus, a Due Process violation looms notwithstanding the City's eventual calculation.

**III.        Portside Satisfies The Remaining Preliminary-Injunction Factors.**

In addition to being likely to succeed on the merits, Portside will be irreparably harmed by the Order, and the balance of equities and public interest favor Portside.

***Irreparable harm.*** Enforcement of the Board's Order (and any related calculation of purported permissible rents at Portside) during the pendency of this action would cause irreparable harm to Portside, for several reasons.

*First*, with respect to Portside's state-law claim, Portside may only obtain invalidation of the wrongful agency action, not money damages. *See Wessie Corp. v. Sea Isle City Zoning Bd. of Adjustment*, 2007 WL 1892473, at *1 n.1 (D.N.J. June 29, 2007) (when a plaintiff prevails on prerogative-writ claim, wrongful agency action is set aside). Therefore, even if Portside prevails on that state-law claim, it would be unable to recover lost rent from the City and would be compelled to further pursue damages under its federal claims. And it is very unlikely as a legal and practical matter that Portside could retroactively recover lost rents from the tenants, including because tenants will argue they relied in good faith on the Board's Order, and tenants may move away without paying. Ex. D, Marchewka Decl. ¶¶ 3, 6-8. Thus, if Portside is required to forego the lawful collection of rent during the pendency of this proceeding, Portside is unlikely ever to recover those funds from the tenants and will have suffered irreparable injury. *See Cigar Assoc. of Am. v. City of Philadelphia*, 2021 WL 5505406, at *5 (3d Cir. Nov. 24, 2021) (upholding finding of irreparable harm when local government was immune from damages).

28

*Second*, while Portside's federal claims seek money damages for some of the harm inflicted by the City's unlawful actions, even recovery of those damages cannot fully compensate Portside. Among other things, the Tenants are mistakenly asserting an entitlement to withhold *all* rent: they insist that they are "fully within their rights to withhold rent," and they have sought an injunction barring *any* evictions for non-payment of rent, even if the tenants pay *zero* rent. Dkt. 34-1 at 2-3. If Portside prevails in this case, the City will undoubtedly argue that Portside should collect lost rents from tenants (not the City), and debts owed by the tenants are likely to be extremely difficult to collect. Ex. D, Marchewka Decl. ¶3.

Even if the City ultimately pays all of Portside's lost rent as damages, enforcement of the illegal rent control regime—even temporarily—will seriously harm Portside's relationship with its tenants, resulting in irreparable harm. "[I]nterfer[ence] with . . . customer relationships" often causes "quintessential irreparable injuries." *Healthcare Servs. Grp., Inc. v. Fay*, 977 Fed. App'x 102, 104 (3d Cir. 2015) (upholding preliminary injunction where plaintiff would likely suffer irreparable harm from defendants' interference with customer relationships); *see Money Marketing v. Silver Aspen, Inc.*, 2006 WL 8457663, at *5 (D.N.J. June 8, 2006) (granting preliminary injunction where plaintiff would likely suffer irreparable harm from "permanently damaged relationships with its customers"). Here, if Portside is forced to reduce rent during the pendency of this case, but later increases rents as permitted by law when the Board's Order is invalidated, it will suffer significant disruption to its relationships with its tenants, who may move away or become extremely hostile over a perceived "whipsaw" in rent. By contrast, if Portside is permitted to charge lawful rent for the duration of this case (with any disputed amounts in escrow), no such disruption or inability to recoup lost rents would result. *See* Ex. D, Marchewka Decl. ¶ 8.

29

More fundamentally, the Order purports to ban Portside from entering into lawful leases at market rates, and hence prevents Portside from exercising core property rights. Such an interference with Portside's property rights, in and of itself, constitutes irreparable harm. *See Lamplighter Village Apartments LLP v. City of St. Paul*, 534 F. Supp. 3d 1029, 1034 (D. Minn. 2021) (granting landlords' preliminary injunction against an unlawful city ordinance providing "extensive protections to tenants" while suspending owners' core property rights); *Villas at Parkside Partners v. City of Farmers Branch*, 496 F. Supp. 2d 757, 776 (N.D. Tex. 2007) (granting landlords' preliminary injunction against an unlawful city ordinance interfering with owners' right to lease to certain tenants).

*Finally*, the City's threat of retroactive criminal prosecution gives rise to reputational harm and imposes untenable risks of a loss of liberty and financial distress through staggering fines, as a condition of operating a lawful business. Ex. D at Ex. 4. The reputational and economic harms of defending against a criminal prosecution under an unconstitutional order could not be redressed by money damages. *See Am. Exp. Travel Related Servs. Co. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 614 (D.N.J. 2010) (holding that a "threat of prosecution" pursuant to a potentially "unconstitutional" statute is an irreparable harm). This risk of irreparable harm will persist even after the City announces the calculated base rents; criminal prosecutions for rents charged *before* that announcement would continue to violate the Due Process Clause and inflict irreparable harm.

***Balance of equities and public interest.*** The equities also strongly favor Portside. The Board has waited over *25 years* since Portside sent the purportedly faulty notices to initiate its enforcement action; it can wait a little while longer. Moreover, even the Board acknowledged that Portside's alleged violation of the Ordinance was purely technical; no one has ever doubted that Portside satisfies the eligibility criteria for the rent control exemptions. And when Portside sent its

30

notice in 1994—allegedly too late—the relevant administrator was not even aware of the Ordinance and thought the notice had been conveyed to the wrong person. Ex. B at 4 n.5.

In contrast, any alleged equitable interests of the Tenants or the City in opposing a status quo order would not outweigh the factors supporting Portside's requested relief. The Tenants and City effectively seek a massive windfall—retroactive and prospective rent reductions based on an alleged technical notice violation 30 years ago that caused tenants no harm. Indeed, proposed Plaintiff Kevin Weller told the media before the Board's decision that "It is going to be news-breaking when we win because now you are going to have *luxury apartments in Jersey City at rates that are half the price now*." Jersey Journal, Feb. 9, 2023 (emphasis added). As the Bureau properly determined, Portside has always complied with its statutory obligations to notify the tenants that Portside Towers are exempt from rent control. Ex. B at 3. The asserted violation was the decades-old failure to notify the *City* of information that the City already knew. Granting an injunction would not deprive the Tenants of their "right to housing," as the Tenants contend. Dkt. 34-1 at 16. Instead, it would merely require the Tenants to adhere to the leases they signed.

The public interest also favors Portside. The public interest always favors protecting constitutional rights and avoiding due process violations. *Kraft v. Wells Fargo & Co.*, 2016 WL 6841076, at *4 (D.N.J. Nov. 21, 2016) (it is "in the public interest to require the Government to provide due process, whenever practicable."); *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023) ("the enforcement of an unconstitutional law vindicates no public interest."). Moreover, New Jersey enacted its rent-control exemption statute for the public purpose of encouraging the construction of housing. N.J.S.A. §2A:42-84.5(b). The public interest does not warrant stripping Portside of a statutory right it relied on in good faith. Jersey City's action sets

31

the precedent that a local government can strip a landlord of an exemption years after the fact on slender, pretextual terms, undermining all of those reliance interests.

## IV.    The Court Should Enjoin Enforcement Of The Order, Or, Alternatively, Order An Injunctive Framework That Preserves The Status Quo.

For the reasons stated above, Portside is likely to succeed on the merits of its claim that the Board's Order is illegal, and enforcement of the Order should therefore be preliminarily enjoined in its entirety. But if the Court declines to take that step, it should, at a minimum, enter an order that would preserve the status quo, protect all parties' legitimate interests, and would prevent the parties from taking actions into their own hands.

As noted, all parties currently face serious uncertainty, which is disrupting relations between Portside and its tenants. Portside does not know what rents it can, and should, charge. If they are too high, Portside faces the risk of retroactive liability and perhaps retroactive prosecution; if they are too low, Portside faces the risk it will be unable to recover the loss. Tenants likewise face confusion. Some tenants are taking the position that they do not have to pay *anything*; Portside believes that, at present, they should pay the amount specified in their leases. The tenants do not want to be evicted, but also do not want to pay excessive amounts. The City has not even calculated a permitted rental amount and yet is threatening criminal prosecution. Ex. D at Exs. 4, 9. That failure has led certain tenants to publicly accuse the City and Portside of conspiring and violating federal laws, including RICO. *See* Jersey City TV, City Council Mtg. Apr. 9, 2024 at https://youtu.be/ZsMZQbogb-8?t=12975. Given that confluence of circumstances, injunctive relief is manifestly warranted to prevent irreparable harm.

To preserve the status quo, Portside's alternative proposed order resembles the Tenants' proposed order, Dkt. 34-1 at 21, but with certain modifications that would ensure fair treatment of all parties, without prejudice to their legal positions:

32

*Permissible rents*. The Court should direct the tenants to continue paying the rents they paid immediately prior to the Board's November 3, 2023 decision, plus, where applicable, the annual increase permitted under the rent control ordinance (4% or CPI, whichever is less). *See* Jersey City Ord. §260-3. It should authorize Portside to place any permitted increased amount in escrow, to be released in accordance with this Court's determination on the merits. Portside would also stipulate to an order precluding any other increase until the matter is resolved by the Court, reserving its right to seek lost rent as damages from the City.

In contrast, the Tenants proposed "freezing all rents at the rates that existed as of the RLB's decision on October 19, 2023 until the recalculations are completed," Dkt. 34-1 at 21, without permitting Portside to raise rents *at all* while the litigation is pending. Ex. D at Ex. 7, Apr. 5, 2024 Ltr. from the Tenants to Portside. But Jersey City's Ordinance expressly authorizes annual increases even under rent control. *See* Jersey City Ord. §260-3. The Tenants do not offer any justification for banning increases expressly authorized by law. Portside faces the risk of irreparable harm regarding lost rents, because, as discussed above, it will be extremely difficult for Portside to collect lost rents after the invalidation of the Board's Order. *See* Ex. D, Marchewka Decl. at ¶¶5-7. Those circumstances are causing irreparable harm to Portside. *See Alexander v. Primerica Holdings*, 811 F. Supp. 1025, 1036 (D.N.J. 1993) (recognizing harm of being required to pursue "hundreds . . . of individual lawsuits").

*Evictions.* Portside would stipulate that it will not pursue evictions based on non-payment of rent as long as residents pay the rent identified in the paragraph above and otherwise comply with their leases and the law. The Tenants proposed "prohibiting Portside and Equity from filing any actions for evictions against the existing tenants of the property for reasons related to rent payments," Dkt. 34-1 at 21, but that proposal suggests that Portside would be prevented from

33

initiating an eviction action even if a tenant pays *zero* rent. Ex. D at Ex. 8, Apr. 8, 2024 Ltr. from Jersey City to the Tenants. "Rent control" does not mean "no rent." If the Court issues an order freezing rents at a particular rate pending resolution of this dispute, and if a tenant refuses to pay that rate, Portside should be able to pursue ordinary legal remedies.

*Subsequent Board action*: If the Board or Bureau recalculates Portside's rents at a rate lower than as specified in the Court's Order (as set out above), tenants will continue paying the rent specified in the Court's order, but the Tenants may seek to require Portside to deposit into escrow the difference between the pre-November 3, 2023 rents (plus any permitted increase) and any lesser rent amount that the Board or Bureau determines appropriate. Such an order will ensure fairness to all parties. If the Board's Order is ultimately invalidated, Portside will receive the rent it is due without having to sue the tenants for back rent or potentially surprise tenants with substantially increased rents in order to collect amounts it should have been able to collect during the pendency of this action. If the Board's Order is upheld, the Court can direct the escrowed funds to be paid to tenants.

**V.      The Court Should Determine Whether To Exercise Its Discretion Under Rule 65 So As To Further Streamline Any Additional Proceedings**

At the Court's discretion, it may also streamline resolution of further proceedings in this case pursuant to Rule 65(a)(2) by "advance[ing] the trial on the merits" on the state law and due process claims and consolidate[ing] [them] with the hearing" on the preliminary injunction. Alternatively, even if the Court determines not to order consolidation, evidence that is received on this motion and that would be admissible at trial will become part of the trial record and need not be repeated at trial.

## CONCLUSION

For the foregoing reasons, Portside respectfully requests that pursuant to Federal Rules 1, 16 and 65, the Court enter preliminary injunctive relief enjoining enforcement of the Board's November 3, 2023 Order. Alternatively, the Court should order the following status quo framework, without any admission or prejudice to Portside's position in this case:

1. Portside residents should continue to pay the rents they paid as of November 2, 2023 decision, plus the permitted rent control increase (4% or the relevant CPI number, whichever is less). If necessary, going forward Portside will place any increase into escrow, to be released in accordance with this Court's determination on the merits.

2. Portside will not pursue evictions based on non-payment of rent so long as residents pay the rent identified in (1) and otherwise comply with the terms of the lease and the law.

3. Even though Portside is entitled to institute larger increases under its leases and the law, Portside will forego seeking from the residents any other rent increases until the matter is resolved by the Court, but reserves the right to seek lost rent as damages from the City.

4. Enforcement of the Board's November 3, 2023 Order and any follow-on order by the Board or other Jersey City agency is enjoined, except that, if the Board or Rent Leveling Bureau issue recalculated rents for Portside, the Tenants may request that Portside pay the difference between those recalculated rents and the rents charged going forward under the first condition into escrow.

Respectfully submitted,

The Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC

By: */s/ Derek D. Reed*

*Attorney for Plaintiffs the Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC*

Derek D. Reed, Esq. (Attorney ID # 038062003)
Jeffrey Plaza, Esq.
Ehrlich, Petriello, Gudin
Plaza & Reed
A Professional Corporation
60 Park Place, Suite 1016
Newark, New Jersey 07102
Phone: (973) 643-0040

Terri L. Mascherin
Andrew W. Vail
Daniel J. Weiss
Jenner & Block LLC
353 Norh Clark Street
354 Chicago, Illinois 60654
Phone: (312) 222-9350
Facsimile: (312) 840-7375

*Attorneys for Plaintiffs*

36