# EXHIBIT "B"

**Derek D. Reed, Esq. (Attorney ID No. 038062003)**
**EHRLICH, PETRIELLO, GUDIN, PLAZA & REED**
**A Professional Corporation**
**60 Park Place, Suite 1016**
**Newark, New Jersey 07102**
**(973) 643-0040**
**Attorneys for Defendants,**
**The Towers at Portside Urban**
**Renewal Company, LLC and**
**Equity Residential Management, LLC**

|  |  |
|---|---|
| **CITY OF JERSEY CITY and CITY OF JERSEY CITY RENT LEVELING BOARD,** | **: SUPERIOR COURT OF NEW JERSEY**<br>**: LAW DIVISION: HUDSON COUNTY**<br>**:**<br>**: DOCKET NO.: HUD-L-2449-24** |
| **Plaintiffs,** | **:**<br>**:    Civil Action**<br>**:** |
| **vs.** | **:**<br>**:** |
| **THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC, EQUITY RESIDENTIAL MANAGEMENT, LLC, ABC CORP. 1-10 (fictitious entities) and JOHN DOES 1-10 (fictitious names),** | **:**<br>**:**<br>**:**<br>**:**<br>**:** |
| **Defendants.** | **:**<br>**:**<br>**:**<br>**:** |

**PORTSIDE'S RESPONSE IN OPPOSITION TO**
**<u>ORDER TO SHOW CAUSE FOR EMERGENT AND PRELIMINARY INJUNCTION</u>**

The Towers at Portside Urban Renewal Company, LLC and Equity Residential Management, LLC (collectively, "Portside") respectfully submit this response in opposition to the order to show cause for emergent and preliminary injunction filed by the City of Jersey City (the "City") and the Jersey City Rent Leveling Board (the "Board").

**<u>Introduction</u>**

The request for preliminary injunctive relief should be denied. The City, the Board, and Portside are ***currently litigating in federal court*** the very same issues as presented in this newly-

1

filed case.  That federal lawsuit, *Equity Residential, et al. v. The City of Jersey City, et al.*, No. 2:23-cv-22291-MCA-JRA (D.N.J.), has been pending since November 2023.  In that case, Portside alleges that the Board's November 3, 2023 order regarding Portside Towers (the "Board's Order" or the "Order") violates the U.S. and New Jersey Constitutions and New Jersey law.  Portside has moved in the federal case for a preliminary injunction staying enforcement of the Board's Order pending the federal court's determination whether the Order is lawful.  The City and the Board have answered Portside's federal complaint, denied Portside's claims, and filed an opposition to Portside's motion for an injunction.  That motion is fully briefed.  Judge Cox Arleo and Magistrate Judge Almonte are presiding over the federal action and Judge Cox Arleo has taken the preliminary injunction motion under advisement.

In this action, filed nearly *seven months* after the federal case, the City and the Board seek to end-run the federal court and the fully-briefed motion for preliminary injunction pending before Judge Cox Arleo.  That effort is particularly misplaced given that the City and the Board are participating fully in the federal case on the merits, and are free to seek injunctive relief in the federal court in a manner than can be coordinated with Portside's own motion for injunction. Instead, the City and the Board seek to place this Court in direct conflict with the federal court, asking this Court to weigh in on the very same issue—whether and how the Board's Order should be enforced pending legal challenges to the lawfulness of the Order—that is already under consideration in the federal forum.

Further, the City and the Board fail to inform this Court that Portside has *already committed* in the federal case to treat all of its apartments as if they are subject to the City's rent control ordinance while the court considers the lawfulness of the Board's Order, negating any alleged emergency.  Thus, the very basis of the City and the Board's complaint in this case—

2

alleged rental increases by Portside following the Board's Order in November 2023—has already been raised and addressed by Portside's voluntary conduct in the federal action.

The Court should decline the City and the Board's invitation for potentially conflicting rulings, wasted judicial resources, and uncoordinated litigation in multiple fora. Two independent grounds require rejection of the City and the Board's motion:

First, pursuant to New Jersey's "first-filed rule," the Court should decline to enter injunctive relief (or to otherwise proceed in this case) where another court is considering the same issues in a previously-filed case between the same parties. The City and the Board have participated fully in the federal case for the last several months, have taken positions on the merits in that case, and have made no objection to the federal court's handling of all issues pertaining to the Board's Order. There is no valid reason to multiply the proceedings across multiple courts and risk inconsistent results, particularly at this advanced stage.

Second, if the Court nonetheless considers injunctive relief in this case, the Court should deny the motion. There is no emergency—and no threat of irreparable harm—because Portside has already agreed to limit rental increases while the federal court considers the lawfulness of the Board's Order. In this vein, Plaintiffs cannot establish irreparable harm to a third-party when the alleged damage is monetary, as is the case here. To the extent the City and the Board suggest that any other interim order is appropriate, nothing precludes them from seeking it in the federal court.

**Factual Background**

A.     **The Parties Litigate The Lawfulness Of The Board's Order In Federal Court.**

The Board issued its Order on November 3, 2023, finding that Portside Towers is subject to the City's rent control ordinance, notwithstanding that the City, Portside, and tenants have

3

understood Portside Towers to be exempt from rent control pursuant to N.J.S.A. §2A:42-84.1 *et seq.* for nearly thirty years.

Within one week of that Order, on November 10, 2023, Portside filed a complaint in federal court within one week, on November 10, 2023, challenging the lawfulness of the Board's Order under federal and state law. (Ex. A, Federal Compl.) Portside named the City and the Board as defendants in the federal case. (In its papers here, the City contends that only the City and not the Board is a defendant to Portside's federal action, but that is wrong.) In its complaint, Portside alleged that the Board's Order violates the Takings and Due Process clauses of the U.S. Constitution, parallel provisions of the New Jersey Constitution, and New Jersey law, including the state rent control exemption statute, N.J.S.A. §2A:42-84.1. (*Id.* Counts I-V.) Portside further alleged state law challenges to the Board's Order in lieu of prerogative writ. (*Id.* Count VI.)

The City and the Board appeared in federal court and answered Portside's complaint, denying all of Portside's claims. The City and the Board did not move to dismiss or otherwise raise any objection to the federal court presiding over all aspects of Portside's federal and state law claims. (Ex. B, Federal Ans.) The parties thereafter exchanged initial disclosures.

In March 2024, Portside, the City, and the Board negotiated a proposed case schedule for the federal lawsuit. On March 12, 2024, Portside, the City, and the Board appeared at a case scheduling conference before Magistrate Judge Almonte and provided their positions on how the case should proceed. All parties agreed that a relatively speedy schedule would be appropriate. On March 12, 2024, the federal court entered a case scheduling order, with a deadline to amend pleadings or add new parties of May 1, 2024, a close of fact discovery set for October 15, 2024, and a close of expert discovery set for January 30, 2025. (Ex. C, Scheduling Order.)

4

In April 2024, certain tenants and associations of tenants at Portside Towers moved to intervene in the federal case. Those tenants seek to challenge other aspects of the Board's Order. Portside did not oppose the tenants' intervention (on certain conditions), but the City and the Board opposed intervention. The tenants' motion to intervene is fully briefed and pending before Judge Almonte.[1]

In the meantime, Portside, the City, and the Board have moved forward with discovery in the federal case. The parties have issued and responded to written discovery, and Portside has collected and produced thousands of documents requested by the City and the Board. The parties are actively conferring regarding that on-going discovery.

**B.     The Parties Fully Brief A Motion To Enjoin Enforcement Of The Board's Order In Federal Court.**

As the federal case has moved forward, the parties have had multiple exchanges and have made multiple filings regarding the rents that may be charged during the federal court's review of the lawfulness of the Board's Order. This issue has been complicated by the fact that the Board, despite announcing in November 2023 that it would issue recalculated base rents for Portside Towers, has not yet done so despite Portside's timely turnover in early January of thousands of documents requested by the City and the Board and Portside's offer at that time to assist in the recalculations while preserving its objections and federal court challenge.

To provide a clear path forward for all parties and tenants, in April 2024, Portside attempted to negotiate an agreed "status quo" with the City and the Board, which would set the rent that

---

[1] Portside tenants have filed two other actions concerning the Board's Order. On December 19, 2023, tenants filed a complaint in lieu of prerogative writ challenging the Order in state court, *Portside Towers W. Tenant Ass'n, et al v. Jersey City Rent Leveling Bd.*, No. HUD-L-4447-23. On July 2, 2024, tenants filed a class action complaint against Portside in federal court, *Portside Towers W. Tenant Ass'n, et al. v. The Towers at Portside Urban Renewal Company, LLC,* No. 24-cv-07508 (D.N.J. 2024).

Portside may charge during the pendency of the federal action, with a mechanism for tenant refunds if the Board Order's is upheld and if the Board sets lower rents. (*See* Ex. D, Apr. 30, 2024 Ltr.)  The tenant litigants, however, opposed such an agreed framework.  Unable to negotiate an agreed status quo, on May 14, 2024 Portside moved for a preliminary injunction in the federal court. (Ex. E, Portside's Mot.)  In that motion, Portside established that it has a high likelihood of establishing that the Board's Order is unlawful and that it will be irreparably injured if it is forced to forego lawful rent on the basis of an unlawful order (because those funds will be practically impossible to collect after a judgment in Portside's favor).  Portside therefore requested that the federal court enjoin enforcement of the Board's Order pending the court's determination of the lawfulness of the Order.

In the alternative, Portside proposed that the federal court enter the following status quo framework, which would protect all parties' rights during the pendency of the federal lawsuit:

1. Portside would freeze all rents at the rate that applied on November 2, 2023 (immediately before the Board's Order), subject only to the potential annual increase allowed for rent-controlled properties in Jersey City (the lesser of 4% or the applicable CPI figure).  If required, going forward, Portside would escrow any rental increase.

2. Portside would not pursue any evictions for the nonpayment of rent for residents that pay the rent as specified in the first condition.

3. Even though Portside is entitled to institute larger increases under its leases and the law, Portside will forego seeking from tenants any other rent increases until the matter is resolved by the federal court, but reserves the right to seek lost rent as damages from the City.

4. Otherwise, enforcement of the Board's November 3, 2023 Order and any follow-on order by the Board or other Jersey City agency would be enjoined, except that, if the Board or Rent Leveling Bureau issue recalculated rents for Portside, the tenants may request that Portside pay into escrow the difference between those recalculated rents and the rents charged going forward under the first condition.

6

The City and the Board opposed Portside's motion, primarily contending that Portside is unlikely to prevail on the merits because the Board's Order is lawful.  The motion for preliminary injunction is fully briefed and pending decision by Judge Cox Arleo.

**C.      Portside Treats All Apartments As Subject To Rent Control Pending Federal Court Determinations.**

Although the federal court has not yet ruled on Portside's motion for an injunction, Portside has committed to treating all of the Portside Towers apartments as subject to rent control pending the federal court's assessment of the lawfulness of the Board's Order.

Specifically, for 100 Warren Street, Portside has limited annual rent increases consistent with the City's rent control ordinance at all times since September 19, 2022 (*i.e.*, increases no greater than the lesser of 4% or the City's CPI-based figure).  (Ex. F, Feb. 7, 2024 Ltr. from Portside to Jersey City.)  For 155 Washington Street, Portside has agreed to the same limitation while its legal challenge is pending, applicable from November 3, 2023 forward, and has provided credit to tenants for any excess payment since the Board's Order.  (*Id.*)

Portside agreed to take these actions in part because the City's Corporation Counsel, Brittany Murray, stated publicly and on the record that, in the City's view, this would place the rents in compliance with the Jersey City rent control ordinance.  On January 10, 2024, she specifically stated: "The building is subject to rent control, so if something is above 4%, they need to file an illegal rent petition."  Further, in response to Council President Joyce Watterman's questions of whether the tenants "can receive a rent increase" as long as it is not "above 4%," and whether Portside "could still increase their rent . . . 4%," Ms. Murray responded, "Correct."  (City Council Mtg. Jan 10, 2024, available at https://www.youtube.com/watch?v=sYi5JhSQi9I.)

Thus, Portside has already voluntarily implemented interim relief that is directly in line with Ms. Murray's public representations.  In addition, the alleged irreparable harm to third-parties

which Plaintiffs argue supports their request for injunctive relief is solely monetary and therefore injunctive relief is not available to Plaintiffs in this case.

**D.      The City And The Board Change Attorneys And File This Lawsuit Notwithstanding The Federal Proceeding.**

On or about June 10, 2024, the City and the Board terminated the contract of the Eric M. Bernstein & Associates, the attorneys that have represented them in the federal action since December 2023.  On June 24, 2024, the City and the Board filed a notice of that termination in federal court.  Then, on July 1, 2024, the City and the Board filed this lawsuit and an order to show cause for immediate injunctive relief, seeking to prohibit Portside from implementing any rental increases (even those consistent with the City's ordinance) until the Rent Leveling Bureau issues its recalculation of the base rent for Portside Towers.  The City and the Board's complaint fails to disclose that Portside has already agreed to limit any increases to those permitted by the City's ordinance, and that Portside has already proposed a status quo framework that includes a limit on rental increases and a refund mechanism.  Nowhere do the City or the Board attempt to explain why they have initiated a new proceeding when the same issues are pending before the federal court.

## Argument

**I.      The Court Should Not Enter Injunctive Relief When The Same Issues Are Pending In The Federal Court And The City And The Board Have Litigated There Without Objection For Months.**

The Court should reject the City and the Board's effort to end-run the federal court, which is presiding over the *same* issues between the *same* parties, including a fully-briefed motion for a preliminary injunction.  The City and the Board have litigated in the federal court for more than six months without any objection to the federal court hearing all aspects of the lawfulness of the Board's Order, including federal and state law issues and claims in lieu of prerogative writ.  (Exs.

8

A, B.) Judge Cox Arleo is currently deciding whether to enjoin enforcement of the Board's Order during the pendency of the federal case, and/or whether to order another status quo framework that would limit rent increases at Portside Towers. The City and the Board's later-filed case in this Court threatens conflict with the federal court, inconsistent rulings, and wasted judicial resources.

New Jersey's "first-filed rule" was designed to avoid exactly those types of results. Under that rule, "the court which first acquires jurisdiction has precedence in the absence of special equities." *Yancoskie v. Del. River Port Auth.*, 78 N.J. 321, 324 (1978) (affirming dismissal of a suit filed in New Jersey state court in favor of a first-filed suit in Delaware). "Under the first-filed rule, a New Jersey state court ordinarily will stay or dismiss a civil action in deference to an already pending, substantially similar lawsuit in another state." *Rose v. Hassan*, 2011 N.J. Super. Unpub. LEXIS 2352, at *5 (Super. Ct. Aug. 9, 2011).[2] "Substantially similar" does not mean identical; the first-filed rule is triggered where "the parties, legal issues, factual circumstances, and relief sought are substantially the same" across cases. *Id.* at *10-11.

The first-filed rule helps protect against forum shopping, waste of judicial resources, and inconsistent rulings or judgments and preserves comity between the courts. *See Legend Movie Posters Corp. v. Jerry Ohlinger's Movie Material Store, Inc.*, 2018 N.J. Super. Unpub. LEXIS 2329, at *11 (Super. Ct. App. Div. Oct. 22, 2018) ("The litigation of duplicative lawsuits is wasteful of judicial resources and undermines the recognition of the authority of the other jurisdiction to adjudicate the matter"); *Continental Ins. Co. v. Honeywell Intern., Inc.*, 406 N.J. 156, 190 (Super. Ct. App. Div. 2009) ("the comity analysis starts with identifying the first-filed suit"); *Collini v. Nat'l Med. Consultants, PC.*, 2019 N.J. Super. Unpub. LEXIS 1268, at *6 (Super. Ct. June 4, 2019).

---

[2] Copies of these cases have been provided pursuant to NJ Rule 1:36-3. *See* D. Reed Atty. Cert.

9

Here the parties, legal issues, and the factual circumstances all are substantially similar if not identical.  The Board's Order and whether or how it should be enforced are at the center of the federal lawsuit and this one.  Even the question of the interim status quo—the rent that may be charged at Portside Towers during the pendency of Portside's legal challenges to the Board's Order—is squarely at issue in both cases, with a fully-briefed motion for preliminary injunction awaiting decision in the federal court.  The City and the Board's motion in this Court is essentially the inverse of Portside's motion in the federal court.

The first-filed rule applies "unless compelling reasons dictate that [the second court] retain jurisdiction." *Rose*, 2011 N.J. Super. Unpub. LEXIS 2352 at *11.  These include the "1) inability of the first-filed action to provide adequate relief; 2) strong public policy interests of New Jersey; 3) further progression of the second-filed action; and 4) *forum non conveniens* factors." *Id.* at *6-7.  None of those factors applies here.  The City and the Board have not attempted to and cannot meet their burden to show any "special equities" apply.  *See Sensient Colors*, 193 N.J. 373, 397 (2008).

New Jersey courts have repeatedly held that the first-filed rule requires deference to first-filed cases pending in federal court.  In *Jones v. Educ. Testing Serv.*, 2005 WL 975337, at *3 (N.J. Super. Feb. 2, 2005), the court stayed a later-filed state lawsuit and held that the "filing of the first lawsuit in a federal and not a state court is a distinction without a difference."  Similarly, in *Rose*, the court held that "[t]here is no reason the federal [c]ourt cannot provide adequate relief" in the first filed action, and dismissed the second-filed state action.  *See Rose*, 2011 N.J. Super. Unpub. LEXIS 2352, at *12; *see also Collini*, 2019 N.J. Super. Unpub. LEXIS 1268, at *6-7 (dismissing New Jersey state action in favor of first-filed federal action because "with both cases simultaneously proceeding on parallel tracks, the opportunity for inconsistent rulings is palpable");

*Capital One Bank (USA) NA v. King*, 2021 N.J. Super. LEXIS 70, at *2-3 (Super. Ct. Jan. 20, 2021) (dismissing state New Jersey lawsuit in favor of first-filed federal lawsuit). All of the same considerations in those cases apply here.

## II.   The City And The Board Do Not Satisfy Their Burden For Injunctive Relief.

In the alternative, if the Court chooses to address the City and the Board's request for injunctive relief, it should deny that request. "Injunctive judgments are not granted in the absence of clear and convincing proof," where "all [factors] weigh in favor of" injunctive relief. *Dolan v. De Capua*, 16 N.J. 599, 614 (1954); *Sherman v. Sherman*, 330 N.J. Super. 638, (Super. Ct. 1999).[3] Three reasons support denial of the City and the Board's request here:

First, there is no emergency or other threat of irreparable injury supporting the motion. As discussed above, Portside has already committed to treating all of the apartments in Portside Towers as subject to rent control pending the federal court's assessment of the lawfulness of the Board's Order. The only rental increases Portside has implemented are consistent with the City's own rent control ordinance (*i.e.*, the lesser of 4% or a CPI-based figure). Nor is there any question that Portside can and will refund any rental payment that is in excess of the rent ultimately established by the Board if the Board's Order is upheld. Portside has further proposed a status quo framework in the federal court that would preserve the rights of all parties, including the rights of Portside, the City, and Portside's tenants. Under that proposal, Portside has committed to set aside and maintain any disputed funds and not to pursue eviction against tenants that pay rent consistent with the court's order. Given those circumstances and the availability of monetary relief in the

---

[3] To establish entitlement for a preliminary injunction, "[t]he moving parties must establish (1) a likelihood of success on the merits; (2) irreparable harm; (3) a showing that on balance the harm to the moving party is greater than the harm to the party to be restrained; and (4) the public interest will not be harmed." *Matter of City of Newark*, 469 N.J. Super. 366, 387 (Super. Ct. App. Div. 2021).

11

event the City and the Board prevail (*i.e.*, refunds if required by law), there is no basis for injunctive relief.

Second, if the City and the Board believe any more is required, they can request any appropriate interim relief in the federal court, which is currently considering both the lawfulness of the Board's Order and Portside's own motion for a preliminary injunction regarding enforcement of the Order. The court that is considering legal challenges to the Board's Order is best positioned to consider whether or how the Order should be enforced during consideration of those challenges. The federal court can also appropriately shape any interim relief in a coordinated way to address the points raised by Portside as well as any points raised by the City and the Board. The City and the Board provide no explanation for why they have not sought relief in the federal court.

Third, the City and the Board's litigation conduct belies any contention that emergency relief in this Court would be appropriate. The City and the Board have willingly litigated all aspects of the Board's Order in federal court for seven months. They negotiated a case schedule to obtain a decision from that court; notably, Portside pushed for a faster schedule than the City and the Board proposed. They have so far sought no injunctive relief in that court. And the Rent Leveling Bureau, which was tasked with recalculating the base rent at Portside Towers in November 2023, has still not done so, despite representing for months that the recalculations were forthcoming.

In short, for several months, Portside has sought an efficient and timely adjudication of its legal challenges to the Board's Order in federal court and has sought to implement a status quo framework to protect all of the parties' rights during those proceedings. The City and the Board have been fully engaged in that federal court litigation. Though they recently changed counsel,

12

they present no valid reason for this Court to rush into a matter that is firmly within the jurisdiction

of and pending decision in a co-equal forum.

## Conclusion

The Court should deny the request for injunctive relief.

Respectfully Submitted,

*/s/ Derek D. Reed*
Derek D. Reed, Esq. (Attorney ID # 038062003)
Jeffrey Plaza, Esq.
EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED
A Professional Corporation
60 Park Place, Suite 1016
Newark, New Jersey 07102
(973) 643-0040

Terri L. Mascherin (pro hac vice to be submitted)
Andrew W. Vail (pro hac vice to be submitted)
Daniel J. Weiss (pro hac vice to be submitted)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois  60654
Phone:  (312) 222-9350
Facsimile:  (312) 840-7375

*Counsel for Portside*

14

# EXHIBIT "A"

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> The City of Jersey City and the City of Jersey City Rent Leveling Board, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) <br> Civil Action No. _____ |

## COMPLAINT

Plaintiffs, The Towers at Portside Urban Renewal Company, L.L.C. ("Portside") and Equity Residential Management, LLC ("Equity Residential"), for their complaint against the City of Jersey City (the "City") and the City of Jersey City Rent Leveling Board (the "Board"), respectfully allege as follows:

## NATURE OF ACTION

1. This is an action for declaratory and injunctive relief, along with money damages, to remedy Defendants' violations of the United States Constitution, parallel provisions of the New Jersey Constitution, and related New Jersey law.

2. Since 1987, the State of New Jersey has provided by statute that apartment buildings constructed in that year or thereafter shall be exempt from local rent control ordinances for a period of up to thirty years (the "Exemption"). N.J.S.A. § 2A:42-84.1 *et seq.* (the "Exemption Statute"). Introduced at a time of short housing supply and stagnant development, the purpose of the Exemption Statute was to encourage property owners and investors to "increase the supply of newly constructed rental housing" in New Jersey. *Id.* § 84.5.

3.      The Exemption Statute served its purpose.  Property owners and investors built multifamily dwellings that housed thousands of people throughout New Jersey, including in the dozens of apartment towers along the waterfront in Jersey City.  The City gained significant benefits, including newly constructed buildings, improved economic activity, and increased tax revenues.

4.      Plaintiff Portside owns two of those towers: 100 Warren Street and 155 Washington Street, in Jersey City, known as "Portside Towers."  The towers were constructed in the 1990s, during the period of statutory exemption provided in the Exemption Statute.  The towers are physically connected and operate as a single complex.

5.      For decades, the City, the owner, and the tenants all treated Portside Towers as exempt from rent control pursuant to the Exemption Statute.  Portside purchased the property, made investments in the towers, paid taxes on them, and made public filings with the City all based on the mutual understanding that they were covered by the Exemption and not subject to rent control.

6.      After nearly 30 years of that treatment, however, the Jersey City Board decided on November 3, 2023 that Portside Towers is not entitled to the Exemption and is instead retroactively subject to the City's local rent control ordinance (the "Ordinance").  The politically appointed Board announced that decision to cheers in a "standing room only" public meeting (as described by the Board chairman), in which one Board commissioner railed against landlords who do not "allow the tenant to get their due," a phenomenon that he said is "happening all over the country."

7.      The sole stated basis for the Board's decision was that Portside had not proven that its predecessor had sent certain notices to a "city construction official" at a specific time in the 1990s, roughly three decades earlier.  Jersey City's own Rent Leveling Administrator had rejected

2

that conclusion in a 2022 proceeding, but the Board reversed the Administrator's well-reasoned determinations.

8.     The Board's decision was pretextual, arbitrary and capricious, and wrong as a legal matter.  As just one example, the Board focused exclusively on the issue of notices to the city construction official, despite that the state Exemption Statute does not require proof of such notices for purposes of determining eligibility for the Exemption, much less require that a notice must be proven decades after the fact, upon pain of a retroactive loss of the Exemption.  The Board stressed aspects of the City's own rent control Ordinance that purport to require notice as a prerequisite to exemption (contrary to the Exemption Statute), but the undisputed evidence established that the City's own construction official told Portside's predecessor not to send him the notices.

9.     Further, the Board erroneously ordered that the Rent Leveling Administrator should "adjust" the rents charged at Portside Towers to a rent-controlled level during a "lookback window" beginning in 2016 through the present.  That is, going forward, Portside must set rents based on the limited increase available under the City's rent control ordinance, and must do so as if rents have been set under the level allowed by that ordinance since 2016.  Tenants are likely to seek significant refunds or credits on the basis of those calculations.

10.     The Board's decision, if allowed to stand, would potentially transfer millions of dollars of value from the property to the tenants.  Application of the decision may also diminish the market value of the property beyond the value of the lost rent.

11.     Jersey City cannot dispute that it had notice of Portside's exemption to rent control, nor that each of the thousands of tenants who lived at Portside Towers over the last thirty years received individualized notices of that exemption and agreed to them in their leases.  Those tenants

freely entered into leases to live at Portside Towers, including many who have renewed for multiple years with notice on each occasion that the building is exempt from rent control.

12.     Moreover, Jersey City cannot dispute that it has benefited directly and materially from Portside's exempt status.  Since the 1990s, Portside has made regular payments to the City under a "payment in lieu of taxes" based on the revenue received from the exempt rents Portside has charged.  Had Portside Towers been subject to rent control, those payments would have been substantially lower, but the City accepted the higher payments that flowed directly from Portside Towers' exempt status.

13.     Jersey City's decision to overrule the determinations by the Rent Leveling Administrator that the buildings are exempt from rent control was a pretext for depriving Portside of its contractual and property rights for the benefit of a local political constituency.  As set forth below, the decision violates a number of constitutional protections in the United States and New Jersey Constitutions, was contrary to New Jersey state law, and was arbitrary, capricious and unreasonable.

## SUMMARY OF CLAIMS

14.     The Board's decision, and its underlying retroactive and illegal application of the Ordinance, violates the protections afforded by the United States Constitution, the New Jersey Constitution, and New Jersey law in at least five important ways:

15.     First, Defendants' actions constitute an unlawful taking of property without compensation, in violation of the Fifth Amendment to the U.S. Constitution and parallel provisions of the New Jersey Constitution.  The Exemption created by State law is itself a form of valuable property, which the Board has purported to take without compensation.  The buildings and the right to rent them at market prices is also a form of property that has been taken without

4

compensation.  The Takings Clause of the Fifth Amendment prohibits those actions, or, at a minimum, requires the City to pay Portside just compensation for the property it has taken.

16.     <u>Second</u>, Defendants' actions violate the Due Process Clause of the United States Constitution and parallel provisions of the New Jersey Constitution.  After the City and the Board treated Portside Towers as exempt from rent control for nearly thirty years and enjoyed the benefits of Portside's investments in the buildings and the community, the City and the Board are now retroactively stripping Portside of its exempt status through an unfair process that purportedly required Portside to prove the filing of paperwork roughly three decades ago.

17.     <u>Third</u>, the City's rent control scheme violates the Contracts Clause of the United States Constitution and parallel provisions of the New Jersey Constitution, by retroactively impairing Portside's leases with its tenants without an appropriate and lawful basis.

18.     <u>Fourth</u>, the Board's decision and the City's rent control Ordinance violate and are preempted by New Jersey state law, including the Exemption Statute.  The Exemption Statute provides that local rent control ordinances "shall not apply" to buildings like Portside Towers. Nothing in the Exemption Statute permits municipal authorities to disallow the state-law Exemption, nor to add their own retroactive requirements to prove eligibility for the Exemption.

19.     <u>Fifth</u>, the Board's decision was incorrect as a matter of law and arbitrary and capricious.  As the Rent Leveling Administrator found, Portside Towers qualified for the Exemption from the beginning, including because Portside's predecessor provided notice to the city construction official in 1994, which, along with other attendant circumstances, was all that was required to establish substantial compliance.  The Board's decision was arbitrary, capricious, and unlawful in a dozen other respects.

20.     For each reason, Portside respectfully requests that the Court order declaratory, injunctive, and monetary relief as further set out below, including a declaration that:

a.   Portside is entitled to to the continued application of the Exemption;

b.   The Board may not prevent Portside from acting in accordance with the Exemption;

c.   The Board may not enforce the Ordinance's rent control provisions against Portside until the Exemption expires; and

d.   The Board may not direct an adjustment of rents at Portside Towers based on the Ordinance, nor compel Portside to adjust its rents, either prospectively or retroactively, during the period of the Exemption.

## PARTIES

21.     Plaintiff The Towers at Portside Urban Renewal Company, L.L.C. owns Portside Towers, a premiere residential apartment community in Jersey City, New Jersey, comprised of two multi-family residential apartment towers located at 100 Warren Street ("100 Warren") and 155 Washington Street ("155 Washington").  In the Jersey City proceedings, this entity was referred to as "Portside Urban Renewal Company LLC."

22.     Plaintiff Equity Residential Management, LLC is an affiliate of Portside and manages the property under a written management agreement.  Equity Residential Management, LLC acts as agent for Portside with respect to leasing and other operational matters at the property.

23.     Defendant City of Jersey City is a municipality incorporated in the State of New Jersey.

24.     Defendant City of Jersey City Rent Leveling Board is a public entity located at 4 Jackson Square, Jersey City, New Jersey 07305.  The Board is a body of the City of Jersey City established pursuant to Jersey City municipal ordinance and is empowered to execute, consistent

with New Jersey law, Jersey City's Rent Control Ordinance, Chapter 260 of the Jersey City Municipal Code.

## JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because multiple counts of the complaint arise under federal law, including the United States Constitution and 42 U.S.C. § 1983.

26. This Court has supplemental jurisdiction over the state law claims set out herein pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form the same case or controversy.

27. Venue is proper under 28 U.S.C. § 1391 (b) and (c) because all Defendants are subject to personal jurisdiction in the District of New Jersey, the relevant property is located in the District of New Jersey, and a substantial part of the events or omissions that gave rise to this action occurred in the District of New Jersey.

## FACTUAL BACKGROUND

**A. New Jersey Temporarily Exempts From Rent Control Buildings with Four or More Apartments Constructed After 1987.**

28. The Exemption Statute, N.J.S.A. § 2A:42-84.2, provides (emphasis added):

In any municipality which has enacted or which hereafter enacts a rent control or rent leveling ordinance . . . those provisions of the ordinance which limit the periodic or regular increases in base rentals of dwelling units *shall not apply* to multiple dwellings constructed after [June 25, 1987], for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less.

29. The Exemption Statute further provides that the purpose of the statute is to encourage the construction of new multifamily buildings in New Jersey:

The Legislature deems it to be necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in

New Jersey. In an effort to promote this new construction, the Legislature enacted [the statute], the purpose of which was to exempt new construction of rental multiple dwelling units from municipal rent control so that the municipal rent control or rent leveling ordinances would not deter the new construction.

*Id.* § 2A:42-84.5.

30. The Exemption Statute also makes clear that subordinate units of government in New Jersey, including municipalities, have no power to limit the exemption from rent control provided by the statute (emphasis added):

No municipality, county or other political subdivision of the State, or agency or instrumentality thereof, shall adopt any ordinance, resolution, or rule or regulation, or take any other action, *to limit, diminish, alter or impair* any exemption afforded pursuant to [the statute].

*Id*.

31. The Exemption Statute contains two provisions that refer to notices. The first provides that an exempt building owner is to provide a notice to prospective tenants about the exemption. *Id.* § 84.3. The second provides that the building owner is to provide a notice of the exemption to a "municipal construction official" 30 days before the "issuance of a certificate of occupancy for the newly constructed multiple dwelling." *Id.* § 84.4.

32. Importantly, nothing in the Exemption Statute provides that the Exemption is contingent on the provision of those notices, nor that a subsequent inability to prove that the notices were provided years earlier would result in a retroactive forfeiture of the Exemption.

**B.    Jersey City's Rent Control Scheme.**

33. Jersey City has adopted a rent control ordinance at Chapter 260 of the Jersey City Municipal Code. In general, the Ordinance restricts a property owner from increasing the rent charged for an apartment by more than the lesser of: (a) 4%; or (b) the percentage change in the consumer price index over a set period. Code of Jersey City, Ordinance § 260-3. The Ordinance contains other restrictions on the ability of property owners to set rents. For over 25 years, and

8

until recently, Jersey City and the tenants at Portside have recognized that Portside was exempt from this Ordinance pursuant to the Exemption.

34.     The Ordinance recognizes the state-law Exemption provided by the Exemption Statute, but also sets out its own exemption with its own requirements (the "Local Exemption"). Although the state's Exemption Statute does not require notice as a prerequisite to exempt status, the City's Local Exemption purports to create such a condition precedent.  In particular it provides:

> In accordance with [N.J.S.A § 2A:42-84.1], the provisions of this chapter shall not apply to a new dwelling which is constructed [after June 25, 1987] . . . for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the dwelling, or for 30 years following completion of construction, whichever is less.  *This exemption [the Local Exemption] applies only where an owner complied with all requirements contained in [§ 2A:42-84.1, et seq.], including the filing with the municipal construction official required by [id. § 84.4] and service of a written statement upon the tenant required by [id. § 84.3].*

Ordinance § 260-6(C) (emphasis added).

35.     In other words, according to Jersey City's Ordinance as interpreted by the Board, a property owner is not eligible for the Local Exemption unless it can prove that it sent the notices referenced in the Exemption Statute at the times referenced in that statute, which, in this case, were periods in the 1990s.

36.     The state law Exemption exists independently from the Local Exemption. Therefore, the purported unavailability of the Local Exemption has no bearing on the availability of the state Exemption.  Nor can the Local Exemption impose a condition on the availability of the state Exemption, because the state Exemption expressly provides that it may not be "limit[ed], diminish[ed], alter[ed] or impair[ed]" by any municipal enactment.  N.J.S.A § 2A:42-84.2

**C.      Portside Towers Is Constructed And First Rented During The Exemption Period.**

37.     The two towers of Portside Towers were both constructed within the period specified in the Exemption Statute.  Construction on 100 Warren was completed on August 25,

1992, and it was converted to a multifamily building shortly thereafter.  Construction on 155

Washington was completed on December 31, 1997.  Both towers were developed in reliance on

the applicability of the Exemption.

38.     The two towers are part of the same complex on a single block on the waterfront in

Jersey City.  They are part of the same tax block and were constructed under the same development

plan and developer's agreement with the City.

39.     A certificate of occupancy for 100 Warren was initially issued on August 25, 1992.

At that time, the building was not open to residents and was planned as a condominium

development.

40.     A predecessor to Portside acquired the property in a foreclosure sale on November

23, 1994.  It remained unoccupied.

41.     That same day, November 23, 1994, Portside's predecessor sent a notice of

exemption to Jersey City's Construction Code Official, Michael Regan.  The notice stated:

> Portside Apartments Urban Renewal Partners, L.P. is the owner of [100 Washington], which is a newly constructed multiple dwelling unit containing 229 rental dwelling units.  We are hereby claiming exemption from rent controls . . . and any form of future rent control pursuant to N.J.S.A. 2:42-84.1 et seq.  The period for which exemption is claimed for the 229 units in this building shall commence on the anticipated date of initial occupancy, January 1, 1995.

42.     Mr. Regan did not accept the notice.  He responded on December 6, 1994, writing,

"Please be advised that the Office of Construction Official has no jurisdiction over rent controls

and I would suggest that you contact the proper agency charged with that responsibility."

43.     On January 24, 1995, the Jersey City Construction Department issued a certificate

of continued occupancy for 100 Warren.  100 Warren thereafter opened for residential rental

occupancy.

10

44.     Jersey City issued the Certificate of Occupancy for 155 Washington on December 31, 1997.

45.     Although the City was able to locate the 1994 notice letter to Mr. Regan for 100 Warren, neither Portside nor the City has located a letter of exemption sent to Mr. Regan that specifically references 155 Washington.  As noted above, however, Mr. Regan advised Portside in writing in 1994 not to send him such letters.

**D.      Portside Towers Is Treated As Exempt From Rent Control For Many Years.**

46.     Since at least the late 1990s, Portside Towers has been treated as exempt from rent control by all relevant parties in Jersey City.  Portside relied on the rent control exemption and the City directly benefited from the exempt rents that Portside charged.

47.     Portside conspicuously disclosed in its leases with tenants that the buildings are exempt from rent control.  Until 2022, no tenant filed a complaint alleging that the buildings do not qualify for the state-law Exemption or the Local Exemption.

48.     Portside has made filings with Jersey City authorities indicating that the buildings are exempt from rent control.  Until 2023, no Jersey City official indicated a belief that the buildings do not qualify for either Exemption.

49.     For decades, Portside paid fees to Jersey City pursuant to a payment in lieu of taxes ("PILOT") program, based on the revenues that Portside Towers generated by charging market-based rents.  Through the PILOT fees, established through a financial agreement and ordinance and subject to yearly audit by Jersey City, the City directly participated in and benefited financially from the rents Portside was able to charge as a result of the Exemption.  Prior to 2022, no Jersey City official suggested that Portside should pay lower PILOT fees or reduce the rents it charged because Portside Towers allegedly did not qualify for the Exemption.

11

50.     The tenants of Portside Towers also benefited from the increased investment and expenditures that were permitted by exempt rents, through building improvements and numerous amenities.   Further, in a rent control regime, the owner would have been entitled to seek reimbursement from tenants for capital improvements, increases in state and local taxes, and/or other permissible reimbursements and cost increases.

**E.     The Administrator Correctly Finds That Portside Towers Is Exempt.**

51.     Beginning in June 2022, tenants filed petitions with the Office of Landlord/Tenant Relations Bureau of Rent Leveling ("the Bureau") contending Portside Towers is not exempt from Jersey City's rent control Ordinance.   Among other arguments, the tenants argued that Portside could not establish that its predecessor had, decades earlier, sent the notices described in the Exemption Statute.

52.     Over several months, the Bureau's Rent Leveling Administrator received briefing and evidence from the tenants and Portside.

53.     On September 19, 2022, the Rent Leveling Administrator found that Portside Towers properly qualified for the Exemption under the Exemption Statute.

54.     With respect to the notice to tenants described in N.J.S.A. § 2A:42-84.4, the Rent Leveling Administrator found that it was "undisputed that the Landlord has met [that] criteria" by sending tenants a "Rent Control addendum" notifying tenants that the buildings are exempt from rent control.  Ex. A, Sept. 19, 2022 Notice of Decision re 155 Washington Street, at 3.

55.     With respect to the notice to the "city construction official" described in N.J.S.A. § 2A:42-84.4, the Rent Leveling Administrator found that Portside's predecessor had provided the notice for 100 Warren Street by sending the November 23, 1994 letter to Mr. Regan, the Jersey City Construction Code Official.  Ex. B, Sept. 19, 2022 Notice of Decision re 100 Warren Street,

12

at 3.  The tenants argued that the November 23, 1994 letter was too late, because the Exemption Statute called for a notice "at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling."  N.J.S.A. § 2A:42-84.4.  As noted above, the initial certificate of occupancy for Portside Towers was issued on August 26, 1992.  However, as the Rent Leveling Administrator found, Portside Towers was not occupied at that time (it had been planned as condominiums and then fell into a foreclosure proceeding because of economic distress).  It was not until January 24, 1995, after Portside's predecessor purchased the building and adapted it to a rental property, that Portside obtained a certificate of continued occupancy for 100 Warren Street.  The tower was first occupied after that time.  The Rent Leveling Administrator found that the November 23, 1994 notice, delivered more than 30 days before the certificate of continued occupancy, was timely.

56.     With respect to 155 Washington, the Rent Leveling Administrator found that "no letter to the Construction Code Official . . . has been located but that does not mean that one was not sent."  Ex. A at 4.  Rather, given the passage of more than twenty years since the construction of the building and "in light of Mr. Regan's December 6, 1994 letter" telling Portside that he did not believe he was the proper recipient of such notices, it was at least "as likely as not" that a notice was sent but not filed.  *Id.* at 4.  Moreover, the Rent Leveling Administrator found that Jersey City had known since the 1990s that Portside Towers was effectively a single development.  Because Jersey City had received the 1994 letter regarding 100 Warren Street, and because Portside had made multiple filings indicating that the entire project was exempt, there was no doubt that "the City was aware of this development and the Landlord's claim of exemption."  *Id.* at 5.  Further, "[f]rom the start, the Tenants residing at 155 Washington have been advised that the building is not subject to rent control."  *Id.*  The Administrator noted the tenants' arguments that Portside had

13

checked the wrong box regarding rent control on a few registration statements, but found that of no import in light of all of the other circumstances establishing notice to the City and tenants.

57.     For those reasons and others, the Rent Leveling Administrator held that both Portside Towers buildings were exempt from rent control.  Regarding 155 Washington, the Rent Leveling Administrator held that the Exemption applies from December 31, 1997 (the completion of construction) through December 30, 2027.  Regarding 100 Warren Street, the Rent Leveling Administrator held that the Exemption applies from August 24, 1992 (the completion of construction) through August 24, 2022.  Ex. A at 7; Ex. B at 6.

**F.      The Board Erroneously Finds That Portside Towers Does Not Qualify For The Exemption.**

58.     The tenants sought review of the Rent Leveling Administrator's decision by the Board.

59.     The Board received written submissions from the parties and conducted hearings on May 31, 2023 and October 19, 2023.

60.     In the description of the Board's chairman, the October 19, 2023 hearing was held before a "sold out crowd" with "standing-room only box seats."  The hearing lasted approximately 17 minutes and mainly consisted of individual commissioners, all politically appointed by the City's mayor, announcing how they intended to vote.  One commissioner stated in his first remarks: "This is happening all over the country; this is happening too much in Jersey City . . . owners are not doing what they are supposed to do to allow the tenant to get their due."  After the Board announced its decision to "side with the tenants," the sold-out crowd applauded.

61.     The Board issued a written decision on November 3, 2023.  The Board decision stated that "both 100 Warren and 155 Washington are subject to Jersey City rent control regulations."  Ex. C, November 3, 2023 Board Decision, at 10.  The sole basis for that conclusion

14

was the Board's opinion that Portside had not established that timely notices of rent control exemption were provided to the City construction official (Mr. Regan) in the 1990s. *Id.* Notwithstanding that the state-law Exemption is unconditional, the Board conflated the Local Exemption and the state's Exemption, and the Board held that providing the construction official notice "is a mandatory condition precedent to receipt of this rent control exemption requiring strict compliance with its terms." *Id.* at 8.

62.     The Board acknowledged that the Exemption Statute "does not expressly provide for a remedy where an exemption is inaccurately assumed by the municipality and/or the property owner," but nevertheless found that it would retroactively strip Portside Towers of its exemption: *i.e.*, "there was no valid exemption from the beginning of the occupancy of the units." *Id.* at 9.

63.     The Board additionally directed the Bureau to "adjust the rent on all units within the buildings dating back six years from the filing of the first [petition] at issue in the instant matters for each building." *Id.* at 10.

## G.     The Board's Decision Creates Irreparable Harm.

64.     By purporting to find that Portside Towers has never been eligible for the Exemption, the Board's decision creates irreparable harm for Portside.

65.     As discussed, subjecting Portside Towers to the Ordinance will substantially impair and take Portside's property rights.  Portside stands to lose the entire value of the Exemption, the value of future market rents, and the value of retroactive "adjustments" to past rents that have already been paid.  Further, because of tenant turnover, if Portside is required to provide rent credits or other compensation to tenants as a result of the Board's decision, there is a significant risk that Portside will be unable to recover the value of that compensation from tenants if Portside ultimately prevails in this action.

15

66.     The Board's pretextual decision would transfer millions of dollars of value from the property to the tenants. The decision will also diminish the value of the property beyond the value of the lost rent.

**COUNT I**
**THE BOARD'S DECISION AND THE**
**ORDINANCE VIOLATE THE TAKINGS CLAUSES OF THE**
**U.S. CONSTITUTION AND THE NEW JERSEY CONSTITUTION**

67.     Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

68.     The United States and New Jersey Constitutions require just compensation where the government takes private property for public use.

69.     The Fifth Amendment to the United States Constitution states: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

70.     Article I, Section 20 of the New Jersey Constitution states: "Private property shall not be taken for public use without just compensation. Individuals or private corporations shall not be authorized to take private property for public use without just compensation first made to the owners." N.J. Const. art. I, ¶ 20. This provision is considered coextensive with the corollary provision in the Fifth Amendment. *Mansoldo v. State*, 898 A.2d 1018, 1023 (N.J. 2006).

71.     These provisions are known as the Takings Clauses.

72.     The United States Supreme Court has recognized that the fundamental purpose of the Takings Clause is "'to bar [the] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 542 (2005) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). "'[W]hile property may be regulated to a certain extent, if the regulation goes too far

16

it will be recognized as a taking.'" *Id.* at 537 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) (Holmes, J.)).

73.     The Supreme Court in *Yee* held that once a plaintiff raises a takings claim, it may proceed under any and all theories that support that claim:

> Petitioners' arguments that the [rent control] ordinance constitutes a taking in two different ways, by physical occupation and by regulation, are not separate claims. They are, rather, separate arguments in support of a single claim – that the ordinance effects an unconstitutional taking.

*Yee v. City of Escondido*, 503 U.S. 519, 534-35 (1992) (emphasis removed).

74.     The Supreme Court in *Lingle*, 544 U.S. at 538-39, recognized that a takings claim may be brought under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

75.     Here, the Board's decision and the Jersey City Ordinance violate the Takings Clauses in at least three ways: (a) they deprive Portside of its right to the Exemption and its right to charge market rent without compensation; (b) they constitute a regulatory taking of the Towers; and (c) they effect a physical taking of the Towers.

**A.     The Ordinance and the Board's Decision Violate The Takings Clauses By Depriving Portside Of Its Right To The Exemption And Its Right to Charge Market Rent Without Compensation**

76.     If, as the Board held, Portside is deemed to be subject to the Ordinance and to have lost its right to the Exemption, the Board's decision and the Ordinance as applied in this case will effect a taking of Portside's property under the standard set forth in *Penn Central*. *See Om 309-311 6th St., LLC v. City of Union City*, No. 21-12051, 2022 WL 855769, at *7 (D.N.J. Mar. 23, 2022) (recognizing an alleged regulatory taking of the landlord's "right to contract with tenants to charge the maximum legal rent.")

17

77. Specifically, Portside's entitlement to the Exemption has been taken without just compensation. In addition, Portside's property right to charge market rents has been taken without compensation.

78. Although there is no "set formula" for evaluating a regulatory takings claim under *Penn Central*, the Supreme Court has identified "several factors that have particular significance." *Id.* at 124. These factors are the "character of the government action," the "economic impact of the regulation on the claimant," and the "extent to which the regulation has interfered with distinct investment-backed expectations." *Id.*

79. Each factor weighs against the government here.

80. The character of the government action here plainly constitutes a taking. The Board unexpectedly and retroactively revoked the Exemption from Portside for arbitrary and pretextual reasons. *Cf. Om 309-311*, 2022 WL 855769, at *16 (alleged "bad faith on behalf of government can weigh in favor of a taking.").

81. Part of the inquiry into the character of the government action includes whether it promotes a public purpose. *Dolan v. City of Tigard*, 512 U.S. 374, 388 (1994) ("'[A] use restriction may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial government purpose'") (quoting *Nollan v. Cal. Coastal Com*, 483 U.S. 825, 834 (1987)). The Board's actions will not further any legitimate public purpose. Indeed, the entire purpose of the Exemption was to increase new residential rental construction in New Jersey. Exemption Statute § 2A:42-84.5. Arbitrarily revoking the Exemption operates in direct opposition to the stated reason of the New Jersey legislature for enacting it.

82. The economic impact on Portside also weighs in favor of finding a taking. The Exemption provides Portside with the ability to offer rental apartments at the market rate; a right

18

that is worth millions of dollars.  The Board's decision will completely deprive Plaintiffs of the value of the Exemption and completely eliminate Plaintiffs' right to obtain market rent.  *See Cienega Gardens v. United States*, 331 F.3d 1319, 1344 (Fed. Cir. 2003) (finding a taking where the plaintiff's loss of its right to an economic benefit was "both total and immediate.").

83.     The Board's actions also interfere with Portside's reasonable investment-backed expectations.  Portside reasonably expected that the City would continue to treat the buildings as exempt from the Ordinance, as it had for decades.  As reviewed above, Portside made filings with the City indicating that the buildings were exempt, disclosed to tenants that the buildings were exempt, and paid into public funds based on market-based rental revenues.  Given that long course of conduct and the City's acceptance of it, it was reasonable for Portside to expect the government to continue accordingly.  *See Om 309-311*, 2022 WL 855769, at *15.

84.     Portside relied on its reasonable expectation of continued exemption in many material ways.  Portside relied on the Exemption when it initially purchased Portside Towers, knowing that, based on their construction dates, the buildings would be exempt from rent control.  *See Cienega Gardens*, 331 F.3d at 1346 (holding that because reliance on the right to enjoy the property interest in question was "essential" factor to plaintiff's decision to invest, removing that property interest impeded upon plaintiff's investment-backed expectations).  Portside continued to rely on the Exemption when it invested in Portside Towers and made capital improvements to the buildings, as Portside expected the Exemption would allow it to receive a favorable return on those investments.  And Portside relied on the Exemption when offering its lease agreements to its tenants for nearly 30 years, disclosing in each one that the buildings were exempt from rent control.

19

85.     Accordingly, the Board, by applying the rent control provisions of the Ordinance to Portside and prohibiting it from exercising its rights under the Exemption, has effected a regulatory taking in violation of the United States and New Jersey Constitutions.

**B.      The Ordinance Violates The Takings Clauses By Diminishing The Value Of Portside Towers Without Compensation**

86.     Plaintiffs repeat and reallege paragraphs 1 through 85 of the foregoing allegations as if fully set forth herein.

87.     If, as the Board held, the Ordinance is deemed to apply to Portside Towers, then the Ordinance and the Board's decision will deprive Portside of its property without compensation, including by depriving Portside of the full value of its investment in Portside Towers.

88.     Each *Penn Central* factor weighs against the government here.  As discussed, the Board's action was unexpected, retroactive, and will not further a legitimate public purpose.  Any market participant considering an investment in building rental housing in Jersey City will second-guess that choice if the State-law Exemption can be retroactively taken away.  Companies such as Plaintiff will be disincentivized from investing in and operating apartment buildings in Jersey City if they too may be deprived of benefits promised to them based on a disputed technicality.

89.     If the Board's decision stands, Portside will also be materially economically impacted, as it will lose the ability to charge a reasonable rent consistent with the needs of its properties.  The Board's decision will limit Portside's ability to increase rents to the lesser of (a) 4% or (b) the percentage difference between the consumer price index three months prior to the expiration or termination of the lease and three months prior to the commencement of the lease term.

90.     The Board's decision will therefore create an exponentially-expanding gap between the permitted rental income for the buildings and the fair market rent for the buildings.

91.     That economic impact is immediate and permanent.  It will deprive Portside of a substantial portion of the value of its property.  *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987) ("[O]ur test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property. . . .").

92.     The Board's actions, too, interfere with Portside's investment-backed expectations in its investment in Portside Towers.  Portside invested significant capital in purchasing and improving Portside Towers.  Portside has legitimate expectations based on the value of its property for which it can derive a fair market return on the value of its property and on its investments in that property.  Applying the Ordinance to Portside will deprive Portside of a fair return on its property and investments.

93.     As the Supreme Court recognized in *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001), market expectations are based upon fair market values, not historical costs or the value of a property under regulation.  *Id.* at 625 (confirming that "[w]hen a taking has occurred . . . the owner's damages will be based upon the property's fair market value. . . ." (citing *Olson v. United States*, 292 U.S. 246, 255 (1934)).

94.     "The 'investment-backed expectations' that the law will take into account do not include the assumed validity of a restriction that in fact deprives property of so much of its value as to be unconstitutional." *Id.* at 637 (Scalia, J., concurring).

95.     Thus, Portside has a reasonable expectation that it will receive a rate of return commensurate with the current market value of the land and buildings.  Indeed, Portside has acted in reliance on this expectation in significant and material ways, through investing in and improving Portside Towers for decades.  The Board's decision will completely interfere with and preclude Portside from achieving those expectations.

21

96.     Accordingly, the application of the Ordinance to Portside and the deprivation of Portside's right to a fair return in its investment in Portside Towers effects a regulatory taking in violation of the United States and New Jersey Constitutions.

**C.      The Board's Decision And The Ordinance Violates The Takings Clauses By Enacting A Physical Taking Of Portside's Property**

97.     Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

98.     Under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), and *Yee*, the Board's enforcement of the Ordinance on Portside will constitute a physical taking of Portside's property as a matter of law because Portside will be unable to prevent unwanted tenants from physically occupying its land – "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Cienega Gardens*, 331 F.3d 1319, 1338 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 177 (1979)).

99.     Portside never would have acquired or operated these properties if it were required to do so under rent control.  By forcing it to operate on unacceptable terms, the Board's decision has resulted in thousands of tenants occupying Portside's property even though Portside did not and would not have agreed to permit them on its property under those terms.

100.    Accordingly, the Ordinance's deprivation of Portside's ability to exclude people from its property effects a physical taking in violation of the United States and New Jersey Constitutions.

**COUNT II**
**THE ORDINANCE VIOLATES THE DUE PROCESS CLAUSES**
**OF THE UNITED STATES CONSTITUTION AND NEW JERSEY CONSTITUTION**

101.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

102.    The Due Process Clauses of the United States and New Jersey Constitutions protect all persons from arbitrary and capricious government action that lacks a nexus to a public purpose and deprives any person of its property.

103.    The Due Process Clause of the United States Constitution provides that no state may "deprive any person of life, liberty, or property, without due process of law. . . ."  U.S. Const. amend. XIV, § 1.

104.    The New Jersey Constitution guarantees that all persons "have certain natural and unalienable rights" including the fundamental right of "acquiring, possessing, and protecting property. . . ."  N.J. Const. art. I, ¶ 1.

105.    The Board has purported to strip Portside of the Exemption and of its right to charge market rents without due process.  Requiring a property owner to prove that a notice was sent decades in the past by a predecessor owner, upon pain of retroactively losing a valuable legal right, violates due process.  Portside did not receive a fair opportunity to prove its entitlement to the Exemption, including because the City's own construction official told Portside not to send him notices and because the City treated Portside as if it had complied with the Ordinance for decades.

106.    The retroactive nature of this liability constitutes an especially egregious due process violation.  *See General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) ("Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions.")

107.    The application of the Ordinance and the deprivation of the Exemption as to Portside– both unexpected and retroactive – violate the Due Process clauses of the United States and New Jersey Constitutions.

23

## COUNT III
## THE ORDINANCE VIOLATES THE CONTRACTS CLAUSES
## OF THE UNITED STATES CONSTITUTION AND NEW JERSEY CONSTITUTION

108.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

109.    The Contracts Clause of the United States Constitution provides: "No state shall . . . pass any . . . Law impairing the Obligation of Contracts. . . ."  U.S. Const., art. I, Sec. 10.

110.    The Contracts Clause of the New Jersey Constitution provides: "The Legislature shall not pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made."  N.J. Const., art. VII, ¶ 3.

111.    To establish a Contracts Clause violation, a plaintiff must show that a law impairs an existing contractual obligation and that the law is not "reasonable and necessary to serve an important public purpose."  *United States Trust Co. v. New Jersey*, 431 U.S. 1, 17, 25 (1977).

112.    As to lease agreements, and especially with rent control ordinances, "to sustain the retroactive application of a rent control ordinance that exists with existing contract rights, the legislation must have a strong rational public purpose."  *South Hamilton Assocs. V. Morristown*, 99 N.J. 437, 445 (1985).  In other words, for the government to override the agreement to apply market-based rents, which has been embedded in Portside's leases for decades, it must prove that there was very good reason.

113.    Each lease between Portside and its tenants in Portside Towers contains a Rent Control Addendum, which states that the building is "exempt from the provisions of any rent control ordinances instituted by Jersey City or West New York" and that it "will be exempt from any future rent control, rent stabilization, or rent leveling ordinance instituted by these

24

municipalities for a period of thirty years following the completion of construction at the [building]."

114.    These Rent Control Addenda state that they are "dated and effective as of the date" of the lease, "attached and made part of" the lease, and "made by and between Lessor and Resident for the Premises at the [building] identified in the Lease."  These addenda are part and parcel of the lease agreement signed by all new tenants and renewed each year by all existing tenants at Portside Towers.

115.    Those agreements were valid under state law.  As discussed above, the Exemption Statute permits Portside to charge market-based rents.  Portside and its tenants have contractually agreed for nearly 30 years that Portside is covered by the Exemption.  Depriving Portside of the Exemption and applying the Ordinance now, decades later, will deprive Portside and its tenants of their fairly bargained for contractual rights in violation of the Contracts Clauses of the United States and New Jersey Constitutions.

## COUNT IV
### THE ORDINANCE IS UNLAWFULLY CONFISCATORY UNDER NEW JERSEY LAW

116.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

117.    The Supreme Court of New Jersey has recognized that a rent control scheme that does not allow an owner's return to keep pace with inflation is confiscatory and invalid.

118.    Here, the Ordinance limits rental increases at the lesser of (a) 4% or (b) the percentage difference between the consumer price index three months prior to the expiration or termination of the lease and three months prior to the commencement of the lease term.  Yet considering inflation rates in recent years, prices have and will likely continue to increase on

25

average by more than 4% annually, so that the dollar amount of the permissible rent increase will be less than the increase of inflation. Therefore, every year under the Ordinance, Portside will receive a declining rate of return on the value of Portside Towers.

119. In *Helmsley v. Borough of Ft. Lee*, 78 N.J. 200 (1978), a 2.5% limit on rent increases coupled with 5 years of expense increases at a 6% rate was found to result in an annual reduction in net operating margin and net income and was therefore confiscatory and facially invalid. *Id.* at 598. Here, the limit on rent increases, which can only ever reach 4% at the highest, is similarly confiscatory.

120. At present, Portside expends significant revenue it receives on operating expenses and other expenditures that are necessary to maintain and improve Portside Towers.

121. Accordingly, the Ordinance is unlawfully confiscatory and is invalid under New Jersey law.

## COUNT V
## VIOLATION OF N.J.S.A. § 2A:42-84.2 AND PREEMPTION BY SAME

122. Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

123. "Preemption is a judicially created principle based on the proposition that a municipality, which is an agent of the State, cannot act contrary to the state." *Overlook Terrace Mgmt Corp. v. Rent Control Bd.*, 71 N.J. 451, 461 (1976).

124. The New Jersey Supreme Court has set forth "[p]ertinent questions for consideration in determining applicability of preemption." Those are whether (1) the ordinance conflicts with state law; (2) the state law was intended to be exclusive in the field; (3) the subject matter reflects a need for uniformity; (4) the state scheme is "so pervasive or comprehensive that

26

it precludes coexistence of municipal regulation"; and (5) the ordinance stands as an obstacle to executing the state legislature. *Id.* at 461-62.

125.    Here, the Exemption Statute mandates that local rent control ordinances "shall not apply" to buildings constructed after 1987.  N.J.S.A. § 2A:42-84.2.  Additionally, the legislative intent behind the Exemption Statute, noted at 2A:42-84.5, makes it clear that the state legislature intended for the Exemption to be mandatory to those that qualify.  The statute provides that the legislature "deems it necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey," and therefore it enacted this statute "to exempt new construction of rental multiple dwelling units from municipal rent control." Exemption Statute § 2A:42-84.5.

126.    The Exemption Statute also expressly forbids municipalities from taking any action "to limit, diminish, alter or impair any exemption afforded pursuant to [the statute]."  Exemption Statute at 2A:42-84.5.  Clearly, then, the legislature intended that state law govern this field and that municipal law not interfere.  *See Block 268, LLC v. City of Hoboken Rent Leveling & Stabilization Bd.*, 401 N.J. Super. 563 (2008) (finding that N.J.S.A. 2A:42-84.1 *et seq.* pre-empts municipalities from enforcing a rent control ordinance against plaintiff because "the language of the Act makes it clear that the Board may not limit or impair the exemption of multiple Dwellings constructed after the effective date of the Act.")

127.    The Board's decision, which held that Portside must prove that it sent a notice to a construction official nearly thirty years ago in order to enjoy the Exemption, violates and is preempted by the Exemption Statute, which has no such requirement.

128.    The Jersey City Ordinance is also preempted by the Exemption Statute, as it purports to require compliance with notice provisions as a prerequisite to enjoying the Exemption.

27

Ordinance § 260-6(c).  This is exactly the type of action to "limit, diminish, alter or impair" the Exemption that is prohibited by the Exemption Statute.  N.J.S.A. § 2A:42-84.5.

129.    Nothing in the Exemption Statute indicates that compliance with notice provisions is a condition precedent to obtaining the Exemption.  Nothing in the Exemption Statute authorizes municipal officials to investigate compliance with purported notice requirements or to determine whether a property owner qualifies for the Exemption.  Nor does anything in the Exemption Statute permit municipal officials to retroactively revoke the Exemption.

130.    Accordingly, the Board is preempted from enforcing the notice requirements as conditions precedent to the Exemption, and the Exemption must still apply to Portside.  The Board's holding to the contrary is preempted and violates the Exemption Statute.

## COUNT VI
## CLAIM IN LIEU OF PREROGATIVE WRIT

131.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

132.    Upon determination by the Rent Leveling Board, either party may appeal the decision to a court of competent jurisdiction.  Ordinance § 260-13.  The process for doing so is a complaint in lieu of prerogative writ.  N.J. Ct. R. 4:69-6(a).

133.    Pursuant to a complaint in lieu of a prerogative writ, courts review the factual determinations of municipal boards for whether they were arbitrary, capricious, or unreasonable. *Fallone Properties, L.L.C. v. Bethlehem Tp. Planning Bd.*, 369 N.J. Super. 552, 560 (Super. Ct. App. Div. 2004).  Legal determinations are not entitled to deference and are reviewed de novo. *Id.* at 561; *Nuckel v. Borough of Little Ferry Planning Bd.*, 208 N.J. 95, 102 (2011).

134.    The Board's decision regarding Portside was arbitrary, capricious, and wrong as a matter of law in multiple respects:

28

a.       The Board misapplied the Exemption Statute, including because the statute does not provide that notices are a condition precedent to eligibility for the Exemption. The Exemption Statute also does not require a property owner to prove, decades after the fact, that it provided such notices.

b.       The Board further misapplied the Exemption Statute by holding that Portside had not provided sufficient notice of its rent control exemption.  Specifically, the Board was incorrect as a matter of fact in rejecting the Rent Board Administrator's findings that the 1994 notice regarding 100 Warren was sufficient and that the two towers should be treated as one property for purposes of the exemption.  Additionally, the Board's decision to require a property owner to locate a notice nearly 30 years after the fact, where the conduct of the City and the tenants reflects an understanding that the exemption applied, is particularly outlandish.

c.       The Board erroneously interpreted the City's Ordinance as superseding the state Exemption and/or conflated the requirements of the Ordinance with the state Exemption Statute.

d.       The Board failed to apply the State Exemption provision mandating that no local government may diminish the State Exemption.

e.       The Board also failed to take into consideration the substantial evidence that the City and the Board treated Portside Towers as exempt from rent control for decades, with the City enjoying many years of payments from Portside Towers based on market rents.  Those facts estop the City and the Board from taking the position that Portside Towers is retroactively not eligible for the Exemption or the Local Exemption.

f.     The Board failed to provide any deference or even meaningful consideration to the Rent Leveling Administrator, who determined that sufficient notice of the exemption was given to the City.

g.     The Board failed to apply the doctrine of substantial compliance in connection with the Exemption or the Local Exemption, particularly given that every tenant was indisputably provided actual notice, the City has been on notice of the exemption for three decades, the City's official informed the property owner not to send him notices, and the City would not have acted differently had further notice been provided.

h.     The Board failed to apply the doctrine of laches to these actions notwithstanding that they were first brought nearly 30 years after the events at issue and notwithstanding that Portside was prejudiced by the passage of time with respect to its ability to locate relevant evidence including evidence related to whether notice was given decades before.

i.     The Board acted arbitrarily, capriciously, unreasonably, and contrary to law in ordering a six year "look back" period when the relevant limitation period under the Ordinance would allow for a two year "look back" period at most.

j.     The Board failed to give more than perfunctory consideration to this matter, as reflected by the transcript and video of the relevant proceedings, all of which are incorporated herein by reference.

k.     The Board acted contrary to law in interpreting the Ordinance in a manner that would render it unconstitutional under the Due Process Clauses, Contract Clauses and Takings Clauses of the United States and New Jersey Constitutions.

l. The Board failed to consider that any alleged failure to provide notice to the relevant construction official was harmless in light of the fact that the buildings indisputably qualified for rent control and that there was no evidence that the municipality or construction official would have taken any different action based upon further notice.

m. The Board failed to apply the doctrines of waiver and estoppel to the conduct of the City, notwithstanding that the relevant municipal official informed the property owner not to send further notice, the municipality accepted the financial benefits of the Exemption for nearly thirty years, and the municipality failed to contest the applicability of the Exemption and Local Exemption until it had received the full benefits of the Exemptions both through the construction of the buildings and through increased payments to the municipality under the PILOT program.

n. The Board failed to consider that all residents voluntarily agreed to pay the market rents and continuously paid the applicable rents for nearly thirty years.

o. The Board acted arbitrarily, capriciously and unreasonably by terminating the Exemption retroactively on pretextual grounds and by thereby transferring the owner's property to a local political constituency when doing so has no reasonable connection to any appropriate public purpose.

**COUNT VII**
**DECLARATORY JUDGMENT**

135. Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

136. For the reasons set forth above, there exists an actual controversy between Portside, the Board, and the City concerning the rights of Portside with respect to the Exemption, the Local Exemption, and the ability to charge market-based rents for its real estate.

31

137.   The Court should adjudicate the rights of Portside and declare the following:

a.   Portside is entitled to set market rents pursuant to the Exemption.

b.   The Board may not prevent Portside from acting in accordance with the Exemption.

c.   The Board may not enforce the Ordinance's rent control provisions against Portside.

d.   The Board may not direct the Bureau to adjust rents at Portside Towers based on the Ordinance, nor compel Portside to adjust its rents, either prospectively or retroactively.

e.   In the alternative, if the Ordinance is deemed to apply to Portside Towers, the maximum "lookback period" that may be enforced by the Board is two years, under Ordinance § 260-7(C) & (D).

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully demands judgment herein, including for declaratory and injunctive relief, along with the award of monetary damages and just compensation for the taking of its property in an amount to be proven at trial; for reasonable attorneys' fees, costs, and expenses pursuant to all applicable rules, statutes, and law; and for any such additional and further relief as is just and proper.

Dated:   November 10, 2023

Respectfully submitted,

The Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC

By:   /s/ Derek D. Reed

32

*Attorney for Plaintiffs The Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC*

Derek D. Reed, Esq. (Attorney ID # 038062003)
Jeffrey Plaza, Esq.
EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED
A Professional Corporation
60 Park Place, Suite 1016
Newark, New Jersey 07102
(973) 643-0040


Terri L. Mascherin (pro hac vice to be submitted)
Andrew W. Vail (pro hac vice to be submitted)
Daniel J. Weiss (pro hac vice to be submitted)
JENNER & BLOCK LLC
353 North Clark Street
Chicago, Illinois  60654
Phone:  (312) 222-9350
Facsimile:  (312) 840-7375

*Attorneys for Plaintiffs*

33

Case 2:23-cv-22291-MCA-JRA Document 46-2 Filed 07/09/24 Page 50 of 273 PageID: 1304

# EXHIBIT A

Case 2:23-cv-22209-MCA-JRA   Document 46-2   Filed 07/09/24   Page 51 of 273
PageID: 1305

# CITY OF JERSEY CITY

**Department of Housing, Economic Development and Commerce**
**Division of Housing Preservation**
**Office of Landlord/Tenant Relations**

**Steven M. Fulop**
**Mayor**

342 MARTIN LUTHER KING DRIVE • JERSEY CITY, N.J 07305
PHONE: (201) 547-5127

---

### Notice of Rent Leveling Bureau Determination

**Tenant Petition:** Petitions on the list attached

**Tenant:** Tenants residing at 155 Washington Street on the list attached[1]

**Landlord:** Portside Urban Renewal LLC, owner, c/o Equity Residential Management, LLC, agent, c/o Jennifer L. Alexander, Esq., Griffin Alexander, P.C., 415 Route 10, 2nd Floor Randolph, NJ 07869

**Tenant's Petition:** On various dates commencing in June 2022, the Office of Landlord/Tenant Relations Bureau of Rent Leveling (the "Bureau") received Illegal Rent Petitions signed by the Tenants residing in various apartments as listed on the attached list, (the Tenants names are not included on the list to avoid providing personal identifiers in this document), in which the Tenants ask the Bureau to determine whether the rent increases for their apartments at 155 Washington Street, Jersey City (the "Property" or "155 Washington")[2], comply with the Jersey City Rent Control Ordinance, Chapter 260 of the Municipal Code, (the "Ordinance"). The Petitions have been served on the Landlord by the Tenants and were sent via email to the Landlord by the Bureau on various dates shortly after receipt of the Petition by the Bureau.

**Landlord's Response:** The copies of the Petitions that were sent to the Landlord by the Bureau included an email which stated that a response, if any, was to be submitted to the Tenants and the Bureau.  While the names of the Tenants, the tenancy commencement dates, rents, rent increases, and the apartment numbers differ, the issue in connection with all of the Petitions is essentially the same.  The question raised is whether the 155 Washington is subject to the rent restrictions of the Ordinance. The Landlord's response, through its attorney, Jennifer L. Alexander, Esq. of Griffin Alexander, P.C., consisted of a letter brief and a copy of the Tenants' lease agreements and Truth in Renting Statements and a supplemental response which contained additional documentation, specifically a copy of a Certificate of Occupancy ("CO") for 100 Warren dated August 25, 1992,[3] (Appendix 1), a "Letter of Exemption" dated November 23, 1994, (Appendix

---

[1] These are tenants who have filed Illegal Rent Petitions and have been served with the Landlord's response.

[2] The Property is designated on the tax map as Block 15902 Lot 1 (formerly Block 60 Lot 34) and includes the two multiple dwellings (the "Towers").  These are referred to as Portside Towers with street addresses of 100 Warren Street ("100 Warren") and 155 Washington Street.

[3] For ease of reference, documents relied on in this Determination are annexed in the enclosed Appendix.

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 2


2), a Certificate of Continued Occupancy ("COO") for 100 Warren dated January 24, 1995, (Appendix 3), and a CO for 155 Washington dated December 31, 1997, delineated as 1 Washington on the CO (the street address was subsequently changed to 155 Washington). (Appendix 4).

**Discussion**: The Ordinance provides in §260-3 that multiple dwellings with five or more residential housing spaces are subject to rent regulation.  155 Washington consists of 297 units. Due to the size of this multiple dwelling, the building is presumed to be rent controlled. However, there are exemptions to the rent restrictions of the Ordinance.  The exemption that is relevant here is an exemption pursuant to State law which is set forth in the Ordinance at §260-6C where the Ordinance references the exemption for new construction as required by State law, N.J.S.A. 2A:42-84.1 et seq.  As regards this exemption, the Ordinance provides in §260-6C:

> In accordance with N.J.S.A. 2A:42-84.1 et seq., L. 1987, c. 153, the provisions of this chapter shall not apply to a new dwelling which is constructed between June 25, 1987, through June 25, 1992, and which is not constructed for occupation by senior citizens, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the dwelling, or for 30 years following completion of construction, whichever is less. This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4 and the service of a written statement upon the tenant required by N.J.S.A. 2A:42-84.3.

N.J.S.A. 2A:42-84 is titled "State Exemption for New Construction" (the "Statute").  The limitation of the exemption from June 25, 1987 through June 25, 1992 was extended several times and the Statute currently provides in 2A:42-84.5b, "Although this legislation was initially made effective only for a temporary five-year period, it was expanded for a second five-year period by P.L.1992, c.206 until 1997, and then in that year made permanent by P.L.1997, c.56." The reason for the extension and the final change making the exemption permanent, is also set forth in the Statute which explicitly explains the legislative purpose as follows: "The Legislature deems it to be necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey."

There are certain requirements for multiple dwellings seeking the statutory exemption and the question before the Bureau is whether the Landlord has met these requirements.  The Statute provides in 2A:42-84.3:

> The owner of any multiple dwelling exempted from a rent control or rent leveling ordinance pursuant to this act, shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period. Each lease offered to a prospective tenant for any dwelling unit therein during the period the multiple dwelling is so exempted shall contain a provision notifying the tenant of the exemption.

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 3

In addition, the Statute provides in 2A:42-84.4:

> The owner of any multiple dwelling claiming an exemption from a rent control
> or rent leveling ordinance pursuant to this act shall file with the municipal
> construction official, at least 30 days prior to the issuance of a certificate of
> occupancy for the newly constructed multiple dwelling, a written statement of
> the owner's claim of exemption from an ordinance under this act, including
> therein a statement of the date upon which the exemption period so claimed
> shall commence, such information as may be necessary to effectively locate
> and identify the multiple dwelling for which the exemption is claimed, and a
> statement of the number of rental dwelling units in the multiple dwelling for
> which the exemption is claimed.

It is undisputed that the Landlord has met the first criteria as set forth in 2A:42-84.3. The Tenants' lease and lease renewals all contain a "<u>RENT CONTROL ADDENDUM</u>", (Appendix 5), the title of which is prominently written in capital letters and underlined. The Addendum states as follows:

> This Rent Control addendum ("Addendum") is dated and effective as of
> the date on the Residential Lease – Term Sheet (the "Term Sheet") to which
> this Addendum is attached and made a part of (the "Lease") and is made by
> and between Lessor and Resident for the Premises at the Community identified
> in the Lease.
>
> Pursuant to N.J.S.A. 2A:42-84.3, we hereby notify you that the Premises
> and the Community are exempt from the provisions of any rent control
> ordinances instituted by Jersey City or West New York, as the case may be,
> and said Premises and Community will be exempt from any future rent control,
> rent stabilization or rent leveling ordinance instituted by these municipalities
> for a period of thirty years following the completion of construction at the
> Community.

The Rent Control Addendum provided the Tenants with the notice required by the Statute.

The question remains whether the Landlord complied with the requirements of the Statute set forth in 2A:42-84.4 which requires that a written statement of the owner's claim be sent to the municipal construction code official 30 days prior to the issuance of the CO. It is readily apparent that the relevant records are 30 +/- years old. Both parties have made diligent efforts to obtain these records as have several city departments. It seems that several significant documents, were not located and produced in response to the OPRA requests filed by the parties but were found sometime later in response to continued searches by the Division of the Construction Code Official. And, one document, the COO for 100 Warren dated January 24, 1995, (Appendix 3), was located by the Landlord and not the City. In short, we cannot be certain that all of the records have been found. It is therefore critical that I consider all of the circumstances in addition to those documents that have been located in rendering a decision.

As acknowledged by the parties, 155 Washington is one of two multiple dwellings (the

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 4

"Towers") that make up Portside Towers.  The CO was issued on December 31, 1997, (Appendix 4), five years after the CO for the other Tower, 100 Warren (Appendix 1) and was occupied approximately two years after the Tower at 100 Warren was first occupied.  (Appendix 2).   While no letter to the Construction Code Official in connection with 155 Washington has been located, there is correspondence from the developer at the time to the Construction Code Official in connection with 100 Warren.  On November 23, 1994, Portside Apartments Urban Renewal Partners, L.P., ("Portside") sent a letter to the City Construction Code Official, Michael Regan, in which Portside claimed an exemption from rent control pursuant to N.J.S.A. 2A:42-84.1 *et. seq.*, for 229 [sic] units which "shall commence on the anticipated date of initial occupancy, January 1, 1995." (Appendix 2).  The CO for 100 Warren was issued approximately two years earlier on August 25, 1992. (Appendix 1). In a decision entered contemporaneously with this Determination, I found that the November 23, 1994 letter satisfied the statutory requirement of notice to the construction code official despite the delay in requesting the exemption.[4]

It is clear from this letter that Portside, the owner/developer, was aware of the statutory requirement that the Construction Code Official be notified of the claimed exemption.  Portside was not the owner at the time the CO for 100 Warren was issued in August 1992 and, evidently the owner at that time did not apply for the exemption because the intention was to have condominiums, not rentals, in the building.  When that did not happen and the Property came out of foreclosure with a new owner/developer, the letter was sent asserting the exemption. This is noteworthy because, in December 1997 when the CO for 155 Washington was issued, Portside was still the owner/developer.  What is also noteworthy is the fact that the Construction Code Official at the time of Portside's letter, Michael Regan, was unaware of the requirements of the Statute.  On December 6, 1994, he responded to Portside acknowledging receipt of its November 23, 1994 letter.  He wrote, "Please be advised that the Office of Construction Official has no jurisdiction over rent controls and I would suggest that you contact the proper agency charged with that responsibility." (Appendix 8).  Michael Regan was the Construction Code Official in December 1997; he signed the CO for 155 Washington on December 31, 1997.

To date, no letter to the Construction Code Official in connection with the requested exemption from rent control for 155 Washington has been located but that does not mean that one was not sent.  Portside was aware of the Statute and its requirements in November 1994 even if the Construction Code Official at the time, Michael Regan, was not.  It is as likely as not that three years later, with the issuance of the CO for 155 Washington, another request for exemption was sent.  Perhaps, in light of Mr. Regan's December 6, 1994 letter, it was sent to some other City agency.   What is clear, as set forth in detail below, is that 155 Washington was owned by the same owner as 100 Warren and these Towers were managed as one development.  The

---

[4] The Landlord explained the delay between the issuance of the CO and the initial occupancy of 100 Warren.  At the time of the issuance of the CO for 100 Warren, the building was not open to residents. The development was intended as a condominium development but evidently because of economic difficulties, the Property went through foreclosure.  The Landlord's statement is consistent with the recorded Sherriff's Deed dated November 23, 1994, pursuant to which Portside became the new owner/developer of the Property.  (Appendix 6). The letter sent to the Construction Code Official dated the same day, November 23, 1994, was sent more than 30 days before the initial occupancy.

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 5

Tenants were aware that this was one development.  Equally important, the City was aware that this was one development comprised of two newly constructed multiple dwellings.  The statutory requirement of notice to the "construction code official" is meant to provide notice to the city official who is in a position to confirm that the dwelling meets the statutory definitions: that the dwelling is "constructed" (not rehabilitated), is a "multiple dwelling" (contains four or more dwelling units), and that the construction has been "completed" (a CO has been issued).  That 155 Washington meets these criteria is undisputed.

The City was aware of the construction of the two Towers of Portside Towers, 100 Warren and 155 Washington, which are on the same tax block and lot and are part of the same development plan, owned and managed by the same owner.  This is confirmed in several documents.  As early as July 1992, the City was a party to a Developer's Agreement (the "Agreement") dated July 23, 1992.  The Agreement describes the development of the property "known as Block 60 Lot 34" and the progress of construction as of that date.  The site was to include "a mixed residential complex including 525 residential units in two highrise [sic] buildings" and references testimony confirming that 230 units had been completed as of the date of the Agreement. (Appendix 7).  One month later, on August 25, 1994, the CO for 100 Warren was issued for 230 units, (Appendix 1), and on December 31, 1997 the CO for 155 Washington was issued confirming the "construction of 25 story building as per approved plans." (Appendix 4).

Thereafter, in November 1999, the Tidewater Basin Redevelopment Plan (the "Plan") was adopted.  (Appendix 9).  The Plan contains the "Portside District" described as, "partially developed as *Portside*, a mixed-use development consisting of a maximum of 527 dwelling units…"  In addition, the Landlord Registration Statements[5] (the "Registrations") filed with the Bureau from 2017 – 2021 include 527 as the unit count indicating that these Registrations were meant to cover both Towers, 155 Washington and 100 Warren.  From 2017 – 2019, until the format of the form was changed (as explained in detail below), the Registrations stated that the Property (consisting of 527 units) is exempt from rent control.  It is clear that Portside Towers, owned by the same entity, is treated and managed as one property.  From the start, the Tenants residing at 155 Washington have been advised that the building is not subject to rent control.

Given all of these circumstances, the fact that 155 Washington meets the statutory criteria of a newly constructed multiple dwelling, that the City was aware of this development and the Landlord's claim of exemption, and that the Tenants have been properly notified of the exemption in their lease and lease renewals, I must conclude that 155 Washington is exempt from the rent restrictions of the Ordinance for 30 years from the issuance of the CO, December 31, 1997, through December 30, 2027.  I note that no one has provided the initial mortgage financing.  This is not fatal to the Landlord's claim of exemption. In Block 268, LLC v. City of Hoboken Rent Leveling & Stabilization Bd., 401 N.J. Super. 563, 570 (App. Div. 2008), the court found that there was no requirement in the Statute for the owner to provide mortgage

---

[5] It seems that in the past, the Bureau did not always reach out to and obtain Registrations for those multiple dwellings that were exempt from rent control and, because the rents were not regulated, did not follow-up and obtain rent rolls for these properties despite the requirements of the Ordinance.  2017 is the earliest Registration in the Bureau files for the Property.

Case 2:26-cv-22291-MCA-JRA Document 146-2 Filed 07/09/24 Page 56 of 273 PageID: 1310

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 6

information.  The court referenced the Statute, specifically, 2A:42-84.6:

> [t]he Legislature . . . declares it to be public policy of this State that, within the limitations imposed by this act, the exemptions granted under this act shall not be limited, diminished, altered, or impaired during the period of exemption afforded.

Id. at 571.  The court noted that the record did not "reveal the terms of the mortgage, if any" and that in the event it is established that the amortization of the initial mortgage was less than 30 years, the "order may be amended accordingly."  Id. at 572-573.  Similarly, here the exemption is 30 years from the date of the CO unless a mortgage note is submitted proving that the amortization of the initial financing was less than 30 years.

The Landlord has argued that the Property is exempt because it is located in a redevelopment area, specifically the Tidewater Basin Redevelopment area.  The Ordinance does provide a rent control exemption for new construction in a redevelopment area.  This exemption is found as an exemption to the definition of dwelling in §260-1 as follows:

> Newly constructed dwellings with 25 or more dwelling units located within a redevelopment area as defined in Section 5 of the Redevelopment Agencies Law, N.J.S.A. 40:55C-5(o), for which the City Council has approved a redevelopment plan, in accordance with Section 17 of the Redevelopment Agencies Law, N.J.S.A. 40:55C-17.

While the Landlord is correct that the Property is within the Tidewater Basin Redevelopment Area, the Tidewater Basin Redevelopment Plan is dated November 10, 1999, several years after the Property was constructed and occupied. (Appendix 9).  Portside Towers is a "district" described in the Plan as containing 527 units (the total number of units in both Towers).  The Property was already constructed and occupied at the time of the Plan and therefore was not "new construction" as contemplated by this exemption in the Ordinance.  In fact, the Landlord recognized that the basis for the exemption was the Statute and not the exception for new construction in redevelopment areas as evidenced by the language of the Rent Control Addendum which alerts the Tenants to the exemption "[p]ursuant to N.J.S.A. 2A:42-84.3 … for a period of thirty years following the completion of construction at the Community."

The Tenants have raised several issues.  First, the Tenants point out that on some of the annual Registrations, the Landlord has indicated that the Property is not exempt from rent control. The Registration is a registration that the Landlord is required to file with the Bureau annually.  Landlords are asked to state whether the property is subject to rent control.  The format of the 2017 – 2019 Registrations asked the question of exemption in this way:

THIS PROPERTY IS ☐      IS NOT ☐ PRESENTLY UNDER RENT CONTROL

The Registrations for those years contain a check in the box next to "IS NOT" indicating that the Property, according to the Landlord, was not governed by rent control. (Appendix 10). The form was revised in 2020 and the current Registration asks the question, "Is the property you are registering currently under rent control?"  The 2020 – 2022 Registrations answer "yes".

Notice of Decision – Illegal Rent Petitions – 155 Washington Street
September 19, 2022
Page 7

(Appendix 10).  Perhaps it was a misreading of the form associated with the change in format that resulted in these answers but whatever the reason, the Landlord's response in the Registration is not dispositive of whether the Property is exempt from rent control.  What is relevant is whether the Property meets the criteria and the requirements of the Ordinance and the Statute.  As set forth in detail above, I find that 155 Washington did qualify and is exempt from rent control for 30 years, through December 30, 2027.

The Tenants have also relied on a recent unpublished opinion of the New Jersey Appellate Division, Willow Ridge Apts. v. Union City Rent Stabilization Bd., 2022 N.J. Super. Unpub. LEXIS 1232 *; 2022 WL 2525243.  The first page of the decision states prominently, "PLEASE CONSULT NEW JERSEY RULE 1:36-3 FOR CITATION OF UNPUBLISHED OPINIONS."  (Appendix 12).  Rule 1:36-3 provides, "No unpublished opinion shall constitute precedent or be binding upon any court."  So, while this decision might be informative, it is not binding on a court and not binding on the Bureau.  In any event, while Willow Ridge also involved the statutory exemption from rent control pursuant to N.J.S.A. 2A:42-84, the facts of this unpublished case are totally distinguishable from the facts here.  In Willow Ridge, there was no evidence that the owner ever applied for the statutory rent control exemption nor was there ever any notice to the tenants of the owner's claim that the building was exempt.  The CO for the multiple dwelling in Willow Ridge was issued in 2002 and no request for exemption was made until 2019 when the new owner argued that the building should be exempt.  Moreover, no tenants were ever notified of this claimed exemption during those 17 years.  The circumstances are very different here.  The CO for 155 Washington confirms that it met the statutory criteria of a newly constructed multiple dwelling.  The City was aware of the Portside Towers development (the City was a party to a Developer's Agreement (Appendix 7) and the 527 units of Portside Towers are specifically described in the Tidewater Basin Redevelopment Plan (Appendix 9)),  and was aware of the Landlord's claim of exemption by virtue of Portside's (the owner/developer of Portside Towers at the time) letter to the Construction Code Official of its claimed exemption over 30 days prior to the initial occupancy of 100 Warren, the first Tower to be constructed, and also by virtue of the Landlord's annual Registrations which were filed in connection with both Towers, all 527 units, and which stated that the Property was exempt from rent control. And, perhaps the most important distinction is that the Tenants here, unlike those in Willow Ridge, have been properly notified of the exemption in every lease and lease renewal.

To summarize, 155 Washington has been and remains exempt from the rent control restrictions of the Ordinance from December 31, 1997 through December 30, 2027 and the Bureau has no jurisdiction to review or make any findings regarding these rents.

**Final Determination –** 155 Washington is not subject to the Ordinance therefore the Bureau has no jurisdiction to review or make any findings regarding the rent or rent increases charged.

**Signature:** _____
                    Dinah Hendon, Rent Leveling Administrator

**Dated:** September 19, 2022

Case 2:23-cv-22291-MCA-JRA   Document 146-2   Filed 03/09/24   Page 9 Page 58 of 273 PageID: 1312

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 8

**Notice to Parties**

**This Bureau Determination may be appealed to the Rent Leveling Board by filing a Notice of Appeal with the Bureau within 15 days of receipt of this Determination, no later than October 7, 2022.**

A party appealing this Determination must include in the written notice of appeal:

    a) The decision (or part thereof) from which review is sought;

    b) The factual and legal basis for the appeal with citations to the record (ie - registration statements) considered by the Bureau in its determination.

    c) The notice of appeal must be served upon the other party.

    d) Except for good cause shown, no appeal shall rely upon any issue of fact or law or upon any documentary evidence not presented to the Bureau.

## 155 Washingington Street Petitions

(these Petititons have been responded to by the landlord on or before 9/19/22)

| File No. | | Unit # |
|---|---|---|
| R22-026 | 155 Washington Street | 2 |
| R22-029 | 155 Washington Street | 306 |
| R22-044 | 155 Washington Street | 2102 |
| R22-045 | 155 Washington Street | 1409 |
| R22-047 | 155 Washington Street | 1910 |
| R22-051 | 155 Washington Street | 2612 |
| R22-052 | 155 Washington Street | 2405 |
| R22-055 | 155 Washington Street | 1913 |
| R22-058 | 155 Washington Street | 1504 |
| R22-060 | 155 Washington Street | 1502 |
| R22-061 | 155 Washington Street | 1604 |
| R22-063 | 155 Washington Street | 1503 |
| R22-075 | 155 Washington Street | 1506 |
| R22-076 | 155 Washington Street | 1002 |
| R22-084 | 155 Washington Street | 1713 |
| R22-102 | 155 Washington Street | 903 |
| R22-121 | 155 Washington Street | 2101 |

The names of tenants have not been included to avoid providing
personal identifiers.

# EXHIBIT B

<table>
<tr><td></td><td></td></tr>
</table>

**Steven M. Fulop**
**Mayor**

# CITY OF JERSEY CITY

**Department of Housing, Economic Development and Commerce**
**Division of Housing Preservation**
**Office of Landlord/Tenant Relations**

342 MARTIN LUTHER KING DRIVE • JERSEY CITY, N.J 07305
PHONE: (201) 547-5127

---

### Notice of Rent Leveling Bureau Determination

**Tenant Petition:** Petitions on the list attached

**Tenant:** Tenants residing at 100 Warren Street on the list attached[1]

**Landlord:** Portside Urban Renewal LLC, owner, c/o Equity Residential Management, LLC, agent, c/o Jennifer L. Alexander, Esq., Griffin Alexander, P.C., 415 Route 10, 2nd Floor Randolph, NJ 07869

**Tenant's Petition:** On various dates commencing in July 2022, the Office of Landlord/Tenant Relations Bureau of Rent Leveling (the "Bureau") received Illegal Rent Petitions signed by the Tenants residing in various apartments as listed on the attached list, (the Tenants names are not included on the list to avoid providing personal identifiers in this document), in which the Tenants ask the Bureau to determine whether the rent increases for their apartments at 100 Warren Street, Jersey City (the "Property" or "100 Warren")[2], comply with the Jersey City Rent Control Ordinance, Chapter 260 of the Municipal Code, (the "Ordinance"). The Petitions have been served on the Landlord by the Tenants and were sent via email to the Landlord by the Bureau on various dates shortly after receipt of the Petition by the Bureau.

**Landlord's Response:** The copies of the Petitions that were sent to the Landlord by the Bureau included an email which stated that a response, if any, was to be submitted to the Tenants and the Bureau.  While the names of the Tenants, the tenancy commencement dates, rents, rent increases, and the apartment numbers differ, the issue in connection with all of the Petitions is essentially the same.  The question raised is whether the 100 Warren is subject to the rent restrictions of the Ordinance. The Landlord's response, through its attorney, Jennifer L. Alexander, Esq. of Griffin Alexander, P.C., consisted of a letter brief and a copy of the Tenants' lease agreements and Truth in Renting Statements and a supplemental response which contained additional documentation, specifically a copy of a certificate of Occupancy for 100 Warren dated August 25, 1992,[3]

---

[1] These are tenants who have filed Illegal Rent Petitions and have been served with the Landlord's response.

[2] The Property is designated on the tax map as Block 15902 Lot 1 (formerly Block 60 Lot 34) and includes the two multiple dwellings (the "Towers").  These are referred to as Portside Towers with street addresses of 100 Warren Street and 155 Washington Street.  The CO for 155 Washington dated December 31, 1997, delineated the street address as 1 Washington. The street address was subsequently changed to 155 Washington. (Appendix 4)

[3] For ease of reference, documents relied on in this Determination are annexed in the enclosed Appendix.

Notice of Decision – Illegal Rent Petitions – 100 Warren Street
September 19, 2022
Page 2

(Appendix 1), a "Letter of Exemption" dated November 23, 1994, (Appendix 2), and a Certificate of Continued Occupancy for 100 Warren dated January 24, 1995. (Appendix 3).

**Discussion**: The Ordinance provides in §260-3 that multiple dwellings with five or more residential housing spaces are subject to rent regulation.   100 Warren consists of 230 units. Due to the size of this multiple dwelling, the building is presumed to be rent controlled.  However, there are exemptions to the rent restrictions of the Ordinance.  The exemption that is relevant here is an exemption pursuant to State law which is set forth in the Ordinance at §260-6C where the Ordinance references the exemption for new construction as required by State law, N.J.S.A. 2A:42-84.1 et seq.  As regards this exemption, the Ordinance provides in §260-6C:

> In accordance with N.J.S.A. 2A:42-84.1 et seq., L. 1987, c. 153, the provisions of this chapter shall not apply to a new dwelling which is constructed between June 25, 1987, through June 25, 1992, and which is not constructed for occupation by senior citizens, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the dwelling, or for 30 years following completion of construction, whichever is less. This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4 and the service of a written statement upon the tenant required by N.J.S.A. 2A:42-84.3.

N.J.S.A. 2A:42-84 is titled "State Exemption for New Construction" (the "Statute").  The limitation of the exemption from June 25, 1987 through June 25, 1992 was extended several times and the Statute currently provides in 2A:42-84.5b, "Although this legislation was initially made effective only for a temporary five-year period, it was expanded for a second five-year period by P.L.1992, c.206 until 1997, and then in that year made permanent by P.L.1997, c.56." The reason for the extension and the final change making the exemption permanent, is also set forth in the Statute which explicitly explains the legislative purpose as follows: "The Legislature deems it to be necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey."

There are certain requirements for multiple dwellings seeking the statutory exemption and the question before the Bureau is whether the Landlord has met these requirements.  The Statute provides in 2A:42-84.3:

> The owner of any multiple dwelling exempted from a rent control or rent leveling ordinance pursuant to this act, shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period. Each lease offered to a prospective tenant for any dwelling unit therein during the period the multiple dwelling is so exempted shall contain a provision notifying the tenant of the exemption.

In addition, the Statute provides in 2A:42-84.4:

Notice of Decision – Illegal Rent Petitions – 100 Warren Street
September 19, 2022
Page 3

The owner of any multiple dwelling claiming an exemption from a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of exemption from an ordinance under this act, including therein a statement of the date upon which the exemption period so claimed shall commence, such information as may be necessary to effectively locate and identify the multiple dwelling for which the exemption is claimed, and a statement of the number of rental dwelling units in the multiple dwelling for which the exemption is claimed.

It is undisputed that the Landlord has met the first criteria as set forth in 2A:42-84.3.  The Tenants' lease and lease renewals all contain a "RENT CONTROL ADDENDUM", (Appendix 5), the title of which is prominently written in capital letters and underlined.  The Addendum states as follows:

This Rent Control addendum ("Addendum") is dated and effective as of the date on the Residential Lease – Term Sheet (the "Term Sheet") to which this Addendum is attached and made a part of (the "Lease") and is made by and between Lessor and Resident for the Premises at the Community identified in the Lease.

Pursuant to N.J.S.A. 2A:42-84.3, we hereby notify you that the Premises and the Community are exempt from the provisions of any rent control ordinances instituted by Jersey City or West New York, as the case may be, and said Premises and Community will be exempt from any future rent control, rent stabilization or rent leveling ordinance instituted by these municipalities for a period of thirty years following the completion of construction at the Community.

The Rent Control Addendum provided the Tenants with the notice required by the Statute.

The question remains whether the Landlord complied with the requirements of the Statute set forth in 2A:42-84.4 which requires that a written statement of the owner's claim be sent to the municipal construction code official 30 days prior to the issuance of the CO.  On November 23, 1994, Portside Apartments Urban Renewal Partners, L.P., ("Portside") sent a letter to the City Construction Code Official, Michael Regan, in which Portside claimed an exemption from rent control pursuant to N.J.S.A. 2A:42-84.1 *et. seq.*, for 229 [sic] units which "shall commence on the anticipated date of initial occupancy, January 1, 1995." (Appendix 2).  The CO for 100 Warren was issued approximately two years earlier on August 25, 1992. (Appendix 1).

The Landlord explains the delay between the issuance of the CO and the initial occupancy of 100 Warren.  At the time of the issuance of the CO for 100 Warren, the building was not open to residents.  The development was intended as a condominium development but evidently because of economic difficulties, the Property went through foreclosure.  The Landlord's statement is consistent with the recorded Sherriff's Deed dated November 23, 1994,

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 4

pursuant to which Portside became the new owner/developer of the Property.  (Appendix 6).  The letter sent to the Construction Code Official dated the same day, November 23, 1994, was sent more than 30 days before the initial occupancy.  This statutory requirement provides notice to the city official who is in a position to confirm that the dwelling meets the statutory definitions: that the dwelling is "constructed" (not rehabilitated), is a "multiple dwelling" (contains four or more dwelling units), and that the construction has been "completed" (that a CO has been issued).  The developer's letter identifies the Property by address and block and lot, references the statutory exemption, the number of units[4], and the commencement date of initial occupancy, January 1, 1995.  In the circumstances, I find that this letter satisfies the notification requirement of the Statute in 2A:42-84.4.[5]

The Landlord has met the requirements of the Ordinance and the Statute and therefore, 100 Warren was exempt from the rent restrictions in the Ordinance from the date of the CO, August 25, 1992 for 30 years to August 24, 2022.

With regard to the Landlord's position that the exemption runs from the date of the Certificate of Continued Occupancy (the "COO"), January 24, 1995, (Appendix 3), this is without merit.  The Statute is clear that the exemption runs "for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less."  "Completion of construction" is defined in the Statute and "means issuance of a certificate of occupancy" it does not mean occupancy.  The fact that the developer chose or was unable to commence renting the units at the time of the CO in August 1992 does not affect the commencement date of the exemption.

I note that no one has provided the initial mortgage financing.  This is not fatal to the Landlord's claim of exemption. In Block 268, LLC v. City of Hoboken Rent Leveling & Stabilization Bd., 401 N.J. Super. 563, 570 (App. Div. 2008), the court found that there was no requirement in the Statute for the owner to provide mortgage information.  The court referenced the Statute, specifically, 2A:42-84.6:

> [t]he Legislature . . . declares it to be public policy of this State that, within the limitations imposed by this act, the exemptions granted under this act shall not be limited, diminished, altered, or impaired during the period of exemption afforded.

Id. at 571.  The court noted that the record did not "reveal the terms of the mortgage, if any" and that in the event it is established that the amortization of the initial mortgage was less than 30

---

[4] The developer's letter incorrectly states the number of units as 229.  The CO states 204 apartments and 26 townhouses. There is also a Developer's Agreement between the City and the initial developer dated July 23, 1992, which references testimony confirming that 230 units had been completed as of the date of the agreement.  (Appendix 7). The error in the number of units as stated in the letter is inconsequential inasmuch as the City was aware that the number of units was 230, not 229.

[5] It seems that the Construction Code Official at the time of Portside's letter, Michael Regan, was unaware of the requirements of the Statute.  On December 6, 1994, he responded to Portside acknowledging receipt of its November 23, 1994 letter.  He wrote, "Please be advised that the Office of Construction Official has no jurisdiction over rent controls and I would suggest that you contact the proper agency charged with that responsibility." (Appendix 8).

Case 2:23-cv-22241-MCA-JRA   Document 46-2   Filed 07/09/24   Page 65 of 273
PageID: 1319

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 5

years, the "order may be amended accordingly." Id. at 572-573.  Similarly, here the exemption is 30 years from the date of the CO unless a mortgage note is submitted proving that the amortization of the initial financing was less than 30 years.

The Landlord has also argued that the Property is exempt because it is located in a redevelopment area, specifically the Tidewater Basin Redevelopment area.  The Ordinance does provide a rent control exemption for new construction in a redevelopment area.  This exemption is found as an exemption from the definition of dwelling in §260-1 as follows:

> Newly constructed dwellings with 25 or more dwelling units located within a redevelopment area as defined in Section 5 of the Redevelopment Agencies Law, N.J.S.A. 40:55C-5(o), for which the City Council has approved a redevelopment plan, in accordance with Section 17 of the Redevelopment Agencies Law, N.J.S.A. 40:55C-17.

While the Landlord is correct that the Property is within the Tidewater Basin Redevelopment Area, the Tidewater Basin Redevelopment Plan is dated November 10, 1999, several years after the Property was constructed and occupied. (Appendix 9).  Portside Towers is a "district" described in the Plan as containing 527 units (the total number of units in both Towers).  The Property was already constructed and occupied at the time of the Plan and therefore was not "new construction" as contemplated by this exemption in the Ordinance.  In fact, the Landlord recognized that the basis for the exemption was the Statute and not the exception for new construction in redevelopment areas as evidenced by the language of the Rent Control Addendum which alerts the Tenants to the exemption "[p]ursuant to N.J.S.A. 2A:42-84.3 … for a period of thirty years following the completion of construction at the Community." (Appendix 5).

The Tenants have raised several issues.  First, the Tenants point out that on some of the annual Landlord Registration Statements, the Landlord has indicated that the Property is not exempt from rent control. The Landlord Registration Statement (the "Registration") is a registration that the Landlord is required to file with the Bureau annually.  In connection with 100 Warren, the Bureau has two Registrations, one filed in 2021 and one filed in 2022.  There are earlier registrations filed under the 155 Washington address, the other Tower at Portside Towers.  It is clear that those Registrations were meant to apply to both Towers inasmuch as they are on the same block and lot and the Registrations state the number of units as "527", the total number of units in both Towers.  It seems that in the past, the Bureau did not always reach out to and obtain Registrations for those multiple dwellings that were exempt from rent control and, because the rents were not regulated, did not follow-up and obtain rent rolls for these properties despite the requirements of the Ordinance.  2017 is the earliest Registration in the Bureau files for the Property.  In 2021, the first year that a rent roll was supplied, the Registration for 155 Washington included a rent roll that included both Towers.

In the Registration, Landlords are asked to state whether the property is subject to rent control. The format of the 2017 – 2019 Registrations asked the question of exemption in this way:

Case 2:23-cv-22291-MCA-JRA Document 46-2 Filed 07/30/24 Page 66 of 273 PageID: 1320

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 6

THIS PROPERTY <u>IS</u> ☐     <u>IS NOT</u> ☐ PRESENTLY UNDER RENT CONTROL

The Registrations for those years contain a check in the box next to "IS NOT" indicating that the Property, according to the Landlord, was not governed by rent control. (Appendix 10). The form was revised in 2020 and the current Registration asks the question, "Is the property you are registering currently under rent control?"  The 100 Warren 2021 Registration an answered "no" and the 2022 Registration answered "yes".  (Appendix 11).  Perhaps it was a misreading of the form associated with the change in format that resulted in these answers but whatever the reason, the Landlord's response in the Registration is not dispositive of whether the Property is exempt from rent control.  What is relevant is whether the Property meets the criteria and the requirements of the Ordinance and the Statute.  As set forth in detail above, 100 Warren did qualify and has been exempt from rent control for 30 years, through August 24, 2022.

The Tenants have also relied on a recent unpublished opinion of the New Jersey Appellate Division, <u>Willow Ridge Apts. v. Union City Rent Stabilization Bd.</u>, 2022 N.J. Super. Unpub. LEXIS 1232 *; 2022 WL 2525243.  The first page of the decision states prominently, "PLEASE CONSULT NEW JERSEY RULE 1:36-3 FOR CITATION OF UNPUBLISHED OPINIONS."  (Appendix 12).  Rule 1:36-3 provides, "No unpublished opinion shall constitute precedent or be binding upon any court."  So, while this decision might be informative, it is not binding on a court and not binding on the Bureau.  In any event, while <u>Willow Ridge</u> also involved the statutory exemption from rent control pursuant to <u>N.J.S.A.</u> 2A:42-84, the facts of this unpublished case are totally distinguishable from the facts here.  In <u>Willow Ridge</u>, there was no evidence that the owner ever applied for the statutory rent control exemption nor was there ever any notice to the tenants of the owner's claim that the building was exempt.  The CO for the multiple dwelling in <u>Willow Ridge</u> was issued in 2002 and no request for exemption was made until 2019 when the new owner argued that the building should be exempt.  Moreover, no tenants were ever notified of this claimed exemption during those 17 years.  The circumstances are very different here where the owner of the Property notified the Construction Code Official of its claimed exemption over 30 days prior to the initial occupancy of 100 Warren and, more importantly, has notified the Tenants in every lease and lease renewal of the claimed exemption.

To summarize, the rents prior to August 24, 2022 were not governed by the Ordinance and the Bureau has no jurisdiction to review or make any findings regarding these rents.  Going forward, the rents charged are restricted by the Ordinance and may not be greater than the allowable CPI for the month.  The CPI for September 2022 is 6.7% and pursuant to the Ordinance, the maximum increase is the CPI or 4% whichever is less.  Therefore, to the extent increases in excess of 4% have been sent to the Tenants, these are allowed up to 4% and the lease renewals must be adjusted accordingly.  Late fees and similar charges must also comply with the Ordinance (§260-1) and may not be in excess of $35.00.  Going forward, lease renewals should not contain the Landlord's "Rent Control Addendum" and the Registrations should indicate that the 100 Warren is currently under rent control.

**Final Determination** – 100 Warren was not subject to the Ordinance therefore the Bureau has no jurisdiction to review or make any findings regarding the rent charged through August 24, 2022.  Going forward, 100 Warren is subject to the rent restrictions of the Ordinance.  To the

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 7

extent the Tenants have been sent notices of rent increases and/or lease renewals, these must comply with the rent restrictions of the Ordinance.  Further, to the extent rent increases for the month of September 2022 were charged and paid, the tenant must receive a rent credit or refund for amounts in excess of the allowed 4% rent increase.

**Signature:** _____

    Dinah Hendon, Rent Leveling Administrator

**Dated:** September 19, 2022

### Notice to Parties

**This Bureau Determination may be appealed to the Rent Leveling Board by filing a Notice of Appeal with the Bureau within 15 days of receipt of this Determination, no later than October 7, 2022.**

A party appealing this Determination must include in the written notice of appeal:

  a) The decision (or part thereof) from which review is sought;

  b) The factual and legal basis for the appeal with citations to the record (ie - registration statements) considered by the Bureau in its determination.

  c) The notice of appeal must be served upon the other party.

  d) Except for good cause shown, no appeal shall rely upon any issue of fact or law or upon any documentary evidence not presented to the Bureau.

## __100 Warren Street Petitions__

(these Petititons have been responded to by the landlord on or before 9/19/22)

| File No. | | Unit # |
|---|---|---|
| R22-034 | 100 Warren Street | 1807 |
| R22-035 | 100 Warren Street | 1205 |
| R22-065 | 100 Warren Street | 1401 |
| R22-074 | 100 Warren Street | 208 |
| R22-083 | 100 Warren Street | 1705 |
| R22-092 | 100 Warren Street | 1606 |
| R22-101 | 100 Warren Street | 1515 |
| R22-107 | 100 Warren Street | 502 |
| R22-110 | 100 Warren Street | 1003 |
| R22-111 | 100 Warren Street | 1004 |
| R22-125 | 100 Warren Street | 422 |
| R22-126 | 100 Warren Street | 510 |
| R22-127 | 100 Warren Street | 704 |
| R22-128 | 100 Warren Street | 804 |
| R22-129 | 100 Warren Street | 915 |
| R22-130 | 100 Warren Street | 1709 |

The names of tenants have not been included to avoid providing
personal identifiers.

# EXHIBIT C



**Steven M. Fulop**
**Mayor**

# CITY OF JERSEY CITY

**Department of Housing, Economic Development and Commerce**
Division of Housing Preservation
Office of Landlord/Tenant Relations

342 MARTIN LUTHER KING DRIVE • JERSEY CITY, N.J 07305
PHONE: (201) 547-5127

November 3, 2023

**Via Email and Regular Mail**

For the Tenants

Neil Marotta, Esq.
Marotta & Garvey Attorneys at Law
3916 Bergenline Ave., Ste. 2200
Union City, NJ 07087
Email:  mgclawyers@aol.com>

For the Property Owner

Derek Reed, Esq.
Ehrlich, Petriello, Gudin, Plaza & Reed, P.C.
60 Park Place, Suite 1016
Newark, NJ 07102
 Email:  dreed@epgprlaw.com>

Re: Rent Leveling Board Decision

Dear  Mr. Reed and Mr. Marotta,

The Rent Leveling Board conducted a meeting on October 19, 2023, in compliance with the Sunshine Law in order to hear the above-referenced matter.  Commissioners Hill, Hamilton, Isikoff, S. Johnson, and Pinchinat were present, with Chairman Cupo presiding.

Preliminary Statement

Beginning in June 2022, the Jersey City Office of Landlord/Tenant Relations Bureau of Rent

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 2

Leveling (the "Bureau") received Illegal Rent Petitions from numerous tenants residing at 100 Warren Street and 155 Washington Street (hereinafter, "Tenants"). The many Illegal Rent Petitions were combined by the Bureau into one determination for each building. While the two cases remain separate on appeal, many of the facts surrounding the appeal are interwoven. This determination, and the general background regarding the construction and eventual rental of the buildings, as well as a discussion of the legal issues pertaining to the voluminous number of petitions, are combined herein.

In the Illegal Rent Petitions, the Tenants sought a determination from the Bureau as to whether the rent increases for their apartments complied with the Jersey City Rent Control Ordinance, Chapter 260 of the Municipal Code. In particular, the Tenants challenged whether the buildings were exempt from the Jersey City Rent Control Ordinance, as codified in Chapter 260 of the Jersey City Municipal Code. In essence, the Tenants claim that the Property Owner did not qualify for the exemption and that, even if the Property Owner did qualify for the exemption, it failed to perform the required tasks to avail itself of the exemption. In the alternative, they argue that the exemption, if it ever applied, has lapsed, or been forfeited, by subsequent actions.

Initial Determination and Appeal

In response to the Illegal Rent Petitions, the Property Owner, Portside Urban Renewal LLC, c/o Equity Residential Management, LLC, provided via counsel a letter brief and a copy of the Tenants' lease agreements and Truth in Renting Statements, along with several documents, including most notably copies of Certificates of Occupancy for the buildings and a "Letter of Exemption" dated November 23, 1994.

On September 19, 2022, the Rent Leveling Administrator issued Bureau Determinations for both 100 Warren and 155 Washington. With respect to 100 Warren, the Bureau found that rents prior to August 24, 2022 were not governed by the City's rent control regulations because the Property Owner had complied with the requirements of the State's new construction exemption to rent control. The Bureau found that the 30-year exemption expired on August 24, 2022, and that therefore 100 Warren was subject to rent control from that point forward.

With respect to 155 Washington, the Bureau found that "155 Washington has been and remains exempt from the rent control restrictions of the Ordinance from December 31, 1997 through December 30, 2027 and the Bureau has no jurisdiction to review or make any findings regarding these rents."

The Tenants were then permitted additional time to submit documents to the Bureau for

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 3

consideration of the issue of a mortgage which the Tenants argued would limit the exemption to the length of that mortgage, rather than thirty years. The Bureau reviewed the documents submitted and, in supplemental Determinations issued on December 15, 2022, found them unavailing. As such, the initial Determinations remained in place.

Following an extension of time to appeal, the Tenants appealed the Determinations (including the supplemental Determinations) to the Jersey City Rent Leveling Board on January 25, 2023. Following an agreed-upon schedule, the parties submitted their written briefs and related submissions in advance of a hearing date.

The Board heard the tenants' appeal on May 31, 2023. The tenants were represented by Neil Marrota, Esq., of Marotta & Garvey. The property owner was represented by Derek Reed, Esq., of Ehrlich, Petriello, Gudin, Plaza & Reed, PLLC. Appellant Kevin Weller testified on behalf of all Tenants.

At the conclusion of the May 31, 2023, hearing, the Board closed the public portion of the cases and voted to adjourn while reserving its determination. Shortly thereafter, the parties jointly contacted the Board via the Jersey City Law Department to request an adjournment of the cases to permit the parties to attempt to resolve the matters via mediation. The Board granted the joint adjournment request. In September 2023, the parties informed the Board that they wished to place the cases back on the Board's agenda. The cases were heard once more on October 19, 2023, at which time the Board members provided their reasoning and made a motion to find in favor of the Tenants, holding that the exemption claimed by the Property Owner was not properly filed and remanding the case to the Bureau for adjustment of the Tenants' rents. The motion was seconded and adopted unanimously.

Factual Background

100 Warren and 155 Washington are two separate multiple dwellings forming the single apartment community known as Portside Towers. Brief of Property Owner ("PO"), at 1. The original owners of the property financed the new construction with the intention of developing a condominium project. PO, at 1-2. 100 Warren was constructed first, and a Certificate of Occupancy was issued on August 25, 1992. PO, at 2. The project eventually went through foreclosure and was unoccupied between the time of the issuance of the Certificate of Occupancy and a Sheriff's Sale on November 23, 1994, at which time the current owner took possession. PO, at 2.

The same day that it acquired the property, the current Property Owner abandoned the condominium plan and resolved to convert the development to a multiple dwelling residential

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 4

apartment complex.  PO, at 2.  To that end, the current owner provided a letter dated November 23, 1994, and addressed to Michael J. Regan, who was then the Construction Code Official for the City of Jersey City.  The letter states, in pertinent part:

> Portside Apartments Urban Renewal Partners, L.P. is the owner of 1 Washington Street (a/k/a 100 Warren Street), Jersey City, New Jersey (Lot 34, Block 60), which is a newly constructed multiple dwelling containing 229 rental dwelling units.  We are hereby claiming exemption from rent controls under Article XX (Multiple Dwelling Rent Controls_ of the Jersey City Code and any form of future rent control pursuant to N.J.S.A. 2A:42-84.1 et. seq. The period for which exemption is claimed for the 229 units in this building shall commence on the anticipated date of initial occupancy, January 1, 1995.
>
> This written statement is being made pursuant to the requirements of N.J.S.A. 2A:41-84.4.

On December 6, 1994, the Jersey City Construction Official responded to the November 23, 1994 letter.  The City acknowledged receipt, but also wrote

> Please be advised that the Office of Construction Official has no jurisdiction over rent controls and I would suggest that you contact the proper agency charged with that responsibility.
>
> See 100 Warren Determination, at 4.

No letter to the Construction Code Official in connection with the requested exemption from rent control for 155 Washington has been produced by the City or any party.  See 155 Washington Determination, at 4.

On January 24, 1995, a Certificate of Continued Occupancy was issued for 100 Warren.  PO, at 2.  Construction of 155 Washington was completed on or about December 31, 1997, and a Certificate of Occupancy was issued on that date.  Ibid.

100 Warren and 155 Washington operated as exempt from Jersey City's rent control regulations from the date of initial occupancy through the filing of the instant Illegal Rent Petitions.  PO, at 2.

Legal Standards

Chapter §260-3 of the Jersey City Municipal Code provides multiple dwellings as defined therein containing five or more residential housing spaces are subject to the City's rent regulations. It is

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 5

undisputed that both buildings are multiple dwellings with more than five units and are presumed to be rent controlled.

However, the City's ordinance contains several exemptions to the rent restrictions contained in Chapter 260. Pertinent to these cases is an exemption provided by New Jersey State law via N.J.S.A. 2A:42-84.1 et seq.

N.J.S.A. 2A:42-84 is titled "State Exemption for New Construction" (the "Statute"). As currently amended, the exemption provides as follows:

> a. In any municipality which has enacted or which hereafter enacts a rent control or rent leveling ordinance, other than under the authority of P.L.1966, c.168 (C.2A:42-74 et seq.), those provisions of the ordinance which limit the periodic or regular increases in base rentals of dwelling units shall not apply to multiple dwellings constructed after the effective date of this act, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less.
>
> b. In the event that there is no initial mortgage financing, the period of exemption from a rent control or rent leveling ordinance shall be 30 years from the completion of construction.

The State exemption is incorporated in §260-6C of the Municipal Code:

> In accordance with N.J.S.A. 2A:42-84.1 et seq., L. 1987, c. 153, the provisions of this chapter shall not apply to a new dwelling which is constructed between June 25, 1987, through June 25, 1992, and which is not constructed for occupation by senior citizens, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the dwelling, or for 30 years following completion of construction, whichever is less. This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4 and the service of a written statement upon the tenant required by N.J.S.A. 2A:42-84.3.

As noted in the Bureau's determinations, the exemption was initially limited in time, but has since been extended indefinitely. See N.J.S.A. 2A:42-84.5b ("Although this legislation was initially made effective only for a temporary five-year period, it was expanded for a second five-year period by P.L.1992, c.206 until 1997, and then in that year made permanent by P.L.1997, c.56.") The stated reason for the permanence of the exemption is that "[t]he Legislature deems it to be

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 6

necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey." Ibid.

As referenced in the Municipal Code, the Statute contains both a notice requirement to tenants, contained in N.J.S.A. 2A:42-84.3, and a notice requirement to the municipality via its construction official, codified in N.J.S.A. 2A:42-84.4. Those requirements read as follows:

> The owner of any multiple dwelling exempted from a rent control or rent leveling ordinance pursuant to this act, shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period. Each lease offered to a prospective tenant for any dwelling unit therein during the period the multiple dwelling is so exempted shall contain a provision notifying the tenant of the exemption.
>
> . . .
>
> The owner of any multiple dwelling claiming an exemption from a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of exemption from an ordinance under this act, including therein a statement of the date upon which the exemption period so claimed shall commence, such information as may be necessary to effectively locate and identify the multiple dwelling for which the exemption is claimed, and a statement of the number of rental dwelling units in the multiple dwelling for which the exemption is claimed.

Rent Leveling Board's Analysis

As an initial matter, the Board must consider whether the Property Owner satisfied the two notice requirements to avail itself of the "new construction" exemption contemplated by N.J.S.A. 2A:42-84.4. The earlier notice requirement must be presented to the municipality's Construction Official. The Property Owner "shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of exemption." N.J.S.A. 2A:42-84.4.

The second notice requirement states that the Property Owner "shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 7

prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period." N.J.S.A. 2A:42-84.3. Each lease and lease renewal must contain this notice. Ibid.

As it relates to notice to the construction official, the Bureau found that the Property Owner sent the aforementioned letter on November 23, 1994, to the Jersey City Construction Code Official, in which the Property Owner claimed the exemption for 100 Warren only. The Letter of Exemption stated that the exemption "shall commence on the anticipated date of initial occupancy, January 1, 1995." See 155 Washington Determination, at 4. The initial certificate of occupancy for the building was issued on August 25, 1992, but due to the failure of the condominium development plan, there had been no initial occupancy between that time and the foreclosure and subsequent Sheriff's sale. See 100 Warren Determination, at 3; PO, at 2.

However, the Statute requires that the Property Owner file for the exemption "at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling." Here, the certificate of occupancy was issued in August 1992, though the new construction contemplated the sale of condominium units, not apartment rentals. The Bureau found that the Letter of Exemption was sufficient because it meets the purposes of the notice to the Construction Official; namely, that the building has been constructed completely and is a multiple dwelling. However, because the letter claiming the exemption was not filed before the certificate of occupancy for the "new construction" at 100 Warren in 1992, the Rent Leveling Board finds that the Property Owner could not timely avail itself of the exemption. See Jersey City Rent Leveling Board October 19, 2023 Hearing Transcript ("October 19 Hearing"), at 19. The Property Owner argues that the Bureau's determination was sound because the Letter of Exemption for 100 Warren was filed "more than thirty (30) days before the initial occupancy." PO, at 4. The Statute does require notice to the tenants to be provided prior to occupancy and contained in each lease, but it requires notice to the Construction Official to be provided before the issuance of a certificate of occupancy. That did not happen here. As such, the Board rules in favor of the Tenants on this issue, finding that the building at 100 Warren had not availed itself of the thirty-year statutory exemption for new construction. See October 19 Hearing, at 24.

With regard to the lack of a letter seeking the exemption for 155 Washington, the Bureau concluded that

> Portside was aware of the Statute and its requirements in November 1994 even if the Construction Code Official at the time, Michael Regan, was not. It is as likely as not that three years later, with the issuance of the CO for 155 Washington, another request for exemption was sent. Perhaps, in light of Mr. Regan's December 6, 1994 letter, it was sent to some other City agency. What is clear, as set forth in

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 8

detail below, is that 155 Washington was owned by the same owner as 100 Warren and these Towers were managed as one development.

That the Property Owner was clearly aware of the requirement to file the notice and failed to do so does not weigh in its favor, notwithstanding the Construction Official's admittedly confusing response to the Letter of Exemption. The Statute's notice requirement is a mandatory condition precedent to receipt of this rent control exemption requiring strict compliance with its terms. There is no dispute that as it relates to 155 Washington that the record is devoid of any evidence of compliance with the notice requirement. While the Portside Towers community is managed "as one development," the Statute also requires that the letter contain "a statement of the date upon which the exemption period so claimed shall commence and a statement of the number of rental dwelling units in the multiple dwelling for which the exemption is claimed." The address and units referenced in the earlier Letter of Exemption refer only to 100 Warren and, therefore, cannot be applied to the second building or any of its units.

With only speculation and conjecture as to whether the Property Owner has ever provided the required notice, the Board finds that the Property Owner has not fulfilled its obligation to provide notice under the Statute and, therefore, the units at 155 Washington are not exempt from the City's rent control ordinance. See October 19 Hearing, at 19, 24.

Because the Board finds that the Property Owner has not satisfied the requirements of N.J.S.A. 2A:42-84.4, which must be satisfied before the notice to tenants is relevant, the Board declines to rule on the sufficiency of the notices to tenants and allegedly misfiled or inaccurate rent registration statements filed with the Bureau. Moreover, the Board need not opine on the limitations of the mortgage documents which Tenants allege would limit the length of the exemption should it apply to either building.

The Bureau's determination set forth the legislative purpose of the exemption, which is "to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey." See 100 Warren Determination, at 2. The Property Owner concurred in its briefs and at the Board hearing that the Bureau's decision gave effect to the purpose of the Statute. PO, at 11. Notwithstanding the stated goals of the Statute, the notice requirements also have purpose; namely, to allow the municipality's construction official to inspect the subject property and to evaluate whether it qualifies for the exemption. The Bureau's determination would allow a property owner to skirt that obligation and proceed as it if were a voluntary step in the process. Furthermore, the requirements for timely notice both to the municipality and the tenant allows the parties affected by the exemption to have notice regarding the status of the properties and track which properties are subject to, and exempt from, rent control. In this case, because the City and Tenants did not have a record of the exemption or its potential expiration, there was no record of when the

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 9

exemption would expire. That lack of knowledge required a determination for the first time by the Bureau that the exemption for 100 Warren had expired on August 24, 2022. See 100 Warren Determination, at 6.

Finally, the Bureau of Rent Leveling is empowered to "remedy violations of [Chapter 260] by adjusting rentals, ordering rebates and bringing appropriate legal charges." §260-9(A)(1). Here, the Board's decision is that there was no valid exemption for the duration of the tenancies of both buildings. See October 19 Hearing, at 24. The Board's decision affects all tenants in all units of the two buildings, and the Bureau is empowered to apply this decision to all units in both buildings from the date of the first illegal rent petition at issue here in each building. Id., at 23-24.

Rent Leveling Board Decision

The Board unanimously concludes that due to the failure by the Property Owner and its predecessor to comply with the notice requirement in N.J.S.A. 2A:42-84.4, both buildings and all units therein are and have been for the duration of their occupancies subject to rent control.

To summarize, because the Letter of Exemption to the Construction Official in November 1994 was provided to the City after the issuance of the certificate of occupancy for that building, it was not filed timely under the Statute. Further, because it is undisputed that no evidence of a filing for 155 Washington has been produced, the Board finds that 155 Washington is also subject to rent control.

The Statute does not expressly provide for a remedy where an exemption is inaccurately assumed by the municipality and/or property owner; however, the Board finds that there was no valid exemption from the beginning of the occupancy of the units. Any interpretation to the contrary would render the notice provisions voluntary or mere surplusage, whereas the Statute provides that the property owner "shall" provide the required notice in order to obtain the exemption.

The Bureau's policy is to provide a "lookback window" of six years for illegal rent petitions, coinciding with the statute of limitations for a cause of action for breach of contract. The Board understands this is a matter of both policy and practicality for the Bureau, which has limitations relating to recordkeeping and equitable considerations which militate toward finding a reasonable window of time for which adjustments to rent should be made following a successful illegal rent petition. As such, the Board adopts the Bureau's lookback policy and instructs the Bureau to adjust the rents for all units in each building to comply with the City's rent control regulations going back six years from the date of the first petition for each building; namely, June 25, 2022, for 100 Warren, and July 27, 2022, for 155 Washington.

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 10

## Conclusion

The Property Owner did not fulfill its obligations to obtain an exemption from Chapter 260 of the City's Code, and, for the reasons set forth on the record and in this determination, both 100 Warren and 155 Washington are subject to Jersey City rent control regulations. The Bureau is instructed to obtain the records necessary to review and adjust the rent on all units within the buildings dating back six years from the filing of the first Illegal Rent Petition at issue in the instant matters for each building.

The Landlord or the Tenant may appeal the findings of any decision of the Rent Leveling Board by "action in lieu of prerogative writ" to a court of competent jurisdiction filed within 45 days of the Board's decision, as provided by New Jersey Rule of Court 4:69.

This is to certify that this constitutes the decision of the Jersey City Rent Leveling Board in connection with this matter.

Very truly yours,

Al Cupo
Chair, Jersey City Rent Leveling Board

CC: Tenants

# EXHIBIT "B"

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

ERIC M. BERNSTEIN & ASSOCIATES, L.L.C.
Eric M. Bernstein, Esq. NJ Bar ID # 014001982
Dominic P. DiYanni, Esq. NJ Bar ID No. 041342004
Philip G. George, Esq. NJ Bar ID No. 015061982
34 Mountain Boulevard, Building A
P.O. Box 4922
Warren, New Jersey 07059-4922
(732) 805-3360; (732) 805-3346 (Facsimile)
Attorneys for Defendants, City of Jersey City and
the City of Jersey City Rent Leveling Board
Our File No. 3236-1001

| | |
|---|---|
| THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC AND EQUITY RESIDENTIAL MANAGEMENT, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF JERSEY CITY AND THE CITY OF JERSEY CITY RENT LEVELING BOARD, <br><br> Defendants. | Civil Action No. 2:23-cv-22291-MCA-JRA <br><br><br> **DEFENDANTS, CITY OF JERSEY CITY, AND THE CITY OF JERSEY CITY RENT LEVELING BOARD'S ANSWER TO PLAINTIFFS' COMPLAINT** |

Defendants, City of Jersey City (hereinafter referred to as "City" or "Defendant City"), a municipal corporation of the State of New Jersey, whose principal offices are located at 280 Grove Street, City of Jersey City, County of Hudson, State of New Jersey and the Jersey City Rent Leveling Board, whose principal offices are located at 4 Jackson Square, City of Jersey City, County of Hudson, State of New Jersey (hereinafter referred to as "Board" or "Defendant Board"), (collectively known as "Defendants"), by way of Answer to the Complaint of the Plaintiffs, say as follows:

1

## NATURE OF ACTION

1.      Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 1 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

2.      Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 2 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

3.      Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 3 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can not admit nor deny the allegations of this paragraph as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

4.      Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 4 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

5.      Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 5 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 5 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

6. Defendants, jointly and/or severally, acknowledge the action of Defendant Board on November 3, 2023. The Defendants, jointly and/or severally, then deny the remaining allegations of paragraph 6 of Plaintiffs' Complaint.

7. Defendants, jointly and/or severally, deny all of the allegations of paragraph 7 of Plaintiffs' Complaint. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 7 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

8. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 8 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

9. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 9 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

10. Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 10 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

11. Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 11 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

12.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 12 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

13.     Defendants, jointly and/or severally, deny the allegations of paragraph 13 of Plaintiffs' Complaint.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 13 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

## SUMMARY OF CLAIMS

14.     Defendants, jointly and/or severally, deny the allegations of paragraph 14 of Plaintiffs' Complaint.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 14 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

15.     Defendants, jointly and/or severally, deny the allegations of paragraph 15 of Plaintiffs' Complaint.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 15 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally are not qualified to make.

16.     Defendants, jointly and/or severally, deny the allegations of paragraph 16 of Plaintiffs' Complaint.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 16 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

17.     Defendants, jointly and/or severally, deny the allegations of paragraph 17 of Plaintiffs' Complaint.  Furthermore, Defendants, jointly and/or severally, can neither

4

admit nor deny the allegations of paragraph 17 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally are not qualified to make.

18.  Defendants, jointly and/or severally, deny the allegations of paragraph 18 of Plaintiffs' Complaint. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 18 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally are not qualified to make.

19.  Defendants, jointly and/or severally, deny the allegations of paragraph 19 of Plaintiffs' Complaint. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 19 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally are not qualified to make.

20.  Defendants, jointly and/or severally, deny the allegations of paragraph 20 of Plaintiffs' Complaint. Furthermore, Defendants, jointly and/or severally, request this Court deny all of Plaintiffs' request for relief with prejudice and award Defendants, jointly and/or severally, attorneys fees, costs of suit, interest and any and all other relief as the Court shall deem appropriate.

## PARTIES

21.  Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 21 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

22.  Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 22 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

23.     Defendants, jointly and/or severally, admit the allegations of paragraph 23 of Plaintiffs' Complaint.

24.     Defendants, jointly and/or severally, admit the allegations of the first (1st) sentence of paragraph 24 of Plaintiffs' Complaint.  As to the remaining allegations of this paragraph, Defendants, jointly and/or severally, can neither admit nor deny the allegations as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

## JURISDICTION AND VENUE

25.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 25 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

26.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 26 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

27.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 27 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

6

## FACTUAL BACKGROUND

**A.      New Jersey Temporarily Exempts from Rent Control Buildings with Four or More Apartments Constructed After 1987.**

28.      Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 28 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

29.      Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 29 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

30.      Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 30 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

31.      Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 31 of Plaintiffs' Complaint and leave Plaintiff to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

32.      Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 32 of Plaintiffs' Complaint and leave Plaintiff to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor

7

deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

**B.      Jersey City's Rent Control Scheme.**

33.      Defendants, jointly and/or severally, admit as to the adoption of the rent control ordinance which is located at Chapter 260 of the Jersey City Municipal Code. As to the remaining allegations of paragraph 33 of Plaintiffs' Complaint, the Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations and leave Plaintiff to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

34.      Defendants, jointly and/or severally, neither admit nor deny the allegations of paragraph 34 of Plaintiffs' Complaint as the subject Ordinance speaks for itself. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

35.      Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 35 of Plaintiffs' Complaint and leave Plaintiff to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

36.      Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 36 of Plaintiffs' Complaint and leave Plaintiff to their proofs. Furthermore, Defendants, jointly and/or severally, can neither admit nor

8

deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

### C. Portside Towers Is Constructed And First Rented During The Exemption Period.

37. Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 37 of Plaintiffs' Complaint and leave Plaintiff to their proofs.

38. Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 38 of Plaintiffs' Complaint and leave Plaintiff to their proofs.

39. Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 39 of Plaintiffs' Complaint and leave Plaintiff to their proofs.

40. Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 40 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

41. Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 41 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

42. Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 42 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

43.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 43 of Plaintiffs' Complaint and leave Plaintiff to their proofs.

44.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 44 of Plaintiffs' Complaint and leave Plaintiff to their proofs.

45.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 45 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

**D.     Portside Towers Is Treated As Exempt From Rent Control For Many Years.**

46.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 46 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

47.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 47 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

48.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 48 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

49.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 49 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, Defendants, jointly and/or severally, can neither admit nor

deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

50.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 50 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

**E.      The Administrator Correctly Finds That Portside Towers is Exempt.**

51.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 51 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

52.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 52 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

53.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 53 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

54.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 54 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

55.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 55 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

11

56.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 56 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

57.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 57 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

**F.     The Board Erroneously Finds That Portside Towers Does Not Qualify For the Exemption.**

58.     Defendants, jointly and/or severally, admit the allegations of paragraph 58 of Plaintiffs' Complaint.

59.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 59 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

60.     Defendants, jointly and/or severally, deny the allegations of paragraph 60 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

61.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 61 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

62.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 62 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

63.     Defendants, jointly and/or severally, are without knowledge sufficient to admit or deny the allegations of paragraph 63 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

**G.     The Board's Decision Creates Irreparable Harm.**

64.     Defendants, jointly and/or severally, deny any and all implications of wrongdoing. Defendants, jointly and/or severally, also deny the allegations of paragraph 64 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

65.     Defendants, jointly and/or severally, deny any and all implications of wrongdoing. Defendants, jointly and/or severally, also deny the allegations of paragraph 65 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

66.     Defendants, jointly and/or severally, deny the allegations of paragraph 66 of Plaintiffs' Complaint.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

13

## COUNT I

### THE BOARD'S DECISION AND THE ORDINANCE VIOLATE
### THE TAKINGS CLAUSES OF THE US CONSTITUTION AND
### THE NEW JERSEY CONSTITUTION

67.    Defendants, jointly and/or severally, repeat their responses to the preceding paragraphs 1 through 66 of Plaintiffs' Complaint as it is fully set forth herein.

68.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 68 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

69.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 69 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

70.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 70 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

71.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 71 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

72.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor

14

deny the allegations of paragraph 72 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

73.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 73 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

74.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 74 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

75.    Defendants, jointly and/or severally, deny the allegations of paragraph 75 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

**A.    The Ordinance and the Board's Decision Violate The Takings Clauses By Depriving Portside Of Its Rights To The Exemption And Its Right to Charge Market Rent Without Compensation**

76.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 76 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

77.    Defendants, jointly and/or severally, deny the allegations of paragraph 77 of Plaintiffs' Complaint. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

15

78.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 78 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

79.    Defendants, jointly and/or severally, deny the allegations of paragraph 79 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

80.    Defendants, jointly and/or severally, deny the allegations of paragraph 80 of Plaintiffs' Complaint.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

81.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 81 of Plaintiffs' Complaint as they call for a legal conclusion for which Defendants, jointly and/or severally, are not qualified to make.

82.    Defendants, jointly and/or severally, deny the allegations of paragraph 82 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

83.    Defendants, jointly and/or severally, deny the allegations of paragraph 83 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as

16

they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

84.     Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 84 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

85.     Defendants, jointly and/or severally, deny the allegations of paragraph 85 of Plaintiffs' Complaint.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

**B.      The Ordinance Violates The Takings Clauses By Diminishing The Value Of Portside Towers Without Compensation**

86.     Defendants, jointly and/or severally, repeat their responses to the preceding paragraphs 1 through 85 of Plaintiffs' Complaint as it is fully set forth herein.

87.     Defendants, jointly and/or severally, deny the allegations of paragraph 87 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

88.     Defendants, jointly and/or severally, deny the allegations of paragraph 88 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

89. Defendants, jointly and/or severally, deny any and all implications of wrongdoing. Defendants, jointly and/or severally, can also neither admit nor deny the allegations of paragraph 89 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

90. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 90 of Plaintiffs' Complaint as they call for a legal conclusion which Defendants, jointly and/or severally, are not qualified to make.

91. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 91 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

92. Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 92 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, any allegations which call for a legal conclusion can not be answered by or responded to by Defendants, jointly and/or severally.

93. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 93 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

94.     Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 94 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.   Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

95.     Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 95 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

96.     Defendants, jointly and/or severally, deny the allegations of paragraph 96 of Plaintiffs' Complaint.   Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

**C.     The Board's Decision And The Ordinance Violates The Takings Clauses By Enacting A Physical Taking Of Portside's Property**

97.     Defendants, jointly and/or severally, repeat their responses to the preceding paragraphs 1 through 96 of Plaintiffs' Complaint as it is fully set forth herein.

98.     Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 98 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.   Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

99.     Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor

19

deny the allegations of paragraph 99 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

100.    Defendants, jointly and/or severally, deny the allegations of paragraph 100 of Plaintiffs' Complaint.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

## COUNT II

### THE ORDINANCE VIOLATES THE DUE PROCESS CLAUSES OF THE UNITED STATES CONSTITUTION AND NEW JERSEY CONSTITUTION

101.    Defendants, jointly and/or severally, repeat their responses to the preceding paragraphs 1 through 100 of Plaintiffs' Complaint as it is fully set forth herein.

102.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 102 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

103.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 103 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

104. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 104 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

105. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 105 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

106. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 106 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

107. Defendants, jointly and/or severally, deny the allegations of paragraph 107 of Plaintiffs' Complaint. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

## COUNT III

## THE ORDINANCE VIOLATES THE CONTRACTS CLAUSES OF THE UNITED STATES CONSTITUTION AND NEW JERSEY CONSTITUTION

108. Defendants, jointly and/or severally, repeat their responses to the preceding paragraphs 1 through 107 of Plaintiffs' Complaint as it is fully set forth herein.

109. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 109 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

110. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 110 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

111. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 111 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

112. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 112 of Plaintiffs' Complaint and leave Plaintiffs to their

22

proofs. Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

113. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 113 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

114. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 114 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

115. Defendants, jointly and/or severally, deny the allegations of paragraph 115 of Plaintiffs' Complaint. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

## COUNT IV

### THE ORDINANCE IS UNLAWFULLY CONFISCATORY
### UNDER NEW JERSEY LAW

116. Defendants, jointly and/or severally, repeat their responses to the preceding paragraphs 1 through 115 of Plaintiffs' Complaint as it is fully set forth herein.

23

117. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 117 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

118. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 118 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.

119. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 119 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

120. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 120 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, any allegations which call for a legal conclusion can not be answered and/or responded to by Defendants, jointly and/or severally, as they are not qualified to make same.

121.    Defendants, jointly and/or severally, deny the allegations of paragraph 121 of Plaintiffs' Complaint.  Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

## COUNT V

### VIOLATION OF N.J.S.A. § 2A:42-84.2 AND PREEMPTION BY SAME

122.    Defendants, jointly and/or severally, repeat their responses to the preceding paragraphs 1 through 121 of Plaintiffs' Complaint as it is fully set forth herein.

123.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 123 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

124.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 124 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

125.    Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 125 of Plaintiffs' Complaint and leave Plaintiffs to their proofs.  Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

25

126. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 126 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

127. Defendants, jointly and/or severally, deny the allegations of paragraph 127 of Plaintiffs' Complaint. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

128. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 128 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

129. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 129 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

130. Defendants, jointly and/or severally, deny the allegations of paragraph 130 of Plaintiffs' Complaint. Furthermore, Defendants, jointly and/or severally, can neither

admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

## COUNT VI

### CLAIM IN LIEU OF PREROGATIVE WRIT

131. Defendants, jointly and/or severally, repeat their responses to the preceding paragraphs 1 through 130 of Plaintiffs' Complaint as it is fully set forth herein.

132. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 132 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

133. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 133 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, any allegations which call for a legal conclusion can not be answered by and/or responded to by Defendants, jointly and/or severally.

134. Defendants, jointly and/or severally, deny all of the allegations of paragraph 134 of Plaintiffs' Complaint. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

27

## COUNT VII

### DECLARATORY JUDGMENT

135. Defendants, jointly and/or severally, repeat their responses to the preceding paragraphs 1 through 134 of Plaintiffs' Complaint as it is fully set forth herein.

136. Although Defendants, jointly and/or severally, deny any and all implications of wrongdoing, Defendants, jointly and/or severally, can neither admit nor deny the allegations of paragraph 136 of Plaintiffs' Complaint and leave Plaintiffs to their proofs. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

137. Defendants, jointly and/or severally, deny the allegations of paragraph 137 of Plaintiffs' Complaint. Furthermore, Defendants, jointly and/or severally, can neither admit nor deny the allegations of this paragraph as they call for a legal conclusion to which Defendants, jointly and/or severally, are not qualified to make.

### PRAYER FOR RELIEF

WHEREFORE, Defendants, jointly and/or severally, demand judgment dismissing Plaintiffs' Complaint with prejudice, including denying any and all requests for declaratory judgment and injunctive relief, for costs and fees of this litigation, including but not limited to all attorneys' fees, interest, costs of suit and for any and all other relief in law and/or equity as the Court may deem appropriate under the circumstances of this case, including, but not limited to, costs, fees and/or sanctions.

28

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs fail to state a cause of action upon which relief can be granted and Defendants, jointly and/or severally, reserve the right to move, pursuant to Fed. R. Civ. P. 12 and/or Fed. R. Civ. P. 56, for dismissal thereon at any time permitted under the law and the Rules of Court.

### SECOND AFFIRMATIVE DEFENSE

Defendants, jointly and/or severally, are entitled to absolute immunity, in whole or part, against the allegations of Plaintiffs.

### THIRD AFFIRMATIVE DEFENSE

The acts complained of by Plaintiffs, in whole or in part, were and are discretionary acts and exercises of legislative, governmental and/or administrative decision-making and Defendants, jointly and/or severally, are immune therefore under the terms of the Tort Claims Act, N.J.S.A. 59:1-1 et seq. and/or any other Federal and/or State laws/statutes.

### FOURTH AFFIRMATIVE DFENSE

Plaintiffs' suit is barred, in whole or in part, by the doctrines of Unclean Hands.

### FIFTH AFFIRMATIVE DFENSE

Plaintiffs' suit is barred, in whole or in part, by the Entire Controversy Doctrine in that Plaintiff already has pending lawsuit(s) under the same set of facts as brought in this herein matter.

## SIXTH AFFIRMATIVE DEFENSE

The Court lacks the subject matter jurisdiction, in whole or in part, to grant the relief requested by the Plaintiffs.

## SEVENTH AFFIRMATIVE DEFENSE

The Court lacks in personum jurisdiction, in whole or in part, to grant the relief requested by the Plaintiffs.

## EIGHTH AFFIRMATIVE DEFENSE

The acts or omissions to act complained of by the Plaintiffs are due, in whole or in part, to the actions or omissions to act of third (3rd) parties over whom Defendants, jointly and/or severally, had no authority, control and/or discretion.

## NINTH AFFIRMATIVE DEFENSE

The acts or omissions to act complained of by the Plaintiffs are due, in whole or in part, to the actions of the Plaintiffs and not the Defendants, jointly and/or severally.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' suit is barred, in whole or in part, by the applicable statute of limitations for such causes of action pled in Plaintiff's Complaint.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' suit is barred, in whole or in part, due to the Plaintiffs failure to fully comply with the requirements of N.J.S.A. 2A:42-84.1 et seq. and/or the provisions of Chapter 260 of the City of Jersey City Municipal Code.

## RULE 11 NOTICE

Defendants, jointly and/or severally, place Plaintiffs on notice that, pursuant to Fed. R. Civ. P. 11, Defendants, jointly and/or severally, believe that the underlying

30

Complaint is frivolous, insofar as it is without any reasonable basis in law or equity and can not be supported by a good faith argument for an extension, modification or reversal of existing law. Should this action continue to be pursued by the Plaintiffs, the Defendants, jointly and/or severally, may bring the appropriate motion to request both the dismissal of this claim and the payment of all reasonable litigation expenses, including but not limited to attorneys' fees incurred by the Defendants, jointly and/or severally, in its defense of this claim.

## RIGHT TO PLEAD ADDITIONAL AFFIRMATIVE DEFENSES

Defendants, jointly and/or severally, reserve the right to plead additional affirmative defenses as discovery proceeds.

## DEMAND FOR JURY TRIAL

Defendants, jointly and/or severally, requests a jury trial on all issues pursuant to Fed. R. Civ. P. 38(b).

## DESIGNATION OF TRIAL COUNSEL

Eric M. Bernstein, Esq., Dominic P. DiYanni, Esq. and Philip G. George, Esq. of the Law Firm of Eric M. Bernstein & Associates, L.L.C. are hereby designated as trial counsel of record for Defendants, City of Jersey City and the City of Jersey City Rent Leveling Board in the above-captioned matter.

ERIC M. BERNSTEIN & ASSOCIATES, L.L.C.
Attorneys for Defendants, City of Jersey City and
the City of Jersey City Rent Leveling Board

By: _____
Eric M. Bernstein, Esq.

Dated: December 21, 2023

31

# EXHIBIT "C"

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY LLC, et al.,

        Plaintiffs,

        v.

THE CITY OF JERSEY CITY, et al.,

        Defendants.

Civil Action No.

23-cv-22291 (MCA) (JRA)

**PRETRIAL SCHEDULING ORDER**

**THIS MATTER** having come before the Court for a scheduling conference pursuant to Rule 16 of the Federal Rules of Civil Procedure on **March 12, 2024**, and for good cause shown:

**IT IS, on this 12th day of March 2024, ORDERED THAT:**

## I. DISCLOSURES

1.　Fed. R. Civ. P. 26 disclosures have been exchanged.

## II. E-DISCOVERY CONFERENCE

2.　E-Discovery conference pursuant to L.Civ.R. 26.1(d) shall take place on or before **March 21, 2024**.

## III.  DISCOVERY

3.　Fact discovery is to remain open through **October 15, 2024**.  No fact discovery is to be issued or engaged in beyond that date, except upon application and for good cause shown.

4.　The parties may serve initial requests for production of documents and interrogatories on or before **April 1, 2024**, to be responded to within thirty (30) days of receipt.  Consistent with Fed. R. Civ. P. 33(a)(1), the parties are limited to twenty-five (25) interrogatories, including all discrete subparts.

1

5. Depositions of fact witnesses and individuals who will give lay opinion testimony based on particular competence in an area (including but not limited to treating physicians) are to be completed by **October 15, 2024**. No objections to questions posed at depositions shall be made other than as to lack of foundation, form, or privilege. See Fed. R. Civ. P. 32(d)(3)(A). No instruction not to answer shall be given unless a privilege is implicated.

6. Counsel shall confer in a good faith attempt to resolve any and all discovery or case management disputes **before** seeking the Court's intervention. See L.Civ.R. 37.1(a)(1); see also L.Civ.R. 16.1(f)(1). Should such efforts fail to resolve the dispute, the parties must raise the discovery dispute through a joint letter and shall do so in a manner consistent with the Court's Case Management Order, available at https://www.njd.uscourts.gov/sites/njd/files/JRAPreferences.pdf.

Failure by any party to meet and confer in good faith or participate in the joint letter protocol will result in the Court deeming that party to have waived its right to take any position on the discovery issue(s) in dispute.

**No discovery motion or motion for sanctions for failure to provide discovery shall be filed before utilizing the procedures set forth in these paragraphs without prior leave of Court.**

Discovery disputes (other than those arising during depositions) shall be brought to the Court's attention no later than **September 16, 2024**. The Court will not consider any discovery dispute (other than those arising during depositions) brought to its attention after this date. If an unresolved dispute arises at a deposition, then the parties shall contact the Chambers of the Undersigned for assistance during the deposition. Failure to contact Chambers for intervention before adjourning that deposition may constitute waiver of the right to seek relief from the Court.

## IV.  DISCOVERY CONFIDENTIALITY ORDERS

7. Any proposed Discovery Confidentiality Order agreed to by the parties must strictly comply with Fed. R. Civ. P. 26(c) and L.Civ.R. 5.3. See also Glenmede Trust Co. v. Thompson, 56 F.3d 476 (3d Cir. 1995); Pansy v. Borough of Stroudsburg, 23 F.3d 772 (3d Cir. 1994). Counsel are advised that a sample form of Discovery Confidentiality Order is contained in Appendix S to the Local Civil Rules. If the parties submit a confidentiality order that differs from Appendix S, they must submit: (1) a clean version of the proposed order that is ready for signature; and (2) a redline version that indicates the differences between the proposed order and the Appendix S order.

## V.  FUTURE CONFERENCES

8.     There shall be a telephonic status conference before the undersigned on **June 17, 2024, at 3:00 p.m.**  In advance of the conference, but no later than **June 10, 2024**, the parties shall file a joint status letter setting forth the status of completing discovery and any other issue that the Court needs to consider during the telephonic status conference.  The Court will provide the parties with the dial-in information in advance.

9.     The Court may from time to time schedule further conferences as may be required, either *sua sponte* or at the request of a party.

10.     All counsel are required to be on time and ready to proceed for all scheduled proceedings.  In cases where the Court schedules telephonic status conferences involving incarcerated litigants, opposing counsel is directed to coordinate with the prison facility to have all parties on the conference call ahead of time and shall initiate the call at the scheduled time with all parties present.

11.     Counsel should be prepared to discuss settlement at every conference with the Court.  For settlement conferences, the senior attorney in charge of the case and the client(s) with full settlement authority must attend.  In cases involving insurance companies and other corporate or business entities, the executive with settlement authority must be available for the conference.

12.     Since all dates set forth herein are established with the assistance and knowledge of counsel, there will be no extensions except for good cause shown and by leave of Court, even with consent of all parties.

13.     A copy of every pleading, document, or written communication with the Court shall be served on all other parties to the action or may be disregarded by the Court.

## VI.  MOTIONS

14.     **No motions are to be filed without prior written permission from this Court, except motions in lieu of Answer under Fed. R. Civ. P. 12.**  These prerequisites must be met before any motions are filed and the motions will be returned if not met.  All calendar or dispositive motions, if permitted, shall comply with L.Civ.R. 7.1(b) and other applicable local and federal rules.

15.     Any request for leave to file a motion to add new parties or amend pleadings, whether by amended or third-party complaint, must be filed not later than **May 1, 2024**.  Before seeking Court leave to file a motion to amend a pleading, a party shall circulate the proposed amended pleading among all parties in an effort to

3

obtain consent to the amendment.  Any request for leave of the Court to file a motion to amend shall contain a redlined version of the proposed amended pleading as an exhibit.

16.     All dispositive motions must first be subject to a dispositive motion pre-hearing.  Discovery generally must be completed prior to the filing of a dispositive motion.

## VII.  EXPERTS

17.     All affirmative expert reports shall be delivered by **November 29, 2024**. Any such report shall comport with the form and content requirements of Fed. R. Civ. P. 26(a)(2)(B).

18.     All responding expert reports shall be delivered by **December 30, 2024**. Any such report shall comport with the form and content requirements referenced above.

19.     Expert discovery, including the depositions of any expert witnesses, shall be completed on or before **January 30, 2025**.

20.     No expert shall testify at trial as to any opinions or base those opinions on facts not substantially disclosed in his report.

## VIII.  FINAL PRETRIAL CONFERENCE

21.     A final pretrial conference shall be conducted pursuant to Fed. R. Civ. P. 16(e) **at a time and date to be assigned**.

22.     At least forty-five (45) days before the Final Pretrial Conference, all counsel are directed to meet and confer before the final pretrial conference to prepare the Final Pretrial Order in compliance with the form and content requirements of the Court.  Plaintiff's counsel shall prepare the Final Pretrial Order and shall submit it to all other counsel for approval before submitting it to the Court.

23.     The original of the Final Pretrial Order shall be sent to Chambers via email at jra_orders@njd.uscourts.gov not later than **fourteen (14) full business days** before the final pretrial conference.  All parties are responsible for the timely submission of the Final Pretrial Order.

24. **FAILURE TO FOLLOW THIS ORDER MAY RESULT IN SANCTIONS PURSUANT TO Fed. R. Civ. P. 16(f) and 37.**

HON. JOSÉ R. ALMONTE
UNITED STATES MAGISTRATE JUDGE

Original:    Clerk of the Court
      cc:    Hon. Madeline Cox Arleo, U.S.D.J.
             All Parties

5

# EXHIBIT "D"



**Derek Reed | Partner**
direct:  (973) 854-6710
dreed@EPGPRlaw.com

April 30, 2024

**Via ECF**
Honorable Madeline Cox Arleo
Honorable José R. Almonte
U.S. District Court for the District of New Jersey
Mitchell H. Cohen Building
4th & Cooper Streets, Room 2010
Camden, NJ 08101

>   **Re:**   ***The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC, v. The City of Jersey City and the City of Jersey City Rent Leveling Board*, Case No: 2:23-cv-22291-MCA-JRA**

Dear Judge Arleo and Magistrate Judge Almonte:

We represent Plaintiffs (collectively, "Portside") in this matter.  Portside submits this letter to propose an orderly process for handling motions seeking preliminary injunctive relief in this case, including the recent motion filed by certain tenants and associations of tenants (the "Tenants") that have sought to intervene in this case.  (*See* Dkt. 34-1.)

The Tenants' motion is unusual in that the Court has not yet ruled on the Tenants' pending motion to intervene.  (Dkt. 30).  Portside filed a response to the Tenants' motion to intervene that did not oppose the Tenants' intervention as plaintiffs in this case (their proposed complaint contains one count alleged against Portside) but did oppose their suggestion to amend or bifurcate the case schedule the Court recently entered.  (Dkt. 32.)  Portside recognizes that those issues are presently pending before Judge Almonte.

Portside opposes the Tenants' motion for preliminary injunctive relief, but, Portside agrees that it would be appropriate for the Court to enter an order preserving the status quo pending the Court's resolution of challenges to the Jersey City rent control decision at issue in this case. Because of that decision and questions surrounding its legal basis and how it will be implemented, Portside, its residents, and Jersey City face uncertainties and needless risks, including with respect to the amount of rent that may be assessed and must be paid during the pendency of this action. Indeed, the necessity for a status quo order is heightened because Jersey City officials recently threatened to impose criminal penalties against Portside and its employees if they are found to

Please direct replies to:
60 Park Place, Suite 1016, Newark, NJ 07102
Tel: (973) 643-0040  •  Fax: (973) 596-1781  •  www.EPGPRlaw.com

NEWARK   •   NEW YORK   •   MORRISTOWN

Case 2:23-cv-22991-MCA-JRA Document 56-2 Filed 07/09/24 Page 2 of 3 PageID: 1374

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

April 30, 2024
Page 2

have charged rent higher than permitted under the city's ordinance. The City made that threat even though the City's administrators have yet to determine the amount that the City contends is the correct level of base rent. As Portside has already informed the City, any criminal prosecution under these circumstances would violate the Due Process Clause. *See, e.g.*, *Johnson v. United States*, 576 U.S. 591, 602 (2015) (noting that a "law prohibiting grocers from charging an 'unjust or unreasonable rate,'" without stating what the rate ceiling was, violated Due Process Clause) (citing *United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921)).

Portside has already taken voluntary steps to preserve the status quo during the pendency of this proceeding. In their motion, the Tenants erroneously assert that Portside, after the Rent Leveling Board's decision, raised rents for certain residents above the 4% or CPI rent control cap and may pursue evictions for residents who question or withhold their rents. (Dkt. 34-1 at 1-3, 8-13.) Neither assertion is true. As Portside has already communicated to the City and residents, since the Board's decision, Portside has capped rent increases consistent with the City's rent control ordinance, while preserving all the tenants' rights and claims to an even lower rent. For the tower at 100 Warren, Portside has capped rent increases in line with the ordinance at all times since September 19, 2022. For the tower at 155 Washington, Portside has agreed to cap the increase at 4% or CPI, whichever is lesser, as is permitted under the ordinance, and has provided a credit for any payment in excess of that amount that was made since the Board's November 3, 2023, decision. Moreover, while this litigation is pending, Portside has elected to not pursue evictions for any tenant at Portside in relation to a dispute over the amount of rent and, as the Tenants note, has unilaterally dismissed any pending eviction for the non-payment of rent.

Consistent with those steps that Portside has already taken voluntarily, Portside submits that an appropriate framework for preserving the status quo is as follows:

a) Portside residents should continue to pay the rents they paid in November 2023, plus the rent control increase permitted under the ordinance (4% or CPI, whichever is less).

b) Portside will place into escrow the difference between the paid rent (with the 4% increase) and the rent that was in effect before the increase. Those monies would be released in accordance with this Court's determination on the merits.

c) Portside will not pursue evictions based on non-payment of rent as long as residents pay the rent identified in (1) and otherwise comply with the terms of the lease and the law.

d) Portside will forego seeking from the residents any rent increases in excess of the 4% increase until the matter is resolved by the Court, but reserves the right to seek lost rent in excess of that amount as damages from the City.

e) This status quo will remain in effect until this Court resolves the case on the merits and will not be modified on account of any Board or Bureau decision, except that following

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

April 30, 2024
Page 3

any Board or Bureau decision, Tenants may seek to require Portside to deposit into escrow the difference between rents collected (with the 4% increase) and any lesser rent amount that the Board or Bureau determines appropriate.

Prior to sending this letter, Portside offered the same terms to the Tenants in order to reach an agreement. Though Portside has yet to hear a response from the Tenants, Portside remains committed to pursuing an agreement with the Tenants and the City that preserves the status quo and obviates the need for motions for preliminary injunctive relief.

If the parties are unable to negotiate an agreed order preserving the status quo, Portside would plan to present its position in a response to the Tenants' motion and in a potential accompanying cross-motion. Portside notes that, on April 22, 2024, the Court generated an automated entry in response to the Tenants' motion for preliminary injunctive relief that set the hearing date on that motion for May 20, 2024. Accordingly, we assume the dates for a response to that motion is May 6 and reply is May 13 pursuant to the Local Rules.

Portside will meet the above dates if necessary, but, given the threshold issue of intervention and the fact that Portside intends to file a cross-motion, Portside respectfully suggests the following briefing schedule:

| May 13, 2024: | Responses to Tenants' motion and Portside's cross-motion for relief; |
| May 28, 2024: | Reply in support of Tenants' motion and Tenants' response to Portside's cross-motion; and |
| June 4, 2024: | Reply in support of Portside's cross-motion. |

We appreciate the Court's assistance and stand ready should the Court require anything further.

Respectfully submitted,

Derek D. Reed, Esq.

*Attorney for Plaintiffs the Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, L.L.C.*

cc: All Counsel of Record

# EXHIBIT "E"

Case 2:23-cv-22291-MCA-JRA   Document 46-2   Filed 07/09/24   Page 123 of 273   PageID: 1377

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY, NEWARK DIVISION**

| | |
|---|---|
| The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC,<br><br>Plaintiffs,<br><br>v.<br><br><br><br>The City of Jersey City and the City of Jersey City Rent Leveling Board,<br><br>Defendants. | Case No. 2:23-cv-22291-MCA-JRA |

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs' move for a preliminary injunction and rely on the attached Declaration of Danielle Marchewka dated May 14, 2024 and Memorandum of Law.

Dated:  May 14, 2024

Respectfully submitted,

The Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC

By: */s/ Derek D. Reed*

*Attorney for Plaintiffs the Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC*

Derek D. Reed, Esq. (Attorney ID # 038062003)
Jeffrey Plaza, Esq.
Ehrlich, Petriello, Gudin
Plaza & Reed
A Professional Corporation
60 Park Place, Suite 1016
Newark, New Jersey 07102
(973) 643-0040

Terri L. Mascherin
Andrew W. Vail
Daniel J. Weiss
Jenner & Block LLC
353 Norh Clark Street
354 Chicago, Illinois 60654
Phone: (312) 222-9350
Facsimile: (312) 840-7375

*Attorneys for Plaintiffs*

Case 2:23-cv-22291-MCA-JRA   Document 46-2   Filed 04/09/24   Page 125 of 273   PageID: 1379

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY, NEWARK DIVISION**

| | | |
|---|---|---|
| The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC, <br><br> Plaintiffs, <br><br> v. <br><br><br> The City of Jersey City and the City of Jersey City Rent Leveling Board, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 2:23-cv-22291-MCA-JRA <br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... i

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 3

    A.    New Jersey Exempts Buildings Constructed After 1987 From Rent Control. ...................3

    B.    Portside Towers Was Treated As Exempt From Rent Control For Decades......................5

    C.    The Jersey City Bureau Determined That Portside Towers Was Indeed Exempt. .............6

    D.    The Rent Leveling Board Reverses The Bureau's Finding. ...............................................8

    E.    Portside Initiates This Action, Challenging The Board's Order........................................9

    F.    Jersey City Is Threatening To Prosecute Portside Despite Having Yet To Determine What The Base Rent Is. ......................................................................................................9

    G.    The Tenants Move For Injunctive Relief; Portside Agrees That An Injunction Preserving The Status Quo Is Appropriate, But Disagrees With The Tenants' Requested Relief. ..............................................................................................................................10

    H.    Portside Attempts To Reach Agreement With The Tenants and City To Preserve The Status Quo. ..........................................................................................................................12

LEGAL STANDARD............................................................................................................. 12

ARGUMENT.......................................................................................................................... 12

    I.    The Court Should Enjoin Enforcement Of The Board's Order Because Portside Is Likely To Establish It Is Unlawful. ....................................................................................13

        A.    New Jersey State Law Prohibits Jersey City From Stripping Portside Of A Rent-Control Exemption To Which It Is Entitled Under State Law. ............................................ 13

        B.    The Board's Action Violated State Law Because Substantial Compliance, not Strict Compliance, is Required. ................................................................................................... 21

    II.    The Board's Order Violates The Due Process Clause And So Do Jersey City's Recent Actions. ....................................................................................................................................... 26

    III.    Portside Satisfies The Remaining Preliminary-Injunction Factors....................................28

    IV.    The Court Should Enjoin Enforcement Of The Order, Or, Alternatively, Order An Injunctive Framework That Preserves The Status Quo. .........................................................32

    V.    The Court Should Determine Whether to Exercise Its Discretion Under Rule 65 So As To Further Streamline Any Additional Proceedings............................................................34

CONCLUSION....................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Primerica Holdings*,
811 F. Supp. 1025 (D.N.J. 1993) .................................................................................33

*Am. Exp. Travel Related Servs. Co. v. Sidamon-Eristoff*,
755 F. Supp. 2d 556 (D.N.J. 2010) ..............................................................................30

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt.*,
793 F.3d 313 (3d Cir 2015)...........................................................................................12

*Bernstein v. Bd. of Trs. of Teachers' Pension & Annuity Fund*,
376 A.2d 563 (N.J. Super. Ct. App. Div. 1977)............................................................22

*Block 268 v. City of Hoboken Rent Leveling and Stabilization Board*,
952 A.2d 473 (N.J. Sup. Ct., App. Div. 2008)..............................................................22

*Carcol Enters. v. Central License Bureau of City of Elizabeth*,
2018 WL 3447512 (N.J. Super. Ct. App. Div. July 18, 2018)......................................20

*Catlett v. New Jersey State Police*,
2012 WL 3757005 (D.N.J. Aug. 28, 2012) ..................................................................22

*Cigar Assoc. of Am. v. City of Philadelphia*,
2021 WL 5505406 (3d Cir. Nov. 24, 2021)..................................................................28

*Petition of Elizabethtown Water Co.*,
527 A.2d 354 (N.J. 1987)..............................................................................................20

*Galik v. Clara Maass Med. Ctr.*,
771 A.2d 1141 (N.J. 2001).......................................................................................21, 23

*Healthcare Servs. Grp., Inc. v. Fay*,
977 Fed. App'x 102 (3d Cir. 2015)...............................................................................29

*Islamic Soc'y of Basking Ridge v. Twp. of Bernards*,
226 F. Supp. 3d 320 (D.N.J. 2016) ..............................................................................27

*Jersey Cent. Power & Light Co. v. Melcar Util. Co.*,
59 A.3d 561 (D.N.J. 2013).............................................................................................15

*Johnson v. United States*,
576 U.S. 591 (2015).......................................................................................................27

*Kindig v. Gooberman*,
  149 F. Supp.2d 159 (D.N.J. 2001) ................................................................................21–22

*Kos Pharms. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004).......................................................................................12

*Kraft v. Wells Fargo & Co.*,
  2016 WL 6841076 (D.N.J. Nov. 21, 2016) ...............................................................31

*Kyocera Document Sols. Am., Inc. v. Div. of Admin.*,
  2023 WL 8868837 (D.N.J. Dec. 22, 2023).................................................................12

*Lamplighter Village Apartments LLP v. City of St. Paul*,
  534 F. Supp. 3d 1029 (D. Minn. 2021)......................................................................30

*Money Marketing v. Silver Aspen, Inc.*,
  2006 WL 8457663 (D.N.J. June 8, 2006)...................................................................29

*Oorah v. Twp. of Lakewood*,
  2017 WL 6421062 (N.J. Tax Ct. Dec. 15, 2017)........................................................16

*Schrader v. Dist. Att'y of York Cnty.*,
  74 F.4th 120 (3d Cir. 2023) .......................................................................................31

*United States v. L. Cohen Grocery Co.*,
  255 U.S. 81 (1921).....................................................................................................27

*Villas at Parkside Partners v. City of Farmers Branch*,
  496 F. Supp. 2d 757 (N.D. Tex. 2007) ......................................................................30

*W. Orange Twp. v. Joseph Kushner Hebrew Acad.*,
  13 N.J. Tax 48 (1993) ................................................................................................16

*Wessie Corp. v. Sea Isle City Zoning Bd. of Adjustment*,
  2007 WL 1892473 (D.N.J. June 29, 2007).................................................................28

*Willow Ridge Apartments, LLC v. Union City Rent Stabilization Bd.*,
  2022 WL 2525243 (N.J. Super. Ct. App. Div. July 7, 2022)...............................17, 23

**Statutes**

Jersey City Ord. §260-3 ...............................................................................................5, 33

Jersey City Ord. §260-6(c)...................................................................................4, 5, 14, 17

N.J.S.A. §2A:42-6.............................................................................................................17

N.J.S.A. §2A:42-84.1 ............................................................................................3, 14

N.J.S.A. §2A:42-84.2 ................................................................................4, 13, 15, 16

N.J.S.A. §2A:42-84.3 ..........................................................................................4, 19

N.J.S.A. §2A:42-84.4 ............................................................................................. *passim*

N.J.S.A. §2A:42-84.5 ............................................................................................. *passim*

N.J.S.A. §2A:42-84.5(b) .......................................................................................32

N.J.S.A §54:4-4.4 .................................................................................................16

**Other Authorities**

Jersey City Rent Leveling Bd. Mtg. Oct. 19, 2023 at
   https://www.youtube.com/watch?v=oCgWfCSfJN4 ..........................................8, 27

Jersey City TV, City Council Mtg. Apr. 9, 2024 at https://youtu.be/ZsMZQbogb-
   8?t=12975 ..............................................................................................32

Plaintiffs ("Portside") respectfully submit this memorandum in support of their motion for a preliminary injunction.

## INTRODUCTION

Although the Tenants' recent motion for preliminary injunctive relief was terminated administratively, Portside agrees with the premise that a "status quo" order is both necessary and appropriate pending the resolution of this case. The order of the Jersey City Rent Leveling Board (the "Board") at issue in this case not only violates the law, it has created untenable confusion and uncertainty for both Portside and its residents. That confusion, and the attendant likelihood of irreparable harm, has been compounded by recent threats made by Jersey City that it may seek criminal penalties against Portside unless it retroactively reduces rents to an amount that the City has thus far failed to identify. To avoid irreparable harm, the Court should enjoin the enforcement of the Board's order while it considers the issues in this case, or, alternatively, should enter a status quo order as detailed below that preserves all parties' rights, including by authorizing Portside to deposit disputed rents in escrow, pending the resolution of this case.

In its November 2, 2023, order (the "Order"), the Board purported to strip Portside of its state-law rent control exemption, which has been in effect and recognized by Jersey City and Portside's tenants for nearly thirty years. The Board's sole basis for that action was its finding that Portside could not prove that it sent an administrative notice to a local construction official more than 25 years ago. The Board identified no harm from this alleged paperwork deficiency—nobody disputes that Portside Towers otherwise qualifies for the state-law exemption, the City and tenants understood that Portside Towers was a market-rent property, and all Portside residents chose to live in Portside Towers, enjoy its amenities, and pay market rent in return, for decades. The Board nonetheless ordered that, because of the purported administrative notice deficiency in the 1990s,

1

Portside is retroactively subject to rent control, and the bargained-for rents contained in leases voluntarily executed by its tenants must be retroactively recalculated and capped.

The Board's Order is unlawful. As detailed below, the controlling state law prohibits local officials from taking any action to "limit, diminish, alter or impair" the rent control exemption, which is exactly what the Board has done here. *See* N.J.S.A. §2A:42-84.5. The Board's Order and its related conduct also violates the United States Constitution, including the Due Process Clause. For those reasons and others, Portside will establish that the Board's Order must be vacated.

In the meantime, Portside faces irreparable injury from the Board's Order and its related and unfounded threat of *criminal prosecution* if Portside charges rents that are "too high," when the Board has not even told Portside what it will assert the rent should be. Further, while its challenges to the Order are pending, Portside faces the prospect of potentially irreparable disruption to long-term tenant relationships. For example, if Portside is required to charge less than the rent specified in its leases during the pendency of this action, but the Board's Order is subsequently invalidated, tenants are likely to be angered when Portside reverts to charging the lawful rent the tenants agreed to pay in the first place. Portside is also unlikely to be able to recover from tenants any lost rent Portside incurs as a result of the Board's Order, resulting in further irreparable loss. Meanwhile, some tenants are arguing that they need not pay *any* rent because of the Board's Order, or that they may calculate their own "self-help" rent reductions. All the while, Portside must operate the luxury apartment buildings pursuant to its leases that tenants now assert are not binding, even as the City threatens criminal prosecution and civil penalties.

Portside thus agrees with the Tenants' recent request that the Court preserve the status quo during the pendency of this action, but disagrees that the relief sought in the Tenants' now administratively terminated motion would be lawful or appropriate. Instead, as further detailed

2

below, the Court should preserve the pre-dispute status quo by enjoining implementation of the Board's Order while it conducts its review. Portside residents should pay the rents set out in their voluntarily executed leases, subject to a refund in the unlikely event the Board's Order is upheld.

Alternatively, if the Court deems it necessary, during the pendency of these proceedings, Portside is willing to agree to a broader injunctive framework to preserve the status quo, without any admission or prejudice to its position in this action. Specifically:

1. Portside would freeze all rents at the agreed-to rate that applied on November 2, 2023 (immediately before the Board's Order), subject only to the potential annual increase allowed for rent-controlled properties in Jersey City (the lesser of 4% or the relevant CPI number). If required, going forward, Portside would escrow any rental increase.

2. Portside would not pursue any evictions for the nonpayment of rent for residents that pay the rent as specified in the first condition.

3. Even though Portside is entitled to institute larger increases under its leases and the law, Portside will forego seeking from the residents any other rent increases until the matter is resolved by the Court, but reserves the right to seek lost rent as damages from the City.

4. Enforcement of the Board's November 3, 2023 Order and any follow-on order by the Board or other Jersey City agency would be enjoined, except that, if the Board or Rent Leveling Bureau issue recalculated rents for Portside, the Tenants may request that Portside pay into escrow the difference between those recalculated rents and the rents charged going forward under the first condition.

Portside respectfully requests that the Court enter an order preserving the status quo and providing for orderly relations among Portside, its residents, and the City during the pendency of this case.

**STATEMENT OF FACTS**

**A.     New Jersey Exempts Buildings Constructed After 1987 From Rent Control.**

Since 1987, New Jersey has provided by statute that apartment buildings constructed in that year or thereafter shall be exempt from local rent control ordinances for up to thirty years (the

3

"Exemption"). N.J.S.A. §2A:42-84.1 et seq. (the "Exemption Statute"). The Exemption Statute

provides:

> In any municipality which has enacted or which hereafter enacts a rent control or rent leveling ordinance . . . those provisions of the ordinance which limit the periodic or regular increases in base rentals of dwelling units shall not apply to multiple dwellings constructed after [June 25, 1987], for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less.

N.J.S.A. §2A:42-84.2 (emphasis added).

The Exemption Statute also contains provisions that describe administrative notices to be

sent concerning the Exemption it provides. As relevant here, a building owner is to provide a notice

of the exemption to a "municipal construction official" 30 days before the "issuance of a certificate

of occupancy for the newly constructed multiple dwelling." *Id*. §84.4. The owner must also notify

tenants of the Exemption. *Id.* §84.3. Importantly, the statute does not provide that the municipal

construction official (or any other municipal authority) will have any role in assessing the

application of the Exemption or applying the Exemption Statute.

The Exemption Statute also provides that local governments will not undermine owners'

entitlement to the statutory Exemption. It explicitly provides: "No municipality, county or other

political subdivision of the State, or agency or instrumentality thereof, shall adopt any ordinance,

resolution, or rule or regulation, or take any other action, to limit, diminish, alter or impair any

exemption afforded pursuant to [the statute]." *Id.* §84.5.

Jersey City has a separate rent control ordinance. Jersey Cty. Cod. Ord. §260-6(c) (the

"Ordinance"). As further detailed below, the Jersey City Ordinance departs from the state

Exemption Statute in a critical way—it provides that the administrative notice described in Section

4

84.4 is a required condition precedent to enjoying the state-law exemption, a requirement found nowhere in the Exemption Statute. The Ordinance provides in relevant part:

> In accordance with N.J.S.A. 2A:42-84.1 et seq., L. 1987, c. 153, the [rent control] provisions of this chapter shall not apply to a new dwelling which is constructed between June 25, 1987, through June 25, 1992, and which is not constructed for occupation by senior citizens, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the dwelling, or for 30 years following completion of construction, whichever is less. This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4 and the service of a written statement upon the tenant required by N.J.S.A. 2A:42-84.3.

*Id.* Landlords subject to rent control under the Ordinance may not increase rent "greater than four percent or the percentage difference between the consumer price index three months prior to the expiration or termination of the lease and three months prior to the commencement of the lease term, whichever is less." *Id.* §260-3(c).

**B.     Portside Towers Was Treated As Exempt From Rent Control For Decades.**

Portside Towers consists of two connected apartment buildings. The buildings are located at 100 Warren Street ("100 Warren") and 155 Washington Street ("155 Washington"). Construction on 100 Warren was completed on August 25, 1992, and it was converted to a multifamily building shortly thereafter. Ex. A, Sept. 19, 2022 Notice of Decision re 100 Warren, at 3. Construction on 155 Washington was completed on December 31, 1997. Ex. B, Sept. 19, 2022 Notice of Decision re 155 Washington, at 4. The two towers are part of the same complex on a single block on the Jersey City waterfront. *Id.* at 5. They are part of the same tax block and were constructed under the same development plan and developer's agreement with the City. *Id.*

A certificate of occupancy for 100 Warren was initially issued on August 25, 1992. Ex. A at 3. At that time, the building was not open to residents and was planned as a condominium development. *Id.* A predecessor to Portside acquired the property in a foreclosure sale on

5

November 23, 1994. *Id.* at 3-4. It remained unoccupied. *Id.* at 4. That same day, November 23, 1994, Portside's predecessor sent a notice of exemption to Jersey City's Construction Code Official, Michael Regan, as the Exemption Statute provides. *Id.* But Mr. Regan did not accept the notice. He responded on December 6, 1994, writing, "Please be advised that the Office of Construction Official has no jurisdiction over rent controls and I would suggest that you contact the proper agency charged with that responsibility." *Id.*

On January 24, 1995, Jersey City issued a certificate of continued occupancy for 100 Warren. *Id.* 100 Warren thereafter opened for market rate residential rental occupancy and operated accordingly for nearly 30 years. Jersey City issued the Certificate of Occupancy for 155 Washington on December 31, 1997, and it, similarly, operated at market rate rental for approximately 25 years. Ex. B at 2. Although the City was able to locate the 1994 notice letter to Mr. Regan for 100 Warren, neither Portside nor the City has located a letter of exemption sent to Mr. Regan that specifically references 155 Washington. *Id.* at 4.

**C.      The Jersey City Bureau Determined That Portside Towers Was Indeed Exempt.**

About 25 years later, beginning in June 2022, tenants filed petitions with the Jersey City Office of Landlord/Tenant Relations Bureau of Rent Leveling (the "Bureau") contending Portside Towers is not exempt from Jersey City's rent control Ordinance. *See* Ex. C, Nov. 3, 2023 Order. Among other arguments, the tenants maintained that Portside could not establish that its predecessor had, more than two decades earlier, sent an appropriate administrative notice to the city construction official. *See id.* at 3.

On September 19, 2022, after receiving briefing and evidence, the Bureau found that Portside Towers properly qualified for the exemption. *Id.* at 2. With respect to the notice to tenants described in Section 84.3, the Bureau found that it was "undisputed that the Landlord has met

6

[that] criteria" by sending tenants a "Rent Control addendum," notifying the tenants that the buildings are exempt from rent control. Ex. B at 3.

With respect to the notice to the "city construction official" described in Section 84.4, the Bureau found that Portside's predecessor had provided the notice for 100 Warren by sending the November 23, 1994, letter to Mr. Regan, the Jersey City Construction Code Official. Ex. A at 3. The tenants argued that the November 23, 1994, letter was too late, because the Exemption Statute calls for a notice "at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling." *Id.* at 2-3; *see also* N.J.S.A. §2A:42-84.4. As noted, the initial certificate of occupancy for Portside Towers was issued on August 25, 1992. Ex. A at 3. However, as the Bureau found, Portside Towers was not occupied at that time. *Id.* It was not until January 24, 1995, after Portside's predecessor purchased the building and adapted it to a rental property, that Portside obtained a certificate of continued occupancy for 100 Warren. *Id.* at 4. The Bureau found that the November 23, 1994, notice, delivered more than 30 days before the certificate of continued occupancy, was sufficient. *Id.* at 3.

With respect to 155 Washington, the Bureau found that "no letter to the Construction Code Official . . . has been located but that does not mean that one was not sent." Ex. B at 4. Rather, given the passage of more than twenty years since the construction of the building and "in light of Mr. Regan's December 6, 1994 letter" refusing to accept the 100 Warren notice, it was at least "as likely as not" that a notice was sent but not filed or retained. *Id*. Moreover, the Bureau found that Jersey City had actual notice of the exemption in relation to 155 Washington and there was thus no doubt that "the City was aware of this development and the Landlord's claim of exemption." *Id.* at 5. Further, "[f]rom the start, the Tenants residing at 155 Washington have been advised that the building is not subject to rent control." *Id.*

HUD-L-002449-24   07/08/2024 5:10:49 PM   Pg 16 of 120   Trans ID: LCV20241697714
Case 2:23-cv-22201-MCA-JRA   Document 46-2   Filed 07/09/24   Page 137 of 273
PageID: 1391
Case 2:23-cv-22201-MCA-JRA   Document 146-2   Filed 07/09/24   Page 137 of 273
PageID: 1391

Thus, the Bureau held that both Portside Towers buildings were exempt from rent control. Regarding 155 Washington, the Bureau held that the Exemption applies from December 31, 1997 (the completion of construction) through December 30, 2027. *Id.* at 7. Regarding 100 Warren, it held that the Exemption applies from August 25, 1992 (the completion of construction) through August 24, 2022. Ex. A at 4.

### D.   The Rent Leveling Board Reverses The Bureau's Finding.

The tenants sought review of the Bureau's decision by the Board. Ex. C, Order. The Board received written submissions and conducted a non-substantive hearing on May 31, 2023, and a final, substantive hearing on October 19, 2023. *Id.*

In the words of the Board's chairman, the October 19, 2023, hearing was held before a "sold out crowd" with "standing-room only box seats." *See* Jersey City Rent Leveling Brd. Mtg. Oct. 19, 2023 at https://www.youtube.com/watch?v=oCgWfCSfJN4. The hearing lasted approximately 17 minutes and mainly consisted of individual commissioners, all politically appointed by the City's mayor, announcing how they intended to vote. *Id.* One commissioner stated in his first remarks: "This is happening all over the country; this is happening too much in Jersey City . . . owners are not doing what they are supposed to do to allow the tenant to get their due." *Id.* After the Board announced its decision to "side with the tenants," the "sold-out" crowd applauded. *Id.*

The Board issued its Order on November 3, 2023, finding that "both 100 Warren and 155 Washington are subject to Jersey City rent control regulations." Ex. C, Order at 10. The sole basis for that holding was the Board's conclusion that Portside had not established that timely notices were provided to the construction official in the 1990s. *Id.* The Board held such a notice "is a mandatory condition precedent to receipt of th[e] rent control exemption[,] requiring strict

8

compliance with its terms." *Id.* at 8. The Board acknowledged that the Exemption Statute "does not expressly provide for a remedy" to strip a building of its rent control exemption, but nevertheless found "there was no valid exemption from the beginning of the occupancy of the units." *Id.* at 9.

The Board additionally directed the Bureau to "adjust the rent on all units within the buildings dating back six years from the filing of the first [petition] at issue in the instant matters for each building." *Id.* at 10. At present, the Bureau has not yet calculated the adjustment.

**E.     Portside Initiates This Action, Challenging The Board's Order.**

Portside sued Jersey City and the Board in this Court. Dkt. 1. Among other claims, Portside alleged in its complaint that the Board's Order violates the New Jersey Exemption Statute and the Due Process Clause of the U.S. Constitution. *Id.* at 22-23, 26-28.

On April 1, 2024, certain Portside tenants and associations of tenants (the "Tenants") moved to intervene. Dkt. 30. In their proposed complaint, the Tenants allege only claims for declaratory relief, generally contending that the Board did not go far enough and should have found that all of Portside's rent, going back to the 1990s, must be recalculated at rent-control levels. Dkt. 29-2 at 61-64. The Tenants' motion to intervene is pending.

**F.     Jersey City Is Threatening To Prosecute Portside Despite Having Yet To Determine What The Base Rent Is.**

On March 19, 2024, even though the Board has not yet recalculated Portside's permissible rents (and the Corporation Counsel and a City Council member had publicly stated that Portside could increase rent 4%) the City threatened to impose criminal penalties against Portside and its employees if they were found to have charged rent more than that authorized by the City's

Ordinance. *See* Ex. D Marchewka Decl. at Ex. 4, Mar. 19, 2024 Ltr. from Jersey City to Portside, at 3. The City stated:

> Please be reminded that pursuant to § 260-17, a violation of any provisions of Chapter 260 is punishable by a fine of up to two thousand dollars ($2,000.00) and/or imprisonment for a period of up to ninety (90) days and/or a period of community service not exceeding ninety (90) days. A violation affecting more than one tenant shall be considered a separate violation as to each tenant.

*Id*. But as the City conceded, it is still "currently reviewing [the proof] in order to perform the necessary calculations" of the permitted rent. *Id.* at 1.

On March 27, 2024, Portside wrote to the City to ask it to withdraw its threat, but the City only doubled-down in another letter on April 17, 2024—confirming that it would pursue possible civil and criminal penalties against Portside and individual employees even though it has not disclosed any calculation of permitted rent. *See* Ex. D at Ex. 6, Mar. 27, 2024 Ltr. from Portside to Jersey City; Ex. D at Ex. 9, Apr. 17, 2024 Ltr. from Jersey City to Portside.

**G.** **The Tenants Move For Injunctive Relief; Portside Agrees That An Injunction Preserving The Status Quo Is Appropriate, But Disagrees With The Tenants' Requested Relief.**

On April 19, 2024, the Tenants filed their motion seeking an injunction. Dkt. 34-1.[1] Although that motion has now been administratively terminated (Dkt. 36), its filing reflects the Tenants' agreement that there is a need for judicial intercession to preserve the status quo and provide the parties with clarity about their rights and obligations during the pendency of this case.

Portside submits that the necessary clarity should be provided by preserving the pre-dispute status quo, preliminarily enjoining the Board's unlawful Order while the Court resolves the issues in the case. With that temporary relief, tenants will merely have to adhere to the lease agreements

---

[1] At the time the Tenants filed their motion, the Court had not yet ruled on their pending motion to intervene. Dkt. 30.

10

they voluntarily signed, subject to a refund in the unlikely event that the Board's Order is upheld. Alternatively, if the Court grants Portside's alternative proposed injunction, the Tenants would merely pay the rent they were *already* paying prior to the Board's Order, plus rent increases authorized by the City's Ordinance, which increases could be retained in escrow pending resolution of this matter.

That alternative framework tracks the way that Portside is handling rent increases since the issuance of the Board's Order. Since the Board's Order, Portside has limited rent increases consistent with the City's Ordinance, even though Portside would be permitted a greater increase under its market-rent leases. Ex. D at Ex. 2, Jan. 19, 2024 Ltr. from Portside to Jersey City. For 100 Warren, Portside has limited annual rent increases in line with the Ordinance at all times since September 19, 2022. Ex. D at Ex. 3, Feb. 7, 2024 Ltr. from Portside to Jersey City. For 155 Washington, Portside has agreed to limit annual increases consistent with the City's Ordinance (*i.e.*, 4% or CPI), and has provided credit for any payment in excess of that amount since the November Board decision. *Id*.

Additionally, under the framework that Portside proposes, tenants would not be subject to eviction based on disagreements about the applicable rent, so long as the rent required under the status quo order is paid. Again, that scenario would track how Portside is voluntarily handling evictions while this matter has been pending. Portside has elected during the pendency of this case not to pursue evictions of any tenant at Portside based on a dispute over the amount of rent and has voluntarily dismissed any such eviction proceeding. Ex. D at Ex. 10, Apr. 26, 2024 Ltr. from Portside to Tenants. Of course, if a tenant refuses altogether to pay the rent in effect in accordance with this Court's order or is subject to eviction for reasons unrelated to rent, Portside should not be precluded from seeking appropriate remedies.

11

In short, Portside seeks to preserve a status quo that will fully protect legitimate tenant interests and reduce disruption to Portside's tenant relationships during the pendency of this case.

**H.    Portside Attempts To Reach Agreement With The Tenants and City To Preserve The Status Quo.**

After the Tenants filed their motion for injunctive relief, Dkt. 34-1, Portside contacted the Tenants and the City, attempting to reach an agreement on a status quo order. Ex. D at Ex. 10. Portside also submitted a proposal consistent with that letter to the Court. Dkt. 35. To date, neither the Tenants nor the City has responded to Portside's attempts to reach an agreement.

## LEGAL STANDARD

To obtain a preliminary injunction, a litigant must show (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. *See Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt.*, 793 F.3d 313, 318-19 (3d Cir 2015); *Kos Pharms. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The Court has broad discretion to craft an order that preserves the status quo and avoids irreparable harm to all stakeholders. *Kyocera Document Sols. Am., Inc. v. Div. of Admin.*, 2023 WL 8868837, at *8 (D.N.J. Dec. 22, 2023).

## ARGUMENT

The Court should preserve the status quo ante by enjoining enforcement of the Board's Order pending the Court's review. Portside meets all requirements for a preliminary injunction—it is likely to show that the Board's Order is unlawful, it is threatened with irreparable harm, and the balance of equities and public interest favor Portside. Alternatively, Portside is willing to agree to a framework that restricts its ability to raise rents or initiate evictions during the pendency of this case, so long as Portside is protected from unlawful enforcement of the Board's Order.

12

I.        **The Court Should Enjoin Enforcement Of The Board's Order Because Portside Is Likely To Establish It Is Unlawful.**

The Court should enter an injunction because Portside is likely to prevail on its claim that the Board's Order is unlawful. Portside's complaint lays out several defects in the Order, but at least three are largely questions of law and alone sufficient to support injunctive relief. *First*, the Board's Order violates the New Jersey Exemption Statute because it conditions entitlement to a rent-control exemption on compliance with an administrative notice requirement, even though New Jersey law imposes no such condition. *Second*, to the extent such a notice requirement exists, Portside substantially complied with it. *Third*, the Defendants' actions violate the Due Process Clause.

A.       **New Jersey State Law Prohibits Jersey City From Stripping Portside Of A Rent-Control Exemption To Which It Is Entitled Under State Law.**

As reviewed above, New Jersey law exempts newly-constructed buildings from municipal rent-control ordinances for 30 years. N.J.S.A. §2A:42-84.2. This law reflects the Legislature's determination that it is "necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey." *Id.* §84.5(a). To ensure that local governments do not undermine that objective, the Legislature provided that a local government may not "adopt any ordinance, resolution, or rule or regulation, or take any other action, to limit, diminish, alter or impair any exemption afforded pursuant to [the statute]." *Id.* §84.5(b).

In a separate subsection, the Legislature required property owners claiming an exemption under Section 84.2 to file certain notices with a local construction official. Specifically:

> The owner of any multiple dwelling claiming an exemption from a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of

13

exemption from an ordinance under this act, including therein a statement of the date upon which the exemption period so claimed shall commence, such information as may be necessary to effectively locate and identify the multiple dwelling for which the exemption is claimed, and a statement of the number of rental dwelling units in the multiple dwelling for which the exemption is claimed. The owner shall, at least 30 days prior to the date of the termination of the exemption period afforded pursuant to this act, file with the municipal construction official a notice of the date of termination of the exemption period for the affected multiple dwelling.

*Id.* §2A:42-84.4.  Section 84.4 simply requires a notice to be sent to the municipal construction official; it does not authorize the construction official (or any other municipal official) to make any determination about the notice requirement or the application of the Exemption.

Jersey City's rent-control Ordinance departs from the state Exemption Statute in a crucial respect. Although the Ordinance incorporates the 30-year exemption for new construction, it provides that the exemption "applies *only* where an owner complied with all requirements contained in N.J.S.A. §2A:42-84.1 *et seq.*, including the filing with the municipal construction official required by N.J.S.A. §2A:42-84.4." Jersey City Ord. §260-6(c) (emphasis added). In other words, Jersey City's ordinance expressly characterizes compliance with the notice provision of the state Exemption Statute as a mandatory prerequisite to obtaining the benefit of the state law Exemption. No such language appears in the Exemption Statute.

In this case, the Board applied the Ordinance and concluded that strict compliance with the notice provision was a mandatory condition precedent for the rent-control exemption. According to the Board, because Portside submitted notice regarding 100 Warren to the municipal construction official in 1994, even though (according to the Board) it was supposed to do so in 1992, Portside is stripped of its entitlement to the rent-control Exemption for 100 Warren. Ex. C, Order at 8. And because no notice was located regarding 155 Washington, the Board decided Portside is stripped of the rent-control exemption for that building as well. *Id.* In the Board's view,

14

it was wholly irrelevant whether this purported notice violation caused any harm: "the Statute's notice requirement is a mandatory condition precedent to receipt of this rent control exemption requiring strict compliance with its terms." *Id*.

The Board's action violates and is preempted by state law. As further detailed below, under New Jersey law, providing notice pursuant to Section 84.4 is *not* a mandatory condition precedent to a building owner's entitlement to the rent control Exemption. Jersey City has therefore done precisely what state law prohibits: it has taken "action[] to limit, diminish, alter or impair any exemption afforded pursuant to [the statute]." N.J.S.A. §2A:42-84.5.

1. Under the plain text of New Jersey law, compliance with the notice requirement is not a prerequisite to obtaining the rent-control Exemption.

The plain text of the Exemption Statute demonstrates that compliance with the notice provision is not a mandatory prerequisite to the exemption from rent control. Section 84.2 provides that, for newly-constructed buildings, a rent-control ordinance "shall not apply to multiple dwellings constructed after the effective date of this act [June 26, 1987]." Portside's buildings are undisputedly "multiple dwellings constructed after" that date. *See* §2A:42-84.2. Therefore, Jersey City's rent-control ordinance "*shall* not apply." *Id.* (emphasis added).

"[T]he Legislature's choice of the word 'shall' . . . is ordinarily intended to be mandatory, not permissive." *Jersey Cent. Power & Light Co. v. Melcar Util. Co.*, 59 A.3d 561, 567 (D.N.J. 2013). The statute does not recite any exceptions to that mandatory language. Nor does the statute vest authority in any official to determine whether the rent control exemption applies based on a notice or otherwise. The exemption "*shall*" apply based upon only the date of construction. Therefore, Portside Towers is exempt from rent control. N.J.S.A. §2A:42-84.4 (emphasis added).

The notice provision in Section 84.4 does not implicitly repeal that unconditional and mandatory language. It states: "The owner of any multiple dwelling claiming an exemption from

15

a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of exemption from an ordinance under this act." *Id.* Nothing in this provision states that a notice to a local official is a *prerequisite* to obtaining the Exemption in Section 84.2. Nor does this provision confer any authority on the municipal construction official (or any other local official) to make any assessment or do anything else with the notice that relates to deciding whether the Exemption applies. Instead, the notice is described in a separate statutory subsection providing that *if* an owner claims the exemption, *then* the owner is subject to this notice requirement. But regardless whether notice is supplied, the exemption "*shall*" apply. *Id.* §2A:42-84.2 (emphasis added).

In that way, Section 84.4 is analogous to the state law requiring property owners that are exempt from property taxes to file a notice with tax assessors declaring their entitlement to an exemption. *See* N.J.S.A §54:4-4.4. New Jersey courts have consistently held that a failure to comply with that notice requirement does not strip the property owner of the tax exemption. *See, e.g.*, *Oorah v. Twp. of Lakewood*, 2017 WL 6421062, at *6 (N.J. Tax Ct. Dec. 15, 2017) (holding that it is "well established" that "a parcel's exempt status is determined by its ownership and use, and not by the property owner's compliance with exemption claim procedures"); *W. Orange Twp. v. Joseph Kushner Hebrew Acad.*, 13 N.J. Tax 48, 54 (1993) ("[T]he failure to file the triennial statement has no effect upon the claimant's entitlement to exemption."). The same reasoning applies here.

The New Jersey legislature easily could have written Section 84.2 to render compliance with Section 84.4 to be a prerequisite to the rent-control exemption. Most obviously, the legislature could have used the language appearing in Jersey City's Ordinance, which departs from state law

16

and makes notice a *mandatory prerequisite* to obtaining the exemption. *See* Jersey City Ord. §260-6(c) (exemption "applies only where an owner complied with all requirements . . . including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4"). Alternatively, the Legislature could have borrowed from the myriad of state statutes stating that compliance with a notice requirement is a *prerequisite* for the exercise of a statutory right. *E.g.*, N.J.S.A. §2A:42-6 (if a tenant holds over "after demand made and notice in writing for delivering the possession thereof," the landlord may charge double rent). Here, the Legislature did not frame Section 84.4's notice requirements as prerequisites for the statutory Exemption, but instead as regulatory requirements imposed on building owners who are *already* subject to the Exemption. The Court should take the Legislature at its word.

> 2. The notice provision is not "surplusage," but local officials are not permitted to limit, diminish, alter, or impair the state law Exemption.

In holding that a failure to satisfy the notice provision results in loss of the rent-control exemption, the Board theorized: "Any interpretation to the contrary would render the notice provisions voluntary or mere surplusage, whereas the Statute provides that the property owner 'shall' provide the required notice." Ex. C, Order at 9. An unpublished decision applied the same reasoning. *Willow Ridge Apartments, LLC v. Union City Rent Stabilization Bd.*, 2022 WL 2525243, at *8 (N.J. Super. Ct. App. Div. July 7, 2022).

The Board and *Willow Ridge* are wrong. It is not the case that a regulatory requirement is "voluntary" or "surplusage," unless it is enforced with an extreme penalty like the *total loss* of a legal right. Officials have many methods to enforce compliance with regulatory requirements, including deficiency notices, fines, and civil suits. What local governments may *not* do, however, is "limit, diminish, alter or impair any *exemption* afforded pursuant to [the statute]." N.J.S.A. §2A:42-84.5 (emphasis added). Thus, although New Jersey law would have permitted Jersey City

17

to enact a rent-control ordinance that, for example, imposed fines to encourage compliance with the notice requirement, Jersey City may not "impair" the statutory Exemption itself.

Indeed, it is the Board's interpretation, not Portside's, that would yield surplusage. Section 84.4 includes a second notice requirement: "The owner shall, at least 30 days prior to the date of the termination of the exemption period afforded pursuant to this act, file with the municipal construction official a notice of the date of termination of the exemption period for the affected multiple dwelling." Plainly, this notice requirement is not a prerequisite to the Exemption: the owner could not even theoretically comply with it until *after* it has already obtained the benefits of the Exemption. If stripping an owner of the Exemption is the sole way of enforcing Section 84.4's notice requirement, then there would be no way of enforcing Section 84.4's second notice requirement, rendering it pure surplusage. By contrast, if the notice requirements are enforced in the typical manner for administrative requirements—*e.g.,* graduated penalties in the event of non-compliance—then both requirements can be given effect.

3.   Portside's interpretation advances the purpose of the notice requirement.

Enforcing the notice requirement by retroactively stripping a building owner of its rent-control Exemption would also conflict with the purpose of the notice requirement. The Board emphasized that the purpose of notifying the City is "to allow the municipality's construction official to inspect the subject property and to evaluate whether it qualifies for the exemption." Ex. C, Order. But, here, no one has ever suggested that the City was unaware that Portside Towers was operating pursuant to the Exemption, and there is no dispute whether Portside Towers qualifies for the exemption other than with respect to the notice issue. Nor has the City offered an explanation of *how* an inspection of the property would be relevant to Portside's eligibility for the Exemption—the Exemption applies to any multiple dwelling constructed after the statute's effective date.

18

Underscoring the point, when Portside submitted notice of the rent-control exemption regarding 100 Warren to the relevant city official, he said he did not know what to do with it. Ex. A at 4 n.5.

Further, it is undisputed that Portside complied with the requirement to give advance notice to the tenants that their property is not rent-controlled. *See* N.J.S.A. §2A:42-84.3. The tenants were not harmed by Portside's purported failure to submit a timely notice *to the City*, and it makes no sense that they should receive windfall retroactive rent decreases as a result. It would make far more sense to enforce the notice requirement the way filing requirements are traditionally enforced—*i.e.*, a penalty that fits the violation and ensures prospective compliance. For example, Jersey City could impose smaller penalties for small or inadvertent delays in satisfying the notice requirement, and large penalties for long delays or willful misconduct. A local government could also *keep* such a penalty, which makes sense because it is the local government (not the tenants) that failed to receive the notice. This mode of enforcement would avoid the remarkable scenario in this case, where Portside faces the disproportionate penalty of being stripped of its right to charge market rents even though the tenants were always aware of the rent-control exemption.

Moreover, because actions for penalties are typically subject to statutes of limitations, owners would be protected from stale claims. A statute of limitations would avoid the extreme unfairness in this case, in which Portside was stripped of its rent-control exemption for 155 Washington because there was no definitive proof that a document was mailed *30 years ago*—even though, as the Bureau found, there was significant circumstantial evidence that the document *was in fact* sent. Ex. B at 4.

    4.  The Landlord Registration Statements are irrelevant.

In their now-terminated motion, the Tenants pointed to Annual Landlord Registration Statements submitted from 2020 to 2022 in which Portside purportedly represented that the

19

properties at issue were rent-controlled. Dkt. 34-1 at 4. Those statements are no basis for upholding the Board's Order, because the Board did not rely on them. Similar to federal administrative law, New Jersey law provides that judicial review of local government decisions is based "solely on the agency record." *Carcol Enters. v. Central License Bureau of City of Elizabeth*, 2018 WL 3447512, at *5 (N.J. Super. Ct. App. Div. July 18, 2018); *see also Petition of Elizabethtown Water Co.*, 527 A.2d 354, 364 (N.J. 1987) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that the action was based") (quotation marks and citation omitted). The Board's Order cannot be upheld based on a rationale the Board did not offer.

Moreover, the Bureau correctly *rejected* the Tenants' reliance on the Annual Landlord Registration Statements, explaining that Portside's statements may have reflected "a misreading of the form associated with the change in format that resulted in these answers." Ex. B at 7. "[B]ut whatever the reason," the Bureau concluded, "the Landlord's response in the Registration is not dispositive of whether the Property is exempt from rent control. What is relevant is whether the Property meets the criteria and the requirements of the Ordinance and the Statute." *Id.* Although the Board reversed the Bureau on other grounds, it did not disturb this aspect of the Board's analysis. And this analysis is correct—nothing in state law suggests that a local government may withdraw the statutory exemption for including incorrect information on a form not contemplated by state law.

### 5. The Board's Order violated state law.

For each reason, the Board's Order stripping Portside of its rent control exemption violated the state Exemption Statute. The Board relied on Jersey City Ordinance 260-6(c), which impermissibly departs from state law by providing that the administrative notices described in N.J.S.A. 2A:42-84-4 are a mandatory condition precedent to the rent control Exemption, when

they are not. Ex. C, Order at 8. Thus, the Board has taken action "to limit, diminish, alter or impair any exemption afforded pursuant to [the statute]," in violation of state law. N.J.S.A. §2A:42-84.5. Portside is likely to succeed on the merits that the Board's Order violates state law.

**B.** **The Board's Action Violated State Law Because Substantial Compliance, not Strict Compliance, is Required.**

The Board's Order is unlawful for the additional reason that, even if the notices described in Section 84.4 were a condition precedent to obtaining the Exemption, New Jersey law would require only *substantial compliance* with the notice provisions, not strict compliance. As the Bureau's findings make clear, Portside substantially complied with state law. In overturning the Bureau's decision, the Board departed from state law, applying a strict-compliance standard that is far more stringent than the state-law standard. For this reason, too, the Board impermissibly took action "to limit, diminish, alter or impair any exemption afforded pursuant to [the statute]," in violation of state law. *Id*.

1. Under New Jersey law, substantial compliance is sufficient to satisfy the notice provision in Section 84.4.

The New Jersey Supreme Court has recognized the "substantial compliance doctrine," which is "designed to avoid technical rejection of legitimate claims." *Galik v. Clara Maass Med. Ctr.*, 771 A.2d 1141, 1148 (N.J. 2001). A court deciding a substantial compliance claim considers the following factors: "(1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute." *Id.* This doctrine "has deep roots" in the law and applies in "a wide array of contexts." *Id*. (collecting cases). Federal courts routinely apply the doctrine in disputes arising under New Jersey law. *See, e.g.*, *Kindig v. Gooberman*, 149 F. Supp.2d 159, 163-

64 (D.N.J. 2001); *Catlett v. New Jersey State Police*, 2012 WL 3757005, at \*5-6 (D.N.J. Aug. 28, 2012).

The sole published New Jersey appellate decision addressing Section 84.4 has held that substantial compliance is sufficient to satisfy its notice requirement. In *Block 268 v. City of Hoboken Rent Leveling and Stabilization Board*, 952 A.2d 473 (N.J. Super. Ct. App. Div. 2008), the tenants argued that the building owner should be stripped of its rent-control exemption because it did not strictly comply with the filing requirement in Section 84.4. Specifically, Section 84.4 requires that notice to the municipal construction official be sent by the "owner," whereas the tenants alleged that the notice was not technically sent by the "owner." *Id.* at 477. Without deciding whether compliance with the notice requirement is a condition precedent, the court ruled in the owner's favor on the ground that "[a]ny technical non-conformity [in the notice] is excusable under the equitable doctrine of substantial compliance." *Id.* (citing *Bernstein v. Bd. of Trs. of Teachers' Pension & Annuity Fund*, 376 A.2d 563 (N.J. Super. Ct. App. Div. 1977)); *see Bernstein*, 376 A.3d at 566 (applying 5-factor substantial compliance test).

Given that New Jersey courts have applied the substantial-compliance test to a wide array of statutes, including the specific statute at issue in this case, the Court should hold that substantial compliance—not strict compliance—is required to satisfy Section 84.4.

### 2. Portside substantially complied with respect to 100 Warren.

The Bureau's decision makes clear that Portside substantially complied with the notice requirement with respect to 100 Warren. As the Bureau explained, Portside sent notice to the City construction official on November 23, 1994. Ex. A at 3-4. Although the initial certificate of occupancy for 100 Warren was issued in 1992, the Bureau explained that Portside had good reason for waiting until 1994 to send the notice: "At the time of the issuance of the [certificate of

22

occupancy] for 100 Warren, the building was not open to residents. The development was intended as a condominium development but evidently because of economic difficulties, the Property went through foreclosure." *Id.* at 3. The building sat unoccupied until November 1994, when it was purchased in a foreclosure sale by a predecessor to Portside.

Immediately upon purchasing the building in November 1994, the new owner sent a notice to the Jersey City construction official indicating that the building would be rented as apartments and would be exempt from rent control pursuant to the state Exemption Statute. As the Bureau found, "[t]he developer's letter identifies the Property by address and block and lot, references the statutory exemption, the number of units, and the commencement date of initial occupancy, January 1, 1995," and thus "satisfies the notification requirement of the Statute." *Id.* at 4. The Bureau also pointed out that "the Construction Code Official at the time of Portside's letter, Michael Regan, was unaware of the requirements of the Statute"; he sent a response letter stating he "has no jurisdiction over rent controls." *Id.* at 4 n.5.[2]

Although the Bureau did not use the words "substantial compliance," it is plain in context that it found the substantial-compliance requirement to be satisfied. That determination was correct. All five factors of the New Jersey substantial compliance test (set out above) favor Portside. *See Galik*, 771 A.2d at 1148. *First*, there was no prejudice to the City, which received the notice before the building was ever occupied (and whose construction official rejected the

---

[2] The Bureau distinguished *Willow Ridge Apartments v. Union City Rent Stabilization Bd.*, 2022 WL 2525243, at *8 (N.J. Super. Ct. App. Div. July 7, 2022), pointing out that in *Willow Ridge*, "there was no evidence that the owner ever applied for the statutory rent control exemption nor was there ever any notice to the tenants of the owner's claim that the building was exempt." Ex. A at 6. "The circumstances are very different here where the owner of the Property notified the Construction Code Official of its claimed exemption over 30 days prior to the initial occupancy of 100 Warren and, more importantly, has notified the Tenants in every lease and lease renewal of the claimed exemption." *Id.*

notice anyway). Nor was there prejudice to the tenants, who were notified of the rent-control exemption. *Second*, Portside *did* take appropriate steps to comply with the statute in 1994, before the building's occupancy and before any rental charges. *Third*, Portside's action *did* comply with the purpose of the statute—Portside provided notice and there was never a contention that the City was unaware of Portside's claim of exemption. *Fourth*, as already explained, both the City and the tenants had reasonable notice. And *fifth*, Portside had a reasonable explanation—the unoccupied property (at the time not a rental property) went through foreclosure, passed to a new owner, and the new owner immediately sent the notice before the building was occupied.

### 3. Portside substantially complied with respect to 155 Washington.

As to 155 Washington, the Bureau determined that the notice was likely sent, but could not be located nearly three decades after the fact. Ex. B at 4-5. The Board's view that a property owner must locate a thirty-year-old notice upon pain of losing a statutory entitlement is unsupported by anything in the Exemption Statute. But even if there was no notice specific to 155 Washington, Portside's notice with respect to 100 Warren substantially complied with any requirement for 155 Washington. As the Bureau found:

- "155 Washington was owned by the same owner as 100 Warren and these Towers were managed as one development." *Id.* at 3-4. "It is clear that Portside Towers, owned by the same entity, is treated and managed as one property." *Id.* at 5.

- "The Tenants were aware that this was one development." *Id.* at 4-5. Moreover, "[f]rom the start, the Tenants residing at 155 Washington have been advised that the building is not subject to rent control." *Id.* at 5.

- "[T]he City was aware that this was one development comprised of two newly constructed multiple dwellings." *Id.* at 4-5. In particular, "[t]he City was aware of the

construction of the two Towers of Portside Towers, 100 Warren and 155 Washington,
which are on the same tax block and lot and are part of the same development plan,
owned and managed by the same owner." *Id.* at 5.

The Bureau concluded: "Given all of these circumstances, the fact that 155 Washington meets the statutory criteria of a newly constructed multiple dwelling, that the City was aware of this development and the Landlord's claim of exemption, and that the Tenants have been properly notified of the exemption . . . 155 Washington is exempt from the rent restrictions of the Ordinance for 30 years from the issuance of the CO." *Id.*

Again, the Bureau's determination was tantamount to a finding that the substantial-compliance requirement was satisfied. And again, that determination was correct. If the notice with respect to 100 Warren was substantially compliant, then that notice was substantially compliant with respect to 155 Washington as well. *First*, as the Bureau explained, there was no prejudice to Jersey City or the tenants from the failure to send a second notice, particularly where the tenants received notice and the City construction official rejected the 1994 notice. Ex. B at 3-4. *Second*, Portside complied with the statute with respect to 100 Warren, which was part of the same complex. *Third*, as the Bureau explained, the notice with respect to 100 Warren satisfied the statutory purpose with respect to both buildings. Ex. A at 4. *Fourth*, the City had reasonable notice of the exemption as applied to both buildings and never contended that it was unaware of the claim of exemption. And *fifth*, even assuming Portside did not send a separate notice with respect to 155 Washington, that decision was reasonable because the City knew these two buildings operated as a single unit.

4. <u>The Board violated state law by applying a strict-compliance, rather than substantial-compliance, requirement.</u>

Because Portside substantially complied with the notice requirement with respect to both 100 Warren and 155 Washington, it is exempt from rent control under state law. The Board, however, did not apply the New Jersey substantial compliance standard. In the Board's view, the notice requirement "is a mandatory condition precedent to receipt of this rent control exemption requiring *strict compliance* with its terms." Ex. C, Order at 8 (emphasis added).

Thus, Jersey City's rent-control exemption—which applies only if landlords satisfy a strict-compliance requirement—is narrower than the rent-control exemption under state law—which incorporates a substantial-compliance standard. For this reason, too, the Board's Order impermissibly "limit[ed], diminish[ed], alter[ed], or impair[ed] any exemption afforded pursuant to [state law]." N.J.S.A. §2A:42-84.5.

**II.     The Board's Order Violates The Due Process Clause And So Do Jersey City's Recent Actions.**

In addition to violating state law, the Board's Order violates Due Process. The Board's proceedings were gravely unfair. With respect to 155 Washington, the Board punished Portside for its failure to locate a document that Portside was ostensibly required to send 27 years ago. For more than two decades, no one from the Board ever doubted that Portside was exempt from rent control or expressed any interest in seeing this document. As for 100 Warren, the Board has been on notice for three decades that Portside sent its notice in 1994, rather than 1992, and sat by silently as Portside maintained and improved the property and contributed to the tax base. To hold Portside retroactively liable at this point—and effectively retroactively impose rent control—would be an extreme bait-and-switch raising profound Due Process concerns. Those concerns are heightened by the circus-like atmosphere in which the Board reversed the Bureau's reasoned decision, where

26

the Commissioners declared to a "sold-out crowd" that they would impose rent control on Portside in view of what was "happening all over the country." Jersey City Rent Leveling Brd. Mtg. Oct. 19, 2023 at https://www.youtube.com/watch?v=oCgWfCSfJN4.

Jersey City has only compounded its Due Process violations following the Board's decision. The City is now threatening to seek *criminal* sanctions against Portside and its employees for allegedly violating the City's rent control Ordinance—even though the City has not told Portside what it contends Portside should be charging. Ex. D at Ex. 4 and Ex. 9.

Enforcement of the Ordinance in this manner would be a textbook Due Process violation and warrants injunctive relief. Ex. D at Ex. 6, Mar. 27, 2024 Ltr. from Portside to Jersey City. The government violates the Due Process Clause "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). For example, a criminal statute that prohibits "unjust or unreasonable rates" is void when the government does not tell the regulated entity what that rate is. *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921).

This case is *L. Cohen* all over again. Jersey City's Ordinance says that Portside cannot charge rents that are too high—yet the Board has not decided what "too high" is. Portside cannot be punished for charging rents in excess of a ceiling that the Board has not yet determined. *See also, e.g.*, *Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F. Supp. 3d 320, 355 (D.N.J. 2016) (holding that local parking ordinance was void for vagueness when it "fail[ed] to provide sufficient objective guidelines for determining how many parking spaces the Board may require for any given applicant").

Nor will these Due Process deficiencies be cured if or when the City tells Portside what it thinks the rents should be. In addition to the Due Process violations arising from the underlying Order, the City has threatened to prosecute Portside for purported violations *predating* the Board's calculation. Thus, a Due Process violation looms notwithstanding the City's eventual calculation.

### III.      Portside Satisfies The Remaining Preliminary-Injunction Factors.

In addition to being likely to succeed on the merits, Portside will be irreparably harmed by the Order, and the balance of equities and public interest favor Portside.

***Irreparable harm.*** Enforcement of the Board's Order (and any related calculation of purported permissible rents at Portside) during the pendency of this action would cause irreparable harm to Portside, for several reasons.

*First*, with respect to Portside's state-law claim, Portside may only obtain invalidation of the wrongful agency action, not money damages. *See Wessie Corp. v. Sea Isle City Zoning Bd. of Adjustment*, 2007 WL 1892473, at *1 n.1 (D.N.J. June 29, 2007) (when a plaintiff prevails on prerogative-writ claim, wrongful agency action is set aside). Therefore, even if Portside prevails on that state-law claim, it would be unable to recover lost rent from the City and would be compelled to further pursue damages under its federal claims. And it is very unlikely as a legal and practical matter that Portside could retroactively recover lost rents from the tenants, including because tenants will argue they relied in good faith on the Board's Order, and tenants may move away without paying. Ex. D, Marchewka Decl. ¶¶ 3, 6-8. Thus, if Portside is required to forego the lawful collection of rent during the pendency of this proceeding, Portside is unlikely ever to recover those funds from the tenants and will have suffered irreparable injury. *See Cigar Assoc. of Am. v. City of Philadelphia*, 2021 WL 5505406, at *5 (3d Cir. Nov. 24, 2021) (upholding finding of irreparable harm when local government was immune from damages).

28

*Second*, while Portside's federal claims seek money damages for some of the harm inflicted by the City's unlawful actions, even recovery of those damages cannot fully compensate Portside. Among other things, the Tenants are mistakenly asserting an entitlement to withhold *all* rent: they insist that they are "fully within their rights to withhold rent," and they have sought an injunction barring *any* evictions for non-payment of rent, even if the tenants pay *zero* rent. Dkt. 34-1 at 2-3. If Portside prevails in this case, the City will undoubtedly argue that Portside should collect lost rents from tenants (not the City), and debts owed by the tenants are likely to be extremely difficult to collect. Ex. D, Marchewka Decl. ¶3.

Even if the City ultimately pays all of Portside's lost rent as damages, enforcement of the illegal rent control regime—even temporarily—will seriously harm Portside's relationship with its tenants, resulting in irreparable harm. "[I]nterfer[ence] with . . . customer relationships" often causes "quintessential irreparable injuries." *Healthcare Servs. Grp., Inc. v. Fay*, 977 Fed. App'x 102, 104 (3d Cir. 2015) (upholding preliminary injunction where plaintiff would likely suffer irreparable harm from defendants' interference with customer relationships); *see Money Marketing v. Silver Aspen, Inc.*, 2006 WL 8457663, at *5 (D.N.J. June 8, 2006) (granting preliminary injunction where plaintiff would likely suffer irreparable harm from "permanently damaged relationships with its customers"). Here, if Portside is forced to reduce rent during the pendency of this case, but later increases rents as permitted by law when the Board's Order is invalidated, it will suffer significant disruption to its relationships with its tenants, who may move away or become extremely hostile over a perceived "whipsaw" in rent. By contrast, if Portside is permitted to charge lawful rent for the duration of this case (with any disputed amounts in escrow), no such disruption or inability to recoup lost rents would result. *See* Ex. D, Marchewka Decl. ¶ 8.

29

More fundamentally, the Order purports to ban Portside from entering into lawful leases at market rates, and hence prevents Portside from exercising core property rights. Such an interference with Portside's property rights, in and of itself, constitutes irreparable harm. *See Lamplighter Village Apartments LLP v. City of St. Paul*, 534 F. Supp. 3d 1029, 1034 (D. Minn. 2021) (granting landlords' preliminary injunction against an unlawful city ordinance providing "extensive protections to tenants" while suspending owners' core property rights); *Villas at Parkside Partners v. City of Farmers Branch*, 496 F. Supp. 2d 757, 776 (N.D. Tex. 2007) (granting landlords' preliminary injunction against an unlawful city ordinance interfering with owners' right to lease to certain tenants).

*Finally*, the City's threat of retroactive criminal prosecution gives rise to reputational harm and imposes untenable risks of a loss of liberty and financial distress through staggering fines, as a condition of operating a lawful business. Ex. D at Ex. 4. The reputational and economic harms of defending against a criminal prosecution under an unconstitutional order could not be redressed by money damages. *See Am. Exp. Travel Related Servs. Co. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 614 (D.N.J. 2010) (holding that a "threat of prosecution" pursuant to a potentially "unconstitutional" statute is an irreparable harm). This risk of irreparable harm will persist even after the City announces the calculated base rents; criminal prosecutions for rents charged *before* that announcement would continue to violate the Due Process Clause and inflict irreparable harm.

***Balance of equities and public interest.*** The equities also strongly favor Portside. The Board has waited over *25 years* since Portside sent the purportedly faulty notices to initiate its enforcement action; it can wait a little while longer. Moreover, even the Board acknowledged that Portside's alleged violation of the Ordinance was purely technical; no one has ever doubted that Portside satisfies the eligibility criteria for the rent control exemptions. And when Portside sent its

notice in 1994—allegedly too late—the relevant administrator was not even aware of the Ordinance and thought the notice had been conveyed to the wrong person. Ex. B at 4 n.5.

In contrast, any alleged equitable interests of the Tenants or the City in opposing a status quo order would not outweigh the factors supporting Portside's requested relief. The Tenants and City effectively seek a massive windfall—retroactive and prospective rent reductions based on an alleged technical notice violation 30 years ago that caused tenants no harm. Indeed, proposed Plaintiff Kevin Weller told the media before the Board's decision that "It is going to be news-breaking when we win because now you are going to have *luxury apartments in Jersey City at rates that are half the price now*." Jersey Journal, Feb. 9, 2023 (emphasis added). As the Bureau properly determined, Portside has always complied with its statutory obligations to notify the tenants that Portside Towers are exempt from rent control. Ex. B at 3. The asserted violation was the decades-old failure to notify the *City* of information that the City already knew. Granting an injunction would not deprive the Tenants of their "right to housing," as the Tenants contend. Dkt. 34-1 at 16. Instead, it would merely require the Tenants to adhere to the leases they signed.

The public interest also favors Portside. The public interest always favors protecting constitutional rights and avoiding due process violations. *Kraft v. Wells Fargo & Co.*, 2016 WL 6841076, at *4 (D.N.J. Nov. 21, 2016) (it is "in the public interest to require the Government to provide due process, whenever practicable."); *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023) ("the enforcement of an unconstitutional law vindicates no public interest."). Moreover, New Jersey enacted its rent-control exemption statute for the public purpose of encouraging the construction of housing. N.J.S.A. §2A:42-84.5(b). The public interest does not warrant stripping Portside of a statutory right it relied on in good faith. Jersey City's action sets

31

the precedent that a local government can strip a landlord of an exemption years after the fact on slender, pretextual terms, undermining all of those reliance interests.

## IV.       The Court Should Enjoin Enforcement Of The Order, Or, Alternatively, Order An Injunctive Framework That Preserves The Status Quo.

For the reasons stated above, Portside is likely to succeed on the merits of its claim that the Board's Order is illegal, and enforcement of the Order should therefore be preliminarily enjoined in its entirety. But if the Court declines to take that step, it should, at a minimum, enter an order that would preserve the status quo, protect all parties' legitimate interests, and would prevent the parties from taking actions into their own hands.

As noted, all parties currently face serious uncertainty, which is disrupting relations between Portside and its tenants. Portside does not know what rents it can, and should, charge. If they are too high, Portside faces the risk of retroactive liability and perhaps retroactive prosecution; if they are too low, Portside faces the risk it will be unable to recover the loss. Tenants likewise face confusion. Some tenants are taking the position that they do not have to pay *anything*; Portside believes that, at present, they should pay the amount specified in their leases. The tenants do not want to be evicted, but also do not want to pay excessive amounts. The City has not even calculated a permitted rental amount and yet is threatening criminal prosecution. Ex. D at Exs. 4, 9. That failure has led certain tenants to publicly accuse the City and Portside of conspiring and violating federal laws, including RICO. *See* Jersey City TV, City Council Mtg. Apr. 9, 2024 at https://youtu.be/ZsMZQbogb-8?t=12975. Given that confluence of circumstances, injunctive relief is manifestly warranted to prevent irreparable harm.

To preserve the status quo, Portside's alternative proposed order resembles the Tenants' proposed order, Dkt. 34-1 at 21, but with certain modifications that would ensure fair treatment of all parties, without prejudice to their legal positions:

32

***Permissible rents***. The Court should direct the tenants to continue paying the rents they paid immediately prior to the Board's November 3, 2023 decision, plus, where applicable, the annual increase permitted under the rent control ordinance (4% or CPI, whichever is less). *See* Jersey City Ord. §260-3. It should authorize Portside  to place any permitted increased amount in escrow, to be released in accordance with this Court's determination on the merits. Portside would also stipulate to an order precluding any other increase until the matter is resolved by the Court, reserving its right to seek lost rent as damages from the City.

In contrast, the Tenants proposed "freezing all rents at the rates that existed as of the RLB's decision on October 19, 2023 until the recalculations are completed," Dkt. 34-1 at 21, without permitting Portside to raise rents *at all* while the litigation is pending. Ex. D at Ex. 7, Apr. 5, 2024 Ltr. from the Tenants to Portside. But Jersey City's Ordinance expressly authorizes annual increases even under rent control. *See* Jersey City Ord. §260-3. The Tenants do not offer any justification for banning increases expressly authorized by law. Portside faces the risk of irreparable harm regarding lost rents, because, as discussed above, it will be extremely difficult for Portside to collect lost rents after the invalidation of the Board's Order. *See* Ex. D, Marchewka Decl. at ¶¶5-7. Those circumstances are causing irreparable harm to Portside. *See Alexander v. Primerica Holdings*, 811 F. Supp. 1025, 1036 (D.N.J. 1993) (recognizing harm of being required to pursue "hundreds . . . of individual lawsuits").

***Evictions.*** Portside would stipulate that it will not pursue evictions based on non-payment of rent as long as residents pay the rent identified in the paragraph above and otherwise comply with their leases and the law. The Tenants proposed "prohibiting Portside and Equity from filing any actions for evictions against the existing tenants of the property for reasons related to rent payments," Dkt. 34-1 at 21, but that proposal suggests that Portside would be prevented from

33

initiating an eviction action even if a tenant pays *zero* rent. Ex. D at Ex. 8, Apr. 8, 2024 Ltr. from Jersey City to the Tenants. "Rent control" does not mean "no rent." If the Court issues an order freezing rents at a particular rate pending resolution of this dispute, and if a tenant refuses to pay that rate, Portside should be able to pursue ordinary legal remedies.

***Subsequent Board action***: If the Board or Bureau recalculates Portside's rents at a rate lower than as specified in the Court's Order (as set out above), tenants will continue paying the rent specified in the Court's order, but the Tenants may seek to require Portside to deposit into escrow the difference between the pre-November 3, 2023 rents (plus any permitted increase) and any lesser rent amount that the Board or Bureau determines appropriate. Such an order will ensure fairness to all parties. If the Board's Order is ultimately invalidated, Portside will receive the rent it is due without having to sue the tenants for back rent or potentially surprise tenants with substantially increased rents in order to collect amounts it should have been able to collect during the pendency of this action. If the Board's Order is upheld, the Court can direct the escrowed funds to be paid to tenants.

## V.      The Court Should Determine Whether To Exercise Its Discretion Under Rule 65 So As To Further Streamline Any Additional Proceedings

At the Court's discretion, it may also streamline resolution of further proceedings in this case pursuant to Rule 65(a)(2) by "advance[ing] the trial on the merits" on the state law and due process claims and consolidate[ing] [them] with the hearing" on the preliminary injunction. Alternatively, even if the Court determines not to order consolidation, evidence that is received on this motion and that would be admissible at trial will become part of the trial record and need not be repeated at trial.

## CONCLUSION

For the foregoing reasons, Portside respectfully requests that pursuant to Federal Rules 1, 16 and 65, the Court enter preliminary injunctive relief enjoining enforcement of the Board's November 3, 2023 Order. Alternatively, the Court should order the following status quo framework, without any admission or prejudice to Portside's position in this case:

1. Portside residents should continue to pay the rents they paid as of November 2, 2023 decision, plus the permitted rent control increase (4% or the relevant CPI number, whichever is less). If necessary, going forward Portside will place any increase into escrow, to be released in accordance with this Court's determination on the merits.

2. Portside will not pursue evictions based on non-payment of rent so long as residents pay the rent identified in (1) and otherwise comply with the terms of the lease and the law.

3. Even though Portside is entitled to institute larger increases under its leases and the law, Portside will forego seeking from the residents any other rent increases until the matter is resolved by the Court, but reserves the right to seek lost rent as damages from the City.

4. Enforcement of the Board's November 3, 2023 Order and any follow-on order by the Board or other Jersey City agency is enjoined, except that, if the Board or Rent Leveling Bureau issue recalculated rents for Portside, the Tenants may request that Portside pay the difference between those recalculated rents and the rents charged going forward under the first condition into escrow.

Respectfully submitted,

The Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC

By: _/s/ Derek D. Reed_

*Attorney for Plaintiffs the Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC*

Derek D. Reed, Esq. (Attorney ID # 038062003)
Jeffrey Plaza, Esq.
Ehrlich, Petriello, Gudin
Plaza & Reed
A Professional Corporation
60 Park Place, Suite 1016
Newark, New Jersey 07102
Phone: (973) 643-0040

35

Terri L. Mascherin
Andrew W. Vail
Daniel J. Weiss
Jenner & Block LLC
353 Norh Clark Street
354 Chicago, Illinois 60654
Phone: (312) 222-9350
Facsimile: (312) 840-7375

*Attorneys for Plaintiffs*

# EXHIBIT A

# CITY OF JERSEY CITY

**Department of Housing, Economic Development and Commerce**
Division of Housing Preservation
Office of Landlord/Tenant Relations

**Steven M. Fulop**
**Mayor**

342 MARTIN LUTHER KING DRIVE • JERSEY CITY, N.J 07305
PHONE: (201) 547-5127

## Notice of Rent Leveling Bureau Determination

**Tenant Petition:** Petitions on the list attached

**Tenant:** Tenants residing at 100 Warren Street on the list attached[1]

**Landlord:** Portside Urban Renewal LLC, owner, c/o Equity Residential Management, LLC, agent, c/o Jennifer L. Alexander, Esq., Griffin Alexander, P.C., 415 Route 10, 2nd Floor Randolph, NJ 07869

**Tenant's Petition:** On various dates commencing in July 2022, the Office of Landlord/Tenant Relations Bureau of Rent Leveling (the "Bureau") received Illegal Rent Petitions signed by the Tenants residing in various apartments as listed on the attached list, (the Tenants names are not included on the list to avoid providing personal identifiers in this document), in which the Tenants ask the Bureau to determine whether the rent increases for their apartments at 100 Warren Street, Jersey City (the "Property" or "100 Warren")[2], comply with the Jersey City Rent Control Ordinance, Chapter 260 of the Municipal Code, (the "Ordinance"). The Petitions have been served on the Landlord by the Tenants and were sent via email to the Landlord by the Bureau on various dates shortly after receipt of the Petition by the Bureau.

**Landlord's Response:** The copies of the Petitions that were sent to the Landlord by the Bureau included an email which stated that a response, if any, was to be submitted to the Tenants and the Bureau.  While the names of the Tenants, the tenancy commencement dates, rents, rent increases, and the apartment numbers differ, the issue in connection with all of the Petitions is essentially the same.  The question raised is whether the 100 Warren is subject to the rent restrictions of the Ordinance. The Landlord's response, through its attorney, Jennifer L. Alexander, Esq. of Griffin Alexander, P.C., consisted of a letter brief and a copy of the Tenants' lease agreements and Truth in Renting Statements and a supplemental response which contained additional documentation, specifically a copy of a certificate of Occupancy for 100 Warren dated August 25, 1992,[3]

---

[1] These are tenants who have filed Illegal Rent Petitions and have been served with the Landlord's response.

[2] The Property is designated on the tax map as Block 15902 Lot 1 (formerly Block 60 Lot 34) and includes the two multiple dwellings (the "Towers").  These are referred to as Portside Towers with street addresses of 100 Warren Street and 155 Washington Street.  The CO for 155 Washington dated December 31, 1997, delineated the street address as 1 Washington. The street address was subsequently changed to 155 Washington. (Appendix 4)

[3] For ease of reference, documents relied on in this Determination are annexed in the enclosed Appendix.

Notice of Decision – Illegal Rent Petitions – 100 Warren Street
September 19, 2022
Page 2

(Appendix 1), a "Letter of Exemption" dated November 23, 1994, (Appendix 2), and a Certificate of Continued Occupancy for 100 Warren dated January 24, 1995. (Appendix 3).

**Discussion**: The Ordinance provides in §260-3 that multiple dwellings with five or more residential housing spaces are subject to rent regulation.  100 Warren consists of 230 units. Due to the size of this multiple dwelling, the building is presumed to be rent controlled.  However, there are exemptions to the rent restrictions of the Ordinance.  The exemption that is relevant here is an exemption pursuant to State law which is set forth in the Ordinance at §260-6C where the Ordinance references the exemption for new construction as required by State law, N.J.S.A. 2A:42-84.1 et seq.  As regards this exemption, the Ordinance provides in §260-6C:

> In accordance with N.J.S.A. 2A:42-84.1 et seq., L. 1987, c. 153, the provisions of this chapter shall not apply to a new dwelling which is constructed between June 25, 1987, through June 25, 1992, and which is not constructed for occupation by senior citizens, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the dwelling, or for 30 years following completion of construction, whichever is less. This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4 and the service of a written statement upon the tenant required by N.J.S.A. 2A:42-84.3.

N.J.S.A. 2A:42-84 is titled "State Exemption for New Construction" (the "Statute").  The limitation of the exemption from June 25, 1987 through June 25, 1992 was extended several times and the Statute currently provides in 2A:42-84.5b, "Although this legislation was initially made effective only for a temporary five-year period, it was expanded for a second five-year period by P.L.1992, c.206 until 1997, and then in that year made permanent by P.L.1997, c.56." The reason for the extension and the final change making the exemption permanent, is also set forth in the Statute which explicitly explains the legislative purpose as follows: "The Legislature deems it to be necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey."

There are certain requirements for multiple dwellings seeking the statutory exemption and the question before the Bureau is whether the Landlord has met these requirements.  The Statute provides in 2A:42-84.3:

> The owner of any multiple dwelling exempted from a rent control or rent leveling ordinance pursuant to this act, shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period. Each lease offered to a prospective tenant for any dwelling unit therein during the period the multiple dwelling is so exempted shall contain a provision notifying the tenant of the exemption.

In addition, the Statute provides in 2A:42-84.4:

Case 2:23-cv-22919-MCA-JRA   Document 46-2   Filed 07/09/24   Page 169 of 273   PageID: 1423

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 3

> The owner of any multiple dwelling claiming an exemption from a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of exemption from an ordinance under this act, including therein a statement of the date upon which the exemption period so claimed shall commence, such information as may be necessary to effectively locate and identify the multiple dwelling for which the exemption is claimed, and a statement of the number of rental dwelling units in the multiple dwelling for which the exemption is claimed.

It is undisputed that the Landlord has met the first criteria as set forth in 2A:42-84.3.  The Tenants' lease and lease renewals all contain a "RENT CONTROL ADDENDUM", (Appendix 5), the title of which is prominently written in capital letters and underlined.  The Addendum states as follows:

> This Rent Control addendum ("Addendum") is dated and effective as of the date on the Residential Lease – Term Sheet (the "Term Sheet") to which this Addendum is attached and made a part of (the "Lease") and is made by and between Lessor and Resident for the Premises at the Community identified in the Lease.

> Pursuant to N.J.S.A. 2A:42-84.3, we hereby notify you that the Premises and the Community are exempt from the provisions of any rent control ordinances instituted by Jersey City or West New York, as the case may be, and said Premises and Community will be exempt from any future rent control, rent stabilization or rent leveling ordinance instituted by these municipalities for a period of thirty years following the completion of construction at the Community.

The Rent Control Addendum provided the Tenants with the notice required by the Statute.

The question remains whether the Landlord complied with the requirements of the Statute set forth in 2A:42-84.4 which requires that a written statement of the owner's claim be sent to the municipal construction code official 30 days prior to the issuance of the CO.  On November 23, 1994, Portside Apartments Urban Renewal Partners, L.P., ("Portside") sent a letter to the City Construction Code Official, Michael Regan, in which Portside claimed an exemption from rent control pursuant to N.J.S.A. 2A:42-84.1 *et. seq.*, for 229 [sic] units which "shall commence on the anticipated date of initial occupancy, January 1, 1995." (Appendix 2).  The CO for 100 Warren was issued approximately two years earlier on August 25, 1992. (Appendix 1).

The Landlord explains the delay between the issuance of the CO and the initial occupancy of 100 Warren.  At the time of the issuance of the CO for 100 Warren, the building was not open to residents.  The development was intended as a condominium development but evidently because of economic difficulties, the Property went through foreclosure.  The Landlord's statement is consistent with the recorded Sherriff's Deed dated November 23, 1994,

Case 2:23-cv-22919-MCA-JRA   Document 46-2   Filed 07/09/24   Page 170 of 273 PageID: 1424

Notice of Decision – Illegal Rent Petitions – 100 Warren Street
September 19, 2022
Page 4

pursuant to which Portside became the new owner/developer of the Property.  (Appendix 6). The letter sent to the Construction Code Official dated the same day, November 23, 1994, was sent more than 30 days before the initial occupancy.  This statutory requirement provides notice to the city official who is in a position to confirm that the dwelling meets the statutory definitions: that the dwelling is "constructed" (not rehabilitated), is a "multiple dwelling" (contains four or more dwelling units), and that the construction has been "completed" (that a CO has been issued).  The developer's letter identifies the Property by address and block and lot, references the statutory exemption, the number of units[4], and the commencement date of initial occupancy, January 1, 1995.  In the circumstances, I find that this letter satisfies the notification requirement of the Statute in 2A:42-84.4.[5]

The Landlord has met the requirements of the Ordinance and the Statute and therefore, 100 Warren was exempt from the rent restrictions in the Ordinance from the date of the CO, August 25, 1992 for 30 years to August 24, 2022.

With regard to the Landlord's position that the exemption runs from the date of the Certificate of Continued Occupancy (the "COO"), January 24, 1995, (Appendix 3), this is without merit.  The Statute is clear that the exemption runs "for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less."  "Completion of construction" is defined in the Statute and "means issuance of a certificate of occupancy" it does not mean occupancy.  The fact that the developer chose or was unable to commence renting the units at the time of the CO in August 1992 does not affect the commencement date of the exemption.

I note that no one has provided the initial mortgage financing.  This is not fatal to the Landlord's claim of exemption. In Block 268, LLC v. City of Hoboken Rent Leveling & Stabilization Bd., 401 N.J. Super. 563, 570 (App. Div. 2008), the court found that there was no requirement in the Statute for the owner to provide mortgage information.  The court referenced the Statute, specifically, 2A:42-84.6:

> [t]he Legislature . . . declares it to be public policy of this State that, within the limitations imposed by this act, the exemptions granted under this act shall not be limited, diminished, altered, or impaired during the period of exemption afforded.

Id. at 571.  The court noted that the record did not "reveal the terms of the mortgage, if any" and that in the event it is established that the amortization of the initial mortgage was less than 30

---

[4] The developer's letter incorrectly states the number of units as 229.  The CO states 204 apartments and 26 townhouses. There is also a Developer's Agreement between the City and the initial developer dated July 23, 1992, which references testimony confirming that 230 units had been completed as of the date of the agreement.  (Appendix 7). The error in the number of units as stated in the letter is inconsequential inasmuch as the City was aware that the number of units was 230, not 229.

[5] It seems that the Construction Code Official at the time of Portside's letter, Michael Regan, was unaware of the requirements of the Statute.  On December 6, 1994, he responded to Portside acknowledging receipt of its November 23, 1994 letter.  He wrote, "Please be advised that the Office of Construction Official has no jurisdiction over rent controls and I would suggest that you contact the proper agency charged with that responsibility." (Appendix 8).

Notice of Decision – Illegal Rent Petitions – 100 Warren Street
September 19, 2022
Page 5

years, the "order may be amended accordingly." Id. at 572-573.  Similarly, here the exemption is 30 years from the date of the CO unless a mortgage note is submitted proving that the amortization of the initial financing was less than 30 years.

The Landlord has also argued that the Property is exempt because it is located in a redevelopment area, specifically the Tidewater Basin Redevelopment area.  The Ordinance does provide a rent control exemption for new construction in a redevelopment area.  This exemption is found as an exemption from the definition of dwelling in §260-1 as follows:

> Newly constructed dwellings with 25 or more dwelling units located within a redevelopment area as defined in Section 5 of the Redevelopment Agencies Law, N.J.S.A. 40:55C-5(o), for which the City Council has approved a redevelopment plan, in accordance with Section 17 of the Redevelopment Agencies Law, N.J.S.A. 40:55C-17.

While the Landlord is correct that the Property is within the Tidewater Basin Redevelopment Area, the Tidewater Basin Redevelopment Plan is dated November 10, 1999, several years after the Property was constructed and occupied. (Appendix 9).  Portside Towers is a "district" described in the Plan as containing 527 units (the total number of units in both Towers).  The Property was already constructed and occupied at the time of the Plan and therefore was not "new construction" as contemplated by this exemption in the Ordinance.  In fact, the Landlord recognized that the basis for the exemption was the Statute and not the exception for new construction in redevelopment areas as evidenced by the language of the Rent Control Addendum which alerts the Tenants to the exemption "[p]ursuant to N.J.S.A. 2A:42-84.3 … for a period of thirty years following the completion of construction at the Community." (Appendix 5).

The Tenants have raised several issues.  First, the Tenants point out that on some of the annual Landlord Registration Statements, the Landlord has indicated that the Property is not exempt from rent control. The Landlord Registration Statement (the "Registration") is a registration that the Landlord is required to file with the Bureau annually.  In connection with 100 Warren, the Bureau has two Registrations, one filed in 2021 and one filed in 2022.  There are earlier registrations filed under the 155 Washington address, the other Tower at Portside Towers.  It is clear that those Registrations were meant to apply to both Towers inasmuch as they are on the same block and lot and the Registrations state the number of units as "527", the total number of units in both Towers.  It seems that in the past, the Bureau did not always reach out to and obtain Registrations for those multiple dwellings that were exempt from rent control and, because the rents were not regulated, did not follow-up and obtain rent rolls for these properties despite the requirements of the Ordinance.  2017 is the earliest Registration in the Bureau files for the Property.  In 2021, the first year that a rent roll was supplied, the Registration for 155 Washington included a rent roll that included both Towers.

In the Registration, Landlords are asked to state whether the property is subject to rent control. The format of the 2017 – 2019 Registrations asked the question of exemption in this way:

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 6

THIS PROPERTY <u>IS</u> ☐        <u>IS NOT</u> ☐ PRESENTLY UNDER RENT CONTROL

The Registrations for those years contain a check in the box next to "IS NOT" indicating that the Property, according to the Landlord, was not governed by rent control. (Appendix 10). The form was revised in 2020 and the current Registration asks the question, "Is the property you are registering currently under rent control?"  The 100 Warren 2021 Registration an answered "no" and the 2022 Registration answered "yes". (Appendix 11).  Perhaps it was a misreading of the form associated with the change in format that resulted in these answers but whatever the reason, the Landlord's response in the Registration is not dispositive of whether the Property is exempt from rent control.  What is relevant is whether the Property meets the criteria and the requirements of the Ordinance and the Statute.  As set forth in detail above, 100 Warren did qualify and has been exempt from rent control for 30 years, through August 24, 2022.

The Tenants have also relied on a recent unpublished opinion of the New Jersey Appellate Division, <u>Willow Ridge Apts. v. Union City Rent Stabilization Bd.</u>, 2022 N.J. Super. Unpub. LEXIS 1232 *; 2022 WL 2525243.  The first page of the decision states prominently, "PLEASE CONSULT NEW JERSEY RULE 1:36-3 FOR CITATION OF UNPUBLISHED OPINIONS."  (Appendix 12).  Rule 1:36-3 provides, "No unpublished opinion shall constitute precedent or be binding upon any court."  So, while this decision might be informative, it is not binding on a court and not binding on the Bureau.  In any event, while <u>Willow Ridge</u> also involved the statutory exemption from rent control pursuant to <u>N.J.S.A.</u> 2A:42-84, the facts of this unpublished case are totally distinguishable from the facts here.  In <u>Willow Ridge</u>, there was no evidence that the owner ever applied for the statutory rent control exemption nor was there ever any notice to the tenants of the owner's claim that the building was exempt.  The CO for the multiple dwelling in <u>Willow Ridge</u> was issued in 2002 and no request for exemption was made until 2019 when the new owner argued that the building should be exempt.  Moreover, no tenants were ever notified of this claimed exemption during those 17 years.  The circumstances are very different here where the owner of the Property notified the Construction Code Official of its claimed exemption over 30 days prior to the initial occupancy of 100 Warren and, more importantly, has notified the Tenants in every lease and lease renewal of the claimed exemption.

To summarize, the rents prior to August 24, 2022 were not governed by the Ordinance and the Bureau has no jurisdiction to review or make any findings regarding these rents.  Going forward, the rents charged are restricted by the Ordinance and may not be greater than the allowable CPI for the month.  The CPI for September 2022 is 6.7% and pursuant to the Ordinance, the maximum increase is the CPI or 4% whichever is less.  Therefore, to the extent increases in excess of 4% have been sent to the Tenants, these are allowed up to 4% and the lease renewals must be adjusted accordingly.  Late fees and similar charges must also comply with the Ordinance (§260-1) and may not be in excess of $35.00.  Going forward, lease renewals should not contain the Landlord's "Rent Control Addendum" and the Registrations should indicate that the 100 Warren is currently under rent control.

**Final Determination** – 100 Warren was not subject to the Ordinance therefore the Bureau has no jurisdiction to review or make any findings regarding the rent charged through August 24, 2022.  Going forward, 100 Warren is subject to the rent restrictions of the Ordinance.  To the

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 7

extent the Tenants have been sent notices of rent increases and/or lease renewals, these must comply with the rent restrictions of the Ordinance.  Further, to the extent rent increases for the month of September 2022 were charged and paid, the tenant must receive a rent credit or refund for amounts in excess of the allowed 4% rent increase.

**Signature:** _____
Dinah Hendon, Rent Leveling Administrator

**Dated:** September 19, 2022

### Notice to Parties

**This Bureau Determination may be appealed to the Rent Leveling Board by filing a Notice of Appeal with the Bureau within 15 days of receipt of this Determination, no later than October 7, 2022.**

A party appealing this Determination must include in the written notice of appeal:

a) The decision (or part thereof) from which review is sought;

b) The factual and legal basis for the appeal with citations to the record (ie - registration statements) considered by the Bureau in its determination.

c) The notice of appeal must be served upon the other party.

d) Except for good cause shown, no appeal shall rely upon any issue of fact or law or upon any documentary evidence not presented to the Bureau.

## 100 Warren Street Petitions

(these Petititons have been responded to by the landlord on or before 9/19/22)

| File No. | | Unit # |
|---|---|---|
| R22-034 | 100 Warren Street | 1807 |
| R22-035 | 100 Warren Street | 1205 |
| R22-065 | 100 Warren Street | 1401 |
| R22-074 | 100 Warren Street | 208 |
| R22-083 | 100 Warren Street | 1705 |
| R22-092 | 100 Warren Street | 1606 |
| R22-101 | 100 Warren Street | 1515 |
| R22-107 | 100 Warren Street | 502 |
| R22-110 | 100 Warren Street | 1003 |
| R22-111 | 100 Warren Street | 1004 |
| R22-125 | 100 Warren Street | 422 |
| R22-126 | 100 Warren Street | 510 |
| R22-127 | 100 Warren Street | 704 |
| R22-128 | 100 Warren Street | 804 |
| R22-129 | 100 Warren Street | 915 |
| R22-130 | 100 Warren Street | 1709 |

The names of tenants have not been included to avoid providing
personal identifiers.

# EXHIBIT B

HUD-L-002449-24   07/08/2024 5:10:49 PM   Pg 55 of 120   Trans ID: LCV20241697714
Case 2:23-cv-22791-MCA-ARA   Document 46-2   Filed 07/09/24   Page 2 of 176 PageID: 1430
Case 2:23-cv-22791-MCA-ARA   Document 46-2   Filed 07/09/24   Page 176 of 273
PageID: 1430

**Steven M. Fulop**
**Mayor**

# CITY OF JERSEY CITY

**Department of Housing, Economic Development and Commerce**
**Division of Housing Preservation**
**Office of Landlord/Tenant Relations**

342 MARTIN LUTHER KING DRIVE • JERSEY CITY, N.J 07305
PHONE: (201) 547-5127

---

### Notice of Rent Leveling Bureau Determination

**Tenant Petition:** Petitions on the list attached

**Tenant:** Tenants residing at 155 Washington Street on the list attached[1]

**Landlord:** Portside Urban Renewal LLC, owner, c/o Equity Residential Management, LLC, agent, c/o Jennifer L. Alexander, Esq., Griffin Alexander, P.C., 415 Route 10, 2nd Floor Randolph, NJ 07869

**Tenant's Petition:** On various dates commencing in June 2022, the Office of Landlord/Tenant Relations Bureau of Rent Leveling (the "Bureau") received Illegal Rent Petitions signed by the Tenants residing in various apartments as listed on the attached list, (the Tenants names are not included on the list to avoid providing personal identifiers in this document), in which the Tenants ask the Bureau to determine whether the rent increases for their apartments at 155 Washington Street, Jersey City (the "Property" or "155 Washington")[2], comply with the Jersey City Rent Control Ordinance, Chapter 260 of the Municipal Code, (the "Ordinance"). The Petitions have been served on the Landlord by the Tenants and were sent via email to the Landlord by the Bureau on various dates shortly after receipt of the Petition by the Bureau.

**Landlord's Response:** The copies of the Petitions that were sent to the Landlord by the Bureau included an email which stated that a response, if any, was to be submitted to the Tenants and the Bureau. While the names of the Tenants, the tenancy commencement dates, rents, rent increases, and the apartment numbers differ, the issue in connection with all of the Petitions is essentially the same. The question raised is whether the 155 Washington is subject to the rent restrictions of the Ordinance. The Landlord's response, through its attorney, Jennifer L. Alexander, Esq. of Griffin Alexander, P.C., consisted of a letter brief and a copy of the Tenants' lease agreements and Truth in Renting Statements and a supplemental response which contained additional documentation, specifically a copy of a Certificate of Occupancy ("CO") for 100 Warren dated August 25, 1992,[3] (Appendix 1), a "Letter of Exemption" dated November 23, 1994, (Appendix

---

[1] These are tenants who have filed Illegal Rent Petitions and have been served with the Landlord's response.

[2] The Property is designated on the tax map as Block 15902 Lot 1 (formerly Block 60 Lot 34) and includes the two multiple dwellings (the "Towers"). These are referred to as Portside Towers with street addresses of 100 Warren Street ("100 Warren") and 155 Washington Street.

[3] For ease of reference, documents relied on in this Determination are annexed in the enclosed Appendix.

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 2


2), a Certificate of Continued Occupancy ("COO") for 100 Warren dated January 24, 1995, (Appendix 3), and a CO for 155 Washington dated December 31, 1997, delineated as 1 Washington on the CO (the street address was subsequently changed to 155 Washington). (Appendix 4).

**Discussion**: The Ordinance provides in §260-3 that multiple dwellings with five or more residential housing spaces are subject to rent regulation.  155 Washington consists of 297 units. Due to the size of this multiple dwelling, the building is presumed to be rent controlled. However, there are exemptions to the rent restrictions of the Ordinance.  The exemption that is relevant here is an exemption pursuant to State law which is set forth in the Ordinance at §260-6C where the Ordinance references the exemption for new construction as required by State law, N.J.S.A. 2A:42-84.1 et seq.  As regards this exemption, the Ordinance provides in §260-6C:

> In accordance with N.J.S.A. 2A:42-84.1 et seq., L. 1987, c. 153, the provisions of this chapter shall not apply to a new dwelling which is constructed between June 25, 1987, through June 25, 1992, and which is not constructed for occupation by senior citizens, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the dwelling, or for 30 years following completion of construction, whichever is less. This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4 and the service of a written statement upon the tenant required by N.J.S.A. 2A:42-84.3.

N.J.S.A. 2A:42-84 is titled "State Exemption for New Construction" (the "Statute").  The limitation of the exemption from June 25, 1987 through June 25, 1992 was extended several times and the Statute currently provides in 2A:42-84.5b, "Although this legislation was initially made effective only for a temporary five-year period, it was expanded for a second five-year period by P.L.1992, c.206 until 1997, and then in that year made permanent by P.L.1997, c.56." The reason for the extension and the final change making the exemption permanent, is also set forth in the Statute which explicitly explains the legislative purpose as follows: "The Legislature deems it to be necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey."

There are certain requirements for multiple dwellings seeking the statutory exemption and the question before the Bureau is whether the Landlord has met these requirements.  The Statute provides in 2A:42-84.3:

> The owner of any multiple dwelling exempted from a rent control or rent leveling ordinance pursuant to this act, shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period. Each lease offered to a prospective tenant for any dwelling unit therein during the period the multiple dwelling is so exempted shall contain a provision notifying the tenant of the exemption.

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 3

In addition, the Statute provides in 2A:42-84.4:

> The owner of any multiple dwelling claiming an exemption from a rent control
> or rent leveling ordinance pursuant to this act shall file with the municipal
> construction official, at least 30 days prior to the issuance of a certificate of
> occupancy for the newly constructed multiple dwelling, a written statement of
> the owner's claim of exemption from an ordinance under this act, including
> therein a statement of the date upon which the exemption period so claimed
> shall commence, such information as may be necessary to effectively locate
> and identify the multiple dwelling for which the exemption is claimed, and a
> statement of the number of rental dwelling units in the multiple dwelling for
> which the exemption is claimed.

It is undisputed that the Landlord has met the first criteria as set forth in 2A:42-84.3.  The Tenants' lease and lease renewals all contain a "RENT CONTROL ADDENDUM", (Appendix 5), the title of which is prominently written in capital letters and underlined.  The Addendum states as follows:

> This Rent Control addendum ("Addendum") is dated and effective as of
> the date on the Residential Lease – Term Sheet (the "Term Sheet") to which
> this Addendum is attached and made a part of (the "Lease") and is made by
> and between Lessor and Resident for the Premises at the Community identified
> in the Lease.

> Pursuant to N.J.S.A. 2A:42-84.3, we hereby notify you that the Premises
> and the Community are exempt from the provisions of any rent control
> ordinances instituted by Jersey City or West New York, as the case may be,
> and said Premises and Community will be exempt from any future rent control,
> rent stabilization or rent leveling ordinance instituted by these municipalities
> for a period of thirty years following the completion of construction at the
> Community.

The Rent Control Addendum provided the Tenants with the notice required by the Statute.

The question remains whether the Landlord complied with the requirements of the Statute set forth in 2A:42-84.4 which requires that a written statement of the owner's claim be sent to the municipal construction code official 30 days prior to the issuance of the CO.  It is readily apparent that the relevant records are 30 +/- years old.  Both parties have made diligent efforts to obtain these records as have several city departments.  It seems that several significant documents, were not located and produced in response to the OPRA requests filed by the parties but were found sometime later in response to continued searches by the Division of the Construction Code Official. And, one document, the COO for 100 Warren dated January 24, 1995, (Appendix 3), was located by the Landlord and not the City.  In short, we cannot be certain that all of the records have been found.  It is therefore critical that I consider all of the circumstances in addition to those documents that have been located in rendering a decision.

As acknowledged by the parties, 155 Washington is one of two multiple dwellings (the

Notice of Decision – Illegal Rent Petitions – 155 Washington Street
September 19, 2022
Page 4

"Towers") that make up Portside Towers.  The CO was issued on December 31, 1997, (Appendix 4), five years after the CO for the other Tower, 100 Warren (Appendix 1) and was occupied approximately two years after the Tower at 100 Warren was first occupied.  (Appendix 2).   While no letter to the Construction Code Official in connection with 155 Washington has been located, there is correspondence from the developer at the time to the Construction Code Official in connection with 100 Warren.  On November 23, 1994, Portside Apartments Urban Renewal Partners, L.P., ("Portside") sent a letter to the City Construction Code Official, Michael Regan, in which Portside claimed an exemption from rent control pursuant to N.J.S.A. 2A:42-84.1 *et. seq.*, for 229 [sic] units which "shall commence on the anticipated date of initial occupancy, January 1, 1995." (Appendix 2).  The CO for 100 Warren was issued approximately two years earlier on August 25, 1992. (Appendix 1). In a decision entered contemporaneously with this Determination, I found that the November 23, 1994 letter satisfied the statutory requirement of notice to the construction code official despite the delay in requesting the exemption.[4]

It is clear from this letter that Portside, the owner/developer, was aware of the statutory requirement that the Construction Code Official be notified of the claimed exemption.  Portside was not the owner at the time the CO for 100 Warren was issued in August 1992 and, evidently the owner at that time did not apply for the exemption because the intention was to have condominiums, not rentals, in the building.  When that did not happen and the Property came out of foreclosure with a new owner/developer, the letter was sent asserting the exemption. This is noteworthy because, in December 1997 when the CO for 155 Washington was issued, Portside was still the owner/developer.  What is also noteworthy is the fact that the Construction Code Official at the time of Portside's letter, Michael Regan, was unaware of the requirements of the Statute.  On December 6, 1994, he responded to Portside acknowledging receipt of its November 23, 1994 letter.  He wrote, "Please be advised that the Office of Construction Official has no jurisdiction over rent controls and I would suggest that you contact the proper agency charged with that responsibility." (Appendix 8).  Michael Regan was the Construction Code Official in December 1997; he signed the CO for 155 Washington on December 31, 1997.

To date, no letter to the Construction Code Official in connection with the requested exemption from rent control for 155 Washington has been located but that does not mean that one was not sent.  Portside was aware of the Statute and its requirements in November 1994 even if the Construction Code Official at the time, Michael Regan, was not.  It is as likely as not that three years later, with the issuance of the CO for 155 Washington, another request for exemption was sent.  Perhaps, in light of Mr. Regan's December 6, 1994 letter, it was sent to some other City agency.   What is clear, as set forth in detail below, is that 155 Washington was owned by the same owner as 100 Warren and these Towers were managed as one development.  The

---

[4] The Landlord explained the delay between the issuance of the CO and the initial occupancy of 100 Warren.  At the time of the issuance of the CO for 100 Warren, the building was not open to residents. The development was intended as a condominium development but evidently because of economic difficulties, the Property went through foreclosure.  The Landlord's statement is consistent with the recorded Sherriff's Deed dated November 23, 1994, pursuant to which Portside became the new owner/developer of the Property.  (Appendix 6). The letter sent to the Construction Code Official dated the same day, November 23, 1994, was sent more than 30 days before the initial occupancy.

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 5

Tenants were aware that this was one development.  Equally important, the City was aware that this was one development comprised of two newly constructed multiple dwellings.  The statutory requirement of notice to the "construction code official" is meant to provide notice to the city official who is in a position to confirm that the dwelling meets the statutory definitions: that the dwelling is "constructed" (not rehabilitated), is a "multiple dwelling" (contains four or more dwelling units), and that the construction has been "completed" (a CO has been issued).  That 155 Washington meets these criteria is undisputed.

The City was aware of the construction of the two Towers of Portside Towers, 100 Warren and 155 Washington, which are on the same tax block and lot and are part of the same development plan, owned and managed by the same owner.  This is confirmed in several documents.  As early as July 1992, the City was a party to a Developer's Agreement (the "Agreement") dated July 23, 1992.  The Agreement describes the development of the property "known as Block 60 Lot 34" and the progress of construction as of that date.  The site was to include "a mixed residential complex including 525 residential units in two highrise [sic] buildings" and references testimony confirming that 230 units had been completed as of the date of the Agreement.  (Appendix 7).  One month later, on August 25, 1994, the CO for 100 Warren was issued for 230 units, (Appendix 1), and on December 31, 1997 the CO for 155 Washington was issued confirming the "construction of 25 story building as per approved plans."  (Appendix 4).

Thereafter, in November 1999, the Tidewater Basin Redevelopment Plan (the "Plan") was adopted.  (Appendix 9).  The Plan contains the "Portside District" described as, "partially developed as *Portside*, a mixed-use development consisting of a maximum of 527 dwelling units…"  In addition, the Landlord Registration Statements[5] (the "Registrations") filed with the Bureau from 2017 – 2021 include 527 as the unit count indicating that these Registrations were meant to cover both Towers, 155 Washington and 100 Warren.  From 2017 – 2019, until the format of the form was changed (as explained in detail below), the Registrations stated that the Property (consisting of 527 units) is exempt from rent control.  It is clear that Portside Towers, owned by the same entity, is treated and managed as one property.  From the start, the Tenants residing at 155 Washington have been advised that the building is not subject to rent control.

Given all of these circumstances, the fact that 155 Washington meets the statutory criteria of a newly constructed multiple dwelling, that the City was aware of this development and the Landlord's claim of exemption, and that the Tenants have been properly notified of the exemption in their lease and lease renewals, I must conclude that 155 Washington is exempt from the rent restrictions of the Ordinance for 30 years from the issuance of the CO, December 31, 1997, through December 30, 2027.  I note that no one has provided the initial mortgage financing.  This is not fatal to the Landlord's claim of exemption. In Block 268, LLC v. City of Hoboken Rent Leveling & Stabilization Bd., 401 N.J. Super. 563, 570 (App. Div. 2008), the court found that there was no requirement in the Statute for the owner to provide mortgage

---

[5] It seems that in the past, the Bureau did not always reach out to and obtain Registrations for those multiple dwellings that were exempt from rent control and, because the rents were not regulated, did not follow-up and obtain rent rolls for these properties despite the requirements of the Ordinance.  2017 is the earliest Registration in the Bureau files for the Property.

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 6

information.  The court referenced the Statute, specifically, 2A:42-84.6:

> [t]he Legislature . . . declares it to be public policy of this State that, within the limitations imposed by this act, the exemptions granted under this act shall not be limited, diminished, altered, or impaired during the period of exemption afforded.

Id. at 571.  The court noted that the record did not "reveal the terms of the mortgage, if any" and that in the event it is established that the amortization of the initial mortgage was less than 30 years, the "order may be amended accordingly."  Id. at 572-573.  Similarly, here the exemption is 30 years from the date of the CO unless a mortgage note is submitted proving that the amortization of the initial financing was less than 30 years.

The Landlord has argued that the Property is exempt because it is located in a redevelopment area, specifically the Tidewater Basin Redevelopment area.  The Ordinance does provide a rent control exemption for new construction in a redevelopment area.  This exemption is found as an exemption to the definition of dwelling in §260-1 as follows:

> Newly constructed dwellings with 25 or more dwelling units located within a redevelopment area as defined in Section 5 of the Redevelopment Agencies Law, N.J.S.A. 40:55C-5(o), for which the City Council has approved a redevelopment plan, in accordance with Section 17 of the Redevelopment Agencies Law, N.J.S.A. 40:55C-17.

While the Landlord is correct that the Property is within the Tidewater Basin Redevelopment Area, the Tidewater Basin Redevelopment Plan is dated November 10, 1999, several years after the Property was constructed and occupied. (Appendix 9).  Portside Towers is a "district" described in the Plan as containing 527 units (the total number of units in both Towers).  The Property was already constructed and occupied at the time of the Plan and therefore was not "new construction" as contemplated by this exemption in the Ordinance.  In fact, the Landlord recognized that the basis for the exemption was the Statute and not the exception for new construction in redevelopment areas as evidenced by the language of the Rent Control Addendum which alerts the Tenants to the exemption "[p]ursuant to N.J.S.A. 2A:42-84.3 … for a period of thirty years following the completion of construction at the Community."

The Tenants have raised several issues.  First, the Tenants point out that on some of the annual Registrations, the Landlord has indicated that the Property is not exempt from rent control. The Registration is a registration that the Landlord is required to file with the Bureau annually.  Landlords are asked to state whether the property is subject to rent control.  The format of the 2017 – 2019 Registrations asked the question of exemption in this way:

THIS PROPERTY IS ☐      IS NOT ☐ PRESENTLY UNDER RENT CONTROL

The Registrations for those years contain a check in the box next to "IS NOT" indicating that the Property, according to the Landlord, was not governed by rent control. (Appendix 10). The form was revised in 2020 and the current Registration asks the question, "Is the property you are registering currently under rent control?"  The 2020 – 2022 Registrations answer "yes".

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 7

(Appendix 10). Perhaps it was a misreading of the form associated with the change in format that resulted in these answers but whatever the reason, the Landlord's response in the Registration is not dispositive of whether the Property is exempt from rent control. What is relevant is whether the Property meets the criteria and the requirements of the Ordinance and the Statute. As set forth in detail above, I find that 155 Washington did qualify and is exempt from rent control for 30 years, through December 30, 2027.

The Tenants have also relied on a recent unpublished opinion of the New Jersey Appellate Division, Willow Ridge Apts. v. Union City Rent Stabilization Bd., 2022 N.J. Super. Unpub. LEXIS 1232 *; 2022 WL 2525243. The first page of the decision states prominently, "PLEASE CONSULT NEW JERSEY RULE 1:36-3 FOR CITATION OF UNPUBLISHED OPINIONS." (Appendix 12). Rule 1:36-3 provides, "No unpublished opinion shall constitute precedent or be binding upon any court." So, while this decision might be informative, it is not binding on a court and not binding on the Bureau. In any event, while Willow Ridge also involved the statutory exemption from rent control pursuant to N.J.S.A. 2A:42-84, the facts of this unpublished case are totally distinguishable from the facts here. In Willow Ridge, there was no evidence that the owner ever applied for the statutory rent control exemption nor was there ever any notice to the tenants of the owner's claim that the building was exempt. The CO for the multiple dwelling in Willow Ridge was issued in 2002 and no request for exemption was made until 2019 when the new owner argued that the building should be exempt. Moreover, no tenants were ever notified of this claimed exemption during those 17 years. The circumstances are very different here. The CO for 155 Washington confirms that it met the statutory criteria of a newly constructed multiple dwelling. The City was aware of the Portside Towers development (the City was a party to a Developer's Agreement (Appendix 7) and the 527 units of Portside Towers are specifically described in the Tidewater Basin Redevelopment Plan (Appendix 9)), and was aware of the Landlord's claim of exemption by virtue of Portside's (the owner/developer of Portside Towers at the time) letter to the Construction Code Official of its claimed exemption over 30 days prior to the initial occupancy of 100 Warren, the first Tower to be constructed, and also by virtue of the Landlord's annual Registrations which were filed in connection with both Towers, all 527 units, and which stated that the Property was exempt from rent control. And, perhaps the most important distinction is that the Tenants here, unlike those in Willow Ridge, have been properly notified of the exemption in every lease and lease renewal.

To summarize, 155 Washington has been and remains exempt from the rent control restrictions of the Ordinance from December 31, 1997 through December 30, 2027 and the Bureau has no jurisdiction to review or make any findings regarding these rents.

**Final Determination –** 155 Washington is not subject to the Ordinance therefore the Bureau has no jurisdiction to review or make any findings regarding the rent or rent increases charged.

**Signature:** _____
            Dinah Hendon, Rent Leveling Administrator

**Dated:** September 19, 2022

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 8

## Notice to Parties

**This Bureau Determination may be appealed to the Rent Leveling Board by filing a Notice of Appeal with the Bureau within 15 days of receipt of this Determination, no later than October 7, 2022.**

A party appealing this Determination must include in the written notice of appeal:

a)  The decision (or part thereof) from which review is sought;

b)  The factual and legal basis for the appeal with citations to the record (ie - registration statements) considered by the Bureau in its determination.

c)  The notice of appeal must be served upon the other party.

d)  Except for good cause shown, no appeal shall rely upon any issue of fact or law or upon any documentary evidence not presented to the Bureau.

## **155 Washingington Street Petitions**

(these Petititons have been responded to by the landlord on or before 9/19/22)

| File No. | | Unit # |
|---|---|---|
| R22-026 | 155 Washington Street | 2 |
| R22-029 | 155 Washington Street | 306 |
| R22-044 | 155 Washington Street | 2102 |
| R22-045 | 155 Washington Street | 1409 |
| R22-047 | 155 Washington Street | 1910 |
| R22-051 | 155 Washington Street | 2612 |
| R22-052 | 155 Washington Street | 2405 |
| R22-055 | 155 Washington Street | 1913 |
| R22-058 | 155 Washington Street | 1504 |
| R22-060 | 155 Washington Street | 1502 |
| R22-061 | 155 Washington Street | 1604 |
| R22-063 | 155 Washington Street | 1503 |
| R22-075 | 155 Washington Street | 1506 |
| R22-076 | 155 Washington Street | 1002 |
| R22-084 | 155 Washington Street | 1713 |
| R22-102 | 155 Washington Street | 903 |
| R22-121 | 155 Washington Street | 2101 |

The names of tenants have not been included to avoid providing
personal identifiers.

# EXHIBIT C

Case 2:23-cv-22291-MCA-ARA  Document 46-2  Filed 04/09/24  Page 2 of 86 PageID: 1273
PageID: 1440



# CITY OF JERSEY CITY

**Department of Housing, Economic Development and Commerce**
Division of Housing Preservation
Office of Landlord/Tenant Relations

**Steven M. Fulop**
**Mayor**

342 MARTIN LUTHER KING DRIVE • JERSEY CITY, N.J 07305
PHONE: (201) 547-5127

November 3, 2023

**Via Email and Regular Mail**

For the Tenants

Neil Marotta, Esq.
Marotta & Garvey Attorneys at Law
3916 Bergenline Ave., Ste. 2200
Union City, NJ 07087
Email:  mgclawyers@aol.com>

For the Property Owner

Derek Reed, Esq.
Ehrlich, Petriello, Gudin, Plaza & Reed, P.C.
60 Park Place, Suite 1016
Newark, NJ 07102
 Email:  dreed@epgprlaw.com>

Re: Rent Leveling Board Decision

Dear  Mr. Reed and Mr. Marotta,

The Rent Leveling Board conducted a meeting on October 19, 2023, in compliance with the Sunshine Law in order to hear the above-referenced matter.  Commissioners Hill, Hamilton, Isikoff, S. Johnson, and Pinchinat were present, with Chairman Cupo presiding.

Preliminary Statement

Beginning in June 2022, the Jersey City Office of Landlord/Tenant Relations Bureau of Rent

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 2


Leveling (the "Bureau") received Illegal Rent Petitions from numerous tenants residing at 100 Warren Street and 155 Washington Street (hereinafter, "Tenants"). The many Illegal Rent Petitions were combined by the Bureau into one determination for each building. While the two cases remain separate on appeal, many of the facts surrounding the appeal are interwoven. This determination, and the general background regarding the construction and eventual rental of the buildings, as well as a discussion of the legal issues pertaining to the voluminous number of petitions, are combined herein.

In the Illegal Rent Petitions, the Tenants sought a determination from the Bureau as to whether the rent increases for their apartments complied with the Jersey City Rent Control Ordinance, Chapter 260 of the Municipal Code. In particular, the Tenants challenged whether the buildings were exempt from the Jersey City Rent Control Ordinance, as codified in Chapter 260 of the Jersey City Municipal Code. In essence, the Tenants claim that the Property Owner did not qualify for the exemption and that, even if the Property Owner did qualify for the exemption, it failed to perform the required tasks to avail itself of the exemption. In the alternative, they argue that the exemption, if it ever applied, has lapsed, or been forfeited, by subsequent actions.


### Initial Determination and Appeal

In response to the Illegal Rent Petitions, the Property Owner, Portside Urban Renewal LLC, c/o Equity Residential Management, LLC, provided via counsel a letter brief and a copy of the Tenants' lease agreements and Truth in Renting Statements, along with several documents, including most notably copies of Certificates of Occupancy for the buildings and a "Letter of Exemption" dated November 23, 1994.

On September 19, 2022, the Rent Leveling Administrator issued Bureau Determinations for both 100 Warren and 155 Washington. With respect to 100 Warren, the Bureau found that rents prior to August 24, 2022 were not governed by the City's rent control regulations because the Property Owner had complied with the requirements of the State's new construction exemption to rent control. The Bureau found that the 30-year exemption expired on August 24, 2022, and that therefore 100 Warren was subject to rent control from that point forward.

With respect to 155 Washington, the Bureau found that "155 Washington has been and remains exempt from the rent control restrictions of the Ordinance from December 31, 1997 through December 30, 2027 and the Bureau has no jurisdiction to review or make any findings regarding these rents."

The Tenants were then permitted additional time to submit documents to the Bureau for

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 3

consideration of the issue of a mortgage which the Tenants argued would limit the exemption to the length of that mortgage, rather than thirty years. The Bureau reviewed the documents submitted and, in supplemental Determinations issued on December 15, 2022, found them unavailing. As such, the initial Determinations remained in place.

Following an extension of time to appeal, the Tenants appealed the Determinations (including the supplemental Determinations) to the Jersey City Rent Leveling Board on January 25, 2023. Following an agreed-upon schedule, the parties submitted their written briefs and related submissions in advance of a hearing date.

The Board heard the tenants' appeal on May 31, 2023. The tenants were represented by Neil Marrota, Esq., of Marotta & Garvey. The property owner was represented by Derek Reed, Esq., of Ehrlich, Petriello, Gudin, Plaza & Reed, PLLC. Appellant Kevin Weller testified on behalf of all Tenants.

At the conclusion of the May 31, 2023, hearing, the Board closed the public portion of the cases and voted to adjourn while reserving its determination. Shortly thereafter, the parties jointly contacted the Board via the Jersey City Law Department to request an adjournment of the cases to permit the parties to attempt to resolve the matters via mediation. The Board granted the joint adjournment request. In September 2023, the parties informed the Board that they wished to place the cases back on the Board's agenda. The cases were heard once more on October 19, 2023, at which time the Board members provided their reasoning and made a motion to find in favor of the Tenants, holding that the exemption claimed by the Property Owner was not properly filed and remanding the case to the Bureau for adjustment of the Tenants' rents. The motion was seconded and adopted unanimously.

Factual Background

100 Warren and 155 Washington are two separate multiple dwellings forming the single apartment community known as Portside Towers. Brief of Property Owner ("PO"), at 1. The original owners of the property financed the new construction with the intention of developing a condominium project. PO, at 1-2. 100 Warren was constructed first, and a Certificate of Occupancy was issued on August 25, 1992. PO, at 2. The project eventually went through foreclosure and was unoccupied between the time of the issuance of the Certificate of Occupancy and a Sheriff's Sale on November 23, 1994, at which time the current owner took possession. PO, at 2.

The same day that it acquired the property, the current Property Owner abandoned the condominium plan and resolved to convert the development to a multiple dwelling residential

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 4

apartment complex. PO, at 2. To that end, the current owner provided a letter dated November 23, 1994, and addressed to Michael J. Regan, who was then the Construction Code Official for the City of Jersey City. The letter states, in pertinent part:

> Portside Apartments Urban Renewal Partners, L.P. is the owner of 1 Washington Street (a/k/a 100 Warren Street), Jersey City, New Jersey (Lot 34, Block 60), which is a newly constructed multiple dwelling containing 229 rental dwelling units. We are hereby claiming exemption from rent controls under Article XX (Multiple Dwelling Rent Controls_ of the Jersey City Code and any form of future rent control pursuant to N.J.S.A. 2A:42-84.1 et. seq. The period for which exemption is claimed for the 229 units in this building shall commence on the anticipated date of initial occupancy, January 1, 1995.

> This written statement is being made pursuant to the requirements of N.J.S.A. 2A:41-84.4.

On December 6, 1994, the Jersey City Construction Official responded to the November 23, 1994 letter. The City acknowledged receipt, but also wrote

> Please be advised that the Office of Construction Official has no jurisdiction over rent controls and I would suggest that you contact the proper agency charged with that responsibility.

> See 100 Warren Determination, at 4.

No letter to the Construction Code Official in connection with the requested exemption from rent control for 155 Washington has been produced by the City or any party. See 155 Washington Determination, at 4.

On January 24, 1995, a Certificate of Continued Occupancy was issued for 100 Warren. PO, at 2. Construction of 155 Washington was completed on or about December 31, 1997, and a Certificate of Occupancy was issued on that date. Ibid.

100 Warren and 155 Washington operated as exempt from Jersey City's rent control regulations from the date of initial occupancy through the filing of the instant Illegal Rent Petitions. PO, at 2.

### Legal Standards

Chapter §260-3 of the Jersey City Municipal Code provides multiple dwellings as defined therein containing five or more residential housing spaces are subject to the City's rent regulations. It is

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 5

undisputed that both buildings are multiple dwellings with more than five units and are presumed to be rent controlled.

However, the City's ordinance contains several exemptions to the rent restrictions contained in Chapter 260. Pertinent to these cases is an exemption provided by New Jersey State law via N.J.S.A. 2A:42-84.1 et seq.

N.J.S.A. 2A:42-84 is titled "State Exemption for New Construction" (the "Statute"). As currently amended, the exemption provides as follows:

> a. In any municipality which has enacted or which hereafter enacts a rent control or rent leveling ordinance, other than under the authority of P.L.1966, c.168 (C.2A:42-74 et seq.), those provisions of the ordinance which limit the periodic or regular increases in base rentals of dwelling units shall not apply to multiple dwellings constructed after the effective date of this act, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less.
>
> b. In the event that there is no initial mortgage financing, the period of exemption from a rent control or rent leveling ordinance shall be 30 years from the completion of construction.

The State exemption is incorporated in §260-6C of the Municipal Code:

> In accordance with N.J.S.A. 2A:42-84.1 et seq., L. 1987, c. 153, the provisions of this chapter shall not apply to a new dwelling which is constructed between June 25, 1987, through June 25, 1992, and which is not constructed for occupation by senior citizens, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the dwelling, or for 30 years following completion of construction, whichever is less. This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4 and the service of a written statement upon the tenant required by N.J.S.A. 2A:42-84.3.

As noted in the Bureau's determinations, the exemption was initially limited in time, but has since been extended indefinitely. See N.J.S.A. 2A:42-84.5b ("Although this legislation was initially made effective only for a temporary five-year period, it was expanded for a second five-year period by P.L.1992, c.206 until 1997, and then in that year made permanent by P.L.1997, c.56.") The stated reason for the permanence of the exemption is that "[t]he Legislature deems it to be

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 6

necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey." Ibid.

As referenced in the Municipal Code, the Statute contains both a notice requirement to tenants, contained in N.J.S.A. 2A:42-84.3, and a notice requirement to the municipality via its construction official, codified in N.J.S.A. 2A:42-84.4. Those requirements read as follows:

> The owner of any multiple dwelling exempted from a rent control or rent leveling ordinance pursuant to this act, shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period. Each lease offered to a prospective tenant for any dwelling unit therein during the period the multiple dwelling is so exempted shall contain a provision notifying the tenant of the exemption.
>
> . . .
>
> The owner of any multiple dwelling claiming an exemption from a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of exemption from an ordinance under this act, including therein a statement of the date upon which the exemption period so claimed shall commence, such information as may be necessary to effectively locate and identify the multiple dwelling for which the exemption is claimed, and a statement of the number of rental dwelling units in the multiple dwelling for which the exemption is claimed.

<u>Rent Leveling Board's Analysis</u>

As an initial matter, the Board must consider whether the Property Owner satisfied the two notice requirements to avail itself of the "new construction" exemption contemplated by N.J.S.A. 2A:42-84.4. The earlier notice requirement must be presented to the municipality's Construction Official. The Property Owner "shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of exemption." N.J.S.A. 2A:42-84.4.

The second notice requirement states that the Property Owner "shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 7

prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period." N.J.S.A. 2A:42-84.3. Each lease and lease renewal must contain this notice. Ibid.

As it relates to notice to the construction official, the Bureau found that the Property Owner sent the aforementioned letter on November 23, 1994, to the Jersey City Construction Code Official, in which the Property Owner claimed the exemption for 100 Warren only. The Letter of Exemption stated that the exemption "shall commence on the anticipated date of initial occupancy, January 1, 1995." See 155 Washington Determination, at 4. The initial certificate of occupancy for the building was issued on August 25, 1992, but due to the failure of the condominium development plan, there had been no initial occupancy between that time and the foreclosure and subsequent Sheriff's sale. See 100 Warren Determination, at 3; PO, at 2.

However, the Statute requires that the Property Owner file for the exemption "at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling." Here, the certificate of occupancy was issued in August 1992, though the new construction contemplated the sale of condominium units, not apartment rentals. The Bureau found that the Letter of Exemption was sufficient because it meets the purposes of the notice to the Construction Official; namely, that the building has been constructed completely and is a multiple dwelling. However, because the letter claiming the exemption was not filed before the certificate of occupancy for the "new construction" at 100 Warren in 1992, the Rent Leveling Board finds that the Property Owner could not timely avail itself of the exemption. See Jersey City Rent Leveling Board October 19, 2023 Hearing Transcript ("October 19 Hearing"), at 19. The Property Owner argues that the Bureau's determination was sound because the Letter of Exemption for 100 Warren was filed "more than thirty (30) days before the initial occupancy." PO, at 4. The Statute does require notice to the tenants to be provided prior to occupancy and contained in each lease, but it requires notice to the Construction Official to be provided before the issuance of a certificate of occupancy. That did not happen here. As such, the Board rules in favor of the Tenants on this issue, finding that the building at 100 Warren had not availed itself of the thirty-year statutory exemption for new construction. See October 19 Hearing, at 24.

With regard to the lack of a letter seeking the exemption for 155 Washington, the Bureau concluded that

> Portside was aware of the Statute and its requirements in November 1994 even if the Construction Code Official at the time, Michael Regan, was not. It is as likely as not that three years later, with the issuance of the CO for 155 Washington, another request for exemption was sent. Perhaps, in light of Mr. Regan's December 6, 1994 letter, it was sent to some other City agency. What is clear, as set forth in

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 8

detail below, is that 155 Washington was owned by the same owner as 100 Warren and these Towers were managed as one development.

That the Property Owner was clearly aware of the requirement to file the notice and failed to do so does not weigh in its favor, notwithstanding the Construction Official's admittedly confusing response to the Letter of Exemption. The Statute's notice requirement is a mandatory condition precedent to receipt of this rent control exemption requiring strict compliance with its terms. There is no dispute that as it relates to 155 Washington that the record is devoid of any evidence of compliance with the notice requirement. While the Portside Towers community is managed "as one development," the Statute also requires that the letter contain "a statement of the date upon which the exemption period so claimed shall commence and a statement of the number of rental dwelling units in the multiple dwelling for which the exemption is claimed." The address and units referenced in the earlier Letter of Exemption refer only to 100 Warren and, therefore, cannot be applied to the second building or any of its units.

With only speculation and conjecture as to whether the Property Owner has ever provided the required notice, the Board finds that the Property Owner has not fulfilled its obligation to provide notice under the Statute and, therefore, the units at 155 Washington are not exempt from the City's rent control ordinance. See October 19 Hearing, at 19, 24.

Because the Board finds that the Property Owner has not satisfied the requirements of N.J.S.A. 2A:42-84.4, which must be satisfied before the notice to tenants is relevant, the Board declines to rule on the sufficiency of the notices to tenants and allegedly misfiled or inaccurate rent registration statements filed with the Bureau. Moreover, the Board need not opine on the limitations of the mortgage documents which Tenants allege would limit the length of the exemption should it apply to either building.

The Bureau's determination set forth the legislative purpose of the exemption, which is "to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey." See 100 Warren Determination, at 2. The Property Owner concurred in its briefs and at the Board hearing that the Bureau's decision gave effect to the purpose of the Statute. PO, at 11. Notwithstanding the stated goals of the Statute, the notice requirements also have purpose; namely, to allow the municipality's construction official to inspect the subject property and to evaluate whether it qualifies for the exemption. The Bureau's determination would allow a property owner to skirt that obligation and proceed as it if were a voluntary step in the process. Furthermore, the requirements for timely notice both to the municipality and the tenant allows the parties affected by the exemption to have notice regarding the status of the properties and track which properties are subject to, and exempt from, rent control. In this case, because the City and Tenants did not have a record of the exemption or its potential expiration, there was no record of when the

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 9

exemption would expire. That lack of knowledge required a determination for the first time by the Bureau that the exemption for 100 Warren had expired on August 24, 2022. See 100 Warren Determination, at 6.

Finally, the Bureau of Rent Leveling is empowered to "remedy violations of [Chapter 260] by adjusting rentals, ordering rebates and bringing appropriate legal charges." §260-9(A)(1). Here, the Board's decision is that there was no valid exemption for the duration of the tenancies of both buildings. See October 19 Hearing, at 24. The Board's decision affects all tenants in all units of the two buildings, and the Bureau is empowered to apply this decision to all units in both buildings from the date of the first illegal rent petition at issue here in each building. Id., at 23-24.


Rent Leveling Board Decision

The Board unanimously concludes that due to the failure by the Property Owner and its predecessor to comply with the notice requirement in N.J.S.A. 2A:42-84.4, both buildings and all units therein are and have been for the duration of their occupancies subject to rent control.

To summarize, because the Letter of Exemption to the Construction Official in November 1994 was provided to the City after the issuance of the certificate of occupancy for that building, it was not filed timely under the Statute. Further, because it is undisputed that no evidence of a filing for 155 Washington has been produced, the Board finds that 155 Washington is also subject to rent control.

The Statute does not expressly provide for a remedy where an exemption is inaccurately assumed by the municipality and/or property owner; however, the Board finds that there was no valid exemption from the beginning of the occupancy of the units. Any interpretation to the contrary would render the notice provisions voluntary or mere surplusage, whereas the Statute provides that the property owner "shall" provide the required notice in order to obtain the exemption.

The Bureau's policy is to provide a "lookback window" of six years for illegal rent petitions, coinciding with the statute of limitations for a cause of action for breach of contract. The Board understands this is a matter of both policy and practicality for the Bureau, which has limitations relating to recordkeeping and equitable considerations which militate toward finding a reasonable window of time for which adjustments to rent should be made following a successful illegal rent petition. As such, the Board adopts the Bureau's lookback policy and instructs the Bureau to adjust the rents for all units in each building to comply with the City's rent control regulations going back six years from the date of the first petition for each building; namely, June 25, 2022, for 100 Warren, and July 27, 2022, for 155 Washington.

Portside Towers
100 Warren Street and 155 Washington Street
Portside Urban Renewal c/o Equity Residential Management, LLC
Jersey City Rent Leveling Board Determination

November 3, 2023
Page 10

## Conclusion

The Property Owner did not fulfill its obligations to obtain an exemption from Chapter 260 of the City's Code, and, for the reasons set forth on the record and in this determination, both 100 Warren and 155 Washington are subject to Jersey City rent control regulations. The Bureau is instructed to obtain the records necessary to review and adjust the rent on all units within the buildings dating back six years from the filing of the first Illegal Rent Petition at issue in the instant matters for each building.

The Landlord or the Tenant may appeal the findings of any decision of the Rent Leveling Board by "action in lieu of prerogative writ" to a court of competent jurisdiction filed within 45 days of the Board's decision, as provided by New Jersey Rule of Court 4:69.

This is to certify that this constitutes the decision of the Jersey City Rent Leveling Board in connection with this matter.

Very truly yours,

Al Cupo
Chair, Jersey City Rent Leveling Board

CC: Tenants

Case 2:23-cv-22919-MCA-JRA Document 46-2 Filed 07/09/24 Page 196 of 273 PageID: 1450

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY, NEWARK DIVISION**

| | |
|---|---|
| The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC, <br><br> Plaintiffs, <br><br> v. <br><br><br> The City of Jersey City and the City of Jersey City Rent Leveling Board, <br><br><br> Defendants. | Case No. 2:23-cv-22291-MCA-JRA <br><br> **DECLARATION OF DANIELLE MARCHEWKA IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

I, Danielle Marchewka, declare as follows:

1. I am over 18 years old and provide the following based on personal knowledge.

2. I am an Assistant Vice President in the legal department of Equity Residential Management, LLC ("Equity Residential"), which is the managing agent of The Towers at Portside Urban Renewal Company, L.L.C. ("Portside"). I have been in that role for 1.5 years and have been employed by Equity Residential for 24 years.

3. Portside Towers is comprised of two towers that have a total of 527 residential apartment units, substantial common areas, and luxury amenities.

4. All Portside tenants agreed to leases that contain a "Rent Control Addendum" that expressly provides, "Pursuant to N.J.S.A. 2A:42-84.3, we hereby notify you that the Premises and the Community are exempt from the provisions of any rent control ordinances instituted by Jersey City or West New York, as the case may be, and said Premises and Community will be exempt from any future rent control, rent stabilization or rent leveling ordinance instated by these

municipalities for a period of thirty years following the completion of the construction of the Community." *See* attached Exhibit 1.

5.      Certain tenants have been taking the position that they are owed a rental credit based on the Board's Order and threatening to withhold rent based on it. Based on public statements they have made, including accusing Portside of criminal activity and violating the Ordinance by collecting rents that the tenants have agreed to pay, Portside has serious concern that the tenants will withhold rent once the Bureau issues its determination.

6.      The cost to effectively manage and operate the 527 apartments, common areas and amenities at Portside is significant and ongoing, in addition to the substantial taxes and fees imposed by the City of Jersey City, the County of Hudson, and State of New Jersey.

7.      If tenants refused to pay rent, the economic impact would have a negative impact on the resident, guest and staff experience at the two towers.

8.      If Portside is forced to reduce rent during the pendency of this case, but later increases rents as permitted by law when the Board's Order is invalidated, it will suffer significant disruption to its relationships with its tenants, who may move away or become extremely hostile over a perceived "whipsaw" in rent.  By contrast, if Portside is permitted to charge lawful rent for the duration of this case (with any disputed going-forward amounts in escrow), no such disruption or inability to recoup lost rents would result.

9.      If Portside prevails in this case, and tenants have withheld rent based on assertions made by certain tenants and the tenant associations, it is very likely that the debts owed by all of tenants would be extremely difficult to collect.  Based on my experience, first, if and once tenants fall behind in rent payments and do not set aside the rent amount due, they may face economic

2

hardship and or be unable to pay the back rent due.  Second, tenants may move from Portside and not willingly to pay past rent due to their prior landlord.

10.     For both towers, while this litigation is pending, Portside is charging tenants the rent that they had agreed to pay via their leases at the time of the Board's November 2023 decision. For any renewing lease, Portside has limited the rental increase to 4% or the relevant CPI number, whichever is lesser, and, to the extent that Portside imposed a larger increase in rent at 155 Washington, Portside has since credited any payment in excess of the November 2023 rent rate plus 4% or the CPI, while reserving all rights.

11.     I understand that it has been alleged in this action that Portside has pursued eviction proceedings against residents DaShawn Peyton, Anthony Thomas, Kelly Samuels Thomas, Arlene Kessler, and Jennifer Kessler. In fact, although Portside did initiate such proceedings in the ordinary course of administering the Portside Towers property, it voluntarily dismissed those proceedings in light of disputes related to the Board's November 2023 decision. Portside has not commenced any further proceedings relating to any of the above-listed tenants or any other tenants. Portside understands, based on the information available to it, that each of the above tenants remains a resident at Portside Towers.

12.     The City's position (which has changed several times since the first tenant petition was filed) is confusing and concerning, including its recent and repeated threats of civil and criminal penalties to Portside and its employees (without adequate direction as to how to comply), that has created fear and apprehension.

13.     Exhibit 2 is a true and correct copy of the January 19, 2024 correspondence from Derek Reed.

14.     Exhibit 3 is a true and correct copy of the February 7, 2024 correspondence from

3

Derek Reed.

15.     Exhibit 4 is a true and correct copy of the March 19, 2024 correspondence from Shyrone Richardson.

16.     Exhibit 5 is a true and correct copy of the March 20, 2024 correspondence from Derek Reed.

17.     Exhibit 6 is a true and correct copy of the March 27, 2024 correspondence from Derek Reed.

18.     Exhibit 7 is a true and correct copy of the April 5, 2024 correspondence from Neil Marotta.

19.     Exhibit 8 is a true and correct copy of the April 8, 2024 correspondence from Eric Nemeth.

20.     Exhibit 9 is a true and correct copy of the April 17, 2024 correspondence from Eric Bernstein.

21.     Exhibit 10 is a true and correct copy of the April 26, 2024 correspondence from Derek Reed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that I executed this Declaration on May 14, 2024 in Chicago, Illinois.

/s/  *Danielle Marchewka*
Danielle Marchewka

4

# EXHIBIT 1

## RENT CONTROL ADDENDUM
### (Jersey City, Hoboken and West New York Properties Only)

This Rent Control Addendum ("Addendum") is dated and effective as of the date on the Residential Lease - Term Sheet (the "Term Sheet") to which this Addendum is attached and made a part of ("the Lease") and is made by and between Lessor and Resident for the Premises at the Community identified in the Lease.

Pursuant to N.J.S.A. 2A:42-84.3, we hereby notify you that the Premises and the Community are exempt from the provisions of any rent control ordinances instituted by Jersey City or West New York, as the case may be, and said Premises and Community will be exempt from any future rent control, rent stabilization or rent leveling ordinance instituted by these municipalities for a period of thirty years following the completion of construction at the Community.

PORTSIDE_0252459

Case: 2:23-cv-22919-MCA-JRA Document: 46-2 Filed: 07/09/24 Page 208 of 273
PageID: 1457

# EXHIBIT 2

Case 2:23-cv-22901-MCA-JRA  Document 46-2  Filed 07/09/24  Page 204 of 273
PageID: 1458



*Derek Reed | Partner*
direct:  (973) 854-6710
dreed@EPGPRlaw.com

January 19, 2024

**Via Email (seang@jcnj.org)**
**City of Jersey City Municipal Council**
**City Hall**
**280 Grove Street**
**Jersey City, NJ 07305**

> **Re:**   **City of Jersey City Municipal Council Meeting of January 10th - Portside Towers**

Dear Councilmembers:

We write on behalf of Equity Residential Management and The Towers at Portside Urban Renewal Company (together, "Equity Residential") to address the statements made during the January 10, 2024, meeting of the City of Jersey City Municipal Council.  While we appreciate that frank and open discussion is essential to the healthy functioning of any governing body, we were troubled by certain statements of the Council which indicate a fundamental misunderstanding of certain facts relating to our client and the management of Portside Towers.  Moreover, we hope the Council will understand that regardless of the current dispute and litigation, Equity Residential has been and remains committed to its residents and compliance with Jersey City's laws.  Please accept this letter as our client's response to those statements to clarify the record so that all parties can move forward with a complete understanding of the facts.

The November 3rd decision of the Jersey City Rent Leveling Board (the "Board") directed the Jersey City Bureau of Rent Leveling (the "Bureau") to recalculate the rents for over 500 apartments at Portside Towers using a six (6) year lookback period.  To that end, in a letter dated November 27, 2023, the Bureau requested that our client provide certain documents, including all leases, for every tenant dating back to 2018 by December 23, 2023.  On December 14, 2023, our client committed to complying with the Bureau's request to provide thousands of documents, but requested a reasonable extension to January 8, 2024 to respond, which was granted by the Bureau. On January 5, 2024, our client received correspondence from the Bureau requesting an additional year of leases, going back to 2017, and extended the deadline for our client to respond to the Bureau's request for documents to January 19, 2024.  As of January 11, 2024 (more than a week before the Bureau's deadline), our client has provided all the information requested by the Bureau, comprised of several thousand documents, to the City's attorneys per their instruction.  Since the outset, we have expressed our client's intent to comply with the Bureau's requests and its desire to pursue paths where the City and Equity Residential may reach agreements to facilitate the swift, efficient and reasonable resolution to the pending litigation and bring clarity for all involved.  In all of our communications, we have consistently offered our assistance and cooperation to the Bureau in connection with rent calculations for the more than 500 units at issue.

Please direct replies to:
60 Park Place, Suite 1016, Newark, NJ 07102
Tel:  (973) 643-0040  •  Fax:  (973) 596-1781  •  www.EPGPRlaw.com

NEWARK   •   NEW YORK   •   MORRISTOWN

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

January 19, 2024
Page 2


This conduct not only demonstrates that Equity Residential has cooperated with the Bureau's requests, but has done so timely and in good faith, albeit with a full reservation of rights. To suggest otherwise simply is unfair and untrue, and we would be glad to address any questions about our client's production of documents and information and offers of cooperation.

Moreover, although we fully expect that the decision of the Board will be reversed, our client will cap all rent increases in accordance with the Jersey City Rent Control Ordinance (the "Ordinance"), voluntarily and without prejudice to its legal claims, and notwithstanding the pendency of two lawsuits challenging the Board's determination. To the extent that any resident has received an increase in excess of the Ordinance subsequent to the November 3, 2023 decision, that increase will be reduced accordingly and any excess increase which has been paid will be credited to the resident.

Of note, the calculations with which the Bureau has been tasked are extremely complex and time-consuming, and, again, Equity Residential has offered to assist the Bureau in executing this difficult task, notwithstanding its pending challenge of the decision directing those recalculations. This cooperation belies the allegation that our client is acting in bad faith. We submit that any perceived delay in the Bureau's calculations is the result of the breadth and complexity of this task, and our client remains concerned about the Bureau pressing forward with calculations that will likely create further confusion and ultimately be reversed by the federal court.

Despite that a small group of vocal residents may feel differently, Equity Residential cares deeply about its tenant relationships and invests in those relationships so that they are long-standing. Our client sees no benefit to any party for the Bureau to create confusion in circumstances in which a court will soon decide if the Board's decision may stand and if so, whether the City must then follow its own Ordinance's two-year limitation. By way of that example alone, Equity Residential, the tenants' attorney, and the Bureau all currently disagree over the appropriate look-back period. In our view, even assuming the Jersey City rent control ordinance applies, the plain terms of the Ordinance prescribe a two-year "limitations period" (§ 260-7(C)) and thus any potential rent adjustment would be limited to a two-year look-back. In addition, payment of a rental increase "for two consecutive years shall be construed to be an agreed increase." (§ 260-7(D).) The City has identified a look-back period going back to 2018. Meanwhile, the tenants' attorney has written to the City suggesting an interpretation of the Board's November 3rd decision to "mandate" a six-year lookback period, but then argues for a much longer look-back period going all the way back to 1998. We have asked the federal court to determine that, at most, a two-year look-back period applies. Until this fundamental issue is resolved, any calculation of rent adjustments will likely result in a waste of resources and create confusion. Again, notwithstanding these threshold concerns, Equity Residential is cooperating and complying fully with the Board's decision and the law.

While Equity Residential strongly believes that the Board's decision was in error and that its position will ultimately be vindicated, it is likewise committed to behaving fairly and responsibly while the legal process plays out.

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

January 19, 2024
Page 3


      Please do not hesitate to contact us if you have questions or require assistance.  Our client reserves all rights in connection with this proceeding.


                    Very truly yours,


                    Derek D. Reed, Esq.

Cc: Peter Baker, Esq. (pbaker@jcnj.org)
    Thomas Slattery, Esq.(tslattery@jcnj.org)
    Eric Bernstein, Esq. (embernstein@embalaw.com)
    Neil Marotta, Esq. (mgclawyers@aol.com)
    Equity Residential Management (via email)

# EXHIBIT 3

Case 2:23-cv-22919-MCA-JRA Document 46-2 Filed 07/09/24 Page 208 of 273
PageID: 1462



*Derek Reed | Partner*
direct:  (973) 854-6710
dreed@EPGPRlaw.com

February 7, 2024

**Via Email (seang@jcnj.org)**
**City of Jersey City Municipal Council**
**City Hall**
**280 Grove Street**
**Jersey City, NJ 07305**

> Re:    January 23, 2024, Correspondence to the Council - Portside Towers

Dear Councilmembers:

As you are aware, we represent Equity Residential Management and The Towers at Portside Urban Renewal Company (together, "Equity Residential"). We are in receipt of the January 23, 2024 letter submitted by Neil Marotta, Esq., and offer this correspondence to correct several incorrect statements and personal opinions in that letter, which Mr. Marotta characterized as "contrary facts."  While we think the parties are best served by directing their arguments to the appropriate judicial forum, rather than the Council, we are compelled to correct several incorrect assertions.  We respectfully submit that the true state of facts shows that Equity Residential is working in good faith to address the Board's decision and the Bureau's requests, while reserving its legal rights, as it is entitled to do.

As an initial matter, contrary to Mr. Marotta's representation, no increase of 40% has been issued to any resident since the Board's decision.  First, it cannot be disputed that Equity Residential has agreed to operate the Tower at 100 Warren as under rent control since September 19, 2022, consistent with the initial determination of Ms. Dinah Hendon, who, after a thorough investigation determined that both Towers qualified for the 30-year exemption to rent control, but that the exemption for 100 Warren had lapsed.

Second, as we stated in our January 19, 2024 letter to the Council, to the extent Equity Residential sent a notice of a rent increase of more than 4% to any resident in the Tower located at 155 Washington since the Board's decision (and none was near 40%), Equity Residential will cap the increase at 4% and credit past payments under that post-decision lease in excess of 4% to the resident's account, with a full reservation of rights.

Similarly, Mr. Marotta's statement that Equity Residential is prohibited from agreeing to rent amounts with tenants, including any amounts with rent increases, until the Bureau has finished its calculations is also untrue and impractical.  The Board determined that any rent adjustment shall be determined by the Bureau, and the Bureau has not made any determination as to the amount of any adjustment.  In addition, Corporation Counsel expressly advised the Council during its January 10, 2024, meeting that four percent (4%) increases are permissible.

Please direct replies to:
60 Park Place, Suite 1016, Newark, NJ 07102
Tel: (973) 643-0040 • Fax: (973) 596-1781 • www.EPGPRlaw.com

NEWARK   •   NEW YORK   •   MORRISTOWN

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

February 7, 2024
Page 2

Mr. Marotta also asserts that Equity Residential has failed to provide the Bureau with all information necessary to perform the calculations required by the Board's decision. This is simply not true. We have provided all the information requested by the Bureau to date. Since we provided the complete information requested by the Bureau well in advance of the deadline it set, it has not contacted us to seek additional information or input. To the extent that Mr. Marotta or his clients have complaints about the years the Bureau requested Equity Residential to provide responsive information, it is unfair to direct those complaints against Equity Residential. Notably, to the extent the Bureau seeks information relating to 2016, with the same reservation of rights, we are prepared to promptly provide those documents and information. We also have offered, and continue to offer, our assistance in performing calculations as directed by the Board, despite our legal challenges to the Board's decision.

Mr. Marotta's statements regarding the two-year limitations period provided for in the Jersey City Ordinance ("Ordinance") are not correct. As an initial matter, to the extent the Towers were not exempted from the City's Ordinance as Mr. Marotta and his clients contend, under that Ordinance, there are two separate applicable limitation provisions that limit the ability of Mr. Marotta and the tenants to seek a windfall. Section 260-7(C) provides a strict two-year limitations period and does not contain any exemption or waiver to that limitation. No party has offered any explanation at any point as to why the Bureau must not comply with the express limitations language set forth in Section 260-7(C). Separately, Section 260-7(D) provides that, where a tenant agrees to rent increases for two consecutive years, those increases are "deemed accepted." Mr. Marotta argues that Equity Residential "waived" this provision by failing to comply with the requirement to provide tenants with rental statements as set forth in Section 260-1 of the Ordinance. That is not true. Equity Residential has served rental statements in compliance with the law, and the Board did not determine differently.

Equity Residential invested in these buildings on the express understanding that they were exempt from rent control, and every resident to move in – at least prior to late 2022 – also expressly understood and were notified that the buildings were exempt from rent control. Moreover, the residents expressly agreed in writing to pay market rents. Any retroactive disallowance of rent control would be fundamentally unfair and unconstitutional, and would result in a windfall.

It is unfair for Mr. Marotta to say that Equity Residential "is not a good landlord." Inflammatory rhetoric – often repeated at City Council meetings – like this is not only false, but also counterproductive to the orderly resolution of the issues. Equity Residential invested in these Towers to bring them to the residential market at a time when no one else was willing to do so. It has further invested in them over the years, while not passing through many of the costs of increases in taxes and other costs that it would have been entitled to pass through to tenants over the past nearly 30 years. The City directly benefitted from the taxes that Equity Residential paid under the PILOT agreement, including at a higher economic amount because the City and the tenants all understood that the Towers were not subject to rent control. What Equity Residential now faces is, as a Portside tenant put it, "hav[ing] luxury apartments in Jersey City at rates that are half the price now", because a Board, whose Chairperson candidly stated on the record that

Case 2:23-cv-22941-MCA-JRA   Document 46-2   Filed 07/09/24   Page 210 of 273
PageID: 1464

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

February 7, 2024
Page 3

"this [rent control dispute] is so complex this is way beyond our comprehension", abruptly, without any indication there was a careful review of the parties' submissions that were accompanied by thousands of pages of documents, overturned the well-reasoned, thorough determinations of the City's own experienced Rent Leveling Administrator and attorney, in Ms. Hendon.   Notwithstanding its disagreements and challenges to the Board's decision, Equity Residential has fully complied with all informational requests made by the Bureau and is committed to complying with the percentage increase restrictions of the Jersey City Ordinance until contrary court order, decision of the Board, or agreement among the parties.  Despite unfounded allegations to the contrary, our clients' conduct is fully consistent with the Board's decision and the legal guidance offered to the Council by the City's Corporation Counsel.

Moreover, the Board's rejection of the experienced Jersey City Office of Landlord/Tenant Relations Rent Leveling Administrator's thorough, well-reasoned rulings is wrong as a matter of state and local law.  It also violated our clients' constitutional rights under the New Jersey and US constitutions.  As an initial matter, independent of the City's Ordinance, upon which the Board relies, New Jersey state law exempts the Towers from rent control.  State law expressly provides that "[i]n any municipality that has enacted...a rent control ordinance...those provisions of the ordinance which limit...increases in base rental **shall not** apply to multiple dwellings constructed after [June 25, 1987] for a period...30 years following completion of construction...." NJ Rev. Stat. Section 2a:42-84.2 (emphasis added).  This state law (the "Exemption Statute") further expressly provides that "[n]o municipality...or agency or instrumentality thereof, shall adopt any ordinance, resolution, or rule or regulation or take any other action to limit, diminish, alter or impair [this exemption]."  Because both Towers were constructed after June 25, 1987, they are exempt from local rent control, regardless of whether they are also exempt under the terms of the local rent control ordinance, which we believe they also are exempt from consistent with the Rent Leveling Administrator's determinations.  The Board's decision  to the contrary is precisely the type of "action to limit, diminish, alter or impair" the state Exemption Statute expressly prohibits.

The Board's rejection of the Rent Leveling Administrator's rulings that Equity Residential had complied with certain notice provisions in the City's Ordinance is not only illegal under state law, it is both irrelevant and erroneous.  First, it is irrelevant because nothing in the state Exemption Statute indicates that compliance with any state law notice provisions is a condition precedent to obtaining the state law exemption.  To the contrary, the state law exemption language is mandatory ("shall not apply") and does not even refer to the state law notice provisions.  Contrary to the City's Ordinance, the state Exemption Statute conspicuously fails to make compliance with the notice provision a condition precedent to the exemption.  Because the state exemption is not forfeited by a failure to provide notice, that exemption continues to apply and, by its terms, cannot be diminished, altered, or impaired by action of the Board.   Second, even if it were necessary to provide notice as a condition precedent to the state exemption, which it is not, the Rent Leveling Administrator correctly found that Equity Residential sufficiently complied with any notice requirements.  The Rent Leveling Administrator's reasoning and findings on this point are well-reasoned and persuasive.

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

February 7, 2024
Page 4


For all these reasons, we believe the federal court will find the Board's actions were an illegal diminution or impairment of the mandatory state law rent control exemption and, in all events, premised on an irrelevant and erroneous determination on the merits.

In closing, we continue to offer and provide responsive information to the Bureau and offer to assist in any of its forthcoming calculations, and moreover, continue to offer to work with the City's counsel to move Equity Residential's legal challenges to prompt resolution. As explained above, we believe that the federal court will find that the Board acted unfairly and unlawfully in connection with its rejection of Ms. Hendon's thorough, unbiased determinations, and in doing so, will moot the need for the Bureau's calculations. A prompt determination of whether we are correct or wrong in that assessment will bring important clarity for all, and we hope we can cooperate in seeking that prompt resolution.


Very truly yours,


Derek D. Reed, Esq.

Cc: Peter Baker, Esq. (pbaker@jcnj.org)
    Thomas Slattery, Esq.(tslattery@jcnj.org)
    Eric Bernstein, Esq. (embernstein@embalaw.com)
    Neil Marotta, Esq. (mgclawyers@aol.com)

# EXHIBIT 4

Case 2:23-cv-22919-MCA-JRA   Document 46-2   Filed 07/09/24   Page 213 of 273   PageID: 1467

# CITY OF JERSEY CITY

## Department of Housing, Economic Development and Commerce
### Division of Housing Preservation
### Office of Landlord/Tenant Relations

**Steven M. Fulop**
**Mayor**

342 MARTIN LUTHER KING DRIVE • JERSEY CITY, N.J 07305
PHONE: (201) 547-5127

March 19, 2024

Derek Reed, Esq.
Ehlrich, Petriello, Gudin, Plaza & Reed, P.C
60 Park Place, Suite 1016
Newark, NJ, 07102
Email: dreed@epgprlaw.com

**Re: Portside Towers - Tenant Inquiry**

Dear Mr. Reed,

As you know, on October 19, 2023, the Jersey City Rent Leveling Board, (the "Board"), issued a Determination in favor of the Tenants residing at 155 Washington Street and 100 Warren Street, (collectively, "Portside Towers"), which established that Portside Towers is subject to the provisions of the Jersey City Rent Control Ordinance, (the "Ordinance"), Chapter 260 of the Jersey City Municipal Code.

Following the Board's Determination, the Bureau of Rent Leveling, (the "Bureau"), requested additional proofs for submission from both parties in order to calculate the current allowable Base Rent and Actual Rent of each unit at Portside Towers. In response to this request, on March 14, 2024, the Bureau received a trove of documents and is currently reviewing them in order to perform the necessary calculations.

On or about March 7, 2024, the Bureau received an inquiry via email from a tenant residing at Portside Towers. Said tenant provided a copy of an email correspondence dated January 25, 2024, which stated, in pertinent part, that Equity Residential "will be limiting your rent increase for your upcoming renewal to the increased amount permitted under the local rent control ordinance, while the matter is pending in court."

Pursuant to the § 260-1, the base rent for a unit is:

> *The legal rent charged or actually received by the landlord for the rental of a housing space as of January 11, 1983; or if not occupied at that date the "base rent" shall be that actually charged to and received from the previous tenant, plus*

Case 2:23-cv-22921-MCA-JRA Document 46 Filed 07/09/24 Page 214 of 273
PageID: 1468

Re: Portside Towers – Tenant Inquiry
March 19, 2023
Page 2

> *any increases under § 260-3 of this chapter or the ordinance to which this is an amendment, or if insufficient evidence is available from which the Rent Leveling Administrator or Board can determine the legal rent charged or actually received as provided above, then the Rent Leveling Administrator and Board have the power to determine the legal "base rent" by considering the legal base rent of other units, subject to the provisions of this chapter, which are comparable in size, location and facilities to the subject unit.*

As referenced in the Bureaus request for proofs, whether or not a property is subject to the provisions of the Ordinance, a Property Owner is still required to register a rent roll or "a list of the base monthly rents" pursuant to § 260-2F (1) (g):

> *(1) Every owner and/or landlord shall within 90 days following the effective date of this subsection or the creation of the first tenancy in any dwelling containing five (5) or more housing spaces, whether or not subject to the restrictions of rent increases under this Chapter, file a landlord registration statement with the Bureau of Rent Leveling containing the following information:*
>
> . . .
>
> *(g) A list of the base monthly rents of each housing space, by apartment or room number, within the dwelling as of January 1, 1983.*

The Bureau has found that the Property Owner failed to comply with the requirement provided by §260-2F(1)(g) as detailed below:

**155 Washington Street -**
2018 – No Rent Roll Received
2019 – No Rent Roll Received
2020 – No Rent Roll Received
2021 – Rent Roll Received
2022 – Rent Roll Received
2023 – Rent Roll Received

**100 Warren Street –**
2018 – No Rent Roll Received
2019 – No Rent Roll Received
2020 – No Rent Roll Received
2021 – Rent Roll Received
2022 – Rent Roll Received
2023 – Rent Roll Received

In connection with the Board's Determination, the Bureau must calculate the legal base rent for the units of Portside Towers. Due to the Property Owner's failure to provide the Bureau with copies of their rent rolls, or base monthly rents, during the above-referenced registration periods, the Bureau does not recognize any increases imposed or collected from the tenants residing at the properties during those times.

Case 2:23-cv-22919-MCA-JRA   Document 46-2   Filed 07/09/24   Page 215 of 273
PageID: 1469

Re: Portside Towers – Tenant Inquiry
March 19, 2023
Page 3

In the Bureaus request for additional proofs for submission, you were also made aware that in response to the COVID-19 Public Health Emergency, the City Council unanimously passed Rent Freeze Ordinance 20-100 which prohibited landlords from imposing or collecting rental increases from tenants in rent controlled properties from May 15, 2020 to September 15, 2021. New Jersey State law requires that landlords provide tenants with a minimum thirty (30) days' notice prior to collecting any increase. With proper notice, the soonest the Landlord could have collected an increase from the Tenant following the increase provided by the Superior Court as well as the expiry of the Rent Freeze Ordinance would have been on November 1, 2021. As the Property Owner filed their Registration Statements during the 2021 registration period, an increase can be applied to each units Base Rent; however, the Property Owner was not entitled to collect an increase from their tenants while the Rent Freeze Ordinance was in effect.

As such, since the requested proofs are currently being reviewed and the appropriate base rents have yet to be established, the rents imposed on the tenants during the 2023 (or earlier) lease term are no longer the legal base rents upon which Equity Residential is permitted to apply an increase to in accordance with the provisions of the Ordinance. Therefore, any increase in rent applied to t that of which was paid by the tenant from 2023 (or earlier) may violate Chapter 260 of the Jersey City Municipal Code.

Please be reminded that pursuant to § 260-17, a violation of any provisions of Chapter 260 is punishable by a fine of up to two thousand dollars ($2,000.00) and/or imprisonment for a period of up to ninety (90) days and/or a period of community service not exceeding ninety (90) days. A violation affecting more than one tenant shall be considered a separate violation as to each tenant.

Shyrone Richardson
Rent Leveling Administrator
Director of Division of Housing Preservation

# EXHIBIT 5



***Derek Reed | Partner***
direct:  (973) 854-6710
dreed@EPGPRlaw.com

March 20, 2024

**Via Email (SRichardson@jcnj.org)**
**Shyrone Richardson – Rent Leveling Administrator**
**Office of Landlord/Tenant Relations**
**342 Martin Luther King Drive**
**Jersey City, NJ 07305**

   Re: **Portside Towers – March 19, 2024, Correspondence**

Dear Mr. Richardson:

  As you are aware, we represent Equity Residential Management and The Towers at Portside Urban Renewal Company (together, "Equity Residential"). We are in receipt of your March 19, 2024 letter addressed to the undersigned, and offer this response to address some apparent confusion and hopefully lay the groundwork for further cooperation.

  As you are also aware, Equity Residential has cooperated fully and promptly with all document requests of the Office of Landlord/Tenant Relations (the "Bureau") since the Rent Leveling Board (the "Board") issued its November 3, 2023 decision (the "Decision"). Despite strong disagreement with the Decision, our client has produced thousands of documents to the Bureau's attorney, Eric Bernstein, Esq., in response to the Bureau's requests, has recently made redactions to those documents as requested by Mr. Bernstein, and has even offered to assist with the complicated calculations required by the Decision.

  In light of the foregoing, we were disappointed by the tone of your letter, which does not reflect our client's cooperation with the Bureau thus far, as recently noted by Mr. Bernstein. Moreover, the legal pronouncements and directives of your letter are inconsistent with the statements made by Corporation Counsel during the January 10th meeting of the Jersey City Municipal Council (the "Council"). During that meeting, Corporation Counsel explicitly advised the Council that four percent (4%) rent increases are permissible, and that residents would need to bring any alleged violations occurring subsequent to the Decision as new complaints. Equity Residential directly referenced Corporation Counsel's statements in a February 7, 2024 correspondence to the Council, and has relied upon those statements in its efforts to proceed in manner that respects the Decision while still preserving all rights and effecting those increases to which it is entitled under the Jersey City Rent Leveling Ordinance (the "Ordinance").

  We were also troubled by the threat of substantial penalties, including imprisonment and fines. As we sit here today, it is unclear what the base rents at Portside Towers should be pursuant to the Decision. Threatening to impose significant penalties, including incarceration, without articulating what rents can be

Please direct replies to:
60 Park Place, Suite 1016, Newark, NJ 07102
Tel: (973) 643-0040  •  Fax: (973) 596-1781  •  www.EPGPRlaw.com

NEWARK • NEW YORK • MORRISTOWN

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

March 20, 2024
Page 2

charged to avoid such penalties, presents serious Constitutional concerns and runs contrary to the manner in which Equity Residential has dealt with your office, and continues to deal with your office through Mr. Bernstein.  This is especially true where the alleged offense is engaging in conduct consistent with the Decision, the Ordinance, and the guidance of Corporation Counsel.

Notwithstanding the foregoing, Equity Residential has made the determination to stay all rent increases at this time as requested in your March 19, 2024 letter, but reserves all rights and claims, including the right to collect in full all rents due under leases with its residents.  Equity Residential specifically reserves all rights against the City of Jersey City and the City of Jersey City Rent Leveling Board with respect to damages it will incur as a result of the stay, and will seek same in the pending litigation.

We continue to hope for a prompt completion of the calculations ordered by the Board on November 3, 2023, and Equity Residential continues to offer assistance to the Bureau in its efforts to comply with the Decision.

Very truly yours,

Derek D. Reed, Esq.

Cc: Thomas Slattery, Esq.(tslattery@jcnj.org)
     Eric Bernstein, Esq. (embernstein@embalaw.com)
     Neil Marotta, Esq. (mgclawyers@aol.com)
     Brittany Murray, Esq. (bmurray@jcnj.org)

# EXHIBIT 6



***Derek Reed | Partner***
direct:  (973) 854-6710
dreed@EPGPRlaw.com

March 27, 2024

**Via Email (embernstein@embalaw.com)**
**Eric M. Bernstein, Esq.**
**Eric M. Bernstein & Associates, L.L.C.**
**34 Mountain Boulevard, Building A**
**Warren, NJ 07059**

> Re:    Office of Landlord/Tenant Relations – March 19, 2024, Correspondence

Dear Mr. Bernstein:

As you know we represent Equity Residential Management and The Towers at Portside Urban Renewal Company (together, "Equity Residential").  Last week, on March 19, 2024, Mr. Shyrone Richardson, in his capacity as Rent Leveling Administrator, for your clients, the City of Jersey City and the City of Jersey City Rent Leveling Board, sent correspondence directly to me.  Included herewith please find a copy of Mr. Richardson's letter.

As you will see, in that letter, Mr. Richardson takes a new position on behalf of your clients, and one that is contrary to the direction and guidance previously provided by the City Council and Corporation Counsel.  As it does not appear that you or the Corporation Counsel were copied on Mr. Richardson's correspondence, we want to be sure you are aware of the position Mr. Richardson is taking on behalf of your clients and further discuss it with you.

At the same time, we would like to make sure that Mr. Richardson is aware that Equity Residential has cooperated fully and promptly with all document requests made by the Office of Landlord/Tenant Relations (the "Bureau") since the Rent Leveling Board (the "Board") issued its November 3, 2023 decision (the "Decision"), including the production of rent rolls from 2017-2023 for both buildings on January 11, 2024 to your office, which contradicts Mr. Richardson's allegation that our clients did not produce rent rolls from 2018-2020 for either building.  Despite strong disagreement with the Decision, our client has continued to fully cooperate with the process, including we have engaged in productive conversations with your office and Equity Residential has produced thousands of documents.  It also recently has further cooperated with your office to promptly address requested redactions to those documents to protect tenant information, which are being sent

Please direct replies to:
60 Park Place, Suite 1016, Newark, NJ 07102
Tel: (973) 643-0040  •  Fax: (973) 596-1781  •  www.EPGPRlaw.com

NEWARK    •    NEW YORK    •    MORRISTOWN

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

March 27, 2024
Page 2

to you in the near future, and has on every occasion even offered to assist with the calculations that the Bureau will make pursuant to the Decision.

Given the tone of his letter, which does not reflect our client's cooperation and commitments, we can only assume he is not aware of the foregoing information. As you know, but apparently Mr. Richardson does not know, our clients have previously and consistently committed to always complying with the law. They continue to do so.

The legal pronouncements and directives of Mr. Richardson's letter are confusing and make compliance difficult, as they are inconsistent with the pronouncements and directives offered by City Council President Watterman and Corporation Counsel during the January 10th meeting of the Jersey City Municipal Council (the "Council"). During that meeting, Corporation Counsel confirmed for the Council that four percent (4%) rent increases are permissible, and that residents would need to bring any alleged violations occurring subsequent to the Decision as new complaints. That exchange went as follows:

> **Joyce Watterman:** Based on what you said, Brittany, they could still increase their rent by at least four percent. If it's over that, then it's more.
>
> **Brittany Murphy:** Correct they need to file a petition
>
> **Joyce Watterman:** If it's more than four percent.
>
> **Brittany Murphy:** Correct. If they're not following it, they need to file an illegal rent petition again.

Equity Residential thereafter directly referenced Corporation Counsel's statements in a February 7, 2024 letter to you (copying others), and has relied upon those statements in its efforts to proceed in manner consistent with that direction and guidance including with respect to the Decision, while effecting those increases that are permitted under the Jersey City Rent Leveling Ordinance (the "Ordinance") and preserving all rights and claims. At no time did the City direct Equity Residential to act differently.

We were also very troubled by the threats in Mr. Richardson's letter regarding penalties, fines, and even imprisonment. Those types of threats are counterproductive and contrary to the law. Although we strongly prefer to work through all the issues created by the Decision in a cooperative manner, we are forced to note that threatening to imprison company representatives who are only attempting to comply with the Board's and the City's inconsistent directives raises serious legal and constitutional issues. Threatening to impose significant penalties, including incarceration, without identifying the rents that, in the Bureau's view, can be charged to avoid such penalties creates an impossible situation for Equity Residential. It is wholly unfair to threaten to punish Equity employees, including

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

March 27, 2024
Page 3


New Jersey residents, under Section 260-17 for charging excessively high rent when Equity has not been informed by the City as to what base rent the City asserts that Equity should apply. (And Equity certainly can't charge $0.) A "penal statute" must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

We respectfully submit that Mr. Richardson's letter and this course of conduct is contrary to well-settled law and inconsistent with the cooperative approach Equity Residential has followed in dealing with your office.

Mr. Richardson's letter and the City's course of conduct are especially egregious because Mr. Richardson's appointed Board Hearing Officer, Ms. Hendon, determined that Portside was entitled to full exemption. Please recall that beginning in June 2022, tenants filed petitions with the Office of Landlord/Tenant Relations Bureau of Rent Leveling ("the Bureau") contending Portside Towers is not exempt from Jersey City's rent control Ordinance. Among other arguments, the tenants argued that Portside could not establish that its predecessor had, decades earlier, sent the notices described in the Exemption Statute. On September 19, 2022, after receiving briefing and evidence, the Bureau found that Portside Towers properly qualified for the Exemption. With respect to the notice to tenants described in N.J.S.A. § 2A:42-84.3, the Bureau found that it was "undisputed that the Landlord has met [that] criteria" by sending tenants a "Rent Control addendum" notifying tenants that the buildings are exempt from rent control. Ex. A, Sept. 19, 2022 Notice of Decision re 155 Washington Street, at 3.

With respect to the notice to the "City Construction Official" described in N.J.S.A. § 2A:42-84.4, the Bureau found that Portside's predecessor had provided the notice for 100 Warren Street by sending the November 23, 1994 letter to Mr. Regan, the Jersey City Construction Code Official. Ex. B, Sept. 19, 2022 Notice of Decision re 100 Warren Street, at 3. The tenants argued that the November 23, 1994 letter was too late, because the Exemption Statute calls for a notice "at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling." N.J.S.A. § 2A:42-84.4. As noted above, the initial certificate of occupancy for Portside Towers was issued on August 26, 1992. However, as the Bureau found, Portside Towers was not occupied at that time (it had been planned as condominiums and then fell into a foreclosure proceeding because of economic distress). It was not until January 24, 1995, after Portside's predecessor purchased the building and adapted it to a rental property, that Portside obtained a certificate of continued occupancy for 100 Warren Street. The tower was first occupied after that time. The Bureau found that the November 23, 1994 notice, delivered more than 30 days before the certificate of continued occupancy, was timely.

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

March 27, 2024
Page 4

      With respect to 155 Washington, the Bureau found that "no letter to the Construction Code Official . . . has been located but that does not mean that one was not sent." Ex. A at 4. Rather, given the passage of more than twenty years since the construction of the building and "in light of Mr. Regan's December 6, 1994 letter" telling Portside that he did not believe he was the proper recipient of such notices, it was at least "as likely as not" that a notice was sent but not filed. *Id.* at 4. Moreover, the Bureau found that Jersey City had known since the 1990s that Portside Towers was effectively a single development. Because Jersey City had received the 1994 letter regarding 100 Warren Street, and because Portside had made multiple filings indicating that the entire project was exempt, there was no doubt that "the City was aware of this development and the Landlord's claim of exemption." *Id.* at 5. Further, "[f]rom the start, the Tenants residing at 155 Washington have been advised that the building is not subject to rent control." *Id.* The Administrator noted the tenants' arguments that Portside had checked the wrong box regarding rent control on a few registration statements, but found that of no import in light of all of the other circumstances establishing notice to the City and tenants.

      For those reasons and others, the Bureau held that both Portside Towers buildings were exempt from rent control. Regarding 155 Washington, the Bureau held that the Exemption applies from December 31, 1997 (the completion of construction) through December 30, 2027. Regarding 100 Warren Street, the Bureau held that the Exemption applies from August 24, 1992 (the completion of construction) through August 24, 2022. Ex. A at 7; Ex. B at 6.

      By seeking to use the threat of criminal penalties to strong-arm and coerce a result that the Bureau itself rejected, the City is acting improperly and causing needless damage. Relatedly, we are further troubled by Mr. Richardson's letter and the City's course of conduct because the City has refused to cooperate in seeking an expeditious resolution of this dispute. Further delay – which appears to be the City's objective – will result in further violations by the City of state/local statutory law (which entitles Equity to rent increases) and of the Constitution and will result in increased damages. *See Hutton Park Gardens v. Town Council of Town of W. Orange*, 68 N.J. 543, 569 (N.J. 1975) (noting "the requirement that rent regulation must permit a just and reasonable return").

      In light of the above, please advise us whether Mr. Richardson's letter was authorized and represents the position of the City, so that Equity Residential can consider whether to stay further rent increases. Please be advised that Equity Residential reserves all rights against the City of Jersey City and the City of Jersey City Rent Leveling Board with respect to damages it will incur as a result of being required to forego lawful rental increases and will seek same in the pending litigation.

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

March 27, 2024
Page 5


     We continue to hope for a prompt completion of the calculations ordered by the Board on November 3, 2023, and Equity Residential continues to offer assistance to the Bureau in its efforts to comply with the Decision.

     Please share this letter with Mr. Richardson.  Should you, including along with him, wish to discuss the contents of his letter, we would be glad to schedule time to talk. We look forward to your response by April 3, 2024 as to the City's position on Mr. Richardson's letter given the time sensitive nature of this issue

     Please also share it with the City Council.


     Very truly yours,


     Derek D. Reed, Esq.

Cc: Thomas Slattery, Esq.(tslattery@jcnj.org)
    Neil Marotta, Esq. (mgclawyers@aol.com)
    Brittany Murray, Esq. (bmurray@jcnj.org)

# EXHIBIT 7

# MAROTTA & GARVEY
## Attorneys at Law

Neil D. Marotta, Esq.
Kathleen P. Garvey, Esq.

3916 Bergenline Avenue,
Suite 2200
Union City, New Jersey 07087

Phone:(201)552-9200
Fax:(201)552-9204
E-mail:  mgclawyers@aol.com

April 5, 2024

Via email, Certified Mail R.R.R. and
Regular Mail

Eric M. Bernstein, Esq.
Eric M. Bernstein & Associates, LLC
34 Mountain Blvd building a
Warren, NJ 07059

Re:    Richardson Letter of March 19, 2024 and Reed Letter of March 27, 2024

Dear Mr. Bernstein:

Please be advised, this office, along with McLaughlin & Stern, and Eric J. Nemeth, P.C., represent the above Tenants Associations. We submit this letter in response to Mr. Reed's letter dated March 27, 2024, so that your office, the Rent Board ("RLB") and Rent Leveling Bureau ("Bureau") understand the correct and accurate application of the Jersey City Rent Control Ordinance ("Ordinance"). Mr. Reed infers that Jersey City's Corporation Counsel were not aware of Mr. Richardson's letter dated March 19, 2024. It is not possible that Mr. Richardson's letter was written without the knowledge nor advice of counsel.

Although Portside and Equity (collectively "Owners") may have cooperated with the Bureau regarding the production of documents, they have intentionally failed to abide by the direction of the RLB. The RLB specifically directed the Bureau to obtain documents dating *6 years prior* to the first Illegal Rent Petition from each building. For 100 Warren the first Petition was received on June 25, 2022; for 155 Washington it was received on May 31, 2022. While the Bureau may have failed to properly convey these requirements to the Owners, it remains the Owners' responsibility to fully comply with the RLB's decision and provide all necessary documentation. The Owners' failure to do so, regardless of the Bureau's instructions, demonstrates a lack of good faith and a disregard for the RLB's authority. The RLB's decision is binding. All parties, including the Owners and the Bureau are bound. All Parties acknowledge that there was no stay of this decision, however, throughout these proceedings, the Owners continue to disregard the ruling, thereby undermining the integrity of the rent control system.

Mr. Reed continuously states, as in prior letters, that his clients continue to abide by the law. The facts disclose otherwise. The Ordinance is clear – an Owner must file a rent roll, in a specified form and comply with the Landlord Identity Disclosure requirements. Equity has failed

Eric M. Bernstein, Esq.
Page 2

to do either. Query – how can Portside increase rents, which they have attempted to do regularly following the RLB's November 3, 2023 ruling, when they have not followed the steps clearly delineated by the Ordinance to do so and where the RLB has yet to issue legal rent calculations for each unit?

Relying on Council President Watterman and Corporation Counsel Murphy's comments during the January 10th meeting, are most troubling. First, Ms. Murphy's comments totally disregard the requirements of the Ordinance, as set forth above. Her statement that the Owner can raise rents by 4% cannot supersede the clear language of the Ordinance which **requires** that "[t]he landlord shall register the rent roll with the Rent Leveling Bureau *in order to qualify for any rental increase.*" See, Section 260-3H. Section 260-9E provides further that "[n]o complaint application or *rent roll registration will be deemed filed with the Board unless and until submitted on the Board's official forms and accompanied by all appropriate supporting documents and information and the required filing fees.* The Owners have **never** complied with this requirement.

The Owners have failed to abide by Section 260-3J. Section 260-3J provides that "[T]he landlord shall provide to each tenant a copy of the Truth-In-Renting Statement and subsequent amendments to said statement and *be in full compliance with the landlord identity disclosure provision* contained within the statement *in order to qualify for any rental increase*. The Owners have **never** complied with this requirement.

It is incorrect for counsel to attempt to use Council President Watterman and Corporation Counsel Murphy's comments which create a false impression, confusion or inconsistency in the law. Finally, neither Corporation Counsel Murphy, nor Council President Watterman is the RLB. It is the RLB and Bureau which establish legal rents, not the Council President or Corporation Counsel. Moreover, plain commonsense dictates, **you cannot increase a rent legally, if there is no base rent you are using as the basis for your increase.**

Should Mr. Reed's clients desire to comply with the law, they would stop increasing rents and fees until they meet the filing and notice requirements of the Ordinance and the Bureau announces the base rents. Mr. Richardson should be applauded for taking action in enforcing the Ordinance. The question remains, will he do so? His letter was written weeks ago and still tenants are suffering. Failing to enforce the law is not only counterproductive but it permits the Owners to continue to harm their tenants. A base rent is not required to enforce the law. If the property owner has increased rents in contravention of the Ordinance, the Bureau is within its full rights to enforce the law and should do so. Mr. Reed acknowledges that his client is increasing rents, the Bureau should stop this abuse.

Throughout the balance of his letter, Mr. Reed attempts to rehash the issues presented to the Board. The fact is that the RLB has already made its decision. Although it is recognized that Porside/Equity and the Associations are contesting the validity of the RLB's decision for one or more reasons, the Parties' will pursue their remedies in the courts. In the meantime, it is now time for the Bureau to act on that decision and enforce the Ordinance, both by calculating a base rent and by investigating and issuing notices of violation, for violating the Rent Control Ordinance, by

Eric M. Bernstein, Esq.
Page 3

the continued increase of rents. Any excuse that the recalculation should not occur as directed by the RLB because of the pending litigation, cannot be countenanced.

The Owners' position is to dissuade the tenants and other critics from creating publicity around the nature of their conduct. It is a clear attempt to create confusion, muddy the waters, distract from the core issues at hand and attack the Bureau for doing what it is legally obligated to do. The Jersey City Rent Control Ordinance is clear, well-established, and fully enforceable, and any attempt to suggest otherwise is a disservice to the tenants of Portside Towers and to the tenants of Jersey City.

Finally, Mr. Reed has continued to offer his clients' assistance in calculating the rents. It is disturbing that the party who drastically increased rents, irrespective of rent control, and while continuing to flaunt the requisite Ordinance filing requirements, wants to be involved in the initial calculation process. Upon receipt of the calculations, the parties will be able to review the determination of the Bureau, as should be. While we do not see the need for either side to assist in the recalculation process, and strongly believe that the recalculations must be undertaken independently by the Bureau, should the Bureau or City wish for assistance in the calculation of the rents, we request that all relevant parties (including the undersigned) be included, pursuant to a pre-established process, with appropriate notice to all affected parties.

Very truly yours,

Neil D. Marotta

NDM:n

Cc:   Derek Reed, Esq. (via email)
      Mollie Lustig Hartman, Esq.
      Eric J. Nemeth, Esq.
      Clients

# EXHIBIT 8



**_Derek Reed_** | _Partner_
direct:  (973) 854-6710
dreed@EPGPRlaw.com

April 8, 2024

**Via Email (enemeth@ejcounsel.com)**
**Eric J. Nemeth, Esq.**
**Eric J. Nemeth, P.C.**
**55 Madison Avenue, Suite 400**
**Morristown, NJ 07960**

    **Re:**    **Correspondence Dated April 3, 2024**

Dear Mr. Nemeth:

    As you know we represent Equity Residential Management LLC and The Towers at Portside Urban Renewal Company L.L.C. (together, "Equity Residential"). We are in receipt of your correspondence dated April 3, 2024.

    Your suggestion that my firm has violated the Rules of Professional Conduct is unfounded. It is particularly striking that none of the emails attached to your correspondence show any attorney in this firm communicating with one of your purported clients.  We also suggest that you review the enclosed email correspondences of February 22, 2024 and April 3, 2024 to your co-counsel in which we specifically requested that tenant inquiries pertaining to disputed rental amounts be handled through counsel on both sides. In that context, the tone of your letter is extremely inappropriate.

    We are also unpersuaded by your unsupported claim that you represent, at a minimum, all current Portside residents by virtue of your representation of the Portside East and Portside West Tenant Associations (the "Associations"). We do not question that you and co-counsel represent the Associations, however, to date you have not identified which residents are members. Nor have you made any representations as to whether the Associations are registered entities or have any recognized legal existence. Barring some independent basis on which we can determine who the identity of the Association members, such as membership rolls, you will need to specifically identify all such individuals you represent in this litigation by virtue of their membership in the Associations. It is reckless to allege unethical client contact while simultaneously refusing to disclose the identity of your clients, including those derivatively represented through their membership in the Associations.

    As to our clients, Equity Residential may advise its residents to direct their inquiries to whomever it chooses. To the extent you are aware of the Associations' registered members, we

Please direct replies to:
60 Park Place, Suite 1016, Newark, NJ 07102
Tel: (973) 643-0040 • Fax: (973) 596-1781 • www.EPGPRlaw.com

NEWARK   •   NEW YORK   •   MORRISTOWN

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

April 8, 2024
Page 2

suggest that you communicate your concerns directly to them and advise those individuals to forward inquiries regarding the pending litigation to your office.

Further, we believe that it may be mutually beneficial to preserve the *status quo* during the pendency of litigation and would discuss any serious proposal with our clients. However, what you are requesting not only fails to preserve the status quo but would also significantly inhibit our clients' ability to effectively manage Portside to the inevitable detriment of all residents. As you are likely aware, our clients have certain legal obligations, including a duty to maintain the peace and quiet enjoyment of the property for its residents. The suggestion that our clients refrain from **all** evictions, including legal grounds for eviction which have nothing to do with the payment of rent, is not serious and would effectively gut our clients' ability to meet its legal obligations to its residents. In this vein, our clients have an obligation and a right to serve Notices to Cease, Notices to Quit, and initiate eviction proceedings for all lawful grounds under the New Jersey Anti-Eviction Act. Ceding all rights to effectively manage Portside because of a rental dispute is unreasonable. It is also notable that your suggestion would require our clients to voluntarily halt all rental increases, even those consistent with the requirements of rent control, while simultaneously agreeing to forgo any legal remedy if your clients fail to pay even the base rent in effect at the time of the Board's decision.

Equity Residential has been issuing rental increases consistent with the representations of Acting Corporation Counsel. That being said, we have recently received a letter from the Office of Landlord/Tenant Relations which appears to contradict Acting Corporation Counsel's prior guidance. We have written to Mr. Bernstein, who as you know represents The City of Jersey City and the City of Jersey City Rent Leveling Board in this litigation, to confirm what his client's position is with respect to rent increases. Until we receive an official response, our clients intend to comply with prior guidance from Acting Corporation Counsel.

As previously advised, we remain open to discussing all issues that may arise relative to the pending litigation.

Very truly yours,

Derek D. Reed, Esq.

Cc: Mollie Lustig-Hartman, Esq. (via email)
    Neil Marotta, Esq. (via email)

| | |
|---|---|
| **From:** | Derek Reed |
| **To:** | mgclawyers@aol.com |
| **Bcc:** | |
| **Subject:** | Portside - Communications regarding the disputed rent amounts |
| **Date:** | Thursday, February 22, 2024 10:08:00 AM |

Neil,

As we have made clear, our client strongly values its resident relationships.  Given the pending dispute and litigation and that our respective clients are represented by outside counsel regarding this matter, we believe that the parties would be best served if communications about the disputed rent amounts are made through us on behalf of our clients.  We remain committed to resolving this matter as expeditiously as possible, and also remain willing to conference by phone or video to discuss this matter.  Our client's team members will remain available to assist your clients on all matters relating to the building outside of the legal dispute.

Derek

### DEREK D. REED
**Partner**

**website** | **bio** | **offices**

Direct Dial: (973) 854-6710
Facsimile: (973) 624-8850



Newark, NJ          New York, NY          Morristown, NJ

| | |
|---|---|
| **From:** | Derek Reed |
| **To:** | mgclawyers@aol.com; Mollie Lustig |
| **Subject:** | Portside - resident emails regarding pending litigation |
| **Date:** | Wednesday, April 3, 2024 1:30:00 PM |

Neil and Mollie,

Our client's team members continue to receive correspondence from your clients relative to issues that are before the court in the pending litigation, despite my previous correspondence of February 22nd to Neil inviting such inquiries to be forwarded to me through counsel. Given the pending dispute and litigation and that our respective clients are represented by outside counsel regarding this matter, we believe that the parties would be best served if communications about the disputed rent amounts, or other issues pending before the court, are made through us on behalf of our clients.  As you know, we remain committed to resolving this matter as expeditiously as possible, and also remain willing to conference by phone or video to discuss this matter.  Our client's team members will remain available to assist your clients on all matters relating to the building outside of the legal dispute.

Derek

**DEREK D. REED**

**Partner**

**website** | **bio** | **offices**

Direct Dial: (973) 854-6710
Facsimile: (973) 624-8850

Newark, NJ          New York, NY          Morristown, NJ

# EXHIBIT 9



### ERIC M. BERNSTEIN & ASSOCIATES, L.L.C.

34 MOUNTAIN BLVD., BLDG A.
P.O. BOX 4922
WARREN, NEW JERSEY 07059

ATTORNEYS AT LAW

(732) 805-3360
FACSIMILE (732) 805-3346
www.embalaw.com

**April 17, 2024**

Derek D. Reed, Esq.                                    <u>**Via Email Only**</u>
Ehrlich, Petriello, Gudin, Plaza & Reed, P.C.
60 Park Place, Suite 1016
Newark, New Jersey 07102

> **Re:    The Towers at Portside Urban Renewal Company, LLC et. al.
> v. The City of Jersey City et. al.
> Civil Action No. 2:23-CV-22291(MCA-JRA)
> Our File No. 3236-1001**

Dear Mr. Reed:

In response to your inquiries to this office of March 27th and April 8th as to Director Richardson's March 19th correspondence to your clients, we apologize for the delay, but pressing professional/family matters slowed down the process in obtaining the information sought, as well as absences in the City's Law Department. The City stands by the position set forth in Director Richardson's letter. Director Richardson's letter was factual. If your clients are believed to be in violation of the City Code and complaints are brought to the Office of Landlord Tenant, that office will continue to act accordingly. If violations are issued and your clients are found guilty of said violations, the Court could impose a penalty for said violations, which could be municipal jail imprisonment. None of this is a threat. State law allows for municipal code violations to be subject to a fine, imprisonment of up to ninety (90) days and/or community service or a combination of some or all of those items. Therefore, while you and your clients may not agree with the facts related to rent control, those are the facts and the law.

If you have any further questions, or desire any further information, please do not hesitate to contact me. Your prompt attention and response in this matter is greatly appreciated.

Very truly yours,
ERIC M. BERNSTEIN & ASSOCIATES, L.L.C.

By: *Eric M. Bernstein*
Eric M. Bernstein, Esquire

*1*

*N:\Clients\Jersey City\3236-1001 LETTREED response to 3.19.24 Richardson's correspondence240411.docx*

EMB/jkj
Cc:     *(via email only) (personal & confidential)*
        Brittany Murray, Esq., Acting Corporation Counsel
        Philip Adelman, Esq., Assistant Corporation Counsel
        Shyrone Richardson, Director/Rent Leveling Administrator, City of Jersey City

*N:\Clients\Jersey City\3236-1001 LETTREED response to 3.19.24 Richardson's correspondence240411.docx*

# EXHIBIT 10



**Derek Reed | Partner**
direct:  (973) 854-6710
dreed@EPGPRlaw.com

April 26, 2024

Via Email (enemeth@ejcounsel.com)
Eric J. Nemeth, Esq.
Eric J. Nemeth, P.C.
55 Madison Avenue, Suite 400
Morristown, NJ 07960

Via Email (mlustig@mclaughlinstern.com)
Mollie Hartman Lustig, Esq.
McLaughlin & Stern, LLP
1 Elm Street, Suite 2
Westfield, NJ 07090

Via Email (embernstein@embalaw.com)
Eric M. Bernstein, Esq.
Eric M. Bernstein & Associates, LLC
34 Mountain Boulevard, Bldg. A
P.O. Box 4922
Warren, NJ 07059

Re:   ***The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC, v. The City of Jersey City and the City of Jersey City Rent Leveling Board***, **Case No: 2:23-cv-22291-MCA-JRA**

Dear Counsel:

This letter is sent in response to Tenants' motion for a temporary restraining order, (Dkt. 34-1), for the purpose of seeking to resolve or narrow by agreement the issues raised by that motion.

Portside opposes the Tenants' motion.  Portside also notes that the motion contains unfair assertions about Portside's rent amounts and purported eviction of tenants, as detailed below.  Nonetheless, Portside agrees that to avoid needless confusion about the rents to be paid during the pendency of this case, it would be appropriate to preserve the status quo until the Court's resolution of the underlying merits.  Because of the Rent Leveling Board's ("Board") decision at issue, the amount of rent that Portside may charge each resident is currently disputed, which creates uncertainty for Portside with respect to the rents it may assess, and uncertainty for residents with respect to the rents they must pay.  Without a status quo order, all parties face not only needless uncertainty but needless risk, including risk associated with the City's unfounded threat to seek criminal penalties based on Portside collecting rents that the tenants have previously agreed to pay.

Please direct replies to:
60 Park Place, Suite 1016, Newark, NJ 07102
Tel: (973) 643-0040 • Fax: (973) 596-1781 • www.EPGPRlaw.com

NEWARK   •   NEW YORK   •   MORRISTOWN

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

April 26, 2024
Page 2

     In their motion, the Tenants erroneously assert that Portside, after the Board's decision, raised rents for certain residents above the annual 4% or CPI rent control cap and may pursue evictions for those who question or withhold their rents. (*See* Dkt. 34-1 at 1-3, 8-13.)  Neither assertion is true.  As Portside has communicated to both Jersey City (the "City") and residents, since the Board's decision, Portside has capped annual rent increases consistent with the City's ordinance, while preserving all the tenants' rights and claims to an even lower rent.  For the tower at 100 Warren, Portside has capped annual rent increases in line with the ordinance at all times since September 19, 2022.  For the tower at 155 Washington, Portside has agreed to cap the annual increase at 4% or CPI, whichever is lesser, as is permitted under the ordinance, and has provided a credit for any payment in excess of that amount that was made since the Board's November 3, 2023, decision.  Moreover, while this litigation is pending, Portside has elected to not pursue evictions for any tenant at Portside in relation to a dispute over the amount of rent and, as Tenants note, has unilaterally dismissed any pending eviction for the nonpayment of rent.

     As for the Tenants' requested injunctive relief, Portside contends that the status quo should be that which preceded the Board's decision in dispute, with increases thereafter capped by the rent control statute.  Portside is willing to agree to abide by this status quo, even though the Tenants are not entitled to the injunctive relief that they seek.  Specifically, to avoid needless controversy and expense, Portside is willing to agree to, and absent an agreement may request that the Court order, the preservation of the following status quo:

a) Portside residents should continue to pay the rents they paid in November 2023, plus the permitted annual rent control increase (4% or CPI, whichever is less).

b) Portside will place into escrow the difference between the paid rent (with the 4% increase) and the rent that was in effect before the increase.  Those monies would be released in accordance with this Court's determination on the merits.

c) Portside will not pursue evictions based on non-payment of rent as long as residents pay the rent identified in (a) and otherwise comply with the terms of the lease and the law.

d) Portside will forego seeking from the residents any rent increases in excess of the 4% increase until the matter is resolved by the Court but reserves the right to seek lost rent in excess of that amount as damages from the City.

e) This status quo will remain in effect until this Court resolves this on the merits and will not be modified on account of any Board or Bureau decision, except that following any Board or Bureau decision, Tenants may seek to require Portside to

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

April 26, 2024
Page 3

        deposit into escrow the difference between rents collected (with the 4% increase) and any lesser rent amount that the Board or Bureau determines appropriate.

        The necessity for a status quo order is heightened because the City recently threatened to impose criminal penalties against Portside and its employees if they are found to have charged rent in excess of that authorized by the City's rent control ordinance. The City has made that threat even though the Board and the Rent Leveling Bureau have yet to determine the amount that the City contends is the correct level of base rent. Portside seeks the City's agreement that it will not pursue criminal or other penalties if Portside complies with an agreed status quo order and/or a status quo order entered by the Court. Absent such an agreement, Portside would seek that protection through a further order from the Court. As Portside has already informed the City, any criminal prosecution under these circumstances would violate the Due Process Clause. *See, e.g.*, *Johnson v. United States*, 576 U.S. 591, 602 (2015) (noting that a "law prohibiting grocers from charging an 'unjust or unreasonable rate,'" without stating what the rate ceiling was, violated Due Process Clause) (citing *United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921)).

        If the parties are unable to negotiate an agreed order preserving the status quo, Portside would plan to present its position in a response to the Tenants' motion and through a potential accompanying cross-motion. Accordingly, absent a resolution by agreement, Portside proposes the following briefing schedule for such submissions (slightly modified from the usual schedule under the local rules, to accommodate the cross-motion):

- May 6, 2024: Responses to Tenants' motion and Portside's cross-motion for relief;
- May 20, 2024: Reply in support of Tenants' motion and Tenants' response to Portside's cross-motion; and
- May 27, 2024: Reply in support of Portside's cross-motion.

        We look forward to hearing from each of you and would welcome scheduling a call to further discuss these matters.

                Very truly yours,

                Derek D. Reed, Esq.

cc: Andrew W. Vail, Esq. (via email)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY, NEWARK DIVISION

| | |
|---|---|
| The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC, Plaintiffs, v. The City of Jersey City and the City of Jersey City Rent Leveling Board, Defendants. | Case No. 2:23-cv-22291-MCA-JRA **[PROPOSED] ORDER GRANTING PLAINTIFFS' CROSS-MOTION FOR A PRELIMINARY INJUNCTION** |

**UPON CONSIDERATION** of Plaintiffs' request for injunctive relief, the Court having considered the matter, and for good cause shown,

**IT IS** on this _____ day of _____, 2024,

**ORDERED** that Defendants are enjoined from enforcement of the November 3, 2023, Order of the City of Jersey City Rent Leveling Board pending further order of this Court.

_____
Hon.

4879-3677-7916, v. 1

# EXHIBIT "F"



*Derek Reed | Partner*
direct: (973) 854-6710
dreed@EPGPRlaw.com

February 7, 2024

**Via Email (seang@jcnj.org)**
**City of Jersey City Municipal Council**
**City Hall**
**280 Grove Street**
**Jersey City, NJ 07305**

> Re: **January 23, 2024, Correspondence to the Council - Portside Towers**

Dear Councilmembers:

As you are aware, we represent Equity Residential Management and The Towers at Portside Urban Renewal Company (together, "Equity Residential"). We are in receipt of the January 23, 2024 letter submitted by Neil Marotta, Esq., and offer this correspondence to correct several incorrect statements and personal opinions in that letter, which Mr. Marotta characterized as "contrary facts." While we think the parties are best served by directing their arguments to the appropriate judicial forum, rather than the Council, we are compelled to correct several incorrect assertions. We respectfully submit that the true state of facts shows that Equity Residential is working in good faith to address the Board's decision and the Bureau's requests, while reserving its legal rights, as it is entitled to do.

As an initial matter, contrary to Mr. Marotta's representation, no increase of 40% has been issued to any resident since the Board's decision. First, it cannot be disputed that Equity Residential has agreed to operate the Tower at 100 Warren as under rent control since September 19, 2022, consistent with the initial determination of Ms. Dinah Hendon, who, after a thorough investigation determined that both Towers qualified for the 30-year exemption to rent control, but that the exemption for 100 Warren had lapsed.

Second, as we stated in our January 19, 2024 letter to the Council, to the extent Equity Residential sent a notice of a rent increase of more than 4% to any resident in the Tower located at 155 Washington since the Board's decision (and none was near 40%), Equity Residential will cap the increase at 4% and credit past payments under that post-decision lease in excess of 4% to the resident's account, with a full reservation of rights.

Similarly, Mr. Marotta's statement that Equity Residential is prohibited from agreeing to rent amounts with tenants, including any amounts with rent increases, until the Bureau has finished its calculations is also untrue and impractical. The Board determined that any rent adjustment shall be determined by the Bureau, and the Bureau has not made any determination as to the amount of any adjustment. In addition, Corporation Counsel expressly advised the Council during its January 10, 2024, meeting that four percent (4%) increases are permissible.

Please direct replies to:
60 Park Place, Suite 1016, Newark, NJ 07102
Tel: (973) 643-0040 • Fax: (973) 596-1781 • www.EPGPRlaw.com

NEWARK  •  NEW YORK  •  MORRISTOWN

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

February 7, 2024
Page 2

Mr. Marotta also asserts that Equity Residential has failed to provide the Bureau with all information necessary to perform the calculations required by the Board's decision. This is simply not true. We have provided all the information requested by the Bureau to date.  Since we provided the complete information requested by the Bureau well in advance of the deadline it set, it has not contacted us to seek additional information or input.  To the extent that Mr. Marotta or his clients have complaints about the years the Bureau requested Equity Residential to provide responsive information, it is unfair to direct those complaints against Equity Residential.  Notably, to the extent the Bureau seeks information relating to 2016, with the same reservation of rights, we are prepared to promptly provide those documents and information. We also have offered, and continue to offer, our assistance in performing calculations as directed by the Board, despite our legal challenges to the Board's decision.

Mr. Marotta's statements regarding the two-year limitations period provided for in the Jersey City Ordinance ("Ordinance") are not correct.  As an initial matter, to the extent the Towers were not exempted from the City's Ordinance as Mr. Marotta and his clients contend, under that Ordinance, there are two separate applicable limitation provisions that limit the ability of Mr. Marotta and the tenants to seek a windfall.  Section 260-7(C) provides a strict two-year limitations period and does not contain any exemption or waiver to that limitation.  No party has offered any explanation at any point as to why the Bureau must not comply with the express limitations language set forth in Section 260-7(C).  Separately, Section 260-7(D) provides that, where a tenant agrees to rent increases for two consecutive years, those increases are "deemed accepted."  Mr. Marotta argues that Equity Residential "waived" this provision by failing to comply with the requirement to provide tenants with rental statements as set forth in Section 260-1 of the Ordinance.  That is not true.  Equity Residential has served rental statements in compliance with the law, and the Board did not determine differently.

Equity Residential invested in these buildings on the express understanding that they were exempt from rent control, and every resident to move in – at least prior to late 2022 – also expressly understood and were notified that the buildings were exempt from rent control.  Moreover, the residents expressly agreed in writing to pay market rents.  Any retroactive disallowance of rent control would be fundamentally unfair and unconstitutional, and would result in a windfall.

It is unfair for Mr. Marotta to say that Equity Residential "is not a good landlord."  Inflammatory rhetoric – often repeated at City Council meetings – like this is not only false, but also counterproductive to the orderly resolution of the issues.  Equity Residential invested in these Towers to bring them to the residential market at a time when no one else was willing to do so.  It has further invested in them over the years, while not passing through many of the costs of increases in taxes and other costs that it would have been entitled to pass through to tenants over the past nearly 30 years.  The City directly benefitted from the taxes that Equity Residential paid under the PILOT agreement, including at a higher economic amount because the City and the tenants all understood that the Towers were not subject to rent control.  What Equity Residential now faces is, as a Portside tenant put it, "hav[ing] luxury apartments in Jersey City at rates that are half the price now", because a Board, whose Chairperson candidly stated on the record that

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

February 7, 2024
Page 3


"this [rent control dispute] is so complex this is way beyond our comprehension", abruptly, without any indication there was a careful review of the parties' submissions that were accompanied by thousands of pages of documents, overturned the well-reasoned, thorough determinations of the City's own experienced Rent Leveling Administrator and attorney, in Ms. Hendon. Notwithstanding its disagreements and challenges to the Board's decision, Equity Residential has fully complied with all informational requests made by the Bureau and is committed to complying with the percentage increase restrictions of the Jersey City Ordinance until contrary court order, decision of the Board, or agreement among the parties. Despite unfounded allegations to the contrary, our clients' conduct is fully consistent with the Board's decision and the legal guidance offered to the Council by the City's Corporation Counsel.

Moreover, the Board's rejection of the experienced Jersey City Office of Landlord/Tenant Relations Rent Leveling Administrator's thorough, well-reasoned rulings is wrong as a matter of state and local law. It also violated our clients' constitutional rights under the New Jersey and US constitutions. As an initial matter, independent of the City's Ordinance, upon which the Board relies, New Jersey state law exempts the Towers from rent control. State law expressly provides that "[i]n any municipality that has enacted...a rent control ordinance...those provisions of the ordinance which limit...increases in base rental **shall not** apply to multiple dwellings constructed after [June 25, 1987] for a period...30 years following completion of construction...." NJ Rev. Stat. Section 2a:42-84.2 (emphasis added). This state law (the "Exemption Statute") further expressly provides that "[n]o municipality...or agency or instrumentality thereof, shall adopt any ordinance, resolution, or rule or regulation or take any other action to limit, diminish, alter or impair [this exemption]." Because both Towers were constructed after June 25, 1987, they are exempt from local rent control, regardless of whether they are also exempt under the terms of the local rent control ordinance, which we believe they also are exempt from consistent with the Rent Leveling Administrator's determinations. The Board's decision to the contrary is precisely the type of "action to limit, diminish, alter or impair" the state Exemption Statute expressly prohibits.

The Board's rejection of the Rent Leveling Administrator's rulings that Equity Residential had complied with certain notice provisions in the City's Ordinance is not only illegal under state law, it is both irrelevant and erroneous. First, it is irrelevant because nothing in the state Exemption Statute indicates that compliance with any state law notice provisions is a condition precedent to obtaining the state law exemption. To the contrary, the state law exemption language is mandatory ("shall not apply") and does not even refer to the state law notice provisions. Contrary to the City's Ordinance, the state Exemption Statute conspicuously fails to make compliance with the notice provision a condition precedent to the exemption. Because the state exemption is not forfeited by a failure to provide notice, that exemption continues to apply and, by its terms, cannot be diminished, altered, or impaired by action of the Board. Second, even if it were necessary to provide notice as a condition precedent to the state exemption, which it is not, the Rent Leveling Administrator correctly found that Equity Residential sufficiently complied with any notice requirements. The Rent Leveling Administrator's reasoning and findings on this point are well-reasoned and persuasive.

EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED, P.C.

February 7, 2024
Page 4


For all these reasons, we believe the federal court will find the Board's actions were an illegal diminution or impairment of the mandatory state law rent control exemption and, in all events, premised on an irrelevant and erroneous determination on the merits.

In closing, we continue to offer and provide responsive information to the Bureau and offer to assist in any of its forthcoming calculations, and moreover, continue to offer to work with the City's counsel to move Equity Residential's legal challenges to prompt resolution.  As explained above, we believe that the federal court will find that the Board acted unfairly and unlawfully in connection with its rejection of Ms. Hendon's thorough, unbiased determinations, and in doing so, will moot the need for the Bureau's calculations.  A prompt determination of whether we are correct or wrong in that assessment will bring important clarity for all, and we hope we can cooperate in seeking that prompt resolution.


Very truly yours,


Derek D. Reed, Esq.

Cc: Peter Baker, Esq. (pbaker@jcnj.org)
Thomas Slattery, Esq.(tslattery@jcnj.org)
Eric Bernstein, Esq. (embernstein@embalaw.com)
Neil Marotta, Esq. (mgclawyers@aol.com)

Derek D. Reed, Esq. (Attorney ID No. 038062003)
**EHRLICH, PETRIELLO, GUDIN, PLAZA & REED**
A Professional Corporation
60 Park Place, Suite 1016
Newark, New Jersey 07102
(973) 643-0040
Attorneys for Defendants,
The Towers at Portside Urban
Renewal Company, LLC and
Equity Residential Management, LLC

|  |  |
|---|---|
| **CITY OF JERSEY CITY and CITY OF JERSEY CITY RENT LEVELING BOARD,**<br><br>Plaintiffs,<br><br>vs.<br><br>**THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC, EQUITY RESIDENTIAL MANAGEMENT, LLC, ABC CORP. 1-10 (fictitious entities) and JOHN DOES 1-10 (fictitious names),**<br><br>Defendants. | : **SUPERIOR COURT OF NEW JERSEY**<br>: **LAW DIVISION: HUDSON COUNTY**<br>:<br>: **DOCKET NO.: HUD-L-2449-24**<br>:<br>:    Civil Action<br>:<br>: **CERTIFICATION OF**<br>: **DEREK D. REED**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

DEREK D. REED, by way of Certification in lieu of Affidavit, says:

1.    I am an attorney at law of the State of New Jersey and a partner of the law firm of Ehrlich, Petriello, Gudin, Plaza & Reed, A Professional Corporation, attorneys for Defendants, The Towers at Portside Urban Renewal Company, LLC and Equity Residential Management, LLC (collectively, "Portside").

2.    I make this Certification in support of Portside's Verified Response in Opposition to Order to Show Cause for Emergent and Preliminary Injunction.

3.      Annexed as Exhibit "A" is a true copy of the unpublished decision in *Rose v. Hassan*, 2011 N.J. Super. Unpub. LEXIS 2352 (Super. Ct. Aug. 9, 2011).

4.      Annexed as Exhibit "B" is a true copy of the unpublished decision in *Legend Movie Posters Corp. v. Jerry Ohlinger's Movie Material Store, Inc.*, 2018 N.J. Super. Unpub. LEXIS 2329 (Super. Ct. App. Div. Oct. 22, 2018).

5.      Annexed as Exhibit "C" is a true copy of the unpublished decision in *Collini v. Nat'l Med. Consultants, PC.*, 2019 N.J. Super. Unpub. LEXIS 1268 (Super. Ct. June 4, 2019).

6.      Annexed as Exhibit "D" is a true copy of the unpublished decision in *Capital One Bank (USA) NA v. King*, 2021 N.J. Super. LEXIS 70 (Super. Ct. Jan. 20, 2021).

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated:  July 8, 2024                                         */s/ Derek D. Reed*
                                                             DEREK D. REED

# EXHIBIT "A"



# *Rose v. Hassan*

Superior Court of New Jersey, Chancery Division, General Equity, Essex County

August 9, 2011, Decided

DOCKET NO.: ESX-C-264-2010

**Reporter**

2011 N.J. Super. Unpub. LEXIS 2352 *

Sylvia L. Rose, et al., Derivatively on Behalf of Merck & Co, Inc., Plaintiffs v. Fred Hassan, et al., Defendants

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE COMMITTEE ON OPINIONS.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Judges:** **[*1]** Walter Koprowski, Jr., J.S.C.

**Opinion by:** Walter Koprowski, Jr.

## Opinion

REASONS

Oral argument was held before this Court on August 5, 2011. The following attorneys and litigants appeared: Gary Graifman, Esq. of Kantrowitz, Goldhamer & Graifman, P.C. appeared on behalf of the Plaintiffs; Andrew Gordon, Esq. of Paul, Weis, Rifkind, Wharton & Garrison, LLP appeared pro hac vice and William B. McGuire, Esq. of Tompkins McGuire Wachenfeld & Barry both appeared on behalf of the Defendants.

The issue before the court is whether this derivative shareholder action filed against various board members and executives of Merck & Co, Inc, successor in interest to the former Schering-Plough Corporation, should be dismissed without prejudice or stayed pending the outcome of substantially similar litigation proceeding in the U.S. District Court for the District of New Jersey under the "First-Filed Rule".

The facts giving rise to this litigation as well as at least five other litigations pending in District Court in New Jersey are not disputed for purposes of this motion. Defendants are various board members, executives, and officers of the former Schering-Plough Corp. and its successor entity as a result of merger, Merck &

**[*2]** Co., Inc. In an effort to market several of its cholesterol control drugs, Schering-Plough conducted a series of clinical trials known as the ENHANCE trials the company hoped would demonstrate successful results for a combined use of two of its cholesterol drugs. It is alleged that the early returns from the trials, dated approximately late 2005 - early 2006, did not demonstrate the desired results, but the negative results of the tests were not publicly disclosed until 2008, ultimately triggering a substantial drop in the company's stock price. Plaintiffs claim the Individual Defendants were aware of the problems and short-comings of the products, and yet they failed to tell the public of these problems and continued to publicize the benefits of the products until Defendants had no choice but to release the information about the trials. Starting on January 14, 2008, the Company began partial disclosures about the failed ENHANCE study results. The Company's stock prices began to "slide." When the Company finally released the full results to the public on March 30, 2008, the Company's stock dropped about 20%. (Complaint ¶ 158).

Steven Waldman was the first Schering shareholder to question **[*3]** Defendants' conduct regarding the ENHANCE trials, when on February 6, 2008, he made a demand on the Board to pursue these issues. The Schering Board formed a Special Committee ("SC") and referred the demand to the SC. Mr. Waldman is not a plaintiff in this matter. On February 25, 2008, another set of shareholders filed a shareholder derivative action in the New Jersey District Court against substantially the same officers and directors as Plaintiff has done here. The first-filed derivative action, *Cain v. Hassan*, is being litigated before the Honorable Dennis M. Cavanaugh. (Hereinafter "first-filed action"). These plaintiffs did not make a demand upon the Board. The first-filed action is one of a cluster of cases filed in the District Court which deal with the same common nucleus of factual allegations surrounding the ENHANCE study; these cases include the following: two derivative actions

(including the first-filed action), two federal securities actions, and two actions arising under the Employee Retirement Income Security Act. The six pending federal actions have been coordinated for discovery and pre-trial purposes.

On June 5, 2009, Plaintiff, Sylvia Rose, a shareholder, made her **[\*4]** demand letter upon the Schering Board referencing the ENHANCE controversy, the omissions and misrepresentations constituting wrongful action and demanded that the Board bring legal action to protect the Company and its shareholders, including actions for breach of fiduciary duty, unjust enrichment and other causes of action. (Complaint, Ex. C, Rose Demand). On October 31, 2009, the SC's counsel informed Plaintiff's counsel that the SC investigations had been completed and the Schering Board declined to pursue claims against any present or former officers or directors. (Complaint, Ex. D). Plaintiffs filed this complaint in General Equity on November 16, 2010, more than two and a half years after the negative results were disclosed and the first-filed action was commenced, and more than one year after the Schering board declined to pursue her demand. The court notes that Schering-Plough and Merck completed a merger transaction in November of 2009 as well.

Defendants filed a motion to either stay or dismiss without prejudice this case under New Jersey's First-Filed Rule, pending the outcome of the various federal litigations. To prevent simultaneous and/or duplicitous litigation, New Jersey **[\*5]** courts have long adopted the "first-filed rule." The parties agree the controlling case on this issue is *Sensient Colors, Inc. v. Allstate Ins. Co., 193 N.J. 373, 939 A.2d 767 (2008)*. In that case, the Supreme Court of New Jersey set forth the motives, history, and applicable test for the first-filed rule. The court stated, "New Jersey has long adhered to the general rule that the court which first acquired jurisdiction has precedence in the absence of special equities. . . Under the first-filed rule, a New Jersey state court ordinarily will stay or dismiss a civil action in deference to an already pending, substantially similar lawsuit in another state, unless compelling reasons dictate that it retain jurisdiction." *Id. at 387* (internal citations omitted). The Court continued, "[t]he question is not whether a state court has the power to exercise jurisdiction over a case filed within its jurisdiction, but whether the court should restrain itself and not exercise that power." *Id. 386-87*. "If [New Jersey courts] are to have harmonious relations with . . . sister states, absent extenuating circumstances sufficient to qualify as special equities, comity and common sense counsel that

a New Jersey court **[\*6]** should not interfere with a similar, earlier-filed case in another jurisdiction that is 'capable of affording adequate relief and doing complete justice.'" *Id.* "Thus, any comity analysis should begin with a presumption in favor of the earlier-filed action." *Id.* (quoting *O'Loughlin v. O'Loughlin, 6 N.J. 170, 179, 78 A.2d 64 (1951))*.

The Court clearly held the presumption favoring the "first-filed" jurisdiction can be overcome only by a showing of "special equities" in existence, which justify the New Jersey court retaining jurisdiction over the matter. "Special equities are reasons of a compelling nature that favor the retention of jurisdiction by the court in the later-filed action. Special equities have been found when one party has engaged in jurisdiction shopping to deny the other party the benefit of its natural forum." *Id. at 387*. The New Jersey Supreme Court has identified at least four interrelated "special equities "that may be marshaled to rebut the presumption favoring dismissal or stay of a later-filed action: 1) inability of the first-filed action to provide adequate relief; 2) strong public policy interests of New Jersey; 3) further progression of the second-filed action; and 4) *forum* **[\*7]** *non conveniens* factors. *See Sensient Colors, 193 N.J. at 391-96*. The Court explained that "[a]ll special equities are grounded in principles of fairness, and are implicated when a first-filed action may not do full justice to a party." *Id.* "Whether special equities exempt a court from deferring to a first-filed action depends on a fact-specific inquiry that weighs considerations of fairness and comity. The determination of whether to grant a comity stay or dismissal is generally within the discretion of the trial court." *Id. at 389-90*. (internal cites omitted).

A. *The First-Filed Action Involves Substantially The Same Parties, Claims, And Legal Issues*

As explained above, on February 25, 2008, two plaintiffs filed a shareholder derivative action against various officers and directors of Schering-Plough in New Jersey District Court under the name *Cain v. Hassan*. (Tarnofsky Aff., Ex. B). On November 5, 2009, another federal derivative action was brought against various officers and directors of Merck, which named defendants who were associated with Merck rather than Schering-Plough. (Tarnofsky Aff., Ex. E). Since the underlying controversy related to the same ENHANCE allegations as in the **[\*8]** Schering-Plough federal derivative case, Judge Cavanaugh coordinated the Merck federal derivative case with the Schering-Plough federal derivative case due to their common question of

fact and the desire to avoid duplicative discovery. (Tarnofsky Aff., Ex. G). The other federal actions which revolve around the same core facts are two federal securities actions, and two actions arising under the Employee Retirement Income Security Act. (Id. at Ex. I, K, and N and P). All of these matters were consolidated for discovery purposes in December of 2009.

On November 16, 2010, Plaintiff filed her complaint in this case. The complaint names the same defendants, makes the same factual claims, raises the same legal issues, and pursues the same causes of action under New Jersey state law as the first-filed action. Specifically, the Rose Complaint is filed against the same defendants in the first-filed federal derivative action, except for two defendants who are not named in the federal derivative case (one is named in the securities case), and four defendants in the first-filed action, who are not named in this case. Moreover, the legal issues in both cases are substantially the same in that both **[*9]** cases are shareholder derivative actions and both cases allege the same legal causes of action, including: (1) breach of fiduciary duty; (2) unjust enrichment, (3) corporate waste, and (4) gross mismanagement. Both cases apply New Jersey law. If anything, the first-filed action seeks slightly broader relief than the Rose Case. Plaintiffs argue this case is distinguishable from the first-filed case because demand was made of the board in this case, and was not made of the board by the plaintiffs in the first-filed action.

Plaintiffs argue that it is significant that Plaintiffs herein made a demand upon the Board prior to initiating suit because when a demand made is improperly refused or not acted upon, in a subsequent litigation the defendants have the initial burden to demonstrate that the Board members were independent and disinterested, citing to *In re PSE&G Shareholder Litigation, 173 N.J. 258, 286, 801 A.2d 295 (2002)*. When a demand is not made of the board by shareholders prior to commencing derivative litigation, the shareholders have the burden of proving demand would be futile, because the board is either conflicted, complicit, or otherwise unable to render an independent decision. When **[*10]** a demand is made of the board, and the board declines or refuses to pursue the litigation demanded, the burden shifts to the board to demonstrate its decision not to pursue the action was reasonable under the business judgment rule. As Defendants argue, the procedural distinction between the two actions regarding demand-futility and demand-made has no bearing on the *Sensient Colors* first-filed analysis under New Jersey law. The existence of a

board demand in a derivative suit does not alter the underlying claims or remedies — it simply shifts the burden of proof. Furthermore, if the federal derivative actions are dismissed on the issue of demand futility, then this Court can lift the stay or reinstate the case. Plaintiffs have not cited any case in their papers holding that the presence of a board demand distinguishes a later-filed action from an earlier one which involves the same parties, claims and issues.

The court finds that the parties, legal issues, factual circumstances, and relief sought are substantially the same in this case as they are in the pending federal derivative litigations. Identical similarity is not required. The presumption that the second-filed action should **[*11]** be dismissed or stayed pending the outcome in the first-filed litigation is therefore triggered.

B. *There Are No Special Equities That Would Overcome The Presumption Of Stay Or Dismissal, And Compel The Court To Keep The Case Active*

After establishing the elements required to trigger a presumption of dismissal or stay under the first-filed rule, the burden shifts to the non-moving party to demonstrate "special equities" or compelling reasons, for allowing the later-filed action to proceed. The New Jersey Supreme Court has identified at least four interrelated "special equities "that may be marshaled to rebut the presumption favoring dismissal or stay of a later-filed action: 1) inability of the first-filed action to provide adequate relief; 2) strong public policy interests of New Jersey; 3) further progression of the second-filed action; and 4) *forum non conveniens* factors. *See Sensient Colors, 193 N.J. at 391-96*.

No "special equities" exist here to rebut the presumption in favor of dismissal or a stay of this action. Plaintiffs have not shown that the first-filed federal actions are incapable of providing adequate relief because the federal derivative case seeks broader relief than **[*12]** the Rose Case. There is no reason the federal court cannot provide adequate relief in the *Cain* consolidated derivative case. The plaintiffs in that case seek the same relief, i.e. compensatory damages and fees, as well as the additional relief of 1) punitive and exemplary damages; 2) an order implementing corrective measures, including a system of internal controls to prevent future violations; 3) an accounting for all losses sustained by reason of the alleged unlawful conduct; 4) disgorgement of all incentive-based or equity-based compensation during the period of alleged breach; 5) disgorgement and a constructive trust on defendant's assets or proceeds of alleged insider

trading; and 6) a pre- and post-judgment interest. The U.S. District Court has been managing the various litigations related to the ENHANCE trials for more than three years, and Plaintiffs have not demonstrated any reason that court could provide less than adequate relief. Arguments that the presence of different burdens resulting from the failure of the first-filed plaintiffs to make a demand on the board are not convincing as a reason why the federal court could not provide adequate relief. That is a tactical choice **[*13]** made by plaintiff's counsel in the first-filed action, and does not impact the adequacy of the relief the court could afford.

Second, Plaintiffs have not identified any strong public interest of New Jersey sufficient to rebut the presumption in favor of dismissal or stay because there are no specialized policy interests or public safety concerns here. Again, Plaintiff points to the presence of a demand in this case, and failure to make demand in the first-filed action as a reason to justify denial of a stay or dismissal for public policy grounds. There can be no doubt that New Jersey law encourages potential derivative plaintiffs to make demand on the board by erecting substantial burden-shifting obstacles to derivative claims made without demand on the board. In this way, the courts have chosen to incentivize derivative plaintiffs to make their demand on the board before filing litigation, allowing the board to consider the demand and rule on in it as a business decision. However, the court cannot find that it is a strong public policy concern of the State of New Jersey to allow litigation to proceed in multiple venues simply because demand was made in one case, and not another. The **[*14]** Supreme Court has established the burdens of proof regarding demand—made and demand-futility cases, interpreting Court *Rule 4:32-5*[1]. If it was a strong policy preference of the State of New Jersey to make demands on the board prior to commencing litigation, the Legislature could have elected to bar all cases in which prior demand is not made completely. It has not done so, leaving it to the courts, who have opted instead to shift the burden of proof, and leaving it to potential litigants to decide for themselves how to proceed.

Plaintiff's reliance on *In re PSE&G, supra*, to demonstrate that a demand requirement is a strong public policy preference is unavailing. In that case, the Supreme Court of New Jersey adopted a modified form

of the business judgment rule, and held that if a demand was made, the burden was initially on the board to demonstrate the board acted independently, in good faith and with due care in their investigation, and reasonably under the business judgment rule. If a demand was not made, the burden shifted to the litigant, to establish reasonable **[*15]** doubt that either the directors are disinterested and independent, or the challenged transaction was otherwise the product of a valid exercise of business judgment. The court did not at any point state New Jersey had a strong public policy concern in requiring demands to be made of Boards. To the contrary, the procedural and evidentiary framework established by the court in *PSE&G* is the product of "an appropriate balance between director autonomy and the interests of the shareholders in this context." *PSE&G, 173 N.J. at 282*. The court continued, "More broadly, we are satisfied that the demand-futility doctrine and the modified business judgment rule each serve a discrete but critical function. . . The practical reality is that in many cases a shareholder will want to make a demand on the board to avoid the burden of demonstrating demand-futility. Given the salutary purposes of the demand requirement, that practical reality convinces us that our approach is proper. It preserves the most useful elements of *Rule 4:32-5* while advancing an overarching standard to guide judicial review." *Id. at 313*.

The policy interests that have been recognized as creating "special equities" are those that **[*16]** concern "significant state interests...[which] are implicated" such as: the remediation of polluted site, *Sensient, supra, 193 N.J. at 387*; parental rights in child custody cases, *Innes v. Carrascosa, 391 N.J. Super. 453, 492-94, 918 A.2d 686 (App. Div.)* certif. denied, *192 N.J. 73, 926 A.2d 857 (2007)*; *Van Haren v. Van Haren, 171 N.J. Super. 12, 407 A.2d 1242 (App. Div. 1979)*, and determinations of mental incapacity, *In re Glasser*, 2006 WL 510096 (N.J. Ch. 2006) (New Jersey public policy strongly favors adjudicating incapacity issues in the state of domicile). In short, the public policy concerns previously found to constitute "special equities" all involve situations in which New Jersey courts are presumed best able to judge how to apply New Jersey law. The following cases illustrate some of the policy arguments made by parties which New Jersey Courts have rejected. In *Karzhevsky v. Loving Care Agency, Inc., 2010 N.J. Super. Unpub. LEXIS 88 (App.Div. Jan. 14, 2010)* the Appellate Court was not convinced by Plaintiffs' argument that the trial court erred by dismissing their complaint on comity grounds because New Jersey has a strong public policy in enforcing the LAD. The Court did not find that New York is any less committed **[*17]** than New Jersey to

---

[1] Pleading requirements regarding derivative shareholder litigation previously found at *Rule 4:32-5* are now found at *Rule 4:32-3*.

addressing unlawful discrimination in employment on the basis of national origin and religion. *Id. at \*15-16*. Furthermore, in *Continental Ins. Co. v. Honeywell Intern., Inc., 406 N.J. Super. 156, 193, 967 A.2d 315 (App. Div. 2009)* looking at the special equities the Court noted that "it is New Jersey's interest in the health and safety of *its* citizens and the remediation of property within *its* boundaries." *Id.* citing to *Sensient, supra, 193 N.J. at 394*; *Century Indem. Co., 398 N.J. Super. at 437*.

At oral argument, Plaintiff's counsel cited *Ryan v. Gifford, 918 A.2d 341 (Del. Ch. 2007)*, a Delaware chancery case in which the court declined to stay the Delaware action pending the outcome of several similar actions filed in U.S. District Court in California. That case is easily distinguishable. In that case, which involved claims against board members and executives for breach of fiduciary duty for backdating stock options, the Delaware Court retained jurisdiction and allowed the case to proceed because the issue was one of first impression, and the court held it was too important to allow another forum to interpret Delaware law where the Delaware courts themselves had not ruled on **[\*18]** the issue. There is no such claim in this case, and Plaintiffs do not argue that the issues before the federal court in the first-filed action constitute uncharted legal waters that require a New Jersey court to interpret the issue. Plaintiffs in the first-filed case undoubtedly weighed the merits of making a demand versus filing their complaint without a demand, and elected to take the risk that they could establish demand futility. There is no strong New Jersey public policy concern regarding demand letters requiring this court to retain jurisdiction. The Supreme Court (not the Legislature) has spoken on the issue, and established different burdens of proof in different scenarios regarding demands on the board in derivative actions. The Court left plaintiffs with a tactical choice, and the first-filed plaintiffs have elected to proceed without a demand.

Third, Plaintiffs have not shown that this action has progressed further than the first-filed federal action. Plaintiffs' argument that this case, like previous Vioxx litigation against Merck, could quickly "catch-up" to the first-filed demand futility action because the discovery has already been checked for privilege, bates-stamped, **[\*19]** sorted, and electronically stored, is unconvincing. Plaintiffs further argue production of that discovery would then allow this case to race ahead of the first-filed litigation, which is "bogged down" by motion practice concerning the futility of the demand. This argument is also not convincing. To the contrary, the end of fact-discovery in the first-filed case is drawing near. More

than 11 million pages of discovery have already been produced, and dozens of depositions have been taken. This case is just getting started. The first-filed case is years ahead of this case, and Plaintiffs' arguments to the contrary are speculative at best.

Finally, Plaintiffs have not shown or argued that the first-filed federal actions are in an inconvenient forum, which could be grounds to overcome the presumption of the first-filed rule as a special equity. This line of argument would not apply in this case, because the first-filed case before Judge Cavanaugh and the second-filed case before this court are both venued in New Jersey.

CONCLUSION

The parties, causes of action, and underlying facts are substantially the same in this case and *Cain v. Hassan*, pending before the U.S. District Court for the District **[\*20]** of New Jersey. A presumption is triggered in favor of staying or dismissing this case. There are no special equities present to rebut or overcome the presumption. The case is dismissed without prejudice, subject to revival upon application by the Plaintiff and pending the outcome in U.S. District Court for the District of New Jersey.

---

**End of Document**

# EXHIBIT "B"

 Neutral

As of: July 8, 2024 7:53 PM Z

# *Legend Movie Posters Corp. v. Jerry Ohlinger's Movie Material Store, Inc.*

Superior Court of New Jersey, Appellate Division

October 1, 2018, Argued; October 22, 2018, Decided

DOCKET NO. A-3553-16T1

**Reporter**

2018 N.J. Super. Unpub. LEXIS 2329 *; 2018 WL 5117180

LEGEND MOVIE POSTERS CORPORATION, a Nevada corporation, and XINGLING HU, a New Jersey resident, Plaintiffs-Appellants, v. JERRY OHLINGER'S MOVIE MATERIAL STORE, INC., and JERRY OHLINGER, Defendants-Respondents.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Subsequent History:** Certification denied by *Legend Movie Posters Corp. v. Jerry Ohlinger's Movie Material Store, Inc., 238 N.J. 34, 207 A.3d 748, 2019 N.J. LEXIS 674 (May 9, 2019)*

Related proceeding at *Xingling Hu v. Jerry Ohlinger's Movie Materials, 2019 U.S. Dist. LEXIS 179239 (S.D.N.Y., Oct. 16, 2019)*

**Prior History: [*1]** On appeal from Superior Court of New Jersey, Chancery Division, Passaic County, Docket No. C-000123-16.

**Counsel:** Anthony N. Iannarelli, Jr., argued the cause for appellants.

Douglas M. Schneider argued the cause for respondents (Summers & Schneider, PC, attorneys; Douglas M. Schneider, on the brief).

**Judges:** Before Judges Gooden Brown and Rose.

## Opinion

PER CURIAM

Plaintiffs Legend Movie Posters Corporation and Xingling Hu (collectively plaintiffs) appeal from Chancery Division orders entered on January 11 and March 28, 2017, essentially dismissing plaintiffs' complaint on comity grounds. The January 11, 2017 order denied plaintiffs' order to show cause and granted Jerry Ohlinger's Movie Material Store, Inc. (JOMMS) and Jerry Ohlinger's (collectively defendants) cross-motion "to dismiss or stay" plaintiffs' complaint "in favor of a prior action commenced by [d]efendants in the New York County Supreme Court." The March 28, 2017 order superseded the January 11, 2017 order, clarified that plaintiffs' complaint was dismissed, rather than stayed, and denied plaintiffs' motion for reconsideration. For the reasons that follow, we affirm.

We recite that part of the procedural history and record pertinent to this appeal. On **[*2]** October 22, 2014, JOMMS filed a complaint in the U.S. District Court for the District of New Jersey against Legend Movie Posters Corporation (Legend Corporation), Legend Movie Posters Enterprise Corporation (Legend Enterprise), Sean Chatoff, and Xingling Hu (collectively Legend). In the complaint, JOMMS, a New York corporation owned and operated by Jerry Ohlinger, alleged that Legend Corporation, a Nevada corporation doing business in New Jersey, and Legend Enterprise, a New Jersey corporation, both owned and operated by Chatoff and Hu, husband and wife, breached their joint venture agreement involving the sale of "movie memorabilia, including scripts, studio photos, posters, [and] promotional materials." According to the complaint, pursuant to their oral agreements, Legend agreed to lease warehouse space in New Jersey to store JOMMS's inventory of collectible movie memorabilia worth millions of dollars. JOMMS agreed to pay the costs of moving the inventory to the warehouse as well as "all expenses for the [w]arehouse, including rent, common charges and insurance," and "Legend agreed to provide staff at the [w]arehouse to service sales from the inventory." Under their agreement, JOMMS **[*3]** was permitted to sell items from the inventory at its discretion without any obligation to share the net profits generated from the sales with Legend. On the other hand, Legend was only permitted to sell select

items from the inventory, subject to JOMMS's consent and pricing directives, and was allowed to keep only twenty-five percent of the proceeds of such sales with the remaining seventy-five percent to be paid to JOMMS.

The complaint stated further that when Legend "unilaterally determined that JOMMS had fallen behind on repaying monies allegedly owed to [Legend]," Legend "unlawfully and improperly took complete control over the [i]nventory, . . . and began selling items without JOMMS's consent or pricing input."[1] According to the complaint, Legend also "refused to pay" JOMMS's "share of the net profits [generated] from such sales," claimed that "they had 'purchased' the complete [i]nventory years earlier for a mere $70,000," and "refused to permit JOMMS to continue to sell items from the [i]nventory." As a result, Legend allegedly "unlawfully converted approximately $5 million worth of [i]nventory," and "interfere[d] with . . . a tentative agreement . . . with a third party to purchase **[\*4]** the entire [i]nventory at market value." In the eleven-count complaint alleging causes of action for conversion, prima facie tort, breach of contract, breach of fiduciary duties, and tortious interference with prospective economic advantage, JOMMS sought "a writ of replevin for possession of the [i]nventory," an accounting of all transactions, injunctive relief, and a declaratory judgment.

Following mediation, on September 14, 2015, the parties entered into a settlement agreement resolving all claims. In the agreement, the parties agreed that JOMMS would take possession of and remove designated items from the warehouse by December 31, 2015, and would pay one half of the monthly rent and utilities for the warehouse through December 31, 2015, regardless of when the property was removed. Further, the parties agreed that JOMMS would execute a promissory note in the amount of $162,500, payable in eighteen months and secured by the personal guarantee of Jerry Ohlinger and a security agreement granting Legend a second priority security interest in JOMMS's assets. Paragraph nine of the settlement agreement provided that "[s]imultaneous[ly] with [the]

execution of the Note, Security Agreement **[\*5]** and Guarantee[,] the parties shall execute mutual Releases of all claims they have against each other accruing prior to the date hereof, except for claims to enforce this Agreement."

Upon receiving notice of the settlement, on July 9, 2015, the district court entered an order dismissing the case "without prejudice to the right, upon good cause shown within sixty (60) days," to reopen the case "solely to enforce the terms of the settlement agreement." On September 4, 2015, the court entered an order extending the deadline until November 9, 2015. The note, security agreement and guarantee required under the settlement agreement were executed on December 11 and 12, 2015. However, the mutual releases were never executed as required by paragraph nine of the agreement. On March 24, 2016, JOMMS and Ohlinger (collectively JOMMS)[2] filed a complaint in the Supreme Court of New York seeking to rescind the settlement agreement and damages for its breach. On April 7, 2016, Legend removed the action on diversity grounds to the U.S. District Court for the Southern District of New York.

While JOMMS's motion to remand the case to the New York state court based on deficient removal was pending, on June **[\*6]** 24, 2016, Legend moved to reopen the case in the U.S. District Court for the District of New Jersey based upon JOMMS's failure to provide a release as required under the settlement agreement. On December 5, 2016, the court denied Legend's motion to reopen the case, concluding that it was "without jurisdiction" because the prior dismissal orders "provided deadlines" that had expired and Legend could "present their position" in the "ongoing" New York proceedings. The court noted further that "the interests of judicial economy" were "served by avoiding duplicative parallel proceedings." Thereafter, on February 7, 2017, JOMMS's motion to remand the case from the U.S. District Court for the Southern District of New York to the Supreme Court of New York was granted because the amount in controversy was "below the minimum threshold for federal jurisdiction."

While JOMMS's New York complaint was pending, on September 30, 2016, Legend Corporation and Hu (collectively Legend) filed a verified complaint and order

---

[1] Although JOMMS acknowledged in the complaint that Legend had, in fact, made loans to JOMMS amounting to "approximately $80,000" to "provide working capital," the parties had allegedly agreed that "any monies owed by [JOMMS] to Legend would be repaid from [JOMMS's] seventy-five percent share of sales made by Legend from the [i]nventory."

[2] For purposes of clarity, we interchange references to JOMMS and Legend, collectively defendants and plaintiffs, respectively, depending upon the particular action and the specific parties involved.

to show cause in New Jersey Superior Court seeking to enjoin JOMMS from "misappropriating" its assets and seeking to "foreclose upon Legend's security interest in [JOMMS's] inventory **[\*7]** and assets" based upon JOMMS's default of the settlement agreement. JOMMS filed a cross-motion to dismiss or stay the complaint in favor of the pending New York case, arguing that Legend could assert their claims in the New York action as a counterclaim. On January 11, 2017, Judge Thomas J. LaConte denied Legend's order to show cause and granted JOMMS's motion to dismiss or stay the action.

On January 31, 2017, Legend moved for reconsideration. In its supporting certification, Legend's counsel stated the New York action was "immaterial" to the relief Legend sought in this court and the New York litigation would likely "go on for years" while "[Legend's] interests [would] be at great risk." On March 28, 2017, in an oral decision, Judge LaConte denied Legend's motion for reconsideration. However, acknowledging that the "January 11, 2017 [order] was not artfully drafted," at Legend's request, the judge issued a superseding order to clarify that Legend's complaint was dismissed, rather than stayed.

After recounting at length the litigation's "tortured" procedural history, Judge LaConte determined that Legend "fail[ed] to establish grounds for reconsideration under *[Rule] 4:49-2*," failed **[\*8]** to "point[] out any facts . . . or controlling decisions that have been overlooked," and only "repeat[ed] the arguments previously made to and rejected by the [c]ourt." The judge explained that other than expressing "dissatisfaction with the . . . result of the prior proceedings," Legend "offered no reason why this [c]ourt instead of the New York Supreme Court [was] the proper tribunal" to adjudicate the action. The judge also determined that Legend presented no evidence "that JOMMS [was] liquidating [its] inventory in violation of the security agreement" to warrant injunctive relief.

The judge pointed out that "[JOMMS] chose to bring their claims in New York and commence their action long before [Legend] sued here." According to the judge,

> [Legend] can assert defenses and counterclaims in the . . . earlier pending New York action for the relief they seek. The New York Supreme Court has all the parties before it, so it is just as well positioned as this [c]ourt to issue an enforceable interim order if appropriate providing the relief sought in this . . . proceeding before this [c]ourt.

Relying on *Yancoskie v. Delaware River Port Authority, 78 N.J. 321, 395 A.2d 192 (1978)*, the judge explained that "New Jersey law is clear that where a party commences a later **[\*9]** action in New Jersey that duplicates a prior action between the same parties in another jurisdiction, [the] New Jersey action should be dismissed or stayed pending resolution of the prior action."

The judge rejected Legend's assertion that "the settlement agreement or related documents prohibit[ed] litigation in the New York Supreme Court of the parties['] dispute over . . . [their] respective rights and responsibilities thereunder." According to the judge,

> All the . . . settlement agreement states is that the parties consent to jurisdiction of the Superior Court of the State of New Jersey or the United States District Court for the District of New Jersey.[3] An agreement conferring jurisdiction in one for[u]m will not be interpreted as excluding jurisdiction elsewhere unless it contains specific language of exclusion. That is a quote from *[City of New York v. Pullman, Inc., 477 F. Supp. 438 (S.D.N.Y. 1979)]*.
> The security agreement and guaranty in this case do not purport to require [JOMMS] to sue in any particular court. Thus, they are free to use the New York Court to remedy [Legend's] breach of the settlement agreement.

This appeal followed.

We begin by setting forth the principles that guide our analysis. When a substantially similar lawsuit is pending in two jurisdictions, the first-filed rule generally requires that the court in the later-filed action defer to the court that first acquired jurisdiction over the dispute. *Yancoskie, 78 N.J. at 324*. The rule reflects the principle that any comity analysis begins with the presumption that "the court that first obtains possession of the controversy, or of the property in dispute, must be

---

[3] Paragraph fifteen of the security agreement executed by JOMMS in connection with the settlement agreement provided:

> *Law Governing.* All terms herein contained and the rights, duties and remedies of the parties shall be governed by **[\*10]** the laws of New Jersey. In any action brought by [Legend] to enforce this Security Interest, . . . [JOMMS] knowingly, voluntarily and intentionally . . . consents . . . to the jurisdiction of the Superior Court of the State of New Jersey or the United States District Court for the District of New Jersey . . . .

allowed to dispose of it without interference or interruption from the co-ordinate court." *Riggs v. Johnson Cty., 73 U.S. 166, 196, 18 L. Ed. 768 (1868)*. Like many states, New Jersey adheres to the first-filed rule and ordinarily will stay or dismiss a civil action in deference to the jurisdiction in which the substantially similar litigation was first filed. *See Exxon Research & Eng'g Co. v. Indus. Risk Insurers, 341 N.J. Super. 489, 506, 775 A.2d 601 (App. Div. 2001)*; *see also CTC Demolition Co. v. GMH AETC Mgmt./Dev. LLC, 424 N.J. Super. 1, 6, 34 A.3d 1258 (App. Div. 2012)*.

Even where the New Jersey court has jurisdiction to hear the case, "[i]f we are to have harmonious **[*11]** relations with our sister states, . . . comity and common sense counsel that a New Jersey court should not interfere with a similar, earlier-filed case in another jurisdiction that is 'capable of affording adequate relief and doing complete justice.'" *Sensient Colors, Inc. v. Allstate Ins. Co., 193 N.J. 373, 387, 939 A.2d 767 (2008)* (quoting *O'Loughlin v. O'Loughlin, 6 N.J. 170, 179, 78 A.2d 64 (1951)*); *see also Century Indem. Co. v. Mine Safety Appliances Co., 398 N.J. Super. 422, 426, 942 A.2d 95 (App. Div. 2008)*. The litigation of duplicative lawsuits is wasteful of judicial resources and undermines recognition of the authority of the other jurisdiction to adjudicate the matter. *See Sensient, 193 N.J. at 387*.

A "clear entitlement to comity-stay relief" is established by proof: "(1) that there is a first-filed action in another state, (2) that both cases involve substantially the same parties, the same claims, and the same legal issues, and (3) that plaintiff will have the opportunity for adequate relief in the prior jurisdiction." *Am. Home Prods. Corp. v. Adriatic Ins. Co., 286 N.J. Super. 24, 37, 668 A.2d 67 (App. Div. 1995)* (footnote omitted). Under such circumstances, "the judge should grant the stay unless plaintiff demonstrates 'special equities.'" *Ibid.* "[E]xtenuating circumstances sufficient to qualify as special equities" arise when there are "compelling" reasons "that favor the retention of jurisdiction by the court in the later-filed action." *Sensient, 193 N.J. at 387*. Such circumstances are present "if an injustice would be perpetrated on a party in the **[*12]** first-filed action and no hardship, prejudice or inconvenience would be inflicted on the other by proceeding in the second-filed case." *Id. at 389* (internal citations omitted). A trial court's decision to apply the doctrine of comity requires "a fact-specific inquiry that weighs considerations of fairness and comity," which we review under an abuse of discretion standard. *Id. at 389-90*.

Similarly, our standard of review on a motion for reconsideration is deferential. "Motions for reconsideration are governed by *Rule 4:49-2*, which provides that the decision to grant or deny a motion for reconsideration rests within the sound discretion of the trial court." *Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382, 113 A.3d 1217 (App. Div. 2015)*. Reconsideration

> is not appropriate merely because a litigant is dissatisfied with a decision of the court or wishes to reargue a motion, but

> > should be utilized only for those cases which fall into that narrow corridor in which either 1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence.

> *[Palombi v. Palombi, 414 N.J. Super. 274, 288, 997 A.2d 1139 (App. Div. 2010)* (quoting *D'Atria v. D'Atria, 242 N.J. Super. 392, 401, 576 A.2d 957 (Ch. Div. 1990)*.]

Thus, we will not disturb a trial judge's denial of a motion for reconsideration absent a clear **[*13]** abuse of discretion. *Pitney Bowes Bank, 440 N.J. Super. at 382*. An "abuse of discretion only arises on demonstration of 'manifest error or injustice,'" *Hisenaj v. Kuehner, 194 N.J. 6, 20, 942 A.2d 769 (2008)* (quoting *State v. Torres, 183 N.J. 554, 572, 874 A.2d 1084 (2005))*, and occurs when the trial judge's decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." *Milne v. Goldenberg, 428 N.J. Super. 184, 197, 51 A.3d 161 (App. Div. 2012)* (quoting *Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571, 796 A.2d 182 (2002))*.

Here, we discern no abuse of discretion in Judge LaConte's dismissal of Legend's complaint on comity grounds, or denial of Legend's motion for reconsideration, which was predicated only on Legend's dissatisfaction with the judge's decision. We affirm substantially for the reasons expressed by the judge in his March 28, 2017 oral decision. Legend argues the judge erred in imposing the "extreme sanction" of dismissal, thereby "putting their interests in the settlement at risk." Finding no support in the record for the arguments, we are satisfied that Legend's arguments are without sufficient merit to warrant

discussion in a written opinion. *R. 2:11-3(e)(1)(E).*

Affirmed.

---

**End of Document**

# EXHIBIT "C"



# *Collini v. National Med. Consultants, PC.*

Superior Court of New Jersey, Appellate Division

May 21, 2019, Argued; June 4, 2019, Decided

DOCKET NO. A-2857-18T4

**Reporter**

2019 N.J. Super. Unpub. LEXIS 1268 *; 2019 WL 2354934

JOSEPH E. COLLINI, ESQ., JOHN C. EMOLO, ESQ., individually and as partners of the law firm known as EMOLO & COLLINI, ESQS., Plaintiffs-Respondents, v. NATIONAL MEDICAL CONSULTANTS, PC, and EUGENE DEBLASIO, M.D., Defendants-Appellants/Cross-Respondents, and LAEL E. FORBES, M.D., Defendant-Respondent/Cross-Appellant.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Prior History: [*1]** On appeal from Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-1418-18.

*Estate of Grieco v. Schmidt, 440 N.J. Super. 557, 115 A.3d 277, 2015 N.J. Super. LEXIS 85 (App.Div., May 19, 2015)*

**Counsel:** Vincent E. Reilly argued the cause for appellants/cross-respondents National Medical Consultants, PC, and Eugene DeBlasio, M.D. (Kinney Lisovicz Reilly & Wolff PC, attorneys; Vincent E. Reilly, of counsel; Vincent E. Reilly and Nicholas J. Guarino, on the brief).

Stuart Kagen (Kagen & Caspersen, PLLC) of the New York bar, admitted pro hac vice, argued the cause for respondent/cross-appellant Lael E. Forbes, M.D. (Kagen & Caspersen, PLLC, attorneys; Joshua C. Gillette and Stuart Kagen, on the brief).

Joseph E. Collini argued the cause for pro se respondents (John C. Emolo, on the brief).

**Judges:** Before Judges Fisher and Enright.

## Opinion

PER CURIAM

To understand the issues presented in this interlocutory appeal, it is initially necessary to know of other related lawsuits. The first was a medical malpractice action filed by plaintiffs here — Joseph E. Collini, Esq., John C. Emolo, Esq., and Emolo & Collini (plaintiffs) - on behalf of their former clients, the Estate of Patricia Grieco and her husband (collectively, the estate), against Hans J. Schmidt, M.D. and Advanced Laparoscopic Associates (ALA). The medical **[*2]** malpractice complaint alleged that Schmidt and ALA were engaged to perform laparoscopic gastric banding surgery on Patricia Grieco in November 2007 and that, due to their negligence, she suffered a pulmonary embolism and died.

In representing the estate, plaintiffs communicated in some fashion with defendants National Medical Consultants and Dr. Eugene DeBlasio; this led to the retention of defendant Dr. Lael Forbes to provide expert testimony in the medical malpractice action.

During the course of the medical malpractice action, we reviewed and reversed a pretrial evidence ruling favorable to the defense. *Estate of Grieco v. Schmidt, 440 N.J. Super. 557, 561, 115 A.3d 277 (App. Div. 2015)*. Following our remand, trial was scheduled to occur in September 2015, but, not long before, Dr. Forbes advised plaintiffs she would no longer participate. Plaintiffs sought an adjournment to hire a new expert. That request was denied and the action soon after dismissed. No appeal was filed.

In January 2016, the estate — through plaintiffs — commenced an action against Dr. Forbes, National Medical Consultants, and Dr. DeBlasio. Dr. Forbes removed the action to federal district court and then moved to disqualify plaintiffs as the estate's counsel.

Plaintiffs withdrew as counsel and **[\*3]** another attorney entered an appearance for the estate.

The new attorney moved in the medical malpractice action for relief from the dismissal order pursuant to *Rule 4:50-1*. That motion was denied and we affirmed that disposition on appeal. *Estate of Grieco v. Schmidt, No. A-0756-16, 2018 N.J. Super. Unpub. LEXIS 205 (App. Div. Jan. 29, 2018)*.

In April 2018 - with the estate's federal action in some sort of limbo[1] - plaintiffs commenced this action on their own behalf. They sued National Medical Consultants, Dr. DeBlasio, and Dr. Forbes, alleging, among other things, breach of contract and negligence, seeking damages caused *to them* by both the termination of the medical malpractice action and their departure from the federal action. Dr. Forbes moved for a dismissal, and the other defendants joined in. The motion was granted in part and denied in part; the judge also denied a motion to stay what remained of this action pending a disposition of the estate's federal action.

Dr. Forbes moved for leave to appeal, as did the other defendants. She argues the judge erroneously treated her dismissal motion as a summary judgment motion and made "erroneous findings of fact" without notice or the opportunity to present additional evidence; she **[\*4]** also argues the judge mistakenly created a "new cause of action" contrary to settled New Jersey law. The other defendants similarly contend that the judge erred in recognizing plaintiffs' right to pursue an independent cause of action for lost attorneys' fees and expenses. They argue that the pleaded claims belong to the estate, not plaintiffs, and that the judge erred in applying the "first-filed" doctrine and by refusing to apply the entire controversy doctrine, which they believe required a dismissal or a stay of this action. We granted defendants' motions for leave to appeal to consider these issues.

We initially observe that the judge's decision was governed by *Rule 4:6-2(e)*. That rule commanded an assumption of the truth of plaintiffs' allegations and entitled the pleader to all reasonable inferences; the rule requires that the court search the challenged pleading "in depth and with liberality to determine whether a cause of action can be gleaned even from an obscure statement." *Seidenberg v. Summit Bank, 348 N.J. Super. 243, 250, 791 A.2d 1068 (App. Div. 2002)*. The motion judge clearly adhered to that limitation, and, on appeal, we must take the same approach. *Ibid.* So, we consider the order under review by assuming defendants were negligent and breached their agreements **[\*5]** with plaintiffs.

Now, to be sure, plaintiffs were in large measure acting as the estate's representative in their dealings with defendants, but that does not preclude either a derivative or independent right to relief if defendants' negligence or breach of contract wrongly caused plaintiffs injury beyond or different from the estate's alleged injury. The very nature of plaintiffs' contingency fee agreement with the estate reveals plaintiffs had a real stake in the outcome of the medical malpractice action because certain obligations incurred during the litigation would be solely borne by plaintiffs if no recovery was obtained and because a recovery in favor of the estate would also benefit plaintiffs.[2] In short, it may be that plaintiffs' claim is largely derivative of the estate's, but, if the estate has a recovery in the federal action against the defendants, then plaintiffs' interest may transform from a theoretical claim to a claim that might entitle them to compensation from defendants directly or through the estate's recovery. We, thus, find no error in the judge's denial of the motion to dismiss the breach of contract and negligence claims — contained in the first three counts **[\*6]** of the complaint — against these defendants.[3]

---

[1] The record on appeal is unclear about the federal action's status. During oral argument, counsel advised that the estate retained a new attorney and that the new attorney has (or will) withdraw the existing complaint and will file (or has filed) a new complaint in federal court.

[2] Defendants argue that *Rich v. Bongiovanni, 4 N.J. Super. 243, 66 A.2d 888 (App. Div. 1949)* precludes plaintiffs' assertion of a claim in their own right. That reliance is misguided. There, a breach of contract suit was commenced by both the principal and the principal's agent. We noted that the principal could commence the action and, also, that an agent "who contracts in his own name may sue[,] . . . [b]ut . . . we doubt[ed] whether the agent may be joined as a plaintiff unless the complaint discloses some reason for the joinder beyond the mere fact that the contract was made through his agency." *Id. at 246*. Here, the complaint reveals a reason for plaintiffs' assertion of a claim on their own behalf: the alleged right to recover the expenses they incurred in the medical malpractice action and the right — established by the contingency fee agreement — to recover a portion of any recovery obtained by the estate.

[3] The judge dismissed the fifth count (misrepresentation), sixth count (prima facie tort), seventh count (tortious conduct that caused plaintiffs to incur litigation costs), and eighth count (physician's failure to aid lawsuit). The judge also dismissed

We, however, reverse with respect to one discrete aspect of the order under review. As noted, the judge recognized the inherent link between the estate's federal case and plaintiffs' state case but did not stay the latter pending disposition of the former. We conclude that sound management principles require that this case be stayed pending the disposition of the estate's federal case because plaintiffs' suit is predominantly derivative of the success of the estate's claim. Moreover, with both cases simultaneously proceeding on parallel tracks, the opportunity for inconsistent rulings is palpable; we conclude **[*7]** the best course requires a stay of this action pending disposition of the first-filed federal action. *See Continental Ins. Co. v. Honeywell Intern., Inc., 406 N.J. Super. 156, 173-75, 967 A.2d 315 (App. Div. 2009)*.

Affirmed in part and reversed in part. We remand for the entry of an order staying this action pending disposition of the estate's federal action. We do not retain jurisdiction.

---

**End of Document**

---

the part of the fourth count that seeks punitive damages insofar as it is based on a breach of contract theory; he denied the remainder of that count while expressing "serious[] doubt" about its "viability." Plaintiffs did not move for leave to appeal those parts of the order, so, we express no view about those rulings.

# EXHIBIT "D"



# *Capital One Bank (USA) NA v. King*

Superior Court of New Jersey, Law Division, Special Civil Part, Ocean County

January 20, 2021, Decided

DOCKET NO. DC-632-20

**Reporter**

2021 N.J. Super. LEXIS 70 *

CAPITAL ONE BANK (USA) NA, Plaintiff v. CAROLINE KING, Defendant

**Prior History:** *In re Capital One Customer Data Sec. Breach Litig., 396 F. Supp. 3d 1364, 2019 U.S. Dist. LEXIS 174034 (J.P.M.L., Oct. 2, 2019)*

**Judges: [*1]** JAMES DEN UYL, J.S.C.

**Opinion by:** JAMES DEN UYL

## Opinion

ORDER

THIS MATTER having come before the Court on motion of Plaintiff to dismiss Defendant's counterclaim and for reasons that follow:

IT IS ON THIS 20TH DAY OF JANUARY 2021, ORDERED:

Plaintiff's motion is granted

IT IS FURTHER ORDERED Defendant's counterclaim is dismissed without prejudice

/s/ James Den Uyl

JAMES DEN UYL J.S.C.

STATEMENT OF REASONS

The Complaint was filed on January 17, 2020 wherein the Plaintiff sought a judgment in the amount of $2,378.70 for an unpaid balance due and owing. Defendant filed an Answer and Counterclaim on February 28, 2020 denying the debt. The counterclaim alleges the Plaintiff failed to protect the Defendant's personal information from a data breach. Count 1 alleges Negligence. Count 2 alleges Breach of Contract. Count 3 alleges Consumer Fraud. Count 4 alleges Breach of Invasion of Privacy. On August 11, 2020

Judge Palmer entered a consent order permitting Plaintiff/Counterclaim Defendant 30 days to file an answer to the counterclaim. On November 3, 2020 Judge Troncone entered an order relieving Mr. Gutman from representing the Defendant and giving pro-se Defendant 30 days to obtain counsel.

On September 9, 2020 counsel for **[*2]** Capital One Bank filed the instant motion to dismiss Defendant's Counterclaim without prejudice, or, in the alternative, stay the counterclaim. Counsel states on July 29, 2019 an incident of unauthorized criminal access to Capital One databases may have impacted the personal information of certain consumers. Between July 30, 2019 and September 11, 2019 61 class action lawsuits were filed in federal courts across the country. The cases have been consolidated into the multidistrict litigation in the US District Court for the Eastern District of Virginia (MDL).

On November 1, 2019 the MDL court issued its first pretrial order outlining procedures to eliminate duplicative discovery. On March 3, 2020 plaintiffs filed their class action complaint alleging negligence, breach of contract and violations of state consumer protection laws. Counsel claims that a handful of cybersecurity incident related counterclaims were asserted in debt-collection actions. Those cases have not passed the pleading stage as they have been dismissed or withdrawn.

Counsel asserts that New Jersey follows the first-filed rule providing the first-filed of similar cases to take precedence over later cases. *Sensient Colors Inc. v. Allstate Ins. Co., 193 N.J. 373, 386, 939 A.2d 767 (2008)*. New Jersey **[*3]** courts generally dismiss or stay civil actions in deference to an already pending, similar federal lawsuit. *Jones v. Educ. Testing Servs.,* No. MER-L-1977-04, 2005 WL 975337, at *8 (N.J. Super. Ct. Law Div. Feb. 7, 2005). Counsel points out that in the Jones case there were several federal lawsuits filed against the defendant resulting in an MDL

and the state action unable to removed. *Id.* at *1. The court determined that the state action should be dismissed for the following reasons: "1) there is a first-filed action in another state; 2) both cases involve substantially the same parties, the same claims, and the same legal issues; and 3) that plaintiff will have the opportunity for adequate relief in the prior jurisdiction." *Id.* at *3. The court also held that the facts demonstrate "a clear entitlement to comity-stay relief and the judge should grant the stay [or dismissal] unless plaintiff demonstrates 'special equities.'" *Id.* Based upon these factors Capital One contends that the Defendant's counterclaim should be dismissed without prejudice or alternatively stayed.

Defendant argues that the counterclaim should not be dismissed as a class action can only adjudicate rights when a proposed settlement is communicated and individuals can opt out, object, or do nothing; however, Defendant is not part of the class **[*4]** action lawsuit. Defendant's prior counsel also asserts that the Entire Controversy Doctrine requires all parts of an action to be adjudicated in one action when they arise out of the underlying controversy. *Prevratil v. Mohr, 145 N.J. 180, 214, 678 A.2d 243 (1996)*.

Counsel claims that the Defendant would be prejudiced if her claims are dismissed for the following reasons: 1) federal cases are more complicated and Defendant would have to proceed without counsel. 2) The Defendant would have basically no involvement in negotiating a settlement and should she opt out of a settlement offer she would be in the same position she is now. 3) The Defendant would have to wait a substantial period of time before the class matter is resolved.

Counsel states that the "First File Rule" is misplaced in that the counterclaim relates to the time in which the original complaint was filed, not the date the counterclaim was filed." *MS Wholesale Plumbing Inc. v. Gen-Kal Pipel, 2019 N.J. Super. Unpub. LEXIS 109 (Slip. Op. App. Div. 2019)* (citing *Sonntag Reporting Serv., Ltd. v. Ciccarelli, 374 N.J. Super. 533, 540, 865 A.2d 747 (App. Div. 2005)*).

Lastly, Defendant argues that *Jones v. Educational Testing* is inapplicable. First, it is an unpublished Law Division case. Second, the court stated there that "the general rule in New Jersey is that the court first acquiring jurisdiction has precedence absent special equities." As a result, there is a presumption that venue **[*5]** should control, and counterclaims and third-party claims should all be heard in that venue. Moreover, there is no federally proposed or issued order dealing with individual, rather than class claims. For these reasons Defendant claims that a federal court has no basis for having jurisdiction over a counterclaim alleging less than $15,000 in damages where no federal statute is alleged to have been violated.

Capital One claims in its reply brief that the Entire Controversy Doctrine does not require the counterclaim to remain in the instant suit as: 1) there is no risk of piecemeal litigation; 2) fairness requires the counterclaim to be litigated with the other cyber incident cases; and 3) litigating the counterclaim in state court would be a waste of judicial resources, cause duplicative discovery and prevent inconsistent outcomes. *Wadeer v. N.J. Mfrs. Ins. Co., 220 N.J. 591, 605, 110 A.3d 19 (2015)* (citing *DiTrolio v. Antiles, 142 N.J. 253, 267, 662 A.2d 494 (1995)*).

Capital One's counsel asserts that the Defendant is part of the litigation class and therefore her rights are protected. Class counsel is already protecting her interests and a claim that it will take years for the counterclaim to be litigated is speculative. Finally, he insists that the only connection between Plaintiff's and Defendant's claims **[*6]** is the fact that the Defendant has a Capital One card. For these reasons Capital One asks that this Court grant its motion to dismiss Defendant's counterclaim.

*HOLDING*

The question raised in this case is whether a counterclaim asserted by the Defendant that is the subject of a class action lawsuit in federal court should be dismissed without prejudice; stayed; or proceed in state court. This situation is governed by the "First-Filed" Rule. Generally, "the court first acquiring jurisdiction has precedence absent special equities." *Bass ex rel. Will of Bass v. De Vink, 336 N.J. Super. 450, 455, 765 A.2d 247 (App. Div. 2001)*.

"When requesting that the court dismiss or stay a New Jersey case for comity reasons, the [moving party] should be required to establish (1) that there is a first-filed action in another state, (2) that both cases involve substantially the same parties, the same claims, and the same legal issues, and (3) that plaintiff will have the opportunity for adequate relief in the prior jurisdiction. When a defendant establishes these requisites, it has shown a clear entitlement to comity-stay relief and the

judge should grant the stay unless plaintiff demonstrates 'special equities.'" *American Home Products Corp. v. Adriatic Ins. Co., 286 N.J. Super. 24, 37, 668 A.2d 67 (App. Div. 1995)*.

As to the first prong, between July 30, 2019 and September 11, 2019 61 class action **[*7]** lawsuits were filed in federal courts concerning a data breach of the Plaintiff's system. Plaintiff filed its collection action in this Court on January 17, 2020. Defendant filed her counterclaim on February 28, 2020. Clearly the state claims were filed well after many of the federal lawsuits were filed. As a result, the Plaintiff satisfies the first prong.

With respect to the second prong, Plaintiff must demonstrate that both cases involve substantially the same parties, the same claims, and the same legal issues. *Id.*, at 37. The claims that have been consolidated in the federal lawsuit allege negligence, breach of contract and violations of state consumer protection laws. (See Ex B of Plaintiff's certification). In the present case, Defendant's counterclaim alleges that the Plaintiff failed to protect the Defendant's personal information from a data breach. Count 1 alleges Negligence. Count 2 alleges Breach of Contract. Count 3 alleges Consumer Fraud. Count 4 alleges Breach of Invasion of Privacy. Clearly the lawsuits contain the same parties, the same claims, and the same legal issues. *Id.*, at 37. Moreover, there is no evidence that the Defendant has opted out of the federal class **[*8]** action suit. As a result, the Plaintiff satisfies the second prong of the "First Filed" Rule.

The third and final prong requires the Plaintiff to prove that Defendant will have the opportunity for adequate relief in the prior jurisdiction. *Id.* Here it is undisputed that the Defendant is part of the litigation class and therefore her rights are protected. Class counsel is already protecting her interests and a claim that it will take years for the counterclaim to be litigated is speculative. Defendant fails to note that the MDL has already set forth a discovery schedule and that the matter is being litigated in the US District Court for the Eastern District of Virginia (MDL), a court that is well known for moving cases rapidly. As a result, the Plaintiff has satisfied the three prongs of the "First Filed" Rule. *Id.*

The burden now shifts to the Defendant to establish special equities that would cause an unjust result. *Id., at 74*. Under this analysis, this Court should "consider [whether] New Jersey's connection to the controversy or parties, whether or not a stay would thwart the public policy of New Jersey, how well advanced to the trial stage the New Jersey case is in comparison with the first-filed **[*9]** action, and convenience and fairness to the parties." *Id.*

In analyzing New Jersey's connection with the parties, the Defendant is a New Jersey resident; however, Capital One is a national bank with its principal place of business in McLean, Virginia. Moreover, the federal lawsuit concerns other New Jersey residents. (See Ex "B" attached to Plaintiff's certification). Although New Jersey has an interest in protecting its residents, it appears that the federal lawsuit has already been filed on behalf of New Jersey residents. Furthermore, there is no nexus between the Plaintiff's collection claim and the Defendant's counterclaim other than the Defendant being in possession of a Capital One card. As a result, there is no evidence that the federal litigation will provide Defendant with an unjust result.

The second issue to analyze is whether the stay would thwart the public policy. *Id.* It appears that Defense counsel claims a stay or dismissal will violate The Entire Controversy Doctrine. The Entire Controversy Doctrine is set forth in *R. 4:30A* and provides, "Non-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the **[*10]** extent required by the entire controversy doctrine, except as otherwise provided by *R. 4:64-5* (foreclosure actions) and *R. 4:67-4(a)* (leave required for counterclaims or cross-claims in summary actions)." The purpose of the Entire Controversy Doctrine is "(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay." *DiTrolio v. Antiles, 142 N.J. 253, 267, 662 A.2d 494 (1995)* (citing *Cogdell v. Hosp. Ctr. at Orange, 116 N.J. 7, 15, 560 A.2d 1169 (1989)*).

With respect to piecemeal litigation, the initial complaint seeks a judgment on a collection claim. Defendant's counterclaim alleges damages from a cybersecurity breach. These two claims do not arise from the same facts or transaction.

As to fairness to the parties to the action and those with a material interest in the action, the data breach claims alleged in this matter as well as those alleged in the federal court arise from the same facts and transaction. The Defendant in this case is part of the federal lawsuit.

The Defendant in this case has counsel to protect Defendant's rights and seek a just result. Should the Defendant be unhappy with the any settlement offered in the federal case, **[*11]** Defendant could opt out and proceed on her own. Additionally, the MDL was designed to hear these types of cases.

Lastly, consolidation of Defendant's counterclaim and the federal claims will provide the most efficiency in resolving the cybersecurity breach issue. The MDL has set forth a discovery order. In the event the instant counterclaim remains in state court there will be duplicative discovery and the possibility of inconsistent outcomes. For these reasons, the Entire Controversy Doctrine does not require Defendant's counterclaim to be heard with the Plaintiff's collection action. Accordingly, Defendant does not provide sufficient facts to support a finding of "special equities" as set forth in _American Home Products, 668 A.2d at 74_.

For these reasons, Plaintiff's motion to dismiss the counterclaim is granted.

---

**End of Document**

**Derek D. Reed, Esq. (Attorney ID No. 038062003)**
**EHRLICH, PETRIELLO, GUDIN, PLAZA & REED**
**A Professional Corporation**
**60 Park Place, Suite 1016**
**Newark, New Jersey 07102**
**(973) 643-0040**
**Attorneys for Defendants,**
**The Towers at Portside Urban**
**Renewal Company, LLC and**
**Equity Residential Management, LLC**

| | |
|---|---|
| **CITY OF JERSEY CITY and CITY OF JERSEY CITY RENT LEVELING BOARD,** | **: SUPERIOR COURT OF NEW JERSEY**<br>**: LAW DIVISION: HUDSON COUNTY**<br>**:**<br>**: DOCKET NO.: HUD-L-2449-24**<br>**:** |
| **Plaintiffs,** | **:   Civil Action**<br>**:** |
| **vs.** | **:   CERTIFICATION OF**<br>**:   DANIELLE MARCHEWKA** |
| **THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC, EQUITY RESIDENTIAL MANAGEMENT, LLC, ABC CORP. 1-10 (fictitious entities) and JOHN DOES 1-10 (fictitious names),** | **:**<br>**:**<br>**:**<br>**:**<br>**:** |
| **Defendants.** | **:**<br>**:**<br>**:** |

DANIELLE MARCHEWKA, by way of Certification in lieu of Affidavit, says:

1.       I am the Assistant Vice President-Legal for Equity Residential, Defendant in the within matter.  In that capacity, I am fully familiar with the facts and circumstances herein.

2.       I have reviewed Defendants' Opposition to Plaintiff's request for injunctive relief in this matter.

3.       The facts alleged in Defendant's Opposition are true to the best of my personal knowledge and understanding.  To the extent a statement refers to a document or documents, including publicly filed documents in the federal case, that document was or those documents were

the source of my information. Counsel for Portside also provided facts and information, which Portside has reviewed and approved.

4.      I am aware that if any of the facts set forth herein are willfully false I am subject to punishment.


Dated:  July 8, 2024                                 _____/s/ Danielle Marchewka_____
                                                    DANIELLE MARCHEWKA