**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC,<br><br>     Plaintiffs,<br><br>     v.<br><br>The City of Jersey City, the City of Jersey City Rent Leveling Board, and the City of Jersey City Bureau of Rent Leveling<br><br>     Defendants, and<br><br>Portside Towers East Tenant Association, Portside Towers West Tenant Association, Kevin Weller, Jessica Brann, Joel Rothfus, and Michele Hirsch,<br><br>     Defendant-Intervenors. | Civil Action No. 2:23-cv-22291-MCA-JRA |

**PLAINTIFFS' ANSWERS TO
INTERVENOR-DEFENDANTS' AFFIRMATIVE
<u>DEFENSES, CROSSCLAIMS AND COUNTERCLAIMS</u>**

Plaintiffs The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC (the "Plaintiffs"), by and through their attorneys, Derek D. Reed, Ehrlich Petriello Gudin Plaza & Reed, P.C., answer the Affirmative Defenses, Crossclaims and Counterclaims of Intervenor-Defendants Portside Towers East Tenant Association, Portside Towers West Tenant Association, Kevin Weller, Jessica Brann, Joel Rothfus and Michele Hirsch ("Intervenor-Defendants") as follows:

**<u>INTERVENOR-DEFENDANTS' AFFIRMATIVE DEFENSES</u>**

**First Affirmative Defense**

The Amended Complaint fails to state a claim, in whole or in part, upon which relief may

be granted.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 1 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 1. Intervenor-Defendants should be barred from asserting Affirmative Defense 1 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 1 if necessary.

### Second Affirmative Defense

The Plaintiff's claims are barred by the applicable statute of limitations.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 2 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 2. Intervenor-Defendants should be barred from asserting Affirmative Defense 2 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 2 if necessary.

### Third Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, insofar as they lack standing to sue and/or there is no actual case or controversy between the parties.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 3 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 3. Intervenor-Defendants should be barred from asserting Affirmative Defense 3 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 3 if necessary.

### Fourth Affirmative Defense

Plaintiffs' claims are barred by the doctrine of *in pari delicto* and/or unclean hands.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 4 on behalf

2

of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 4. Intervenor-Defendants should be barred from asserting Affirmative Defense 4 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 4 if necessary.

### Fifth Affirmative Defense

Plaintiffs' claims are barred by the doctrine of estoppel.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 5 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 5. Intervenor-Defendants should be barred from asserting Affirmative Defense 5 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 5 if necessary.

### Sixth Affirmative Defense

Plaintiffs' claims are barred by the doctrine of laches.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 6 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 6. Intervenor-Defendants should be barred from asserting Affirmative Defense 6 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 6 if necessary.

### Seventh Affirmative Defense

Plaintiffs' claims are preempted by Federal Law.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 7 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 7. Intervenor-Defendants should be barred from asserting Affirmative Defense 7 on behalf of the City at any time in this case. Portside reserves all rights

and waives none, including the right to move to strike Affirmative Defense 7 if necessary.

### Eighth Affirmative Defense

If a plaintiff suffered any damages as a result of the matters alleged in the Amended Complaint, such damages were caused in whole or in part by that plaintiff's own culpable conduct. Any judgment recovered by a plaintiff must be reduced in proportion to the extent that their culpable conduct contributed to the alleged damages.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 8 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 8. Intervenor-Defendants should be barred from asserting Affirmative Defense 8 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 8 if necessary.

### Ninth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by the doctrines of accord, satisfaction, waiver, estoppel, consent, comparative fault, contributory fault, and/or laches.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 9 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 9. Intervenor-Defendants should be barred from asserting Affirmative Defense 9 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 9 if necessary.

### Tenth Affirmative Defense

Plaintiffs are not entitled to any equitable relief because they have an equitable remedy at law.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 10 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 10. Intervenor-Defendants should be barred from asserting Affirmative Defense 10 on behalf of the City at any time in this case. Portside reserves

4

all rights and waives none, including the right to move to strike Affirmative Defense 10 if necessary.

<b>Eleventh Affirmative Defense</b>

Plaintiffs' claims for damages must be dismissed to the extent that they have failed, refused, and/or neglected to mitigate or avoid the damages or injuries complained of in the Amended Complaint, or to the extent that they have been mitigated.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 11 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 11. Intervenor-Defendants should be barred from asserting Affirmative Defense 11 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 11 if necessary.

<b>Twelfth Affirmative Defense</b>

Plaintiffs are not entitled to declaratory or injunctive relief.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 12 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 12. Intervenor-Defendants should be barred from asserting Affirmative Defense 12 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 12 if necessary.

<b>Thirteenth Affirmative Defense</b>

Plaintiffs are not entitled to pre-judgment or post-judgment interest.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 13 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 13. Intervenor-Defendants should be barred from

5

asserting Affirmative Defense 13 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 13 if necessary.

## Fourteenth Affirmative Defense

Plaintiffs' claims are not entitled to a trial by jury due to a voluntary waiver.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 14 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 14. Intervenor-Defendants should be barred from asserting Affirmative Defense 14 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 14 if necessary.

## Fifteenth Affirmative Defense

Lack of personal jurisdiction.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 15 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 15. Intervenor-Defendants should be barred from asserting Affirmative Defense 15 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 15 if necessary.

## Sixteenth Affirmative Defense

Plaintiffs' claims are barred by documentary evidence.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 16 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 16. Intervenor-Defendants should be barred from

asserting Affirmative Defense 16 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 16 if necessary.

### Seventeenth Affirmative Defense

Any damages allegedly sustained by Plaintiffs were caused, in whole or in part, by reason of the culpable conduct of Plaintiffs or a third party. Any judgment recovered by Plaintiffs must be reduced in proportion to the extent that their or any third party's culpable conduct contributed to the alleged damages.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 17 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 17. Intervenor-Defendants should be barred from asserting Affirmative Defense 17 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 17 if necessary.

### Eighteenth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by the doctrine of primary jurisdiction.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 18 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 18. Intervenor-Defendants should be barred from asserting Affirmative Defense 18 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 18 if necessary.

### Nineteenth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, insofar as Plaintiffs seek any remedy to which they are not entitled under applicable law.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 19 on

behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 19. Intervenor-Defendants should be barred from asserting Affirmative Defense 19 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 19 if necessary.

<strong>Twentieth Affirmative Defense</strong>

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs did not suffer any actual injury or damage.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 20 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 20. Intervenor-Defendants should be barred from asserting Affirmative Defense 20 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 20 if necessary.

<strong>Twenty-First Affirmative Defense</strong>

Plaintiffs' claims are barred, in whole or in part, because of Plaintiffs' failure to name an indispensable party or parties.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 21 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 21. Intervenor-Defendants should be barred from asserting Affirmative Defense 21 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 21 if necessary.

<strong>Twenty-Second Affirmative Defense</strong>

Plaintiffs' claims for injunctive relief are barred, in whole or in part, insofar as Plaintiffs

have not suffered irreparable harm.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 22 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 22. Intervenor-Defendants should be barred from asserting Affirmative Defense 22 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 22 if necessary.

### Twenty-Third Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by the Buildings' previous owners' failure to comply with the statutory requirements for claiming an exemption from rent control under the Act.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 23 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 23. Intervenor-Defendants should be barred from asserting Affirmative Defense 23 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 23 if necessary.

### Twenty-Fourth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, because the West Building was not a "newly constructed multiple dwelling" as defined by the Act at the time of its construction.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 24 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 24. Intervenor-Defendants should be barred from asserting Affirmative Defense 24 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 24 if

9

necessary.

### Twenty-Fifth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, because rent control is the default status for the Buildings under the Ordinance, and Plaintiffs' predecessors failed to properly claim and maintain any exemption from such status.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 25 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 25. Intervenor-Defendants should be barred from asserting Affirmative Defense 25 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 25 if necessary.

### Twenty-Sixth Affirmative Defense

Plaintiffs' claims are barred by the doctrine of unclean hands.

**ANSWER:** Intervenor-Defendants lack standing to assert Affirmative Defense 26 on behalf of the City. Moreover, even if Intervenor-Defendants have standing, they fail to plead a factual or legal basis for Affirmative Defense 26. Intervenor-Defendants should be barred from asserting Affirmative Defense 26 on behalf of the City at any time in this case. Portside reserves all rights and waives none, including the right to move to strike Affirmative Defense 26 if necessary.

### INTERVENOR-DEFENDANTS' CROSSCLAIMS AND COUNTERCLAIMS

### PARTIES

1.      PTWTA and PTETA are unincorporated tenants' associations consisting of current and former tenants of 100 Warren Street ("100 Warren" or the "West Building") and 155 Washington Street ("155 Washington" or the "East Building") (collectively, the "Buildings"), adjacent multi-family dwellings located in Jersey City, New Jersey. The Buildings have been subject to rent control since their construction, as neither original owner filed a claim for exemption as required by N.J.S.A. 2A:42-84.1 *et seq.* (the "Act"). Tenants residing in the Buildings, along with former tenants, have authorized PTWTA and PTETA to act on their behalf in this matter.

10

**ANSWER:** Portside lacks knowledge or information sufficient to form a belief as to the truth of the averments in the first sentence of Paragraph 1, and denies them on that basis. Portside denies the averments in the second sentence of Paragraph 1. Portside denies the averments in the third sentence of Paragraph 1 because only certain tenants have authorized PTWTA and PTETA to act on their behalf in this matter.

2.    Jessica Brann ("Brann") is a tenant residing in 155 Washington (Portside East) and is a member of PTETA.

**ANSWER:** Admitted that Brann resides in Portside East. Portside lacks knowledge or information sufficient to form a belief as to the truth of Brann's membership in PTETA, as Portside requested supporting documents about the PTETA and PTWTA and did not receive a response.

3.    Joel Rothfus ("Rothfus") is a tenant residing in 100 Warren (Portside West) and is a member of PTWTA.

**ANSWER:** Admitted that Rothfus resides in Portside West. Portside lacks knowledge or information sufficient to form a belief as to the truth of Rothfus's membership in PTWTA, as Portside requested supporting documents about the PTETA and PTWTA and did not receive a response.

4.    Kevin Weller ("Weller") is a tenant residing in 155 Washington (Portside East) and is a member and President of PTETA.

**ANSWER:** Admitted that Weller resides in Portside East. Portside lacks knowledge or information sufficient to form a belief as to the truth of Weller's membership in PTETA or his status as President thereof, as Portside requested supporting documents about the PTETA and PTWTA and did not receive a response.

5.    Michele Hirsch ("Hirsch") is a tenant residing in 100 Warren (Portside West) and is a member and President of PTWTA.

**ANSWER:** Admitted that Hirsch resides in Portside West. Portside lacks knowledge or information sufficient to form a belief as to the truth of Hirsch's membership in PTWTA or her

11

status as President thereof, as Portside requested supporting documents about the PTETA and

PTWTA and did not receive a response.

6.    Defendant the City of Jersey City Rent Leveling Board ("Board"), has its offices located at 4 Jackson Square, Jersey City, New Jersey 07305, and is a municipal board of Cross-claim Defendant the City of Jersey City ("City") established pursuant to Jersey City Municipal Code ("Ordinance"), Sec. 260-11 concerning rent control. The Board's exclusive powers include, inter alia, to issue and promulgate procedural rules and regulations to implement the purposes of the Ordinance; to supply information to tenants and landlords; to hold hearings and adjudicate appeals on certain matters within its purview. These powers explicitly include adjudicating tenant appeals that seek reduced rents and other hearings concerning corrections to rent determinations in accordance with the provisions of the Ordinance and other applicable laws.

**ANSWER:** Portside admits the averments in the first sentence of Paragraph 6. The

averments in the second and third sentences of Paragraph 6 assert a legal conclusion, and Portside

denies them on that basis.

7.    The Jersey City Bureau of Rent Leveling ("Bureau")[1] is established within the Department of Housing, Economic Development and Commerce, the head of which is the Rent Leveling Administrator. The Bureau is tasked with, inter alia, remedying violations of the Ordinance by adjusting rentals, accepting and reviewing applications, bringing appropriate legal charges for violations of the Ordinance, and generally enforcing the Ordinance and related state statutes affecting the rights of tenants. The decisions of the Bureau are subject to review by the Board.

**ANSWER:** Portside admits the averments in the first sentence of Paragraph 7. The

averments in the second and third sentences of Paragraph 7 assert a legal conclusion, and Portside

denies them on that basis.

8.    Counterclaim Defendant the Towers at Portside Urban Renewal Company, L.L.C. ("Portside"), is a New Jersey limited liability company and the owner of the Buildings. Portside purchased the Buildings after they were constructed.

**ANSWER:** Admitted that Portside is a New Jersey limited liability company which owns

Portside Towers and that Portside purchased Portside Towers after they were originally developed.

---

[1] The Bureau is referred to by myriad different names (e.g. Ordinance uses "Bureau of Rent Leveling", "Jersey City Rent Leveling Bureau"; the Board Decision uses Jersey City Office of Landlord/Tenant Relations Bureau of Rent Leveling). All such references shall mean the Bureau created by Ordinance Sec. 260-9.

9.      Upon information and belief, Counterclaim Defendant Equity Residential Management, LLC ("Equity"), is the management company for Portside.

**ANSWER:** Admitted.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over Intervenors' crossclaims and counterclaims pursuant to 28 U.S.C. § 2201, Federal Rule of Civil Procedure 57, and Declaratory Judgment Act, 28 U.S.C § 2201 et seq.

**ANSWER:** Admitted.

## BACKGROUND

11.     New Jersey's Newly Constructed Multiple Dwelling Act, N.J.S.A. 2A:42-84.1, et seq. (the "Act") permits developers of new construction projects to apply for exemptions from municipal rent control ordinances, provided explicit and strict eligibility criteria are timely satisfied. More specifically, pursuant to the Act, owners claiming an exemption must file a written statement of their claim of exemption with the municipal construction official at least 30 days before the building's initial certificate of occupancy is issued. See N.J.S.A. 2A:42-84.4. Owners **whose buildings are exempted** under the Act, shall, prior to tenants entering into leases, serve tenants with a written statement on the applicable exemption status as well as the duration of the exemption, prior to tenants entering into leases in the affected units. See N.J.S.A. 2A:42-84.3.

**ANSWER:** The averments in Paragraph 11 purport to quote from or characterize N.J.S.A

§ 2A:42-84.1 *et seq.*, to which Portside respectfully refers the Court for its complete and accurate

contents, and denies any allegations inconsistent therewith.

12.     The foregoing are strict prerequisites set by the Act and failure to comply with the statute's requirements means that a building is not exempt via the Act, is subject to any rent control adopted now or in the future and may not claim an exemption from municipal rent control. N.J.S.A. 2A:42-84.3 – 84.5.

**ANSWER:** The averments in Paragraph 12 assert a legal conclusion, and Portside denies

them on that basis.

13.     The Act further limits an owner's ability to claim an exemption from rent increases as follows:

a. The exemption only applies to multiple dwellings constructed after the effective date of the act, *i.e.*, 1987. See N.J.S.A. § 2A:42-84.2. Multiple Dwelling, in turn, is defined as "any building or structure and land appurtenant thereto containing four or more

dwelling units, other than dwelling units constructed for occupation by senior citizens, rented or offered for rent to four or more tenants or family units." N.J.S.A. § 2A:42-84.1(e);

b.  The Act limits the period of exemption for "a period of time, not to exceed the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years following completion of construction, whichever is less." N.J.S.A. § 2A:42-84.2;

c.  The Act requires that: "the owner of any multiple dwelling claiming an exemption from a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owners claim of exemption from an ordinance under this act . . ." N.J.S.A. § 2A:42-84.4;

d.  The owner of a multiple dwelling claiming an exemption under the Act has two separate notice requirements concerning prospective tenants and those tenants entering into leases.

e.  Prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, owners who qualify for the exemption shall furnish the prospective tenant with a written statement that the multiple dwelling in which the premises are located is exempt from rent control for such time as may remain in the exemption period.

f.  Each lease offered to a prospective tenant for any dwelling unit therein during the period the multiple dwelling is so exempted shall contain a provision notifying the tenant of the exemption.

**ANSWER:** Sections (a) through (c) of Paragraph 13 purport to quote from or characterize

N.J.S.A §§ 2A:42-84.2 and 84.4, to which Portside respectfully refers the Court for its complete

and accurate contents, and denies any allegations inconsistent therewith. Sections (d) through (f)

of Paragraph 13 assert a legal conclusion, and Portside denies them on that basis.

14.    The legislative intent regarding the strict nature of these requirements was unequivocally reinforced by the 1999 amendment to the Act (P.L. 1999, Chapter 291) (the "Amendment"). The Amendment explicitly stated: "This act shall take effect immediately and shall be applicable to all multiple dwellings or portions of multiple dwellings for which construction was completed prior to the effective date of this act, **provided that the owner of the**

14

**multiple dwellings has fully complied with the requirements of section 4 of P.L.1987, c.153 (C.2A:42-84.4)."** [Emphasis added].

**ANSWER:** Portside denies the averments in the first sentence of Paragraph 14. The averments in the second sentence of Paragraph 14 purport to quote from or characterize the Amendment, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

15.    This legislative clarification establishes an incontrovertible standard for rent control exemption eligibility:

    a.  The filing of a claim for exemption under <u>N.J.S.A.</u> 2A:42-84.4 is not merely a procedural formality, but an absolute prerequisite for any rent control exemption.

    b.  The Legislature's use of the phrase **"fully complied"** underscores that partial compliance or substantial compliance is insufficient.

    c.  This statutory mandate applies to all multiple dwellings seeking exemption under the Act.

**ANSWER:** The averments in Paragraph 15 assert a legal conclusion, and Portside denies them on that basis.

16.    The significance of this provision is clear:

    a.  It creates a bright-line rule for compliance with the filing requirement.

    b.  It applies retroactively, encompassing multiple dwellings constructed before the Amendment's effective date.

    c.  It reinforces that the filing requirement is an essential element of the exemption process.

**ANSWER:** The averments in Paragraph 16 assert a legal conclusion, and Portside denies them on that basis.

17.    On or about February 7, 1986, the City adopted Ordinance, Chapter 260 governing rent control (hereinafter, the "Ordinance").

**ANSWER:** Admitted.

18.    The Ordinance incorporated provisions mirroring the Act's stringent rules – i.e., mandating that developers wishing to be considered for an exemption submit comprehensive

15

exemption claims to the City's construction office at least 30 days prior to a certificate of occupancy being issued, or otherwise forfeit eligibility. This requirement, purposefully designed by the legislature, establishes timely notification as a jurisdictional prerequisite for exemption eligibility.

**ANSWER:** The averments in Paragraph 18 assert a legal conclusion, and Portside denies them on that basis.

19.     However, even where an exemption from "those provisions of the ordinance which limit the periodic or regular increases in base rentals of multiple dwelling units" applies, owners are still required to comply with other provisions of the Ordinance. See N.J.S.A. § 2A:42-84.2.

**ANSWER:** The averments in Paragraph 19 purport to quote from or characterize N.J.S.A § 2A:42-84.2, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith. The averments in Paragraph 19 also assert a legal conclusion, and Portside also denies them on that basis.

20.     For example, the Ordinance not only has various filing and reporting requirements that apply regardless of any statutory rent control exemption, but also specifies how, and by how much, building owners of rental units are permitted to increase rents if they are not otherwise exempt. The Ordinance at Chapter 260-3 governs allowable rent increases for landlords that are not exempt pursuant to N.J.S.A. § 2A:42-84.1 et seq.

**ANSWER:** The averments in Paragraph 20 purport to quote from or characterize the Ordinance, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith. The averments in Paragraph 20 also assert a legal conclusion, and Portside also denies them on that basis.

21.     Notably, pursuant to Chapter 260-3(D) of the Ordinance, landlords must supply each new tenant with a written statement detailing the prior tenant's rent within the first 10 days of the new tenancy. Failure to provide this information can serve as the basis for an illegal rent increase determination. Furthermore, Chapter 260-3(I) mandates that landlords must not misinform tenants concerning the rent paid by prior tenants, ensuring transparency and compliance with allowable rent increases.

**ANSWER:** The averments in Paragraph 21 purport to quote from or characterize the Ordinance, to which Portside respectfully refers the Court for its complete and accurate contents,

16

and denies any allegations inconsistent therewith. The averments in Paragraph 21 also assert a legal conclusion, and Portside also denies them on that basis.

22.    In addition, pursuant to the Ordinance at Chapter 260-3(H), a landlord shall register its rent roll with the Bureau in order to qualify for any rental increase. Pursuant to Chapter 260- 9(E), "No … rent roll registration will be deemed filed with the Board unless and until submitted on the Board's official forms and accompanied by all appropriate supporting documents and information and the required filing fees."

**ANSWER:** The averments in Paragraph 22 purport to quote from or characterize the Ordinance, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith. The averments in Paragraph 22 also assert a legal conclusion, and Portside also denies them on that basis.

23.    Moreover, pursuant to Chapter 260-3(J) of the Ordinance, "[t]he landlord shall provide each tenant a copy of the Truth-in-Renting Statement and subsequent amendments to said statement and be in full compliance with the landlord identity disclosure provision contained within the statement in order to qualify for any rental increase." These Truth-in-Renting Statements are a product of The Truth-in-Renting Act, N.J.S.A. 46:8-43 et seq.

**ANSWER:** The averments in the first sentence of Paragraph 23 purport to quote from or characterize the Ordinance, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith. Portside lacks knowledge or information sufficient to form a belief as to the truth of the averments in the second sentence of Paragraph 23, and denies them on that basis.

24.    The current Truth-in-Renting Statements issued by the New Jersey Department of Community Affairs, Division of Codes and Standards, sets forth at page 22, under the heading "Identity of Landlord," language from N.J.S.A. §§ 46:8-27 to 37 and specifically, N.J.S.A. § 46:8-28. This latter provision is from New Jersey's Landlord Identity Law ("Landlord Identity Law"), N.J.S.A. §§ 46:8-27 through 46:8-37, which provides, among other things, that every landlord must comply with certain registration and disclosure requirements and requires that same be provided to every tenant.

**ANSWER:** Portside admits the averments in the first sentence of Paragraph 24. The averments in the second sentence of Paragraph 24 purport to quote from or characterize N.J.S.A §§ 46:8-27–8:37, to which Portside respectfully refers the Court for its complete and accurate

contents, and denies any allegations inconsistent therewith. The averments in the second sentence of Paragraph 24 also assert a legal conclusion, and Portside also denies them on that basis.

25.    Specifically, the Landlord Identity Law, requires that all rental properties consisting of three dwelling units or more file with the NJ Department of Community Affairs a certificate of registration containing the following pertinent identifying information:

a.  The name and address of the record owner or owners and the record owners of the rental business, if not the same persons;

b.  If the record owner is a corporation, the name and address of the registered agent and corporate officers of said corporation;

c.  If the address of any record owner is not located in the county in which the premises are located, the name and address of a person who resides in the county in which the premises are located and is authorized to accept notices from a tenant and to issue receipts therefor and to accept service of process on behalf of the record owner;

d.  The name and address of the managing agent of the premises, if any;

e.  The name and address, including dwelling unit, apartment or room number of the superintendent, janitor, custodian or other individual employed by the record owner or managing agent to provide regular maintenance service, if any;

f.  "The name, address and telephone number of an individual representative of the record owner or managing agent who may be reached or contacted at any time in the event of an emergency affecting the premises . . . and who has authority to make emergency decisions concerning the building . . . and shall, at all times, have access to a current list of building tenants that shall be made available to emergency personnel . . ."; and

g.  The name and address of every holder of a recorded mortgage on the premises.

**ANSWER:** The averments in Paragraph 25 purport to quote from or characterize N.J.S.A §§ 46:8-27–8:37, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith. The averments in Paragraph 25 also assert a legal conclusion, and Portside also denies them on that basis.

26.    Chapter 260-2(F)(1) of the Ordinance incorporates identical requirements as those found in the Landlord Identity Law at <u>N.J.S.A.</u> §§ 46:8-28(a) through (f), differing only with the additions of sections (g) and (h) as follows:

    a.   Chapter 260-2(F)(1)(g) requires that the landlord include "a list of the base monthly rents of each housing space, by apartment or room number, within the dwelling as of January 1, 1983."

    b.   Chapter 260-2(F)(2) requires that between January 1 and March 3 of each calendar year, all owners and/or landlords of dwellings shall file with the Bureau a new landlord registration statement for each dwelling owned.

    c.   Chapter 260-2(G) also requires that the same information be posted at all times in the lobby, hallway or other conspicuous place within the dwelling.

**ANSWER:** The averments in Paragraph 26 purport to quote from or characterize the Ordinance, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith. The averments in Paragraph 26 also assert a legal conclusion, and Portside also denies them on that basis.

27.    Furthermore, Chapter 260-2(G) states that if any information contained in the statement changes, the landlord shall inform each occupant or tenant of the change in writing within 30 days and correct the information posted within seven days after the change.

**ANSWER:** The averments in Paragraph 27 purport to quote from or characterize the Ordinance, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith. The averments in Paragraph 27 also assert a legal conclusion, and Portside also denies them on that basis.

28.    Section § 260-3 of the Ordinance provides the relevant language concerning allowable increases to rents in buildings that are subject to rent control.  That Section provides, in pertinent part, as follows:

    a.   At the expiration of a lease or at the termination of a lease of a periodic tenant, no landlord of any dwelling as defined in § 260-1 may request or receive a percentage increase in rent which is greater than four percent or the percentage difference between the consumer price index three months prior to the expiration or termination of the lease and three months prior to the

commencement of the lease term, whichever is less. For a periodic tenant or for a tenant whose lease term shall be less than one year, said tenant shall not suffer or be caused to pay more than one rent increase in any 12-month period, commencing 15 months prior to and ending three months prior to, the effective date of the proposed increase, whichever is less.

b. No more than one such cost-of-living rental increase in any one twelve-month period shall be permitted irrespective of the number of different tenants occupying said housing space during said 12-month period.

c. In the event of a vacant housing space, the landlord may raise the rental above the cost-of-living increase without prior application being made to the Bureau of Rent Leveling, and only if he or she has made capital improvements to the housing space. Such capital improvements will entitle the landlord to increase the base rent of the vacant unit by the following amount:

    i. For capital improvements up to $5,000.00 in value, the vacant unit's monthly base rent shall be increased by $1.35 per $100.00 of improvement; and

    ii. For capital improvements in excess of $5,000.00, the vacant unit's monthly base rent shall increase by $1.55 per $100.00 of improvement.

d. The landlord shall supply the following information in writing to any new tenant within the first 10 days of a new tenant's tenancy: the name of and rent paid by all tenants who occupied the apartment rented by the new tenant during the prior 12 months. The landlord shall keep a written record of the information described herein. The landlord shall make this record available to the Rent Leveling Administrator or Board upon request.

h. The landlord shall register the rent roll with the Rent Leveling Bureau in order to qualify for any rental increase.

i. If the landlord does not inform or misinforms the tenant concerning the rent paid by the prior tenants or in any manner illegally increases the tenant's rent, the Rent Leveling Bureau shall then accept, hear and adjudicate a compliance of an illegal increase.

j. The landlord shall provide to each tenant a copy of the Truth-In-Renting Statement and subsequent amendments to said statement

**and be in full compliance with the landlord identity disclosure provision contained within the statement in order to qualify for any rental increase.**

**ANSWER:** The averments in Paragraph 28 purport to quote from or characterize the Ordinance, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

29.    The Amendment reinforces strict compliance for exemption eligibility, stating: "This act shall take effect immediately and shall be applicable to all multiple dwellings or portions of multiple dwellings for which construction was completed prior to the effective date of this act, provided that the owner of the multiple dwellings has fully complied with the requirements of section 4 of P.L.1987, c.153 (C.2A:42-84.4)." This update establishes that filing for exemption is an essential element of the exemption process, not a mere procedural formality.

**ANSWER:** The averments in the first sentence of Paragraph 29 purport to quote from or characterize the Amendment, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith. The averments of the second sentence of Paragraph 29 assert a legal conclusion, and Portside denies them on that basis.

30.    The Ordinance defines "RENT" in § 260-1 as: "Any price for the use of a housing space. It includes any charge, no matter how set forth, paid by the tenant for the use of any service in connection with the housing space." This broad definition encompasses various fees and charges related to tenancy.

**ANSWER:** The averments in the first sentence of Paragraph 30 purport to quote from or characterize the Ordinance, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith. The averments in the second sentence of Paragraph 30 assert a legal conclusion, and Portside denies them on that basis.

31.    Under the Ordinance, rent control is the default status for residential rental properties in Jersey City. Any exemption from rent control must be properly claimed and maintained in strict compliance with both state and local laws.

**ANSWER:** The averments in Paragraph 31 assert a legal conclusion, and Portside denies them on that basis.

21

32.     The Buildings, collectively known as 100 Warren Street and 155 Washington Street, are located on Block 15902, Lot 1 (previously known as Block 60, Lot 34) on the tax map of the City of Jersey City (hereinafter the "Property").

**ANSWER:** Admitted.

33.     By deed dated September 20, 1988, the Property was transferred from Waterview Associates, a New Jersey general partnership, to DeMatteis/Waterview Associates, a New Jersey general partnership, for One Million Dollars ($1,000,000.00).

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 33, and denies them on that basis.

34.     Thereafter, on September 27, 1988, DeMatteis/Waterview Associates entered into a mortgage and mortgage note on the Property with Citibank, N.A. for One Hundred Twenty Million Dollars ($120,000,000.00). The amortization period of this Citibank mortgage was four (4) years.

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 34, and denies them on that basis.

35.     In 1989, the Office of the Construction Official for Jersey City ("Construction Official") issued building permit number 89-0504 to DeMatteis/Waterview Associates for the construction of Portside West.

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 35, and denies them on that basis.

36.     The property owner, DeMatteis/Waterview Associates, took out the loan and obtained all approvals to build condominiums for sale.

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 36, and denies them on that basis.

37.     On August 25, 1992, the Construction Official issued a Certificate of Occupancy for Portside West ("West CO").

**ANSWER:** Admitted.

38.     Following the completion of construction and the issuance of the West CO, the then Property owner defaulted on their mortgage to Citibank.

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 38, and denies them on that basis.

39.    It was not until June of 1994, pursuant to Ordinance 94-062, two (2) years after completion of construction, that Citibank and Jersey City agreed that Portside West, originally constructed as a condominium project, and not as a multiple dwelling as defined in the Act, would be used for rental apartments.

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 39, and denies them on that basis.

40.    Following a foreclosure on the Property by Citibank, on November 23, 1994, the Hudson County Sheriff issued a Sheriff's Deed transferring the Property to Portside Apartments Urban Renewal Partners, LP.

**ANSWER:** Admitted that on November 23, 1994, Portside Apartments Urban Renewal Partners, L.P., acquired Portside West in a foreclosure sale.

41.    By letter dated November 23, 1994, nearly two (2) years and two (2) months after the issuance of the West CO for Portside West, Portside Apartments Urban Renewal Partners, LP sent a letter to the Construction Official stating that pursuant to N.J.S.A. § 2A:42-84.4, Portside Apartments Urban Renewal Partners, LP considered Portside West to be exempt from the Ordinance.  This letter cited N.J.S.A. § 2A:42-84.4 as the basis for the exemption claim. This belated correspondence, occurring long after the completion of construction, significantly deviated from the statutory requirements for filing a timely exemption claim under the Act, which explicitly requires the original owner of a newly constructed multiple dwelling, to file such a claim at least 30 days prior to the issuance of a certificate of occupancy.

**ANSWER:** Admitted that on November 23, 1994, Portside Apartments Urban Renewal Partners, L.P. sent a letter to the Construction Official, claiming that Portside West was exempt from rent control pursuant to N.J.S.A. § 2A:42-84.1 *et seq*. Portside denies that this occurred "two (2) years and two (2) months after the issuance of the West CO for Portside West," because a Certificate of Continued Occupancy was issued for Portside West on January 24, 1995. Portside denies the averments of the second and third sentences of Paragraph 41.

42.    On January 24, 1995, the Construction Official issued a Certificate of Continued Occupancy for Portside West. It is crucial to note that this document differs significantly from a Certificate of Occupancy. A Certificate of Continued Occupancy is issued for an already

23

constructed building, not for new construction as stipulated by N.J.S.A. 2A:42-84.1.a. This further underscores the inapplicability of the exemption claim to Portside West.

**ANSWER:** Portside admits the averments in the first sentence of Paragraph 42. Portside denies the averments in the second, third, and fourth sentences of Paragraph 42.

43.     Upon information and belief, at some point after acquiring title to the Property on November 23, 1994, but prior to 1996, Portside Apartments Urban Renewal Partners, LP changed the ownership entity of the Property to Portside Apartments Urban Renewal Company, L.L.C., without recording a deed for such change in ownership.

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 43, and denies them on that basis.

44.     On or about July 18, 1996, Portside Apartments Urban Renewal Company, LLC entered into a mortgage on the Property with Fleet Bank, N.A. for Sixteen Million Five Hundred Thousand Dollars ($16,500,000.00) ("Fleet Mortgage").

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 44, and denies them on that basis.

45.     On the same day, July 18, 1996, Portside Apartments Urban Renewal Company, LLC, entered into a mortgage on the Property with The Northwest Mutual Life Insurance Company for Twenty-two Million Five Hundred Thousand Dollars ($22,500,000.00) ("Northwestern Mutual Mortgage").

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 45, and denies them on that basis.

46.     Both the Fleet Mortgage and the Northwestern Mutual Mortgage had an amortization period ending in July of 2006.

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 46, and denies them on that basis.

47.     In July of 1996, Portside Apartments Urban Renewal Company, LLC began construction of Portside East, the second of the Buildings, pursuant to Building Permit numbered 89-0504, which was the same permit number issued for Portside West.

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 47, and denies them on that basis.

48.     The Certificate of Occupancy for Portside East was issued on December 31, 1997 ("East CO").

**ANSWER:** Admitted.

49.     The owner at the time, Portside Apartments Urban Renewal Company, LLC, did not file a claim of exemption with the Construction Official. Indeed, it is undisputed that Portside Apartments Urban Renewal Company, LLC failed to send any letter to the Construction Official claiming an exemption for Portside East, as required by N.J.S.A. § 2A:42-84.4, prior to the issuance of the certificate of occupancy for such property.

**ANSWER:** Portside denies the averments in Paragraph 49 as phrased, including because

Portside was not required to file a claim of exemption as a prerequisite to a rent increase. The

averments in Paragraph 49 also assert a legal conclusion, and Portside also denies them on that

basis. Portside further reasserts its allegations in its Amended Complaint that the then-City

Construction Code Official, Michael Regan, did not accept Portside's predecessor's notice in

November 1994, stating "Please be advised that the Office of Construction Official has no

jurisdiction over rent controls and I would suggest that you contact the proper agency charged with

that responsibility." *See* Am. Compl. ¶¶ 50-51.

50.     On or about June 10, 1998, both the Fleet Bank Mortgage and the Northwestern Mutual Mortgage were satisfied of record and discharged.

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the

averments in Paragraph 50, and denies them on that basis.

51.     Thereafter, by deed dated June 11, 1998, Portside Apartments Urban Renewal Company, LLC transferred the Property for One Hundred Dollars ($100.00) to the current owner, Portside.

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the

averments in Paragraph 51, and denies them on that basis.

52.     On June 11, 1998, the same day that Portside assumed ownership of the Property, Portside took out a new mortgage on the Property for Fifty-eight Million Five Hundred Thousand Dollars ($58,500,000.00) with Northwestern Mutual Life Insurance Company (the "New Mortgage").

25

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 52, and denies them on that basis.

53.     The amortization period of the New Mortgage was until July 1, 2008 and the New Mortgage was discharged on July 9, 2008.

**ANSWER:** Portside lacks sufficient information to form a belief as to the truth of the averments in Paragraph 53, and denies them on that basis.

54.     Throughout their operation and ownership of the Buildings, Plaintiffs failed to abide by the Ordinance and Act.

**ANSWER:** Denied.

55.     Throughout their operation and ownership of the Buildings, Plaintiffs failed to abide by the New Jersey statute governing an exemption from those provisions of the Ordinance which limit the periodic or regular increases in base rentals of dwelling units.

**ANSWER:** Denied.

56.     Throughout their operation and ownership of the Buildings, Plaintiffs failed to file rent rolls with the City pursuant to the requirements of Chapter 260-3(H) and Chapter 260-9(E) of the Ordinance, which is a prerequisite for any increases in rent.

**ANSWER:** Portside denies the averments in Paragraph 56 as phrased, including because Portside was not required to file rent roles as a prerequisite to a rent increase. The averments in Paragraph 56 also assert a legal conclusion, and Portside also denies them on that basis.

57.     Throughout their operation and ownership of the Buildings, Plaintiffs failed to provide any tenant with the landlord certificate of registration required by N.J.S.A. § 46:8-28 and Chapter 260-3(J) of the Ordinance, which is a prerequisite for any increases in rent.

**ANSWER:** Portside denies the averments in Paragraph 57 as phrased, including because the provision of a certificate was not a prerequisite to a rent increase. The averments in Paragraph 57 also assert a legal conclusion, and Portside also denies them on that basis.

58.     Throughout their operation and ownership of the Buildings, Plaintiffs have failed to comply with Chapter 260-2(F)(1)(g) of the Ordinance by providing each tenant with a list of the base monthly rents of each housing space, by apartment or room number, within the dwelling . . .”

**ANSWER:** Denied. The averments in Paragraph 58 also assert a legal conclusion, and Portside also denies them on that basis, including because the provision of such a list was not a prerequisite to a rent increase.

59.     Throughout their operation and ownership of the Buildings, Plaintiffs have failed to comply with Chapter 260-2(G) of the Ordinance by failing to post the landlord registration statement at all times in the lobby, hallway or other conspicuous place within the dwelling, which is a landlord identity disclosure prerequisite for any increases in rent per 260-3(J).

**ANSWER:** Denied. The averments in Paragraph 59 also assert a legal conclusion, and Portside also denies them on that basis.

60.     Throughout their operation and ownership of the Buildings, Plaintiffs have failed to file with the Bureau of Rent Leveling (the "Bureau"), between January 1 and March 3 of each calendar year, a new landlord registration statement for each dwelling owned, as required by Chapter 260-2(F)(2) of the Ordinance.

**ANSWER:** Portside denies the averments in Paragraph 60 as phrased including because Portside was not required to file registration statements as a prerequisite to a rent increase. The averments in Paragraph 60 also assert a legal conclusion, and Portside also denies them on that basis.

61.     Throughout their operation and ownership of the Buildings, Plaintiffs have failed to inform occupants and tenants in writing, within 30 days, if any information contained in the landlord registration statement changes, in violation of Chapter 260-2(G), which is a landlord identity disclosure prerequisite for any increases in rent per 260-3(J).

**ANSWER:** Portside denies the averments in Paragraph 61 as phrased, including because Portside was not required to provide such notice as a prerequisite to a rent increase. The averments in Paragraph 61 also assert a legal conclusion, and Portside also denies them on that basis.

62.     Throughout their operation and ownership of the Buildings, Plaintiffs have failed to correct the posted information on the landlord registration statement within seven days after any change, in violation of Chapter 260-2(G) of the Ordinance), which is a landlord identity disclosure prerequisite for any increases in rent per 260-3(J).

**ANSWER:** Portside denies the averments in Paragraph 62 as phrased, including because Portside was not required to correct posted information with seven days of a change as a

27

prerequisite to a rent increase. The averments in Paragraph 62 also assert a legal conclusion, and

Portside also denies them on that basis.

63.    Plaintiffs engaged in a systematic pattern of fraudulent concealment designed to prevent tenants from discovering their rights under applicable rent control laws. This pattern included:

      a.    Providing false or misleading information in lease agreements;

      b.    Omitting required disclosures about rent control status;

      c.    Misrepresenting the basis for rent increases;

      d.    Submitting false statements to government agencies; and,

      e.    Using complex pricing algorithms to obscure the true nature of rent calculations.

**ANSWER:** Denied.

64.    These actions were not mere oversight but part of a calculated strategy to conceal tenants' rights and the true legal status of the properties.

**ANSWER:** Denied.

65.    Throughout their operation and ownership of the Buildings, Plaintiffs have improperly increased rents for the tenants of the Buildings (a) when they had no authority to do so as they had failed to satisfy various filing and notice requirements set forth under the Ordinance, or (b) which exceeded the rent increases allowed by the Ordinance even if they had complied with said filing and notice requirements.

**ANSWER:** Denied.

66.    Throughout their operation and ownership of the Buildings, Plaintiffs have increased rents in contravention of the provisions of Chapter 260-3(H) and (J) of the Ordinance. These illegal rent increases further demonstrate Portside and Equity's disregard for the Ordinance and tenant rights.

**ANSWER:** Denied.

67.    Throughout their operation and ownership of the Buildings, Plaintiffs have failed to supply new tenants, within the first 10 days of the new tenant's tenancy, with the name of and rent paid by all tenants who occupied the apartment rented by the new tenant during the prior 12 months, in violation of Chapter 260-3(D) and 260-3(I) of the Ordinance.

28

**ANSWER:** Portside denies the averments in Paragraph 67 as phrased, including because Portside was not required to provide such information as a prerequisite to a rent increase. The averments in Paragraph 67 also assert a legal conclusion, and Portside also denies them on that basis.

68.     Upon information and belief, Plaintiffs utilized pricing software provided by RealPage, Inc. to set and adjust rents. This software facilitates the sharing of competitively sensitive information among property owners and managers, effectively coordinating pricing decisions.

**ANSWER:** Portside admits that it uses RealPage's Revenue Management Software product LRO as part of its process for independently setting prices of its rental units, and denies any averments in the first sentence of Paragraph 68 inconsistent therewith. Portside denies the averments in the second sentence of Paragraph 68.

69.     The use of this algorithm, combined with Plaintiffs' systematic violation of rent control laws, allowed for artificial inflation of rents above both legal limits and competitive market rates, constituting a potential per se violation of federal and state antitrust law.

**ANSWER:** Denied.

70.     Throughout their operation and ownership of the Buildings, Plaintiffs have charged new tenants rent in excess of that allowed by Chapter 260, without the authority to do so.

**ANSWER:** Denied.

71.     On December 16, 2021, Plaintiffs submitted a Landlord Registration Statement to Jersey City authorities, certifying that all 527 units in the Buildings were subject to rent control. This certification was consistent with a June 5, 2020 registration for 155 Washington Street, which also acknowledged the Buildings' rent-controlled status.

**ANSWER:** Portside admits that it submitted the documents referenced within Paragraph 71, yet asserts that such documents were sent in error, as all parties understood that Portside Towers were exempt from rent control.

72.     On December 29, 2021, the Jersey City Bureau of Rent Leveling responded to Plaintiffs' certification with a "Notice of Incomplete 2021 Landlord Registration.". In complete alignment with the status of the Buildings as subject to rent control, the city's notice included a rent control enforcement notification: "Notwithstanding the rejection of the Registration as

29

incomplete, this Office will review the rents set forth in the Registration that has been signed and certified by the Landlord as accurate, and in the event there are rents that this Office deems are in violation of the JC Mun. Code Chapter 260 -- Rent Control, the Landlord and any affected tenants will be sent a Rent Leveling Administrator Preliminary Determination regarding such rents."

**ANSWER:** Portside admits that it received a Notice of Incomplete 2021 Landlord Registration on December 29, 2021 after Portside inquired with the City how to complete the Landlord Registration online instead of via paper submission. Portside denies that Portside Towers' "status" was "subject to rent control." The remaining averments in Paragraph 72 purport to quote from or characterize the Notice of Incomplete 2021 Landlord Registration, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith. The remaining averments in Paragraph 72 also assert a legal conclusion, and Portside also denies them on that basis.

73.     Consistent with their previous certification and the city's enforcement notice, Defendants, on January 31, 2022, submitted another Landlord Registration Statement again certifying that the Buildings were subject to rent control.

**ANSWER:** Portside admits that it submitted the documents referenced within Paragraph 73, yet asserts that such documents were sent in error, as all parties understood that Portside Towers were exempt from rent control.

74.     Despite their repeated acknowledgments of the Buildings' rent-controlled status, Plaintiffs later attempted to claim exemption from rent control. On September 19, 2022, the Bureau definitively determined that 100 Warren and 155 Washington were not newly constructed in a redevelopment zone. Nevertheless, in a 2023 registration for 155 Washington Street, Plaintiffs falsely claimed exemption based on "New Construction - 25+ units in a Redevelopment Area," directly contradicting the Bureau's determination and their own earlier admissions. This false statement, made under penalty of perjury, appears to be a deliberate attempt to circumvent rent control regulations, despite the fact that no exemption claim was ever filed by either of the Buildings respective original owner. These conflicting statements were made by high-ranking executives including First Vice President at EQR, James von Albade and Vice President, Investments at EQR, Wayne Ngai.

**ANSWER:** Portside denies that Portside Towers' status was "rent-controlled" and admits that it has claimed an exemption from rent control, and denies any averments in the first and third

sentences of Paragraph 74 that are inconsistent therewith. The second sentence of Paragraph 74

purports to quote from or characterize the Bureau's September 19, 2022 determination, to which

Portside respectfully refers the Court for its complete and accurate contents, and denies any

allegations inconsistent therewith. Portside further denies that the Bureau's determination

regarding the redevelopment zone was "definitive." Portside denies the remaining averments in

Paragraph 74.

75.    These events demonstrate that both Plaintiffs and city authorities understood and acknowledged the Buildings' rent-controlled status months before Defendant-Intervenors filed their first petition claiming illegal rent on May 31, 2022.

**ANSWER:** Denied.

76.    Despite these repeated admissions and the city's enforcement notice, Plaintiffs continued to charge rents in excess of legal limits and made knowingly improper representations to tenants that the subject properties were exempt from rent control.

**ANSWER:** Denied.

77.    In or around 2020 and 2022, various City officials confirmed to inquiring tenants of the Buildings that the rent control laws applied to both Portside West and Portside East. However, in or around early 2022, tenants from both Buildings received various rent increases, many exceeding the 4% maximum permitted by the City's rent control ordinance (when prerequisite authorization requirements are met), with some increases soaring as high as 60%.

**ANSWER:** Portside lacks knowledge or information sufficient to form a belief as to the

truth of the averments in the first sentence of Paragraph 77, and denies them on that basis. Portside

denies the averments in the second sentence of Paragraph 77.

78.    These increases prompted some tenants to submit inquiries with the City's Rent Control Office as to whether they were subject to rent control. In a response email, the Rent Leveling Administrator advised that Portside West was indeed subject to rent control. In 2020, via a "see-click-fix" inquiry, Tenants learned that Portside East was also subject to rent control.

**ANSWER:** Portside lacks knowledge or information sufficient to form a belief as to the

truth of the averments in Paragraph 78, and denies them on that basis.

79.    Accordingly, tenants from both Portside West and Portside East filed illegal rent petitions with the Bureau which, pursuant to Chapter 260-7(G) of the Ordinance, were submitted

31

on behalf of all other tenants. Tenants of Portside East filed their petitions on or about May 31, 2022, and tenants of Portside West filed their petitions on or about June 25, 2022. Through their filings, the tenants claimed their rents were being illegally raised by their landlord. The filing was subsequently recognized by the Bureau. The property owner subsequently filed oppositions to the illegal rent petitions.

**ANSWER:** Admitted.

80. Thereafter, on or around September 19, 2022, the Rent Leveling Administrator, through the Bureau, in an about-face manner from her prior written statement that the Buildings were, in fact, subject to rent control, issued a determination that they were exempt from rent control, in accordance with N.J.S.A. § 2A:42-84.1 et seq. There was no mention of her prior opinion, or that she was now reversing it.

**ANSWER:** Admitted that on September 19, 2022, the Rent Leveling Administrator issued a determination that Portside Towers were exempt from rent control, in accordance with N.J.S.A. § 2A:42-84.1 *et seq*. To the extent the averments in Paragraph 80 purport to characterize the Rent Leveling Administrator's September 19, 2022 determination, Portside respectfully refers the Court thereto for its complete and accurate contents, and denies any allegations inconsistent therewith.

81. Thus, pursuant to the procedures afforded under the Ordinance (which, in addition to allowing petitions challenging illegal rents to be filed with the Bureau, also allows tenants to appeal Bureau determinations to the RLB), these tenants appealed the Rent Leveling Administrator's determination. These tenants filed their legal argument on February 7, 2023, the property owner filed its response on March 3, 2023, and the tenants filed their reply on March 24, 2023.

**ANSWER:** To the extent the averments in Paragraph 81 purport to quote from or characterize the Ordinance, Portside respectfully refers the Court thereto for its complete and accurate contents, and denies any allegations inconsistent therewith. Portside otherwise admits the averments in Paragraph 81.

82. After receiving the parties' submissions, the RLB held a hearing on May 31, 2023, where it heard arguments from the parties. Although separate appeals for the Buildings were filed, the RLB consolidated both matters. After the hearing, and at the suggestion of the RLB, the parties agreed to take part in mediation. The mediation, however, was unsuccessful, and the parties consequently returned to the RLB for a determination as to the illegal rent increases.

**ANSWER:** Admitted except Portside denies the rent increases were illegal.

83.     The RLB convened on October 19, 2023, and issued a pivotal decision declaring that the respective, original property owners of both Buildings failed to comply with the requirements of N.J.S.A. 2A:42-84.1 et seq., concluding that the Buildings had always been subject to rent control, were not exempt, and that the Buildings were in violation of applicable law (the "RLB Decision").

**ANSWER:** Admitted that the RLB convened on October 19, 2023 and issued a ruling that Portside Towers are not exempt from rent control. To the extent the averments in Paragraph 83 purport to quote from or characterize the RLB Decision, Portside respectfully refers the Court thereto for its complete and accurate contents, and denies any allegations inconsistent therewith.

84.     As to Portside West, the RLB found that the Ordinance requires that the building owner file for the exemption "at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling" and that based on the issuance of the certificate of occupancy on August 25, 1992, the owner did not timely avail itself of the exemption. See id. at p. 8.

**ANSWER:** The averments in Paragraph 84 purport to quote from or characterize the RLB Decision, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

85.     As to Portside East, the RLB held that the property owner was "clearly aware" of the requirement to file an exemption letter prior to the issuance of a certificate of occupancy, which is a "mandatory condition precedent" and "[t]here is no dispute that as it relates to [Portside East] that the record is devoid of any evidence of compliance with the notice requirement." Id.

**ANSWER:** The averments in Paragraph 85 purport to quote from or characterize the RLB Decision, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

86.     In concluding its analysis of this issue, the RLB stated that "[w]ith only speculation and conjecture as to whether the Property Owner has ever provided the required notice, the Board finds that the Property Owner has not fulfilled its obligation to provide notice under the Statute and, therefore, the units at 155 Washington are not exempt from the City's rent control ordinance." Id.

**ANSWER:** The averments in Paragraph 86 purport to quote from or characterize the RLB Decision, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

87.     The RLB thus concluded that "due to the failure by the Property Owner and its predecessor to comply with the notice requirement in N.J.S.A. § 2A:42-84.4, both buildings and all units therein are and have been for the duration of their occupancies subject to rent control." Id. at p. 10 (emphasis added). Significantly, the RLB held that there was no valid exemption from the beginning of the occupancy of the units. Id.

**ANSWER:** The averments in Paragraph 87 purport to quote from or characterize the RLB Decision, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

88.     Despite the RLB's clear and unambiguous ruling, Plaintiffs have continued to violate the Act and Ordinance and disregard the rights of the Tenants by overcharging tenants rent in excess of the applicable rent control rate.

**ANSWER:** Denied.

89.     Intervenor-Defendants and all other Tenants of the Buildings since inception have been paying rents substantially above the applicable rent control rates that Plaintiffs should have been implementing.

**ANSWER:** Denied.

90.     Defendant-Intervenor Weller moved into unit 2102 at Portside East (155 Washington Street) in April 2021, initially paying a monthly base rent of $4,534. This initial rate was illegal as it did not conform to the legal base rent as defined in § 260-1 of the Ordinance, plus only those increases authorized under § 260-3. Per § 260-2(B), (C), and (D) of the Ordinance. Plaintiffs also failed to provide Weller with the contact information and rental rates of all prior tenants for the preceding 12 months, as required by § 260-3(D) of the Ordinance and did not serve the mandatory landlord identity statement required by § 260-3(J).

**ANSWER:** Portside admits the averments in the first sentence of Paragraph 90. Portside denies the remaining averments in Paragraph 90, including because they wrongly assert that the charged rents were illegal and that requirements applicable to rent controlled apartments applied to Mr. Weller's apartment. The remaining averments in Paragraph 90 also assert a legal conclusion, and Portside also denies them on that basis.

91.     Plaintiffs subsequently implemented additional unlawful increases to Weller's rent as follows: (i) Weller's rent from July 19, 2022 to July 18, 2023 increased to $6,102 per month; (ii) Weller's rent increased from July 19, 2023 to July 22, 2024 to $6,706 per month; and Weller's rent from July 23, 2024 to July 28, 2025 increased to $6,961 per month.

**ANSWER:** Portside denies the averments in Paragraph 91 as phrased, including because they wrongly assert that the charged rents were illegal. The averments in Paragraph 91 also assert a legal conclusion, and Portside also denies them on that basis.

92.     Defendant-Intervenor Brann has been a co-tenant with Weller in unit 2102 at Portside East since April 2021. Brann experienced the same initial illegal base rate and subsequent unlawful rent increases applicable to Weller.

**ANSWER:** Portside admits the averments in the first sentence of Paragraph 92. Portside denies the averments in the second sentence of Paragraph 92, including because they wrongly assert that the charged rents were illegal. The averments in Paragraph 92 also assert a legal conclusion, and Portside also denies them on that basis.

93.     Defendant-Intervenor Hirsch has resided in multiple units at Portside Towers since September 2019. For each tenancy, the initial rate was illegal as it did not conform to the legal base rent as defined in § 260-1 of the Ordinance. Plaintiffs failed to provide Hirsch with the required information on prior tenants' rents and contact details per § 260-3(D) and did not serve the mandatory landlord identity statement per § 260-3(J).

**ANSWER:** Portside admits the averments in the first sentence of Paragraph 93. Portside denies the remaining averments in Paragraph 93, including because they wrongly assert that the charged rents were illegal and presume that the rent control ordinance applied to Portside. The remaining averments Paragraph 93 also assert a legal conclusion, and Portside also denies them on that basis.

94.     Hirsch's rent history, all of which started from an illegal base rate, is as follows: (i) September 21, 2019 to September 22, 2020: $4,132 per month (unit 902, 100 Warren Street); (ii) September 23, 2020 to October 22, 2020: $4,215 per month (unit 902, 100 Warren Street); (iii) October 9, 2020 to June 19, 2021: $5,319 per month (unit 2305, 155 Washington Street); (iv) June 19, 2021 to June 13, 2022: $5,683 per month (unit 1807, 100 Warren Street); (vi) June 21, 2023- June 20, 2024: $6676 per month; and (vii) her current lease of June 21, 2024- June 20, 2025: $6903 per month. All rent increases suffered by Hirsch, whether for the same unit or a new unit, were illegal as they did not comply with § 260-3 of the Ordinance.

**ANSWER:** Portside admits the averments in the first sentence of Paragraph 94, except that for the years 2020 to 2021, Portside's records reflect the following leases: (i) September 23, 2020 to September 22, 2021: $4,215 per month (unit 902, 100 Warren Street); (ii) October 9, 2020 to October 11, 2021: $5,139 per month (unit 2305, 155 Washington Street). Portside denies the averments in the second sentence of Paragraph 94 as phrased, including because they wrongly assert that the charged rents were illegal. The averments in the second sentence of Paragraph 94 also assert a legal conclusion, and Portside also denies them on that basis.

95.    Defendant-Intervenor Rothfus has been a co-tenant with Hirsch in each of the same units at Portside Towers since September 2019. Rothfus experienced the same initial illegal base rate and subsequent unlawful rent increases applicable to Hirsch.

**ANSWER:** Portside admits the averments in the first sentence of Paragraph 95. Portside denies the averments in the second sentence of Paragraph 95, including because they wrongly assert that the charged rents were illegal and presume that the rent control ordinance applied to the apartment. The averments in the second sentence of Paragraph 95 also assert a legal conclusion, and Portside also denies them on that basis.

96.    The experiences of Weller, Brann, Hirsch, and Rothfus are typical of all current and former tenants of both Portside East and Portside West. All tenants have been subjected to unlawful rent increases from the very commencement of their tenancies, starting with illegal base rates that did not conform to § 260-1 of the Ordinance. Plaintiffs consistently failed to provide required disclosures about prior tenants' rents and contact information (§ 260-3(D)) and did not serve the mandatory landlord identity statement (§ 260-3(J)).

**ANSWER:** Denied.

97.    The rental rates for each of Weller, Brann, Hirsch, and Rothfus set forth herein represent only the base rent and do not include additional rent charges as defined in the applicable leases, such as late fees, returned item fees, parking and storage charges, utility bills, amenity fees, and other fees related to residency, which have further violated the rent control ordinance and increased the financial burden on tenants.

36

**ANSWER:** Portside denies the averments in Paragraph 97, including because they wrongly assert that the charged rents were illegal. The averments in Paragraph 97 also assert a legal conclusion, and Portside also denies them on that basis.

98.     The rent increases imposed on these Defendant-Intervenors, unlawful from the very start of each tenancy due to illegal base rates and compounded by subsequent increases, demonstrate a pattern of systematic and pervasive overcharging by Plaintiffs, in clear violation of applicable law. This pattern has affected all Tenants across both Buildings since the inception of their tenancies, resulting in significant financial hardship and, in some cases, even homelessness.

**ANSWER:** Denied.

99.     As per § 260-2(D) of the Ordinance, all these unauthorized increases are "null and void and such excess rent shall be refunded or credited by the landlord forthwith."

**ANSWER:** Denied.

100.     On August 7, 2024 the City issued the recalculations of rent for the Buildings, pursuant to what they allege, was the direction of the Board via its Determination.

**ANSWER:** Portside admits that on August 7, 2024, the City issued recalculations for Portside Towers, and that those recalculations followed the direction of the Board's unlawful decision that Portside Towers are retroactively subject to rent control. Portside denies the remaining averments in Paragraph 100.

101.     Notwithstanding that they do not look back far enough, there are several critical areas where the calculation methodology does not align with the Ordinance and the Board's determination. The discrepancies significantly impact the proper determination of legal rents and tenant refunds or credits.

**ANSWER:** Portside denies the averment in Paragraph 101 that the recalculations "do not look back far enough." Portside admits that there are certain areas in which the Bureau's recalculation did not align with the Ordinance, including the failure to hold Portside was entitled to the annual consumer price index permitted by the Ordinance and rewarding a rent credit where one would not be due under the Ordinance, which impacted the proper determination of "legal" rents and tenant refunds and credits. Portside also admits that there are certain areas in which the

37

Bureau's recalculation did not align with the Board's determination, including that the Bureau exceeded its mandate by ruling Portside was not entitled to any rent increases for years where the Bureau ruled Portside did not register the rent roll for Portside Towers with the City, even though the Board specifically "decline[d] to rule" on Portside's "allegedly misfiled or inaccurate rent registration statements filed with the Bureau," which also impacted the proper determination of legal rents and tenant refunds and credits. Portside otherwise denies the averments in Paragraph 101.

102.    Before a landlord can apply for a rent increase, which requires a base rent determination by the Bureau, the landlord is obligated to first satisfy various filing and tenant notice requirements.

**ANSWER:** The averments in Paragraph 102 assert a legal conclusion, and Portside denies them on that basis.

103.    Specifically, a rent increase is not permitted for years where the landlord is not compliant with the following provisions of the Ordinance:

   a.  §260-3(D) and §260-3(I): Requirements for providing tenant information

   b.  §260-3(H): Rent roll registration requirements for rent-controlled properties

   c.  §260-3(J): Compliance with Truth-in-Renting and <u>landlord identity disclosure requirements.</u>

**ANSWER:** The averments in Paragraph 103 assert a legal conclusion, and Portside denies them on that basis.

104.    In prior decisions,[2] the City properly followed its statutory mandates before allowing rent increases, therein recognizing the importance of §260-3(J) and §260-3(D), stating:

> "On May 17, 2019, Dinah Hendon, the director of the Office of Landlord/Tenant Relations, sent a letter to plaintiff explaining that its VCIA was deficient for failing to include the required Truth-In- Renting Statement. She explained that, as a prerequisite to applying for this rent increase, MC §260-3(J) provides: 'The

---

[2] <u>Apple Blossom Holdings, LLC v. The City of Jersey City Rent Leveling Board</u>, No. A-2465-20, (App. Div. May. 9, 2022).

landlord shall provide to each tenant a copy of the Truth-In-Renting Statement and . . . **be in full compliance with the landlord identity disclosure provision contained within the statement in order to qualify for rental increase**.' [Emphasis added.]

The written memorandum noted the fact that plaintiff did not provide Turcich with a writing of 'the name of and rent paid by all tenants who occupied the apartment rented by the new tenant during the prior [twelve] months,' **as required by MC §260-3(D)...**" [Emphasis added.] *Id.* at page 8.

**ANSWER:** Portside denies that the City "properly followed its statutory mandates before allowing rent increases" in prior decisions, "therein recognizing the importance of §260-3(J) and §260-3(D)." The remaining averments in Paragraph 104 purport to quote from or characterize *Apple Blossom Holdings, LLC v. The City of Jersey City Rent Leveling Board*, No. A-2465-20 (App. Div. May 9, 2022), to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

105. In affirming the trial court's decision to uphold the Rent Board's determination, the Appellate Division in Apple Blossom Holdings found that:

[T]he judge considered the fact that plaintiff was originally missing the Truth-In-Renting-Statement, **which was not some "ruse[,]" but "a legal prerequisite [that] was missing**." She ultimately concluded that the Board's decision was not arbitrary, capricious, or unreasonable because plaintiff's proofs were not sufficient. We discern no basis to disturb the judge's decision dismissing plaintiff's complaint. [Emphasis added.]

**ANSWER:** The averments in Paragraph 105 purport to quote from or characterize *Apple Blossom Holdings, LLC v. The City of Jersey City Rent Leveling Board*, No. A-2465-20 (App. Div. May 9, 2022), to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

106. The ordinance specifically provides recourse for tenants in §260-3I:

"If the landlord does not inform or misinforms the tenant concerning the rent paid by the prior tenants or in any manner

39

illegally increases the tenant's rent, the Rent Leveling Bureau shall then accept, hear and adjudicate a compliance of an **<u>illegal increase.</u>"**

**<u>ANSWER:</u>** The averments in Paragraph 106 purport to quote from or characterize the Ordinance, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

107.    Here, Plaintiff has continuously violated this section of the ordinance and is not entitled to increases in rent.

**<u>ANSWER:</u>** Denied.

108.    The Bureau's calculation overlooks significant deficiencies in the Plaintiffs' rent roll submissions from 2021 to 2024. The 2021 Landlord Registration Statement was not submitted until December 16, 2021, well past the March 3rd deadline. Moreover, as per §260-9(E), this registration was not "deemed filed" as it was incomplete. The City's December 29, 2021, response on its 'Notice of Incomplete 2021 Landlord Registration' document stated:

> "This office is in receipt of the 2021 Landlord Registration Statement (the "Registration") in connection with the Property set forth above. Please be advised that this Registration is incomplete. All questions must be answered in full. If information is unknown or not applicable, indicate same. **<u>The Registration submitted cannot be filed</u>** because of the following errors and/or omissions:" [Emphasis added.]

**<u>ANSWER:</u>** Portside denies the averments in the first three sentences of Paragraph 108. The remaining averments in Paragraph 108 purport to quote from or characterize the City's December 29, 2021 response referenced therein, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

109.    Furthermore, in 2022, the same incomplete registration (the incomplete, non-compliant list of rates) was re-filed without any updates or new information. It is inconceivable that the same incomplete document, submitted twice, could satisfy the registration requirements for either year, let alone both years, especially when the Bureau had already rejected it. This repeated failure to properly register disqualifies the landlord from any rent increases for these periods.

**<u>ANSWER:</u>** Portside states that the allegations of Paragraph 109 consist of legal conclusions and characterizations and denies them on that basis.

110.     Again, in 2023, a document was submitted after the deadline again missing most of the required information, as set forth infra.

**ANSWER:** Portside states that the allegations of Paragraph 110 consist of legal conclusions and characterizations and denies them on that basis.

111.     And again, in 2024, Plaintiffs' failed to timely file for both 100 Warren and 155 Washington and filed no rent information for 100 Warren. Despite the foregoing timeliness violations, the bottom line is that Plaintiffs failed to file any rent roll from 1998 to the present in compliance with 260-9(E).

**ANSWER:** Portside states that the allegations of Paragraph 111 consist of legal conclusions and characterizations and denies them on that basis.

112.     In addition to acquiescing in the direct ordinance violations, the Bureau creates a term to justify its process, to wit, "Permitted Base Rent". There is no such term in the Ordinance. The November 3, 2023, determination from the Rent Leveling Board is to conduct a six-year "look back" to determine the damages owed due to overcharges. The Base rent is the legal rent charged or actually received, as clearly established in the Ordinance.

**ANSWER:** The averments in Paragraph 112 assert a legal conclusion, and Portside denies them on that basis.

113.     By utilizing the leases from 2016, the Bureau could not determine the Base Rent, since the leases from 2016 charged a rent in violation of the Ordinance, as Plaintiffs had never followed the prerequisites for a rent increase. The Bureau therefore creates the term "Permitted Base Rent", to justify the rents provided in its calculations. This approach directly contradicts the Board's previous rulings and the Ordinance itself.

**ANSWER:** Portside states that the allegations of Paragraph 113 consist of legal conclusions and characterizations and denies them on that basis. The averments in Paragraph 113 also purport to quote from or characterize the Bureau's August 7, 2024 Recalculations, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

114.     The Bureau's creation and use of "Permitted Base Rent" appears to be an attempt to allow for increases that were foregone or not properly implemented in prior years, which is explicitly prohibited by the Board's previous rulings and the Ordinance.

41

**ANSWER:** The averments in Paragraph 114 purport to quote from or characterize the Bureau's August 7, 2024 Recalculations, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith. The averments in Paragraph 114 also assert a legal conclusion, and Portside also denies them on that basis.

115.    In light of these precedents, it is clear that the rents calculated using the "Permitted Base Rent" concept cannot be considered the legal Base Rent as defined by the Ordinance and interpreted by the Board in previous cases.

**ANSWER:** The averments in Paragraph 115 assert a legal conclusion, and Portside denies them on that basis.

116.    The recalculation letter attempts to exclude various fees from the definition of rent, contradicting both the ordinance and the lease agreements. This mischaracterization artificially lowers the apparent rent, potentially allowing for unauthorized increases. The ordinance provides a definition for Rent:

> **"RENT"**—Any price for the use of a housing space. It includes any charge, **no matter how set forth**, paid by the tenant for the use of **any service** in connection with the housing space." (§260-1)

**ANSWER:** The averments in the first sentence of Paragraph 116 purport to quote from or characterize the Bureau's August 7, 2024 Recalculations to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith. The averments in the first and second sentences of Paragraph 116 also assert a legal conclusion, and Portside also denies them on that basis. The averments of the third sentence of Paragraph 116 purport to quote from or characterize the Ordinance, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

117.    The Tenants' Lease Agreements provide, as follows:

> "Rent: You agree to pay the amount shown in the Total Monthly Rent section of the Term Sheet and all **additional rent** (described below), in advance and without demand, on or before the first day of each calendar month. **All fees and charges related to your residency, including, but not limited to, late charges, returned**

**item fees, parking and storage charges and utility bills that are payable to us or to our utilities billing vendor, parking fees, amenity fees, attorney fees, court costs, lock out fees, pet fees, annual security deposit increases (if any), and replenishment of security deposit balances (if any), <u>are additional rent</u>. <u>Total</u> <u>Monthly Rent and additional rent are, together, referred to in</u> <u>this Lease as rent</u>, and all rent is subject to an enforcement action if not received in a timely manner.**" [Emphasis added]

**ANSWER:** The averments in Paragraph 117 purport to quote from or characterize the Tenants' Lease Agreement, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

118.    The Bureau's mischaracterization is another violation of the Ordinance which requires correction.

**ANSWER:** The averments in Paragraph 118 assert a legal conclusion, and Portside denies them on that basis.

119.    While the Board, in its November 3, 2023 decision, directed the Bureau to determine the rents six years back, it did not direct the Bureau to utilize leases from 2016. The Board directed the Bureau "to adjust the rents for all units in each building to comply with the City's rent control regulations going back six years from the date for the first petition for each building."

**ANSWER:** The averments in Paragraph 119 purport to quote from or characterize the Board's November 3 decision, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith

120.    In order to adjust the rents, the Board instructed the Bureau "to obtain the records necessary to review and adjust the rent on all units within the buildings dating back six years from the filing of the first Illegal Rent Petition at issue in the instant matters for each building."

**ANSWER:** The averments in Paragraph 120 purport to quote from or characterize the Board's November 3 decision, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

121.    The determination of what the rent was to be 6 years prior, was "to comply with the City's rent control regulations going back six years". The landlord was not legally authorized

to raise the rents. The Bureau must therefore use the best evidence, in light of the regulations, to determine what the rent was 6 years ago. That best evidence is the 10k filing by the landlord in 1998. The rent therefore must be carried forward from that date, granting any permitted increases. Since there was no compliance by Plaintiffs, there are no permitted increases, and the base rent is based on the 10k.

**ANSWER:** Portside states that the allegations of Paragraph 121 consist of legal conclusions and characterizations and denies them on that basis.

122.    There is no evidence that the City ever promulgated a policy establishing the use of a six-year lookback period for legal base rent.

**ANSWER:** Portside lacks knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 122, and denies them on that basis.

123.    The determination of the legal base rent is not subject to any temporal limitation and tenant has an unconditional right to refunds for excess rent. Specifically, §260-2(D) of the Jersey City Municipal Code states:

> "Any rent increase imposed after January 11, 1973, the date of expiration of federal rent controls, to the extent that such increase is in excess of that which is permitted by this chapter, is hereby declared to be null and void and such excess rent shall be refunded or credited by the landlord forthwith."

**ANSWER:** Portside denies the averments in the first sentence of Paragraph 123. The averments in the first sentence of Paragraph 123 also assert a legal conclusion, and Portside also denies them on that basis. The averments of the second sentence of Paragraph 123 purport to quote from or characterize the Jersey City Municipal Code, to which Portside respectfully refers the Court for its complete and accurate contents, and denies any allegations inconsistent therewith.

124.    This reasoning, coupled with the explicit language of §260-2(D), underscores why the determination of the legal base rent must not be artificially constrained by time limitations. To do so would contravene the clear intent of the ordinance and potentially allow landlords to retain benefits they had no legal right to receive, directly contradicting the ordinance's mandate for immediate refunds or credits of excess rent.

**ANSWER:** Denied.

125.    Therefore, while the Board's November, 2023 ruling, which directed the Bureau to look back six years for the purpose of calculating damages, that limitation does not apply to the

44

determination of the legal base rent itself. The legal base rent must be established from the earliest point at which a violation of the ordinance occurred, which in this case certainly predates 2016.

**ANSWER:** Denied. The averments in Paragraph 125 also assert a legal conclusion, and

Portside also denies them on that basis.

126. Moreover, Plaintiffs' actions constitute a continuing violation, with each month's excessive rent representing a new violation of the rent control laws.

**ANSWER:** Denied.

127. Finally, the Bureau has left several apartments out of its calculation. Specifically, units W-0320, W-0710, W-0909, and W-1011 from the 100 Warren building are missing from the recalculation. These omissions need to be addressed to ensure a comprehensive and accurate recalculation for all affected units.

**ANSWER:** Admitted.

128. At a minimum, based on the failures to comply with §260-3(D), (H), (I), and (J), all rent increases were unlawful.

**ANSWER:** Denied.

## CROSSCLAIMS

### CROSSCLAIM – COUNT ONE
**(Tenants' Prerogative Writ Against the Board, Bureau and City)**
**(The 6 Year <u>Look</u> Back Period)**

129. Intervenors repeat and re-allege each of the foregoing allegations as though set forth herein verbatim.

**ANSWER:** Portside repeats and reasserts its prior responses to all paragraphs as if set forth

herein.

130. While the Intervenors agree with the Board Decision indicating that the Buildings are not exempt from rent control, the Board's decision to implement a six-year "lookback window" for illegal rent petitions is arbitrary, capricious, and unreasonable and contrary to law. Limiting the recalculation of rents to a six-year period is in violation of the Ordinance. equity and fails to account for the continuous nature of the violations and Plaintiffs' fraudulent concealment of the Buildings' true rent-controlled status.

**ANSWER:** Portside admits that the Board's decision was arbitrary, capricious,

unreasonable, and contrary to law and the Ordinance for the reasons set forth in its Amended

Complaint, including because the lookback window should have been limited to two years (*see* Am. Compl. ¶¶ 167(i), 171(g)), and denies any averments in Paragraph 130 that are inconsistent therewith.

131.   The Board's reliance on a purported policy of a six-year "lookback window", ostensibly based on "practicality", record-keeping limitations, and equitable considerations, is fundamentally flawed, arbitrary, and capricious for the following reasons:

i.   There is no support for this position in the Ordinance. The Ordinance provides no statutory basis for such a limitation, and the Board lacks the authority to impose extra-statutory restrictions that effectively nullify the Ordinance's provisions.

ii.   The record contains clear evidence as to what the rent was in 1998. It is not necessary for the Bureau to randomly guess at the rent. Plaintiffs, in filing its 1999, Securities Exchange Commission 10K, provides an average rent of $1.73 a square foot. This documented evidence renders the Board's concerns about record-keeping limitations moot and underscores the arbitrary nature of the six- year limitation.

iii.   Plaintiffs' failure to comply with the Ordinance's registration and disclosure requirements since 1998 precludes them from realizing the benefit of any legal rent increases. The base rent should be calculated from 1998, using the documented $1.73 per square foot rate, with no subsequent increases permitted due to the property owner's ongoing non-compliance.

iv.   The Board failed to consider that under § 1-25(C) of the Jersey City Municipal Code, "any condition caused or permitted to exist in violation of any of the provisions of this Code or any ordinance shall be deemed to be a public nuisance and may be abated by the city as provided by law, and each day that such condition continues shall be regarded as a new and separate offense." This provision further emphasizes the ongoing nature of the violations and the inapplicability of a fixed limitation period.

v.   The Board overlooked the explicit language of §260-2(D) of the Jersey City Municipal Code, which mandates that any excess rent "shall be refunded or credited by the landlord forthwith," suggesting no time limitation on refunds for excess rent. Furthermore, this provision explicitly states that any rent increase imposed after January 11, 1973, to the extent that such increase exceeds what is permitted by the chapter, "is hereby declared to be null and void." This language clearly invalidates any unauthorized rent increases, regardless of when they were imposed, further undermining the concept of a 6- year limitation period.

46

vi.    The Board failed to consider public policy implications. Given the remedial nature of rent control laws and Plaintiffs' alleged willful violations, strictly enforcing a 6-year limitation would be against public policy, would undermine the very purpose of rent control regulations, and would reward Plaintiffs for their non-compliance and fraudulent behavior.

vii.    The Board failed to consider the retroactive nature of the Ordinance as explicitly stated in § 260-15 (Provisions retroactive), which provides that "No landlord shall after the effective date of this chapter charge any rents in excess of what he or she was receiving from the effective date of this chapter except for increases as authorized by this chapter; nor shall such landlord charge any rents in excess of what he or she was receiving on January 11, 1973, if such excess is in excess of the rental which is authorized by this chapter." This provision clearly establishes that the Ordinance's restrictions on rent increases apply retroactively to January 11, 1973, further invalidating the concept of a 6- year limitation period.

**ANSWER:** Portside admits that the Board's decision was arbitrary, capricious, unreasonable, and contrary to law and the Ordinance for the reasons set forth in its Amended Complaint, including because the lookback window should have been limited to two years (*see* Am. Compl. ¶¶ 167(i), 171(g)), and denies any averments in Paragraph 131 that are inconsistent therewith.

## CROSSCLAIM - COUNT TWO
### (Prerogative Writ Against City, Bureau and Board) (August 7, 2024 Rent Recalculations and Ongoing Violations)

132.    Intervenors repeat and re-allege each of the foregoing allegations, as though set forth herein verbatim.

**ANSWER:** Portside repeats and reasserts its prior responses to all paragraphs as if set forth herein.

133.    The Board issued a determination finding that the Buildings were not exempt from the Ordinance. This determination conclusively establishes that the Buildings have been subject to rent control since their construction, as neither original owner filed a timely claim for exemption as required by the Act. This finding underscores the continuous nature of the violations.

47

**ANSWER:** Portside admits that the Board unlawfully and baselessly found that Portside Towers are not exempt from the Ordinance. *See generally* Am. Compl. Portside denies the averment in the second and third sentences of Paragraph 133.

134.    The Bureau's August 7, 2024 rent recalculations are arbitrary, capricious unlawful and erroneous, as they fail to account for the property owner's longstanding non-compliance with the Ordinance, including but not limited to Plaintiffs failure to meet numerous filing and notice requirements as enumerated under the Act (as amended) and the Ordinance. Portside and Equity have failed to follow the requirements of the Ordinance since the inception of their ownership in 1998 and continue to fail to follow the requirements of the Ordinance, which would enable them to realize a legal increase in rent.

**ANSWER:** Portside states that the allegations of Paragraph 134 consist of legal conclusions and characterizations and denies them on that basis.  Portside admits that the Bureau's August 7, 2024 rent recalculations were arbitrary, capricious, unlawful, and erroneous for the reasons set forth in its Amended Complaint, and denies any averments in Paragraph 134 that are inconsistent therewith.

## COUNTERCLAIMS

### COUNTERCLAIM - COUNT ONE
(Against Portside and Equity)

135.    Intervenors repeat and re-allege each of the foregoing allegations, as though set forth herein verbatim.

**ANSWER:** Portside repeats and reasserts its prior responses to all paragraphs as if set forth herein.

136.    The Board issued a determination finding that the Buildings have always been subject to rent control. This determination conclusively establishes that the Buildings have been subject to rent control since their construction, as neither original owner filed a timely claim for exemption as required by the Act.

**ANSWER:** Subject to its motion to stay, Portside answers as follows: Portside admits that the Board unlawfully and baselessly found that Portside Towers are not exempt from the

48

Ordinance. *See generally* Am. Compl. Portside states that the remaining allegations of Paragraph 136 consist of legal conclusions and characterizations and denies them on that basis.

137.    Portside and Equity have failed to follow the requirements of the Ordinance since the inception of their ownership in 1998 and continue to fail to follow the requirements of the Ordinance, which would enable them to realize a legal increase in rent. This ongoing non-compliance constitutes a continuing violation, with each day representing a separate offense under § 1-25 of the Jersey City Municipal Code.

**ANSWER:** Subject to its motion to stay, Portside states that the allegations of Paragraph 137 consist of legal conclusions and characterizations and denies them on that basis.

138.    This ongoing non-compliance includes, but is not limited to, failure to register rent rolls, failure to provide required tenant notifications, and failure to adhere to rent increase limitations as mandated by §§ 260-3(H), 260-3(D), 260-3(I), 260-3(J), 260-2(F)(2), and 260-9(E) of the Ordinance. These violations have persisted despite Portside and Equity's knowledge of the Buildings' rent-controlled status, as evidenced by their 2021 and 2022 Landlord Registration Statements.

**ANSWER:** Subject to its motion to stay, Portside states that the allegations of Paragraph 138 consist of legal conclusions and characterizations and denies them on that basis.

139.    Portside and Equity have continued to charge rents in excess of those permitted under the Ordinance, even after the Board's determination that the Buildings have always been subject to rent control. The unauthorized, substantial and unlawful increases in rent imposed by Portside and Equity have caused some tenants among the Defendant-Intervenors to lose their homes or placed many others at risk of being displaced. The outrageous actions of Portside and Equity have caused Defendant-Intervenors to undergo economic harm and great pain and suffering, including but not limited to emotional distress.

**ANSWER:** Subject to its motion to stay, Portside states that the allegations of Paragraph 139 consist of legal conclusions and characterizations and denies them on that basis.

140.    Portside and Equity have intentionally, recklessly or in a grossly negligent manner failed to follow the requirements of the Truth in Renting Statement, specifically the Landlord Identity Disclosure requirement, set forth in §260-3J, by refusing to include the Landlord Identity Disclosure statements in the Tenants' leases or by conspicuously posting the Landlord Identity Disclosure statements.

**ANSWER:** Subject to its motion to stay, Portside states that the allegations of Paragraph 140 consist of legal conclusions and characterizations and denies them on that basis.

49

**WHEREFORE**, Intervenor-Defendants seek an order as follows:

a. Restraining Portside and Equity from charging rents in excess of those permitted under the Ordinance;

b. Directing Portside and Equity to comply with all the Ordinance's rent control provisions;

c. Directing Portside and Equity to comply with the recalculation of rents for the Buildings consistent with the Ordinance;

d. Directing Portside and Equity to provide copies of lease agreements for the units at the properties (100 Warren Street and 155 Washington Street) dating to the inception of tenancy at each Building, to facilitate the recalculation of the allowable base rates, based on a recalculation period commencing as of the first occupancy at the Buildings;

e. Directing Portside and Equity to immediately cease all practices that artificially increase so-called market-based rental rates using pricing algorithms.

f. Awarding Defendant-Intervenors compensatory and punitive damages for economic harm associated with or in any way arising from Portside and/or Equity's imposition of rental rates in violation of the Board's November 3, 2023 Ruling, including not limited to Defendant-Intervenors' attorneys' fees and costs.

g. Awarding Defendant-Intervenors compensatory and punitive damages for bodily injuries suffered by the individual tenants.

h. Any such other and further relief as the Court may deem just and proper.

**ANSWER:** These are not allegations to which any answer is required. The prayers for relief in subparts (e)-(g) are legally and factually baseless, improper, and are subject to a motion to dismiss/strike. Portside otherwise denies that Intervenor-Defendants are entitled

50

to the relief sought in this Paragraph. The parties also have agreed to stay prayers (e) through (h) during the pendency of the resolution of the Prerogative Writ and Related Claims.

## **RESERVATION OF RIGHTS**

Intervenor-Defendants reserve the right to amend their Answer, crossclaims and/or counterclaims, and to further plead any other defenses applicable to any and all counts and/or pursue any available counterclaims against Plaintiffs after a reasonable opportunity for discovery. Further, nothing stated in any of the Intervenor Defendants' affirmative defenses constitutes a concession that Intervenor Defendants bear any burden of proof on any issue on which they would not otherwise bear such a burden.

WHEREFORE, Intervenor Defendants deny that Plaintiffs are entitled to judgment or other relief of any kind and pray for judgment as follows:

a. That the Court enter a judgment dismissing Plaintiffs' Amended Complaint in its entirety and with prejudice;

b. That judgment be entered in favor of Intervenor Defendants and against the City, Board, Bureau, Portside and Equity on Intervenor Defendants' crossclaims and counterclaims, awarding Intervenor-Defendants their costs, disbursements, and reasonable attorneys' fees and expenses incurred in connection with this action, including pre and post-judgment interest; and,

c. Any such other and further relief as the Court may deem just and proper.

**ANSWER:** This is not an allegation to which any answer is required; Portside otherwise refers to the Federal Rules of Civil Procedure and Orders of this Court, which control the purported "reservation of rights" set forth in this Paragraph.

51

## PLAINTIFFS' AFFIRMATIVE DEFENSES

### First Affirmative Defense

Defendant-Intervenors' claims are barred under the doctrine of unclean hands.

### Second Affirmative Defense

Defendant-Intervenors' claims are barred under the doctrine of estoppel because Defendant-Intervenors had knowledge of and benefited from Portside's exempt status for many years, including through Portside's improvements and investments into Portside Towers as a result of the Exemption.

### Third Affirmative Defense

Defendant-Intervenors lack standing to assert defenses on behalf of the Defendants which are not otherwise available for the Defendants to assert or which the Defendants have waived.

### Fourth Affirmative Defense

Defendant-Intervenors' claims are barred by the statute of limitations or other time bar, including to the extent they exceed the maximum allowable "lookback" period under Ordinance §§ 260-7(C) & (D).  In the alternative, Defendant-Intervenors' claims are barred to the extent they exceed the maximum allowable six-year "lookback" period asserted by the City.

Dated: October 29, 2024

The Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC

By: */s/ Derek D. Reed*

Derek D. Reed, Esq. (Attorney ID # 038062003)
Jeffrey Plaza, Esq.
EHRLICH, PETRIELLO, GUDIN, PLAZA & REED
A Professional Corporation
60 Park Place, Suite 1016
Newark, New Jersey 07102
(973) 643-0040

Terri L. Mascherin (pro hac vice)
Andrew W. Vail (pro hac vice)
Daniel J. Weiss (pro hac vice)
JENNER & BLOCK LLC
353 North Clark Street
Chicago, Illinois 60654
Phone: (312) 222-9350
Facsimile: (312) 840-7375

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Derek Reed, hereby certify that on the 29 day of October, 2024, I caused a true and correct copy of Plaintiffs' Answers to Defendant-Intervenors' Affirmative Defenses, Crossclaims and Counterclaims, as follows to be served electronically by emailing it to Defendant-Intervenors' counsel.


Dated: October 29, 2024                    */s/ Derek D. Reed*
                                           Derek D. Reed