UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

THE TOWERS AT PORTSIDE URBAN        .
RENEWAL COMPANY, L.L.C., et         .
al.,                                .
                                    . Case No. 23-cv-22291
        Plaintiffs,                 .
                                    . Newark, New Jersey
vs.                                 . March 14, 2025
                                    .
THE CITY OF JERSEY CITY, et         .
al.,                                .
                                    .
        Defendants.                 .


                      TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE JOSE R. ALMONTE
                 UNITED STATES MAGISTRATE


APPEARANCES (the parties appeared in person):

 For the Plaintiffs:    ANDREW VAIL, ESQ.
                        Jenner & Block
                        353 North Clark Street
                        Chicago, Illinois 60654
                        (312) 840-8688
                        Avail@jenner.com

                        LAUREN BENIGERI, ESQ.
                        Jenner & Block
                        1155 Avenue of the Americas
                        New York, New York 10036
                        (212) 407-1741
                        Lbenigeri@jenner.com




Audio Operator:

Transcription Service:    KING TRANSCRIPTION SERVICES, LLC
                          3 South Corporate Drive, Suite 203
                          Riverdale, NJ  07457
                          (973) 237-6080

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

(APPEARANCES continued)

For the Plaintiffs:    DEREK D. REED, ESQ.
                       MATTHEW A. SEBERA, ESQ.
                       Ehrlich, Petriello, Gudin Plaza & Reed
                       60 Park Place,
                       18th Floor
                       Newark, NJ 07102
                       (973) 643-0040
                       Dreed@epgprlaw.com
                       Msebera@epgprlaw.com


For the Defendants:    PHILIP S. ADELMAN, ESQ.
                       JOHN MCKINNEY, ESQ.
                       Assistant Corporation Counsel
                       Jersey City Law Department
                       City Hall - 280 Grove Street
                       Jersey City, New Jersey 07302
                       (201) 547-4810


For the Defendant      MOLLIE HARTMAN LUSTIG
Intervenors            MOHAMED HEGAZI
Portside Towers        McLaughlin & Stern
East Tenant            1 Elm Street
Association, et        Suite 2
al.:                   Westfield, New Jersey 07090
                       (212) 448-1100
                       Mlustig@mclaughlinstern.com
                       MHegazi@mclaughlinstern.com

                       ERIC NEMETH, ESQ.
                       Eric J. Nemeth PC
                       55 Madison Avenue, Suite 400
                       Morristown, NJ 07960
                       (973) 539-2122
                       Enemeth@ejcounsel.com

                       NEIL MAROTTA, ESQ.
                       Marotta & Garvey
                       3916 Bergenline Avenue, Suite 2200
                       Union City, New Jersey 07087
                       (201) 552-9200
                       Marotta.garvey@gmail.com

|Hearing
|23-cv-22291, March 14, 2025

(Commencement of proceedings at 2:35 p.m.)

THE COURT:  Good afternoon.  We're on the record in the Towers at Portside Urban Renewal Company LLC versus the City of Jersey City, et al., Docket Number 23-22291.

May I have the appearance, starting with the plaintiff, please.

MR. VAIL:  Yes, Your Honor.  Good afternoon. Andrew Vail and Lauren Benigeri from Jenner & Block on behalf of the plaintiff.

MR. REED:  Good afternoon, Your Honor.  Derek Reed and Mr. Matthew Sebera, Ehrlich, Petriello, Gudin, Plaza & Reed, on behalf of plaintiff.

THE COURT:  Good afternoon to all of you.

And for Jersey City?

MR. ADELMAN:  Good afternoon, Your Honor.  Philip Adelman, Assistant Corporation Counsel, on behalf of the City of the Jersey City and the Rent Leveling Board.

THE COURT:  Good afternoon.

MR. MCKINNEY:  John McKinney, First Assistant Corporation Counsel, City of Jersey City, on behalf of the City.

THE COURT:  And for the defendants intervenor.

MS. HARTMAN LUSTIG:  Good afternoon, Your Honor. Towers at Portside Urban Renewal Company Hartman Lustig of

McLaughlin & Stern on behalf of the defendant intervenors, along with Mohamed Hegazi.

And, Co-Counsel, I'll allow you to introduce yourself.

MR. NEMETH:  Thank you very much.

Thank Your Honor.  Eric Nemeth, Eric J. Nemeth PC, on behalf of the Tenant Associations East and West.

Thank you.

THE COURT:  Good afternoon.

MR. MAROTTA:  Good afternoon, Your Honor.  Neil Marotta from Marotta & Garvey.  We have the Tenant Associations East and West as well.

THE COURT:  And good afternoon.

Okay.  So we're here for a discovery dispute hearing.  But before diving into the actual issues, I do think it's important that I place some factual background on the record so that the disputes are placed in proper context.

So the Towers at Portside Urban Renewal Company LLC and Equity Residential Management LLC -- collectively, I will refer to these entities as "Portside" -- brought suit against defendants, the City of Jersey City; the City of Jersey City Rent Leveling Board, or the "Board"; and the City of Jersey City Bureau of Rent Leveling, or the "Bureau" -- collectively I will refer to these defendants as "the City defendants."

Portside alleges that after nearly 30 years of

protection against Jersey City's rent control scheme, the Board wrongfully decided that Portside was no longer entitled to the State's rent control exemption statute codified under NJSA § 2A:42-84.4.  I will refer to this as the "exemption statute."

And so, among other causes of action here, the plaintiff is bringing a claim in lieu of a prerogative writ, asserting that the Board was incorrect as a matter of law and that it acted in an arbitrary and capricious manner.

The following facts, I think, are important.  The Towers here, the Portside Towers, were constructed in the 1990s.  The first being completed in 1992 and the second being completed in 1997.  A predecessor to Portside acquired one of the towers in a foreclosure sale on December 1, 1994, and that same day the predecessor sent a notice of exemption from rent control to Jersey City's construction code official, Michael Regan, as required to be exempt from rent control under the exemption statute.

Regan did not accept the notice and on December 6th, 1994, wrote the predecessor back telling them that they did not contact the proper agency.

But Portside maintains that he was the proper official to which the notice was required to be sent.

Jersey City issued the Tower on 155 Washington Street its certificate of occupancy, on December 31, 1997.

The City was able to locate a 1994 notice letter for the Tower at 101, but neither party has located a letter of exemption for 155 Washington, which is the second tower.

Portside also claims it is exempt from rent control pursuant to the redevelopment exemption in the City's rent control scheme. And the redevelopment exemption allows for exemption from rent control for "newly constructed dwelling" within certain "redevelopment areas."

Specifically in 1999, the City Council for Jersey City adopted the Tidewater Redevelopment Plan "to provide for comprehensive redevelopment within the Tidewater Basin Redevelopment Plan Area."

Portside claims the redevelopment plan specifically discusses and identifies Portside Towers as being within "Portside District" of the plan.

Since the late 1990s, the Portside Towers have been treated as rent-exempt by all relevant parties in Jersey City. During this time, Portside claims that the City received a financial benefit from Portside's exemption from rent control via fees Portside paid pursuant to the Payment in Lieu of Taxes, or what's called the "PILOT program," P-I-L-O-T.

Portside's status as exempt from rent control came under questioning in June 2022. That's when Portside's tenants began filing petitions seeking rent control be

applied to the Portside Towers.

On September 19, 2022, the Bureau affirmed Portside's status as exempt from rent control, in part because Portside sent tenants a "rent control addendum," and because Portside provided the City sufficient notice of its exemption from rent control prior to obtaining its certificate of occupancy as required by the exemption statute.

But, notably, the Bureau found that Portside Towers did not qualify for an exemption as a, quote, new redevelopment, despite its inclusion within the Tidewater Basin Redevelopment Plan, because the towers were constructed and occupied before the redevelopment plan was adopted in 1999 and was, therefore, not a, quote/unquote, new construction.

Tenants appealed the Bureau's decision to the Board.  And on November 3rd, 2023, the Board issued its written decision, after conducting various hearings and considering written submissions.  The Board concluded that there was no valid exemption from the beginning of the occupancy of the units and revoked Portside's status as exempt from rent control.

The Board also went on to issue rent recalculations, applying a lookback window beginning in 2016.

Following the Board's decision, Portside began this

action on November 23rd, 2023.  And on April 1, 2024, after the City defendants had answered and discovery had begun, Portside Towers East Tenant Association, Portside Towers West Tenant Association, and tenants Kevin Weller, Jessica Brann, Joel Rothfus -- R-o-t-h-f-u-s -- and Michele Hirsch, collectively "the Tenants," moved to intervene in this suit. And on July 31, 2024, Judge Arleo allowed the Tenants to join this suit as defendants.

On August 8, 2024, I held a status conference to determine the scope of discovery and new deadlines in light of the Tenants joining the suit.  The parties agreed to limit to discovery to "issues relating to the prerogative writ claims before this Court."  That's at ECF Number 62.

On September 3rd, 2024, Portside filed their amended complaint.

And on September 23rd, 2024, the Tenants answered the amended complaint and brought their own suit, which is a counterclaim against Portside and cross-claims against defendants.

In their cross-claim, Tenants seek a prerogative writ against the City defendants, alleging the six-year lookback period and the rent recalculation adopted by the Board on August 7, 2024.

And then on October 29, 2024, the City defendants filed their answer to the amended complaint and the Tenants'

|Hearing
|23-cv-22291, March 14, 2025

cross-claim.

Finally, on October 31, 2024, the parties filed a proposed third amended pretrial scheduling order, which the Court so-ordered.

And after initially failing to resolve various discovery disputes, the parties wrote a status letter at ECF 94, noting that they had resolved the issues.

Then at the status conference on January 7, 2025, there were still outstanding disputes between the parties specifically related to whether Portside's discovery were outside the scope of the prerogative writ claim.

The Court ordered the parties to continue their efforts to meet and confer. But on January 31, the parties filed a joint letter raising its discovery disputes that I will now address. And I will also address the letter that is dated March 6th, 2025.

I know I said a lot, but I wanted to make sure that I was thorough and that I understood the factual allegations here and the procedural history to date.

But I wanted to give you an opportunity to let me know whether there is anything that I got that was inaccurate or anything that I missed that you think, from a factual allegations perspective, is important, before I move on to the legal standard and eventually to the issues.

So, Mr. Vail?

MR. VAIL:  Your Honor, I believe that was an excellent summary.  I believe you hit on all of the points.

The only point that I believe may not have been hit on as part of our allegations in our complaint are, first, that Ms. Hendon got it right when she found us to be exempt, which the Board overturned.

But, additionally, we say that even if this Court were to find that for one or both Towers, that there hadn't been strict compliance, that New Jersey law is very clear that there can be -- that there can be substantial compliance.

And so that is part of our allegations.  And there is a five-factor test under New Jersey law.  And so some of the discovery that we seek is relevant to the Court's determination of whether there was substantial compliance, which is a fact-based determination, Your Honor.

THE COURT:  Okay.  And we will get to the substantial compliance component.

Mr. Adelman.

MR. ADELMAN:  I think Your Honor's summary was more than sufficient and adequate.  We appreciate it.

THE COURT:  Thank you.

Ms. Hartman Lustig.

MS. HARTMAN LUSTIG:  Your Honor, you got it right.

THE COURT:  Okay.  So let me focus on the legal

standard, because it is important for everyone to understand the lens through which I am looking at the legal dispute here.

So Rule 26 provides that, in federal civil litigation, discovery may be obtained regarding any, quote, nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.  That comes from Rule 26(b)(1).

It is axiomatic that, under the rule, all relevant material is discoverable unless an applicable evidentiary privilege is asserted.  That comes from the case Pearson v. Miller.  The citation is 211 F.3d 57, page 65 (3d Cir. 2000).

In addition to relevance, Rule 26 requires the Court to consider the requested discovery's proportionality, which expressly includes, among other things, "the importance of the discovery in resolving the issues," and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Again, that comes from Rule 26(b)(1).

The rule authorizes the Court, for good cause shown, to issue an order limiting discovery or forbidding inquiry into certain matters "to protect the party or person from annoyance, embarrassment, oppression, or undue burden or expenses."  That comes from Rule 26(c).

During the course of this litigation, the parties agreed to limit discovery to focus on the prerogative writ

|Hearing
|23-cv-22291, March 14, 2025

and to stay the remaining claim, at least as to discovery. Therefore, relevant discovery will be related to Portside's prerogative writ claims and the Tenants' prerogative writ claims against the City defendant.

As it relates to that, the New Jersey constitution and New Jersey court rules allow parties dissatisfied with the decision of a municipal board to bring an action in lieu of a prerogative writ in New Jersey Superior Court to review the decision of the municipal board.  That comes from the case OM 309-311, 6th Street LLC v. City of Union City.  The citation is 2022 WL 855769 at *11 (D.N.J. March 23, 2022).

An action in lieu of a prerogative writ is the means by which a plaintiff can have a court review the action of the New Jersey municipality.  It's the same case at page 4.  Pursuant to a complaint in lieu of a prerogative writ, courts review the factual determinations of municipal boards for whether they were arbitrary, capricious, and unreasonable.  That comes from the case, Fallone Properties LLC v. Bethlehem Township Planning Board.  The citation is 369 N.J. Super. 552, page 560 (App. Div. 2004).

Under a prerogative writ, courts consider whether an agency erred in acting the way it did.  An agency's final determination decision will be affirmed unless it is arbitrary, capricious, unreasonable, or not supported by credible evidence in the record.

The relevant factors include, quote, whether an agency followed the law; number two, whether the record contains substantial evidence to support the finding on which the agency based its action; and, three, whether the agency clearly erred in reaching a conclusion that could not reasonably have been met.

That comes from the case -- I will spell it -- is Wyche v. Five Star Barber Shop. Citation is 2025 WL 337749 at page 3 (App. Div. January 30, 2025).

So this takes us to the disputes. As I said before, I received two letters from the parties. One is dated January 31. The other one is dated March 6th. The March 6th seems somewhat duplicative of the January 31 letter.

So I'm going to start with the March 31 [sic] letter and go in order, and we'll see how far we get today.

The first dispute, which is on page 1 of the January 31, 2025, letter, the City defendants allegedly reneged on commitments made to Portside and representations to the Court in which the City defendants committed to provide certain discoveries that they now refuse to provide, resulting in prejudice to Portside.

Notably, Portside believes all of the City defendants and the Tenants' position in this letter are prejudicial and unfair, given that Portside has responded to

all of the parties' discovery requests to this point.

I don't need oral argument on point Number 1 because it appears to me that this dispute is general in nature.  This dispute does not relate to any specific set of documents but, rather, Portside's, what appears to me, frustration that the City defendants reneged on their previous promise to produce requested documents.  So I will not address this dispute because it's broad in scope.  And, instead, what we're going to do is focus on the individual disputes.

So moving on to Dispute Number 2, defendants refuse to confirm their methodology for searching for documents responsive to Portside's requests for production.

So it's my understanding that Portside says that they asked the City defendants to confirm that Portside's discovery requests would include ESI review of custodians, documents, hard copies of documents, central file locations, and interviews with relevant custodians about additional information and potentially responsive documents.

Defendants have supposedly stonewalled Portside and refused to answer whether their discovery responses are met to any of these criteria.

As I understand the City's position is that it has general objections and don't address this specifically.  Instead, they say that the scope of the request is overly

broad specifically as to unrelated metadata, record retention, and Rent Board policies.

I'm going to compel the City defendants to disclose the search methodology that was used, Mr. Adelman.  This does not compel them to apply Portside's requested search terms but just making them show how they are finding the requested information.  What Portside is asking for is relevant to understand whether the City's search efforts have been reasonable.

Any questions?

MR. ADELMAN:  Your Honor.

THE COURT:  Any questions on that?

MR. ADELMAN:  Do you want me to respond or --

THE COURT:  I've made my decision, but I'm happy to hear if there is something that you would like to place on the record.

MR. ADELMAN:  I just want to make sure I understand.  We've conducted the search, as was requested, and provided responses in response to the search.  So --

THE COURT:  As I understood Mr. Vail's argument is that they needed to understand the methodology that you used to provide the answer.

Is that correct, Mr. Vail?

MR. VAIL:  That is correct, Your Honor, both for the electronic information, which they provided us some of

|Hearing
|23-cv-22291, March 14, 2025

that information, and some of it is adequate.

But we're also looking for what they did to identify nonelectronic information, given the historical nature of some of this case, and we haven't learned any of that.

THE COURT:  So, again, this is not an order to produce specific information -- specific documents but, rather, to show them how you derived at satisfying yourself that your research was reasonable.  Okay?

MR. ADELMAN:  Okay.  Thank you.

THE COURT:  You're welcome.

I also don't need oral argument as to Dispute Number 3.  Portside alleges that the City defendants are withholding at least 2,376 responsive documents.  Portside says that in a January 6th email and January 7 status conference of this year, the City defendants represented that they ran the search terms Portside requested and found 2,376 emails, which they also represented they would produce subject to a review of privilege.

Portside understands that these are internal communications about the Board's decision involving decision-makers and City officials.  The City defendant now refuses to produce the documents, seemingly relying on their general position here.

Portside seeks leave to file a brief on the

|Hearing
|23-cv-22291, March 14, 2025

importance of these documents and why the City defendants should be required to produce them.

The only thing I have from the City is just a general objection.  But let me hear -- actually, I will require oral argument here.

So, Mr. Vail, help me understand the relevance of these documents.  And then I'll give Mr. Adelman an opportunity to chime in and let me know what the objection is to the production.

MR. VAIL:  Yes, Your Honor.  So my understanding is this is the second set of documents relating to communications specifically about this dispute and communications between City decision-makers and officials and the tenants, among others.

And so, Your Honor, my understanding is that -- and when we first engaged in meet and confer with the City about their review of electronic documents, we were told that they had identified using search terms that they asked us to provide to them -- we did that -- that they had identified a certain number of -- a certain universe of documents.  And the first universe was their external communications -- so the communications with the tenants themselves, that they could, in their view, most easily review because likely would not involve privilege -- and provide those documents to us.

They did that.

THE COURT:  And I'm sorry to interrupt because I -- this was something that was not clear in the letter, and I want to make sure that I'm following.

Are these communications that happened before the decision was rendered by the City?

MR. VAIL:  Some of them, yes.  Some at the time.

And, Your Honor, some of them followed the -- here we have the Board decision on the alternate exemption question.  And then we have the Bureau calculations that came later, if you recall.  And the Tenants were communicating with the Board and the Bureau and the head of the agency, City Council members, all about this dispute during the time the decision was going to be made and after.  And they were presenting them from some of the things we've seen with arguments and new facts and things that aren't actually in the record, as you would call it.

So, for example, Mr. Weller would email Council members -- or Mr. Richardson -- and say, "You need to make sure you do this because of this fact, that fact.  I have talked to other legislatures [sic].  And if you don't do these things, we are going to make you the face of this dispute and news cameras are going to be at your office," and those types of communications.  So we have those.

But the City told us there's a second set now that they had already reviewed, identified, and are prepared to

produce, except for this set is the internal communications about these very same issues. And they wanted more time to review those, Your Honor, because they said those could involve privilege, which is fair and makes sense.

And that's when, if you recall at the last status hearing, Mr. McKinney told Your Honor, "There is a set of documents, we've identified them, but we need" -- I believe he told you they needed some eight weeks -- some amount of time to review them and produce them.

And Your Honor gave them a little bit less than what they had asked for by way of extending the discovery schedule for this specific set we're talking about to be produced to us. He represented to the Court, only needs a privilege review; then it's going to come to us.

Sometime thereafter is when we were told by them that they refuse to engage in any more discovery whatsoever because it's their view that our case has no merit and their boss has told them that there will be no more discovery in this case.

So that's what -- where things have been left since January. We've had multiple meet and confers with them to see if their position would change. We've heard that their position will not change. They will not engage in any more discovery with us unless the Court orders them to.

So our understanding of these documents are they're

communications internally about this very decision, including communications that could involve the response views of the tenants, facts, other information that was outside the record that was considered and/or influenced the decision-makers. This is directly in line with our ability to bring our PW claim, whether this was arbitrary, capricious, and followed the law, and defend against their PW claim, which they're also asserting the Board got things wrong for different reasons.

So we're entitled to all this to understand what was considered by the decision-makers when making their respective decisions, Your Honor.

THE COURT:  Thank you, Mr. Vail.

I am not sure whether Mr. McKinney or Mr. Adelman is handling this one.

MR. ADELMAN:  Oh, we -- I want to -- we're both going to speak to it, especially because John has more information as to the technical aspect --

THE COURT:  And "John," you mean Mr. McKinney?

MR. ADELMAN:  I'm sorry?  Yeah, Mr. McKinney. Yeah.

THE COURT:  Okay.

MR. ADELMAN:  But I -- the main thing I want to point out before I defer to Mr. McKinney is that the complaint does not have one allegation whatsoever asserting

|Hearing
|23-cv-22291, March 14, 2025

that the Tenants interfered with the decision -- the Board's decision.

So given that, why do we need -- why does that even -- why is that relevant in this case whatsoever?  It wasn't part of the decision.  And there's no allegation that it was.

So we may have turned it over, but there's no allegation that it was part of the decision.  The decision is what's in the decision that was written in the record. That's the case.

But I'm going to let John talk about the search terms.

THE COURT:  Before you move on, and from what I understand the prerogative writ is generally left to what was considered before making their decision, isn't it possible that part of what was considered was conversations with some of the tenants?

MR. ADELMAN:  Like, I can't say that it's -- I suppose it's possible.

But, I mean, quite frankly, we're not aware of any. And I didn't want to go to this point, but Mr. Vail's client made -- had conversations with people in our -- had conversations with other City members regarding the same issue.  So it's possible -- I mean, if you want to go back and forth on this, we're going to go on forever.

THE COURT:  But, Mr. Vail, you can sit down.

MR. ADELMAN:  He may or may not be aware of them, but it's irrelevant.  That's why it's not being brought up.

But the point is, is that it's a prerogative writ. The decision is based upon the record and the submissions. The decision itself is self-explanatory.  The case law is clear that prerogative writs are based on the record below. The record below has been exchanged.  It's right here for Your Honor.

Beyond that, there's nothing else to show that any decision was influenced by anyone other than the record.  And any communications that says threats or "I may do this" or "I may do that," that is not reflected in any decision or any part of the record.

So in light of that, despite posturing that may have gone on between the Tenants -- and, quite frankly, Your Honor, there were -- I can't -- there are countless Council meetings where Tenants came and made multiple, multiple statements and complaints about the Rent Leveling Board and what should be done and what should not be done and what should be stopped and what the landlord was doing.

So if we're going to do this, we may as well as disclose all of the video records there.  They can go through that.  I mean, it's endless.

At the end of the day, this is the record.  And,

|Hearing
|23-cv-22291, March 14, 2025

you know, constituents can speak to members of the City and say whatever it is they wish, especially at the public meetings.

But, at the end of the day, the City's decision is based on the record, and that's what the Court is supposed to consider, and I say that with all respect.

THE COURT:  Mr. McKinney, was there anything else you wanted to add?

MR. MCKINNEY:  Yes, Your Honor.  I just wanted to clarify, in response to some of the statements that Mr. Vail made, the first search that I ran was when we received their initial discovery request.  It didn't provide us with any keywords.  It was just, they wanted communications between the Tenants and various City officials.

I did a broad search with the terms "Portside" and "rent control" on all the parties that they had identified. We produced for them, as he pointed out, the ones that were in between the public and City officials, roughly 57,000 pages of documents.

But once I did that, they said that the search terms I used weren't adequate, and they provided me with a set of Boolean search terms, which I -- was at my request. If that isn't good enough, give me a set of terms.

They're claiming that that limited the scope of the request.  But, in fact, it expanded it to about 87,000 pages

of documents that I was going to have to review.  And at that point, that's when I said I can't go forward in good faith on this anymore because the documents that you're seeking do not even pertain to the record that's in front of you that the Rent Leveling Board issued.

I had suggested at the time to give us a limited discovery request to poke holes in the factual record that the Rent Leveling Board had relied upon to reach its decision, and they refused to do that.

So that's why we are here today.

MR. ADELMAN:  Judge, can I make one more point, if you don't mind?

THE COURT:  Sure.  Go ahead.

MR. VAIL:  The last thing I want to just say is -- and the law is clear -- municipal actions enjoy a presumption of validity.  Thus, a challenge to the validity of a municipal ordinance or action must overcome the presumption of invalidity, which is a heavy burden.  And that's Bryant v. Atlantic City, 309 N.J. Super. 596.

So, yes, there may be --

THE COURT:  But isn't that a summary judgment argument?

MR. ADELMAN:  No.  No.

THE COURT:  So how does it relate to discovery?

MR. ADELMAN:  That applies to prerogative writ

actions.  That --

THE COURT:  No, no.  I understand.

But my point is, is --

(Simultaneous conversation)

MR. ADELMAN:  My point is is that --

(Simultaneous conversation)

THE COURT:  -- is that relating to discovery in this case?

MR. ADELMAN:  Yes, because -- let me explain why -- because they are suggesting that the decisions made by the Rent Board were influenced by various people, various Board members, by threats.  Maybe the decision is not what it should be because threats were made, whatever it was.

But the bottom line is, is that the decision is presumed to be valid.  And that's all I'm trying to say as far as this goes.

THE COURT:  Mr. Vail?

MR. VAIL:  Thank you, Your Honor.

I think you just heard, in essence, our concern. They're saying they decided the case.  The decision is valid. We don't get any discovery into it.

That is not the law, Your Honor.

And I want to address two points he made.  First, he said we don't have any allegations relating to the influence of the Tenants.  That's completely wrong.  Our

entire case, Your Honor, is that the Rent Board got this wrong as a matter of law and fact because of the political pressure and threats the Tenants were placing on them.  That is what this whole case is about.  That is exactly why we think they got it wrong.

Second, Your Honor, we call it a political decision by political appointees that we believe that's what happened here.

Second thing, he said these communications, they're not relevant.

Well, they're clearly relevant given that's our claim, Your Honor.

But let me do even better than that.  They both asked us for all of our communications with the City about this issue.  You heard him say, "We have those communications."  He asked for them.  They asked for them. We produced them all.

So they asked us for the communications with the City.  We produced them.  We asked them for the communications in the City.  The City promised us they would give them to us back in December.  Otherwise, this could have been teed up then for resolution.  But they told us and they told you that they would do this, and then they backtracked on it, Your Honor.

THE COURT:  Let me ask you a question, Mr. Vail.

So if the Rent Control Board makes a decision because of, as you put it, political pressures from the Tenants, is that information relevant to determine whether or not their decision was ultimately arbitrary and capricious and unreasonable?

MR. VAIL:  Yes, I think exactly so, Your Honor.

THE COURT:  Why?

MR. VAIL:  So, for example, let's say that what happened here was, despite the actual law and the facts that come out our way, as Ms. Hendon said, that the Board disregarded all of that because they wanted to make a decision that insulated them from political pressure or threats or whatever the Tenants were saying to them.

So, thus far, we have the emails with the Tenants where they are making those threats to them.

What we don't have now is how the decision-makers reacted to those threats, what they talked about to one another.  "Hey, Decision-Maker 2, shouldn't we all come to a decision that is favorable for the Tenants so we don't have to deal with this anymore?"

Your Honor, that is the definition of arbitrary and capricious.  They disregard the facts, they disregard the law, and they made a decision for other reasons.  That is exactly our case here, Your Honor.

THE COURT:  All right.  So, look, I'm going to

find -- I'm going to rule that how the decision was made is going to be important to determine whether or not plaintiff will be able to ultimately satisfy the burden of showing that the decision was arbitrary and capricious or unreasonable.

So, Mr. Adelman and Mr. McKinney, review these documents as soon as possible.  It sounds to me that there's some internal communications.  To the extent that some of the information is privileged, then you need to produce a privilege log.

Now, I do think Mr. Vail is correct, that I had previously addressed this issue, not in broad -- well, in broad terms, not this specific issue.  I was under the impression that everyone was working on it.

So the question that I have is how much time do you need to review the 2,376 emails and either produce or assert a privilege?

MR. ADELMAN:  Well, Your Honor, I'm -- it might be 2300 emails, but the pages -- John can speak more to -- are, I think, in excess of 100,000.  So I'll let John speak to that because he did -- personally did the search.

THE COURT:  Does that include duplicate emails?

MR. MCKINNEY:  No.  There was 87,500 pages of emails that I was able to de-duplicate.  That was all original pages with an incredibly broad set of discovery terms, some of which are hinging on arguments that have

absolutely no basis.

For example, one of the -- one of the requests they put out was in regards to the Tidewater Basin Redevelopment Plan, which they said to you during one of our conferences they believe entitles them to an exemption from rent control in perpetuity.  If you read the City Code, it does say that developments that were made pursuant to a redevelopment plan are entitled to a rent control exemption in perpetuity.  However, the certificates of occupancy for their clients' properties were both issued before the redevelopment plan existed.  The redevelopment plan wasn't adopted until 1999.  So the exemption simply doesn't apply here.

So why do we need to dig through every document that we have about a redevelopment plan that simply wasn't in existence at the time?  These are the type of things that we were trying to hash out with them, where I say take a look at the record.  If you believe that there's factual points in the record that are wrong and influenced the Board's decision the wrong way, limit your discovery requests to those.  Don't give us gigantic, broad discovery requests that you want to see every communication from the constituents, the Council members, that reference a chapter of the City Code or rent control or just incredibly broad terms.

THE COURT:  So is there a way, Mr. Vail, to narrow this down?

I was not aware that it was roughly 100,000 pages. I was looking at this from 2,376 emails.

MR. VAIL:  Yes, Your Honor.  So if we recall, we did do that at their requests.  We sent them terms.  We offered to meet and confer repeatedly over this to try and get to that point months ago.  And I'm still willing to do that, Your Honor, but what we really want to do is get this case to the point of being done with discovery so we can get to summary judgment briefing.

So I'm willing to meet and confer.  Last time you told them to do that, they refused.  They told us, "We're not doing any more discovery."

We bent over backwards to give them search terms, and then we get nothing back.

So if they're saying it's too broad and he's identified certain terms that are making it too broad, I'm more than willing to hear that, not have them use that term, so that we can get the actual relevant materials, Your Honor.

THE COURT:  So the finding is this, that documents showing how decision-makers or what decision-makers considered before making the decision is relevant.

Figure out a way to narrow that search down.

MR. VAIL:  Could I ask for -- on that, Your Honor, I believe the communications from the Tenants about the dispute are relevant.  So --

THE COURT:  Why is that relevant, the communication with the -- I'm more concerned about the internal communications between --

MR. VAIL:  I agree.  We have -- so I'm saying the communications, where if an internal decision-maker says, "We're getting these calls, emails from the Tenants we should decide a certain way," that should be -- that should be part of this.

MR. ADELMAN:  Your Honor --

THE COURT:  Well, hold on.  Look, I don't want to engage in hypotheticals, because I don't have an email in front of me.

The order here is emails, documents that show the internal thought process of the decision-makers so that you can have your argument as to whether or not this was arbitrary and capricious.

If they had conversations from -- you know, from the Tenants, that's the case every single day where politicians or people in certain positions are going to be facing criticism and pressures from constituents about making a decision.  So I don't want to go down a rabbit hole where you end up with, you know, information that is not truly relevant here.

MR. VAIL:  I agree.  I do not want that either, Your Honor.

So what I'll do is commit to meet and confer with them immediately so that we can see if there can be agreed-upon terms based on what he's seeing and based on your order, Your Honor.  I'm more than glad to do that.  I want to get that done right away.

The only other point that I'd add, Your Honor, is -- because you heard some of it, and you mentioned it in some of your opening remarks -- the Tidewater Basin issue is centrally part of our complaint.  Just because they don't agree with it doesn't mean that we don't get discovery on it, Your Honor.

And to be clear, what the Tidewater Basin plan provided was newly constructed.  So there's a factual dispute about whether Portside, which had been constructed -- the second tower -- two years before would be considered newly or not.  They have a different view than we do.  But that's certainly relevant.

And, moreover, in the City's own documents, which he referenced in 1999 -- so after the towers are created -- they described them as within the Tidewater Basin and part of the Tidewater Basin plan.  So that is why we believe, Your Honor, that additional documents, to the extent they exist about Portside and the Tidewater Basin plan, are directly relevant to our claim that we also fall under that exemption.  And if that is true, then we have a perpetual

exemption from rent control, Your Honor.

MR. MCKINNEY:  Your Honor, this kind of goes back to what my colleague was referencing before, the decisions of the Rent Leveling Board and the prerogative writ motion are supposed to be given deference, as is our interpretation of our own code.

The exact language from § 260-1 of the Code for the exemption that they're referencing is "newly constructed dwellings with 24 more -- 25 or more dwelling units located within a redevelopment area as defined in N.J.S.A. 48:12-1, *et seq.,* for which the City Council has approved a redevelopment plan in accordance with N.J.S.A. 48:12-1, *et seq."*

There was no redevelopment plan approved at the time; so there is no way that these were ever newly constructed units built pursuant to that redevelopment plan.

It doesn't -- in that regard --

(Simultaneous conversation)

THE COURT:  When was the plan?

MR. ADELMAN:  1999.

THE COURT:  And the Towers, I think, it was '90 --

MR. MCKINNEY:  And we gave them a copy of that.

MR. VAIL:  The second tower was '97, Your Honor. Two years.  So --

(Simultaneous conversation)

THE COURT:  So two years before --

(Simultaneous conversation)

MR. MCKINNEY:  They were occupied before it was --

MR. ADELMAN:  Before.

THE COURT:  Hold on.  One at a time.

Two years before the redevelopment plan; right?

MR. MCKINNEY:  Correct.

MR. VAIL:  Correct.

So my argument, Your Honor, would be in a world where these buildings exist for a hundred or more years, two years is newly constructed.  When my house was built -- it's now 10 years old -- within the first two years, I still thought of it as newly constructed --

(Simultaneous conversation)

THE COURT:  But wait a minute.

So the building was constructed before the passage of this ordinance.

MR. VAIL:  Exactly.  And then the ordinance said -- the ordinance said, which he just read to you, "newly constructed will be considered part of this."

We would argue that --

THE COURT:  And how does the ordinance define "newly constructed"?

MR. VAIL:  It doesn't.  That's the problem.  And that's why we want discovery --

THE COURT:  But using sort of plain English definition, "newly constructed," and after the passage of the statute presumably means newly constructed after its passage, not newly constructed before the passage of the ordinance.

MR. VAIL:  The only -- in some contexts, Your Honor, but here's what I'd say.  So in 1999, when they put together this plan -- and I have the plan, that actual document -- they describe it as being part of it.  So why would have they have done that after the fact?

So in 1999 they called the Portside Tower as part of the basin.  We want to understand why and what else they considered to be newly constructed.  Do they always only consider the buildings after or have some been considered before?

"Newly constructed," in my world, two years could be newly constructed.

It didn't say "construction after this plan."  It could have said, "construction built after this plan."

It said, "newly constructed."

MR. MCKINNEY:  Your Honor, if I may.

THE COURT:  Go ahead.

MR. MCKINNEY:  Redevelopment plans are presented to the planning Board.  They have specific construction parameters within them block by block, sometimes lot by lot, on what bonuses you can get for building certain structures

in order to redevelop an area.  It is a very specific legal instrument.

The idea that buildings that were built before that redevelopment plan went into effect, which shows exactly what the City wanted to see built in the area, nothing built before that could be considered a newly constructed unit pursuant to a redevelopment plan.

THE COURT:  Mr. Vail, is there any provision in the 1999 redevelopment plan that says that it applies retroactively in any way?

MR. VAIL:  I would have to go back and see, Your Honor.  I can't answer that now.

But what I can tell you, again, is in their documents, they described Portside, and they described the number of units.  It's not like this is -- I'm suggesting this was some accidental sweep.  They're specifically referring to our tower in their documents.  I have --

THE COURT:  Which documents are you referring to? Because I'm --

MR. VAIL:  The Tidewater Basin plan.  I have a copy of it, Your Honor.

THE COURT:  Okay.  And the Tidewater Basin -- you know what?  Here's what we're going to do because it seems that this is a little more complicated than I initially anticipated.

I'm going to allow you to brief this issue and present me with exhibits so that I can think about this more carefully and issue a decision that is balanced, because right now, you know, some of what you're arguing to me is a little bit abstract, and I want to make sure that I consider the parties' arguments thoroughly.

MR. VAIL:  Thank you, Your Honor.

And, again, we only want discovery here.  We're not trying to argue that we win or lose.  We just want --

THE COURT:  No, no.  I understand.

But even in the context of discovery --

MR. VAIL:  When would you like us --

THE COURT:  -- I need to understand, you know -- it sounds to me that this ordinance was passed in 1999.  The buildings were constructed before then.  And I need to make sure that I understand how this new ordinance in any way impacts the discovery relating to the Tidewater Basin plan.

MR. VAIL:  When would you like -- I feel like we -- how would you like us to present --

THE COURT:  We will -- let's talk about that at the end.  Remind me, just in case I forget, because I want to make sure -- there may be other issues, and that may impact the scheduling.

MR. MCKINNEY:  Your Honor, in regards to the discovery relating to the actual Board decision, rather than

having us meet and confer multiple time and potentially continue to disagree, I'd like to proffer maybe we put something on the record now where the City would be amenable to doing searches for communications made directly to the members of the Rent Leveling Board from anyone.  We did include those in our searches initially, but if it's limited to that with the various search terms, the amount of communications are likely going to be significantly less, and we could address it from that.

THE COURT:  So this would be to and from --

MR. MCKINNEY:  Anyone on the Rent Leveling Board, regardless if they're a constituent or a City employee.

MR. VAIL:  Your Honor, actually as long as it's -- as long as it's "to," "from," "cc'd," so they're recipients, and it's the decision-makers.  So the Rent Leveling Board and the Bureau, because both of those bodies made decisions that are being challenged by both parties here.  And the administrator, Hendon and -- Ms. Hendon and Mr. Richardson, who are the overall heads of the agency, I would agree to his proffer, Your Honor.

THE COURT:  Mr. McKinney?

MR. MCKINNEY:  Your Honor, I would just state it's the Rent Leveling Board that makes the decision at the end. So whether it's communication coming from an administrator, it's coming from the director of the Bureau, or it's coming

from constituents, whatever they're concerned about, they will see those communications as to how they were being made to the Board for their consideration.

MR. VAIL:  My understanding -- and you can correct me if I'm wrong -- is that there's a board who made the rent exemption decision, and then there's a bureau who did the rent calculations, which both sides are challenging.

Is that fair?

MR. MCKINNEY:  The rent --

THE COURT:  It's the decision-maker that is at issue here.

MR. VAIL:  Right.  And my understanding is for the calculations, the Bureau made the decision is my understanding.

THE COURT:  Who made the decision for the calculations?

MR. ADELMAN:  Judge, I mean, the calculations are separate.  It's a separate issue.

MR. VAIL:  Well, it's being challenged by a -- they have a PW as to the calculations, as do we.

THE COURT:  Ms. Hartman Lustig, would you like to be heard?

MS. HARTMAN LUSTIG:  Thank you, Your Honor.  I've tried to be quiet.

I don't want to repeat anything that anybody said

|Hearing
|23-cv-22291, March 14, 2025

here.  But the Tidewater Basin issue is not our issue to argue.  It's the issue of the City here.

The issue of what's reasonable in this case, Your Honor read Rule 26 into the regard.  And I appreciate that because I was going to do it.

But there are federal cases that are directly on point to this sort of fishing expedition that's going on; right?  And Your Honor sort of intimated this to Mr. Vail: Do we need all of this extra information to make a decision as to whether or not that Board reached a decision based on the law and fact or whether or not it was arbitrary, capricious, or unreasonable?

And I'm going to submit to you that we've had hundreds of thousands of pages of documents, and at this point there is no smoking gun.  There is no document that points to communications, even between the Tenants and the Rent Leveling Board members.  Of course the communications everybody's talking about are constituents to Council people, elected officials; not the actual decision-makers.

And so it's frustrating to be up here because the Tenants, the Tenant intervenors have spent an inordinate number of hours, tens of thousands of dollars bringing in third-party discovery provider to move this case along, to get Portside the documents that they're requesting.

And so this looking to the City for communications

with the Tenants, I have not -- I don't know what that universe of documents is; so I can't sit there and compare them to what's already been produced.  But the Tenants have produced any and all communications they've had with any officials at Jersey City:  Rent Leveling Board members, Bureau employees, all the up to the Mayor's office.

And so, again, we're wasting time here because those communications, for the large majority, postdate the decision and relate to enforcing ordinance § 260 following the determination of the Board, which was never stayed.

And one of the things that, you know, I think we've met and conferred about and I think we can all agree on is that these recalculations are separate.  And perhaps the only item in this prerogative writ litigation that deserves a special treatment is -- are those recalculations.  It's a forensic bear, if you will, Your Honor.  It's a lot of figures.  We know that there are errors.  Portside's identified errors.  We've identified errors.  The City's identified errors, even after they issued them.  So that really is a separate issue.

You don't get to those recalculations, Your Honor, until you've made a determination on whether that prerogative writ -- whether or not that decision of the Rent Leveling Board was valid.

And so I submit to you that we need that first.  We

absolutely don't need all this additional documentation.  I am not speaking to the Tidewater Basin.

And I will hold off on our specific disputes because I know we've gone on a lot on Dispute Number 3, unless you want me to speak on those as well.

THE COURT:  No.  This was helpful --

MS. HARTMAN LUSTIG:  Thank you, Your Honor.

THE COURT:  -- to understand your perspective.

So, look, I'm going to limit Dispute Number 3 to information relating to the Rent Leveling Board at this time.  I do think Ms. Hartman Lustig is correct, that concerning the rent calculation, you first have to get through this issue of whether the prerogative -- whether the Board's decision was arbitrary and capricious.  And then, assuming that you're able to prove that, then we get to the issue of recalculation at a later time.

So you're not waiving this issue.  We're just tabling it in the event that this case continues.

MR. VAIL:  Your Honor, I don't have disagreement because, you know, in my world, if we win on that first issue, we don't need to deal with the second issue.

But to be clear, so we're all clear, the Tenants -- and we both, as part of our PW, have a claim about the Bureau's calculations.  So if we all agree today that we're bifurcating that claim, this makes sense.

|Hearing
|23-cv-22291, March 14, 2025

Absent that agreement, we're taking away the discovery on that claim.  And I'm standing here right now saying I'm willing to do that for all the reasons you just said.

THE COURT:  Is this an issue that either side or any of the sides are going to present to Judge Arleo, the recalculation?

MS. HARTMAN LUSTIG:  I am not sure where we ended up with that.

But I guess if the issue of a stay, potential evictions does go to Judge Arleo, then the recalculations may impact that.  If we are going with the undisturbed -- as of yet -- decision of the City and we're going to use those recalculations, then, yes, you know, to prove what the rent should have been at some specific time.

The concern, though, is that a determination being made on whether those numbers are accurate or not, I think that's really premature.

I agree with Mr. Vail --

MR. VAIL:  So let's just get to the -- for Your Honor, though, for the exact reasons --

THE COURT:  Wait.  I'm sorry.  Were you done speaking?

MS. HARTMAN LUSTIG:  I handed it over.  I apologize, Your Honor.

MR. VAIL:  I thought.  So for the exact reasons that my counsel identified, that it's still possibly part of the PW case, the calculations, that we should get discovery on those unless there's an agreement that it's not part of the case.  Otherwise, we can't be left to defend against their claim without any discovery.

And let me give you one real-life example of what's relevant here.

Here, again, after the decision was made and when they were deciding on how to do the calculations, there's a number of factors that we dispute, respectively.  How can they -- can they not calculate a year where they argue that our rent statement wasn't correct.

The Board said we're not going to decide that.

The Bureau said we are going to decide that and not include that in the calculations.

It's our understanding and view that, again, the Tenants, Mr. Weller, were sending emails, making communications, presenting facts and arguments to the Bureau as to why they needed to accept his view of how the recalculations were done.

So I think we have a very live dispute about how those calculation determinations were made and whether they were correct.

But, again, if everyone's willing to bifurcate and

say we can deal with that after we decide whether or not they should have even been calculating anything, I would agree. But if they won't take it off the table, we have to get discovery on it, Your Honor.

MS. HARTMAN LUSTIG:  Your Honor --

THE COURT:  Who wants to go first?

MS. HARTMAN LUSTIG:  I'll go first.

Your Honor, I am not suggesting that there be discovery on the recalculations.  The recalculations --

THE COURT:  But I think his -- Mr. Vail's point is, if this is going to be an issue that the parties are going to be arguing about -- to Judge Arleo about, the calculation of the rent -- and given our off-the-record conversation before, it sounds like it might be -- shouldn't there be discovery on that?

MS. HARTMAN LUSTIG:  No.

THE COURT:  Why not?

MS. HARTMAN LUSTIG:  Not at this point, at least. And I don't -- I think "discovery" is the wrong word.

There doesn't -- those are clerical -- not clerical.  They're calculations that were done after the rent levelling decision was handed down.  And so, ostensibly, they should follow that decision.

If there is -- if there are ways in which it did not follow the decision, then that's something.  This is a

matter of numbers.  This is a matter of sitting down with leases and rent registrations, the information that is provided in them over a course of years, and digging in.  There's no more discovery to be done on how those calculations were done.  Mr. Adelman can speak to that.  It was all hands on deck, which he told everybody throughout the entire litigation and leading up to the recalculations being issued, everybody in Jersey City was tasked with reviewing leases, plugging the numbers into a calculator.

This isn't a matter of law.  It's simply are the numbers right or are they wrong?

We don't get there until a determination is made on the decision.

And I agree with Mr. Vail that the issue should be bifurcated, but I do not agree that it would be because there needs to be further discovery on the recalculations.

THE COURT:  All right.

Mr. Adelman.

MR. ADELMAN:  I mean, to simplify this, the calculations is like being in third grade.  Like, show your work.  It's really what it comes down to.

But to simplify this even more, if this were a personal injury case, we decide liability first.  If there's no liability, why are we calculating damages?

(Simultaneous conversation)

MR. VAIL:  Again, I agree.

THE COURT:  Oh, I will tell you in a lot of cases, sometimes those two things go -- proceed in parallel to move the case along.

MR. ADELMAN:  Understood.

THE COURT:  So ...

MR. VAIL:  But I think -- I believe, if I understood, they both said they agree with me in premise, that if we take this issue to later -- because if we're right, as a first matter, we don't need to get there -- I'm in agreement with that.

But after that, Your Honor, this isn't simple calculations.  There's disputes over how and what factors were used.

So, again, let's be very clear.  The Tenants have an argument that they made, and they made it to the Board, that for years where they argue our rental statements did not comply with the ordinance, they argue we're not entitled to even the 4 percent increase under the rent control regime.

So they argued to the Bureau, who did the calculations, that there are certain years for which we did not comply here or there.  And in some instances, the Bureau agreed with the Tenants, despite that the Board had come out a different way.

And so it's clear, at least to us, that the Tenant

|Hearing
|23-cv-22291, March 14, 2025

communications were influencing the Bureau decisions, and it's not simple math.  It's absolutely not simple math, and that's in our papers.

MR. ADELMAN:  Your Honor, if I may offer something. The City's concern about the numbers that are on the record right now, maybe they're right, maybe they're wrong, but we would like to offer is, due to the fact that we were not doing these calculations under ideal circumstances, regularly we would have had an annual rental statement from a landlord that shows what the rents were every single year.  It would have been fairly easy to come to what a rent determination was.

Instead, we had to go through hundreds of leases, figure out what they were being charged in different years. There was no simple sheet for us to work off of.  So are there possibly errors there?  Yes.

What I would propose is, since this is largely a concern between the landlord and the Tenants, they hire an independent auditor to come up with a new calculation, an auditor that both parties agree upon.  But because the landlord should have been doing this from day one, the landlord should pay for it.

MR. VAIL:  Your Honor, obviously object to that right now.

All we're talking about is discovery, about what

was done and the determines that were made.  If the City is standing here --

THE COURT:  Sorry to interrupt, Mr. Vail.

I just want to make sure I understand, you know, where we're going with this.

Again, it's a prerogative writ.  The question is whether the decision was arbitrary, capricious, and unreasonable.  Right?

MR. VAIL:  Yes.

THE COURT:  So the question that I have is what is it that you need at this point that you believe is necessary for the district court judge to make a decision as to whether or not the decision was arbitrary, capricious, or unreasonable?

MR. VAIL:  So, Your Honor, my answer is, as I've been trying to say, if we are limiting, if we are both agreeing -- and I'm willing to do that right now -- that the PW will first only be decided on what they want -- let's call it the liability, whether or not we were exempt, if we're going to only -- and we all agree we're only going to do that first, I fully agree.  And that's what I tried to present, and then I heard counsel say they wouldn't agree to that.

If we can agree to that, I don't need discovery on it yet.  It can wait.

Only if they are going to challenge the

calculations as part of their PW -- and as would we, because it is part of the PW, but I'm willing to bifurcate that -- we would need the discovery.  If they're not willing to bifurcate it that way, how can we be pressed to defend or prosecute our claims on the calculations if we don't have the discovery?

So I think the question to them, Your Honor, in fairness, is are they willing to agree that they will not present to Judge Arleo -- both sides will not present to Judge Arleo -- until it is decided whether or not there should have even been any type of recalculations, whether those are correct or not.  Because if she agrees with us, that the Board's overturning of Ms. Hendon's decision was wrong, then this all is done.  It all goes away, other than possibly their appeal of it.  So we would not need to move on to that part.

But if they're not willing to agree to that, they're leaving me tied with one hand behind my back and not knowing what they are going to argue as part of summary judgment.

So all we need is clarification of what is going to be the issue in front of Judge Arleo as to the PW.  If it's limited to the decision on whether we are exempt, I'm in full agreement; I do not need discovery on the calculations at this time.

THE COURT:  Okay.

MR. MAROTTA:  Your Honor, if I may.

THE COURT:  Sure.  And you're Mr. Marotta; right?

MR. MAROTTA:  Yes.

THE COURT:  Got it.

MR. MAROTTA:  I don't see how discovery on the calculations is required at all.  The ordinance says how to do a calculation.  It says whether you did -- the landlord has done this, then they move forward.  If they haven't done it, they don't get an increase in that.

So I don't understand why there is a requirement or a need for discovery on whether the landlord did what was necessary.

The main example -- or one of the main examples is in 260-3(h), which provides --

THE COURT:  When you say 260-3(h), what are you referring to?

MR. MAROTTA:  It's the rent control ordinance, Your Honor.

THE COURT:  Okay.

MR. MAROTTA:  I'm just very used to just calling it 260.

THE COURT:  Just remember, I don't deal with rent control issues every day.

MR. MAROTTA:  Yes.  Thank you.

[As read] So the landlord shall register the rent roll with the Rent Levelling Bureau in order to qualify for any rental increase.

They either provided the rent roll, and it says what the rent roll, or they didn't provide the rent roll. If they didn't provide the rent roll or what was necessary, according to the ordinance, and it describes what is necessary for a rent roll, then they don't get the increase that year. It's straightforward.

I don't see why we have to have discovery on that issue.

So -- but, again, going to the prerogative writ, that is the main issue. That's the main thing before us. If that's resolved in their favor, there's no need to go further.

THE COURT: Well, let's just -- let me just make sure I understand.

Let's say Judge Arleo says that the exemption applies; right? What then?

MR. VAIL: So if Judge Arleo rules in our favor -- that's what you're asking, Your Honor?

THE COURT: Yes.

MR. VAIL: Right?

Well, then it would be our view that you do not need to get to calculations because there would be no

violation -- or alleged violation by my client of the rent control regime.

And so we would have won this case. And my assumption is they -- the Tenants may appeal it.

THE COURT: And if they say that the exemption did not apply?

MR. VAIL: Then we need to move to calculate -- you know, to the arguments around the calculations.

THE COURT: And what is the burden of providing information about these calculations? Because I'm hearing a lot of different things, but no one has truly really pinpointed what the burden is and the proportionality need for the calculations.

So I see both of you standing up. Let me -- Ms. Hartman Lustig, go ahead.

MS. HARTMAN LUSTIG: Thank Your Honor.

The decision directed -- the decision was accompanied by a letter with some directions to the parties. And one of the directions was "Portside, you need to provide us with leases."

And the reason -- dating back -- we'll say to 2016. Initially they asked 2018, and then they said we were wrong; we need 2016.

In any event, we need those leases.

The reason why we need those leases is because, as

Mr. Marotta suggested, the mechanism by which the City says, oh, this rent is either, you know, within the law or outside of law are not complete in the manner that they've been provided by Portside.

So there is a world in which this whole inquiry with respect to the leases and all this work wasn't necessary; right?

In our view, had Portside complied appropriately with the requirements to give the City this rent information, the information about the tenants, the information about what unit they lived in, the information about the tenant before them, the rent before them, the rent before them, they wouldn't have to look at all those leases.

And so that is one of the issues, of course, with respect to whether they're entitled to an increase. But discovery is for -- again, it's the wrong inquiry here. Just because a mistake might have been made, you know, maybe they put the wrong tenant in the wrong unit and it's clear that we have to move them around, that's not arbitrary, capricious, and unreasonable. I mean, that's a clerical error. Right? That's something we can fix. We are all smart people. We can sit down and go, of course, this man doesn't belong in this unit. We have a transcription error here.

That doesn't require discovery, Your Honor.

THE COURT:  How are you going to figure that out if

you don't have discovery?

MS. HARTMAN LUSTIG:  How are we going to figure that out?

THE COURT:  Yeah.  How are you going to figure out if there was a clerical error if there wasn't discovery?

MS. HARTMAN LUSTIG:  We have it all.  We have all the discovery on that.

I mean, I can tell you, Your Honor --

THE COURT:  So I'm confused.

MS. HARTMAN LUSTIG:  Right.

THE COURT:  So you're telling me that you have the information they're looking for?  Is that --

MR. VAIL:  Well, Your Honor, I don't -- I don't totally follow.  I'll try and summarize my perspective here.

And, first, I will also start off by saying that both the Tenants and the City asked us for the very same information, and we produced it.

So, again, this is a little bit of an uneven playing field, where almost exact requests they asked of us, we do it; we ask it of them, and they turn around and say, oh, this isn't relevant.

But here's why it's relevant.  Again, only if we're talking about the recalculation part of the respective PWs.  Okay?  If we get to that part, it is relevant because there are certain factors that the Bureau -- again, the Board

issued a written decision. One of the things the Board said was -- to Mr. Marotta's point about these rent rolls -- was we're not going to deal with that. We're not deciding that now. That's part of the written decision.

The Bureau then, after getting emails and calls and letters, decides they are going to decide that, and they're going to find that where, in Tenants' view, we didn't properly provide a statement or some other document, they're not going to give us credit for that year for an increase, and that's part of their calculations.

That is an issue of fact and an issue of fact that the Tenants were communicating with the decision-makers about. If they're going to argue this calculation issue in front of Judge Arleo, those are facts and considerations that we're entitled to learn and know what they were. That's it.

THE COURT: Okay. So it seems to me that the Bureau made a decision about what calculation should apply after the Rent Leveling Board decided that they were not exempt; right?

MS. HARTMAN LUSTIG: Exactly.

THE COURT: So it sounds like we're talking about two different issues. One was does the exemption apply? Second, what is the appropriate calculation?

So these are two separate decisions.

MS. HARTMAN LUSTIG: Yes.

MR. VAIL:  Correct.

MS. HARTMAN LUSTIG:  Yes, Your Honor.

THE COURT:  So it seems to me that the decision -- or what the parties are alleging is whether each of those decisions was arbitrary, capricious, or unreasonable; right?

Am I wrong on that?

(Simultaneous conversation)

MR. MAROTTA:  Your Honor, I might -- a little bit on that.

Correct on the one.

THE COURT:  Go ahead, Mr. Marotta.

MR. MAROTTA:  Correct on the one with regards to the Board's decision.

As to the --

THE COURT:  When you say "the Board," you mean the --

MR. MAROTTA:  The Rent Leveling Board.  The actual decision-maker.

They made the determination that there is no exemption.  That is subject to the prerogative writ.  That is the main issue on the prerogative writ.

With regards to the calculations, just -- just to be complete on the facts, the Board directed the Bureau. There wasn't any emails or calls from the tenants saying, hey, you have to calculate it.

They disagreed with the way the Bureau calculated it, absolutely.

But it was the Board that directed the Bureau to go ahead and go back six years and calculate the rents.

So the question then becomes, going forward, whether or not the landlord took correct action to be entitled to any increases so that the Bureau would be able to go ahead and calculate forward what the actual rent is today.

So -- and our position is the landlord did not do that correctly.  They're not entitled to any increases at all.

So -- but, again, that is not a prerogative writ. That is not an arbitrary and capricious standard, I believe. It's whether or not they got it right.  It's based upon documents that are submitted.

And we have those documents.  We have the leases. We have the rent rolls or we do not have the rent rolls. They either presented --

THE COURT:  Isn't -- sorry to interrupt, Mr. Marotta.

But isn't what plaintiff is looking for is sort of -- I assume it's the internal communications, which is where we started out with -- about not just the Rent Leveling Board but also the Bureau and how they came to that decision to then assess whether or not it was reasonable and not

capricious, I guess, is --

MR. MAROTTA:  The Bureau's original decision, which was by Ms. Hendon, was appealed to the Board.  Okay?  So that's the process.

The Bureau makes the determination originally, and then it gets appealed -- if a party wants to appeal it, appeals it to the Board.  And the Board hears it.  And then, based upon all of the evidence that's presented, it makes a final determination.  And that is what is being -- I believe is being appealed as part of their prerogative writ.

I don't see how you can go back and have a prerogative writ based on Ms. Hendon's determination.  I don't believe it's relevant.

Really, what -- all that matters is the Board's decision.

Now, the Board went ahead and said to the Bureau -- because it's their administrative arm -- it says, "Calculate it.  Let's find out what's at stake."  Okay?

And that -- I don't believe there's a need for discovery.  Either they provided the necessary information to entitle them to a rent increase or they didn't.

MS. HARTMAN LUSTIG:  And, Your Honor, we have that discovery.  We have exchanged, as we've submitted in our letters -- I don't know the exact numbers -- hundreds of thousands of pages of discovery, much of which is all of this

evidence as to how the calculations got made.

They looked at the leases. They looked at the registrations. And they said this is the number on the -- I have it right here. You know, this is the number -- this is the number that you should have paid. This is the number that the lease says you were paying. This is the overcharge; right?

Again, we're all pretty smart. We can sit down with the numbers. It's an exercise in just making sure the numbers are right.

And like Mr. Marotta said, if the document's not there, the document's not there.

If there's a year in which they say, well, we filled out, you know, 11 of the 14 fields that's required, well, that's a decision, if we bifurcate this, for the Court to say, no, you didn't -- you didn't fill out the 14 fields, so you're not entitled to an increase. It's really simple. There's no discovery that even exists out there.

And I would submit further, I am not -- I can't speak to the City's communications or the internal deliberations that were made, but they have all the communications between the Tenants and the decision-makers.

THE COURT: Well, I think that's a dispute. They're saying that they don't have those communications.

MS. HARTMAN LUSTIG: From us? From the Tenants?

They absolutely --

THE COURT:  No, no.  From the City.

MS. HARTMAN LUSTIG:  Mm-hmm.  Yes, I can't speak to that, Your Honor.

THE COURT:  Okay.

So, Mr. Adelman.

MR. ADELMAN:  So --

THE COURT:  And I know we have to take a break in --

MR. ADELMAN:  I appreciate that.

The calculation is really -- I'm sorry -- to Mollie's point -- is really an assessment as to mathematical error.  The calculation --

THE COURT:  So let me interrupt for a second.

Does that mean that there is no communication?  If what you're telling me is, is this is just a mathematical equation, are you representing that there are no communications about how the Bureau made its decision?

Because, then, that resolves the whole issue.

MR. ADELMAN:  I'm sure the Bureau sat in their office and spoke and went through documents and asked each other questions.  I don't know exactly what happened.  But all of that -- all of the --

THE COURT:  But I think he's not asking -- he's asking for email communications.

Isn't that what you're asking for?

MR. VAIL:  Yes, Your Honor.

THE COURT:  Okay.  So we're not talking about, you know, a spreadsheet, a calculation.  We're talking about communications.

MR. ADELMAN:  I mean, it's -- I disagree, because it's really -- at the end of the day is whether the calculation was made correctly.  Like, whether -- whether they said, you know, here's this number, here's that number, ultimately you just look at what numbers were used to make the calculation despite what they discussed.

So, for example, John and I are part of the Board.  And I say, "John, here's this document, and use these three numbers," you know, and he ultimately doesn't and he uses something else, then the assessment is the calculation John made with whatever numbers he chose, not what I told him to do or not to do.  And so that's really why it's a calculation error.

And secondly -- and Mollie can correct me if I'm wrong -- but the calculation is based upon information that we received from Portside.  So I don't know what else there is to exchange, because the information is based on their documents in order to make the calculation.

And, finally -- and I'll let John speak in a second -- I think I can say that we can separate the issues

and first stick to the decision as to whether or not it applies --

THE COURT:  Well, hold on.  I see Ms. Hartman Lustig, you know, nodding her head furiously but before he said no.  So I'm confused here.

MS. HARTMAN LUSTIG:  No, no, Your Honor.  I absolutely agree that they can be bifurcated.

I disagree that there needs to be any further discovery on the recalculation issue after we get a decision on the prerogative writ.  If it's in, you know --

THE COURT:  Well, I think he's challenging whether the recalculation was arbitrary and capricious.  And to the extent that there are email communications that show the thought process of how the Bureau came to a decision, that certainly is something that he would be entitled to.

MS. HARTMAN LUSTIG:  And I don't object to that. Again, I can't speak -- I can't speak for the City.

If there are communications as to the methodology, as to the thought process that they undertook to make -- to get to those numbers, I agree.  I agree with Portside that those are valid.

What I don't agree with is a fishing expedition to find each and every communication that may have anything to do --

THE COURT:  No.  We just talked about --

MS. HARTMAN LUSTIG:  -- with this matter.  It's --

THE COURT:  -- communications by the decision -- to and from the decision-maker.

Is that what we're talking about?

MR. REED:  Yes.  And/or the administrator, Shyrone Richardson, who's their boss.  So, yes, only that internal group.  Exactly, Your Honor.

THE COURT:  All right.  But I'm not going to spend more time.  I'm now going to bifurcate this issue.  To the extent that there are communications about the decision, then, you know, that should be part of the calculation.  And it should be -- again, I don't want you to go into a fishing expedition.  If someone from the general public, you know, contacted, you know, one of the decision-makers to express dissatisfaction and unhappiness with the way they were handling something, that is not where any of you should go.

But to the extent that there are communications between folks within who are saying, "Hey, we should calculate it this way," and somebody says, "No.  Forget it. Don't do it that way," well, then, maybe that gives you an argument, and that may or may not be relevant later on.

So I just want to make sure everyone understands what my instructions are.

MR. ADELMAN:  So just -- and, again, to Your Honor's point that it is limited to internal

communications between the decision-makers.

THE COURT:  Right.

MR. ADELMAN:  Okay.

MR. MCKINNEY:  So this would be Director Richardson and anyone he tasked with doing the calculations?

THE COURT:  Yes.  So, again, keep it in perspective.  This is a prerogative writ, whether we're talking about --

MR. MCKINNEY:  Exactly.

THE COURT:  -- the exemption or whether we are talking about the calculation or recalculation.  Since you're challenging that the decision is arbitrary and capricious, it's only fair to understand what the thought process was. That's it.

MR. MAROTTA:  Your Honor, if I may, just one more point on that.

THE COURT:  I've already ruled on it, so.

MR. MAROTTA:  No.  It's not -- it just for clarification.

THE COURT:  Okay.

MR. MAROTTA:  It's not to change your ruling.

The Bureau communications from myself to Mr. Richardson saying, "Mr. Richardson, you're doing it wrong."  Okay?  There's communications from the Tenants showing where specific -- the sections of the rent control

ordinance were not complied with by Mr. Richardson's office, and, therefore, the calculation was wrong.

There's nothing improper about that and going ahead and saying the ordinance says this.

At the end of the day, maybe it is a part of the case whether or not the ordinance does say that, but it's a legal analysis, and then it's a calculation.

MR. VAIL:  Just so I'm clear on the record, I am not suggesting any impropriety at all at this point.  I just want to see what was said to one another so we can understand what was communicated, what was considered.  But by no means am I suggesting anything improper by communicating.

MR. MCKINNEY:  So, again, I just want to be clear. These are internal communications only, not from Mr. Marotta or anyone else.

THE COURT:  Correct.

MR. MCKINNEY:  Thank you, Your Honor.

MR. VAIL:  Well, it's my understanding we've received the other communications from the Tenants, so that's why we're limited at this point to just speaking about the City's discovery.

THE COURT:  Okay.  So we go through Issue Number 3.

I think, Mr. Adelman, you're free to use the other conference room.

MR. ADELMAN:  Which way is that?

THE COURT:  So the same one where we were before, when there was -- we were having the off-the-record conversation.

I'll have one of my interns escort you.

MR. ADELMAN:  If that's okay, that would be great.

THE COURT:  And are you okay with us proceeding with Mr. McKinney?

MR. ADELMAN:  Yeah.  That's fine.

THE COURT:  Do you want to take a break, Mr. McKinney?

MR. MCKINNEY:  If you don't mind, I would appreciate that.

THE COURT:  All right.  Why don't we take a five-minute break and then --

MR. MCKINNEY:  Thank you.

THE COURT:  -- a ten-minute break, and then I'll be back.

(Recess)

THE COURT:  We're on the record in the Towers and Portside Urban Renewal Company versus the City of Jersey City, Docket Number 23-22291.

We took a break because we were -- went on for quite some time talking about one issue.

Now we're moving on to the next issue, Dispute Number 4.  At least the way that the dispute was framed is

that the City refuses to produce emails with defendant intervenors.  It's my understanding that that issue is now moot.

Is that correct, Mr. Vail?

MR. VAIL:  Yes, Your Honor, based on our discussions that we've received those emails from Tenants, yes.

And also, again, Your Honor, subject to the discussion around the methodology to learn if there are hard-copy documents.

THE COURT:  Mr. McKinney?

MR. MCKINNEY:  Yeah.  We'll look if there are any hard copies sent to the decision-makers.

THE COURT:  All right.

So, then, this takes us to Dispute Number 5, the City defendants refuse to produce relevant historical documents to Portside related to the construction of Portside Towers and the City's rent control regime.

I will be honest.  I was confused as to what this issue is really about.

So I'm going to ask you to break it down into the most fundamental way and to explain it in as basic form as possible so that I can understand what the dispute is really about.

MR. VAIL:  I'll do my best.

THE COURT:  Okay.

MR. VAIL:  Okay.  So let's start with Tidewater Basin documents are part of it, and we've already discussed those, and that's going to be subject to briefing per Your Honor's direction.  So I'll take those out of this discussion.

Let's start with what might be the first category of documents.  As Your Honor recited in your opening remarks, this whole case in some ways starts with the communications around the exemption and the application for exemption.  And you touched on, Your Honor, the Michael Regan, where he received one letter and told them, "Take it to a different agency," but didn't tell him what agency to take them to.

So to the extent there are documents, whether in historical files -- because this is going back into the '90s now -- if the construction office, or Michael Regan's department, has a file around exemptions and exemption applications that's somewhere in the city, we would like to -- you know, we would like to have discovery into those core documents.

So that's one category.

THE COURT:  Okay.  So let's break it down one category at a time because I think that may be more easy to digest.

So the Category Number 1 is whether Michael --

|Hearing
|23-cv-22291, March 14, 2025

there are historical files concerning whether Michael Regan received notice from the Towers; correct?

MR. VAIL:  And communications relating to those. Whatever he wrote or whatever else he received relating to that rent control application exemption, certification of occupancy, exactly.

THE COURT:  And just for the record, explain why you believe that is relevant.

MR. VAIL:  Because what they are arguing is that we aren't entitled to rent control exemption because they argue that we did not comply with their view of the City's ordinance's demand that, at a certain period of time, you submit an application for exemption or notice of exemption to the City official, and that is what basically starts the ability for you to claim exemption to the rent control.

They are saying that did not happen here.  There is an issue of fact of exactly what was received, what was sent, and we want to make sure that we have everything relating to that.

THE COURT:  Okay.  So just this one category that we're talking about.

Mr. Adelman?

MR. ADELMAN:  Well, I'll start with the fact that the plaintiff really has the burden to demonstrate they served this document to the City.  It's not our burden to

prove that we received it and prove their case, number one.

Secondly, from what I understand, Mr. Regan rejected the document, and by virtue of that made it prob- -- is not, it seems to me, would not be in possession of it if he rejected it.

So whatever service they claim they made is on them.

Secondly, it's really unduly burdensome to ask us to go back to the early 1990s to find documents that were likely generated by them if they're the ones who served it. It would be part of their records.

So, I mean -- and to be honest -- well, not that I'm not being honest, but --

THE COURT:  I would hope not.

MR. ADELMAN:  No.  But as far as I recall, there's no discussion of this issue in the Rent Board's decision.  As far as -- I don't know if Mr. Regan -- was it in there?

Yes.  Okay.  I'm sorry.

But regardless, I mean, it's still their burden to show that they served this.

I really -- recordkeeping in government, I am not going to go on to explain how well kept they are or not, but I don't know where Mr. Regan is.  I'm pretty certain he's not with the City any longer.  I am not even sure if he's alive, to be honest.

So we would be on a major -- we'd be looking for the, I guess, proverbial needle in a haystack.  So --

THE COURT:  So is it a needle in a haystack -- what they're asking for is whatever file Mr. Regan -- whether Mr. Regan works for the City or not, whether he's alive or not, if there was a file relating to the decision, or for the noted provisions, which appears to be at issue here, wouldn't that be kept in the City file for some period of time?

MR. ADELMAN:  Well, in theory, it should be.  But it's unlikely to be there.

THE COURT:  What's the City's document retention policy?

MR. MCKINNEY:  That would be the issue, Your Honor. I'd have to look at the record retention schedule to see if it's outside of the time period.  If it is, then there's potential that the City went through the process of destroying it.

However, you know, we're willing to go to the construction code officials' office, see if they have a file for Portside Towers and if there's something in there.  But I believe we did that already.

THE COURT:  Okay.  I see Mr. Nemeth.

MR. NEMETH:  I'm sorry.  Just to add some thoughts on this, Your Honor.  I deal with a lot of governmental entities over my many years.  And what we do in situations

like this -- because records from decades ago are just not kept, even with a good record retention policy -- is we have the clerk issue a certification saying that a diligent search has been conducted and they've been unable to locate the document.  That's basically the only way we can address it.

That is just my thoughts on it.

MR. VAIL:  Your Honor, briefly, it was the City who actually found, to my understanding, the one letter that we all admit -- we all can agree was received that he responded to.

I think what Mr. McKinney has proposed is reasonable, and all we're asking for is to go and learn what is there, and then to understand and let us know.

THE COURT:  I mean, look.  It seems that this -- I do agree with Mr. Adelman, that to some extent it is your burden to show that this notice was served.

That said, given the passage of time, if the records do exist, they're certainly relevant here.  I want to make sure, though, that it's not so unduly burdensome.

So check the document retention policy with the City.  If these records are -- I don't want to use the term "easily accessible" because there's no such -- that's hard to define.  But if they are accessible, then it shouldn't be that big of a burden to look for one file and produce it. Because we're talking about a finite period of time.

Although the record itself is old, we're talking about -- well, everybody knows the time frame for when this notice should have been provided; right?

MR. VAIL:  The two, yes, Your Honor, exactly.

THE COURT:  So what -- and what is the time frame so that the order's clear?

(Simultaneous conversation)

THE COURT:  Does anybody know?

(Simultaneous conversation)

THE COURT:  And when was the CO issued?

MR. MAROTTA:  In 1992 for the East tower and 1997 for the West tower.

MS. HARTMAN LUSTIG:  I thought it was the other way.

(Simultaneous conversation)

MR. VAIL:  Your Honor, if we could simply do this. We know the periods for which -- and we can agree with them, the time frame for which we are claiming that the buildings were to be occupied where you would need this type of notice. We can give them those dates and provide those dates.

There is no reason to believe that there was some communications prior to the dates Mr. Marotta's referring to. We're talking about the things that are all should be agreed upon.  We can get to agreement with Mr. McKinney on what the time frame is.

MR. MCKINNEY:  The document that was produced before was received additionally; correct?

MR. VAIL:  Exactly --

(Simultaneous conversation)

MR. MCKINNEY:  So we've already done -- we've already done this through letter.

So what I propose we'll do, I'll talk to the construction code official.  See if he's still got a file in their office on Portside Towers.  If they don't, I'll find if there is something in archives.  We'll see if we received a letter or not.  I've got no issue with that.

THE COURT:  Okay.

MR. VAIL:  Thank you.

And, Your Honor, let me add one other offer -- and Mr. McKinney.  If we get to a place -- and I've done this in my career, especially when I was a junior -- where he says there's a box of documents here.  We're not worried whether they're privileged or not.  But we -- you know, that's a lot for us to look at.  If they give us access to, as the federal rules provide, I'll send someone to go look at them.

(Simultaneous conversation)

THE COURT:  Yeah.  So seems that this issue can be worked out.  So the order will say that the City shall search for the --

MR. MCKINNEY:  The letters from the original

|Hearing
|23-cv-22291, March 14, 2025

developer seeking an exemption.  And we'll file a certification as to what, if we don't find anything, the searches we conducted and whether or not files were found.

MR. VAIL:  And responsive letters relating the same.  Like Regan's letter back; right?  So it's communications around those --

MR. MCKINNEY:  Yeah.

MR. VAIL:  Okay.

THE COURT:  Okay.

MR. MAROTTA:  Your Honor, if I may, on that point, I think we're going far afield.

THE COURT:  Well --

(Simultaneous conversation)

MR. MAROTTA:  Well, there's already been an adjudication --

(Simultaneous conversation)

THE COURT:  Hold on.

But is it far afield when there is -- the reason why they are not exempt from Rent Board is because they didn't give notice?  And so isn't this notice issue relevant?

MR. MAROTTA:  Absolutely.  But it's already been adjudicated by the Board based upon the review and the research that has already taken place.  By going far afield, I'm saying we're opening it up to something that is far beyond the record.  There's been a hearing held.  There's

been searches made.  This has been litigated by the Board.

The whole decision now, it's -- I guess in state court it would be a motion to open the record to go further, a separate proceeding to see -- you know, there's newly discovered evidence or something of that nature.

But this matter's already been heard.  I don't -- I don't think it's appropriate to go ahead and relitigate the whole case again from bottom up to see whether or not the proper notices were made.  That was done already.  I just don't think -- I think it's going far beyond what a prerogative writ case is.  We have a record --

THE COURT:  So what if the notice exists?

MR. MAROTTA:  Well, the -- the record below shows that they searched for the notice.  They did this already.

THE COURT:  So then the response should be the same.

MR. MAROTTA:  I'm not saying it's not.  And I am not concerned that it's going to show up.

But if we're going to go ahead and we're going to open it up for this and we're going to open it for anything else that has already been presented --

THE COURT:  Well, we'll take it one issue at a time.

(Simultaneous conversation)

MR. MCKINNEY:  Your Honor, to be fair --

|Hearing
|23-cv-22291, March 14, 2025

(Simultaneous conversation)

MR. VAIL:  To be clear, I'm asking for one specific issue that we and the City have agreed on at this point. Let's move to the next issue.

MR. MCKINNEY:  To be fair, in deference to Neil, again, as Phil pointed out earlier, the City is supposed to be -- the Board's decisions are supposed to be presumed to be valid.  There was evidence presented and referenced in their letter that there was a -- or their decision that a letter was located, that the construction code official rejected for one of the properties, and it wasn't located for the other.

So we are, like, doing the search again, kind of relitigating the same manner.

I'm not opposed to it.  But, at the same time, I do think Mr. Marotta has a point.

MS. HARTMAN LUSTIG:  Absolutely.

THE COURT:  All right.  What's the next category?

MR. VAIL:  So we addressed 6, Your Honor, so we can skip over 6, and we're at 7 now, I believe.

THE COURT:  Wait.

MR. VAIL:  Oh, subcategories.

MR. MCKINNEY:  Well, just before we move on, what exactly are we doing?

(Simultaneous conversation)

MR. ADELMAN:  So the understanding is we're going

to ask for a file from the construction code official if they have anything from Mr. Regan and on the Portside building.

THE COURT:  Right.

MR. ADELMAN:  And ask the clerk to do a search and provide a certification as to the search performed --

THE COURT:  Right.

MR. ADELMAN:  -- and what was or was not found.

THE COURT:  Right.

MR. ADELMAN:  Is that a fair summary?

THE COURT:  Correct.  Yes.

MR. ADELMAN:  Okay.

THE COURT:  So was there any other category?

MR. VAIL:  No, Your Honor.

THE COURT:  Okay.  So, then, now we're moving on to Number 6?

MR. VAIL:  We covered that in the preamble, Your Honor, where we've agreed to limit that one.

So to put on the record for Number 6, plaintiffs are saying we'll agree to limit that to decision-makers only.

THE COURT:  Okay.  So Interrogatory Number 1, as it currently reads, it says "Identify all persons and entities with whom you have communicated regarding the Board's decision and from any appeal therefrom."

So when you say "with whom you have communicated" -- well, how are you restructuring this

|Hearing
|23-cv-22291, March 14, 2025

interrogatory?

MR. VAIL:  Yes.  So now here's what I propose, Your Honor.

All I seek to know is who the decision-makers communicated about their decisions with.  With whom did the decision-makers communicate their deliberations and decisions?  So that we just have a list of who those folks were, to the extent they can recall.

THE COURT:  But don't you have that?  That would be the Board and --

MR. VAIL:  So, for example, Your Honor, if one of the decision-makers spoke to Mr. Marotta about it, we would want that on the list, that Mr. Marotta called me.

THE COURT:  Why is that relevant?

MR. VAIL:  Because we want to know who all the people they are who spoke to because we're getting the discovery -- the documents on it.

MR. ADELMAN:  But that's after the decision.

THE COURT:  No.  No.  Look, I am not going to spend much time on it.

MR. VAIL:  Okay.

THE COURT:  I think that is not relevant to the prerogative writ, because I think there you are going too far afield.

MR. VAIL:  Okay.

THE COURT:  All right.  So I'm going to deny Number 6.

Dispute Number 7?

MR. VAIL:  7 is to supplement Interrogatory Number 2, which is simply asking for decisions made on this same issue basically.  That's all we want.

I'll frame it for us today:  All we want, coming out of today is, to the extent that the City made decisions on similar issues, allegations that a property was not entitled to an exemption because they did meet the notice requirement, if they've either denied that in the past or agreed with that, we should be entitled to see if they're treating us differently than they've treated other buildings where the same argument was being made.

THE COURT:  But, as with cases -- right? -- it's hard to do an apple-to-apple comparison, and then you're going to be opening this up to, you know, sort of trying a case within a case, possibly trying multiple cases within a case; right?  Because let's say that they granted it in another scenario where the notice may not have been submitted on time.  It would may have been, you know, two days late, you know, but there were other factors.  I don't know.  I confess I don't, you know, know the exact thought process of the Board and how they make these decisions.

But now you're opening it up to other cases that go

beyond this one.

MR. VAIL:  Well, I don't want to do that, and maybe the starting place would just be to understand whether there have been other cases where on the sole issue of whether the notice was timely provided and where the Board found it was or wasn't, did they then strip that property of rent control as they did here?  Or did they say, you know what?  That's a technical violation.  We're not worried about it.  And they did not take such action as they took here.

We just want to see if we're being treated disparately in a situation that's very, very similar.  That's all.

And if there are no like decisions, if they tell us, look, we haven't had any other cases where this has been an issue --

THE COURT:  Hold on one second.

I'm going to -- to the extent counsel need to confer, we can take a break and you can do that outside.

All right.

MR. VAIL:  So if they say there's been none with no like issues, no issue.

We just want to know if we're being treated differently on the same issues that were decided here.

THE COURT:  Mr. Adelman?

MR. ADELMAN:  Judge, he's asking for something

that's impossible to do.  There is no way -- we would have to take -- go through every decision and look at every fact considered made to make -- that came to that conclusion to see if every fact is identical to theirs, because if one fact is different than theirs, then they're completely different.

So as we started from the beginning, this is the record.  And that's what the prerogative writ decision is based on, the record.

Going back and deciding and forcing us to examine other buildings and how decisions were made on other buildings and even if decisions were even based on whether a document was produced or served on time is completely unrelated to this decision.  It's overbroad.  It's unduly burdensome.  I don't see the relevance to this.

And even if we -- if Your Honor directed us to produce it, we would still object to it to the use in briefing.  There is no evidence of being mistreated or they're not in some sort of protected class here of being mistreated.  They're a developer.  They're a builder.  I mean, we're not talking about somebody with a handicap or that's in a protected class.

So I don't know where this is going.  But it's simply another part of the fishing expedition that's just going to make this case go on and that on for endless amounts of time and rather than just getting to a decision.

And I don't know see, even if we find a case that's in any way similar to this one where it was a different decision in favor of the builder, how is that -- why is that even relevant or impactful on this case at all?

THE COURT:  Okay.

MS. HARTMAN LUSTIG:  Your Honor, if I may, the type of disparate treatment that Mr. Vail is bringing up is akin to a 1983 action:  You know, the government did something different to me because I am a part of a class or because they didn't like me or whatever it is; right?

And those allegations are just not before the Court right now.

As Mr. Adelman submitted, this is an extremely fact-sensitive analysis; right?  And so this Board took this voluminous record.  They weighed the facts.  They weighed the law.  And they made a determination.

The fact that an exemption or nonexemption was granted to another property, it's -- it would be, I submit, a waste of resources to do if it were even possible for the City to come up with some sort of case summary of every property they've ever been -- decided a rent control exemption on.  Your --

(Simultaneous conversation)

MR. ADELMAN:  And, Your Honor, could I just say one more thing?

|Hearing
|23-cv-22291, March 14, 2025

THE COURT:  Go ahead, Mr. Adelman.

MR. ADELMAN:  Just so you know, rent Bureau is a small group of people.  Okay?  Their focus is to review applications for various types of things going on in the city.

If you direct them to look for this information, they're going to have to drop every application that is actually pending before them and go dig through their boxes for the possibility of finding some sort of other document or some sort of other action or building that may or may not be in any way related to their building and then have to sit there and make a comparison.  And it's -- now you're prejudicing other people who have applications that are pending before the Board.  And they're going to have to wait longer because we're looking for information that has to do with this matter whatsoever.

We -- this is not a board that's made up of hundreds of people.  I mean, this is a small group of people who do -- who use the limited resources they can.  And asking them to do that without the -- basically bring government to a grinding halt to search for these documents to see if they were mistreated or not properly treated when they're not even -- when they're even making an accusation.

MR. VAIL:  Your Honor, briefly.

So, first, this is exactly what will help decide or

determine or understand whether the decision was arbitrary, whether one building was treated differently than another building for no other reason than potentially political pressure.

We are not asking for them to go look for every document. We're only looking for decisions that were made, Board decides that were made where the Tenant was alleging that there was not proper notice of exemption and the Board stripped the property of that exemption because of that.

Only that discrete issue, only Board decisions -- and I'll further limit it -- only to the last six years.

THE COURT: I'm going to deny your request, Mr. Vail. I think that this goes far afield of what the prerogative writ requires. Even if this information was somehow relevant, I think for the reasons that Mr. Adelman and Ms. Hartman Lustig placed on the record, it seems disproportional to the needs of the case because ultimately there may be one factor that applies in one case that doesn't apply in another, and then you're going to be asking someone to make a determination of whether that particular scenario was similar to this one.

I think with the information you have, the information I've given you so far, and there may be information that is relevant here, that makes this factor or this particular interrogatory, I think, unduly burdensome and

not proportional to the needs of the case.

So let's move on to Interrogatory Number 3.  It says, "Identify and describe all determinations issued by the office -- landlord-tenant relations -- so it's --

MR. VAIL:  Your Honor, I'll just, based on your ruling of the prior one, I'll treat those two together.

THE COURT:  Okay.  So then let's move on to -- I believe the next one is Dispute Number 8:  The City defendants refuse to respond to Portside Interrogatory Number 5, identify the annual -- that interrogatory reads:  [As read] Identify the annual revenue for the City since the inception of the Payment in Lieu of Taxes program.  That's the PILOT program, due to Portside's participation in the pilot and what they would with if Portside had not participated in PILOT.

So I guess the question is how does that interrogatory relate to the Board's decision as to whether or not -- and I guess your argument -- that they acted in a way that was arbitrary, capricious, and unreasonable?

MR. VAIL:  Thank you, Your Honor.

So this actually goes to substantial -- one of the factors under substantial compliance, Your Honor.  I touched on that at the beginning.  And that is here something we've pleaded in this case, that we substantially complied, which New Jersey law permits.  If you don't find strict compliance,

there is five factors.  One of those factors is prejudice to the other party.

Here, we have argued and we believe it's pretty clear that in considering whether they've been prejudiced or not, if you were to overturn what they've done, one consideration should be how much did they profit from this arrangement themselves?

So in essence, Your Honor, the PILOT -- it's called the PILOT program, provided that monies were provided in the City in a more direct way than they would be under an ordinary tax regime but they related to the taxes that would be owed on the property.

So the City was gaining additional monies, significant monies, to our understanding, from us not being determined to be under rent control.  They were charging higher rents; accordingly, paying more money under the PILOT arrangement.

If that is the case, if we are right about that, that is something that should be considered as to whether they were prejudiced or would be prejudiced if this decision were overturned because they would not -- they were not prejudiced in any way under the old regime.  They were making more money.  They knew about it.  They were happy with that.

It's only now they want to pull the rug out under but still keep those monies.

That goes to the prejudice, Your Honor.  And all we simply want to know is the value that we were providing through our PILOT program payments, because we know what we paid them.  But we want to know what the overall -- like, what -- how big of a chunk of the overall monies they were making from PILOT was coming from our agreement with them, which they then benefitted off of this arrangement for nearly 30 years.

THE COURT:  But doesn't -- didn't you answer your own question?

MR. ADELMAN:  That's exactly what I was going to say.

THE COURT:  You provided -- and, Mr. Adelman, do not interrupt --

MR. ADELMAN:  Sorry.  I apologize.

THE COURT:  Let me finish.

You said that you provided payments to them.  So shouldn't you know what information --

MR. VAIL:  So I am not asking for that.  I've told Mr. Adelman, I don't care about that anymore.  I have those records.

But all I care to know -- and this could literally be a line entry somewhere that they may have is how big percentage of all the PILOT monies they were receiving was our slice of that, just to be -- so that they --

THE COURT:  Why does that matter?

(Simultaneous conversation)

THE COURT:  -- hold on -- what they were receiving from others?

MR. VAIL:  Well, if they tell us it doesn't matter, I'll take it off the table.

But what I'm concerned they may argue at the end of the day is that this money was small and not relevant.  And if they tell us that's not the case, fine.  But if they're going to argue that, I want to test that that's not true.

THE COURT:  Okay.

Now you may speak, Mr. Adelman.

MR. ADELMAN:  Sorry.  My apology for the interruption.

I was actually going to say the exact words Your Honor said.

Let's go back in time about two hours ago when we talked about what the standard is for a prerogative writ, prejudice to the City is not an issue in a prerogative writ. That's not the issue here.

The issue is whether this rent control ordinance applies.  So that's number one.

Number two is Payment in Lieu of Taxes, that's a benefit to this entity here.  Okay?  They're paying something else in lieu of taxes, which is usually beneficial to them so

they don't have to pay actual taxes.  Number one.

Number two is I am not going to make an overriding accusation, but I want to bring this to the Court's attention:  Portside does have a tax appeal pending, a separate action, tax appeal, pending in the tax court.  And I just think it's interesting that they're asking for tax documents in this venue when I am not sure they can get it.  I don't know what the limits of the scope of discovery is in the tax court is, but it just seems interesting to me --

THE COURT:  Well, I don't want to get into speculation.

Let's focus on that prerogative writ here.

MR. ADELMAN:  I'm just bringing that to the Court's attention.

But -- excuse me.  But the percentage of what they paid or didn't pay or how much we received in revenue separate from their payments in lieu of taxes, how does that in any way relate to the decision as to whether or not rent control applies to their building?  I mean, what -- I mean, I didn't hear the answer to that question from Mr. Vail.

And he's giving Your Honor a hypothetical as to -- we may argue this issue in the prerogative writ brief, but I don't see why we would even broach this issue whatsoever as to how much money was paid on a PILOT and how much -- what percentage of that is compared to other PILOTs paid, but it's

|Hearing
|23-cv-22291, March 14, 2025

not relevant.  It wouldn't even be in our brief.

MR. REED:  Your Honor, so --

THE COURT:  Go ahead, Mr. Vail.

MR. VAIL:  -- because I said many times today and it's in our pleading, our argument about substantial compliance.  So I'll give counsel a couple of case cites so that we can all be on the same page here.  And a quote:  [As read] The substantial compliance doctrine's purpose is to avoid the harsh consequences that flow from technically inadequate actions that nonetheless meet a statute's underlying purpose.  It's a doctrine based on justice and fairness and to avoid technical rejection of legitimate claims.  That is Galik v. Clara Maass Med. Center, 771 A.2d 1141 (N.J. 2001).

Secondly, in Block 268 v. City of Hoboken Rent Leveling Stabilization Board, 952 A.2d 473 (2008), any technical nonconformity in exemption notice letter is excusable under the equitable doctrine of a substantial compliance.

So we've argued that, Your Honor.

So then what does the Court have to do to understand if we substantially complied?

It needs to look to five factors.  Under the Galik case that I cited, the court made clear that those five factors are the lack of prejudice to the defending party --

that's those two parties, the City and the Tenant; a series of steps taken to comply with the statute involved; a general compliance with the purpose of the statute; a reasonable notice of petitioner's claim; and, last, a reasonable explanation why there was not strict compliance with the statute.

So we're going to have to address these factors, all of us, at some point, at summary judgment, and one of those factors is the lack of prejudice to the defending party.  If they were making more money under this arrangement, that is a lack of prejudice that we should be able to understand and argue.

THE COURT:  But does it have to go as broad as you're requesting, which is what they were making from the entire PILOT program?

MR. VAIL:  It doesn't necessarily, as long as they're not going to argue it was *de minimis*.  That's it.

So if they argue that --

THE COURT:  Well, prejudice doesn't have to be in comparison to what they're making overall.  Prejudice can mean they didn't get certain monies from you, period; whether that money was $10,000 or $100,000.

MR. VAIL:  Right.  So I agree with you completely, Your Honor.

All I'm saying is say we get to trial together and

they argue, sure, we got an extra $5 million, but that's *de minimis* because we get hundreds of millions off the PILOT program so we didn't really care or pay attention or even know about it.

If they're not going to argue that, then I don't need the relative comparison.

But if they're going to argue something like that, then I should be able to know and say, no, that's not true, Your Honor, Jury.  They were, in fact, getting a substantial amount from our arrangement.  They knew about it.  They liked it.

THE COURT:  Okay.

I see both Mr. McKinney and Mr. Adelman.

So who's going to go first?

MR. ADELMAN:  Well, I -- maybe I'm -- maybe I am not, you know, as smart as Mr. Vail.  Maybe I'm stupid here. But I'm not sure what it is that they've substantially complied with insofar as PILOT programs go.  What does the PILOT and payment of PILOTs and percentage of payment of PILOTs have to do with substantial compliance with regard to a decision of whether rent control applies to their building?

And I'm going to let John talk about this, but the statute regarding PILOT is completely different, separate, and unrelated to represent control.

MR. MCKINNEY:  That's all I was going to bring up,

Your Honor.  There's the long-term tax exemption statute which has -- that's for PILOT payments.  It has nothing to do with represent controls.  We're not talking about canceling their PILOT here in this dispute.  We're talking about whether or not they complied with rent control.

So I'm just having a very hard time understanding what this has to do with the Board's decision.

THE COURT:  Okay.

Mr. Vail --

MR. REED:  Briefly, Your Honor --

THE COURT:  Well, I'm sorry.  I see Mr. Marotta, who I have not given an opportunity to talk about this --

MR. MAROTTA:  Thank you, Your Honor.

Yeah, I understand the argument.  But it has nothing to do with -- I don't believe it has anything to do with substantial compliance.  If anything, it has something to do with damages.  They might believe they're not getting the benefit of their bargain -- as to what's taking place now and the City has gotten all its money over the years.  And now the rug has been pulled out.

Well, then, amend their complaint or file a charge for, you know, damages --

(Simultaneous conversation)

MR. MAROTTA:  But it has nothing to do, as Mr. Adelman stated, whether the Board made a correct decision

on rent control in this matter.  I just don't see it.  I think it just -- might go to damages.  I don't think it does there either.  But I don't see the substantial compliance.  I guess they're trying to say, we didn't comply with the PILOT agreement because we were exempt.  By the way, they could have put an exemption in the PILOT agreement.  But we did that, so we substantially complied.

That doesn't --

THE COURT:  How does -- how does the PILOT agreement work?  In other words, if you comply with the PILOT agreement, which I think what Mr. Vail is arguing, does that create an exception that then says, okay, well, you didn't have to give notice?  Which is --

(Simultaneous conversation)

THE COURT:  So break it down for me in a rudimentary way.  How does the PILOT program work?  And how does it relate to the Board's decision?

MR. VAIL:  So, one, I think -- when they said there seems to be a refusal to recognize the substantial compliance law -- right? -- so again there is this law in New Jersey that you can be found to substantially comply with the ordinance in a way that they don't get the type of relief that they're seeking, stripping 30 years of rent control exemption.

The New Jersey courts have said for the Court to

analyze that issue, the Court needs to look at five factors. These factors don't go to whether the Board decision was wrong or right. It goes to whether we substantially complied.

Here, the Board didn't even consider that. And so this Court will need to determine on its own whether we substantially complied. And one of the --

THE COURT: Complied with what? I guess that's what I'm stuck with.

MR. VAIL: The ordinance. That's what the --

THE COURT: Okay. And what does the ordinance require for you to comply?

MR. VAIL: I'm sorry. The statute and the ordinance -- because we have two arguments here; right? We have the state statute and the ordinance.

But it has a number of arguable things that they've argued that you need to -- that you need to comply with these requirements. You've heard Mr. Marotta talk about the timing of the notice, other provisions.

What this law says is in certain circumstances, if you did not strictly comply with that, there's still the ability to maintain your exemption. That's what this whole body of law is saying and saying to understand whether that's available, the argument of substantial compliance is available to a party, you need to look at the five factors

that I --

THE COURT:  Including whether there's prejudice or not.

MR. VAIL:  Yes.

THE COURT:  I get that part.

But I'm still confused and stuck in --

MR. VAIL:  How do they connect?

THE COURT:  Well, two things.  How -- what is it that -- you say -- if you substantially meaning you, the Towers, substantially complied with the statute and the ordinance, then you would be forgiven, for lack of a better word, for the lack of notice.

MR. VAIL:  Correct.

THE COURT:  Right?  So then the question that I have for you is how does this PILOT program tie into substantial compliance?

MR. VAIL:  Right.  Okay.  So perfect, Your Honor.  You've got it exactly.

So when you then consider whether we substantially complied, some of the factors are the steps that we took to comply.  But this first one that I keep going back to that the Court will need to consider is was there any prejudice?  So were they prejudiced by our failure to strictly comply with it.  And there is number of cases in New Jersey on this.

And what we're saying is, no.  They weren't

|Hearing
|23-cv-22291, March 14, 2025

prejudiced by our failure to strictly comply.  They were making more money, and they knew about it because they were making more money because we were able to charge market rent as opposed to rent under the rent control regime.  And the market rents are higher generally than the rent control regime.  And so, therefore, they were making more money, and they knew they were making more money because we were not under rent control.

They now want to come and say, "You should have been under rent control."  But they're not offering to give back that money.  They weren't prejudiced by us not being under rent control because they knew it and were making more money.  That's the first factor.

THE COURT:  Okay.  So I follow that logic.

But then I guess the question and what I'm still struggling with is you know what you paid them.

MR. VAIL:  Yup.

THE COURT:  Right?  So what -- it seems to me information above that is disproportional to the needs of the argument you're making, which is you were not -- meaning "you," the defendants -- were not prejudiced by, you know, the rent control issue because we were paying this amount of money and this was market rate.  That's --

MR. VAIL:  Yes.

THE COURT:  If I'm understanding correctly for the

substantial compliance part and using the prejudice factor, then that's all you have to show.  No?

MR. VAIL:  So you have -- you're following me exactly, Your Honor.  Exactly the point I'm trying to make.

And so I'm saying we know -- and that's why I've agreed previously with Mr. Adelman that I would not ask him to tell me all the payments we made.  We have that.  We know that.

THE COURT:  Okay.

MR. VAIL:  But what I'm worried about is we go to trial and I'm arguing substantial compliance; they were not prejudiced.  Right?  As we just discussed.  They were not prejudiced.  They were making more money.

And they say, "We didn't care.  That wasn't very much money relative to how much we were making in other PILOT programs."

If they're not going to do that, I don't -- I don't care.  I just want to protect against being surprised at trial that they argue that our money that we were paying didn't matter to them because in the big scheme of things -- which I'm sure is just one line entry in their accounting somewhere, they can just tell us -- is, you know, what the comparison was.

If they're not going to argue that, I don't care.

MR. MCKINNEY:  Your Honor, we have no intention of

arguing about PILOTs at all because we don't see how it has anything to do with substantial compliance with our rent control ordinance.

If we were talking about substantial compliance with the long-term tax exemption statute, maybe there's something there.

But as my colleague did point out, there's a separate matter that they have in the tax court, which neither of us are versed in, but that would seem like the more appropriate venue to bring this up.

Whether or not they're making timely payments on their PILOT agreement, how much those were, how it benefitted the City, it has nothing to do with whether or not they hit the check boxes on the ordinance for rent control.  Making those payments does not prove substantial compliance with our rent control ordinance.

THE COURT:  So it seems to me that this issue is really moot because your concern is being mitigated by the representation.

So let's move on to the next issue.

Dispute Number 9, Dispute Number 9, defendants are not searching for documents responsive to Portside's Request For Production Number 6.

And give me one moment.

(Pause in proceedings)

THE COURT:  Okay.  So again Dispute Number 9, Tenants are not searching for documents responsive to Portside Request For Production Number 6.

So let me hear from you, Ms. Hartman Lustig.

MS. HARTMAN LUSTIG:  Thank you, Your Honor.

RFP Number 6 seeks all documents reflecting knowledge or information known by Portside Towers' Tenants that Portside was or was not covered by the exemption, including before the Tenant agreed to enter the original lease at Portside.

Again, we have to go back to what we are talking about here.  We are talking about the prerogative writ action.  And it does not matter what any one of the Tenants knew or did not know about the exemption of those Towers when they moved in as to whether they are or are not exempt.  It would be unreasonable to expect that a Tenant would ask a landlord when they're looking at an apartment, "Oh, by the way, you know, I never lived in Jersey City before, but are you guys under rent control?" especially when there are certain requirements that a landlord is supposed to comply with in terms of just automatically providing that information to the Tenant.

And so in a situation where a Tenant moves in and they're not given anything, they're not given any information about the prior Tenant and, in fact, they're told, "Well,

we're not -- we're not subject to rent control," that's not relevant. The Board would have never considered -- nor would the Bureau have ever considered -- for that matter in the recalculation aspect of things -- what the Tenants knew or did not know.

And so we have objected to this. We believe our objection is valid. We have cited the rule -- and this is not even a proportionality issue. It is simply not relevant to a determination by this Court.

MR. REED: Okay. Sure, Your Honor.

Again, now we're focused again on the lack of prejudice to the defending party. If these Tenants knew conceded, recognized that they were entering into leases for luxury apartments on the waterfront that were not under the rent control regime, they were not prejudiced. This is about as plain as day as it could be. They can't argue that they were prejudiced if they fully knew this when they entered -- or at least they can argue -- I will argue against that they were prejudiced if they fully knew the terms that they were entering into, agreed to those terms, and get benefit from living in a luxury apartment.

So they have a few named Tenants. We know they got the addendum to the lease before they signed that told them we were exempt from rent control. All we want to know is if they have other communications where they conceded, admitted,

recognized that the lease they were entering into was not under rent control before they entered into it because it would show they're not prejudiced by then years later arguing oh, we should be exempt from -- or we should be under rent control and our apartment rates should be low far back to the 1990s.

That's our position, Your Honor.

MR. MAROTTA:  Your Honor, if I may be heard on that?  Then it's irrelevant.  The law is clear the Tenant cannot waive rent control.  It's against public policy.  <u>Tave v. Furst</u>, 182 N.J. Super. 497.  That is the Law Division case -- I'm sorry.  I do not have the Appellate Division cite that echos it and says the same thing.  It's against public policy.  It's not relevant to this.  It doesn't go to a prejudice against the Tenants.  The Tenant -- the case states that the Tenant, one of the nicer apartments, said, you know what?  I'll pay that higher rent.

Comes down.  The court said no.  You can't waive rent control.  You're subject to rent control.

So I don't believe it's relevant.  And there's no reason to have discovery in that regard.

MR. REED:  Wait.  I would just briefly say, Your Honor, that context of waiver is different than this context of prejudice under the factors that the Court needs to have facts on to evaluate, if we get to that point.

|Hearing                                                                    105
|23-cv-22291, March 14, 2025

THE COURT:  Look, I am not convinced that this is relevant.  In fact, I'm very skeptical of it.

But I'm hearing case law that I don't think I have fully digested.  So if you want an opportunity to brief it, I'll give you that opportunity.  But I will tell you, based on the arguments I'm hearing today, I'm skeptical that this is relevant.

And if you want to spend the time trying to convince me otherwise, I'll entertain those arguments.

MR. VAIL:  Thank Your Honor.

I'm listening very clearly to you.  So we'll consider it and decide what makes the most sense.

Okay, Your Honor.  I am going to -- I think we're on Dispute Number 10 now.  I'm going to hand off to Mr. Reed because I am not involved in --

THE COURT:  Okay.

MR. VAIL:  -- this part.

THE COURT:  So Dispute Number 10, to put it in context, the Tenants refuse to produce documents responsive to Portside Request For Production Number 11.  And that request says that all defendant intervenors WhatsApp group chat messages related to the dispute or in which Portside Tower Tenants communicate about this dispute.

Why is that relevant to the prerogative writ action?

|Hearing
|23-cv-22291, March 14, 2025

MR. REED: Yes, Judge. As we talked about earlier regarding communications before -- between residents, we -- and we're -- it is really relevant to know what they're talking about, what's happening as far as their influence with decision-makers, what they're planning. We do know from emails that we have from the residents, that they were talking to certain City Council members, certain other public officials, meeting with them, having conversations.

And so it is relevant to understand what type of conversations were going on, what type of pressure was putting on -- was being put on the decision-makers and the City.

And, Judge, just for some context here, we -- the Tenants had first objected due to relevance. But they then agreed to produce all nonprivileged aspects of this group chat that, by the way, was created just for this dispute back in April 2022, on November 8th, and on December 13th. They had agreed to produce nonprivileged aspects of this group chat.

And only recently, totally pivoted and said, well, its not relevant -- it's not relevance anymore. It's all privileged.

Judge, we don't even know who are -- who are on this group chat, whether or not they're represented by counsel. We have not never gotten a ledger about that. We

would at least respectfully request a privilege log as far as what's the privileged facts of this.

And the other aspect of this, Judge, is the Tenants fought very hard and infused themselves into this case. They have a PW action as well. And they're looking to go back, roll back these rents much, much further than even the Board did. And so this group chat that was created by these residents to talk about this case, in particular to strategize and to, I believe, as Ms. Hirsch had quoted, neighborhood character and the first step in organizing their Tenant activism at first relative to this particular issue.

Judge, this is information that's relevant to this case. It's information that's not privileged. It should not be subject to any objection relative to relevance. And this is something that we're entitled to to take a look at and see.

THE COURT: How does it tie in the Board's decision to issue -- make a decision here?

MR. REED: Well, we know from emails between the Tenants that this group chat was at least created in April 2022. This is before they even started filing complaints with the Rent Control Board.

So I think it's relevant to see what type of communication, what type of pressure was being put on not only the Bureau and the Bureau determinations and how that

|Hearing
|23-cv-22291, March 14, 2025

played out, but also throughout the Board process.  This is where they put together their group activism to promote their positions with the Board, with the Bureau throughout this entire process.

And that should be relevant for us --

THE COURT:  But isn't it always the case that constituents are going to place -- you know, they're passionate about an issue, they're going to sort of put pressure on politicians, and -- or folks who are in positions of power.  Isn't what matters, not the pressure that was put on these individuals but what they ultimately decided and how they came to that decision?  Meaning their internal thought process, which we talked about earlier today.

MR. REED:  Yeah, and certainly meetings with Mr. Richardson, who's the rent control administrator; even meetings with Ms. Hendon during her tenure as the rent control administrator; meetings they may have had with decision-makers as part of the City -- I mean, all of that is relevant.  I mean, the Court has already talked about emails that would be relevant with decision-makers.  I think the planning and outcome of those meetings that may be on this group chat, likely are on this group chat has created this particular litigation, would be relevant for us to at least see and test potentially at trial.

THE COURT:  Okay.

Mr. Adelman?  Or actually this is more for Ms. Hartman Lustig.

MR. ADELMAN:  Well --

MS. HARTMAN LUSTIG:  Go ahead.

MR. ADELMAN:  Okay.

MS. HARTMAN LUSTIG:  If I may, Your Honor.  I'll let Mr. Adelman speak for us.

MR. ADELMAN:  Judge, in theory, anything is relevant.  Anything.  Anything could be relevant to this case.

Everything that we're discussing here, this record -- I mean, anything is relevant.  I mean, how far are we going to take relevant?

But you have to look no far than all of the aggressive, persistent, emotional and, respectfully, some inappropriate comments made at Council meetings regarding their -- I understand they're impassioned.  But it's all on video.  They're acting as if this is some sort of conspiracy through WhatsApp chat, and ultimately they then colluded with Director Richardson to come to this decision, to somehow mistreat Portside.

I mean, this is not a mystery here.

And I wouldn't call some of the communications -- or any of the communications between the Tenants and Mr. Richardson, Ms. Hendon as meetings when many of them

showed up at their own personal places, such as Mr. Richardson's church, to talk with him.  This is not a situation where Tenants were making appointments and coming in and having coffee and tea.  I mean, this was an aggressive adversarial situation.

And to say -- no.  And -- but to say this WhatsApp chat has anything to do with the Rent Board's decision?  I mean, you know, this case will never get decided.  This case will never -- for them to say that they want this expedited, I mean, it's completely disingenuous to say they need this WhatsApp chat.  I don't know what that's going to show.

And I want to just -- let's take this back.  We've already agreed to produce communications that we're able to locate simply between the decision-makers.  So that's all you need.  I mean, whatever -- whatever statements the Tenants made, which they have a right to make at Council meetings and say to other public representatives, those are statements.  Those are public statements.  Most of them are on video.

But at the end of the day, you're looking at the decision-makers.

So we're just -- this is more time that's being wasted.

And I'll Mollie continue.

But go ahead.

THE COURT:  Well, let Mr. Reed respond, and then I

will turn to Ms. Hartman Lustig.

Go ahead.

MR. REED:  If I could, yeah, just respond to Mr. Adelman because I think Mr. Adelman actually highlights the reason that we need this chat.  We didn't know that Tenants met with Mr. Richardson at his church to inform him or discuss with him about this case.

But maybe there's a summary of that communication in this WhatsApp chat.  Maybe there's something in this WhatsApp chat that give us that type of information.

This is the type of influence that we're not -- we weren't apprised of.  And I think we should be entitled to.  We're talking about a very, very serious issue, Judge.  I mean, this is over 30 years of a rent control exemption where everybody, including the City, the Tenants, the owner were living one way, living one way as exempt from rent control, paying PILOT paying a PILOT agreement.  I don't want to go back too far.  But living that way.

And then 30 years -- actually when the statutory exemption expired, the City comes back and pulls the rug out from under us.

The Tenants right now have a companion case pending that's been stayed, as Your Honor knows, for $400 million.  This is not pennies.  They should be entitled to test all of these aspects of our case to see how the residents and others

may have influenced these decision-makers -- Mr. Richardson is a decision-maker -- how those folks were persuade.

This is one chat, Judge. This shouldn't be hard to provide.

And anything that is privileged in the chat, they can give us a privilege log, and they can -- they can black it out.

But we should be able to explore these various aspects because it goes to the heart of arbitrary and capricious. It goes to the heart of the undue pressure that Mr. Adelman simply -- admits and talks about here today, even outside of emails, as Mr. Adelman has just informed us, Judge.

This chat is one aspect of us being able to explore various aspects of pressure that were put on the City and especially decision-makers that we should be entitled to. Let me hear from Ms. Hartman Lustig.

MS. HARTMAN LUSTIG: Thank you, Your Honor.

The focus of today, I can summarize it, has been on communications between -- with decision-makers.

And with all due respect, I don't think that plaintiff has reviewed all of the paper discovery because if they had, they'd know that the Tenants went and visited Mr. Richardson at his church because there's correspondence about it. And we've produced that correspondence.

|Hearing
|23-cv-22291, March 14, 2025

But what they're now seeking -- and I think Mr. Nemeth explained it the best, the WhatsApp chat -- and I'm talking about a WhatsApp chat that began in January of 2024 between represented Tenants all of whom are represented, all of those Tenants, I should say, the units of Tenants have been provided to plaintiff, so they're aware that that -- they're aware of the universe of represented Tenants here.

But more importantly, Mr. Nemeth explained it, the privileges are so interwoven in the WhatsApp chat that it is hard to break it apart. And we have tried. This is one of the main issues that we have been meeting and conferring on for months now. We've of course maintained that, you know, similar to the Robinson v. Horizon Blue Cross Blue Shield case, which is a case out of this Court, unpublished. It's 2013 U.S. Dist. LEXIS. The cite is 2123. And I have a copy of that for Your Honor. This is a case where voluminous discovery had already been produced, and it just didn't contain the facts that plaintiff wanted. Right? And so plaintiff insisted that they continue to compel further documentation.

And the Court said, no. You can't just continue to discover things in the hopes that you're going to find something and that you're going to find some theory that's quite frankly, not supported here. This is exactly the type of fishing expedition that Rule 26 prohibits.

We still have not heard from them other than to say that there might be communications in here about how the Tenants communicated with certain decision-makers or their strategy in how they were going to approach those decision-makers.

But at the heart of it what was actually communicated to the decision-makers and whether it had an effect on the decision here.

And I submit to you that they have that. They're aware of those facts. And they are aware of the pressure -- I think it was a twisting of records. Pressure is not always undue. Pressure is not always unlawful. As Your Honor has highlighted, constituents are free to come and redress their grievances to the public, which is exactly what these Tenants did. And I am not certain that their strategization as to how they presented those arguments is relevant to this case.

Actually, I am sure that it is not.

THE COURT: Mr. Nemeth.

MR. NEMETH: Thank Your Honor.

I'll just mention briefly. The one aspect of this that maybe we haven't really focused on here is that this was a -- and is a Tenant gathering group. It's for the purpose of pulling in Tenants that have concerns, introducing them to us, for representation. And it's a way for them to voice their concerns about the way they're being treated by the

landlord.

They're exercising their First Amendment rights. And by trying to produce all of those communications, besides the privilege component, is that it chills those rights because for all of those Tenants who want to be heard about their concerns, if they have to be concerned that now Portside and Equity are going to know what they're saying about them, now they can fear retaliation.

And I'm telling you, Judge, the way this has worked, these Tenants are constantly, day to day, week to week, having problems with the landlord, not meeting their obligations under the lease.

And one of the reasons -- and I don't want to invert us here too much, but the reason we're looking at the order to show cause is we need to find way to get them relief because no state court judge will take a complaint from us knowing there's a federal court action.

So, again, just rolling back to this, this is a sounding board for those Tenants with information we've given them to arm them to help them gather Tenants to teach them about the litigation.

And this is, as Ms. Lustig has said -- Ms. Hartman has said -- sorry -- this is an interwoven communication that maybe there are some pieces of it that don't say "Gee, Mr. Marotta told me this."  But it's in the course of those

communications.  So tell us what we can do about this to Mr. Weller and Ms. Hirsch and others.

Thank Your Honor.

THE COURT:  Okay.

Mr. McKinney, was there anything.

MR. MCKINNEY:  I was more or less going to say exactly what Mr. Nemeth said and just say, at the end of the day, we've already got it on the record that we're supposed to get the communications from the decision-makers.

The citizens should have the right to privacy to communicate amongst themselves.  What they're saying in that chat has absolutely no bearing, most likely, on what any decision-makers made.

Government employees are used to pressure.  We're understaffed.  We're often overworked.  What people are saying in public about us is not necessarily anything that breaks us --

MALE SPEAKER:  Thank you.

MR. REED:  And, Judge, I may agree with some of those arguments relative to First Amendment and having some privacy.  But these residents have made a targeted effort to be in this case.  They are plaintiff/defendants in this case. Not only the named defendants -- Weller, Hirsch, Rothfus, and Brann -- but also the Tenant associations.  This is a Tenant association blog.  They are parties in this case, Judge.  We

should be entitled to this information.

And, by the way, Ms. Lustig talks about a group chat that was started in January of 2024.

Judge, we have documentary evidence and emails from Mr. Weller to our client as early as April 2022 that they started a WhatsApp chat.

So -- I don't know if there's two chats here. But we're interested in the chat that crosses the time period of when the dispute was live before the Bureau and the Board. Not really interested in anything that happened after that -- because we want to see what type of communications were going on with decision-makers -- as Mr. Shyrone Richardson. Maybe there was a meeting with a Board member. Maybe they went to Board member's house, and they had tea with them, and they were talking about this on this WhatsApp chat.

They are now parties to this litigation. We should have access to that. And, of course, if there's privileged information in that WhatsApp chat, they can redact that. And, in fact, that's initially what we agreed to. We agreed to that on November 8th and on September 13th, that they were going to provide the WhatsApp chat to us with a privilege log, redacting any privileged communications.

We don't have any idea who are members, by the way, of this WhatsApp chat. This is a large chat. It's almost 300 people, as I understand it.

So the claim of privilege, I think, is far afield here.

But we should be entitled at least to the nonprivileged communications that are on this chat during that relevant period of time, Judge.

THE COURT:  Okay.  So, look, I'm going to deny your request here.  Let me explain why.

I am not going to turn this into a constitutional issue of First Amendment.  I'm looking at this in a very narrow way:  Is it relevant to the -- to the current action?  Is it -- let me rephrase that.  Is it relevant to the prerogative writ claim that is what is being litigated right now.  And for me, the question is did the Board act in a way that was arbitrary, capricious, and unreasonable?

The fact that -- let's assume you're right, that the Tenants put undue pressure on the Board.  Well, then that should be borne out in the decision that they made.  What pressure was put on them from my perspective is not relevant and proportional to the needs of the case.

What is ultimately relevant is what they decided and how they decided.

And so I think that Request For Production Number 11 doesn't quite get to that point.

Now, is it relevant to other things?  Maybe.  But we'll see what happens after the case is, you know, addressed

from the perspective of the prerogative writ.  If later on the case survives that aspect of it and there is, you know, another claim that you want to bring, then I will consider that request at that point in time.  But not for purposes of the prerogative writ.

So that takes me, then, to Dispute Number 11, which I understand has been withdrawn, Mr. Vail.  Correct?

MR. VAIL:  Correct, Your Honor.  For the purposes of the PW, we've agreed to withdraw it, yes.

THE COURT:  Okay.  All right.

And then we've talked about the order to show cause.  That is not an issue for me to address.  It's going to be for Judge Arleo to address.  And so I understand the parties have already reached out to her chambers.

I will notify her that, you know, if you submitted letters to her.

This then takes me to the March 6th, 2025, letter.  There is -- it says the City refuses to participate in any additional discovery in this case, including depositions.

Again, its -- you know, I would want a little more details to what the positions are being -- you want to take and why those depositions are relevant to the prerogative writ claim.

MR. VAIL:  Sure.  Would you like me to address that now, Your Honor?

THE COURT:  Yes.

MR. VAIL:  Okay.  So the depositions that we've noticed to date are limited to essentially the parties and the decision-makers and, frankly not even all of them.

So far, we have noticed the depositions of who we would characterize to be the decision-makers.  Shyrone Richardson, you've heard that name; he's currently the lead at the agency.  Dinah Hendon, she was previously the administrator at agency.

THE COURT:  How do you spell that?

MR. ADELMAN:  Her name is D-i-n-a-h.  Her last name is Hendon, H-e-n-d-o-n.

THE COURT:  Okay.

MR. REED:  She is the one who made the initial determination that we're exempt.  That was appealed.

And then the only other decision-maker that, at this point, we have noticed up, was the chair of the Board, Mr. Albert Cupo, if I'm saying that correctly.

So those are three that we've noticed in the role of decision-makers and tried to keep it very limited initially, chair, and the two leads from the agency.

We then noticed the four named defendants, who brought their own claims in this case, including against our clients.  So that's -- I have Kevin Weller, Michelle Hirsch, Joel Rothfus, Jessica Brann.  These are the folks,

Your Honor, who basically get up at every City Council meeting and speak about this issue.

And then last the party representative, so the 30(b)(6) from the defendants and the 30(b)(6)s from the two associations. And we provided them topics for those depositions. We'd be willing to meet and confer to discuss those topics, if that's helpful. But at this point we've been told by both parties that they refuse to present anyone for deposition in this case.

THE COURT: Okay. I am not sure for the City, who's taking this?

MR. ADELMAN: Judge, if I can have just a moment. I'm just looking for a citation.

THE COURT: While you're looking for that, Ms. Hartman Lustig, do you have a position on this?

MS. HARTMAN LUSTIG: Yes, Your Honor. We do not believe that depositions -- I should back up.

I've had very few prerogative writ actions in my lifetime that have -- where we've even been discussing depositions -- right? -- because we're assuming as valid municipal decision, we're going to do a review of the record below, we're not doing a de novo review, and so we don't need to ask people questions about why they did or why they didn't do things.

The topics, I understand that they -- representing

that they were, you know, culled or shortened in some way.

They're really quite broad.  So for the Tenant associations, they are asking Tenant knowledge and understanding of the Jersey City rent control ordinance and an exemption thereunder; Tenant knowledge and understanding of the state exemption; facts recording the November 3rd decision, including Tenant attempts to influence it, which we've already represented there's no communications betweenactual Rent Leveling Board decision-makers and these Tenants at all; Tenants' efforts to persuade City officials; any prejudice Tenants suffered without rent control prices in place; Tenants' knowledge of exemption applicability to towards Towers prior to renting; reasons that the Tenants chose to live at Portside Towers; the Tenants' lease agreements, including a provision that rent control is inapplicable and Tenants' discovery responses.

We've talked about a lot of these today, Your Honor.  And in some of these, you've made your rulings quite clear.

So I am not sure how you --

THE COURT:  So I guess, you know, the -- what's the legal objection tos deposition --

MS. HARTMAN LUSTIG:  The legal objection is that these Tenant associations were created to organize the Tenants so they can make petitions and that they can get

decisions that uniformly affect all of them.

Their knowledge of the law -- they're lay people. They're Tenants.

THE COURT:  I just want to make sure I'm understanding.

Are you objecting to the topics?  Or are you objecting to the depositions?

MS. HARTMAN LUSTIG:  I'm objecting to both. We're --

THE COURT:  Oh, we don't even need to get to the topic if you're objecting --

MS. HARTMAN LUSTIG:  We're objecting to the depositions in general.

THE COURT:  So what's the legal basis to objecting to the depositions?

MS. HARTMAN LUSTIG:  Because there is absolutely no facts that they could glean from those depositions that would change the decision of the Board or determine whether the decision of the Board was arbitrary, capricious, or unreasonable, especially where you do not have any written evidence in this volume of evidence that leads you to that conclusion.

THE COURT:  Mr. Adelman?

MR. ADELMAN:  Well, first let me talk about the subpoena to Dinah Hendon.  Dinah Hendon's a lawyer.  And many

of her conversations would be considered privileged in her role with the Board, for starters.

Number two is her decision was overturned. So when we're talking about the decision, that's in play here. Not the one that preceded it.

Her opinions as to this matter, especially if they're legal opinions or they involve legal -- they involve legal advice that she may have given to the Bureau would be privileged. And it's not within the means of the proportionality of this case. The legal citation that I would cite to is U.S. v. Morgan -- and I apologize because I'm --

THE COURT: Is this cited in your letter?

MR. ADELMAN: No, it's not.

THE COURT: Okay. So then I am not going to consider it for today.

Let me just cut to the chase on this issue. I think this is an issue that is sufficiently complicated that I'm going to require briefing on this because the parties are, from what I'm gathering, not giving me the arguments that I think I need to really consider, in other words, to make an informed decision.

Go ahead, Mr. McKinney.

MR. MCKINNEY: I would just go back to the fact that under prerogative writ motions, the decision of boards

are presumed to be valid.

The point of these depositions are essentially to prove that there's a conspiracy theory when there is absolutely no evidence to suggest that.

There are the facts on the record the Board considered and made their conclusion on.  Now, they want to depose them to say, "Well, what did you mean when you said this on the record?"

It doesn't get us anywhere.

THE COURT:  So, no, I understand where you're going.

What I want, just for the sake of time, is a brief where you focus on case law dealing with depositions and prerogative writs and when those depositions are appropriate and when they're not.

And then I will make a decision based on that.

MR. MCKINNEY:  Understood, Your Honor.  Thank you.

THE COURT:  You're welcome.

Dispute Number 4, Tenants refuse to produce any additional discovery in this case.

That seems like the broadest possible --

MR. VAIL:  We've covered --

THE COURT:  -- issue that anyone could ever raise.

So -- so when you say we've covered this, meaning what?

MR. VAIL:  Your Honor, this again was a later letter that, you know, the letter we just went through had some of the items broken down and more specifics.

And here in this letter we're just basically saying, you know, they refused to engage any further.

So I believe that we've covered what would be our grievances about the discovery in what we've done already today.

THE COURT:  Okay.  Okay.  Then we're nearing the end.  I only have two many of pages.

So the Tenants seek leave to file a motion to quash the subpoena that Portside issued to Meta platform.

Isn't that the issue we just decided before?

MR. MCKINNEY:  Yes, Your Honor.  And, you know, if plaintiffs are willing to withdraw the subpoena, then we won't ask leave of Court to quash it.  But we'll pursue that with Your Honor's leave, if necessary.

THE COURT:  Anything else I need to consider on this, Mr. Vail?

MR. VAIL:  No.  Your Honor, remember, I promised you that if you ruled that at least as part of this part, we would not -- you didn't view that we should get the WhatsApp, we're going to -- we're going to withdraw the subpoena.

THE COURT:  Okay.

So good news, I think we're done.

Unless five pages fell off of my script.

Is there anything else that I missed?  Anything that we need to discuss?  Let me just go one by one.

Mr. Vail or Mr. Reed?

MR. VAIL:  I don't believe so, Your Honor.  And we appreciate your time today.

THE COURT:  Absolutely.

Mr. McKinney or Mr. Adelman?

MR. MCKINNEY:  Same, Your Honor.  Appreciate your time.  I think we're good.

THE COURT:  Ms. Hartman Lustig.

MS. HARTMAN LUSTIG:  Nothing further.  Just some time by which we are supposed to submit the briefing on the different issues.

THE COURT:  Good point.

So let's talk about that.

So the issues that need to be briefed, it wasn't Issue Number 3; right?  No.  Because we decided that one.

MR. VAIL:  Your Honor, I believe -- I believe we've collectively recalled, subject to everyone agreeing.  One was the briefing on Tidewater.  One was briefing on Tenant --

THE COURT:  I'm sorry.  The Tidewater Basin?

MR. VAIL:  Yes, Your Honor.

THE COURT:  Okay.

MR. VAIL:  One was briefing with the Tenants on

Tenant knowledge.  And then the last one is depositions.

THE COURT:  Briefing on Tenant knowledge of -- let's just be a little more specific --

(Simultaneous conversation)

THE COURT:  I mean, I would have go back through the record.  And I'm trying to avoid that --

(Simultaneous conversation)

MR. VAIL:  Issue 9.

MS. BENIGERI:  Issue 9 where it's Tenant knowledge of the exemption prior to or coinciding with the renting out Portside Towers.

THE COURT:  So dispute -- the Tidewater Basin, that was Dispute Number?

MS. BENIGERI:  That was tied to Dispute Number 3. But that it was just generally the relevance of Tidewater discovery to the case.

THE COURT:  Okay.

And then Dispute Number 9.

UNIDENTIFIED SPEAKERS:  Yes.

THE COURT:-- official -- Dispute Number 9, so it was -- I think this is where you were arguing about the substantial -- remind me.

MR. VAIL:  Compliance.

THE COURT:  Substantial compliance, and the relevance of that to the --

MR. VAIL:  To their knowledge, prejudice, et cetera, yes.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  Yeah -- to Tenant -- whether a Tenant can waive rent control.  That was all part of the same argument.

UNIDENTIFIED SPEAKERS:  Yes.

THE COURT:  Well, I'll tell you what my argument and my concern is how does it all tie into the prerogative writ?  And, you know, why is that needed for Judge Arleo to decide whether the decision here was arbitrary, capricious, and unreasonable.

MR. VAIL:  Yes, Your Honor.  If you recall, that's what we argued.  You had it exactly right on the substantial compliance, prejudice prong, that that could be something that could be considered.

And you said you wanted more briefing to understand that.

THE COURT:  Okay.  And then --

MR. VAIL:  And then depositions was the third one, Your Honor, the one we just did.

THE COURT:  Deposition -- there was another one that I told you that I think I was --

(Simultaneous conversation)

THE COURT:  -- skeptical about the relevance.

(Simultaneous conversation)

MS. BENIGERI:  Oh, actually, I'm sorry.  This was one where he -- that was -- sorry, Your Honor.  Dispute Number 9 was when you said that we could brief it, and we said we would just consider briefing it.  Apologies.

THE COURT:  Okay.  So that was the one.  Okay.

FEMALE SPEAKER:  Yes.

THE COURT:  And then is there another one?  No was there anything else we needed to brief?

MR. VAIL:  Possibly three.  Two for sure, possibly three.

Tidewater, for sure.  Depositions for sure.  And a potential for us to brief 9.

THE COURT:  Okay.

And then on your end, was there --

MS. HARTMAN LUSTIG:  Your Honor, may I allow Mr. Hegazi speak to it?  He has a better recollection because he was taking notes.

THE COURT:  Absolutely.

MR. HEGAZI:  I just -- I wanted to clarify for a second the dispute as to Request For Production Number 6, that was the documents concerning the Tenants' alleged knowledge.

My understanding was that Your Honor expressed some skepticism is to whether or not that was relevant, that

plaintiffs would consider possibly withdrawing that request in light of what you had stated earlier.

THE COURT:  -- filing a motion.

MR. HEGAZI:  Or filing that --

(Simultaneous conversation)

THE COURT:  I gave them the option.

MR. HEGAZI:  So then I think we're good.

THE COURT:  Okay.  All right?  Nothing else.  -- right? -- that needs to be briefed?

MR. ADELMAN:  Yeah, as far as briefing, no.

THE COURT:  Okay.  So then the question that I have is you have the burden here.

So what's -- how much time do you need?  Are.

MR. VAIL:  Can I have one moment to huddle?

THE COURT:  Sure.

MR. VAIL:  I want to keep this moving but don't want to put too much pressure on the team.

MR. ADELMAN:  Andrew, can I just make a statement before you huddle so you don't miss it?

I just wanted to sum up what the City agreed to produce as far as discovery goes so that it's clear for the record --

THE COURT:  I am not going to go back because --

MR. ADELMAN:  Did we already do that?

THE COURT:  -- two and a half hour long; so --

|Hearing
|23-cv-22291, March 14, 2025

MR. ADELMAN:  No, no.  It's just --

THE COURT:  -- or four hours long.  I don't even know how many hours we've gone so far.

So look at the record and, you know, whatever I said on the record.

MR. ADELMAN:  Well -- okay.  Well, that aside, I wanted to just inquire about a time frame for that too is all.

THE COURT:  Okay.

(Pause in proceedings)

THE COURT:  Okay.

MR. VAIL:  I'm ready, Your Honor.

So we -- I'm trying to work with counsel, because given spring break and everything, I want to try and -- we all try and accommodate each other.  We do have, despite a lot of differences, a pretty good attorney civil working relationship here.

So we would be ready on our side to go in 10 days.

But if it would beneficial for folks do 14/14, we think that could be appropriate.  We really don't want to go too far out with all this because we want to keep this case moving toward summary judgment as prompt as possible.

MS. HARTMAN LUSTIG:  And, Your Honor, we are fine with the 14/14.  It's a Friday.  It'll bring us right before the Friday -- well, I don't know about Chicago spring break,

but it won't interrupt mine, Your Honor.  And you'll have my brief right before I leave.

THE COURT:  Okay.

Mr. Adelman is there anything you need to respond to here?  And then we have to account for a reply.

MR. ADELMAN:  Well, I won't go into too much detail.

THE COURT:  It's only 6:00 P.M.

MR. ADELMAN:  Well, I may be having surgery next week.

THE COURT:  Okay.

MR. ADELMAN:  So that was the reason for the extended time, but I can --

THE COURT:  No problem.  We can certainly accommodate --

MR. ADELMAN:  I can make something work.  That's all.

THE COURT:  Well, no, look, this case is important. I'm sure that the parties want to see resolution, but I think we can all agree that health should come first.

So if you need more time, just let me know.

MR. ADELMAN:  In other words.  I think if I called Andrew and said, can -- and the Court and said, could we have two more days to respond, I don't -- would that be --

MR. VAIL:  We've always agreed with you.  So ...

THE COURT:  And if someone objects to that, you're going to have to come and explain why.

MR. VAIL:  Which is probably why we never would do it other than ...

MR. ADELMAN:  And then do we want to determine a time frame for the production of discovery?  Or is that after you want --

THE COURT:  No, I do, but before we do that, do you need time, one week to reply, then?

MR. VAIL:  Yes, Your Honor.  That's fine.

THE COURT:  So 14/14/7.

And then the documents, I'm trying to remember, it was the records from, like -- I guess that may be in archive, he's going to do the due diligence to see if those records exist.  It sounds like that due diligence was already done, you know, in connection with the prior determination, and there were none.  So it's just a matter of double-checking.

How much time do you need?

MR. MCKINNEY:  I'll inquire about that next week. So if you give us just two weeks, I should probably be able to get an answer on that.  But I'm hoping that part does not take too long.

THE COURT:  Okay.  Was that the only item --

MR. ADELMAN:  Well, I know we have to produce communications between decision-makers.  So that requires a

search on our system.  And --

MR. MCKINNEY:  Well, it's going to be a little more difficult than that because not all of the decision-makers have City email accounts.  So I'm going to have to get in touch with them.

So I guess 30 days.  Would that work for everybody?

MR. VAIL:  For me, that's acceptable.

The one thing I'd ask John is on the ones you already have, if we could get those on a rolling basis, that -- if you can do that, I think that would help move things along.

MR. MCKINNEY:  I'm just going to start the search from scratch based off of what he discussed here so I don't have to try and sort through things that might not be responsive at this point.

THE COURT:  Well, look, I am not going to get into mechanics of how you're going to do it other than you're going to do it.

MR. MCKINNEY:  I'm going to do it.  Give me 30 days.  If something comes up, I will let the Court know.

THE COURT:  That seems reasonable.

MR. MCKINNEY:  Thank you, Your Honor.

THE COURT:  Is there any other issue that we need to put a time frame on?

MS. HARTMAN LUSTIG:  Well, the document search

related to Tidewater Basin -- related to whether the

construction official has a file on Portside, I mean, that

seems relatively quick.  And we can end that inquiry.

Defendant.

THE COURT:  Well, he says he's going to do it in

two weeks.

MS. HARTMAN LUSTIG:  You're going to do that in two

weeks?

MR. MCKINNEY:  Yeah, I'm hoping -- I'm hoping

they'll be able to get an answer on that by Tuesday.  So...

THE COURT:  Okay.  I hope that you don't spend as

much time looking for that file as we did arguing today in

court.

MR. MCKINNEY:  I hope so too, Your Honor.

THE COURT:  Okay.  Was there anything else that I'm

missing?

MR. VAIL:  No, Your Honor.

THE COURT:  No?  Let me just check to see if we

need clarification on anything.

(Pause in proceedings)

THE COURT:  Okay.  So I think we're done.  So there

being no other business with the Court, this matter is

adjourned.

Thank you very much for your time.

MR. VAIL:  Well, wait a minute.  Sorry, Your Honor.

THE COURT:  Oh, there is one more.

MR. VAIL:  There is one more.

So, Your Honor, you also ruled that they have to provide us a methodology for their searching.  I've just agreed with Mr. McKinney, if it's okay with Your Honor, that that can come within the 30 days.

THE COURT:  Sure.

MR. MCKINNEY:  I'll provide a certification for how the search was done with the documents that are provided.

THE COURT:  Okay.

MR. VAIL:  But we're also asking for, like, if you went to interview someone, who that was and what it was.

MR. MCKINNEY:  Yeah, it'll be in the search.

MR. VAIL:  Okay.

THE COURT:  Okay.  That's it?

MS. HARTMAN LUSTIG:  That's it.

THE COURT:  Are you sure?  One last chance.  All right.  Thank you.  We're done.

UNIDENTIFIED SPEAKERS:  Thank you, Your Honor.

(Conclusion of proceedings)

Certification

I, SARA L. KERN, Transcriptionist, do hereby certify that the 138 pages contained herein constitute a full, true, and accurate transcript from the official electronic recording of the proceedings had in the above-entitled matter; that research was performed on the spelling of proper names and utilizing the information provided, but that in many cases the spellings were educated guesses; that the transcript was prepared by me or under my direction and was done to the best of my skill and ability.

I further certify that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

s/ *Sara L. Kern*                                28th of March, 2025
_____     _____
Signature of Approved Transcriber                    Date


Sara L. Kern, CET**D-338
King Transcription Services, LLC
3 South Corporate Drive, Suite 203
Riverdale, NJ  07457
(973) 237-6080