# EXHIBIT A

**BRITTANY M. MURRAY**
**ACTING CORPORATION COUNSEL**
Philip S. Adelman, Esq.
Assistant Corporation Counsel
Jersey City Law Department
City Hall-280 Grove Street
Jersey City, New Jersey 07302
(201) 547-4810
padelman@jcnj.org
Attorney for Defendants the City of Jersey City
and the City of Jersey City Rent Leveling Board

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC and EQUITY RESIDENTIAL MANAGEMENT, LLC, <br><br> Plaintiff, <br><br> v. <br><br> THE CITY OF JERSEY and THE CITY OF JERSEY CITY RENT LEVELING BOARD, <br><br> Defendants. <br><br> v. <br><br> PORTSIDE TOWERS EAST TENANT ASSOCIATION, PORTSIDE TOWERS WEST TENANTS ASSOCIATION, KEVIN WELLER, JESSICA BRANN, JOEL ROTHFUS and MICHELLE HIRSCH <br><br> Intervenor - Defendants | CIVIL ACTION NO. 2:23-cv-22291 (MCA) (JRA) <br><br><br> **REQUEST FOR PRODUCTION OF DOCUMENTS AND TANGIBLE ITEMS FROM PLAINTIFFS THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC AND EQUITY RESIDENTIAL MANAGEMENT, LLC** |

To:    Derek Reed, Esq.
        Ehrlich, Petriello, Gudin, Plaza & Reed
        60 Park Place, Suite 1016
        Newark, NJ 07102

COUNSEL:

PLEASE TAKE NOTICE that Defendants the City of Jersey City and the Jersey City Rent

Leveling Board hereby request plaintiff The Towers at Portside Urban Renewal Company, LLC

1

and Equity Residential Management, LLC to produce true, correct and complete copies of the

documents and tangible items requested herein and deliver same to the Jersey City Law

Department, City Hall, 280 Grove Street, Jersey City, New Jersey 07302.

<div style="margin-left: 40%;">

**BRITTANY M. MURRAY**
**CORPORATION COUNSEL**
Attorney for Defendants City of Jersey City and the
Jersey City Rent Leveling Board

By: */s/ Philip S. Adelman*
        Philip S. Adelman
        Assistant Corporation Counsel
</div>

Dated: September 4, 2024

2

**DEFINITIONS AND INSTRUCTIONS**

1. The terms, "you," "your," "yourself," "Plaintiffs" and "Landlord," when used herein collectively refers to plaintiffs the Towers at Portside Urban Renewal Company, LLC and Equity Residential Management, LLC together with their agents and any other persons or entities acting or purporting to act on their behalf.

2. The term "City" when used herein refers to defendant the City of Jersey City.

3. The term "Board" when used herein refers to defendant Jersey City Rent Leveling Board.

4. The term "Council" when used herein refers to the Jersey City Council.

5. The term "Bureau" when used herein refers to Jersey City Rent Leveling Bureau.

6. The term "Tenants" when used herein collectively refers to defendant intervenors Portside Towers East Tenant Association and the members of this entity, Portside Towers West Tenant Association and the members of this entity, Kevin Weller, Jessica Brann, Joel Rothfus and Michelle Hirsch together with their agents and any other persons or entities acting or purporting to act on their behalf.

7. The term "defendants" when used herein collectively refers to the City and Board.

8. The term "parties" when used herein collectively refers to the City, Board, Tenants and Landlord.

9. The term "Decision" when used herein refers to the November 3, 2023 decision of the Board also attached as Exhibit C to the Landlord's Complaint [Dkt no. 1] and Exhibit A to the Landlord's Amended Complaint [Dkt no. 65].

10. The term "Recalculation" when used herein refers to the August 7, 2024 letter and calculations in the spreadsheets referenced therein and served to the parties by email dated August 7, 2024.

11. The term "Litigation" when used herein collectively refers to the above captioned matter pending in the District Court of the State of New Jersey bearing Civil Action 2:23-cv-22291 (MCA) (JRA) and collectively includes and refers to the contents of the pleadings filed and that are filed after the date of this document.

12. The term "prerogative writ claims" when used herein refers to the prerogative writ claims referenced in paragraph 9 of the Court's August 27, 2024 Order that you filed in your Amended Complaint [Dkt no. 65] or will file after the date of this document against the City in the Litigation captioned above.

13. These requests are continuing and you are instructed to make prompt, further and supplemental production when an additional document is discovered that is responsive hereto.

14. If any document called for by these requests is withheld on the ground that it is privileged, constitutes attorney work product, or is for any other reason exempt from discovery,

3

set forth the ground or grounds for withholding such document, its present location and custodian, and such additional information as may be required to enable it to be identified and to enable the Court to adjudicate the propriety of the withholding, including but not limited to the type of document, its date, author(s), addressee(s), if different, its recipient(s), and its general subject matter.

15. Documents produced in response to these requests shall be produced, pursuant to the Federal and Local Rules of Civil Procedure, in such a manner so as to identify the specific request to which they relate.

16. As used herein, the term "document" means and includes, by way of illustration and not by way of limitation, the following items, whether printed or recorded or reproduced by any other mechanical process, written, produced by hand or produced by or stored in a computer, regardless of origin or location: books, records, communications, reports, correspondence, letters, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, sound recording, applications, booklets, books, brochures, catalogues, circulars, articles, magazines, newspaper, pamphlets, periodicals, bulletins, instructions, minutes, any communications (including, but not limited to, inter- and intra-office communications), purchase orders, bills of lading, bid tabulations, questionnaires, surveys, contracts, agreements, options to purchase, memoranda of agreements, assignments, licenses, books of account, orders, invoices, statements, bills, checks, vouchers, ledger sheets, diary, accounts, journals, canceled checks, bank statements, bank passbooks, confirmations, statements of accounts, analyses, diaries, graphs, notebooks, notes, charts, tables, working papers plans, indices, summaries or records of meetings or conferences, summaries or reports of investigations or negotiations, calendar, opinions or reports of accountants or consultants, reports, data sheets, data processing cards, photographs, statistical statement, photographic negatives, phono-records, message, study, electronic mail, text messages, expert or consultant opinion, appraisal electronically stored information stored in any medium, tape recordings, tests, discs, wire recordings, transcripts of recordings, drawings, summary compilations, telex, motion picture film, forecast, advertisements, press releases, drafts, and marginal comments appearing on any such documents, all other written, graphic, electronic or printed matter of any kind, or any other and all other data compilations from which information can be obtained and translated if necessary.

17. As used herein, the term "person" means an individual, firm, partnership, corporation, proprietorship, association, governmental body or any other organization or entity.

18. As used herein, any term in the singular shall be deemed to include the plural where appropriate and vice versa.

19. As used herein, all terms including "and" and "or" shall be construed either conjunctively or disjunctively as required by the context to include in the response any document that might be deemed nonresponsive by any other construction.

20. The term "communication" as used herein means any written or verbal communication or other statement from one person to another, including, but not limited to, any letter, text message, email, interview, conference, meeting or telephone conversation.

21. As used herein, "documents relating to" means documents constituting, containing, showing, regarding, relating to or referring in any way, directly or indirectly.

### DOCUMENTS TO BE PRODUCED

1)   Any and all documents and/or tangible items relating to the testimony of any witnesses that may be called by you to testify at trial or any hearing to prove and/or that support your prerogative writ claims.

2)   Any and all documents and/or tangible items including but not limited to reports, notes, drafts, treatises and articles reviewed, considered, examined and/or relied upon and/or authored by any experts upon which you will rely to prove and/or support your prerogative writ claims.

3)   Any and all documents and/or tangible items that you will utilize, rely upon, mark as an exhibit, introduce into evidence, refer to or otherwise utilize for any purpose relating to your prerogative writ claims.

4)   Any and all documents and/or tangible items containing written or oral statements, admissions, communications or declarations from any person or entity relating to the Decision and/or the Recalculation and/or the facts that form the subject of and/or support your prerogative writ claims.

5)   Any and all documents and/or tangible items containing written or oral statements or communications between the Landlord and the Council, City, Board, Bureau, Tenants or City employees including, but not limited to Shyrone Richardson, Johna Noel, Dinah Hendon or Eric Bulwith relating to your prerogative writ claims and/or the Decision and/or the Recalculation.

6)   Any and all documents and/or tangible items relating to and/or identifying any individuals that possess knowledge relating to the Decision and/or the Recalculation and/or the facts that form the subject of and/or support your prerogative writ claims.

7)   Any and all documents and/or tangible items relating to any communications between and/or involving any parties relating to the Decision and/or the Recalculation and/or the facts that form the subject of and/or support your prerogative writ claims.

8)   Any and all documents and/or tangible items relating to any communications between and/or involving any persons relating to the Decision and/or the Recalculation and/or the facts that form the subject of and/or support your prerogative writ claims.

9)   Any and all documents and/or tangible items that referenced, reviewed, considered, relied upon or that support or contain facts regarding your answers to the set of interrogatories propounded upon you by the City and the Board on September 4, 2024.

10)  Any and all documents and/or tangible items relating to and/or that support your prerogative writ claims asserted against the City and Board in the Litigation.

11)  Any and all documents and/or tangible items referenced in, reviewed, considered or relied upon to prepare the prerogative writ claims contained in your pleadings in the Litigation.

12)  Any and all documents and/or tangible items relating to the Decision.

13)  Any and all documents and/or tangible items relating to the Recalculation.

14) Any and all documents and/or tangible items not specifically requested herein relating to the Decision and/or the Recalculation and/or the facts that form the subject of and/or support your prerogative writ claims.

# EXHIBIT B

**BRITTANY M. MURRAY**
**ACTING CORPORATION COUNSEL**
Philip S. Adelman, Esq.
Assistant Corporation Counsel
Jersey City Law Department
City Hall-280 Grove Street
Jersey City, New Jersey 07302
(201) 547-4810
padelman@jcnj.org
Attorney for Defendants the City of Jersey City
and the City of Jersey City Rent Leveling Board

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC and EQUITY RESIDENTIAL MANAGEMENT, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF JERSEY and THE CITY OF JERSEY CITY RENT LEVELING BOARD,<br><br>Defendants.<br><br>v.<br><br>PORTSIDE TOWERS EAST TENANT ASSOCIATION, PORTSIDE TOWERS WEST TENANTS ASSOCIATION, KEVIN WELLER, JESSICA BRANN, JOEL ROTHFUS and MICHELLE HIRSCH<br><br>Intervenor - Defendants | CIVIL ACTION NO.<br>2:23-cv-22291 (MCA) (JRA)<br><br><br>**REQUEST FOR ANSWERS TO INTERROGATORIES FROM PLAINTIFFS THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC AND EQUITY RESIDENTIAL MANAGEMENT, LLC** |

To:    Derek Reed, Esq.
        Ehrlich, Petriello, Gudin, Plaza & Reed
        60 Park Place, Suite 1016
        Newark, NJ 07102

COUNSEL:

        PLEASE TAKE NOTICE that Defendants the City of Jersey City and the Jersey City Rent

Leveling Board hereby request plaintiff The Towers at Portside Urban Renewal Company, LLC

1

and Equity Residential Management, LLC to provide certified answers to the following

interrogatories.  Please be advised that there is a continuing obligation to amend and supplement

your answers as additional information becomes available.

**BRITTANY M. MURRAY**
**CORPORATION COUNSEL**
Attorney for Defendants City of Jersey City and the
Jersey City Rent Leveling Board

By: */s/ Philip S. Adelman*

Philip S. Adelman
Dated: September 4, 2024                    Assistant Corporation Counsel

2

## DEFINITIONS AND INSTRUCTIONS

1.    The terms, "you," "your," "yourself," "Plaintiffs" and "Landlord," when used herein collectively refers to plaintiffs The Towers at Portside Urban Renewal Company, LLC and Equity Residential Management, LLC together with their agents and any other persons or entities acting or purporting to act on their behalf.

2.    The term "City" when used herein refers to defendant the City of Jersey City.

3.    The term "Board" when used herein refers to defendant the Jersey City Rent Leveling Board.

4.    The term "Council" when used herein refers to the Jersey City Council.

5.    The term "Bureau" when used herein refers to Jersey City Rent Leveling Bureau.

6.    The term "Tenants" when used herein collectively refers to defendant intervenors Portside Towers East Tenant Association and the members of this entity, Portside Towers West Tenant Association and the members of this entity, Kevin Weller, Jessica Brann, Joel Rothfus and Michelle Hirsch together with their agents and any other persons or entities acting or purporting to act on their behalf.

7.    The term "defendants" when used herein collectively refers to the City and Board.

8.    The term "parties" when used herein collectively refers to the City, Board, Tenants and Landlord.

9.    The term "Decision" when used herein refers to the November 3, 2023 decision of the Board also attached as Exhibit C to the Landlord's Complaint [Dkt no. 1] and Exhibit A to the Landlord's Amended Complaint [Dkt no. 65].

10.    The term "Recalculation" when used herein refers to the August 7, 2024 letter and calculations in the spreadsheets referenced therein and served to the parties by email dated August 7, 2024.

11.    The term "Litigation" when used herein collectively refers to the above captioned matter pending in the District Court of the State of New Jersey bearing Civil Action 2:23-cv-22291 (MCA) (JRA) and collectively includes and refers to the contents of the pleadings filed and that are filed after the date of this document.

12.    The term "prerogative writ claims" when used herein refers to the prerogative writ claims referenced in paragraph 9 of the Court's August 27, 2024 Order that you filed in your Amended Complaint [Dkt no. 65] or will file after the date of this document against the City in the Litigation captioned above.

13.    The term "communication" as used herein means any written or verbal communication or other statement from one person to another, including, but not limited to, any letter, text message, email, interview, conference, meeting or telephone conversation.

3

14.  As used herein, the term "document" means and includes, by way of illustration and not by way of limitation, the following items, whether printed or recorded or reproduced by any other mechanical process, written, produced by hand or produced by or stored in a computer, regardless of origin or location: books, records, communications, reports, correspondence, letters, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, sound recording, applications, booklets, books, brochures, catalogues, circulars, articles, magazines, newspaper, pamphlets, periodicals, bulletins, instructions, minutes, any communications (including, but not limited to, inter- and intra-office communications), purchase orders, bills of lading, bid tabulations, questionnaires, surveys, contracts, agreements, options to purchase, memoranda of agreements, assignments, licenses, books of account, orders, invoices, statements, bills, checks, vouchers, ledger sheets, diary, accounts, journals, canceled checks, bank statements, bank passbooks, confirmations, statements of accounts, analyses, diaries, graphs, notebooks, notes, charts, tables, working papers plans, indices, summaries or records of meetings or conferences, summaries or reports of investigations or negotiations, calendar, opinions or reports of accountants or consultants, reports, data sheets, data processing cards, photographs, statistical statement, photographic negatives, phono-records, message, study, text messages, electronic mail, expert or consultant opinion, appraisal electronically stored information stored in any medium, tape recordings, tests, discs, wire recordings, transcripts of recordings, drawings, summary compilations, telex, motion picture film, forecast, advertisements, press releases, drafts, and marginal comments appearing on any such documents, all other written, graphic, electronic or printed matter of any kind, or any other and all other data compilations from which information can be obtained and translated if necessary.

15. "Documents relating to" means documents constituting, containing, showing, regarding, relating to or referring in any way, directly or indirectly.  It is meant to include, without limitation, all documents underlying, supporting, now or previously attached or appended to, or used in the preparation of any answer called for by the Interrogatory.

16.  To the extent that information sought by any interrogatory can be furnished by reference to the answer furnished in another Interrogatory, such practice will be acceptable. However, separate answers should be provided in all cases, and Interrogatories shall not be joined together and accorded a common answer.

17.  If any of these interrogatories cannot be answered in full, answer to the extent possible, specifying the reasons for the inability to answer the remainder and stating whatever information, knowledge, or belief there is concerning the unanswered portion.

18.  If any information requested by these interrogatories is claimed to be immune from discovery on the grounds of privilege or otherwise, the basis of such claim and a description of the information sufficient to enable the Court to decide if such claim has been properly invoked should be specified.  A privilege log should also be provided.

19.  These interrogatories are continuing, and to the extent that the answers may be enlarged, diminished, or otherwise modified by information acquired by you subsequent to the service of answers hereto, you are requested to promptly thereafter serve supplemental answers reflecting such changes.

20.  As used herein, the word "any" include the word "all," and vice-versa.

4

21.  The conjunctives "and" and "or" shall be construed conjunctively or disjunctively as necessary to bring within the scope of the request or question matters which might otherwise be construed to be outside their scope.

22.  *Identify, describe and provide copies of any documents that support or are related to or reflect the answers to the within interrogatories.*

## <u>INTERROGATORIES TO THE LANDLORD</u>

1.    Describe with specificity all facts that support your prerogative writ claims against the City and the Board.

**<u>Answer:</u>**

2.    Describe with specificity all communications (written and verbal) between any of the Tenants and the Landlord relating to the Decision, the Recalculation and/or regarding the facts that support your prerogative writ claims from January 1, 2020 to the present.

**<u>Answer:</u>**

3.    Describe with specificity all communications (written and verbal) between the Landlord and any of the Tenants and any person employed by the City, which includes, but is not limited to the Board, Bureau, Shyrone Richardson, Johna Noel, Dinah Hendon, Eric Bulwith and any other person not specifically named herein relating to the Decision, the Recalculation and/or regarding the facts that support the Landlord's prerogative writ claims from January 1, 2020 to the present.

**<u>Answer:</u>**

4.    Describe with specificity all facts showing that the Decision and/or the Recalculation should be vacated or is otherwise incorrect.

**<u>Answer:</u>**

6

## **CERTIFICATION**

I hereby certify that the answers to the preceding Interrogatories are true and correct to the best of my knowledge, information, and belief.

I understand that if I have willfully made any false statements, I am subject to punishment.

Dated:_____, 2024            By: _____

7

# EXHIBIT C

Mollie Hartman Lustig, Esq.
Attorney ID 000862011
McLaughlin & Stern
One Elm Street, Suite 2
Westfield, New Jersey 07090
(908) 578-5458
MLustig@mclaughlinstern.com
Attorney for Intervenor Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC and EQUITY RESIDENTIAL MANAGEMENT, LLC, | CIVIL ACTION NO.<br><br>2:23-cv-22291 (MCA) (JRA) |
| Plaintiff, | |
| v. | **REQUEST FOR PRODUCTION OF DOCUMENTS AND TANGIBLE ITEMS FROM PLAINTIFFS THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC AND EQUITY RESIDENTIAL MANAGEMENT, LLC BY INTERVENOR DEFENDANTS** |
| THE CITY OF JERSEY CITY and THE CITY OF JERSEY CITY RENT LEVELING BOARD, | |
| Defendants. | |
| v. | |
| PORTSIDE TOWERS EAST TENANT ASSOCIATION, PORTSIDE TOWERS WEST TENANTS ASSOCIATION, KEVIN WELLER, JESSICA BRANN, JOEL ROTHFUS and MICHELLE HIRSCH | |
| Intervenor - Defendants | |

1

To:    Derek Reed, Esq.

Ehrlich, Petriello, Gudin, Plaza & Reed

60 Park Place, Suite 1016

Newark, NJ 07102

COUNSEL:

PLEASE TAKE NOTICE that Intervenor Defendants hereby request plaintiff The Towers at

Portside Urban Renewal Company, LLC and Equity Residential Management, LLC to produce

true, correct and complete copies of the documents and tangible items requested herein and deliver

same to counsel for the Intervenor Tenants via electronic mail or delivery at One Elm Street, Suite

2, Westfield, New Jersey 07090, or make same available for physical review at a location within

the State of New Jersey, County of Hudson.

Attorney for Intervenor Defendants

By:    */s/ Mollie Hartman Lustig*
Mollie Hartman Lustig

Dated: September 4, 2024

2

## **Definitions and Instructions**

1. The terms, "you," "your," "yourself," "Plaintiffs" and "Landlord," when used herein collectively refers to plaintiffs the Towers at Portside Urban Renewal Company, LLC and Equity Residential Management, LLC together with their agents and any other persons or entities acting or purporting to act on their behalf.
2. The term "City" when used herein refers to defendant the City of Jersey City.
3. The term "Board" when used herein refers to defendant Jersey City Rent Leveling Board.
4. The term "Council" when used herein refers to the Jersey City Council.
5. The term "Bureau" when used herein refers to Jersey City Rent Leveling Bureau.
6. The term "Tenants" when used herein collectively refers to defendant intervenors Portside Towers East Tenant Association and the members of this entity, Portside Towers West Tenant Association and the members of this entity, Kevin Weller, Jessica Brann, Joel Rothfus and Michelle Hirsch together with their agents and any other persons or entities acting or purporting to act on their behalf.
7. The term "defendants" when used herein collectively refers to the City and Board.
8. The term "parties" when used herein collectively refers to the City, Board, Tenants and Landlord.
9. The term "Decision" when used herein refers to the November 3, 2023 decision of the Board also attached as Exhibit C to the Landlord's Complaint [Dkt No. 1] and Exhibit A to the Landlord's Amended Complaint [Dkt No. 65].
10. The term "Recalculation" when used herein refers to the August 7, 2024 letter and calculations in the spreadsheets referenced therein and served to the parties by email dated August 7, 2024.
11. The term "Litigation" when used herein collectively refers to the above captioned matter pending in the District Court of the State of New Jersey bearing Civil Action 2:23 -cv-22291 (MCA) (JRA) and collectively includes and refers to the contents of the pleadings filed and that are filed after the date of this document.
12. The term "prerogative writ claims" when used herein refers to the prerogative writ claims referenced in paragraph 9 of the Court's August 27, 2024 Order contained in the Amended Complaint [Dkt No. 65].
13. These requests are continuing and you are instructed to make prompt, further and supplemental production when an additional document is discovered that is responsive hereto.
14. If any document called for by these requests is withheld on the ground that it is privileged, constitutes attorney work product, or is for any other reason exempt from discovery, set forth the ground or grounds for withholding such document, its present location and custodian, and such additional information as may be required to enable it to be identified and to enable the Court to adjudicate the propriety of the withholding, including but not limited to the type of document, its date, author(s), addressee(s), if different, its recipient(s), and its general subject matter.
15. Documents produced in response to these requests shall be produced, pursuant to the Federal and Local Rules of Civil Procedure, in such a manner so as to identify the specific request to which they relate.
16. As used herein, the term "document" means and includes, by way of illustration and not by way of limitation, the following items, whether printed or recorded or reproduced by any other mechanical process, written, produced by hand or produced by or stored in a

3

computer, regardless of origin or location: books, records, communications, reports, correspondence, letters, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, sound recording, applications, booklets, books, brochures, catalogues, circulars, articles, magazines, newspaper, pamphlets, periodicals, bulletins, instructions, minutes, any communications (including, but not limited to, inter- and intra-office communications), purchase orders, bills of lading, bid tabulations, questionnaires, surveys, contracts, agreements, options to purchase, memoranda of agreements, assignments, licenses, books of account, orders, invoices, statements, bills, checks, vouchers, ledger sheets, diary, accounts, journals, canceled checks, bank statements, bank passbooks, confirmations, statements of accounts, analyses, diaries, graphs, notebooks, notes, charts, tables, working papers plans, indices, summaries or records of meetings or conferences, summaries or reports of investigations or negotiations, calendar, opinions or reports of accountants or consultants, reports, data sheets, data processing cards, photographs, statistical statement, photographic negatives, phono-records, message, study, electronic mail, text messages, expert or consultant opinion, appraisal electronically stored information stored in any medium, tape recordings, tests, discs, wire recordings, transcripts of recordings, drawings, summary compilations, telex, motion picture film, forecast, advertisements, press releases, drafts, and marginal comments appearing on any such documents, all other written, graphic, electronic or printed matter of any kind, or any other and all other data compilations from which information can be obtained and translated if necessary.

17. As used herein, the term "person" means an individual, firm, partnership, corporation, proprietorship, association, governmental body or any other organization or entity.

18. As used herein, any term in the singular shall be deemed to include the plural where appropriate and vice versa.

19. As used herein, all terms including "and" and "or" shall be construed either conjunctively or disjunctively as required by the context to include in the response any document that might be deemed nonresponsive by any other construction.

20. The term "communication" as used herein means any written or verbal communication or other statement from one person to another, including, but not limited to, any letter, text message, email, interview, conference, meeting or telephone conversation.

21. As used herein, "documents relating to" means documents constituting, containing, showing, regarding, relating to or referring in any way, directly or indirectly.

**Documents To Be Produced**

1. All documents and/or tangible items relating to the testimony of any witnesses and/or any of the individuals or entities listed in Plaintiffs' First Amended Rule 26(a)(1) Initial Disclosure that may be called by you to testify at trial or any hearing to prove and/or that support your prerogative writ claims.

2. All documents and/or tangible items including but not limited to reports, notes, drafts, treatises and articles reviewed, considered, examined and/or relied upon and/or authored by any experts upon which you will rely to prove and/or support your prerogative writ claims.

3. All documents and/or tangible items that you will utilize, rely upon, mark as an exhibit, introduce into evidence, refer to or otherwise utilize for any purpose relating to your prerogative writ claims.

4. All documents and/or tangible items containing written or oral statements, admissions, communications or declarations from any person or entity relating to the facts that form the subject of and/or support your prerogative writ claims.

5. All documents and/or tangible items that you will utilize, rely upon, mark as an exhibit, introduce into evidence, refer to or otherwise utilize for any purpose relating to the allegations contained in paragraphs 15, 94, 95, and 96 of the Amended Complaint (Dkt. 65).

6. All documents and/or tangible items relating to and/or identifying any individuals that possess knowledge relating to the facts that form the subject of and/or support your prerogative writ claims.

7. All documents and/or tangible items relating to communications regarding treatment of tenants and lease renewals since the first illegal rent petition was filed by the tenants on May 31, 2022.

8. All documents and/or tangible items relating to communications between Dinah Hendon and representatives of the Plaintiff between 2019 and present.

9. All documents and/or tangible items relating to (a) communications between and among any employees, officers, directors, consultants, etc. related to compliance with the Jersey City Rent Control ordinance and state statute from the period 1994 to present; and, (b) compliance with the Jersey City Rent Control ordinance and state statute from the period 1994 to present.

10. All documents and/or tangible items relating to communications between and among all employees, officers, directors, agents, etc. related to imposition of rents for Portside tenants in connection with lease renewals following the first illegal rent petition filed by the tenants on May 31, 2022.

5

11. All documents and/or tangible items relating to communications between you, including between any former owners of plaintiff (e.g. Dematteis/Waterview Associates, Joseph Barry, Applied, etc.) or any of plaintiff's subsidiaries, and employees of the City from 1997 through present.

12. Any and all documents and/or tangible items not specifically requested herein relating to the prerogative writ claims.

# EXHIBIT D

Mollie Hartman Lustig, Esq.
Attorney ID 000862011
McLaughlin & Stern
One Elm Street, Suite 2
Westfield, New Jersey 07090
(908) 578-5458
MLustig@mclaughlinstern.com
Attorney for Intervenor Defendants

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC and EQUITY RESIDENTIAL MANAGEMENT, LLC, | CIVIL ACTION NO. 2:23-cv-22291 (MCA) (JRA) |
| Plaintiff, | |
| v. | **REQUEST FOR ANSWERS TO INTERROGATORIES FROM PLAINTIFF THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC AND EQUITY RESIDENTIAL MANAGEMENT, LLC BY INTERVENOR DEFENDANTS** |
| THE CITY OF JERSEY CITY and THE CITY OF JERSEY CITY RENT LEVELING BOARD, | |
| Defendants. | |
| v. | |
| PORTSIDE TOWERS EAST TENANT ASSOCIATION, PORTSIDE TOWERS WEST TENANTS ASSOCIATION, KEVIN WELLER, JESSICA BRANN, JOEL ROTHFUS and MICHELLE HIRSCH | |
| Intervenor - Defendants | |

1

To:    Derek Reed, Esq.

Ehrlich, Petriello, Gudin, Plaza & Reed

60 Park Place, Suite 1016

Newark, NJ 07102

COUNSEL:

PLEASE TAKE NOTICE that Intervenor Defendants hereby request Plaintiffs The Towers at

Portside Urban Renewal Company, LLC and Equity Residential Management, LLC to provide

certified answers to the following interrogatories. Please be advised that there is a continuing

obligation to amend and supplement your answers as additional information becomes available.

<div style="text-align: right;">

Attorney for Intervenor Defendants

By:    */s/ Mollie Hartman Lustig*
Mollie Hartman Lustig

</div>

Dated: September 4, 2024

<div style="text-align: center;">2</div>

## Definitions and Instructions

1. The terms, "you," "your," "yourself," "Landlord" and "Plaintiffs" when used herein collectively refers to Plaintiff, Portside and Equity together with their agents and any other persons or entities acting or purporting to act on their behalf.
2. The term "Board" when used herein refers to defendant Jersey City Rent Leveling Board.
3. The term "Council" when used herein refers to the Jersey City Council.
4. The term "Bureau" when used herein refers to Jersey City Rent Leveling Bureau.
5. The term "Tenants" when used herein collectively refers to defendant intervenors Portside Towers East Tenant Association and the members of this entity, Portside Towers West Tenant Association and the members of this entity, Kevin Weller, Jessica Brann, Joel Rothfus and Michelle Hirsch together with their agents and any other persons or entities acting or purporting to act on their behalf.
6. The term "parties" when used herein collectively refers to the City, Board, Tenants and Landlord.
7. The term "Decision" when used herein refers to the November 3, 2023 decision of the Board also attached as Exhibit C to the Landlord's Complaint [Dkt No. 1] and Exhibit A to the Landlord's Amended Complaint [Dkt No. 65].
8. The term "Recalculation" when used herein refers to the August 7, 2024 letter and calculations in the spreadsheets referenced therein and served to the parties by email dated August 7, 2024.
9. The term "Litigation" when used herein collectively refers to the above captioned matter pending in the District Court of the State of New Jersey bearing Civil Action 2:23 -cv-22291 (MCA) (JRA) and collectively includes and refers to the contents of the pleadings filed and that are filed after the date of this document.
10. The term "prerogative writ claims" when used herein refers to the prerogative writ claims referenced in paragraph 9 of the Court's August 27, 2024 Order contained in the Amended Complaint [Dkt No. 65].
11. If any document called for by these requests is withheld on the ground that it is privileged, constitutes attorney work product, or is for any other reason exempt from discovery, set forth the ground or grounds for withholding such document, its present location and custodian, and such additional information as may be required to enable it to be identified and to enable the Court to adjudicate the propriety of the withholding, including but not limited to the type of document, its date, author(s), addressee(s), if different, its recipient(s), and its general subject matter.
12. Documents produced in response to these requests shall be produced, pursuant to the Federal and Local Rules of Civil Procedure, in such a manner so as to identify the specific request to which they relate.
13. As used herein, the term "document" means and includes, by way of illustration and not by way of limitation, the following items, whether printed or recorded or reproduced by any other mechanical process, written, produced by hand or produced by or stored in a computer, regardless of origin or location: books, records, communications, reports, correspondence, letters, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, sound recording, applications, booklets, books, brochures, catalogues, circulars, articles, magazines, newspaper, pamphlets, periodicals, bulletins, instructions, minutes, any

3

communications (including, but not limited to, inter- and intra-office communications), purchase orders, bills of lading, bid tabulations, questionnaires, surveys, contracts, agreements, options to purchase, memoranda of agreements, assignments, licenses, books of account, orders, invoices, statements, bills, checks, vouchers, ledger sheets, diary, accounts, journals, canceled checks, bank statements, bank passbooks, confirmations, statements of accounts, analyses, diaries, graphs, notebooks, notes, charts, tables, working papers plans, indices, summaries or records of meetings or conferences, summaries or reports of investigations or negotiations, calendar, opinions or reports of accountants or consultants, reports, data sheets, data processing cards, photographs, statistical statement, photographic negatives, phono-records, message, study, electronic mail, text messages, expert or consultant opinion, appraisal electronically stored information stored in any medium, tape recordings, tests, discs, wire recordings, transcripts of recordings, drawings, summary compilations, telex, motion picture film, forecast, advertisements, press releases, drafts, and marginal comments appearing on any such documents, all other written, graphic, electronic or printed matter of any kind, or any other and all other data compilations from which information can be obtained and translated if necessary.

14. "Documents relating to" means documents constituting, containing, showing, regarding, relating to or referring in any way, directly or indirectly. It is meant to include, without limitation, all documents underlying, supporting, now or previously attached or appended to, or used in the preparation of any answer called for by the Interrogatory.

15. To the extent that information sought by any interrogatory can be furnished by reference to the answer furnished in another Interrogatory, such practice will be acceptable. However, separate answers should be provided in all cases, and Interrogatories shall not be joined together and accorded a common answer.

16. If any of these interrogatories cannot be answered in full, answer to the extent possible, specifying the reasons for the inability to answer the remainder and stating whatever information, knowledge, or belief there is concerning the unanswered portion.

17. If any information requested by these interrogatories is claimed to be immune from discovery on the grounds of privilege or otherwise, the basis of such claim and a description of the information sufficient to enable the Court to decide if such claim has been properly invoked should be specified. A privilege log should also be provided.

18. As used herein, the term "person" means an individual, firm, partnership, corporation, proprietorship, association, governmental body or any other organization or entity.

19. As used herein, any term in the singular shall be deemed to include the plural where appropriate and vice versa.

20. As used herein, all terms including "and" and "or" shall be construed either conjunctively or disjunctively as required by the context to include in the response any document that might be deemed nonresponsive by any other construction.

21. The term "communication" as used herein means any written or verbal communication or other statement from one person to another, including, but not limited to, any letter, text message, email, interview, conference, meeting or telephone conversation.

22. As used herein, "documents relating to" means documents constituting, containing, showing, regarding, relating to or referring in any way, directly or indirectly.

4

**Interrogatories**

1. Identify all persons with knowledge of the claims asserted in the Complaint and with regard to answers to all counterclaims and affirmative defenses asserted in response thereto.

2. Identify all experts you have interviewed and/or retained, whether or not any of them has or is intended to produce an expert report.

3. Identify all persons who will present testimony on your behalf at any trial or hearing in this matter if allowed by the Court.

4. Identify all persons employed by or otherwise affiliated with Plaintiffs, their predecessors, consultants, and others, who participated in the decision-making process regarding (a) the renewals and terms of leases for each tenant at the Portside Towers Buildings from January 2020 forward, (b) the nature and extent of penalties or other sanctions to be imposed on each tenant deemed by You to be in violation of their lease agreements, and (c) compliance with the City's Rent Control Ordinance and State Statute from 1994 forward.

5. Describe with specificity all communications, written or verbal (a) between and among all Plaintiffs, their predecessors, consultants, and others, who participated in the decision-making process regarding (i) the renewals and terms of leases for each tenant at the Portside Towers Buildings from January 2020 forward, (ii) the nature and extent of penalties or other sanctions to be imposed on each tenant deemed by You to be in violation of their lease agreements, and (iii) compliance with the City's Rent Control Ordinance and State Statute from 1994 forward, and (b) between among the City and its various departments and bureaus, and Plaintiffs, their predecessors, consultants, and others, who participated in the decision-making process regarding (iv) the renewals and terms of leases for each tenant at the Portside Towers Buildings from January 2020 forward, (v) the nature and extent of penalties or other sanctions to be imposed on each tenant deemed by You to be in violation of their lease agreements, and (vi) compliance with the City's Rent Control Ordinance and State Statute from 1994 forward.

## <u>CERTIFICATION</u>

I hereby certify that the answers to the preceding Interrogatories are true and correct to the best of my knowledge, information, and belief.

I understand that if I have willfully made any false statements, I am subject to punishment.


Dated:_____, 2024

By:_____

# EXHIBIT E

353 N. CLARK STREET CHICAGO, IL 60654-3456

**J E N N E R & B L O C K** LLP

October 31, 2024

Andrew Vail
Tel  +1 312 840 8688
AVail@jenner.com

**VIA EMAIL**
Philip S. Adelman
John McKinney
Assistant Corporation Counsel
Jersey City Law Department
280 Grove Street
Jersey City, New Jersey  07302

Re:    ***The Towers at Portside Urban Renewal Company, et al. v. The City of Jersey City, et al., Civil Action No. 2:23-cv-22291-MCA-JRA***

Dear Counsel:

Happy Halloween. We write regarding the Defendants' deficient responses and production related to Portside's discovery requests, per your request during our meet and confer.

**I.    Written Responses to Discovery.**

Portside served Plaintiffs' First Set of Requests for Production of Documents to Defendants on April 1, 2024 and Plaintiffs' Second Set of Requests for Production of Documents to Defendants on May 8, 2024 (collectively, the "Requests") and then streamlined those requests and interrogatories to be solely those relevant to the PW related claims and otherwise raised specific concerns with Defendants' prior written response in our September 4 letter, enclosed.   We request that you respond to that letter as discussed during the parties' recent meet and confer.

**II.    Methods for Search, Identification and Productions of Responsive Documents**

**a.    Method for Search and Identification.**

On October 24, 2024 you helpfully identified the email addresses against which search terms were applied for the Defendants' production of documents.  This list includes Rent Leveling Board members who do not have jcnj.org email addresses.  Please explain how sources of documents were identified and collected and whether any of these individuals communicated about the Portside rent dispute in ways other than those listed email addresses.

*You also* identified "Portside AND 'rent control'" as the search terms applied across the identified email addresses.  This is too limited to address Portside's Requests and the relevant issues of this litigation, including how and what may have been communicated in emails about the matter. We request that the Defendants' search include the limited following variations, while reserving all right to further discuss and propose terms as reasonable and appropriate:

October 31, 2024
Page 2

- Portside AND (2A:42-84*" OR (exempt* OR "rent board" OR "260-3" OR "260-6(C)" OR (PILOT* OR "payment in lieu of taxes") OR "rent increase")

- ("Equity Residential" OR "EQR") AND ((2A:42-84*" OR (exempt* OR "rent board" OR "260-3" OR "260-6(C)" OR (PILOT* OR "payment in lieu of taxes") OR "rent increase")

- We also ask that Defendants search these email accounts for emails to and from any of the named Defendant-Intervenors, including the Tenant Associations.

Please also confirm that Defendants will search for historical documents, including hard-copy documents, from the 1990s relating to Portside Towers, the exemption, and Tidewater Basin Plan, along with the other categories set forth in our September 4 letter.

**b. Form of Production.**

To date, Defendants produced 12 agglomerated PDF files that contain over 57,000 pages and cannot be appropriately used in litigation, *e.g.* at deposition or trial. For example, the PDFs combine many documents from many custodians into one document. The PDFs lack information identifying the custodian, parent/child relationships, or page breaks.

Federal Rule 34(b)(2)(E)(ii) requires parties to produce electronically stored information "in a form or forms in which it is ordinarily maintained or in a reasonably usable form." The Advisory Committee Notes to Rule 34 further explain that the Rule does not allow the responding party to produce ESI in "a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation." Fed. R. Civ. P. 34 Advisory Committee Note to 2006 Amendment.

Here, Defendants have failed to comply with Rule 34 by producing 17,000 pages of various documents in 12 compiled PDFs. For years, federal courts have routinely and consistently found this approach impermissible. *See, e.g., In re Valsartan N-Nitrosodimethylamine and Irbesartan Prods. Liab. Lit.*, 2012 WL 12142010, at *3 (D.N.J. Nov. 12, 2021) (ordering production of exhibit document "in its native format with metadata" upon plaintiff's complaint that that the document "was produced in PDF format only without any metadata, even though it was undoubtedly created via computer" where plaintiff could not explain why the document "was produced in PDF without metadata"); *vMedex, Inc. v. TDS Operating, Inc.*, 2021 WL 4709978, at *1-2 (D. Del. Oct. 8, 2021) (ordering plaintiff "to produce each document as a single PDF, in a manner that preserves the familial relationship of the documents to each other" where plaintiff's initial production consisted of "multiple documents from multiple custodians merged into a single 2,281 page PDF."). *See also Johnson v. Italian Shoemakers, Inc.*, No. 17-cv-00740, 2018 WL 5266853 (W.D.N.C. Oct. 23, 2018) (emails produced in pdf format "is not how emails are kept in the ordinary course of business."); *Flynn v. Love*, No. 19-CV-00239, 2023 WL 2561158,at *4-5 (D. Nev. Mar. 16, 2023) (describing production of various documents grouped together as a single pdf as a "'do it yourself' document dump, which flies in the face of both the spirit of Rule 34, and established case law.")

EQR requests that the Defendants comply with Rule 34 and produce documents consistent with Rule 34, including so that custodians and family relationships are clearly identified, and the

October 31, 2024
Page 3

relevant metadata is provided.  For further guidance on form, we refer you to our recent productions of emails and other documents, as an example, and otherwise would be glad to discuss.

This letter may not be exhaustive as to all the concerns we have with the Defendants' production of documents and discovery issues and we reserve all rights in that regard.

We look forward to your response  and promptly discussing these matters in the hopes of resolving these issues efficiently, or bringing them to the Court's attention so they can be resolved.

Sincerely,

*s/Andrew W. Vail*

Andrew Vail

cc: Derek Reed

# **EXHIBIT F**

353 N. CLARK STREET CHICAGO, IL 60654-3456

**JENNER & BLOCK** LLP

November 23, 2024

Andrew Vail
Tel  +1 312 840 8688
AVail@jenner.com

**VIA EMAIL**
Philip S. Adelman
John McKinney
Assistant Corporation Counsel
Jersey City Law Department
280 Grove Street
Jersey City, New Jersey  07302

Re:    *The Towers at Portside Urban Renewal Company, et al. v. The City of Jersey
City, et al., Civil Action No. 2:23-cv-22291-MCA-JRA*

Dear Counsel:

We write in response to Defendants' letter dated November 14, 2024, responding to Portside's
September 4 and October 31, 2024 letters.

As a preliminary matter, we do not agree with Defendants' assertion that "the City has fulfilled its
discovery obligations."   Defendants have the obligation to conduct a reasonable search for
information and documents responsive to Portside's discovery requests.  *See* Advisory Committee
Notes to Fed. R. Civ. P. 26 ("the [lawyer's] signature [on a discovery response] certifies that the
lawyer has made a reasonable effort to assure that the client has provided all the information and
documents available to [the client] that are responsive to the discovery demand").  Defendants
have not met this obligation, as explained in more detail below.

**Defendants Are Refusing To Respond To Relevant Discovery Requests.**

Defendants are incorrect that Portside's requests related to the PILOT agreements and past Bureau
and Board decisions, as clarified in Portside's September 4, 2024 letter, are irrelevant because they
supposedly do not "pertain to the prerogative writ claim or Rent Leveling Board's decision that
forms the subject of the claim."

*First*, Portside's requests related to the PILOT agreements are directly relevant to Portside's claim
that it substantially complied with the New Jersey Rent Control Exemption Statute's notice
provisions and that the Board was wrong as a matter of law in not applying the substantial
compliance doctrine in its determination.  *See Block 268, LLC v. City of Hoboken Rent Leveling
& Stabilization Bd.*, 401 N.J. Super. 563, 569, (App. Div. 2008) (holding for building owner in
complaint in lieu of prerogative writ because "[a]ny technical non-conformity [in the notice of rent
control exemption] is excusable under the equitable doctrine of substantial compliance").  One of
the five factors considered in the "equitable doctrine of substantial compliance" is "the lack of
prejudice to the defending party."  *Bernstein v. Bd. of Trustees of Teachers' Pension & Annuity
Fund*, 151 N.J. Super. 71, 76–77 (App. Div. 1977).  The PILOT agreements show that Defendants
were aware that Portside was exempt from rent control and thus were not prejudiced by any

purported failure to strictly comply with the purported notice requirement. They further show that Defendants entered into a specific financial arrangement in connection with Portside's rent control status and obtained significant economic benefit. These materials are plainly relevant to the Court's determination.

*Second*, far from requesting "all" Bureau and/or Board decisions, Portside's requests are tailored to a central issue in this litigation: the Board's determination that Portside Towers was not exempt from rent control because of a purported lack of notice or certification. Portside specifically requested (i) Bureau and/or Board decisions since 1992 "based on a purported lack of notice or certification in connection with rent control and/or determination of a look-back period upon non-exempt determination" and (ii) "[o]ther Jersey City exemption complaints since 1992 made against a building for lack of notice, and resulting actions by the Bureau and/or Board." Portside is entitled to learn how Defendants have interpreted and acted on the ordinance in similar or relevant situations.

It appears that Defendants are refusing to comply with discovery in this case based in their view that the Court can look only at the underlying record before the Board. We have covered this ground on multiple occasions and in each of those instances Defendants agreed not to take that position given it is incorrect as a matter of law and flatly contradicts the position taken by the Court during the August 1, 2024 chambers conference and the October 31, 2024 Agreed Third Amended Pretrial Scheduling Order.

Again, contrary to Defendants' assertion, actions in prerogative writ can be subject to de novo review. *Lyons v. City of Camden*, 226 A.2d 625, 625 (N.J. 1967); *Concerned Citizens of Princeton, Inc. v. Mayor and Council of Borough of Princeton*, 851 A.2d 685, 708 (N.J. Super. Ct. App. Div. 2004). New Jersey law is clear that the court – not the defending party – determines the scope of discovery in a prerogative writ action, N.J. Ct. R. 4:69-4, and that the court may use this discretion to order additional discovery extending beyond the administrative record. *See, e.g.*, *Shain v. Twp. of Lakewood*, No. A-0824-13T3, 2017 WL 193183, at *1 (N.J. Super. Ct. App. Div. Jan. 18, 2017); *Bloomfield 206 Corp. v. City of Hoboken*, 2011 WL 9820, at *2 (N.J. Super. Ct. App. Div., Aug. 24, 2010).

Here, consistent with those principles, the Court and the parties have contemplated and Court orders all reflect that there will be discovery on the prerogative writ claims. If discovery was limited to the administrative record, there would be no need to set a discovery schedule or to delineate a scope of discovery. Again, we raised this exact issue during our October 23, 2024 meet and confer, and Defendants confirmed they would not be taking the baseless position that they now assert. Defendants cannot turn back to this as a basis to refuse to comply with their discovery obligations.

**Defendants Are Not Applying Sufficient Search Terms Over Their ESI.**

As explained in my October 31, 2024 letter, Defendants' minimal search terms of "Portside" AND "rent control" are insufficient to respond to Portside's requests, as clarified in its September 4 letter ("Requests"). Defendants have the obligation to conduct a reasonable search, including constructing and applying sufficient search terms, in response to Portside's Requests. Fed. R. Civ.

2

P. 26.  Although not required, Portside suggested search terms in my October 31, 2024 letter in the interest of good faith.

Prior to my October 31, 2024 letter, for *weeks*, I sought to work with Defendants in good faith on their ESI search terms.  We were initially told by Defendants that that Mr. McKinney would run some initial ESI searches and report back to discuss. Through multiple emails, Portside asked for that update and/or to meet and confer with Defendants regarding their search over ESI data.  *See, e.g*., 9/20/24, 10/1/24, 10/5/24, 10/10/24 emails from A. Vail.  Defendants did not provide any update and refused to conference.  Accordingly, we did not learn those search terms until Defendants finally responded to my request following the October 23 meet and confer.  Portside promptly raised issues with Defendants' search terms once they provided them.

We appreciate that Defendants are willing to run some of the terms that we suggested in our October 31, 2024 letter.  However, we ask that Defendants reconsider their decision not to use all the terms and searches listed in our October 31 letter.  Contrary to Defendants' assertion otherwise, as discussed above, Portside's requested terms related to the PILOT agreements ("PILOT" or "payment in lieu of taxes") are relevant to the prerogative writ claim, including to Portside's substantial compliance.

In good faith and the spirit of cooperation, including to further simplify the requests for Defendants into two term searches (which inevitably creates more searches to run), Portside provides the following proposed Boolean search terms:

- Portside AND 2A:42-84*
- Portside AND exempt*
- Portside AND "rent board"
- Portside AND "260-3"
- Portside AND "260-6(C)"
- Portside AND PILOT*
- Portside AND "Payment in Lieu of Taxes"
- Portside AND "rent increase"
- Portside AND registration
- "Equity Residential" AND 2A:42-84*
- "Equity Residential" AND exempt*
- "Equity Residential" AND "rent board"
- "Equity Residential" AND "260-3"
- "Equity Residential" AND "260-6(C)"
- "Equity Residential" AND PILOT*
- "Equity Residential" AND "Payment in Lieu of Taxes"
- "Equity Residential" AND "rent increase"
- "Equity Residential" AND registration
- "100 Warren" AND 2A:42-84*
- "100 Warren" AND exempt*
- "100 Warren" AND "rent board"
- "100 Warren" AND "260-3"

3

- "100 Warren" AND "260-6(C)"
- "100 Warren" AND PILOT*
- "100 Warren" AND "Payment in Lieu of Taxes"
- "100 Warren" AND "rent increase"
- "100 Warren" AND registration
- "155 Washington" AND 2A:42-84*
- "155 Washington" AND exempt*
- "155 Washington" AND "rent board"
- "155 Washington" AND "260-3"
- "155 Washington" AND "260-6(C)"
- "155 Washington" AND PILOT*
- "155 Washington" AND "Payment in Lieu of Taxes"
- "155 Washington" AND "rent increase"
- "155 Washington" AND registration

Portside maintains the request for emails to and from any of the named Defendant-Intervenors, including the Tenant Associations. This is not overly broad because there is a limited number of Defendant-Intervenors and any communications with named parties are likely to be relevant to the prerogative writ claim or facts underlying that claim. They also can easily be searched for using the Defendant-Intervenors' names and/or emails addresses.

Please also clarify what Defendants mean in stating, "In light of your objections and 3 new search queries, the City will no longer work on the original request."

**<u>Defendants Are Not Producing ESI In A Form That Complies With Rule 34.</u>**

Defendants incorrectly assert that their method of producing ESI in compiled PDFs is sufficient because we can run text searches and can see certain information on the face of the email, such as sender and recipient. This position violates Federal Rule 34(b)(2)(E)(ii)'s requirement that parties produce ESI "in a form or forms in which it is ordinarily maintained or in a reasonably usable form." A compiled PDF is not the form in which the ESI is ordinarily maintained. As I explained in my October 31, 2024 letter, under Rule 34, a responding party cannot produce ESI in "a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation." Advisory Committee Notes to Fed. R. Civ. P. 34. We provided Defendants with a number of cases that reflect the consistent view that Defendants' production is not workable or acceptable under the Federal Rules. The Defendant-Intervenors have since agreed to produce their ESI in an electronic manner and dropped the position that it is acceptable to produce these different emails, attachments and other documents as single compiled PDFs. Despite being text searchable, a compiled PDF is not reasonably usable and makes it more difficult to efficiently review and use the ESI, including because the family relationships between parent emails and attachments are not intact, and individual emails need to be manually extracted from the longer PDF and cannot easily be grouped together by topic or witness. It will make it difficult to nearly impossible for the Court and the parties to have these compiled PDFs as exhibits for depositions, briefing, and/or trial. We attempted to separate and organize a hundred or so pages and it required days of multiple staff members undertaking the work.

I ask again that Defendants comply with their obligations under the Federal Rules and produce documents consistent with Rule 34, including so that custodians and family relationships are clearly identified, and the relevant metadata is provided.

Defendants also ignored my request in my October 31, 2024 letter to explain how sources of documents were identified and collected and whether any of the individuals in Defendants' October 24, 2024 list communicated about the Portside rent dispute in ways other than those listed email addresses. Please respond to my request.

### Defendants Have Not Confirmed That They Have Searched For Historical Documents Outside Of Limited Email Searches.

During our past meet and confers, Defendants previously committed to searching for historical and policy related documents, including to take the position that they would not resist producing anything that was relevant. We have not received any. Defendants ignored the request in my October 31, 2024 letter regarding the status of their search for historical and other documents responsive to Portside's requests. We repeat our request for answers to the following:

1. Did Defendants search for historical documents, including hard copy documents, from the 1990s relating to Portside Towers, the exemption, and the Tidewater Basin Redevelopment Plan, along with the other categories set forth in our September 4 letter?

2. Did Defendants search for the City's record retention policies since 1992?

3. Did Defendants search for the Board policies governing review of applications for exemption from rent control under the Exemption Statute?

### Interrogatories

Finally, Defendants failed to supplement their interrogatory responses to address the deficiencies raised in Portside's June 13, 2024 letter, which were then streamlined in Portside's September 4, 2024 letter. Defendants' letter does not address those. We again ask that Defendants promptly provide supplemental responses correcting the deficiencies laid out therein.

This letter may not be exhaustive as to all the concerns we have with the Defendants' production of documents, including because it is incomplete in many ways, and discovery issues and we reserve all rights in that regard.

We agree that if the Defendants are not willing to address the above items or if further conferencing will not change the Defendants' position on any of them, that Portside and Defendants should submit these issues to Judge Almonte in the letter due on November 26, 2024.

Sincerely,
*Andrew W. Vail*

cc: Counsel of Record

5

6

# EXHIBIT G

353 N. CLARK STREET CHICAGO, IL 60654-3456

**J E N N E R & B L O C K** LLP

December 10, 2024

Andrew Vail
Tel  +1 312 840 8688
AVail@jenner.com

**VIA EMAIL**
Philip S. Adelman
John McKinney
Assistant Corporation Counsel
Jersey City Law Department
280 Grove Street
Jersey City, New Jersey  07302

Re:    ***The Towers at Portside Urban Renewal Company, et al. v. The City of Jersey City, et al., Civil Action No. 2:23-cv-22291-MCA-JRA***

Dear Counsel:

Pursuant to the Court's November 27, 2024 text order, we write to request a meet-and-confer regarding the various discovery issues still in dispute.

We were disappointed that, despite Portside's good faith attempt to file a joint letter with Defendants and Defendant-Intervenors as the Court ordered, both Defendants and Defendant-Intervenors opted to file a separate letter.  After your phone call to Mr. Reed on November 26, 2024 in which you requested Portside send you its draft joint letter to insert Defendants' discovery issues, we were surprised that you then refused to file a joint letter in compliance with the Court's October 31, 2024 but instead file a separate letter with Defendant-Intervenors.  You then attempted to blame Portside and its counsel for your failure to know that a letter was due to the Court and to be prepared to share your portion in order to submit it jointly.

We were also surprised to see in Defendants' and Defendant-Intervenors' separate letter an assertion that the parties are unable to open Portside's production, especially given that (a) Defendants have had the first volumes of that production since January 2024 and (b) shortly after calling Mr. Reed on November 26 and stating you could not access the production, you updated him later that day that you were able to access it after updating Defendants' software.  Portside has not heard from either Defendants or Defendant-Intervenors about any other issue with accessing the production, and should any further issues arise, we ask that you contact us first instead of raising an issue with the Court when none actually exists.

As for Portside's concerns regarding Defendants' discovery responses and production, we understand we are likely at impasse given Defendants' resistance to working with Portside toward a mutual resolution and prior refusals to meet and confer when requested.  However, we hope that Defendants will meet with Portside to explore potential resolutions in good faith, as the Court requires, regarding the following issues, and to that end, we ask that you meet with this week to discuss them:

December 10, 2024
Page 2

**RFPs.** Despite Portside's repeated explanations—including in its October 31 and November 23, 2024 letters—regarding the relevance and propriety of its requests for documents relating to the PILOT program and to relevant Board decisions, Defendants remain steadfast in their refusal to produce these documents. In their letter to the Court, Defendants repeat their misguided interpretation of the scope of discovery in this case, which flatly contradicts the Court's orders. Portside intends to discuss this issue during the upcoming meet-and-confer, but it is prepared to raise this matter with the Court should Defendants maintain their position.

**Search Terms.** In its October 31 and November 23 letters, Portside explained why the search terms used by Defendants ("Portside" AND "rent control") are insufficient. In its November 14, 2024 letter to Portside, Defendants stated that they "will consider running a single e-mail search if the search is provided with specific Boolean search terms that work with Microsoft Office 365." Portside offered Defendants a series of Boolean search terms in its November 23 letter—terms which, to date, Defendants have ignored. Portside looks forward to discussing Defendants' plans to use these terms during the meet-and-confer.

**Historical Searches.** In meet-and-confers and its September 4, October 31, and November 23 letters, Portside requested confirmation that Defendants have searched for historical documents. Those types of documents are set forth in Portside's September 4 letter (now over 4 months without any adequate response from Defendants), and include (1) historical documents, including hard copy documents, from the 1990s relating to Portside Towers, the Exemption, and the Tidewater Basin Redevelopment Plan; (2) Defendants' record retention policies since 1992; and (3) Board policies governing review of applications for exemption from rent control under the Exemption Statute. Please come to the meet-and-confer prepared to explain Defendants' efforts thus far to search for and produce such documents.

**Interrogatories.** Portside has explained the deficiencies in Defendants' interrogatory responses and requested supplemental responses in its June 13, September 4, and November 23 letters. Yet Defendants have entirely ignored this request in each of its letters in response. Portside assumes the parties are at an impasse on this issue, but remains open to discussing any forthcoming supplemental responses during the meet-and-confer.

**Form of Production.** Portside has documented the ways Defendants' production does not comply with the Federal Rules in its October 31 and November 23 letters and has repeatedly requested that Defendants produce documents in accordance with their discovery obligations. These efforts have been met with unwavering resistance by Defendants, thus Portside assumes the parties are at an impasse. However, in an effort to help further illustrate why Defendants' production is not workable, we ask that Defendants consider the following additional information:

- Defendants asserted in their letter to the Court that "[a]ll of the metadata pertaining to the . . . documents was provided." That was not true. No document -specific metadata has been provided. And Rule 34 requires that parties provide metadata for the documents produced by the parties, not for the combined PDFs created by a party. *See In re Valsartan N-Nitrosodimethylamine and Irbesartan Prods. Liab. Lit.*, 2012 WL 12142010, at *3 (D.N.J. Nov. 12, 2021).

December 10, 2024
Page 3

- Portside attempted to manually separate a sample of the City's production by the individual documents contained therein. Portside was forced to spend 4 hours to separate only 200 pages in the over 57,000-page production. Thus, to separate all 57,000 pages, it will likely take Portside over 1,100 hours and, even then, Portside would be significantly prejudiced by the form of production.

- Portside has attempted to review the PDF productions to determine whether Defendants' production is complete, and even this endeavor has proven unworkably time-consuming and challenging. For example, Portside is unable to confirm whether likely relevant attachments to emails have been produced, because the emails and potential attachments are scattered across the production. However, Portside has identified several instances where an email references a likely relevant attachment, but where that attachment appears to be omitted from the production. Examples include CITY-024944-51 and CITY-056929-47. Both of these documents reference attachments, including documents seemingly pertaining to rent increases, but those documents were not located in the production. Portside is also unable to confirm whether all emails in a relevant email thread have been provided due to Defendants' production format.

We look forward to your prompt response and to scheduling a meet-and-confer tomorrow or Thursday, December 12 on these issues and any others that remain in dispute. Our clients continue to reserve all rights.

Sincerely,

*s/Andrew W. Vail*

Andrew Vail

cc: All counsel of record

# EXHIBIT H

| | |
|---|---|
| **From:** | Philip Adelman |
| **To:** | Benigeri, Lauren M.; John McKinney |
| **Cc:** | MLustig@mclaughlinstern.com; mgclawyers@aol.com; enemeth@ejcounsel.com; MHegazi@mclaughlinstern.com; MHegazi@mclaughlinstern.com; Vail, Andrew W.; Derek Reed |
| **Subject:** | RE: Portside - Requests re Defendants" Discovery - update and response |
| **Date:** | Monday, January 6, 2025 11:47:32 AM |
| **Attachments:** | Tidewater Basin RDP 20220908 Amd11.pdf |

**External Email - <u>Do Not Click</u> Links or Attachments Unless You Know They Are Safe**



Good Morning:

I write to follow up on the below email and clarify some issues that were incorrectly asserted by the landlord in the December 30th letter to the Court. The City continues to assert all of its objections and maintains that the demands are overbroad, unduly burdensome and outside the scope of the prerogative writ claim. Contrary to the statements in the December 30 letter to the Court, the City stated it will continue to maintain its objections while making all reasonable efforts to produce outstanding items. The Landlord's demands seek an enormous amount of materials. I will respond to each numbered section from the below email.

1.  <u>Search Terms</u> – As stated in the December 19 letter to the Court, the City agreed to perform a search with the terms that are listed in the bullet points below. We have also updated you on the status of the search by first indicating there were approximately 2,376 emails that the search yielded as of December 19. We believe the search is finally complete and has yielded over 63,000 pages of results that we must review for privilege issues and will produce responsive materials thereafter.

2.  <u>Documents to Search for and Produce</u> – Some of the demands in this section are duplicative of the bullet point list of searches. Moreover, the items demanded are extremely overbroad, unduly burdensome and outside the scope of the prerogative writ claims. If the landlord can create specific search terms written in the same manner as the bullet point list, the City will take them under consideration and advise if the searches can be performed.

    The Tidewater Basin Redevelopment Plan is attached hereto. However, asking for all documents "related" to this plan is extremely overbroad and unduly burdensome. If the Landlord can narrow this demand to search terms written in a similar manner to the bullet point list, the City will take them under consideration and advise if the search can be performed.

    With regard to record retention policies, All the City's record retention schedules can be found at https://www.nj.gov/treasury/revenue/rms/retention.shtml

    With regard to the last paragraph in section 2, we again request for specific search terms like those in the bullet list.

3.  <u>Form of Production</u> – On December 19, we produced the native form of the City's initial 57,000 page pdf production. The City will make all reasonable efforts to produce the documents the were recently located through the bullet point search terms in native form.

4.  <u>Interrogatories</u> – the information sought seeks a substantial amount of materials and the City is in the process of preparing more specific responses.  In particular, as to interrogatories numbers 2 and 3 in the Landlord's September 4, 2024 letter, we are in the process of determining what items the Rent Board has is response to these interrogatories.  As to interrogatory number 5, the Landlord knows the amount of money it paid in connection with any PILOT program in which it participated.  The amount of the City's revenue generated had the Landlord not participated is absolutely is beyond the scope of the prerogative writ claims.  It is also extremely overbroad and unduly burdensome.  We are, however, willing to discuss this issue in more detail in order to attempt to resolve this dispute or we can allow the Court to decide.

Regarding the City's request to file a motion for the landlord to pay for the expenses associated with the production of the materials that are allegedly outstanding, this was expressly stated in the December 19 letter to the Court and was not first mentioned in the December 30th letter.

As has been stated several times, the City is committed to resolving any discovery disputes.  All of the City's rights, objections, defenses and immunities are hereby reserved.

Philip S. Adelman, Esq.
Assistant Corporation Counsel
Jersey City Law Department
280 Grove Street
Jersey City, New Jersey 07302
Tel: 201-547-4810
padelman@jcnj.org

NOTICE: The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any review, use, transmission, conversion to hard copy, dissemination, distribution, or copying of this message, or any attachments, is strictly prohibited. If you have received this message in error, please notify the original sender by email or telephone (201) 547-4810 and immediately delete this message, along with any attachments, from your computer. Thank you.

**From:** Benigeri, Lauren M. <LBenigeri@Jenner.com>
**Sent:** Monday, December 16, 2024 4:02 PM
**To:** Philip Adelman <PAdelman@jcnj.org>; John McKinney <JMcKinney@jcnj.org>
**Cc:** MLustig@mclaughlinstern.com; mgclawyers@aol.com; enemeth@ejcounsel.com; MHegazi@mclaughlinstern.com; MHegazi@mclaughlinstern.com; Vail, Andrew W. <AVail@jenner.com>; Derek Reed <dreed@epgprlaw.com>
**Subject:** Portside - Requests re Defendants' Discovery

CAUTION: This email originated from outside our organization. Use caution when clicking links or opening attachments.

Phil,

Thank you for the time today. We are pleased Defendants have now agreed to provide discovery to Portside that was previously identified in our prior correspondence to you, specifically our letters dated September 4, October 31, November 23, and December 10. As you requested, we summarize our previous requests for Defendants to provide the following information relating to Defendants' discovery responses and production:

1. **Search Terms**

As provided in Portside's November 23 letter, Portside agreed to provide Defendants with Boolean search terms broken down into only two terms.  We propose the following terms are used:

- Portside AND 2A:42-84*
- Portside AND exempt*
- Portside AND "rent board"
- Portside AND "260-3"
- Portside AND "260-6(C)"
- Portside AND PILOT*
- Portside AND "Payment in Lieu of Taxes"
- Portside AND "rent increase"
- Portside AND registration
- "Equity Residential" AND 2A:42-84*
- "Equity Residential" AND exempt*
- "Equity Residential" AND "rent board"
- "Equity Residential" AND "260-3"
- "Equity Residential" AND "260-6(C)"
- "Equity Residential" AND PILOT*
- "Equity Residential" AND "Payment in Lieu of Taxes"
- "Equity Residential" AND "rent increase"
- "Equity Residential" AND registration
- "100 Warren" AND 2A:42-84*
- "100 Warren" AND exempt*
- "100 Warren" AND "rent board"
- "100 Warren" AND "260-3"
- "100 Warren" AND "260-6(C)"
- "100 Warren" AND PILOT*
- "100 Warren" AND "Payment in Lieu of Taxes"
- "100 Warren" AND "rent increase"
- "100 Warren" AND registration

"155 Washington" AND 2A:42-84*
- "155 Washington" AND exempt*
- "155 Washington" AND "rent board"
- "155 Washington" AND "260-3"
- "155 Washington" AND "260-6(C)"
- "155 Washington" AND PILOT*
- "155 Washington" AND "Payment in Lieu of Taxes"
- "155 Washington" AND "rent increase"
- "155 Washington" AND registration

2. **Documents to Search For and Produce**

We understand from your representations on today's call that Defendants will use the above terms to search for and produce documents responsive to all RFPs set forth in the attached letter to Defendants, dated September 4, 2024.

As noted in Portside's October 31, November 23, and December 10 letters, this includes, and Defendants agreed to search for and produce, historical documents—including hardcopy documents—listed in the September 4 letter, including documents related to the Tidewater Basin Redevelopment Plan, the City's record retention policies, and Board policies governing review of applications for exemption under the Exemption Statute.

Further, as we requested in Portside's October 31 and November 23 letters, we also understand that Defendants will search for and produce its emails to, from, or cc'ing the named Defendant-Intervenors: Portside Towers East Tenant Association, Portside Towers West Tenant Association, Kevin Weller, Jessica Brann, Joel Rothfus, and Michele Hirsch. We also would like any voicemails or other communications.

3. **Form of Production**

We appreciate Defendants' agreement to produce their documents in native form. We await Defendants' link to that production, which we understand has already been prepared and is ready to be sent.

4. **Interrogatories**

We appreciate Defendants' agreement to supplement its interrogatory responses and await those amended responses.

Please confirm your agreement with this approach as soon as possible. If Defendants disagree with any of Portside's statements herein, promptly notify us so that we may list the dispute in our letter to the Court.

Portside reserves all rights regarding the above issues.


Thank you,

Lauren

---

**Lauren M. Benigeri**

**Jenner & Block LLP**
1155 Avenue of the Americas
New York, NY 10036-2711   |   jenner.com
+1 212 407 1741   |   Tel
+1 312 982 4837   |   Mobile
LBenigeri@Jenner.com
Download V-Card   |   View Biography

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system

---

# EXHIBIT I

353 N. CLARK STREET CHICAGO, IL 60654-3456

**JENNER&BLOCK** LLP

January 17, 2025

Andrew Vail
Tel  +1 312 840 8688
AVail@jenner.com

**VIA EMAIL**
Philip S. Adelman
John McKinney
Assistant Corporation Counsel
Jersey City Law Department
280 Grove Street
Jersey City, New Jersey  07302

Re:    ***The Towers at Portside Urban Renewal Company, et al. v. The City of Jersey
City, et al., Civil Action No. 2:23-cv-22291-MCA-JRA***

Dear Counsel:

Pursuant to the January 7, 2025 status conference with the Honorable Jose R. Almonte, we write
to request a meet-and-confer to work through the remaining issues relating to Defendants'
discovery responses and production.

To streamline the meet-and-confer, we restate and summarize our understanding of the parties'
positions and outstanding issues herein.  If you disagree with anything set forth in this letter, please
promptly inform us so that we may work with Defendants towards resolution or, if resolution is
not feasible, timely raise the matter with the Court in line with the Fourth Amended Pretrial
Scheduling Order (Dkt. 97).  Portside does not anticipate Defendants raising objections given their
representation to the Court at the January 7 conference that they will not be standing on their
objections and will comply with all of Portside's discovery requests in full.  We ask that to the
extent Defendants are standing on any objections or refusals to produce, they do so specifically,
as vague and unspecified objections leave Portside not knowing what Defendants will be providing
despite their agreements to produce.  If Defendants do not raise specific disagreement with
anything stated in this letter, Portside is forced to assume that it does not need to raise any of these
issues with the Court by the end of this month because Defendants agree and will provide
documents and information as set forth below.

## I.    Scope of Search

We would like to confirm our understanding of the process through which Defendants have or will
search for and produce responsive documents, consistent with their obligations under the Federal
Rules.

First, Sections II and III below discuss requests for production of documents relating to the PW
and ESI search terms that we have proposed at your request to help Defendants respond to the

electronic search for documents responsive to the requests for production.  You helpfully confirmed, including with the Court, that Portside has provided Defendants with search terms Defendants have agreed to run in order to facilitate their ESI review of their custodians' documents.  The search terms and requests for production are not meant to be distinct requests for separate searches; instead, the search terms are meant to help cull the universe of documents that Defendants review and/or produce as part of their search for documents that are responsive to Portside's document requests.  If it could be helpful to further discuss, we would be glad to during a meet-and-confer conference.

Accordingly, Defendants' search for documents responsive to Portside's requests will not be limited to only search terms applied to ESI.  Given the nature of the PW and the evidence related to it, Defendants should learn from their custodians and others likely to possess responsive documents (such as record keepers) to identify additional sources (texts, voice messages), files (checking with the current construction official for relevant files and document locations), or hard-copy documents (including notes) that would be relevant to the PW.

II.    **Agreed-Upon ESI Search Terms** *[Responds to Point 1 of Defendants' January 6, 2025 email]*

As set forth in Defendants' January 6, 2025 email, Defendants are utilizing the search terms identified in Portside's December 16, 2024 email to search for responsive documents in their custodian's ESI.  Defendants have reported that this search has yielded approximately 2,376 emails, which Defendants will produce subject to their review for privilege.  Mr. McKinney reported to Judge Almonte that he is currently undertaking that review.  We appreciate the report. Please produce documents on a rolling basis to help put this case back on track for swift resolution and keep us apprised as to when we can expect the next production.

III.    **Agreed-Upon Documents to Search for and Produce** *[Responds to Point 2 of Defendants' January 6, 2025 email]*

**Requests for Production.**  Defendants have agreed to produce all non-privileged documents found in their possession, custody or control that are responsive to Portside's document requests set forth in its September 4, 2024 letter.  While Defendants characterized some of these requests as "duplicative" in their January 6, 2025 email, Portside trusts that its above explanation in Part I of this letter resolves those concerns, and that Defendants are not withholding any documents on the basis of that characterization.

**Communications with Defendant-Intervenors.**  Defendants have agreed to search for and produce their emails to, from, or cc'ing the named Defendant-Intervenors: Portside Towers East Tenant Association, Portside Towers West Tenant Association, Kevin Weller, Jessica Brann, Joel Rothfus, and Michele Hirsch.  As noted above, Portside would also like any voicemails or other communications with the named Defendant-Intervenors.

2

In their January 6, 2025 email, Defendants requested that Portside propose search terms to facilitate Defendants' search for documents responsive to this request.  If Defendants are capable of running a compound search, we think that one could suffice:

- (Portside OR "Equity Residential") AND ("Kevin Weller" OR "Michele Hirsch" OR "Joel Rothfus" OR "Jessica Brann" OR "Portside Towers East Tenant Association" OR "Portside Towers West Tenant Association")

If you again would like us to break them up for you those search terms would be:

- Portside AND "Kevin Weller"
- "Equity Residential" AND "Kevin Weller"
- Portside AND "Michele Hirsch"
- "Equity Residential" AND "Michele Hirsch"
- Portside AND "Joel Rothfus"
- "Equity Residential" AND "Joel Rothfus"
- Portside AND "Jessica Brann"
- "Equity Residential" AND "Jessica Brann"
- Portside AND "Portside Towers East Tenant Association"
- "Equity Residential" AND "Portside Towers East Tenant Association"
- Portside AND "Portside Towers West Tenant Association"
- "Equity Residential" AND "Portside Towers West Tenant Association"

In addition to the search terms, Portside asks that Defendants search for email addresses associated with each of the Defendant-Intervenors in the "to," "from," and "cc" fields of the inboxes of each of Defendants' custodians.

Again, as with all other productions, please produce these documents on a rolling basis and keep us apprised as to when we can expect the next production.

**Historical Documents.**  Defendants have agreed to produce the following categories of historical documents—meaning documents in Defendants' possession, custody, or control dating back to 1992:

- **The City's record retention policies:** Portside understands that Defendants have supplied the City's record retention policies in their January 6, 2025 email.  Should Defendants possess any additional record retention policies that are not included at the link provided on January 6, Portside asks that Defendants produce those.

- **Board policies governing review of applications for exemption from rent control under the Exemption statute:** Defendants stated in their January 6, 2025 email that they will consider Portside's recommended search terms to execute their search for documents responsive to this request.  Portside proposes the following terms:

  - "Board policy" and Exempt and rent
  - "Board policy" and "Exempt from rent control"
  - "Board policy" and "Exempt from rent leveling"

3

In speaking to Board members, please learn whether policies exist and where they are most likely to be located.

- **Documents relating to the Tidewater Basin Redevelopment Plan and related predecessor plans:** Defendants stated in their January 6 letter that they will consider Portside's recommended search terms to execute their search for documents responsive to this request. Portside proposes the following terms:

  o Portside AND "Tidewater Basin"
  o "Equity Residential" AND "Tidewater Basin"
  o "100 Warren" AND "Tidewater Basin"
  o "155 Washington" AND "Tidewater Basin"

IV.    **Form of Production** *[Responds to Point 3 of Defendants' January 6, 2025 email]*

We appreciate and are replying upon tht Defendants have previously committed to produce all electronic documents in native form, consistent with their obligations under the Federal Rules.

V.    **Interrogatories** *[Responds to Point 4 of Defendants' January 6, 2025 email]*

While, during the December 16, 2024 meet-and-confer, Defendants agreed to supplement their responses to Portside's interrogatories to address the deficiencies Portside raised in its June 13, 2024 and September 4, 2024 letters, Portside understands Defendants have retreated from this position. Specifically, in Defendants' January 6 email, Defendants relayed its belief that Interrogatory 5 is beyond the scope of the prerogative writ action. However, this Interrogatory goes directly to Portside's claim as part of its prerogative writ case that the City benefitted from treating Portside as exempt from rent control for nearly 30 years and thus should now be estopped from attempting to retroactively invalidate Portside's exempt status. Additionally, the City's benefit from the PILOT program directly relates to Portside's assertion in its prerogative writ claim that it substantially complied with the New Jersey Rent Control Exemption Statute's notice provisions, and that the Board was wrong as a matter of law in not applying the substantial compliance doctrine in its determination. *See Block 268 LLC v. City of Hoboken Rent Leveling & Stabilization Bd.*, 401 N.J. Super. 563, 569 (App. Div. 2008) (excusing "technical non-conformit[ies]" with notice provision for rent control exemption "under the equitable doctrine of substantial compliance.") One of the five factors considered in this "equitable doctrine of substantial compliance" is "the lack of prejudice to the defending party." *Bernstein v. Bd. of Trustees of Teachers' Pension & Annuity Fund*, 151 N.J. Super. 71, 76-77 (App. Div. 1977). That the City may have *benefitted* from Portside's exempt status, and thus was not prejudiced by any purported failure to strictly comply with the notice requirement, directly relates to Portside's claim of substantial compliance.

However, notwithstanding that Interrogatory 5 is indisputably relevant to the prerogative writ claims at issue in this case, and reserving all rights, Portside does not insist Defendants produce information on all PILOT payments at this stage.

4

Regarding Interrogatories 1-4, Portside understands that Defendants' agreement to produce supplemental responses still stands, though Defendants are awaiting additional information from the Board to aid their responses to Interrogatories 2 and 3. Portside looks forward to receiving these supplemental responses promptly, given that the request for such information has been pending in its original form since April 2024 and as revised since September 2024.

*        *        *

Again, please promptly inform Portside whether Defendants disagree with any of the statements set forth herein. We look forward to discussing these items in a meet-and-confer, with the hope of resolving all outstanding issues in good faith. Please let us know your availability for a meet-and-confer on Monday or Tuesday of next week. Our clients continue to reserve all rights.

Sincerely,

*s/Andrew W. Vail*

Andrew Vail

cc: All counsel of record

# EXHIBIT J

| | |
|---|---|
| **From:** | Philip Adelman |
| **To:** | Derek Reed; Mollie Lustig |
| **Cc:** | Mohamed Hegazi; Carmen Moreno; Eric Nemeth; mgclawyers@aol.com; John McKinney; Vail, Andrew W.; Matthew Sebera; Benigeri, Lauren M. |
| **Subject:** | RE: Meta and Dinah Hendon subpoenas |
| **Date:** | Tuesday, March 4, 2025 2:19:03 PM |

**External Email - Do Not Click** Links or Attachments Unless You Know They Are Safe



Derek:

Just wanted to touch base and provide a quick update.  The City objects to the subpoena(s) and deposition notices served as to current and former City employees.  In the status letter to court due on 3/6, the City will request the Court to grant permission to quash the subpoena(s) and deposition notices.  Accordingly, no witnesses will be produced before the March 13 court conference at which time the court will advise on how we can proceed with all outstanding discovery, which includes depositions. Thanks

Philip S. Adelman, Esq.
Assistant Corporation Counsel
Jersey City Law Department
280 Grove Street
Jersey City, New Jersey 07302
Tel: 201-547-4810
padelman@jcnj.org

NOTICE: The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any review, use, transmission, conversion to hard copy, dissemination, distribution, or copying of this message, or any attachments, is strictly prohibited. If you have received this message in error, please notify the original sender by email or telephone (201) 547-4810 and immediately delete this message, along with any attachments, from your computer. Thank you.

**From:** Derek Reed <dreed@epgprlaw.com>
**Sent:** Friday, February 28, 2025 3:12 PM
**To:** Philip Adelman <PAdelman@jcnj.org>; Mollie Lustig <MLustig@mclaughlinstern.com>
**Cc:** Mohamed Hegazi <MHegazi@mclaughlinstern.com>; Carmen Moreno <CMoreno@mclaughlinstern.com>; Eric Nemeth <enemeth@ejcounsel.com>; mgclawyers@aol.com; John McKinney <JMcKinney@jcnj.org>; Vail, Andrew W. <AVail@jenner.com>; Matthew Sebera <msebera@epgprlaw.com>; Benigeri, Lauren M. <LBenigeri@Jenner.com>
**Subject:** Meta and Dinah Hendon subpoenas

CAUTION: This email originated from outside our organization. Use caution when clicking links or opening attachments.

Phil and Mollie,

We attach copies of subpoenas that will be served to Meta and Dina Hendon for the reasons set forth therein.

**DEREK D. REED**
**Partner**

website | bHYPERLINK "http://www.newark-lawyers.com/Attorney-Profiles/Derek-Reed.aspx"iHYPERLINK "http://www.newark-lawyers.com/Attorney-Profiles/Derek-Reed.aspx"o | offices

Direct Dial: (973) 854-6710
Facsimile: (973) 624-8850



Newark, NJ          New York, NY          Morristown, NJ

# EXHIBIT K

| | |
|---|---|
| **From:** | Kevin Weller < ███████████████ > |
| **Sent:** | Tue 2/14/2023 5:39:21 PM (UTC) |
| **To:** | Shyrone Richardson <SRichardson@jcnj.org> |
| **Subject:** | Fwd: Petition Claiming illegal Rent: 100 Warren Street |
| **Attachment:** | 01 PETITION Claiming Illegal Rent and Illegal Rent Increase-Portside Towers-Patricia Karthas.pdf |
| **Attachment:** | 02-Proof of Servicev02 Patricia Karthas.pdf |
| **Attachment:** | 001-505.pdf |
| **Attachment:** | 001-505-2020.pdf |
| **Attachment:** | 001-505-2014.pdf |
| **Attachment:** | 001-505-2011.pdf |
| **Attachment:** | 001-505-2012.pdf |
| **Attachment:** | 001-505-2010.pdf |
| **Attachment:** | 001-505-2022.pdf |
| **Attachment:** | 001-505-2016.pdf |
| **Attachment:** | 001-505-2021.pdf |
| **Attachment:** | 001-505-2015.pdf |
| **Attachment:** | 001-505-2013.pdf |
| **Attachment:** | 001-505-2019.pdf |
| **Attachment:** | 001-505-2017.pdf |
| **Attachment:** | PortsideLetterFeb23.pdf |
| **Attachment:** | 13-2022_100_Warren_Street_Part_1.pdf |

This is really great!
Now you can put forward your own determination for this new petitioner.

It was great that she had an email from Dinah Hendon which confirmed her building **is subject to rent control**, well before the 8/24/2022 current start date, and she even provided the signed statement from our landlord which certified the same, subject to punishment.

I can also confirm a State Senator; a Hudson County lawyer; our Hudson County Commissioner, and the Press are either in possession of or aware of these documents and the email to you asking for your lawful reply. It was not sent to the Jersey City Rent Leveling Board or its lawyer given Patricia is not a party to any action under their review, and she has made it known to you that she wants your independent de novo review, a right each tenant has - which you have confirmed to me.

As a reminder, the Jersey City official landlord-tenant website has your position, your picture, and your legal obligation posted here: https://www.jerseycitynj.gov/cityhall/HousingAndDevelopment/housingpreservation/landlordtenantrelations

**"The Office of Landlord Tenant Relations <u>administers and enforces</u> the Rent Control**

**Ordinance**, Chapter 260 of the Jersey City Municipal Code and provides education, information and referrals to city residents in connection with landlord/tenant issues."

The letter from our Commissioner to you documents the Ordnance you were appointed to enforce. Per Corporation Counsel, Peter Baker's public announcement at City Hall, you are the only person with this power, and responsibility.

It may be useful for you to know that a lawyer and active member of the largest political party in the State obtained via an OPRA request every exemption request that was ever made to the department you now head. **I can confirm Patricia's building is not among those records.** Furter, we have discovered your department assigns exemption IDs to properties, and there has never been an exemption ID assigned to Patricia's building. It would be too late to assign such an ID now, since that assessment can only happen prior to the completion of construction of a building, in response to a claim filed by the original owner. At some point a simple acknowledgement of the facts shouldn't be difficult.

I would never tell you how to rule, but I am asking you to rule lawfully and without delay. The entire city is watching.

Thanks in advance,

Kevin

---------- Forwarded message ---------
From: **PATRICIA KARTHAS** ██████████████████████
Date: Mon, Feb 13, 2023 at 8:18 PM
Subject: Petition Claiming illegal Rent: 100 Warren Street
To: SRichardson@jcnj.org <SRichardson@jcnj.██████████████████████
████████████████████████████████████████████████████

Jnewton@eqr.com <Jnewton@eqr.com>, landlord-tenant@jcnj.org <landlord-tenant@jcnj.org>

Director Richardson,

Hello. I have lived at 100 Warren Street since 8/26/2006. I learned from Dinah Hendon on May 18, 2022 that my building is subject to rent control when she said "According to the records in this office at this time, this building is subject to rent control." Since Director Hendon mentioned the 2022 Annual Landlord Registration Statement in her email, I have also attached it here. That registration statement was submitted to Jersey City on 2/1/2022, 7 months before the current rent control went into effect. That form was signed by our building manager (copied) and a VP of Equity Residential, in agreement with Director Hendon's May 18th email. The email I received from Dinah is below.

I have not yet been a party to any rent control action. I do not wish to be a party to any administrative process that came before your appointment as the Rent Leveling Administrator.

I have attached a letter I received from my Hudson County Commissioner, Anthony Romano where he states the law, and his agrees that my building has been subject to rent control, since it was newly constructed in 1992.

While my more recent increases have not been in violation of Chapter 260, my understanding is I have been paying a rate that is much higher than it should have been for over 16 years.

**Please respond to this below request at your earliest convince:**

Attached please find my petition claiming illegal rent; kindly reply with (a) proof of the timely filing of a claim of exemption that occurred at least 30 days prior to the completion of construction for my building by its original owner, as well as proof which satisfies the entirety of Ordinance 260-6C, or (b) your lawful determination that my building has never been exempt from rent control.

I have copied the President of the Portside Towers East and West Tenant Associations on this email.

Thank you,
Patricia Karthas
100 Warren Street


---------- Forwarded message ---------
From:
Dinah E. Hendon
<
DHendon@jcnj.org
>
Date: Wed, May 18, 2022, 3:49 PM
Subject:
100 Warren Street
To: Patricia Karthas <

>
Cc: Landlord Tenant Relations <
Landlord-Tenant@jcnj.org
>
Dear Ms. Karthas,
According to the records in this office at this time, this building is subject to rent control. I

am waiting for updated rent information in connection with the 2022 Landlord Registration Statement. Should you wish to file a rent petition, I will have a petition and instructions sent via email or you may call or visit the office for assistance.

Yours,
Dinah E. Hendon
Dinah E. Hendon
(Pronouns: she/her/hers)
Director
Department of Housing, Economic Development & Commerce
Division of Housing Preservation
342 Martin Luther King Drive
Jersey City, NJ 07305
201.547.4821

From:
Patricia Karthas <
████████████████
>
Sent:
Wednesday, May 18, 2022 3:47 PM
To:
Dinah E. Hendon <
DHendon@jcnj.org
>
Subject:
2/10/23, 12:57 AM Gmail - Fwd: 100 Warren Street
https://mail.google.com/mail/u/0/?ik=7c1661a2d0&view=pt&search=all&permthid=thread-f%3A1733195988820812764%7Cmsg-f%3A1733195988820… 2/2
CAUTION: This email originated from outside our organization. Use caution when clicking links or opening attachments.

Hello Ms. Henson
I'm a resident at Portside Towers in Jersey City at
100 Warren St, Jersey City, NJ 07302
.
Is there any way you can tell me if this building is on rent control of any type?
Thank you.
Patricia Karthas.

# EXHIBIT L

| | |
|---|---|
| **From:** | Kevin Weller ▇▇▇▇▇▇▇▇▇▇ |
| **Sent:** | Wed 9/20/2023 3:59:13 AM (UTC) |
| **To:** | Shyrone Richardson <SRichardson@jcnj.org> |
| **Subject:** | Re: Follow up about 2/8/2023 call |

Director Richardson,

Hello, it has been some time and I hope you are well. First, I want to let you know that I miss your Sunday sermons. I stopped coming because I believed it became too likely that because of the rent control fight, my attendance would turn into a disruption at your church, which I absolutely didn't want to happen. I initially came to get to know you, so I could learn if you were a "good guy" or a "bad guy". Once I knew you were a good guy, I came back because you are so good at what you do, and I really enjoyed coming. I even brought others who also found the experience to be really great. To this day, I believe you are not the problem, and I actually worry that you could end up becoming a victim because of the way some in the city are handling a few very important issues given the responsibilities of your position. If I can help you as this unfolds, please let me know. I am always on the side of the people who do what's right.

That being said, I do need to touch base with you about two long outstanding petitions claiming illegal rent. This time I am not copying anyone else because I am only looking for an answer from you, based on a conversation you and I had back in February.

As a reminder, you and I had a phone call on 2/8/2023 when you told me that tenants have a legal right to submit new petitions, and if they did send new petitions, you would make your own determination, with a fresh set of eyes. I also asked you if I could announce at city council, that same night, that you would review these new petitions and put forward your own determination. After receiving your permission, I did just that. You and I also discussed the administrative process, and I remember saying that based on your determinations related to the two new petitions, it was possible that all 100+ tenants would withdraw their appeals so as to not have an unnecessary administrative burden, and to realign in support of the city in defense of the law. It is also likely that your determinations would have resulted in a change of course with regard to what tenants present at city council meetings. I understand that you did not make any representation as to how you would rule, but I knew the two new petitioners would send something that would be <u>extremely simple for you to evaluate</u> - they boiled it down to just one question.

I touched base on 3/14/2023, one full month after you received the two short questions, with a cc to mayor Folup, the person who is ultimately responsible for ordinance enforcement per the Faulkner Act, and at that time you said that you didn't yet have time to address those two new petitions.

Both of those two petitioners simply asked for you to acknowledge what we have definitive proof of, which is that our landlord has not proved that the original owner ever filed a claim of exemption from rent control for either tower, 155 Washington Street or 100 Warren Street.

Now it has been more than 6 additional months, more time than it took for Dinah Hendon to

respond to over 100 petitions. Based on the conversation you and I had on 2/8/2023, this delay is extremely unexpected, very disappointing and a significant deviation from the clearly established turn-around-time of your department.

I am the President of the Portside Towers East Tenant Association, and in that role, the tenant in my building has asked that I follow up with you on her petition. Likewise the tenant in the West Tower has asked Michele (the President of the Portside Towers West Tenant Association) to follow up on her petition. I have agreed to reach out on behalf of both tenants since the invitation for them to file came from you to me, which I then represented, with confidence, after receiving your permission.

Here again are the original requests (simplified), which after 218 days, remains unanswered by you:

---
Director Richardson,

**With regard to case R23-004, 100 Warren Street Unit #505, submitted to you on 2/13/2023, per your invitation on 2/8/2023:**

Jersey City Ordinance 260-6C mandates:

"...This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., **including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4**..."

On the one-year anniversary of Dinah Hendon's 9/19/2022 certification, I am supplying her answer to this question, along with her signature from that determination:

*"Portside was not the owner at the time the CO for 100 Warren was issued in August 1992 and, evidently <u>the owner at that time did not apply for the exemption"</u>*

– Dinah Hendon 9/19/2022 signed determination

Signature: _____
Dinah Hendon, Rent Leveling Administrator

**Dated:** September 19, 2022

**Note:** Verbatim quote and actual signature from this sworn statement from Dinah Hendon

Before her determination, Dinah Hendon sent written confirmation of the same to multiple tenants:



Note: While not necessary according to the NJ statute, the landlord registration statement Director Hendon referred to **confirmed her determination** that 100 Warren was subject to rent control.

<span style="color:red">**Director Richarson:** Has our landlord, Equity Residential, provided proof that the original owner of 100 Warren Street filed a claim of exemption to rent control, at least 30 days prior to the issuance of the certificate of occupancy <u>for this property</u> (prior to 8/25/1992)? **Yes or No**</span>

Secondly,

**With regard to case R23-005, 155 Washington Street, Unit #1008, submitted to you on 2/13/2023, per your invitation on 2/8/2023:**

Jersey City Ordinance 260-6C mandates:

"...This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., **including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4**..."

On the one-year anniversary of Dinah Hendon's 9/19/2022 certification, I am supplying her answer to this question, along with her signature from that determination:

*"To date, no letter to the Construction Code Official in connection with the requested exemption from rent control for 155 Washington has been located"*

– Dinah Hendon 9/19/2022 signed determination

Signature: _Dinah Hendon_
Dinah Hendon, Rent Leveling Administrator

**Dated:** September 19, 2022

**Note:** Verbatim quote and actual signature from this sworn statement from Dinah Hendon

Before her determination, when Dinah Hendon was already the Director of the Office of Landlord-Tenant relations, her office also supplied written confirmation of the rent control status of 155 Washington Street:



**Director Richardson:** Has our landlord, Equity Residential, provided proof that the original owner of 155 Washington Street filed a claim of exemption to rent control, at least 30 days prior to the issuance of the certificate of occupancy for this property (prior to 12/31/1997)? **Yes or No**

218 days is too long of a period of time to wait for you to answer this very simple, easy to verify question. I'm asking for you to please prioritize supplying me with this answer without additional administrative delay.

I want to underscore how important it is that you supply your answer to these questions without further delay.

These tenants deserve their administrative process. As you made clear during our 2/8/2023 call, these tenants or their landlord can dispute any determination you make within 14 days, should they choose to. The **fresh look** you committed to could very well significantly reduce the administrative burden the city is currently facing.

As a reminder, Corporation Counsel Peter Baker publicly acknowledged, in a widely shared official Jersey City video, that you are the only person with the power to put forward your own, denovo determination for new petitions from tenants at each of these buildings.

While I did not copy anyone on this email, by sending it to your City email address, it is now a matter of public record.

According to my notes from our 2/8 call, you made it very clear that a new determination can happen very quickly if new petitions are submitted, because there is a designated amount of time for the landlord to respond, or not.

You went so far as to say if there was a "conspiracy" (your word), the "easy way out" would be to let the timeframe of the process run out.

I would like to point out that the landlord was properly served on 2/13/2023 via the official process and Jersey City official form, and according to the established Jersey City process. The City subsequently assigned cases numbers. According to the tenants who are a party to those petitions, **the landlord did not supply any counter or any information whatsoever during the allowable time frame**. To allow new information related to these petitions, more than 6 months after the clearly established administrative process for such a response has long concluded, would not be lawful for these two petitions.

Kindly either respond with either: 1) proof of the **timely** filings of claims of exemptions to rent control for these buildings (at least 30 days prior to the issuance of the original certificate of occupancy - one for each building), or 2) your lawful determinations.

I really appreciate your prompt response.

Obviously, you are free to share this email with anyone for any purpose as appropriate.

Thank you,
Kevin

On Tue, Mar 14, 2023 at 1:50 PM Shyrone Richardson <SRichardson@jcnj.org> wrote:

As you are fully aware of, the number of Petitions received during the various months in 2022 for 100 Warren and 155 Washington Street was approximately 113. Under the former Director, this Office consolidated the case files and issued two determinations on September 19, 2022; one for each tower. Since then, there have been several Illegal Rent Petitions and Failure to Maintain Service Petitions submitted to the Office of Landlord/Tenant Relations by other constituents from different properties since these two determinations were issued. And also, per our discussion, I informed you that the Office of Landlord/Tenant Relations reviews Petitions in the order they are received. The two new submissions will be addressed accordingly and in the aforementioned order.



Shyrone Richardson

Director

Department of Housing, Economic Development & Commerce

Division of Housing Preservation

342 Martin Luther King Drive

Jersey City, New Jersey, 07305

(201)-547-5127

**From:** Kevin Weller ▮▮▮▮▮▮▮▮▮▮ >
**Sent:** Monday, March 13, 2023 4:12 PM
**To:** Shyrone Richardson <SRichardson@jcnj.org>
**Cc:** Steve Fulop  FulopS@jcnj.org  ; Michele Hirsch ▮▮▮▮▮▮▮▮▮▮
**Subject:** Follow up about 2/8/2023 call

CAUTION  This email originated from outside our organization  Use caution when clicking links or opening attachments

Director Richardson,

I am writing to follow up on our call on Wednesday, February 8th regarding your rent control determinations for two new petitions. These petitions concern tenants who are not involved in any previous determinations for their buildings and are not a party to any matter before the Rent Leveling Board or the courts. During our conversation, you expressed that you would conduct a de novo review of the newly submitted petitions, and you confirmed that it was the legal right of these tenants to receive such a review from you. Additionally, Corporation Counsel Peter Baker publicly acknowledged, in a widely shared video, that you have the power to put forward your own determination.

Based on your commitment, which was announced at the 2/8/023 city council meeting, two tenants submitted petitions for your review on 2/13/2023, one full month ago today.

Their request was simple: **provide proof of the timely filing of a claim of exemption by the original owners, or your lawful determination that their buildings are subject to rent control.**

We know those cases were number 4 and 5 for the year 2023:

R23-00**4**, 100 Warren Street Unit #505

R23-00**5**, 155 Washington Street, Unit #1008

Since the landlord for those petitions did not respond for a full month since they were served related to those cases, you are free to make your determination without further delay.

You should also know we have found yet **another previous determination by your office, this time from 2020,** (before your appointment) which has just been published online, already has been viewed over 5,000 times and has been shared with the press.



Director Richardson, I would like to emphasize the seriousness of the matter at hand, as it is causing significant harm to a large number of Jersey City tenants. This issue has even resulted in a growing number of individuals becoming homeless. It is important to note that this problem is not exclusive to the tenants of Portside Towers.

Please do not delay. You have the power to make this right.

I have come to find out a large number of tenants will feature Mayor Fulop and you at the council meeting next Thursday. I cannot control what all tenants will say publicly, but to the degree I can influence the speakers, I will urge them to be respectful. They have the right to demand answers as they continue to overpay, three months after you were appointed to enforce Ordinance 260.  Why must they continue to struggle?

It is important to recognize that unless you and Mayor Fulop take a stand and enforce the existing rent control Ordinance in Jersey City, you both will become the face of Ordinance non-enforcement and the exclusive focus of this growing movement which now includes an estimated 5,000 tenants across a growing number of buildings.

As a reminder of the law, please review the attached letter from Commissioner Romano, which has been included in a SeeClickFix support ticket which is on its way to being viewed 10,000 times - a ticket which includes a growing number of addresses in Jersey City with documented illegal rents.

Kevin

President Portside Towers East Tenant Association

# EXHIBIT M

| | |
|---|---|
| **From:** | Kevin Weller ████████████████ |
| **Sent:** | Mon 3/13/2023 8:12:09 PM (UTC) |
| **To:** | Shyrone Richardson <SRichardson@jcnj.org> |
| **Cc:** | Steve Fulop <fulops@jcnj.org>, Michele Hirsch████████████████████ |
| **Subject:** | Follow up about 2/8/2023 call |
| **Attachment:** | PortsideLetterFeb23.pdf |

Director Richardson,

I am writing to follow up on our call on Wednesday, February 8th regarding your rent control determinations for two new petitions. These petitions concern tenants who are not involved in any previous determinations for their buildings and are not a party to any matter before the Rent Leveling Board or the courts. During our conversation, you expressed that you would conduct a de novo review of the newly submitted petitions, and you confirmed that it was the legal right of these tenants to receive such a review from you. Additionally, Corporation Counsel Peter Baker publicly acknowledged, in a widely shared video, that you have the power to put forward your own determination.

Based on your commitment, which was announced at the 2/8/023 city council meeting, two tenants submitted petitions for your review on 2/13/2023, one full month ago today.

Their request was simple: **provide proof of the timely filing of a claim of exemption by the original owners, or your lawful determination that their buildings are subject to rent control.**

We know those cases were number 4 and 5 for the year 2023:

R23-00**4**, 100 Warren Street Unit #505
R23-00**5**, 155 Washington Street, Unit #1008

Since the landlord for those petitions did not respond for a full month since they were served related to those cases, you are free to make your determination without further delay.

You should also know we have found yet **another previous determination by your office, this time from 2020,** (before your appointment) which has just been published online, already has been viewed over 5,000 times and has been shared with the press.



Director Richardson, I would like to emphasize the seriousness of the matter at hand, as it is causing significant harm to a large number of Jersey City tenants. This issue has even resulted in a growing number of individuals becoming homeless. It is important to note that this problem is not exclusive to the tenants of Portside Towers.

Please do not delay. You have the power to make this right.

I have come to find out a large number of tenants will feature Mayor Fulop and you at the council meeting next Thursday. I cannot control what all tenants will say publicly, but to the degree I can influence the speakers, I will urge them to be respectful. They have the right to demand answers as they continue to overpay, three months after you were appointed to enforce Ordinance 260.  Why must they continue to struggle?

It is important to recognize that unless you and Mayor Fulop take a stand and enforce the existing rent control Ordinance in Jersey City, you both will become the face of Ordinance non-enforcement and the exclusive focus of this growing movement which now includes an estimated 5,000 tenants across a growing number of buildings.

As a reminder of the law, please review the attached letter from Commissioner Romano, which has been included in a SeeClickFix support ticket which is on its way to being viewed 10,000 times - a ticket which includes a growing number of addresses in Jersey City with documented illegal rents.


Kevin
President Portside Towers East Tenant Association

# EXHIBIT N

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC and EQUITY RESIDENTIAL MANAGEMENT, LLC,<br><br>               Plaintiffs,<br><br>v.<br><br>THE CITY OF JERSEY and THE CITY OF JERSEY CITY RENT LEVELING BOARD,<br><br>               Defendants,<br><br>v.<br><br>PORTSIDE TOWERS WEST TENANT ASSOCIATION, PORTSIDE TOWERS EAST TENANT ASSOCIATION, KEVIN WELLER, JESSICA BRANN, MICHELE HIRSCH, and JOEL ROTHFUS<br><br>               Defendants-Intervenors. | CIVIL ACTION NO.<br>2:23-cv-22291 (MCA) (JRA) |

**PLAINTIFFS' NOTICE OF DEPOSITION OF
DEFENDANTS PURSUANT TO RULE 30(b)(6)**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs ~~The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC~~ (collectively, "Portside"), by and through their undersigned counsel, will take the deposition upon oral examination of the City of Jersey City and the City of Jersey City Rent Leveling Board (collectively, "Defendants") under oath for purposes of discovery and use at trial. Defendants are directed to designate a person to testify on their behalf regarding~~to~~ information known by or ~~which can~~ reasonably available to Defendants ~~be known~~ related to the topics set forth in Schedule A. All terms used therein shall have the meaning designated to them in Portside's Amended Complaint, Dkt. 65. The deposition shall commence at 9:00 a.m. on [date

TBD] at the offices of Ehrlich, Petriello, Gudin, Plaza & Reed, 60 Park Place, 18th Floor, Newark, New Jersey 07102 or another mutually convenient time and place, if so agreed upon in advance of the set date.

The deposition will be taken before a court reporter or other officer authorized to administer oaths ~~and will be conducted in accordance with the Superior Court Rules~~.  The deposition will be recorded stenographically and by audiovisual means.  All counsel of record are invited to attend and participate.

Portside expressly reserves the right to reexamine Defendants if documents and other information responsive to Portside's discovery requests have not been provided with adequate advance timing to be reviewed and considered in connection with the deposition~~requests that at least seven (7) business days in advance of the deposition, the representative witness produce all documents and information in his/her/their possession, custody, and/or control that is responsive to Portside's PW document requests to Defendants and expressly reserves the right to reexamine him/her/them if documents and other information responsive to Portside's discovery requests have not been provided by him/her/them or Defendants with adequate advance timing to be reviewed and considered in connection with the deposition~~.

Dated: [Date TBD], 2025                    The Towers at Portside Urban Renewal Company
                                           L.L.C. and Equity Residential Management, LLC

                                           By: */s/ Derek D. Reed*

                                           Derek D. Reed, Esq. (Attorney ID # 038062003)
                                           Jeffrey Plaza, Esq.
                                           EHRLICH, PETRIELLO, GUDIN, PLAZA &
                                           REED
                                           A Professional Corporation
                                           60 Park Place, 18th Floor
                                           Newark, New Jersey 07102
                                           (973) 643-0040

                                           Terri L. Mascherin (pro hac vice)
                                           Andrew W. Vail (pro hac vice)
                                           Daniel J. Weiss (pro hac vice)
                                           JENNER & BLOCK LLC
                                           353 North Clark Street
                                           Chicago, Illinois 60654
                                           Phone: (312) 222-9350
                                           Facsimile: (312) 840-7375

                                           *Attorneys for Plaintiffs*

## SCHEDULE A

## TOPICS

1. Defendants' understanding or ~~/~~knowledge of the meaning and operation of relevant rent control laws and regulations applicable in Jersey City, New Jersey, including those set forth in Jersey City's Rent Control Ordinance located at Chapter 260 of the Jersey City Municipal Code ~~(the "Ordinance")~~ and New Jersey state law located at N.J.S.A § 2A:42-84.1 *et seq.*, ~~the exemption from rent control set forth therein at § 260-6 (the "Local Exemption")~~ including ~~the purpose of the Local Exemption and Ordinance; whether Portside Towers was ever treated as exempt under the Ordinance and, if so, why; what properties are subject to the Ordinance's rent control provisions or Local Exemption~~any past treatment of Portside as exempt under either provision, how the Jersey City ordinance and New Jersey state law interact,~~;~~ and any communications regarding the same.

2. ~~Defendants' understanding/knowledge of the state of New Jersey's law exempting certain properties from rent control, located at N.J.S.A § 2A:42-84.1 *et seq.* (the "State Exemption") including any facts supporting the contention that this exemption does not apply independently of the local rent control Ordinance and any communications regarding the same.~~

3. ~~Defendants' interpretation of the provision in N.J.S.A § 2A:42-84.2 providing that the State Exemption may not be limited, diminished, altered, or impaired by any municipal enactment, including any facts or circumstances that inform that interpretation.~~

4. ~~Rent control enforcement/treatment in Jersey City, including how many properties are subject to the Ordinance, Local Exemption, or State Exemption; whether notices were received prior to construction of all such properties; whether any such notices exist; what actions Defendants took with respect to each such notice; what factors or circumstances Defendants have considered with respect to each such notice; whether Defendants have ever refused to apply the State or Local Exemptions to any property; when Defendants first determined that they would not apply the State or Local Exemptions to Portside Towers; why Defendants made that decision; and who in Defendants made that decision.~~

~~5.~~2. The Board's ~~November 3, 2023 decision~~determination regarding Portside Towers memorialized in its October 19, 2023 oral determination and November 3, 2023 written decision, including all facts, circumstances, and matters ~~referenced in that~~

~~decision~~considered in reaching the determination~~,~~ and any communications regarding the same.

~~6.~~3.The Bureau's 2024 recalculation related to rent at Portside Towers, including the assumptions and data underlying those recalculations, and any communications regarding the recalculation.

~~7.~~4.The Board or Bureau's communications about Portside Towers and its exemption from rent control, including any communications with Portside Towers tenants and those advocating on their behalf, or other~~,~~ Jersey City officials~~, or other persons~~.

~~Any communications amongst and between Jersey City officials, members of the Board or Bureau, and any residents of Portside Towers.~~

~~How property taxes for Portside Towers have been calculated, including Portside's participation in the PILOT program, payments to Jersey City from that participation, the impact of Portside's exemption status on Jersey City's ability to retain those funds, and whether the rents received while Portside Towers was treated as exempt from rent control were considering in valuing Portside Towers for tax purposes.~~

~~10.~~5.     The Tidewater Basin Redevelopment Plan, including how it has been administered, whether it is applicable to Portside Towers, why it is or is not applicable to Portside Towers, and the consequences of its application to Portside Towers should it be deemed applicable.

~~11.~~6.     Defendants' record retention policy and the retention of records relevant to this case, including the retention of notices and other documents related to the construction of Portside Towers.

~~The retention of records of any other property that would be subject to rent control but for the Local or State Exemptions.~~

~~Defendants' response to Portside's discovery requests in this matter, including their efforts to search for responsive documents and their decision not to respond to various of Portside's document requests, not to supplement its responses to Portside's interrogatories, and to withhold responsive emails from production.~~

## <u>CERTIFICATE OF SERVICE</u>

I, Derek Reed, hereby certify that on the [Date TBD], 2025, I caused a true and correct copy of the foregoing Notice of Deposition to be served electronically by emailing it to Defendants' and Defendants-Intervenors' counsel.


Dated: [Date TBD], 2025                                  */s/ Derek D. Reed*
                                                         Derek D. Reed

# EXHIBIT O

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC and EQUITY RESIDENTIAL MANAGEMENT, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF JERSEY and THE CITY OF JERSEY CITY RENT LEVELING BOARD,<br><br>Defendants,<br><br>v.<br><br>PORTSIDE TOWERS WEST TENANT ASSOCIATION, PORTSIDE TOWERS EAST TENANT ASSOCIATION, KEVIN WELLER, JESSICA BRANN, MICHELE HIRSCH, and JOEL ROTHFUS<br><br>Defendants-Intervenors. | CIVIL ACTION NO.<br>2:23-cv-22291 (MCA) (JRA) |

**PLAINTIFFS' NOTICE OF DEPOSITION OF
PORTSIDE TOWERS WEST TENANT ASSOCIATION PURSUANT TO RULE 30(b)(6)**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs ~~The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC~~ (collectively, "Portside"), by and through their undersigned counsel, will take the deposition upon oral examination of Portside Towers West Tenant Association ("PTWTA") under oath for purposes of discovery and use at trial. ~~Portside Towers West Tenant Association~~ PTWTA is directed to designate a person to testify on its behalf regarding ~~to~~ information known by or ~~which can~~ reasonably available to PTWTA ~~be known~~ related to the topics set forth in Schedule A. All terms used therein shall have the meaning designated to them in Portside's Amended Complaint, Dkt. 65. The deposition shall commence at 9:00 a.m. on [date

TBD] at the offices of Ehrlich, Petriello, Gudin, Plaza & Reed, 60 Park Place, 18th Floor, Newark, New Jersey 07102 or another mutually convenient time and place, if so agreed upon in advance of the set date.

The deposition will be taken before a court reporter or other officer authorized to administer oaths ~~and will be conducted in accordance with the Superior Court Rules~~.  The deposition will be recorded stenographically and by audiovisual means.  All counsel of record are invited to attend and participate.

Portside expressly reserves the right to reexamine ~~Portside Towers West Tenant Association~~PTWTA if documents and other information responsive to Portside's discovery requests have not been provided with adequate advance timing to be reviewed and considered in connection with the deposition.

Dated: [Date TBD], 2025

The Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC

By: */s/ Derek D. Reed*

Derek D. Reed, Esq. (Attorney ID # 038062003)
Jeffrey Plaza, Esq.
EHRLICH, PETRIELLO, GUDIN, PLAZA & REED
A Professional Corporation
60 Park Place, 18th Floor
Newark, New Jersey 07102
(973) 643-0040

Terri L. Mascherin (pro hac vice)
Andrew W. Vail (pro hac vice)
Daniel J. Weiss (pro hac vice)
JENNER & BLOCK LLC
353 North Clark Street
Chicago, Illinois 60654
Phone: (312) 222-9350
Facsimile: (312) 840-7375

*Attorneys for Plaintiffs*

2

## SCHEDULE A

## TOPICS

1. ~~Tenants' knowledge/understanding of Jersey City's Rent Control Ordinance located at Chapter 260 of the Jersey City Municipal Code (the "Ordinance") and the exemption from rent control set forth therein at § 260-6 (the "Local Exemption"), including tenants' understanding of the Local Exemption and Ordinance and their applicability to Portside Towers prior to renting at Portside Towers, tenants' efforts to have Portside Towers rendered subject to the rent control provisions of the Ordinance, and tenants' communications regarding the same.~~

2. ~~Tenants' knowledge/understanding of the state of New Jersey's law exempting certain properties from rent control, located at N.J.S.A § 2A:42-84.1 *et seq.* (the "State Exemption"), including tenants' understanding of the State Exemption and its applicability to Portside Towers prior to renting at Portside Towers, tenants' efforts to have Portside Towers rendered not exempt to rent control under the State Exemption, and tenants' communications regarding the same.~~

3. ~~3.~~1. The Board's determination regarding Portside Towers memorialized in its October 19, 2023 oral determination and November 3, 2023 written decision, including PTWTA's or tenants' knowledge of any facts set forth in that ~~decision~~determination, PTWTA's or tenants' efforts to influence or inform the outcome of the ~~decision~~determination, and PTWTA's or tenants' communications ~~with one another or~~ with City, Board, or Bureau officials regarding the ~~decision~~determination.

4. ~~4.~~2. The Bureau's 2024 recalculation regarding rent at Portside Towers, including PTWTA's or tenants' communications ~~with one another or~~ with City, Board, or Bureau officials regarding the recalculations.

5. ~~Efforts and communications from the tenants or Portside Towers West Tenant Association to inform, influence or persuade the City, Board, or Bureau officials in their determination of Portside's exemption status under the State and Local Exemptions, and communications regarding the same.~~

6. ~~6.~~3. Any prejudice to tenants resulting from Portside's alleged failure to provide a notice of rent control exemption to the City's construction official and/or from Portside's exemption to rent control ~~and/or from it rent control not being implemented for any of the past 30 years, including financial hardship from rent increases~~, and all communications related to the same.

7. ~~7.~~4. PTWTA's or ~~t~~Tenants' knowledge of the Exemptions and/or of the applicability of rent control prior to and/or while renting at Portside Towers, including through their lease agreements with Portside, and any communication related to the same.

8. ~~8.~~5. The reasons that tenants chose to live at Portside Towers, including any desire to live in luxury apartments, any interest in discounted rents, and all communications related to the same.

9. Tenants' lease agreements with Portside, including provisions providing notice to Tenants that the buildings are not subject to rent control.

10. Tenants' response to Portside's discovery requests in this matter, including its efforts to search for responsive documents and any decision not to respond to certain Portside's document requests.

## CERTIFICATE OF SERVICE

I, Derek Reed, hereby certify that on the [Date TBD], 2025, I caused a true and correct copy of the foregoing Notice of Deposition to be served electronically by emailing it to Defendants' and Defendants-Intervenors' counsel.

Dated: [Date TBD], 2025                                     */s/ Derek D. Reed*
                                                            Derek D. Reed

# EXHIBIT P

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC and EQUITY RESIDENTIAL MANAGEMENT, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF JERSEY and THE CITY OF JERSEY CITY RENT LEVELING BOARD, <br><br> Defendants, <br><br> v. <br><br> PORTSIDE TOWERS WEST TENANT ASSOCIATION, PORTSIDE TOWERS EAST TENANT ASSOCIATION, KEVIN WELLER, JESSICA BRANN, MICHELE HIRSCH, and JOEL ROTHFUS <br><br> Defendants-Intervenors. | CIVIL ACTION NO. 2:23-cv-22291 (MCA) (JRA) |

PLAINTIFFS' NOTICE OF DEPOSITION OF
PORTSIDE TOWERS EAST TENANT ASSOCIATION PURSUANT TO RULE 30(b)(6)

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs ~~The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC~~ (collectively, "Portside"), by and through their undersigned counsel, will take the deposition upon oral examination of Portside Towers East Tenant Association ("PTETA") under oath for purposes of discovery and use at trial. Portside Towers East Tenant Association is directed to designate a person to testify on its behalf regarding ~~to~~ information known by or ~~which can~~ reasonably available to PTETA ~~be known~~ related to the topics set forth in Schedule A. All terms used therein shall have the meaning designated to them in Portside's Amended Complaint, Dkt. 65. The deposition shall commence at 9:00 a.m. on [date

TBD] at the offices of Ehrlich, Petriello, Gudin, Plaza & Reed, 60 Park Place, 18th Floor, Newark, New Jersey 07102 or another mutually convenient time and place, if so agreed upon in advance of the set date.

The deposition will be taken before a court reporter or other officer authorized to administer oaths ~~and will be conducted in accordance with the Superior Court Rules~~.  The deposition will be recorded stenographically and by audiovisual means.  All counsel of record are invited to attend and participate.

Portside expressly reserves the right to reexamine ~~Portside Towers East Tenant Association~~PTETA if documents and other information responsive to Portside's discovery requests have not been provided with adequate advance timing to be reviewed and considered in connection with the deposition.

Dated: [Date TBD], 2025

The Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC

By: */s/ Derek D. Reed*

Derek D. Reed, Esq. (Attorney ID # 038062003)
Jeffrey Plaza, Esq.
EHRLICH, PETRIELLO, GUDIN, PLAZA & REED
A Professional Corporation
60 Park Place, 18th Floor
Newark, New Jersey 07102
(973) 643-0040

Terri L. Mascherin (pro hac vice)
Andrew W. Vail (pro hac vice)
Daniel J. Weiss (pro hac vice)
JENNER & BLOCK LLC
353 North Clark Street
Chicago, Illinois 60654
Phone: (312) 222-9350
Facsimile: (312) 840-7375

*Attorneys for Plaintiffs*

2

**SCHEDULE A**

**TOPICS**

1. ~~Tenants' knowledge/understanding of Jersey City's Rent Control Ordinance located at Chapter 260 of the Jersey City Municipal Code (the "Ordinance") and the exemption from rent control set forth therein at § 260-6 (the "Local Exemption"), including tenants' understanding of the Local Exemption and Ordinance and their applicability to Portside Towers prior to renting at Portside Towers, tenants' efforts to have Portside Towers rendered subject to the rent control provisions of the Ordinance, and tenants' communications regarding the same.~~

2. ~~Tenants' knowledge/understanding of the state of New Jersey's law exempting certain properties from rent control, located at N.J.S.A § 2A:42-84.1 *et seq.* (the "State Exemption"), including tenants' understanding of the State Exemption and its applicability to Portside Towers prior to renting at Portside Towers, tenants' efforts to have Portside Towers rendered not exempt to rent control under the State Exemption, and tenants' communications regarding the same.~~

~~3.~~1. The Board's <u>determination regarding Portside Towers memorialized in its October 19, 2023 oral determination and</u> November 3, 2023 <u>written</u> decision, including <u>PTETA's or</u> tenants' knowledge of any facts set forth in that ~~decision~~<u>determination</u>, <u>PTETA's or</u> tenants' efforts to influence or inform the outcome of the ~~decision~~<u>determination</u>, and <u>PTETA's or</u> tenants' communications ~~with one another or~~ with City, Board, or Bureau officials regarding the ~~decision~~<u>determination</u>.

~~4.~~2. The Bureau's 2024 recalculation <u>regarding rents at Portside Towers</u>, including <u>PTETA's or</u> tenants' communications ~~with one another or~~ with City, Board, or Bureau officials regarding the recalculations.

5. ~~Efforts and communications from the tenants or Portside Towers East Tenant Association to inform, influence or persuade the City, Board, or Bureau officials in their determination of Portside's exemption status under the State and Local Exemptions, and communications regarding the same.~~

~~6.~~3. Any prejudice to tenants resulting from Portside's <u>alleged failure to provide a notice of rent control exemption to the City's construction official and/or from Portside's</u> exemption to rent control ~~and/or from it rent control not being implemented for any of the past 30 years, including financial hardship from rent increases~~, and all communications related to the same.

~~7.~~4. <u>PTETA's or t</u>~~T~~enants' knowledge of the Exemptions and/or of the applicability of rent control prior to and/or while renting at Portside Towers<u>, including through their lease agreements with Portside,</u> and any communication related to the same.

~~8.~~5. The reasons that tenants chose to live at Portside Towers, including any desire to live in luxury apartments, any interest in discounted rents, and all communications related to the same.

9. Tenants' lease agreements with Portside, including provisions providing notice to Tenants that the buildings are not subject to rent control.

10. Tenants' response to Portside's discovery requests in this matter, including its efforts to search for responsive documents and any decision not to respond to certain Portside's document requests.

## <u>CERTIFICATE OF SERVICE</u>

I, Derek Reed, hereby certify that on the [Date TBD], 2025, I caused a true and correct copy of the foregoing Notice of Deposition to be served electronically by emailing it to Defendants' and Defendants-Intervenors' counsel.


Dated: [Date TBD], 2025                              */s/ Derek D. Reed*
                                                      Derek D. Reed

# EXHIBIT Q

# TIDEWATER BASIN REDEVELOPMENT PLAN

**November 10, 1999**
Amended June 27, 2007: Ord. 07-109
Amended Sept 9, 2009: Ord. 09-092
Amended March 24, 2010: Ord. 10-036
Amended April 28, 2010: Ord. 10-053
Block & Lot Updates: October 25, 2012
Amended October 8, 2014:  Ord. 14-120
Amended January 14, 2015: Ord. 14-173
Amended May 13, 2015: Ord. 15-053
Amended May 27, 2017: Ord. 15-067

**CITY OF JERSEY CITY**
**DIVISION OF CITY PLANNING**

1

I.      Introduction

The purpose of the Tidewater Basin Redevelopment Plan (hereinafter referred to as the "Plan"), is to provide for comprehensive redevelopment designed to ensure coordinated and harmonious growth within the Tidewater Basin Redevelopment Plan Area (hereinafter referred to as the "Area").

The redevelopment plan takes into consideration the surrounding neighborhoods and takes into account the character and nature of current and proposed land-uses.  Bordering the Tidewater Basin area to the east is the Colgate Redevelopment Area.  Until recently the Colgate area was dominated by vacant lots and unused industrial buildings.  It is planned to become a mixed use area with office, commercial and residential uses.  This area is now active with construction as this project moves forward.  The Paulus Hook Historic District, a quiet neighborhood of nineteenth century brownstones, borders the Tidewater Basin area to the north and to the east.  The Liberty Harbor North Redevelopment Plan Area borders the Area to the west. Liberty Harbor North is planned as a predominantly residential, waterfront community.

A common element throughout all of these neighborhoods and the Area is the Hudson-Bergen Light Rail Transit System which will connect them all by means of a modern trolley service, and the Hudson River Waterfront Walkway, which connects these neighborhoods by means of a pedestrian ribbon park along the water's edge.

II.     Boundary Description

        See the Boundary Map for the boundary illustration.

III.    Redevelopment Objectives and Minimum Standards

        All new development, rehabilitation, or adaptive re-use must conform to, and be consistent with the following objectives and minimum standards:

A.      At street level, human-scale development to compliment the neighboring Paulus Hook Historic District is required.  New development, especially infill housing, shall be consistent in height, scale, material and design with the predominant form of housing – the brick rowhouse – of the neighborhood.

B.      Eliminate incongruous land uses by reinforcing, through acquisition and demolition, if necessary, the dominant residential pattern of the neighborhood.

C.      Encourage the elimination of obsolete and deleterious land uses and structures and the rehabilitation of deteriorated structures, including dilapidated piers and bulk-heading.

D.      Improve vehicular and pedestrian traffic through the re-establishment of a public neighborhood street grid, while improving the circulation through the neighborhood by addressing traffic direction, R-O-W width, cartway width and sidewalk design to discourage vehicular through traffic while improving pedestrian and bicycle access and by incorporating into all waterfront projects the public pedestrian walkway system known as the Hudson River Waterfront Walkway.

E.      Provide for decorative streetscape and site improvements for the beautification of the

2

redevelopment plan area and adjacent neighborhoods.

F.      Provide for the enhancement of the Paulus Hook Historic District through improvement of its waterfront access, redevelopment of industrial sites and historically sensitive treatment of vacant sites within and immediately contiguous to the historic district.

G.      Encourage the preservation and promotion of the buildings contributing to the area's historic and cultural fabric, and the protection and re-establishment of view corridors along existing and new public streets to accentuate views of Manhattan Island, the Statue of Liberty, Ellis Island and Liberty State Park.

H.      Develop a network of private and public open space nodes along the Hudson River Waterfront Walkway and other districts. These spaces shall be designed to enhance light and air in the neighborhoods, improve pedestrian circulation, act as a catalyst for residential and retail development, provide a sense of place, and help to improve valuable and desirable vistas.

IV.     **Types of Proposed Redevelopment Actions**

This plan will improve and upgrade the Tidewater Basin Redevelopment Area substantially through a combination of redevelopment actions. These include, but are not limited to:

- Clearance of dilapidated, deteriorated, obsolete or under-utilized structures.

- Assembly of vacant and/or underutilized land into developable parcels.

- Construction of new structures and complementary facilities.

- Provisions for public infrastructure necessary to service and support the new development, including separated storm and sanitary sewers, through special assessment, if necessary, so that the low-lying areas of the Redevelopment Area can experience improved drainage as a result of this Plan's implementation.

- Designation of pedestrian and vehicular Rights of Way to be improved in conjunction with project area development and dedicated to the City.

V.      **Redevelopment Regulations and Guidelines**

A.      The following guidelines apply to all development within the Redevelopment Area and are mandatory.

1.      All structures that share a property line with a historic district or property must be compatible to the design of the historic district property design, including, but not limited to: building height, scale, setback, fenestration, window and door placement, construction material, roofline and shape, and colors.
2.      All infill housing must complement the existing indigenous housing on the street, especially with regard to height, scale, materials, rooflines and setbacks.
3.      All structures shall be designed to have an attractive and finished appearance from all vantage points and utilize the same high quality material on all facades of the building.

3

4.   Signage:
   - No billboards or junior billboards permitted.
   - No back lighted signs or flashing lights.
   - Signage shall be in proportion to the structure
   - Signage shall be of quality material

5.   Standard chain link fencing and/or barbed wire is prohibited, except that chain link fencing may be utilized during construction.

6.   View corridors along the existing street network and extended network made part of this redevelopment plan shall be preserved, to maximize sight lines to the Manhattan Skyline, the Statue of Liberty, Ellis Island and Liberty State Park.

7.   All utility distribution lines and utility service connections from such lines to the project area's individual uses shall be located underground.  All meters for utility service shall be located inside the building they serve and shall not be visible from the street (remote readers are permitted, however, to be located on the exterior of structures).

8.   All mechanical equipment located on the roof of any building must be enclosed by the building's façade, which must be consistent in design with the rest of the building.  Where roofs can be looked down upon from adjacent buildings, a "roofscape" plan must be developed and submitted for Planning Board approval.   All electrical communications equipment shall be located in such a way that it does not adversely impact the appearance of the building or site, nor create objectionable views as seen from surrounding structures or public areas.

B.   The following regulations apply to all development and are mandatory.

1.   **Façade Materials:**  With the exception of Penthouses as outlined in §VII.E below, the predominant building material for exterior cladding shall be brick, and the façade shall consist of no more than three materials, textures or colors.

2.   **Façade Articulation:** Buildings shall consist of three horizontal elements: the base, a middle, and a top, which shall be achieved through the use of different materials, colors or surface treatments.

3.   **Rooflines:**  All roofs shall be flat, and may contain roof decks for recreation purposes.  Access structures, such as staircase bulkheads or elevator rooms may be provided to allow access such rooftop areas.  The bulk of such access structures shall be the minimum necessary to meet building codes and shall not be considered as part of the height of the structure.  No habitable space is allowed in such access structures.  Color and materials shall compliment that of the principal structure.

4.   **Cornices:**  All buildings shall incorporate a cornice feature at the roofline, which may not be constructed of lightweight material such as plastic, and which should be of natural materials such as wood, masonry or metal.  Fiberglas reproduction cornices are acceptable provided they are well made and true to original form.

5.   **Common Elements:**  All projects, as part of the site plan approval process, shall identify and incorporate at least three (3) elements that are similar to adjacent structures, such as the type and color of brick, or the height and scale of the cornice, so that there is connectivity across time as the Area builds out.

6.   **Stoops and Stairs:**  All residential developments shall incorporate stoops and stairs along all frontages where stoops and stairs are the established mode on the same or opposite side of the street.

7.   **Residential Heights Above Sidewalk:**  All residential uses located on the first floor or story shall maintain visual separation to maintain a sense of privacy.  The floor of such

4

residences shall be at least two feet higher than the adjacent public sidewalk or walkway, and the window sills of all windows on such frontages shall be at least five feet higher than the adjacent public sidewalk or walkway.  Wheelchair access may be provided by means of lifts or internal ramps.

8.  Story Height:  With the exception of parking levels and mechanical areas, The maximum height for any story shall be fourteen feet and the minimum height shall be nine feet, except that the first story height shall be a minimum of ten feet, unless the floor is raised at least three feet above the sidewalk level.  Except for parking levels and mechanical areas, the first story height shall be taller than the stories above it, either by raising the first story from grade level with a stoop, or by raising the ceiling height.   Maximum height for penthouses, where permitted, is twelve (12) feet.

9.  Shopfronts:  All shopfronts shall be a minimum of 75% glass or void, shall be individually designed, and shall have three distinct elements: the storefront, the entrance and the sign band.  Each retail storefront shall be allowed one sign and one blade sign, which shall be located in a sign band area.  If lighted, only direct lighting is permitted.

10.  Fencing:  All front yard fencing shall consist of mild steel "wrought iron" style fencing, painted black, and consisting of solid pickets a minimum 5/8 inch thick which fully penetrate all horizontal rails and are capped with decorative elements.  Rear yards may be fenced with wooden fences, provided such fencing shows a "good" side on both sides.

11.  Balconies and Outdoor Space:  Balconies shall be recessed into, rather than projecting out of, the façade.  In developments of 4 units or more, at least 25 percent of the units shall contain a balcony or, as an alternative, at least 20,000 square feet of any combination of private, common, or public access outdoor space shall be provided for the entire development.

12.  **Sidewalks:**  All sidewalks shall be tinted "French Gray" and contain an admixture of mica.  All sidewalks shall be a minimum of 10 feet wide, which may include the planting strip, and may be located within the property line, if necessary, to achieve the required ten feet minimum.  Minimum cross sections shall be as follows:  Curb: 8 inches / Planting strip: 28 inches / Sidewalk: 7 feet.  The planting strip, if not vegetative, will be constructed of bricks or cobblestone between the tree wells.

The Planning Board may grant a waiver for superior design which relates to adjacent architecture or other public purpose.

13.  **Landscaping:**  All landscaped areas shall be irrigated.  Street trees are required to be planted along all streets, within a planting strip, which is within the first 36 inches inboard of the curb face.  All trees shall be a minimum 3.0 to 3.5 inches caliper.  All trees shall be protected by a suspended tree grate which must be approximately 3 by 6 feet, and be of two halves, and be made so as to facilitate growth of the tree by having easily removed sections.  A minimum of 10 percent of every lot shall be landscaped with living vegetative material, which shall provide more than 90 percent coverage after one growing season.   Mulch is not considered "living vegetative material."

14.  Accessibility: All buildings three stories and higher must have an elevator.

15.  Development Parcels are required as follows:
Parcel 1: Block 14205, Lots 22, 23, 24;
Parcel 2: Block 14204, Lot 8;
Parcel 3: Block 14201, Lot 1;
Parcel 4: Block 14205, Lot 21
Any redevelopment on these parcels shall include all properties within the designated

5

development parcel.

## VI.    Parking Standards and Requirements

1. Where not otherwise regulated or prohibited in Plan Subdistricts, all residential development must provide parking at a minimum ratio of one space for every unit containing up to two bedrooms, and two spaces for every unit containing more than two bedrooms. All such spaces must be tied to the residential lease or deed, unless otherwise authorized by the Planning Board pursuant to a Community Benefit Parking Plan and Developer's Agreement referenced under Section VII herein. An additional number of spaces, equal to 10% of the number required by the above calculations shall be required for guest and staff parking.
2. Where not otherwise regulated or prohibited in Plan Subdistricts, parking garages must be either under the principal building(s) of an individual project and have an elevation above the average grade of the public sidewalk abutting the project of no more than one-half the floor to floor height of the garage/first occupied floor, or, if at ground level, be wrapped and completely surrounded by and be covered from view by the principal use building.
3. Parking at grade level, in Subdistricts where permitted, must be screened and not appear readily visible from street level. The use of brick walls, landscaped berms and evergreen hedges (in combination or singularly) is the preferred means of achieving this requirement. The Planning Board may allow other, equally appropriate means of screening parking, at their complete discretion.
4. Neither at-grade exposed parking, nor parking as a principal use are permitted.
5. No unimproved lots may be used for off-street parking, even on an interim basis.  All lots used for construction workers' parking shall be improved to the satisfaction of the Planning Board, and must, at a minimum, be covered with crushed stone and gravel to prevent mud from being tracked into the streets and sewers, and be fenced.  Chain link is permitted in such cases where the parking area will only be used for the duration of the construction activity it serves.

## VII.    Land Use District Standards

A. **Formula Business Restrictions:** All commercial retail areas within each structure or within a single tax lot shall limit formula business establishments, as defined by the Land Development Ordinance, to a maximum of 30% of ground floor gross leasable commercial area.  For the purposes of this area restriction, the formula business definition shall apply to the following uses, whether functioning as a principal or accessory use:

1. Retail sales of goods and services.
2. Restaurants, all categories.
3. Bars.
4. Financial service facilities and banks.

Grocery stores greater than 15,000 square feet may exceed 30% of gross leasable commercial area, but shall be the only formula business within such structure or lot.

B. **Legacy District**

1. This district contains all of Block 14405.  It is currently approved for 324 dwelling units in

6

four story structures with an additional story of parking under the building and fifth floor mezzanine space provided on the interior courtyards.  These buildings are approved not to exceed 65 feet in height, are predominantly comprised of brick cladding, have peaked roofs, some individual entries and stoops, and balconies. This Redevelopment Plan establishes the current zoning approval, as approved by the Zoning Board of Adjustment in their resolution of January 14, 1999, as the land use regulations and standards for this district.  Nothing contained herein is intended to negate, modify, nor amend that approval.  However, the referenced approval shall be the maximum development allowed within this district

2. Minor alterations in site plan and façade characteristics may be permitted by the Planning Board provided such alterations are consistent with the redevelopment regulations and parking standards of this Plan.  Any changes not consistent with this Plan are cognizable under a deviation application, and will be judged on their merits.

## C.   Portside District

1. This district contains Lot 1 of Block 15902, an area of 5.35 Acres as per the City's Tax Assessor's maps.  It has been approved and is partially developed as *Portside*, a mixed-use development consisting of a maximum of 527 dwelling units, a maximum of 753 parking spaces, and approximately 62,000 square feet of commercial space. Phases one and two of this three phase project have been completed.  This Redevelopment Plan establishes the current zoning approval, as first approved by the Zoning Board of Adjustment in their resolution of March 3, 1986, which approvals were amended several times, as the land use regulations and standards for this district.  Nothing contained herein is intended to negate, modify nor amend that approval.  However, the referenced approval shall be the maximum development allowed within this district.

2. Minor alterations in site plan and façade characteristics may be permitted by the Planning Board provided such alterations are consistent with the redevelopment regulations and parking standards of this Plan.  Any changes not consistent with this Plan are cognizable under a deviation application, and will be judged on their merits.

## D.   Waterfront District

1. This district lies between Warren Street and the extension of Van Vorst Street and runs from Morris Street to the Tidewater Basin.  A significant portion of this district is located on the water's edge, where a marina is permitted and encouraged to be developed as part of a larger, predominantly residential development.  The Hudson River Waterfront Walkway is required for all development located on property that abuts the water's edge.  The minimum standards of the New Jersey Department of Environmental Protection (DEP) for the Hudson River Waterfront Walkway are adopted herein by reference, and are considered to be a part of this Redevelopment Plan.

2. Permitted Uses
   a. Residential
   b. mixed-uses consisting of residential uses mixed with retail sales and services, including child day care, restaurants, offices, and medical offices.
      i. Medical Offices are limited to corner lots and may not to exceed 1,500 square feet of floor area.
   c. marina and related uses on the underwater parcels.

3. Accessory uses
   a. off-street parking

b. recreation areas
c. child day care facilities
d. access to the marina.

4. Maximum Heights
   a. Heights shall not exceed six stories and 75 feet on Blocks 15901 and 14205.
   b. Heights shall not exceed four stories and 50 feet on Block 14204. However, a height bonus of up to an additional 30 feet and three stories, for a maximum height of 80 feet and seven stories, may be permitted where the Planning Board approves a community benefit parking plan ("Community Benefit Parking Plan") and enters into an agreement with a developer outlining such Community Benefit Parking Plan ("Developer's Agreement"), providing for the development of accessory off-street parking on the site. Any such approved Community Benefit Parking Plan and Developer's Agreement must comply with the Parking Standards and Requirements set forth in Section VI herein, with the exception that a 10% additional number of spaces for guest and staff parking, referenced in Section VI(1), shall not be required. Any approved Community Benefit Parking Plan and Developer's Agreement must require that additional parking of at least 50 parking spaces above the minimum parking standard shall be provided and made available to residents of the Tidewater Basin Redevelopment Plan Area, which shall not include residents of the proposed development. The Community Benefit Parking Plan and Developer's Agreement may permit valet parking.

5. Setbacks
   a. Development containing commercial space on the ground floor may locate up to the property line for the length of the entire development. Development with 100% ground floor residential must set back a minimum of 5 feet from the front property line. Residential buildings fronting on the required waterfront walkway shall set back a least ten feet from the walkway easement, which setback area may be landscaped and fenced. All facades facing onto the waterfront walkway shall be designed to appear as front entrances and not back yards.

6. Densities
   a. 75 dwelling units per acre for developments that are 100 percent residential. Mixed use projects shall have their residential density reduced by the number of units that could have been built in the commercial space given the average square footage of a residential unit within the development not including any common areas. However, a density bonus of up to an additional 100 units per acre, for a maximum density of 175 units per acre, may be permitted where the following is achieved:
      1) The Planning Board approves a Community Benefit Parking Plan and enters into a Developer's Agreement, consistent with the requirements of Section VII C 4(b) above.
      2) The developer incorporates within the development at least one "green" building component, which shall consist of the installation of a solar panel array covering a minimum of 10% of the roof area above the highest residential floor or 5% of the footprint of any proposed building, whichever is greater, for the purpose of converting sunlight into useable electricity
      3) The developer agrees that through-the-wall heat pumps will not be installed within any first or second floor residential units that front on a public street.

8

**E.    Historic Buffer District**

1.    This district is designed to compliment and maintain the historic district streetscape and pattern of land uses.  Design standards are established to ensure development which is appropriate to be located adjacent to a National Register Historic District.  The area includes portions of Block 14203 and Block 14205 (lots 9, 10 (partial), 11, 12, and 13). (Please refer to the Land Use Map for identification of the Zoning Districts' boundaries.) Any development project that has legally valid approvals at the time this Plan is adopted by the Jersey City Municipal Council shall be considered to have established the Land Use Standards for such project, the following notwithstanding, provided, however, that such standards shall become the maximum development potential for such project sites unless the standards below provide greater development potential.

2.    Principal permitted uses
  a)    One, two and three family attached dwellings
  b)    Recreation and open space

3.    Accessory Uses
  a.    Off-street parking, conforming with plan standards
  b.    Fences and railings
  c.    Home occupations

4.    Maximum Height
  a.    4 stories, not to exceed 45 feet, provided that the maximum height shall not exceed the average height of the existing structures immediately adjacent and within the same block or across the street. All structures shall be of a scale and design that mirrors that of the historic structures across the street.

5.    Minimum lot size
  a.)    Interior lot - 2000 square feet
  b.)    Corner lot  - 2400 square feet
  c.)    Minimum lot sizes may be reduced by an equivalent amount of lot area dedicated to any rear alleyway.

6.    Maximum Lot Coverage:
  a.)    75%, except that under building parking garages shall not be considered as building coverage, provided that the area of such garages covered by a principal use building shall be bound by the 75% maximum coverage rule, and the remaining area shall be covered by landscaped areas, sidewalks, stairs, walls and/or recreation areas.
  b.)    80% in the case of development that provides parking structures surrounded along all public rights-of-way by principal use buildings
  c.)    recreation and open space may cover 100% of the lot area

7.    Setbacks:
  a.)    Front: 5 feet minimum, 15 feet maximum, or in the case of a block of continuous structures of more than 20 years old, the setback shall line up with the contiguous existing properties on the block.
  b.)    Rear Yards:   Interior lots – 15 feet
        Corner lots – none

8.    Parking:
  a.)    Residential: a minimum of 1 space per dwelling unit and a maximum of 2 spaces per dwelling unit, accessed from the rear of the property, and which may be provided in free standing garage located at the rear.
  b.)    All parking must be covered and under the building and at least four feet below average sidewalk grade adjacent to the principal structure or, if at grade or above,

9

be located within and be wrapped by the principal structure so as to not be visible from the public view.

c.)    If rear access is not possible, or would severely compromise the architectural integrity and historic appropriateness of the development the parking requirements may be waived, at the sole discretion of the Planning Board.

9.    Design Standards

a.)    Building design of this district shall be compatible with the Paulus Hook historic district structures. Building height, width, mass and proportion are important elements of the historic district.  All building facades will feature decorative elements harmonious with the architecture of the historic district including, but not exclusive to lintels, decorative brickwork, cornices, railings, light fixtures, doors and doorways.

b.)    Buildings in the redevelopment area that also are part of the Paulus Hook historic district must follow the Jersey City Historic Preservation Commission Regulations for Alterations and Additions to buildings and New Construction in Historic Districts.

c.)    Openings on Frontal Facades: The width and height of windows, doors, and entries must harmonize in scale and proportion with the width and height of windows, doors, and entries of buildings and structures of historic significance in the surrounding environment.

d.)    Relationship of Unbroken Planes to Voids (i.e., Punctured Planes) in Front Facades: The relationship of unbroken planes (i.e. walls) to voids (i.e., windows and doors) on the facade of a building or structure should be aesthetically harmonious with that of buildings and structures of historic significance in the surrounding environment.

e.)    Roof forms must be honored.  In new construction, designers must take care to paradigmatically honor the existing historic roof forms and slopes of the area so as not to violate the aesthetic harmony of the whole.

f.)    Building materials: All new structures must be constructed of high quality masonry materials.

g.)    Fences:  Permitted are decorative tubular steel, wrought iron, wooden board on board, or board on baton.

h.)    Rehabilitation: The rehabilitation of historically significant structures (of 70 years or older) shall follow the historic district guidelines for rehabilitation to ensure compatibility within the neighborhood.  Required of rehabilitation are: Historic store fronts be preserved; Historic features are not removed, covered or converted; Doorway and window size cannot be diminished.

i.)    Additions: Building additions which add height shall not be visible from the street frontage of the structure and shall not exceed building coverage standards.

j.)    Landscaping:  Front yards are to be attractively landscaped and at least one 3"-3.5" caliper tree shall be planted curbside for every 25 feet of frontage.

k.)    Signs may not exceed two square feet, and must be of natural materials.

## E.    Grand and Marin District

This district is designed to provide space for athletic fields, open space, recreation and educational facilities at the corner of Marin and Grand Streets.

1.    Principal Permitted Uses

a.    Outdoor recreation and improved open space

b. Athletic facilities
c. Educational facilities
d. Residential above the ground floor
e. Ground floor retail on corner properties
f. Ground floor restaurant, categories one and two as defined by the Land Development Ordinance, on corner properties
g. Mixed uses of the above

2. Accessory Uses
a. Off-street parking conforming with plan standards
b. Fences and railings
c. Signs, not to exceed 12 square feet, and not to be internally illuminated

3. Maximum Height:
a. 4 stories and forty-five (45) feet
b. One additional penthouse story, not to exceed 12 (twelve) feet for a total of fifty-seven (57) feet, and compliant with the standards outlined in §VII.E(7) below, is permitted on corner lots.

4. Maximum Lot Coverage
a. Seventy percent (70%)

5. Setbacks:
a. Maximum Front yard – Zero (0) feet
b. Minimum Side yard – Zero (0) feet, except where side windows are proposed to be located on interior lot lines, in which case six (6) feet
c. Minimum Rear yard – Thirty (30) feet
a. On corner lots, the side yard which runs parallel to the rear façade shall be subject to rear yard setback requirements.
d.

6. Parking & Loading
a. Parking is prohibited
b. One garaged loading space per building is permitted, provided that access to this garage is not from Grand Street.

7. Penthouses (as permitted in §E(3.a) above) on corner lots
a. Penthouses must be set back five (5) feet from all streetfront facades
b. Penthouses may not exceed twelve (12) feet in height
c. Penthouses must be constructed primarily of glass, with metal or other modern elements permitted as details.
d. Penthouses must have a flat roof

8. Buffering
a. All permitted principal uses must be adequately buffered from adjoining residential uses, through the use of a five feet wide evergreen hedge-row, of a species that will grow tall and can be trained (clipped) into a dense evergreen hedge, and contain fencing, which must be located on the non-residential side of the landscaped buffer.

9. All other requirements shall be as regulated in Sub-Section D. Historic Buffer District

**F**. **Mixed Use District**
This district fronts on Van Vorst Street, and contains several sites that were predominantly historically used for industrial purposes. Re-use of these sites for residential purposes is favored for feasibility reasons, and because of the strong demand for residential uses. Mixed use development is also permitted to service the existing and future residential development within the district.

11

1.      Permitted Principal Uses
   a.      Residential
   b.      Ground floor Office
   c.      Ground Floor Retail
   d.      Ground floor cafes, and bars
   e.      Ground floor restaurants, categories 1 and 2
   f.      Parks, pedestrian and bicycle paths, open space, plazas
   g.      Child Care and Day Care Centers
   h.      Athletic facilities on Block 14205, limited to one per block
   i.      A combination of any of the above
2.      Accessory Uses – Uses which are customarily associated with and incidental to permitted principal uses, limited to the following:
   a.      Off-street parking
   b.      Health clubs serving units
   c.      Residential amenities
   d.      Fences and railings
   e.      Home occupations
   f.      Signs

3.  Maximum Height
   a.      The maximum height shall be seven (7) stories and eighty-three (83) feet.

4.  Minimum Lot Size
   a.      Interior Lot – 2,000 square feet
   b.      Corner lot – 2,400 square feet

5.  Maximum Lot coverage – 100%

6.  Landscaping - Required 10% landscaping may be provided in landscaped planting areas, green roof plantings, and raised planters.  If a project is completed in phases, the calculation may be calculated over the entire development site as a whole.

7.  Minimum Setbacks
   None required

8.  Stepbacks are required along Van Vorst Street between Morris and Sussex Streets for buildings utilizing the height bonus.
   a.      At the 7th story, a 10 foot stepback from the ground level façade is required
   b.      At the 8th story, a 20 foot stepback from the ground level façade is required
   c.      At the 9th story, a 30 foot stepback from the ground level façade is required
   d.      Notwithstanding the foregoing, at the corner building on Sussex and Van Vorst Streets, only one stepback is required.  It is to be located at the 7th story and must have a minimum stepback of 25 feet from the ground level façade.

9.  Minimum Parking
   a.      Residential – 0.6 spaces per unit.  There shall be no lease/deed parking requirements or guest/staff parking requirements.
   b.      Retail, restaurants, cafes, nightclubs, and bars – 0.5 spaces per 1,000 square feet of

floor area

c.    Office – 0 spaces required

Where a project is developed in phases, the parking and loading constructed with phase 1 must meet or exceed the parking and loading requirements for that phase.  Required parking and loading for the entire project may be constructed in Phase I.

Valet parking is permitted.

Maximum driveway width: 12 feet one way, 20 feet two way

10.    Loading   Off-street loading shall conform to Article V of the Zoning Ordinance of the City of Jersey City.

11.    Signs

| Use | Type | Number | Size |
|---|---|---|---|
| Residential | Nameplate or Awning | 1 per entry | 12 sf |
| Retail, restaurant, café, bar | Façade Band sign | 1 per street or plaza frontage | 20 sf or 15% of ground floor area of that portion of the primary façade, whichever is less |
| | Blade Sign | 1 per street or plaza frontage | 8 sf |
| | Canopy Sign | 1 per window bay | Shall be calculated into the maximum façade sign area |
| Office | Façade Band sign | 1 per street or plaza frontage | 20 sf or 15% of ground floor area of that portion of the primary façade, whichever is less |
| Home Occupations | Plaque | 1 | 2 sf |

a.  Façade signs in the sign band area above the display window(s) are permitted. Band signs shall display the name and/or logotype of the store only. Band signs shall be illuminated at night. The sign band shall be limited to an area not less than ten (10) feet and not greater than fifteen (15) feet above grade level. In addition, all signs shall set back a minimum of two (2) feet from each side of the building. Sign lettering within the sign band may also be applied directly onto the building surface, rather than onto a sign board.
b.  During construction, one (1) temporary sign indicating: the name of the project or development, general contractor, subcontractor, financing institution and public entity officials (where applicable) shall be permitted. The sign area shall not exceed forty (40) square feet.
c.  All wall signs shall be flush mounted
d.  All blade signs shall project no more than 30 inches from the facade and the bottom of the sign must be a minimum of 9 feet above the sidewalk or plaza.

13

e. Internally lit sign boxes are prohibited. Internally lit channel letters are permitted.
f. Storefront windows shall not be blocked by any interior display case or other form of barrier. Pedestrians on the street shall have the ability to see into the shop and view the activity within.
g. Signs may include the name of the store and street number only.

12. Design Standards
a. Parking garages must be wrapped by the principal use building to disguise the garage area. Garages fronting on Sussex Street, however, are not required to be wrapped. Instead, the façade of all parking levels along Sussex Street shall be of compatible material and quality to that used throughout the development and shall be designed to provide visual interest.
b. Bike parking requirements, as outlined in the Land Development Ordinance, apply
c. Except for the Sussex Street frontage, no more than fifteen (15) percent of the first floor street and plaza frontage or thirty (30) consecutive linear feet along a public right-of-way and plaza frontage - whichever is greater - may be dedicated to other uses such as meter rooms, blank walls, garage doors or loading zones, emergency exits, etc.
d. Large blank walls (rear façade, etc.) without fenestration must incorporate facade relief, an expressed structural system, sculpted, carved or penetrated wall surfaces, architectural lighting, or other architectural techniques to provide visual interest.
e. Window HVAC units (PTAC units) shall not be permitted below twenty (20) feet above grade. At and above twenty (20) feet above grade, all facade vents for air conditioning or heating units must be incorporated into the window opening and mullion design such that vent grills and windows appear as a single unit. This is best achieved by lining up vent grills with the vertical or horizontal edge of the adjacent window and matching the window's length or width or using a spandrel panel to fill any voids.

13. Height Bonus - In recognition of its close proximity to mass transit, and as supported by the Jersey City Master Plan, this district can accommodate greater building heights

An additional 8 stories and 92 feet, for a maximum of 15 stories and 175 feet of height are permitted when the following are all provided:

a. A privately held and maintained 10,000 square foot pedestrian plaza is developed for 24-hour public use. The Developer and its successors and assigns must agree to maintain and repair the plaza in accordance with a Developer's Agreement entered into with the Planning Board.
b. Open Space Requirement – 30% of the total lot area shall be provided as outdoor recreation space, which may be averaged over the entire development when a project is developed in phases. This can be allocated and divided up as needed, at grade, as plaza space, as rooftop amenity space, and so forth.
c. The Developer agrees to enter into an easement with the Jersey City Municipal Utilities Authority ("JCMUA") for ten dollars ($10.00) nominal consideration for the construction by the JCMUA, at its sole cost and expense, of an underground water main pipe line ("pipe line") on a portion of the land where the private pedestrian plaza is planned. The easement shall provide that such pipe line shall be located in a place on such land that will not disrupt or impede the project and that the construction of the pipe line will not delay or obstruct the developer's construction schedule. Such easement shall

14

give the JCMUA the right to construct the pipe line at any time up to the date the developer applies to the City for the first certificate of occupancy for the project. The developer shall give the JCMUA 90 days written notice of its intention to apply to the City for a certificate of occupancy for the project.

d.  The developer agrees to enter into an easement agreement with the JCMUA for ten dollars ($10.00) nominal consideration granting a ten (10) foot wide  easement to the JCMUA for the  maintenance, operation, repair and replacement of the pipe line by the JCMUA, at its sole cost and expense. The easement shall provide that should it be necessary for the JCMUA to remove any portion of the pedestrian plaza improvements and materials, it will reinstall and restore them, at the JCMUA's sole cost and expense, with the same color, type and quality improvements and materials.

e.  The developer agrees to make cross-street improvements at the intersection of Van Vorst Street and Morris Street utilizing materials that are compatible with the pedestrian plaza;

f.  Buildings must be designed and built with LEED or equivalent green measures that will reduce the overall energy consumption by the building occupants, the energy demands on local utilities, and water consumption by occupants.

g.  For phased development, the developer shall adhere to the following benchmarks:

   i.  Subject to the easement grant limitations identified in this Subsection, the aforementioned easements to JCMUA must be granted with the first phase prior to the issuance of a Certificate of Occupancy by the Jersey City Building Department for that phase

   ii.  Aforementioned plaza and necessary Van Vorst / Morris Street intersection improvements must be completed prior to the issuance of a Certificate of Occupancy by the Jersey City Building Department for the second phase

## VIII.  PROCEDURAL REQUIREMENTS

### A.    Submission of Redevelopment Proposals

Site plan review shall be conducted by the Jersey City Planning Board pursuant to NJSA 40:55D-1 et seq.

As part of the final site plan approval process, the Jersey City Planning Board may require a developer to furnish performance guarantees pursuant to NJSA 40:55D-53.  Such performance guarantees shall be in favor of the City of Jersey City, in a form approved by either the Corporation Counsel of the City of Jersey City, or the Attorney for the Jersey City Planning Board.  The amount of such performance guarantees shall be determined by the City Engineer and shall be sufficient to assure completion of improvements within one (1) year of final site plan approval.

### B.    Duration of Plan's Effect

The provisions of this plan specifying the redevelopment of the project area and the requirements and restrictions with respect thereto shall be in effect for a period of forty (40) years from the date of approval of this plan by the City Council of the City of Jersey City.

15

## C.    Deviation Requests

The Planning Board may grant deviations from the regulations contained within this Redevelopment Plan, where, by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or by reason of exceptional topographic conditions, pre-existing structures or physical features uniquely affecting a specific piece of property, the strict application of any area, yard, bulk or design objective or regulation adopted pursuant to this Redevelopment Plan, would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property.  The Planning Board may also grant such relief in an application relating to a specific piece of property where the purposes of this Redevelopment Plan would be advanced by a deviation from the strict requirements of this Plan and the benefits of the deviation would outweigh any detriments.  No relief may be granted under the terms of this section unless such deviation or relief can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the Redevelopment Plan.

## D.    Procedure for Amending this Plan

This Redevelopment Plan may be amended from time-to-time upon compliance with the requirements of law.  A fee of $1,000 plus all costs of copying and transcripts shall be payable by the applicant to the City of Jersey City for any request to amend this plan. Fees shall not be charged for amendments proposed by a local and recognized neighborhood association.

## E.    Interim Uses

Interim uses may be established, subject to site plan approval and agreement between the developers and the Planning Board that such use will not have an adverse effect upon existing or contemplated development during the interim use period.  Interim uses may be granted for a period of up to three (3) years, and may be renewed at the discretion of the board.  Commuter parking that does not serve employees of this redevelopment plan area is specifically prohibited and does not qualify as an interim use.

## IX.    OTHER PROVISIONS TO MEET STATE AND LOCAL REQUIREMENTS

In accordance with NJSA 40A:12A-1 et seq., Chapter 79, Laws of New Jersey 1992, known as *The Local Redevelopment and Housing Law*, the following statements are made.

A.    The Plan herein has delineated a definite relationship to local objectives as to appropriate land uses, density of population, and improved traffic and public transportation, public utilities, recreation and community facilities and other    public improvements.

B.    The Plan has laid out various strategies needed to be implemented in order to carry out the objectives of this Plan.

C.    The Plan has given proposed land uses and building requirements for the redevelopment area.

D.    The Acquisition Maps which are a part of this Plan lists all property to be acquired as a result of this Plan.  Jersey City shall ensure that any residents displaced by this Redevelopment Plan are afforded all reasonable and lawfully required efforts to secure adequate replacement housing.   It is estimated that sufficient relocation housing is available, including subsidized housing, if necessary.  All commercial enterprises to be acquired under this Plan will be given relocation assistance in compliance with all

16

applicable laws.

E.    The Plan is in compliance with the Jersey City Master Plan.  The Master Plan of the County of Hudson is not contrary to the goals and objectives of the Jersey City Master Plan. The Plan complies with the goals and objectives of the New Jersey Development and Redevelopment Plan is that this Plan and the State's Plan both recognize the need to redevelop urban land.

F.    This Redevelopment Plan shall supersede all provisions of the Jersey City Land Development Ordinance that are specifically addressed herein.  Any zoning related question that is not addressed herein shall refer to the Jersey City Land Development Ordinance for clarification.  No variance from the requirements herein shall be cognizable by the Zoning Board of Adjustment.  The Planning Board alone shall have the authority to grant deviations from the requirements of this Plan, a provided herein.  Upon final adoption of this Plan by the Municipal Council of Jersey City, the Jersey City Zoning Map shall be amended to rezone the area covered by this Plan as the Tidewater Basin Redevelopment Area, and all underlying zoning will be voided.

17





# Tidewater Basin Redevelopment Plan
## Acquisition Map

To be Acquired

1 inch = 300 feet

N

Jersey City
Planning Division
30 Montgomery Street Suite 1400
Jersey City, NJ 07302-3821
Phone: 201.547.5010
Fax: 201.547.4323

August 6, 2009

| 0 | 150 | 300 | 600 | 900 | 1,200 |
|---|-----|-----|-----|-----|-------|

Feet



# Tidewater Basin Redevelopment Plan
# Land Use Map

**ZONE**

Grand and Marin

Historic Buffer

Legacy

Mixed Use

Portside

Waterfront

1 inch = 300 feet

N

Jersey City
**City Planning Division**
30 Montgomery Street Suite 1400
Jersey City, NJ 07302-3821
Phone: 201.547.5010
Fax: 201.547.4323

September 10, 2014

0    150    300         600         900       1,200
                                                    Feet

18

# EXHIBIT R

# CITY OF JERSEY CITY

**Department of Housing, Economic Development and Commerce**
Division of Housing Preservation
Office of Landlord/Tenant Relations

**Steven M. Fulop**
**Mayor**

342 MARTIN LUTHER KING DRIVE • JERSEY CITY, N.J 07305
PHONE: (201) 547-5127

---

### Notice of Rent Leveling Bureau Determination

**Tenant Petition:** Petitions on the list attached

**Tenant:** Tenants residing at 100 Warren Street on the list attached[1]

**Landlord:** Portside Urban Renewal LLC, owner, c/o Equity Residential Management, LLC, agent, c/o Jennifer L. Alexander, Esq., Griffin Alexander, P.C., 415 Route 10, 2nd Floor Randolph, NJ 07869

**Tenant's Petition:** On various dates commencing in July 2022, the Office of Landlord/Tenant Relations Bureau of Rent Leveling (the "Bureau") received Illegal Rent Petitions signed by the Tenants residing in various apartments as listed on the attached list, (the Tenants names are not included on the list to avoid providing personal identifiers in this document), in which the Tenants ask the Bureau to determine whether the rent increases for their apartments at 100 Warren Street, Jersey City (the "Property" or "100 Warren")[2], comply with the Jersey City Rent Control Ordinance, Chapter 260 of the Municipal Code, (the "Ordinance"). The Petitions have been served on the Landlord by the Tenants and were sent via email to the Landlord by the Bureau on various dates shortly after receipt of the Petition by the Bureau.

**Landlord's Response:** The copies of the Petitions that were sent to the Landlord by the Bureau included an email which stated that a response, if any, was to be submitted to the Tenants and the Bureau. While the names of the Tenants, the tenancy commencement dates, rents, rent increases, and the apartment numbers differ, the issue in connection with all of the Petitions is essentially the same. The question raised is whether the 100 Warren is subject to the rent restrictions of the Ordinance. The Landlord's response, through its attorney, Jennifer L. Alexander, Esq. of Griffin Alexander, P.C., consisted of a letter brief and a copy of the Tenants' lease agreements and Truth in Renting Statements and a supplemental response which contained additional documentation, specifically a copy of a certificate of Occupancy for 100 Warren dated August 25, 1992,[3]

---

[1] These are tenants who have filed Illegal Rent Petitions and have been served with the Landlord's response.

[2] The Property is designated on the tax map as Block 15902 Lot 1 (formerly Block 60 Lot 34) and includes the two multiple dwellings (the "Towers"). These are referred to as Portside Towers with street addresses of 100 Warren Street and 155 Washington Street. The CO for 155 Washington dated December 31, 1997, delineated the street address as 1 Washington. The street address was subsequently changed to 155 Washington. (Appendix 4)

[3] For ease of reference, documents relied on in this Determination are annexed in the enclosed Appendix.

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 2

(Appendix 1), a "Letter of Exemption" dated November 23, 1994, (Appendix 2), and a Certificate of Continued Occupancy for 100 Warren dated January 24, 1995. (Appendix 3).

**Discussion**: The Ordinance provides in §260-3 that multiple dwellings with five or more residential housing spaces are subject to rent regulation.  100 Warren consists of 230 units. Due to the size of this multiple dwelling, the building is presumed to be rent controlled.  However, there are exemptions to the rent restrictions of the Ordinance.  The exemption that is relevant here is an exemption pursuant to State law which is set forth in the Ordinance at §260-6C where the Ordinance references the exemption for new construction as required by State law, N.J.S.A. 2A:42-84.1 et seq.  As regards this exemption, the Ordinance provides in §260-6C:

> In accordance with N.J.S.A. 2A:42-84.1 et seq., L. 1987, c. 153, the provisions of this chapter shall not apply to a new dwelling which is constructed between June 25, 1987, through June 25, 1992, and which is not constructed for occupation by senior citizens, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the dwelling, or for 30 years following completion of construction, whichever is less. This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4 and the service of a written statement upon the tenant required by N.J.S.A. 2A:42-84.3.

N.J.S.A. 2A:42-84 is titled "State Exemption for New Construction" (the "Statute").  The limitation of the exemption from June 25, 1987 through June 25, 1992 was extended several times and the Statute currently provides in 2A:42-84.5b, "Although this legislation was initially made effective only for a temporary five-year period, it was expanded for a second five-year period by P.L.1992, c.206 until 1997, and then in that year made permanent by P.L.1997, c.56." The reason for the extension and the final change making the exemption permanent, is also set forth in the Statute which explicitly explains the legislative purpose as follows: "The Legislature deems it to be necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey."

There are certain requirements for multiple dwellings seeking the statutory exemption and the question before the Bureau is whether the Landlord has met these requirements.  The Statute provides in 2A:42-84.3:

> The owner of any multiple dwelling exempted from a rent control or rent leveling ordinance pursuant to this act, shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period. Each lease offered to a prospective tenant for any dwelling unit therein during the period the multiple dwelling is so exempted shall contain a provision notifying the tenant of the exemption.

In addition, the Statute provides in 2A:42-84.4:

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 3

> The owner of any multiple dwelling claiming an exemption from a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of exemption from an ordinance under this act, including therein a statement of the date upon which the exemption period so claimed shall commence, such information as may be necessary to effectively locate and identify the multiple dwelling for which the exemption is claimed, and a statement of the number of rental dwelling units in the multiple dwelling for which the exemption is claimed.

It is undisputed that the Landlord has met the first criteria as set forth in 2A:42-84.3.  The Tenants' lease and lease renewals all contain a "RENT CONTROL ADDENDUM", (Appendix 5), the title of which is prominently written in capital letters and underlined.  The Addendum states as follows:

> This Rent Control addendum ("Addendum") is dated and effective as of the date on the Residential Lease – Term Sheet (the "Term Sheet") to which this Addendum is attached and made a part of (the "Lease") and is made by and between Lessor and Resident for the Premises at the Community identified in the Lease.

> Pursuant to N.J.S.A. 2A:42-84.3, we hereby notify you that the Premises and the Community are exempt from the provisions of any rent control ordinances instituted by Jersey City or West New York, as the case may be, and said Premises and Community will be exempt from any future rent control, rent stabilization or rent leveling ordinance instituted by these municipalities for a period of thirty years following the completion of construction at the Community.

The Rent Control Addendum provided the Tenants with the notice required by the Statute.

The question remains whether the Landlord complied with the requirements of the Statute set forth in 2A:42-84.4 which requires that a written statement of the owner's claim be sent to the municipal construction code official 30 days prior to the issuance of the CO.  On November 23, 1994, Portside Apartments Urban Renewal Partners, L.P., ("Portside") sent a letter to the City Construction Code Official, Michael Regan, in which Portside claimed an exemption from rent control pursuant to N.J.S.A. 2A:42-84.1 *et. seq.*, for 229 [sic] units which "shall commence on the anticipated date of initial occupancy, January 1, 1995." (Appendix 2).  The CO for 100 Warren was issued approximately two years earlier on August 25, 1992. (Appendix 1).

The Landlord explains the delay between the issuance of the CO and the initial occupancy of 100 Warren.  At the time of the issuance of the CO for 100 Warren, the building was not open to residents.  The development was intended as a condominium development but evidently because of economic difficulties, the Property went through foreclosure.  The Landlord's statement is consistent with the recorded Sherriff's Deed dated November 23, 1994,

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 4

pursuant to which Portside became the new owner/developer of the Property.  (Appendix 6).
The letter sent to the Construction Code Official dated the same day, November 23, 1994, was
sent more than 30 days before the initial occupancy.  This statutory requirement provides notice
to the city official who is in a position to confirm that the dwelling meets the statutory
definitions: that the dwelling is "constructed" (not rehabilitated), is a "multiple dwelling"
(contains four or more dwelling units), and that the construction has been "completed" (that a
CO has been issued).  The developer's letter identifies the Property by address and block and lot,
references the statutory exemption, the number of units[4], and the commencement date of initial
occupancy, January 1, 1995.  In the circumstances, I find that this letter satisfies the notification
requirement of the Statute in 2A:42-84.4.[5]

The Landlord has met the requirements of the Ordinance and the Statute and therefore,
100 Warren was exempt from the rent restrictions in the Ordinance from the date of the CO,
August 25, 1992 for 30 years to August 24, 2022.

With regard to the Landlord's position that the exemption runs from the date of the
Certificate of Continued Occupancy (the "COO"), January 24, 1995, (Appendix 3), this is
without merit.  The Statute is clear that the exemption runs "for a period of time not to exceed
the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for
30 years following completion of construction, whichever is less."  "Completion of construction"
is defined in the Statute and "means issuance of a certificate of occupancy" it does not mean
occupancy.  The fact that the developer chose or was unable to commence renting the units at the
time of the CO in August 1992 does not affect the commencement date of the exemption.

I note that no one has provided the initial mortgage financing.  This is not fatal to the
Landlord's claim of exemption. In Block 268, LLC v. City of Hoboken Rent Leveling &
Stabilization Bd., 401 N.J. Super. 563, 570 (App. Div. 2008), the court found that there was no
requirement in the Statute for the owner to provide mortgage information.  The court referenced
the Statute, specifically, 2A:42-84.6:

> [t]he Legislature . . . declares it to be public policy of this State that, within the
> limitations imposed by this act, the exemptions granted under this act shall not
> be limited, diminished, altered, or impaired during the period of exemption
> afforded.

Id. at 571.  The court noted that the record did not "reveal the terms of the mortgage, if any" and
that in the event it is established that the amortization of the initial mortgage was less than 30

---

[4] The developer's letter incorrectly states the number of units as 229.  The CO states 204 apartments and
26 townhouses. There is also a Developer's Agreement between the City and the initial developer dated
July 23, 1992, which references testimony confirming that 230 units had been completed as of the date of
the agreement.  (Appendix 7). The error in the number of units as stated in the letter is inconsequential
inasmuch as the City was aware that the number of units was 230, not 229.

[5] It seems that the Construction Code Official at the time of Portside's letter, Michael Regan, was
unaware of the requirements of the Statute.  On December 6, 1994, he responded to Portside
acknowledging receipt of its November 23, 1994 letter.  He wrote, "Please be advised that the Office of
Construction Official has no jurisdiction over rent controls and I would suggest that you contact the
proper agency charged with that responsibility." (Appendix 8).

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 5

years, the "order may be amended accordingly." Id. at 572-573. Similarly, here the exemption is 30 years from the date of the CO unless a mortgage note is submitted proving that the amortization of the initial financing was less than 30 years.

The Landlord has also argued that the Property is exempt because it is located in a redevelopment area, specifically the Tidewater Basin Redevelopment area. The Ordinance does provide a rent control exemption for new construction in a redevelopment area. This exemption is found as an exemption from the definition of dwelling in §260-1 as follows:

> Newly constructed dwellings with 25 or more dwelling units located within a redevelopment area as defined in Section 5 of the Redevelopment Agencies Law, N.J.S.A. 40:55C-5(o), for which the City Council has approved a redevelopment plan, in accordance with Section 17 of the Redevelopment Agencies Law, N.J.S.A. 40:55C-17.

While the Landlord is correct that the Property is within the Tidewater Basin Redevelopment Area, the Tidewater Basin Redevelopment Plan is dated November 10, 1999, several years after the Property was constructed and occupied. (Appendix 9). Portside Towers is a "district" described in the Plan as containing 527 units (the total number of units in both Towers). The Property was already constructed and occupied at the time of the Plan and therefore was not "new construction" as contemplated by this exemption in the Ordinance. In fact, the Landlord recognized that the basis for the exemption was the Statute and not the exception for new construction in redevelopment areas as evidenced by the language of the Rent Control Addendum which alerts the Tenants to the exemption "[p]ursuant to N.J.S.A. 2A:42-84.3 … for a period of thirty years following the completion of construction at the Community." (Appendix 5).

The Tenants have raised several issues. First, the Tenants point out that on some of the annual Landlord Registration Statements, the Landlord has indicated that the Property is not exempt from rent control. The Landlord Registration Statement (the "Registration") is a registration that the Landlord is required to file with the Bureau annually. In connection with 100 Warren, the Bureau has two Registrations, one filed in 2021 and one filed in 2022. There are earlier registrations filed under the 155 Washington address, the other Tower at Portside Towers. It is clear that those Registrations were meant to apply to both Towers inasmuch as they are on the same block and lot and the Registrations state the number of units as "527", the total number of units in both Towers. It seems that in the past, the Bureau did not always reach out to and obtain Registrations for those multiple dwellings that were exempt from rent control and, because the rents were not regulated, did not follow-up and obtain rent rolls for these properties despite the requirements of the Ordinance. 2017 is the earliest Registration in the Bureau files for the Property. In 2021, the first year that a rent roll was supplied, the Registration for 155 Washington included a rent roll that included both Towers.

In the Registration, Landlords are asked to state whether the property is subject to rent control. The format of the 2017 – 2019 Registrations asked the question of exemption in this way:

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 6

THIS PROPERTY IS ☐        IS NOT ☐ PRESENTLY UNDER RENT CONTROL

The Registrations for those years contain a check in the box next to "IS NOT" indicating that the Property, according to the Landlord, was not governed by rent control. (Appendix 10). The form was revised in 2020 and the current Registration asks the question, "Is the property you are registering currently under rent control?"  The 100 Warren 2021 Registration an answered "no" and the 2022 Registration answered "yes". (Appendix 11).  Perhaps it was a misreading of the form associated with the change in format that resulted in these answers but whatever the reason, the Landlord's response in the Registration is not dispositive of whether the Property is exempt from rent control.  What is relevant is whether the Property meets the criteria and the requirements of the Ordinance and the Statute.  As set forth in detail above, 100 Warren did qualify and has been exempt from rent control for 30 years, through August 24, 2022.

The Tenants have also relied on a recent unpublished opinion of the New Jersey Appellate Division, Willow Ridge Apts. v. Union City Rent Stabilization Bd., 2022 N.J. Super. Unpub. LEXIS 1232 *; 2022 WL 2525243.  The first page of the decision states prominently, "PLEASE CONSULT NEW JERSEY RULE 1:36-3 FOR CITATION OF UNPUBLISHED OPINIONS."  (Appendix 12).  Rule 1:36-3 provides, "No unpublished opinion shall constitute precedent or be binding upon any court."  So, while this decision might be informative, it is not binding on a court and not binding on the Bureau.  In any event, while Willow Ridge also involved the statutory exemption from rent control pursuant to N.J.S.A. 2A:42-84, the facts of this unpublished case are totally distinguishable from the facts here.  In Willow Ridge, there was no evidence that the owner ever applied for the statutory rent control exemption nor was there ever any notice to the tenants of the owner's claim that the building was exempt.  The CO for the multiple dwelling in Willow Ridge was issued in 2002 and no request for exemption was made until 2019 when the new owner argued that the building should be exempt.  Moreover, no tenants were ever notified of this claimed exemption during those 17 years.  The circumstances are very different here where the owner of the Property notified the Construction Code Official of its claimed exemption over 30 days prior to the initial occupancy of 100 Warren and, more importantly, has notified the Tenants in every lease and lease renewal of the claimed exemption.

To summarize, the rents prior to August 24, 2022 were not governed by the Ordinance and the Bureau has no jurisdiction to review or make any findings regarding these rents.  Going forward, the rents charged are restricted by the Ordinance and may not be greater than the allowable CPI for the month.  The CPI for September 2022 is 6.7% and pursuant to the Ordinance, the maximum increase is the CPI or 4% whichever is less.  Therefore, to the extent increases in excess of 4% have been sent to the Tenants, these are allowed up to 4% and the lease renewals must be adjusted accordingly.  Late fees and similar charges must also comply with the Ordinance (§260-1) and may not be in excess of $35.00.  Going forward, lease renewals should not contain the Landlord's "Rent Control Addendum" and the Registrations should indicate that the 100 Warren is currently under rent control.

**Final Determination** – 100 Warren was not subject to the Ordinance therefore the Bureau has no jurisdiction to review or make any findings regarding the rent charged through August 24, 2022.  Going forward, 100 Warren is subject to the rent restrictions of the Ordinance.  To the

Notice of Decision – Illegal Rent Petitions - 100 Warren Street
September 19, 2022
Page 7

extent the Tenants have been sent notices of rent increases and/or lease renewals, these must comply with the rent restrictions of the Ordinance.  Further, to the extent rent increases for the month of September 2022 were charged and paid, the tenant must receive a rent credit or refund for amounts in excess of the allowed 4% rent increase.

**Signature:** _____

Dinah Hendon, Rent Leveling Administrator

**Dated:** September 19, 2022

<div align="center">

**Notice to Parties**

</div>

**This Bureau Determination may be appealed to the Rent Leveling Board by filing a Notice of Appeal with the Bureau within 15 days of receipt of this Determination, no later than October 7, 2022.**

A party appealing this Determination must include in the written notice of appeal:

a) The decision (or part thereof) from which review is sought;

b) The factual and legal basis for the appeal with citations to the record (ie - registration statements) considered by the Bureau in its determination.

c) The notice of appeal must be served upon the other party.

d) Except for good cause shown, no appeal shall rely upon any issue of fact or law or upon any documentary evidence not presented to the Bureau.

## **100 Warren Street Petitions**

(these Petititons have been responded to by the landlord on or before 9/19/22)

| File No. | | Unit # |
|---|---|---|
| R22-034 | 100 Warren Street | 1807 |
| R22-035 | 100 Warren Street | 1205 |
| R22-065 | 100 Warren Street | 1401 |
| R22-074 | 100 Warren Street | 208 |
| R22-083 | 100 Warren Street | 1705 |
| R22-092 | 100 Warren Street | 1606 |
| R22-101 | 100 Warren Street | 1515 |
| R22-107 | 100 Warren Street | 502 |
| R22-110 | 100 Warren Street | 1003 |
| R22-111 | 100 Warren Street | 1004 |
| R22-125 | 100 Warren Street | 422 |
| R22-126 | 100 Warren Street | 510 |
| R22-127 | 100 Warren Street | 704 |
| R22-128 | 100 Warren Street | 804 |
| R22-129 | 100 Warren Street | 915 |
| R22-130 | 100 Warren Street | 1709 |

The names of tenants have not been included to avoid providing
personal identifiers.

# EXHIBIT S

# CITY OF JERSEY CITY

## Department of Housing, Economic Development and Commerce
### Division of Housing Preservation
### Office of Landlord/Tenant Relations

**Steven M. Fulop**
**Mayor**

342 MARTIN LUTHER KING DRIVE • JERSEY CITY, N.J 07305
PHONE: (201) 547-5127

---

## Notice of Rent Leveling Bureau Determination

**Tenant Petition:** Petitions on the list attached

**Tenant:** Tenants residing at 155 Washington Street on the list attached[1]

**Landlord:** Portside Urban Renewal LLC, owner, c/o Equity Residential Management, LLC, agent, c/o Jennifer L. Alexander, Esq., Griffin Alexander, P.C., 415 Route 10, 2nd Floor Randolph, NJ 07869

**Tenant's Petition:** On various dates commencing in June 2022, the Office of Landlord/Tenant Relations Bureau of Rent Leveling (the "Bureau") received Illegal Rent Petitions signed by the Tenants residing in various apartments as listed on the attached list, (the Tenants names are not included on the list to avoid providing personal identifiers in this document), in which the Tenants ask the Bureau to determine whether the rent increases for their apartments at 155 Washington Street, Jersey City (the "Property" or "155 Washington")[2], comply with the Jersey City Rent Control Ordinance, Chapter 260 of the Municipal Code, (the "Ordinance"). The Petitions have been served on the Landlord by the Tenants and were sent via email to the Landlord by the Bureau on various dates shortly after receipt of the Petition by the Bureau.

**Landlord's Response:** The copies of the Petitions that were sent to the Landlord by the Bureau included an email which stated that a response, if any, was to be submitted to the Tenants and the Bureau. While the names of the Tenants, the tenancy commencement dates, rents, rent increases, and the apartment numbers differ, the issue in connection with all of the Petitions is essentially the same. The question raised is whether the 155 Washington is subject to the rent restrictions of the Ordinance. The Landlord's response, through its attorney, Jennifer L. Alexander, Esq. of Griffin Alexander, P.C., consisted of a letter brief and a copy of the Tenants' lease agreements and Truth in Renting Statements and a supplemental response which contained additional documentation, specifically a copy of a Certificate of Occupancy ("CO") for 100 Warren dated August 25, 1992,[3] (Appendix 1), a "Letter of Exemption" dated November 23, 1994, (Appendix

---

[1] These are tenants who have filed Illegal Rent Petitions and have been served with the Landlord's response.

[2] The Property is designated on the tax map as Block 15902 Lot 1 (formerly Block 60 Lot 34) and includes the two multiple dwellings (the "Towers"). These are referred to as Portside Towers with street addresses of 100 Warren Street ("100 Warren") and 155 Washington Street.

[3] For ease of reference, documents relied on in this Determination are annexed in the enclosed Appendix.

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 2

2), a Certificate of Continued Occupancy ("COO") for 100 Warren dated January 24, 1995, (Appendix 3), and a CO for 155 Washington dated December 31, 1997, delineated as 1 Washington on the CO (the street address was subsequently changed to 155 Washington). (Appendix 4).

**Discussion**: The Ordinance provides in §260-3 that multiple dwellings with five or more residential housing spaces are subject to rent regulation.  155 Washington consists of 297 units. Due to the size of this multiple dwelling, the building is presumed to be rent controlled. However, there are exemptions to the rent restrictions of the Ordinance.  The exemption that is relevant here is an exemption pursuant to State law which is set forth in the Ordinance at §260-6C where the Ordinance references the exemption for new construction as required by State law, N.J.S.A. 2A:42-84.1 et seq.  As regards this exemption, the Ordinance provides in §260-6C:

> In accordance with N.J.S.A. 2A:42-84.1 et seq., L. 1987, c. 153, the provisions of this chapter shall not apply to a new dwelling which is constructed between June 25, 1987, through June 25, 1992, and which is not constructed for occupation by senior citizens, for a period of time not to exceed the period of amortization of any initial mortgage loan obtained for the dwelling, or for 30 years following completion of construction, whichever is less. This exemption applies only where an owner complied with all requirements contained in N.J.S.A. 2A:42-84.1 et seq., including the filing with the municipal construction official required by N.J.S.A. 2A:42-84.4 and the service of a written statement upon the tenant required by N.J.S.A. 2A:42-84.3.

N.J.S.A. 2A:42-84 is titled "State Exemption for New Construction" (the "Statute").  The limitation of the exemption from June 25, 1987 through June 25, 1992 was extended several times and the Statute currently provides in 2A:42-84.5b, "Although this legislation was initially made effective only for a temporary five-year period, it was expanded for a second five-year period by P.L.1992, c.206 until 1997, and then in that year made permanent by P.L.1997, c.56." The reason for the extension and the final change making the exemption permanent, is also set forth in the Statute which explicitly explains the legislative purpose as follows: "The Legislature deems it to be necessary for the public welfare to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey."

There are certain requirements for multiple dwellings seeking the statutory exemption and the question before the Bureau is whether the Landlord has met these requirements.  The Statute provides in 2A:42-84.3:

> The owner of any multiple dwelling exempted from a rent control or rent leveling ordinance pursuant to this act, shall, prior to entering into any lease with a person for tenancy of any premises located in the multiple dwelling, furnish the prospective tenant with a written statement that the multiple dwelling in which the premises is located is exempt from rent control or rent leveling for such time as may remain in the exemption period. Each lease offered to a prospective tenant for any dwelling unit therein during the period the multiple dwelling is so exempted shall contain a provision notifying the tenant of the exemption.

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 3

In addition, the Statute provides in 2A:42-84.4:

> The owner of any multiple dwelling claiming an exemption from a rent control
> or rent leveling ordinance pursuant to this act shall file with the municipal
> construction official, at least 30 days prior to the issuance of a certificate of
> occupancy for the newly constructed multiple dwelling, a written statement of
> the owner's claim of exemption from an ordinance under this act, including
> therein a statement of the date upon which the exemption period so claimed
> shall commence, such information as may be necessary to effectively locate
> and identify the multiple dwelling for which the exemption is claimed, and a
> statement of the number of rental dwelling units in the multiple dwelling for
> which the exemption is claimed.

It is undisputed that the Landlord has met the first criteria as set forth in 2A:42-84.3.  The
Tenants' lease and lease renewals all contain a "<u>RENT CONTROL ADDENDUM</u>", (Appendix
5), the title of which is prominently written in capital letters and underlined.  The Addendum
states as follows:

> This Rent Control addendum ("Addendum") is dated and effective as of
> the date on the Residential Lease – Term Sheet (the "Term Sheet") to which
> this Addendum is attached and made a part of (the "Lease") and is made by
> and between Lessor and Resident for the Premises at the Community identified
> in the Lease.

> Pursuant to N.J.S.A. 2A:42-84.3, we hereby notify you that the Premises
> and the Community are exempt from the provisions of any rent control
> ordinances instituted by Jersey City or West New York, as the case may be,
> and said Premises and Community will be exempt from any future rent control,
> rent stabilization or rent leveling ordinance instituted by these municipalities
> for a period of thirty years following the completion of construction at the
> Community.

The Rent Control Addendum provided the Tenants with the notice required by the Statute.

The question remains whether the Landlord complied with the requirements of the Statute
set forth in 2A:42-84.4 which requires that a written statement of the owner's claim be sent to the
municipal construction code official 30 days prior to the issuance of the CO.  It is readily
apparent that the relevant records are 30 +/- years old.  Both parties have made diligent efforts to
obtain these records as have several city departments.  It seems that several significant
documents, were not located and produced in response to the OPRA requests filed by the parties
but were found sometime later in response to continued searches by the Division of the
Construction Code Official. And, one document, the COO for 100 Warren dated January 24,
1995, (Appendix 3), was located by the Landlord and not the City.  In short, we cannot be certain
that all of the records have been found.  It is therefore critical that I consider all of the
circumstances in addition to those documents that have been located in rendering a decision.

As acknowledged by the parties, 155 Washington is one of two multiple dwellings (the

Notice of Decision – Illegal Rent Petitions – 155 Washington Street
September 19, 2022
Page 4

"Towers") that make up Portside Towers.  The CO was issued on December 31, 1997, (Appendix 4), five years after the CO for the other Tower, 100 Warren (Appendix 1) and was occupied approximately two years after the Tower at 100 Warren was first occupied.  (Appendix 2).   While no letter to the Construction Code Official in connection with 155 Washington has been located, there is correspondence from the developer at the time to the Construction Code Official in connection with 100 Warren.  On November 23, 1994, Portside Apartments Urban Renewal Partners, L.P., ("Portside") sent a letter to the City Construction Code Official, Michael Regan, in which Portside claimed an exemption from rent control pursuant to N.J.S.A. 2A:42-84.1 *et. seq.*, for 229 [sic] units which "shall commence on the anticipated date of initial occupancy, January 1, 1995." (Appendix 2).  The CO for 100 Warren was issued approximately two years earlier on August 25, 1992. (Appendix 1). In a decision entered contemporaneously with this Determination, I found that the November 23, 1994 letter satisfied the statutory requirement of notice to the construction code official despite the delay in requesting the exemption.[4]

It is clear from this letter that Portside, the owner/developer, was aware of the statutory requirement that the Construction Code Official be notified of the claimed exemption.  Portside was not the owner at the time the CO for 100 Warren was issued in August 1992 and, evidently the owner at that time did not apply for the exemption because the intention was to have condominiums, not rentals, in the building.  When that did not happen and the Property came out of foreclosure with a new owner/developer, the letter was sent asserting the exemption. This is noteworthy because, in December 1997 when the CO for 155 Washington was issued, Portside was still the owner/developer.  What is also noteworthy is the fact that the Construction Code Official at the time of Portside's letter, Michael Regan, was unaware of the requirements of the Statute.  On December 6, 1994, he responded to Portside acknowledging receipt of its November 23, 1994 letter.  He wrote, "Please be advised that the Office of Construction Official has no jurisdiction over rent controls and I would suggest that you contact the proper agency charged with that responsibility." (Appendix 8).  Michael Regan was the Construction Code Official in December 1997; he signed the CO for 155 Washington on December 31, 1997.

To date, no letter to the Construction Code Official in connection with the requested exemption from rent control for 155 Washington has been located but that does not mean that one was not sent.  Portside was aware of the Statute and its requirements in November 1994 even if the Construction Code Official at the time, Michael Regan, was not.  It is as likely as not that three years later, with the issuance of the CO for 155 Washington, another request for exemption was sent.  Perhaps, in light of Mr. Regan's December 6, 1994 letter, it was sent to some other City agency.   What is clear, as set forth in detail below, is that 155 Washington was owned by the same owner as 100 Warren and these Towers were managed as one development.  The

---

[4] The Landlord explained the delay between the issuance of the CO and the initial occupancy of 100 Warren.  At the time of the issuance of the CO for 100 Warren, the building was not open to residents. The development was intended as a condominium development but evidently because of economic difficulties, the Property went through foreclosure.  The Landlord's statement is consistent with the recorded Sherriff's Deed dated November 23, 1994, pursuant to which Portside became the new owner/developer of the Property.  (Appendix 6). The letter sent to the Construction Code Official dated the same day, November 23, 1994, was sent more than 30 days before the initial occupancy.

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 5

Tenants were aware that this was one development.  Equally important, the City was aware that this was one development comprised of two newly constructed multiple dwellings.  The statutory requirement of notice to the "construction code official" is meant to provide notice to the city official who is in a position to confirm that the dwelling meets the statutory definitions: that the dwelling is "constructed" (not rehabilitated), is a "multiple dwelling" (contains four or more dwelling units), and that the construction has been "completed" (a CO has been issued).  That 155 Washington meets these criteria is undisputed.

The City was aware of the construction of the two Towers of Portside Towers, 100 Warren and 155 Washington, which are on the same tax block and lot and are part of the same development plan, owned and managed by the same owner.  This is confirmed in several documents.  As early as July 1992, the City was a party to a Developer's Agreement (the "Agreement") dated July 23, 1992.  The Agreement describes the development of the property "known as Block 60 Lot 34" and the progress of construction as of that date.  The site was to include "a mixed residential complex including 525 residential units in two highrise [sic] buildings" and references testimony confirming that 230 units had been completed as of the date of the Agreement.  (Appendix 7).  One month later, on August 25, 1994, the CO for 100 Warren was issued for 230 units, (Appendix 1), and on December 31, 1997 the CO for 155 Washington was issued confirming the "construction of 25 story building as per approved plans."  (Appendix 4).

Thereafter, in November 1999, the Tidewater Basin Redevelopment Plan (the "Plan") was adopted.  (Appendix 9).  The Plan contains the "Portside District" described as, "partially developed as *Portside*, a mixed-use development consisting of a maximum of 527 dwelling units…"  In addition, the Landlord Registration Statements[5] (the "Registrations") filed with the Bureau from 2017 – 2021 include 527 as the unit count indicating that these Registrations were meant to cover both Towers, 155 Washington and 100 Warren.  From 2017 – 2019, until the format of the form was changed (as explained in detail below), the Registrations stated that the Property (consisting of 527 units) is exempt from rent control.  It is clear that Portside Towers, owned by the same entity, is treated and managed as one property.  From the start, the Tenants residing at 155 Washington have been advised that the building is not subject to rent control.

Given all of these circumstances, the fact that 155 Washington meets the statutory criteria of a newly constructed multiple dwelling, that the City was aware of this development and the Landlord's claim of exemption, and that the Tenants have been properly notified of the exemption in their lease and lease renewals, I must conclude that 155 Washington is exempt from the rent restrictions of the Ordinance for 30 years from the issuance of the CO, December 31, 1997, through December 30, 2027.  I note that no one has provided the initial mortgage financing.  This is not fatal to the Landlord's claim of exemption. In <u>Block 268, LLC v. City of Hoboken Rent Leveling & Stabilization Bd.</u>, 401 N.J. Super. 563, 570 (App. Div. 2008), the court found that there was no requirement in the Statute for the owner to provide mortgage

---

[5] It seems that in the past, the Bureau did not always reach out to and obtain Registrations for those multiple dwellings that were exempt from rent control and, because the rents were not regulated, did not follow-up and obtain rent rolls for these properties despite the requirements of the Ordinance.  2017 is the earliest Registration in the Bureau files for the Property.

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 6

information.  The court referenced the Statute, specifically, 2A:42-84.6:

> [t]he Legislature . . . declares it to be public policy of this State that, within the
> limitations imposed by this act, the exemptions granted under this act shall not
> be limited, diminished, altered, or impaired during the period of exemption
> afforded.

Id. at 571.  The court noted that the record did not "reveal the terms of the mortgage, if any" and
that in the event it is established that the amortization of the initial mortgage was less than 30
years, the "order may be amended accordingly."  Id. at 572-573.  Similarly, here the exemption
is 30 years from the date of the CO unless a mortgage note is submitted proving that the
amortization of the initial financing was less than 30 years.

The Landlord has argued that the Property is exempt because it is located in a
redevelopment area, specifically the Tidewater Basin Redevelopment area.  The Ordinance does
provide a rent control exemption for new construction in a redevelopment area.  This exemption
is found as an exemption to the definition of dwelling in §260-1 as follows:

> Newly constructed dwellings with 25 or more dwelling units located within a
> redevelopment area as defined in Section 5 of the Redevelopment Agencies
> Law, N.J.S.A. 40:55C-5(o), for which the City Council has approved a
> redevelopment plan, in accordance with Section 17 of the Redevelopment
> Agencies Law, N.J.S.A. 40:55C-17.

While the Landlord is correct that the Property is within the Tidewater Basin
Redevelopment Area, the Tidewater Basin Redevelopment Plan is dated November 10, 1999,
several years after the Property was constructed and occupied. (Appendix 9).  Portside Towers is
a "district" described in the Plan as containing 527 units (the total number of units in both
Towers).  The Property was already constructed and occupied at the time of the Plan and
therefore was not "new construction" as contemplated by this exemption in the Ordinance.  In
fact, the Landlord recognized that the basis for the exemption was the Statute and not the
exception for new construction in redevelopment areas as evidenced by the language of the Rent
Control Addendum which alerts the Tenants to the exemption "[p]ursuant to N.J.S.A. 2A:42-
84.3 … for a period of thirty years following the completion of construction at the Community."

The Tenants have raised several issues.  First, the Tenants point out that on some of the
annual Registrations, the Landlord has indicated that the Property is not exempt from rent
control. The Registration is a registration that the Landlord is required to file with the Bureau
annually.  Landlords are asked to state whether the property is subject to rent control.  The
format of the 2017 – 2019 Registrations asked the question of exemption in this way:

THIS PROPERTY IS ☐      IS NOT ☐ PRESENTLY UNDER RENT CONTROL

The Registrations for those years contain a check in the box next to "IS NOT" indicating that the
Property, according to the Landlord, was not governed by rent control. (Appendix 10). The form
was revised in 2020 and the current Registration asks the question, "Is the property you are
registering currently under rent control?"  The 2020 – 2022 Registrations answer "yes".

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 7

(Appendix 10). Perhaps it was a misreading of the form associated with the change in format that resulted in these answers but whatever the reason, the Landlord's response in the Registration is not dispositive of whether the Property is exempt from rent control. What is relevant is whether the Property meets the criteria and the requirements of the Ordinance and the Statute. As set forth in detail above, I find that 155 Washington did qualify and is exempt from rent control for 30 years, through December 30, 2027.

The Tenants have also relied on a recent unpublished opinion of the New Jersey Appellate Division, Willow Ridge Apts. v. Union City Rent Stabilization Bd., 2022 N.J. Super. Unpub. LEXIS 1232 *; 2022 WL 2525243. The first page of the decision states prominently, "PLEASE CONSULT NEW JERSEY RULE 1:36-3 FOR CITATION OF UNPUBLISHED OPINIONS." (Appendix 12). Rule 1:36-3 provides, "No unpublished opinion shall constitute precedent or be binding upon any court." So, while this decision might be informative, it is not binding on a court and not binding on the Bureau. In any event, while Willow Ridge also involved the statutory exemption from rent control pursuant to N.J.S.A. 2A:42-84, the facts of this unpublished case are totally distinguishable from the facts here. In Willow Ridge, there was no evidence that the owner ever applied for the statutory rent control exemption nor was there ever any notice to the tenants of the owner's claim that the building was exempt. The CO for the multiple dwelling in Willow Ridge was issued in 2002 and no request for exemption was made until 2019 when the new owner argued that the building should be exempt. Moreover, no tenants were ever notified of this claimed exemption during those 17 years. The circumstances are very different here. The CO for 155 Washington confirms that it met the statutory criteria of a newly constructed multiple dwelling. The City was aware of the Portside Towers development (the City was a party to a Developer's Agreement (Appendix 7) and the 527 units of Portside Towers are specifically described in the Tidewater Basin Redevelopment Plan (Appendix 9)), and was aware of the Landlord's claim of exemption by virtue of Portside's (the owner/developer of Portside Towers at the time) letter to the Construction Code Official of its claimed exemption over 30 days prior to the initial occupancy of 100 Warren, the first Tower to be constructed, and also by virtue of the Landlord's annual Registrations which were filed in connection with both Towers, all 527 units, and which stated that the Property was exempt from rent control. And, perhaps the most important distinction is that the Tenants here, unlike those in Willow Ridge, have been properly notified of the exemption in every lease and lease renewal.

To summarize, 155 Washington has been and remains exempt from the rent control restrictions of the Ordinance from December 31, 1997 through December 30, 2027 and the Bureau has no jurisdiction to review or make any findings regarding these rents.

**Final Determination –** 155 Washington is not subject to the Ordinance therefore the Bureau has no jurisdiction to review or make any findings regarding the rent or rent increases charged.

**Signature:** _____
                Dinah Hendon, Rent Leveling Administrator

**Dated:** September 19, 2022

Notice of Decision – Illegal Rent Petitions - 155 Washington Street
September 19, 2022
Page 8

**Notice to Parties**

**This Bureau Determination may be appealed to the Rent Leveling Board by filing a Notice of Appeal with the Bureau within 15 days of receipt of this Determination, no later than October 7, 2022.**

A party appealing this Determination must include in the written notice of appeal:

a)  The decision (or part thereof) from which review is sought;

b)  The factual and legal basis for the appeal with citations to the record (ie - registration statements) considered by the Bureau in its determination.

c)  The notice of appeal must be served upon the other party.

d)  Except for good cause shown, no appeal shall rely upon any issue of fact or law or upon any documentary evidence not presented to the Bureau.

## 155 Washingington Street Petitions

(these Petititons have been responded to by the landlord on or before 9/19/22)

| File No. | | Unit # |
|---|---|---|
| R22-026 | 155 Washington Street | 2 |
| R22-029 | 155 Washington Street | 306 |
| R22-044 | 155 Washington Street | 2102 |
| R22-045 | 155 Washington Street | 1409 |
| R22-047 | 155 Washington Street | 1910 |
| R22-051 | 155 Washington Street | 2612 |
| R22-052 | 155 Washington Street | 2405 |
| R22-055 | 155 Washington Street | 1913 |
| R22-058 | 155 Washington Street | 1504 |
| R22-060 | 155 Washington Street | 1502 |
| R22-061 | 155 Washington Street | 1604 |
| R22-063 | 155 Washington Street | 1503 |
| R22-075 | 155 Washington Street | 1506 |
| R22-076 | 155 Washington Street | 1002 |
| R22-084 | 155 Washington Street | 1713 |
| R22-102 | 155 Washington Street | 903 |
| R22-121 | 155 Washington Street | 2101 |

The names of tenants have not been included to avoid providing
personal identifiers.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| The Towers at Portside Urban Renewal Company, L.L.C. and Equity Residential Management, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>The City of Jersey City, the City of Jersey City Rent Leveling Board, and the City of Jersey City Bureau of Rent Leveling<br><br>Defendants, and<br><br>Portside Towers East Tenant Association, Portside Towers West Tenant Association, Kevin Weller, Jessica Brann, Joel Rothfus, and Michele Hirsch,<br><br>Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:23-cv-22291-MCA-JRA |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION**
**TO COMPEL LIMITED DEPOSITIONS AND PRODUCTION OF DOCUMENTS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 3

ARGUMENT ..................................................................................................... 6

I.     The City And Tenants Should Be Compelled To Produce Witnesses And Corporate
       Representatives For Depositions; Any Motion To Quash The Subpoena For Ms.
       Hendon's Deposition Should Be Denied. ............................................................ 6

       A.     The Depositions Are Relevant And Tailored To The Prerogative Writ
              Claims. .................................................................................................. 7

       B.     New Jersey Courts Allow Depositions In Prerogative Writ Claims. ..................... 10

II.    The Court Should Compel City To Produce Documents Related To The Tidewater
       Plan. .................................................................................................... 12

       A.     Documents Related To The Tidewater Plan Are Relevant And Tailored To
              The Prerogative Writ Claims. ................................................................... 12

       B.     The City Has Not Demonstrated That Producing Documents Related To
              The Tidewater Plan Would Be Unduly Burdensome. ..................................... 14

CONCLUSION ................................................................................................ 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. Schultes & Sons v. Haddon Twp.*,
83 A.2d 896 (N.J. 1951)...................................................................................................11

*Abreu v. State of New Jersey*,
2015 WL 9480021 (D.N.J. Dec. 29, 2015) .....................................................................14

*Aparin v. Cnty. of Gloucester*,
783 A.2d 271 (N.J. Super. Ct. Law Div. 2000) ..............................................................10

*Aruanno v. Johnson*,
2020 WL 1951605 (D.N.J. Apr. 23, 2020) ......................................................................11

*Averbach v. Rival Mfg. Co.*,
879 F.2d 1196 (3d Cir. 1989)............................................................................................7

*Barrett v. Union Twp. Comm.*,
553 A.2d 62 (N.J. Super. Ct. App. Div. 1989)................................................................11

*Care of Tenafly, Inc. v. Tenafly Zoning Bd. of Adjustment*,
704 A.2d 1032 (N.J. Super. Ct. App. Div. 1998)............................................................10

*Corradi v. New Jersey State Parole Board*,
2019 WL 1795545 (D.N.J. Apr. 24, 2019) ......................................................................11

*Ezeani v. Anderson*,
2022 WL 18158543 (D.N.J. Dec. 8, 2022) (Almonte, J.)..................................................7

*Galik v. Clara Maass Med. Ctr.*,
771 A.2d 1141 (N. J. 2001)...............................................................................................9

*Gutierrez v. Johnson & Johnson, Inc.*,
2002 WL 34717245 (D.N.J. Aug. 13, 2002) .....................................................................7

*Haack v. Ranieri*,
200 A.2d 522 (N.J. Super. Ct. Law Div. 1964) ..............................................................11

*Occidental Chem. Corp., v. 21st Century Fox Am., Inc.*,
2022 WL 3369661 (D.N.J. Aug. 16, 2022) .......................................................................9

*Porreca v. City of Millville*,
16 A.3d 1057 (N.J. Super. Ct. App. Div. 2011)..............................................................10

ii

*Spectraserv, Inc. v. Kearny Mun. Utils. Auth.*,
   2008 WL 4790978 (N.J. Super. Ct. App. Div. Nov. 5, 2008) ...................................................10

*Warrenville Plaza, Inc. v. Warren Twp. Sewerage Auth.*,
   553 A.2d 874 (N.J. Super. Ct. App. Div. 1989).......................................................................10

*Worthy v. City of Newark*,
   2008 WL 413309 (D.N.J. Feb. 13, 2008) .................................................................................7

**Statutes**

Chapter 260 of the Jersey City Municipal Code.......................................................................2, 14

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)...........................................................................................................8, 14

Fed. R. Civ. P. 30(a)(1)................................................................................................................6

Fed. R. Civ. P. 30(b)(6)................................................................................................................6

Fed. R. Civ. P. 37(a)(3)(B)(ii)......................................................................................................6

Fed. R. Civ. P. 45(d)(3)(A) ..........................................................................................................7

**INTRODUCTION**

This motion concerns Defendants' ("the City") and Defendant-Intervenors' ("Tenants") refusal to produce deponents and documents in response to narrow discovery requests relevant to Plaintiffs' ("Portside") and Tenants' prerogative writ claims and defenses, along with the City's contemplated motion to quash Portside's subpoena for a deposition from a relevant non-party witness. As the Court knows, Portside contends in its prerogative writ claim that the Board's 2023 decision stripping Portside Towers' rent control exemption ("Decision") and the Bureau's 2024 rent recalculations ("Recalculations") were "arbitrary, capricious, and wrong as a matter of law in multiple respects." (Dkt. 65 ¶¶164-167.) Portside's discovery requests at issue seek the following information:

**A. Depositions Of Key Participants.** Portside seeks to depose the following key participants in the facts and decision-making underlying the Board's Decision and the Bureau's Recalculations: (i) Albert Cupo, the Board chair at the time of the Decision; (ii) Shyrone Richardson, Director of the Office of Landlord/Tenant Relations, who oversaw the Bureau's Recalculations; (iii) Dinah Hendon, former Bureau's Rent Leveling Administrator, whose initial determination that Portside Towers was entitled to the rent control exemption was overturned by the Board; (iv) the four named tenants who intervened in this lawsuit as parties and who communicated information to the Bureau and the City officials for the purpose of influencing the relevant decisions and decisionmakers; and (v) Rule 30(b)(6) corporate representatives of the City and Tenants.

Moreover, the City and Tenants have made allegations, pleaded answers, and asserted defenses that Portside must be allowed to test at depositions. As explained at the March 14, 2025 hearing, Portside and the Court do not have a complete record of the information considered by the Board and Bureau in developing the Decision and Recalculations. All witnesses noticed by

1

Portside have knowledge regarding the information that the Board and Bureau received and considered outside of the formal administrative "record." Understanding the information the Board and Bureau considered is the most basic step of assessing whether their decisions have an appropriate foundation or were arbitrary, capricious, or otherwise unlawful.

The City and Tenants do not dispute that the witnesses noticed by Portside have knowledge related to the Decision and the Recalculations as well as knowledge related to what non-record information was considered by the decision-makers. Their sole basis for refusing to produce these witnesses is their blanket assertion that depositions are inappropriate in state court prerogative writ claims. That is both wrong and ignores the Federal Rules of Civil Procedure, which govern this proceeding. As explained below, New Jersey courts allow depositions in prerogative writ claims. Depositions are especially appropriate here given the uniqueness of this case, the amount in ultimate controversy, and, significantly, that the formal record indisputably does not capture all of the information considered by the Board and Bureau.

**B. Documents Regarding Tidewater Basin Redevelopment Plan.** Portside also seeks documents from the City related to the Tidewater Basin Redevelopment Plan ("Tidewater Plan"). Chapter 260 of the Jersey City Municipal Code exempts from rent control "[n]ewly constructed dwellings with 25 or more dwelling units located within a redevelopment area . . . for which the City Council has approved a redevelopment plan" (the "Redevelopment Exemption"). Portside argued before the Bureau and presented in the record before the Board that it was exempt from rent control under this Redevelopment Exemption. That argument was rejected. Portside specifically alleges in its prerogative writ claim that Portside Towers meets the Redevelopment Exemption criteria, including because it is located within the Tidewater Plan Area and identified as part of the Tidewater Plan. (Dkt. 65 ¶¶58, 167(p).) Tenants and the City deny that Portside is

2

exempt under the Redevelopment Exemption.  (Dkts. 72 & 84 ¶¶58, 167.)  Documents related to the Tidewater Plan thus bear directly on Portside's prerogative writ claim.  Because the City created and administered the Tidewater Plan, the City has custody of documents related to the Tidewater Plan that cannot be obtained from another source.

Accordingly, and for the reasons set forth below, the Court should grant Portside's motion to compel.

## BACKGROUND

At the August 1, 2024 hearing with Portside, the City, and Tenants, Judge Cox Arleo noted she would be reviewing this matter *de novo* and discussed a discovery process leading to summary judgment and/or trial.  (*See* Dkt. 54.)  On August 8, 2024, the parties appeared before Judge Almonte to discuss that discovery process.  (*See* Dkt. 57 at 1.)  The next day, Judge Almonte issued an Amended Pretrial Scheduling Order that contemplated documentary and deposition discovery,[1] while also confirming the parties' agreement that "[d]iscovery is to be limited to issues relating to the prerogative writ claims before this Court."  (*Id.* at 1-2.)  The scheduling order established initial deadlines for both fact and deposition discovery.  (*Id.* at 2.)  In every iteration since August 2024, the scheduling order has always contemplated document and deposition discovery, re-setting deadlines to accommodate the City's and Tenants' requests for more time.  And at every instance, those schedules were agreed to by the parties before they were submitted to the Court.

Specifically, the Second Amended Pretrial Scheduling Order was amended on October 1, 2024 (Dkt. 76), October 7, 2024 (Dkt. 78), October 15, 2024 (Dkt. 80), and October 23, 2024 (Dkt. 82) to provide Tenants with additional time to answer Portside's complaint.  Each of the four times

---

[1] The prior schedule agreed to by the parties also contemplated fact discovery, including depositions.  (*See* Dkt. 25 at 1-2.)

it was amended, the Second Scheduling Order stated: "All other dates set forth in the Second Amended Pretrial Scheduling Order . . . shall remain unchanged at this time." The Third Amended Pretrial Scheduling Order (Oct. 31, 2024, Dkt. 88) extended fact discovery and specifically deposition discovery by two months. The Fourth Amended Pretrial Scheduling Order (Jan. 7, 2025, Dkt. 97) set and extended an individual deadline for paper discovery and also extended deposition discovery another two months.

The City and Tenants availed themselves of the opportunity for discovery under those orders and issued sweeping written discovery to Portside. (*See* Exs. A-D.) Portside fully complied. Then, after receiving Portside's discovery responses, the City and Tenants began to resist all discovery from Portside—unleveling the playing field. As relevant to this motion, Portside served requests for production on the City on September 4, 2024, seeking (among other items) "[d]ocuments related to the Tidewater [] Plan and related predecessor plans." After receiving no written response to this request, Portside sought confirmation from the City that it would search for documents relating to the Tidewater Plan. (Exs. E-G.) The City so agreed during a December 16, 2024 meet-and-confer. On January 6, 2025, the City requested that Portside provide terms to aid its search. (Ex. H.) Portside did so on January 17, 2025. (Ex. I.) The City never objected to the search terms or provided a hit report. Instead, during a January 31, 2025 meet-and-confer, the City stated that it would not produce any further discovery in this case. The City took the position that discovery related to the Tidewater Plan was inappropriate given the City's unilateral determination that Portside's claims concerning the plan (and all of its other claims) lacked merit.

In late February 2025, in line with the then-governing Fourth Amended Pretrial Scheduling Order and the absence of any objection to depositions from the City or Tenants—including in

4

meet-and-confers, status conferences, and letters to the parties and the Court—Portside served the City and Tenants with deposition notices for: (i) Mr. Cupo (chair of Board at the time of the Decision); (ii) Mr. Richardson (overseer of the Bureau's Recalculations); (iii) named Defendant-Intervenors Kevin Weller, Michele Hirsch, Joel Rothfus, and Jessica Brann, and (iv) Rule 30(b)(6) corporate representatives for the City and the Defendant-Intervenor Tenant Associations. Portside also issued a subpoena to depose Ms. Hendon, the Bureau's former Rent Leveling Administrator, who determined that Portside Towers was entitled to the rent control exemption, and who is no longer employed with the City. In March 3 and March 4, 2025 communications, the City and Tenants told Portside they would not present *any* witnesses for deposition in this case. (*E.g.*, Ex. J.) Also on March 4, the City stated that it would seek leave to move to quash the subpoena to depose Ms. Hendon. (*Id.*)

At a March 14, 2025 hearing, among other things, Judge Almonte ordered the City to produce internal communications between the relevant agency-decisionmakers regarding the Board's Decision. (Dkt. 109 ¶¶3, 14, 16.) Judge Almonte stated: "Rule 26 provides that, in federal civil litigation, discovery may be obtained regarding any, quote, nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . . . It is axiomatic that, under the rule, all relevant material is discoverable unless an applicable evidentiary privilege is asserted." (Mar. 15, 2025 Hrg. Tr. 11:4-11.) Judge Almonte further noted that "relevant discovery will be related to Portside's prerogative writ claims and the Tenants' prerogative writ claims against the City defendant." (*Id*. at 12:2-4.) Judge Almonte explained that "how the decision was made is going to be important to determine whether or not plaintiff will be able to ultimately satisfy the burden of showing that the decision was arbitrary and capricious or unreasonable" and that "documents showing how decision-makers or what decision-makers

5

considered before making the decision is relevant." (*Id.* at 28:1-4, 30:19-21; *see also id.* at 63:12-15 ("to the extent that there are email communications that show the thought process of how the Bureau came to a decision, that certainly is something that he [(counsel for Portside)] would be entitled to"). Judge Almonte also addressed the City's and Tenants' resistance to depositions, explaining: "Since you[ are] challenging that the decision is arbitrary and capricious, it[ is] only fair to understand what the thought process was." (*Id.* at 65:10-14.)

## ARGUMENT

### I.    The City And Tenants Should Be Compelled To Produce Witnesses And Corporate Representatives For Depositions; Any Motion To Quash The Subpoena For Ms. Hendon's Deposition Should Be Denied.

The rules are simple. "A party may, by oral questions, depose any person, including a party, without leave of court except as provided in Rule 30(a)(2) [which is not applicable here]." Fed. R. Civ. P. 30(a)(1). Under Rule 30(b)(6), when a party names a corporation in its deposition notice, "[t]he named organization *must* designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf." Fed. R. Civ. P. 30(b)(6) (emphasis added). The designated corporate representative "must testify about information known or reasonably available to the organization." *Id.*

Under Federal Rule 37, a party may move to compel discovery, including when a corporation "fails to make a designation under Rule 30(b)(6)." Fed. R. Civ. P. 37(a)(3)(B)(ii). Under Rule 45, to quash a subpoena, a party must show the subpoena "(i) fails to allow a reasonable time to comply; (ii) requires [compliance] beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A).

Those rules provide for depositions because depositions play a "vital role" in the preparation of any case for final disposition. *Worthy v. City of Newark*, 2008 WL 413309, at *3 (D.N.J. Feb. 13, 2008). Without them, a party "cannot evaluate the strengths and weaknesses of their case," *Ezeani v. Anderson*, 2022 WL 18158543, at *6 (D.N.J. Dec. 8, 2022) (Almonte, J.), and a trial becomes "a game of blindman's buff." *Averbach v. Rival Mfg. Co.*, 879 F.2d 1196, 1201 (3d Cir. 1989). For those reasons, "absent extraordinary circumstances, it is an error for a court to prevent the taking of a deposition." *Gutierrez v. Johnson & Johnson, Inc.*, 2002 WL 34717245, at *3 (D.N.J. Aug. 13, 2002) (denying protective order sought to prevent depositions of party representatives).

**A.      The Depositions Are Relevant And Tailored To The Prerogative Writ Claims.**

Portside seeks to depose (a) parties and three fact witnesses directly involved in the Decision, Recalculations, and related dispute and (b) corporate representatives for the named parties on topics tailored to the prerogative writ claims. The City and Tenants do not dispute that these witnesses have knowledge relevant to the facts underlying the prerogative writ claims. In particular, Portside seeks three categories of deponents:

*First*, Portside seeks to depose three decisionmakers: (1) Mr. Cupo, chairman of the Board that issued the Decision; (2) Mr. Richardson, overseer of the disputed Recalculations; and (3) Ms. Hendon, the Bureau's former Rent Leveling Administrator, who determined that Portside was entitled to the rent control exemption. As explained at the March 14 hearing, Portside has seen evidence that Defendant-Intervenors were emailing and engaging in external discussion with the decisionmakers, including providing them with alleged facts and arguments that are not reflected

<div align="center">7</div>

in the purported administrative "record" in front of the Board and Bureau. (*See, e.g.,* INTERVENORS058490 (Ex. K); INTERVENORS072787 (Ex. L); INTERVENORS026583 (Ex. M).) Even Tenants' attorney was engaging in such off-the-record advocacy. (*See* Mar. 15, 2025 Hrg. Tr. 65:22-66-4 ("The Bureau communications from myself to Mr. Richardson saying, 'Mr. Richardson, you're doing it wrong.'").) As Judge Almonte indicated in the March 14, 2025 hearing, information about "what decision-makers considered before making the decision is relevant." (Mar. 15, 2025 Hrg. Tr. 30:19-21.) Portside and the Court are entitled to get to the bottom of what the Board and the Bureau saw and considered, including what the tenants were telling them to consider.

*Second*, Portside seeks to depose the named Defendant-Intervenors. These individuals fought to intervene as *parties* to this case (*see* Dkt. 29), opted to be named as representatives of the Tenant Associations, and assert myriad claims and defenses relating to the prerogative writ claims, including their own prerogative writ claim asserting that the Decision and Recalculations were arbitrary and capricious (*see* Dkt. 72). Portside should be allowed to test the Defendant-Intervenors' allegations, answers, and affirmative defenses. Fed. R. Civ. P. 26(b)(1). As explained above, the documents produced by Tenants thus far show that the named Defendant-Intervenors communicated with the decisionmakers regularly, including in meetings and phone calls. Tenants' counsel affirmed such communications at the March 14 hearing. (*See* Mar. 15, 2025 Hrg. Tr. 65:22-66-4.) Any information communicated to the Board and Bureau outside of the official administrative "record" is necessary for the Court, as the fact finder, to understand what the Board and Bureau considered and how that information supports or undermines the decisions at issue.

*Third*, Portside seeks to depose corporate representatives from Defendants and Defendant-Intervenor Associations on Rule 30(b)(6) topics directly bearing on key issues in the prerogative

8

writ claims.  *See Occidental Chem. Corp., v. 21st Century Fox Am., Inc.*, 2022 WL 3369661, at *5, *8 (D.N.J. Aug. 16, 2022) (A party "cannot seek to preclude a [Rule 30(b)(6)] deposition simply based on its subjective belief that another method of discovery can be used, especially since the propounding party is the one that may choose the means of discovery."). In the interest of good faith, Portside is willing to cull its original Rule 30(b)(6) topics in recognition of the Court's March 14 order to be consistent with the Court's rulings and guidance.  (*See* Exs. N-P, Proposed Revised Rule 30(b)(6) Notices.)  The Rule 30(b)(6) topics relate directly to the City's and Tenants' knowledge of the facts and law underlying the Decision and Recalculations, and what information the decisionmakers received, including from Tenants, when making those determinations.

The deponents noticed by Portside also have knowledge of the facts underlying Portside's contention that the Board failed to apply the doctrine of substantial compliance in connection with the state exemption statute.  (Dkt. 65 ¶¶167(e), (g).)  The substantial compliance doctrine's "purpose is to avoid the harsh consequences that flow from technically inadequate actions that nonetheless meet a statute's underlying purpose." *Galik v. Clara Maass Med. Ctr.*, 771 A.2d 1141, 1148 (N.J. 2001).  "It is a doctrine based on justice and fairness, designed to avoid technical rejection of legitimate claims." *Id.*  The factors for substantial compliance are: "(1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute." *Id*. at 1149.  In their answers, the City and Tenants have denied Portside's allegations related to these factors, including that the tenants and the City received reasonable notice for nearly 30 years that Portside was operating as exempt from rent control and thus were not prejudiced by any purported failure to strictly comply with the notice provisions of the state exemption statute.  (Dkt.

9

72 ¶¶40, 63; Dkt. 84 ¶¶11, 12.)  Portside is entitled to the City and Tenants' bases for these answers and any information supporting its claim regarding substantial compliance.  Depositions of the fact witnesses described above and Defendants' and Defendants-Intervenors' corporate representatives are an efficient way to cover this information and the other areas of fact discovery needed for the prerogative writ claims.

> **B.       New Jersey Courts Allow Depositions In Prerogative Writ Claims.**

The City's and Tenants' stated reason for refusing to produce witnesses and corporate representatives and the City's explanation for moving to quash the subpoena for Ms. Hendon's deposition are that depositions are supposedly categorically inappropriate for prerogative writ claims because they go beyond the purported administrative "record."  (*See* Mar. 15, 2025 Hrg. Tr. 121:18-24, 125:5-9.)  They are wrong.

New Jersey courts allow depositions on relevant issues in prerogative writ actions, including depositions of leaders of municipal bodies, representatives of third parties, and other fact witnesses.  *See, e.g., Porreca v. City of Millville*, 16 A.3d 1057, 1061-62 (N.J. Super. Ct. App. Div. 2011) (discovery included depositions of municipality's assessor and planning director); *Aparin v. Cnty. of Gloucester*, 783 A.2d 271, 273-74, 281 (N.J. Super. Ct. Law Div. 2000) (pursuant to discovery order issued by court, parties took depositions of "representatives" of municipal commission and third-party defendant New Jersey department of personnel); *Spectraserv, Inc. v. Kearny Mun. Utils. Auth.*, 2008 WL 4790978, at *2 (N.J. Super. Ct. App. Div. Nov. 5, 2008) (prior to trial, defendant municipality body took videotaped deposition of its own expert engineer); *Care of Tenafly, Inc. v. Tenafly Zoning Bd. of Adjustment*, 704 A.2d 1032, 1035 (N.J. Super. Ct. App. Div. 1998) ("[j]udge . . . ordered that [member of defendant board] submit to a deposition"); *Warrenville Plaza, Inc. v. Warren Twp. Sewerage Auth.*, 553 A.2d 874, 875 (N.J.

Super. Ct. App. Div. 1989) (parties "relied" on depositions, including of the defendant municipality agency's chairman, at oral argument on the summary judgment motions); *Barrett v. Union Twp. Comm.*, 553 A.2d 62, 65, 67 (N.J. Super. Ct. App. Div. 1989) (discovery included multiple depositions); *Haack v. Ranieri*, 200 A.2d 522, 523 (N.J. Super. Ct. Law Div. 1964) (parties stipulated that "depositions . . . be considered in lieu of other testimony"); *A.C. Schultes & Sons v. Haddon Twp.*, 83 A.2d 896, 897 (N.J. 1951) (discovery included depositions).

Aside from asserting (wrongly) that depositions are beyond the scope of the prerogative writ claims, the City and Tenants have identified no burden—much less an undue burden—to producing fact witnesses and corporate representatives for depositions. *See Aruanno v. Johnson*, 2020 WL 1951605, at *2 (D.N.J. Apr. 23, 2020) ("The [party] resisting discovery must explain with specificity why discovery is inappropriate; the boilerplate litany that the discovery sought is overly broad, burdensome, oppressive, vague, or irrelevant is insufficient."); *Corradi v. New Jersey State Parole Board*, 2019 WL 1795545, at *1-2 (D.N.J. Apr. 24, 2019) ("[M]ere[ly] stat[ing] a discovery request is overly broad, burdensome, oppressive and irrelevant is not adequate to voice a successful objection."). Nor can they—these depositions are limited in number and scope and, considering the magnitude of the threatened long-term penalties Portside faces should the Decision stand, are proportionate to the needs of this case. Further, Portside expects that the Tenant Association designees will be named Tenants, reducing the number of depositions and any alleged burden on Tenants' counsel.

11

**II.    The Court Should Compel City To Produce Documents Related To The Tidewater Plan.**

    **A.    Documents Related To The Tidewater Plan Are Relevant And Tailored To The Prerogative Writ Claims.**

Discovery—including historical documents—relating to the Tidewater Plan ties directly to Portside's prerogative writ claim that the Board was arbitrary, capricious, and wrong as a matter of law for "fail[ing] to account for the fact that Portside Towers is located within the Tidewater [] Plan Area and identified as part of the Tidewater [] Plan and is [therefore] exempt from rent control pursuant to the Redevelopment Exemption."  (Dkt. 65 ¶167(p).)

As mentioned above, the City's rent control ordinance contains a rent control exemption for "[n]ewly constructed dwellings with 25 or more dwelling units located within a redevelopment area . . . for which the City Council has approved a redevelopment plan. . . ."  *Id*. ¶44.  The statute does not define "[n]ewly constructed dwellings."  In 1999, the City adopted the Tidewater Plan, which is a redevelopment plan.  (*See* Ex. Q, Tidewater Basin Redevelopment Plan.)  The Tidewater Plan designates "Portside District" as a redevelopment plan area and states that the district "has been approved of and is partially developed as *Portside*, a mixed-use development consisting of a maximum of 527 dwelling units, a maximum of 753 parking spaces, and approximately 62,000 square feet of commercial space."  (*Id.* at 7 (emphasis added).)  Portside Towers are the only structures that can be built in the Portside District.  (*Id*.)

12

**C.    Portside District**

1.    This district contains Lot 1 of Block 15902, an area of 5.35 Acres as per the City's Tax Assessor's maps. It has been approved and is partially developed as *Portside*, a mixed-use development consisting of a maximum of 527 dwelling units, a maximum of 753 parking spaces, and approximately 62,000 square feet of commercial space. Phases one and two of this three phase project have been completed. This Redevelopment Plan establishes the current zoning approval, as first approved by the Zoning Board of Adjustment in their resolution of March 3, 1986, which approvals were amended several times, as the land use regulations and standards for this district. Nothing contained herein is intended to negate, modify nor amend that approval. However, the referenced approval shall be the maximum development allowed within this district.

2.    Minor alterations in site plan and façade characteristics may be permitted by the Planning Board provided such alterations are consistent with the redevelopment regulations and parking standards of this Plan. Any changes not consistent with this Plan are cognizable under a deviation application, and will be judged on their merits.

The plan also includes a map depicting the Portside District within the Tidewater Plan Area. (*Id.* at 17.)



13

Portside Towers meets every requirement for the Redevelopment Exemption: it was newly constructed at the time (built in 1992 (100 Warren) and 1997 (155 Washington)); has over 25 dwelling units (527 between the two buildings); and—as recognized by the Bureau in its September 2022 determination—is located within a redevelopment area ("Portside District"). (*See* Ordinance §260-1; Ex. Q at 7, 17; Ex. R at 5; Ex. S at 6.)  While the Board declined to deem Portside a "newly constructed dwelling" within the meaning of the Redevelopment Exemption, the Board failed to explain (a) how the City understood and applied that undefined phrase as used in the exemption or (b) why the City would draft the Tidewater Plan to specifically reference Portside Towers, including through naming a redevelopment area "Portside District"—wherein Portside Towers sits—if it did not mean to include Portside Towers within the exemption.  (*See* Ex. Q at 7, 17).  Portside is entitled to discovery thereto.  Fed. R. Civ. P. 26(b)(1); *Abreu v. State of New Jersey*, 2015 WL 9480021, at *5 (D.N.J. Dec. 29, 2015) (Parties must produce "nonprivileged information that is relevant to [a] plaintiff's claim or claims.").

**B.      The City Has Not Demonstrated That Producing Documents Related To The Tidewater Plan Would Be Unduly Burdensome.**

The City has not and cannot demonstrate that searching for and producing documents related to the Tidewater Plan would be unduly burdensome.  Portside has already suggested search terms to the City for its ESI review of documents related to the plan.  (*See* Ex. I.)  Should the City provide a hit count that shows those terms are too broad, Portside is willing to revise them.  Additionally, the scope of historical documents to review is inherently limited by the City's retention of historical documents related to Portside.  Once the City completes its search for those archives (Dkt. 109 ¶5), Portside is willing to confer with the City about a reasonable method to search for historical documents related to the Tidewater Plan located therein.  The City, which

14

created and administered the Tidewater Plan, is the most likely custodian of relevant information on this topic.

## CONCLUSION

For each of the foregoing reasons, Portside respectfully requests that the Court grant this Motion and enter an Order compelling the City to provide documents related to the Tidewater Plan and the City and Tenants to produce the witnesses previously noticed for deposition.  If the City moves to quash the subpoena to Ms. Hendon, Portside respectfully requests that the Court deny that motion.

Dated:    April 4, 2025

Respectfully submitted,

The Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC

By:    */s/ Derek D. Reed*

*Attorney for Plaintiffs The Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC*

Derek D. Reed, Esq. (Attorney ID # 038062003)
Jeffrey Plaza, Esq.
EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED
A Professional Corporation
60 Park Place, 18th Floor
Newark, New Jersey 07102
(973) 643-0040

Terri L. Mascherin
Andrew W. Vail
Daniel J. Weiss
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois  60654
Phone:  (312) 222-9350
Facsimile:  (312) 840-7375

*Attorneys for Plaintiffs*

15

16

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

The Towers at Portside Urban Renewal )
Company, L.L.C. and Equity )
Residential Management, LLC, )
                           )
         Plaintiffs, )
                           )     Civil Action No. 2:23-cv-22291-MCA-JRA
         v. )
                           )
The City of Jersey City, the City of )
Jersey City Rent Leveling Board, and the City )
of Jersey City Bureau of Rent Leveling )
                           )
         Defendants, and )
                           )
Portside Towers East Tenant Association, )
Portside Towers West Tenant Association, )
Kevin Weller, Jessica Brann, Joel Rothfus, and )
Michele Hirsch, )
                           )
         Defendant-Intervenors. )

**PLAINTIFFS' MOTION TO COMPEL LIMITED DEPOSITIONS AND PRODUCTION
OF DOCUMENTS**

Pursuant to the Court's March 14, 2025 order (Dkt. 109), Plaintiffs the Towers at Portside Urban

Renewal Company, L.L.C. and Equity Residential Management, LLC ("Portside") respectfully

move this Court for an order compelling Defendants to produce documents related to the Tidewater

Basin Redevelopment Plan (*see id.* ¶5) and both Defendants and Defendant-Intervenors to produce

witnesses for deposition (*id.* ¶14). If Defendants move to quash the subpoena to Dinah Hendon,

Portside respectfully requests that the Court deny that motion. Plaintiffs rely on the attached

supporting memorandum of law and exhibits.

Dated:     April 4, 2025                 Respectfully submitted,

                                           The Towers at Portside Urban Renewal Company
                                           L.L.C. and Equity Residential Management, LLC

By:    */s/ Derek D. Reed*

*Attorney for Plaintiffs The Towers at Portside Urban Renewal Company L.L.C. and Equity Residential Management, LLC*

Derek D. Reed, Esq. (Attorney ID # 038062003)
Jeffrey Plaza, Esq.
EHRLICH, PETRIELLO, GUDIN,
PLAZA & REED
A Professional Corporation
60 Park Place, 18th Floor
Newark, New Jersey 07102
(973) 643-0040

Terri L. Mascherin
Andrew W. Vail
Daniel J. Weiss
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois  60654
Phone:  (312) 222-9350
Facsimile:  (312) 840-7375

*Attorneys for Plaintiffs*