# EXHIBIT Q

# TIDEWATER BASIN REDEVELOPMENT PLAN

**November 10, 1999**
Amended June 27, 2007: Ord. 07-109
Amended Sept 9, 2009: Ord. 09-092
Amended March 24, 2010: Ord. 10-036
Amended April 28, 2010: Ord. 10-053
Block & Lot Updates: October 25, 2012
Amended October 8, 2014:  Ord. 14-120
Amended January 14, 2015: Ord. 14-173
Amended May 13, 2015: Ord. 15-053
Amended May 27, 2017: Ord. 15-067

**CITY OF JERSEY CITY**
**DIVISION OF CITY PLANNING**

1

# I.    Introduction

The purpose of the Tidewater Basin Redevelopment Plan (hereinafter referred to as the "Plan"), is to provide for comprehensive redevelopment designed to ensure coordinated and harmonious growth within the Tidewater Basin Redevelopment Plan Area (hereinafter referred to as the "Area").

The redevelopment plan takes into consideration the surrounding neighborhoods and takes into account the character and nature of current and proposed land-uses.  Bordering the Tidewater Basin area to the east is the Colgate Redevelopment Area.  Until recently the Colgate area was dominated by vacant lots and unused industrial buildings.  It is planned to become a mixed use area with office, commercial and residential uses.  This area is now active with construction as this project moves forward.  The Paulus Hook Historic District, a quiet neighborhood of nineteenth century brownstones, borders the Tidewater Basin area to the north and to the east.  The Liberty Harbor North Redevelopment Plan Area borders the Area to the west. Liberty Harbor North is planned as a predominantly residential, waterfront community.

A common element throughout all of these neighborhoods and the Area is the Hudson-Bergen Light Rail Transit System which will connect them all by means of a modern trolley service, and the Hudson River Waterfront Walkway, which connects these neighborhoods by means of a pedestrian ribbon park along the water's edge.

# II.    Boundary Description

See the Boundary Map for the boundary illustration.

# III.    Redevelopment Objectives and Minimum Standards

All new development, rehabilitation, or adaptive re-use must conform to, and be consistent with the following objectives and minimum standards:

A.    At street level, human-scale development to compliment the neighboring Paulus Hook Historic District is required.  New development, especially infill housing, shall be consistent in height, scale, material and design with the predominant form of housing – the brick rowhouse – of the neighborhood.

B.    Eliminate incongruous land uses by reinforcing, through acquisition and demolition, if necessary, the dominant residential pattern of the neighborhood.

C.    Encourage the elimination of obsolete and deleterious land uses and structures and the rehabilitation of deteriorated structures, including dilapidated piers and bulk-heading.

D.    Improve vehicular and pedestrian traffic through the re-establishment of a public neighborhood street grid, while improving the circulation through the neighborhood by addressing traffic direction, R-O-W width, cartway width and sidewalk design to discourage vehicular through traffic while improving pedestrian and bicycle access and by incorporating into all waterfront projects the public pedestrian walkway system known as the Hudson River Waterfront Walkway.

E.    Provide for decorative streetscape and site improvements for the beautification of the

redevelopment plan area and adjacent neighborhoods.

F.   Provide for the enhancement of the Paulus Hook Historic District through improvement of its waterfront access, redevelopment of industrial sites and historically sensitive treatment of vacant sites within and immediately contiguous to the historic district.

G.   Encourage the preservation and promotion of the buildings contributing to the area's historic and cultural fabric, and the protection and re-establishment of view corridors along existing and new public streets to accentuate views of Manhattan Island, the Statue of Liberty, Ellis Island and Liberty State Park.

H.   Develop a network of private and public open space nodes along the Hudson River Waterfront Walkway and other districts.  These spaces shall be designed to enhance light and air in the neighborhoods, improve pedestrian circulation, act as a catalyst for residential and retail development, provide a sense of place, and help to improve valuable and desirable vistas.

**IV.   Types of Proposed Redevelopment Actions**

This plan will improve and upgrade the Tidewater Basin Redevelopment Area substantially through a combination of redevelopment actions.  These include, but are not limited to:

- Clearance of dilapidated, deteriorated, obsolete or under-utilized structures.

- Assembly of vacant and/or underutilized land into developable parcels.

- Construction of new structures and complementary facilities.

- Provisions for public infrastructure necessary to service and support the new development, including separated storm and sanitary sewers, through special assessment, if necessary, so that the low-lying areas of the Redevelopment Area can experience improved drainage as a result of this Plan's implementation.

- Designation of pedestrian and vehicular Rights of Way to be improved in conjunction with project area development and dedicated to the City.

**V.   Redevelopment Regulations and Guidelines**

A.   The following guidelines apply to all development within the Redevelopment Area and are mandatory.

1.   All structures that share a property line with a historic district or property must be compatible to the design of the historic district property design, including, but not limited to: building height, scale, setback, fenestration, window and door placement, construction material, roofline and shape, and colors.
2.   All infill housing must complement the existing indigenous housing on the street, especially with regard to height, scale, materials, rooflines and setbacks.
3.   All structures shall be designed to have an attractive and finished appearance from all vantage points and utilize the same high quality material on all facades of the building.

4. Signage:
- No billboards or junior billboards permitted.
- No back lighted signs or flashing lights.
- Signage shall be in proportion to the structure
- Signage shall be of quality material

5. Standard chain link fencing and/or barbed wire is prohibited, except that chain link fencing may be utilized during construction.

6. View corridors along the existing street network and extended network made part of this redevelopment plan shall be preserved, to maximize sight lines to the Manhattan Skyline, the Statue of Liberty, Ellis Island and Liberty State Park.

7. All utility distribution lines and utility service connections from such lines to the project area's individual uses shall be located underground.  All meters for utility service shall be located inside the building they serve and shall not be visible from the street (remote readers are permitted, however, to be located on the exterior of structures).

8. All mechanical equipment located on the roof of any building must be enclosed by the building's façade, which must be consistent in design with the rest of the building.  Where roofs can be looked down upon from adjacent buildings, a "roofscape" plan must be developed and submitted for Planning Board approval.   All electrical communications equipment shall be located in such a way that it does not adversely impact the appearance of the building or site, nor create objectionable views as seen from surrounding structures or public areas.

B. The following regulations apply to all development and are mandatory.

1. **Façade Materials:**  With the exception of Penthouses as outlined in §VII.E below, the predominant building material for exterior cladding shall be brick, and the façade shall consist of no more than three materials, textures or colors.

2. **Façade Articulation:** Buildings shall consist of three horizontal elements: the base, a middle, and a top, which shall be achieved through the use of different materials, colors or surface treatments.

3. **Rooflines:**  All roofs shall be flat, and may contain roof decks for recreation purposes. Access structures, such as staircase bulkheads or elevator rooms may be provided to allow access such rooftop areas.  The bulk of such access structures shall be the minimum necessary to meet building codes and shall not be considered as part of the height of the structure.  No habitable space is allowed in such access structures.  Color and materials shall compliment that of the principal structure.

4. **Cornices:**  All buildings shall incorporate a cornice feature at the roofline, which may not be constructed of lightweight material such as plastic, and which should be of natural materials such as wood, masonry or metal.  Fiberglas reproduction cornices are acceptable provided they are well made and true to original form.

5. **Common Elements:**  All projects, as part of the site plan approval process, shall identify and incorporate at least three (3) elements that are similar to adjacent structures, such as the type and color of brick, or the height and scale of the cornice, so that there is connectivity across time as the Area builds out.

6. **Stoops and Stairs:**  All residential developments shall incorporate stoops and stairs along all frontages where stoops and stairs are the established mode on the same or opposite side of the street.

7. **Residential Heights Above Sidewalk:**  All residential uses located on the first floor or story shall maintain visual separation to maintain a sense of privacy.  The floor of such

4

residences shall be at least two feet higher than the adjacent public sidewalk or walkway, and the window sills of all windows on such frontages shall be at least five feet higher than the adjacent public sidewalk or walkway.  Wheelchair access may be provided by means of lifts or internal ramps.

8.  Story Height:  With the exception of parking levels and mechanical areas, The maximum height for any story shall be fourteen feet and the minimum height shall be nine feet, except that the first story height shall be a minimum of ten feet, unless the floor is raised at least three feet above the sidewalk level.  Except for parking levels and mechanical areas, the first story height shall be taller than the stories above it, either by raising the first story from grade level with a stoop, or by raising the ceiling height.   Maximum height for penthouses, where permitted, is twelve (12) feet.

9.  Shopfronts:  All shopfronts shall be a minimum of 75% glass or void, shall be individually designed, and shall have three distinct elements: the storefront, the entrance and the sign band.  Each retail storefront shall be allowed one sign and one blade sign, which shall be located in a sign band area.  If lighted, only direct lighting is permitted.

10.  Fencing:  All front yard fencing shall consist of mild steel "wrought iron" style fencing, painted black, and consisting of solid pickets a minimum 5/8 inch thick which fully penetrate all horizontal rails and are capped with decorative elements.  Rear yards may be fenced with wooden fences, provided such fencing shows a "good" side on both sides.

11.  Balconies and Outdoor Space:  Balconies shall be recessed into, rather than projecting out of, the façade.  In developments of 4 units or more, at least 25 percent of the units shall contain a balcony or, as an alternative, at least 20,000 square feet of any combination of private, common, or public access outdoor space shall be provided for the entire development.

12.  **Sidewalks:**  All sidewalks shall be tinted "French Gray" and contain an admixture of mica.  All sidewalks shall be a minimum of 10 feet wide, which may include the planting strip, and may be located within the property line, if necessary, to achieve the required ten feet minimum.  Minimum cross sections shall be as follows:  Curb: 8 inches / Planting strip: 28 inches / Sidewalk: 7 feet.  The planting strip, if not vegetative, will be constructed of bricks or cobblestone between the tree wells.

The Planning Board may grant a waiver for superior design which relates to adjacent architecture or other public purpose.

13.  **Landscaping:**  All landscaped areas shall be irrigated.  Street trees are required to be planted along all streets, within a planting strip, which is within the first 36 inches inboard of the curb face.  All trees shall be a minimum 3.0 to 3.5 inches caliper.  All trees shall be protected by a suspended tree grate which must be approximately 3 by 6 feet, and be of two halves, and be made so as to facilitate growth of the tree by having easily removed sections.  A minimum of 10 percent of every lot shall be landscaped with living vegetative material, which shall provide more than 90 percent coverage after one growing season.   Mulch is not considered "living vegetative material."

14.  Accessibility: All buildings three stories and higher must have an elevator.

15.  Development Parcels are required as follows:
Parcel 1: Block 14205, Lots 22, 23, 24;
Parcel 2: Block 14204, Lot 8;
Parcel 3: Block 14201, Lot 1;
Parcel 4: Block 14205, Lot 21
Any redevelopment on these parcels shall include all properties within the designated

development parcel.

## VI.    Parking Standards and Requirements

1.    Where not otherwise regulated or prohibited in Plan Subdistricts, all residential development must provide parking at a minimum ratio of one space for every unit containing up to two bedrooms, and two spaces for every unit containing more than two bedrooms. All such spaces must be tied to the residential lease or deed, unless otherwise authorized by the Planning Board pursuant to a Community Benefit Parking Plan and Developer's Agreement referenced under Section VII herein. An additional number of spaces, equal to 10% of the number required by the above calculations shall be required for guest and staff parking.

2.    Where not otherwise regulated or prohibited in Plan Subdistricts, parking garages must be either under the principal building(s) of an individual project and have an elevation above the average grade of the public sidewalk abutting the project of no more than one-half the floor to floor height of the garage/first occupied floor, or, if at ground level, be wrapped and completely surrounded by and be covered from view by the principal use building.

3.    Parking at grade level, in Subdistricts where permitted, must be screened and not appear readily visible from street level. The use of brick walls, landscaped berms and evergreen hedges (in combination or singularly) is the preferred means of achieving this requirement. The Planning Board may allow other, equally appropriate means of screening parking, at their complete discretion.

4.    Neither at-grade exposed parking, nor parking as a principal use are permitted.

5.    No unimproved lots may be used for off-street parking, even on an interim basis.  All lots used for construction workers' parking shall be improved to the satisfaction of the Planning Board, and must, at a minimum, be covered with crushed stone and gravel to prevent mud from being tracked into the streets and sewers, and be fenced.  Chain link is permitted in such cases where the parking area will only be used for the duration of the construction activity it serves.

## VII.    Land Use District Standards

A.    **Formula Business Restrictions:** All commercial retail areas within each structure or within a single tax lot shall limit formula business establishments, as defined by the Land Development Ordinance, to a maximum of 30% of ground floor gross leasable commercial area.  For the purposes of this area restriction, the formula business definition shall apply to the following uses, whether functioning as a principal or accessory use:

1.  Retail sales of goods and services.
2.  Restaurants, all categories.
3.  Bars.
4.  Financial service facilities and banks.

Grocery stores greater than 15,000 square feet may exceed 30% of gross leasable commercial area, but shall be the only formula business within such structure or lot.

B.    **Legacy District**

1.    This district contains all of Block 14405.  It is currently approved for 324 dwelling units in

four story structures with an additional story of parking under the building and fifth floor mezzanine space provided on the interior courtyards.  These buildings are approved not to exceed 65 feet in height, are predominantly comprised of brick cladding, have peaked roofs, some individual entries and stoops, and balconies. This Redevelopment Plan establishes the current zoning approval, as approved by the Zoning Board of Adjustment in their resolution of January 14, 1999, as the land use regulations and standards for this district.  Nothing contained herein is intended to negate, modify, nor amend that approval.  However, the referenced approval shall be the maximum development allowed within this district

2.  Minor alterations in site plan and façade characteristics may be permitted by the Planning Board provided such alterations are consistent with the redevelopment regulations and parking standards of this Plan.  Any changes not consistent with this Plan are cognizable under a deviation application, and will be judged on their merits.

## C.  Portside District

1.  This district contains Lot 1 of Block 15902, an area of 5.35 Acres as per the City's Tax Assessor's maps.  It has been approved and is partially developed as *Portside*, a mixed-use development consisting of a maximum of 527 dwelling units, a maximum of 753 parking spaces, and approximately 62,000 square feet of commercial space. Phases one and two of this three phase project have been completed.  This Redevelopment Plan establishes the current zoning approval, as first approved by the Zoning Board of Adjustment in their resolution of March 3, 1986, which approvals were amended several times, as the land use regulations and standards for this district.  Nothing contained herein is intended to negate, modify nor amend that approval.  However, the referenced approval shall be the maximum development allowed within this district.

2.  Minor alterations in site plan and façade characteristics may be permitted by the Planning Board provided such alterations are consistent with the redevelopment regulations and parking standards of this Plan.  Any changes not consistent with this Plan are cognizable under a deviation application, and will be judged on their merits.

## D.  Waterfront District

1.  This district lies between Warren Street and the extension of Van Vorst Street and runs from Morris Street to the Tidewater Basin.  A significant portion of this district is located on the water's edge, where a marina is permitted and encouraged to be developed as part of a larger, predominantly residential development.  The Hudson River Waterfront Walkway is required for all development located on property that abuts the water's edge.  The minimum standards of the New Jersey Department of Environmental Protection (DEP) for the Hudson River Waterfront Walkway are adopted herein by reference, and are considered to be a part of this Redevelopment Plan.

2.  Permitted Uses
    a.  Residential
    b.  mixed-uses consisting of residential uses mixed with retail sales and services, including child day care, restaurants, offices, and medical offices.
        i.  Medical Offices are limited to corner lots and may not to exceed 1,500 square feet of floor area.
    c.  marina and related uses on the underwater parcels.

3.  Accessory uses
    a.  off-street parking

7

    b.  recreation areas

    c.  child day care facilities

    d.  access to the marina.

4.    Maximum Heights

    a.  Heights shall not exceed six stories and 75 feet on Blocks 15901 and 14205.

    b.  Heights shall not exceed four stories and 50 feet on Block 14204. However, a height bonus of up to an additional 30 feet and three stories, for a maximum height of 80 feet and seven stories, may be permitted where the Planning Board approves a community benefit parking plan ("Community Benefit Parking Plan") and enters into an agreement with a developer outlining such Community Benefit Parking Plan ("Developer's Agreement"), providing for the development of accessory off-street parking on the site. Any such approved Community Benefit Parking Plan and Developer's Agreement must comply with the Parking Standards and Requirements set forth in Section VI herein, with the exception that a 10% additional number of spaces for guest and staff parking, referenced in Section VI(1), shall not be required. Any approved Community Benefit Parking Plan and Developer's Agreement must require that additional parking of at least 50 parking spaces above the minimum parking standard shall be provided and made available to residents of the Tidewater Basin Redevelopment Plan Area, which shall not include residents of the proposed development. The Community Benefit Parking Plan and Developer's Agreement may permit valet parking.

5.    Setbacks

    a.  Development containing commercial space on the ground floor may locate up to the property line for the length of the entire development. Development with 100% ground floor residential must set back a minimum of 5 feet from the front property line. Residential buildings fronting on the required waterfront walkway shall set back a least ten feet from the walkway easement, which setback area may be landscaped and fenced. All facades facing onto the waterfront walkway shall be designed to appear as front entrances and not back yards.

6.    Densities

    a.  75 dwelling units per acre for developments that are 100 percent residential. Mixed use projects shall have their residential density reduced by the number of units that could have been built in the commercial space given the average square footage of a residential unit within the development not including any common areas. However, a density bonus of up to an additional 100 units per acre, for a maximum density of 175 units per acre, may be permitted where the following is achieved:

        1)  The Planning Board approves a Community Benefit Parking Plan and enters into a Developer's Agreement, consistent with the requirements of Section VII C 4(b) above.

        2)  The developer incorporates within the development at least one "green" building component, which shall consist of the installation of a solar panel array covering a minimum of 10% of the roof area above the highest residential floor or 5% of the footprint of any proposed building, whichever is greater, for the purpose of converting sunlight into useable electricity

        3)  The developer agrees that through-the-wall heat pumps will not be installed within any first or second floor residential units that front on a public street.

8

**E.      Historic Buffer District**

1.      This district is designed to compliment and maintain the historic district streetscape and pattern of land uses.  Design standards are established to ensure development which is appropriate to be located adjacent to a National Register Historic District.  The area includes portions of Block 14203 and Block 14205 (lots 9, 10 (partial), 11, 12, and 13). (Please refer to the Land Use Map for identification of the Zoning Districts' boundaries.) Any development project that has legally valid approvals at the time this Plan is adopted by the Jersey City Municipal Council shall be considered to have established the Land Use Standards for such project, the following notwithstanding, provided, however, that such standards shall become the maximum development potential for such project sites unless the standards below provide greater development potential.

2.      Principal permitted uses
   a)      One, two and three family attached dwellings
   b)      Recreation and open space

3.      Accessory Uses
   a.      Off-street parking, conforming with plan standards
   b.      Fences and railings
   c.      Home occupations

4.      Maximum Height
   a.      4 stories, not to exceed 45 feet, provided that the maximum height shall not exceed the average height of the existing structures immediately adjacent and within the same block or across the street. All structures shall be of a scale and design that mirrors that of the historic structures across the street.

5.      Minimum lot size
   a.)      Interior lot - 2000 square feet
   b.)      Corner lot  - 2400 square feet
   c.)      Minimum lot sizes may be reduced by an equivalent amount of lot area dedicated to any rear alleyway.

6.      Maximum Lot Coverage:
   a.)      75%, except that under building parking garages shall not be considered as building coverage, provided that the area of such garages covered by a principal use building shall be bound by the 75% maximum coverage rule, and the remaining area shall be covered by landscaped areas, sidewalks, stairs, walls and/or recreation areas.
   b.)      80% in the case of development that provides parking structures surrounded along all public rights-of-way by principal use buildings
   c.)      recreation and open space may cover 100% of the lot area

7.      Setbacks:
   a.)      Front: 5 feet minimum, 15 feet maximum, or in the case of a block of continuous structures of more than 20 years old, the setback shall line up with the contiguous existing properties on the block.
   b.)      Rear Yards:   Interior lots – 15 feet
                              Corner lots – none

8.      Parking:
   a.)      Residential: a minimum of 1 space per dwelling unit and a maximum of 2 spaces per dwelling unit, accessed from the rear of the property, and which may be provided in free standing garage located at the rear.
   b.)      All parking must be covered and under the building and at least four feet below average sidewalk grade adjacent to the principal structure or, if at grade or above,

9

be located within and be wrapped by the principal structure so as to not be visible from the public view.

c.) If rear access is not possible, or would severely compromise the architectural integrity and historic appropriateness of the development the parking requirements may be waived, at the sole discretion of the Planning Board.

9. Design Standards

a.) Building design of this district shall be compatible with the Paulus Hook historic district structures. Building height, width, mass and proportion are important elements of the historic district.  All building facades will feature decorative elements harmonious with the architecture of the historic district including, but not exclusive to lintels, decorative brickwork, cornices, railings, light fixtures, doors and doorways.

b.) Buildings in the redevelopment area that also are part of the Paulus Hook historic district must follow the Jersey City Historic Preservation Commission Regulations for Alterations and Additions to buildings and New Construction in Historic Districts.

c.) Openings on Frontal Facades: The width and height of windows, doors, and entries must harmonize in scale and proportion with the width and height of windows, doors, and entries of buildings and structures of historic significance in the surrounding environment.

d.) Relationship of Unbroken Planes to Voids (i.e., Punctured Planes) in Front Facades: The relationship of unbroken planes (i.e. walls) to voids (i.e., windows and doors) on the facade of a building or structure should be aesthetically harmonious with that of buildings and structures of historic significance in the surrounding environment.

e.) Roof forms must be honored.  In new construction, designers must take care to paradigmatically honor the existing historic roof forms and slopes of the area so as not to violate the aesthetic harmony of the whole.

f.) Building materials: All new structures must be constructed of high quality masonry materials.

g.) Fences:  Permitted are decorative tubular steel, wrought iron, wooden board on board, or board on baton.

h.) Rehabilitation: The rehabilitation of historically significant structures (of 70 years or older) shall follow the historic district guidelines for rehabilitation to ensure compatibility within the neighborhood.  Required of rehabilitation are: Historic store fronts be preserved; Historic features are not removed, covered or converted; Doorway and window size cannot be diminished.

i.) Additions: Building additions which add height shall not be visible from the street frontage of the structure and shall not exceed building coverage standards.

j.) Landscaping:  Front yards are to be attractively landscaped and at least one 3"-3.5" caliper tree shall be planted curbside for every 25 feet of frontage.

k.) Signs may not exceed two square feet, and must be of natural materials.

## E.    Grand and Marin District

This district is designed to provide space for athletic fields, open space, recreation and educational facilities at the corner of Marin and Grand Streets.

1. Principal Permitted Uses

a. Outdoor recreation and improved open space

    b.    Athletic facilities

    c.    Educational facilities

    d.    Residential above the ground floor

    e.    Ground floor retail on corner properties

    f.    Ground floor restaurant, categories one and two as defined by the Land Development Ordinance, on corner properties

    g.    Mixed uses of the above

2.    Accessory Uses

    a.    Off-street parking conforming with plan standards

    b.    Fences and railings

    c.    Signs, not to exceed 12 square feet, and not to be internally illuminated

3.    Maximum Height:

    a.    4 stories and forty-five (45) feet

    b.    One additional penthouse story, not to exceed 12 (twelve) feet for a total of fifty-seven (57) feet, and compliant with the standards outlined in §VII.E(7) below, is permitted on corner lots.

4.    Maximum Lot Coverage

    a.    Seventy percent (70%)

5.    Setbacks:

    a.    Maximum Front yard – Zero (0) feet

    b.    Minimum Side yard – Zero (0) feet, except where side windows are proposed to be located on interior lot lines, in which case six (6) feet

    c.    Minimum Rear yard – Thirty (30) feet

        a.  On corner lots, the side yard which runs parallel to the rear façade shall be subject to rear yard setback requirements.

    d.

6.    Parking & Loading

    a.    Parking is prohibited

    b.    One garaged loading space per building is permitted, provided that access to this garage is not from Grand Street.

7.    Penthouses (as permitted in §E(3.a) above) on corner lots

    a.    Penthouses must be set back five (5) feet from all streetfront facades

    b.    Penthouses may not exceed twelve (12) feet in height

    c.    Penthouses must be constructed primarily of glass, with metal or other modern elements permitted as details.

    d.    Penthouses must have a flat roof

8.    Buffering

    a.    All permitted principal uses must be adequately buffered from adjoining residential uses, through the use of a five feet wide evergreen hedge-row, of a species that will grow tall and can be trained (clipped) into a dense evergreen hedge, and contain fencing, which must be located on the non-residential side of the landscaped buffer.

9.    All other requirements shall be as regulated in Sub-Section D. Historic Buffer District

**F**. **Mixed Use District**
This district fronts on Van Vorst Street, and contains several sites that were predominantly historically used for industrial purposes. Re-use of these sites for residential purposes is favored for feasibility reasons, and because of the strong demand for residential uses. Mixed use development is also permitted to service the existing and future residential development within the district.

1.    Permitted Principal Uses
    a.    Residential
    b.    Ground floor Office
    c.    Ground Floor Retail
    d.    Ground floor cafes, and bars
    e.    Ground floor restaurants, categories 1 and 2
    f.    Parks, pedestrian and bicycle paths, open space, plazas
    g.    Child Care and Day Care Centers
    h.    Athletic facilities on Block 14205, limited to one per block
    i.    A combination of any of the above

2.    Accessory Uses – Uses which are customarily associated with and incidental to permitted principal uses, limited to the following:
    a.    Off-street parking
    b.    Health clubs serving units
    c.    Residential amenities
    d.    Fences and railings
    e.    Home occupations
    f.    Signs

3.    Maximum Height
    a.    The maximum height shall be seven (7) stories and eighty-three (83) feet.

4.    Minimum Lot Size
    a.    Interior Lot – 2,000 square feet
    b.    Corner lot – 2,400 square feet

5.    Maximum Lot coverage – 100%

6.    Landscaping - Required 10% landscaping may be provided in landscaped planting areas, green roof plantings, and raised planters.  If a project is completed in phases, the calculation may be calculated over the entire development site as a whole.

7.    Minimum Setbacks
    None required

8.    Stepbacks are required along Van Vorst Street between Morris and Sussex Streets for buildings utilizing the height bonus.
    a.    At the 7th story, a 10 foot stepback from the ground level façade is required
    b.    At the 8th story, a 20 foot stepback from the ground level façade is required
    c.    At the 9th story, a 30 foot stepback from the ground level façade is required
    d.    Notwithstanding the foregoing, at the corner building on Sussex and Van Vorst Streets, only one stepback is required.  It is to be located at the 7th story and must have a minimum stepback of 25 feet from the ground level façade.

9.    Minimum Parking
    a.    Residential – 0.6 spaces per unit.  There shall be no lease/deed parking requirements or guest/staff parking requirements.
    b.    Retail, restaurants, cafes, nightclubs, and bars – 0.5 spaces per 1,000 square feet of

floor area
c.      Office – 0 spaces required

Where a project is developed in phases, the parking and loading constructed with phase 1 must meet or exceed the parking and loading requirements for that phase.  Required parking and loading for the entire project may be constructed in Phase I.

Valet parking is permitted.

Maximum driveway width: 12 feet one way, 20 feet two way

10.     Loading   Off-street loading shall conform to Article V of the Zoning Ordinance of the City of Jersey City.

11.     Signs

| Use | Type | Number | Size |
|---|---|---|---|
| Residential | Nameplate or Awning | 1 per entry | 12 sf |
| Retail, restaurant, café, bar | Façade Band sign | 1 per street or plaza frontage | 20 sf or 15% of ground floor area of that portion of the primary façade, whichever is less |
| | Blade Sign | 1 per street or plaza frontage | 8 sf |
| | Canopy Sign | 1 per window bay | Shall be calculated into the maximum façade sign area |
| Office | Façade Band sign | 1 per street or plaza frontage | 20 sf or 15% of ground floor area of that portion of the primary façade, whichever is less |
| Home Occupations | Plaque | 1 | 2 sf |

a.  Façade signs in the sign band area above the display window(s) are permitted. Band signs shall display the name and/or logotype of the store only. Band signs shall be illuminated at night. The sign band shall be limited to an area not less than ten (10) feet and not greater than fifteen (15) feet above grade level. In addition, all signs shall set back a minimum of two (2) feet from each side of the building. Sign lettering within the sign band may also be applied directly onto the building surface, rather than onto a sign board.
b.  During construction, one (1) temporary sign indicating: the name of the project or development, general contractor, subcontractor, financing institution and public entity officials (where applicable) shall be permitted. The sign area shall not exceed forty (40) square feet.
c.  All wall signs shall be flush mounted
d.  All blade signs shall project no more than 30 inches from the facade and the bottom of the sign must be a minimum of 9 feet above the sidewalk or plaza.

13

e.  Internally lit sign boxes are prohibited. Internally lit channel letters are permitted.
f.  Storefront windows shall not be blocked by any interior display case or other form of barrier. Pedestrians on the street shall have the ability to see into the shop and view the activity within.
g.  Signs may include the name of the store and street number only.

12. Design Standards
a.  Parking garages must be wrapped by the principal use building to disguise the garage area. Garages fronting on Sussex Street, however, are not required to be wrapped.  Instead, the façade of all parking levels along Sussex Street shall be of compatible material and quality to that used throughout the development and shall be designed to provide visual interest.
b.  Bike parking requirements, as outlined in the Land Development Ordinance, apply
c.  Except for the Sussex Street frontage, no more than fifteen (15) percent of the first floor street and plaza frontage or thirty (30) consecutive linear feet along a public right-of-way and plaza frontage - whichever is greater - may be dedicated to other uses such as meter rooms, blank walls, garage doors or loading zones, emergency exits, etc.
d.  Large blank walls (rear façade, etc.) without fenestration must incorporate facade relief, an expressed structural system, sculpted, carved or penetrated wall surfaces, architectural lighting, or other architectural techniques to provide visual interest.
e.  Window HVAC units (PTAC units) shall not be permitted below twenty (20) feet above grade.  At and above twenty (20) feet above grade, all facade vents for air conditioning or heating units must be incorporated into the window opening and mullion design such that vent grills and windows appear as a single unit. This is best achieved by lining up vent grills with the vertical or horizontal edge of the adjacent window and matching the window's length or width or using a spandrel panel to fill any voids.

13. Height Bonus - In recognition of its close proximity to mass transit, and as supported by the Jersey City Master Plan, this district can accommodate greater building heights

An additional 8 stories and 92 feet, for a maximum of 15 stories and 175 feet of height are permitted when the following are all provided:

a.  A privately held and maintained 10,000 square foot pedestrian plaza is developed for 24-hour public use.  The Developer and its successors and assigns must agree to maintain and repair the plaza in accordance with a Developer's Agreement entered into with the Planning Board.
b.  Open Space Requirement – 30% of the total lot area shall be provided as outdoor recreation space, which may be averaged over the entire development when a project is developed in phases.  This can be allocated and divided up as needed, at grade, as plaza space, as rooftop amenity space, and so forth.
c.  The Developer agrees to enter into an easement with the Jersey City Municipal Utilities Authority ("JCMUA")  for ten dollars ($10.00) nominal consideration for the construction by the JCMUA, at its sole cost and expense, of an underground water main pipe line ("pipe line") on a portion of the land where the private pedestrian plaza is planned. The easement shall provide that such pipe line shall be located in a place on such land that will not disrupt or impede the project and that the construction of the pipe line will not delay or obstruct the developer's construction schedule. Such easement shall

14

give the JCMUA the right to construct the pipe line at any time up to the date the developer applies to the City for the first certificate of occupancy for the project. The developer shall give the JCMUA 90 days written notice of its intention to apply to the City for a certificate of occupancy for the project.

    d.  The developer agrees to enter into an easement agreement with the JCMUA for ten dollars ($10.00) nominal consideration granting a ten (10) foot wide easement to the JCMUA for the maintenance, operation, repair and replacement of the pipe line by the JCMUA, at its sole cost and expense. The easement shall provide that should it be necessary for the JCMUA to remove any portion of the pedestrian plaza improvements and materials, it will reinstall and restore them, at the JCMUA's sole cost and expense, with the same color, type and quality improvements and materials.

    e.  The developer agrees to make cross-street improvements at the intersection of Van Vorst Street and Morris Street utilizing materials that are compatible with the pedestrian plaza;

    f.  Buildings must be designed and built with LEED or equivalent green measures that will reduce the overall energy consumption by the building occupants, the energy demands on local utilities, and water consumption by occupants.

    g.  For phased development, the developer shall adhere to the following benchmarks:

        i.  Subject to the easement grant limitations identified in this Subsection, the aforementioned easements to JCMUA must be granted with the first phase prior to the issuance of a Certificate of Occupancy by the Jersey City Building Department for that phase

        ii.  Aforementioned plaza and necessary Van Vorst / Morris Street intersection improvements must be completed prior to the issuance of a Certificate of Occupancy by the Jersey City Building Department for the second phase

## VIII.  PROCEDURAL REQUIREMENTS

### A.  Submission of Redevelopment Proposals

Site plan review shall be conducted by the Jersey City Planning Board pursuant to NJSA 40:55D-1 et seq.

As part of the final site plan approval process, the Jersey City Planning Board may require a developer to furnish performance guarantees pursuant to NJSA 40:55D-53. Such performance guarantees shall be in favor of the City of Jersey City, in a form approved by either the Corporation Counsel of the City of Jersey City, or the Attorney for the Jersey City Planning Board. The amount of such performance guarantees shall be determined by the City Engineer and shall be sufficient to assure completion of improvements within one (1) year of final site plan approval.

### B.  Duration of Plan's Effect

The provisions of this plan specifying the redevelopment of the project area and the requirements and restrictions with respect thereto shall be in effect for a period of forty (40) years from the date of approval of this plan by the City Council of the City of Jersey City.

C.      **Deviation Requests**

The Planning Board may grant deviations from the regulations contained within this Redevelopment Plan, where, by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or by reason of exceptional topographic conditions, pre-existing structures or physical features uniquely affecting a specific piece of property, the strict application of any area, yard, bulk or design objective or regulation adopted pursuant to this Redevelopment Plan, would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property.  The Planning Board may also grant such relief in an application relating to a specific piece of property where the purposes of this Redevelopment Plan would be advanced by a deviation from the strict requirements of this Plan and the benefits of the deviation would outweigh any detriments.  No relief may be granted under the terms of this section unless such deviation or relief can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the Redevelopment Plan.

D.      **Procedure for Amending this Plan**

This Redevelopment Plan may be amended from time-to-time upon compliance with the requirements of law.  A fee of $1,000 plus all costs of copying and transcripts shall be payable by the applicant to the City of Jersey City for any request to amend this plan. Fees shall not be charged for amendments proposed by a local and recognized neighborhood association.

E.      **Interim Uses**

Interim uses may be established, subject to site plan approval and agreement between the developers and the Planning Board that such use will not have an adverse effect upon existing or contemplated development during the interim use period.  Interim uses may be granted for a period of up to three (3) years, and may be renewed at the discretion of the board.  Commuter parking that does not serve employees of this redevelopment plan area is specifically prohibited and does not qualify as an interim use.

IX.   **OTHER PROVISIONS TO MEET STATE AND LOCAL REQUIREMENTS**

In accordance with NJSA 40A:12A-1 et seq., Chapter 79, Laws of New Jersey 1992, known as *The Local Redevelopment and Housing Law*, the following statements are made.

A.      The Plan herein has delineated a definite relationship to local objectives as to appropriate land uses, density of population, and improved traffic and public transportation, public utilities, recreation and community facilities and other   public improvements.

B.      The Plan has laid out various strategies needed to be implemented in order to carry out the objectives of this Plan.

C.      The Plan has given proposed land uses and building requirements for the redevelopment area.

D.      The Acquisition Maps which are a part of this Plan lists all property to be acquired as a result of this Plan.  Jersey City shall ensure that any residents displaced by this Redevelopment Plan are afforded all reasonable and lawfully required efforts to secure adequate replacement housing.   It is estimated that sufficient relocation housing is available, including subsidized housing, if necessary.  All commercial enterprises to be acquired under this Plan will be given relocation assistance in compliance with all

16

applicable laws.

E.     The Plan is in compliance with the Jersey City Master Plan.  The Master Plan of the County of Hudson is not contrary to the goals and objectives of the Jersey City Master Plan. The Plan complies with the goals and objectives of the New Jersey Development and Redevelopment Plan is that this Plan and the State's Plan both recognize the need to redevelop urban land.

F.     This Redevelopment Plan shall supersede all provisions of the Jersey City Land Development Ordinance that are specifically addressed herein.  Any zoning related question that is not addressed herein shall refer to the Jersey City Land Development Ordinance for clarification.  No variance from the requirements herein shall be cognizable by the Zoning Board of Adjustment.  The Planning Board alone shall have the authority to grant deviations from the requirements of this Plan, a provided herein.  Upon final adoption of this Plan by the Municipal Council of Jersey City, the Jersey City Zoning Map shall be amended to rezone the area covered by this Plan as the Tidewater Basin Redevelopment Area, and all underlying zoning will be voided.





# Tidewater Basin Redevelopment Plan
# Acquisition Map

To be Acquired

1 inch = 300 feet

August 6, 2009

Jersey City
**Planning Division**
30 Montgomery Street Suite 1400
Jersey City, NJ 07302-3821
Phone: 201.547.5010
Fax: 201.547.4323

0    150    300        600        900        1,200
Feet

N



# Tidewater Basin Redevelopment Plan Land Use Map

**ZONE**

- Grand and Marin
- Historic Buffer
- Legacy
- Mixed Use
- Portside
- Waterfront

1 inch = 300 feet

N

Jersey City
**City Planning Division**
30 Montgomery Street Suite 1400
Jersey City, NJ 07302-3821
Phone: 201.547.5010
Fax: 201.547.4323

September 10, 2014

0    150    300    600    900    1,200
Feet

