# EXHIBIT A

13544

005806
RECEIVED

3

96 JUL 19 AM 11:39
Kenneth E. Clark
HUDSON COUNTY
REGISTER OF DEEDS

# MASTER DEED

## OF

# PORTSIDE, A CONDOMINIUM



Prepared by:

Barbara Oif Stack, Esquire
The Applied Companies
5 Marine View Plaza
Hoboken, New Jersey 07030
(201) 963-3194

231-227

BK 5018 PG 165



## TABLE OF CONTENTS

| Article | | Page |
|---|---|---|
| | Preamble. | 1 |
| 1. | Submission of Lands to the Condominium Act. | 3 |
| 2. | Definitions. | 3 |
| 3. | General Description of the Condominium | 8 |
| 4. | Unit Descriptions. | 9 |
| 5. | Description of Common and Limited Common Elements. | 14 |
| 6. | Percentage Interests in the Common Elements and Common Expenses; Voting Rights of Unit Owners | 17 |
| 7. | Association and Administration. | 19 |
| 8. | Maintenance and Capital Improvement Assessments; Lien for Unpaid Assessments; Maintenance Responsibilities. | 21 |
| 9. | Restrictions. | 27 |
| 10. | Easements, Grants and Covenants | 33 |
| 11. | Provisions for the Benefit of Eligible Mortgage Holders | 39 |
| 12. | Damage or Destruction to Condominium Property | 41 |
| 13. | Total or Partial Condemnation | 47 |
| 14. | Amendments to this Master Deed. | 49 |
| 15. | Limitations on the Grantor and Board as to Amendments. | 51 |
| 16. | General Provisions. | 54 |
| 17. | Schedules Attached Hereto and Made a Part Hereof. | 58 |
| 18. | Signatures. | 58 |

- 1 -

BK5018PG166



### PORTSIDE, A CONDOMINIUM

PREAMBLE:

THIS MASTER DEED is made this 18th day of July, 1996, by Portside Apartments Urban Renewal Company, L.L.C., a limited liability company of the State of New Jersey, having offices at 5 Marine View Plaza, Suite 500, Hoboken, New Jersey 07030, (hereinafter referred to alternatively as the "GRANTOR", "DEVELOPER" or "SPONSOR").

WHEREAS, the Grantor is the Owner of the fee simple title to the lands and premises located in the City of Jersey City, County of Hudson, State of New Jersey, known as Block 60, Lot 34 on the Tax Map of the City of Jersey City and which are more particularly described in Schedule A, entitled "Description of Property", attached hereto and made a part hereof and Schedule B entitled "Map of Property of Lot 34, Block 60, Tax Map of City of Jersey City, Hudson County, New Jersey, prepared by the Faraldi Group, Inc., Professional Land Surveyors and Planners dated July 3, 1996 (the "Land"), which together with the improvements and buildings now existing or hereafter constructed shall be collectively referred to as the "Property"; and

WHEREAS, the Property includes or is planned to include two (2) high-rise residential buildings known as Tower 1 and Tower 2; and

WHEREAS, within Tower 2 there shall be established one (1) separate retail Unit (hereinafter referred to as "Retail Unit A") as more particularly shown on that certain Site Plan prepared by Gruzen Samton, Architects, attached hereto and made a part hereof as Schedule C and also

as depicted on that certain Cross-Section Tower 1 prepared by Gruzen Samton, attached hereto and made a part hereof as Schedule D; and

WHEREAS, the Property is planned to include a total of three (3) Units known as: (1) Residential Unit Tower 1 (which shall consist of all of Tower 1 and shall be constructed after the recording of this Master Deed); (2) Residential Unit Tower 2 (existing at the time of the recording of this Master Deed and consisting of all of Tower 2 excluding Retail Unit A); and (3) Retail Unit A (hereinafter collectively referred to as "Units"), together with certain other improvements, all as more particularly shown on the aforesaid Site Plan (Schedule C); and

WHEREAS, this Master Deed is intended to establish the condominium form of ownership for the Property described in Schedule A aforesaid, as shown on Schedules B, C and D, to be known as Portside, A Condominium (hereinafter the "Condominium"); and

WHEREAS, the Portside Condominium Owners' Association, Inc., a New Jersey non-profit corporation (hereinafter referred to as the "Association"), has been or is about to be established as the condominium association to have the responsibility for the administration, operation and management of the Condominium, and the improvements intended for the common use and enjoyment of the residents of the Condominium; and

WHEREAS, all Owners of Units in the Condominium will automatically be Members of the Association, and subject to the Master Deed, the Certificate of Incorporation and the By-Laws of the Association (as each may be modified or amended);

2

BK5018PG168



THEREFORE, WITNESSETH:

ARTICLE 1.  Submission of Lands to the Condominium Act.

1.1  The Grantor does hereby submit, declare and establish Portside, A Condominium, in accordance with N.J.S.A. 46:8B-1 et seq., for the Property described in Schedule A, "Description of Property" with all improvements thereon, and as more particularly shown on Schedules B, C and D, subject to the Grantor's rights to amend as set forth in Article 14 of this Master Deed.

1.2  Recordation of Master Deed.  Upon the recording of this Master Deed and the establishment of the Condominium thereby, the Grantor shall be the Owner of every Unit and its appurtenant percentage interest in the Common Elements and shall have the right to sell and convey, lease, mortgage or otherwise dispose of each such Unit as it may deem appropriate in its sole discretion.

ARTICLE 2.  Definitions.

2.1  General.  The following words and terms, when used in this Master Deed, the Certificate of Incorporation or the By-Laws, shall have the following meanings unless the context clearly indicates otherwise.  All definitions set forth in N.J.S.A. 46:8B-3 are incorporated herein by reference and the definitions set forth herein shall be used in conjunction therewith, unless the context clearly indicates otherwise.

3

BK5018PG169



2.2   "Annual Common Expense Assessments" shall mean and refer to those assessments imposed upon the Unit Owners as described in Article 8.3 of this Master Deed.

2.3   "Apartment" shall mean a residential dwelling within a Unit.

2.4   "Appurtenance" shall mean those rights and interests in other property, including but not limited to easements and rights-of-way, necessary for the full enjoyment of the Property.

2.5   "Association" shall mean the Portside Condominium Owners' Association, Inc., a New Jersey non-profit corporation, formed to administer, manage and operate the common affairs of the Unit Owners of the Condominium and to maintain, repair and replace the Common Elements of the Condominium as provided in this Master Deed and the By-Laws.

2.6   "Board" shall mean the Board of Trustees of the Association and any reference herein or in the Certificate of Incorporation, By-Laws or Rules and Regulations to any power, duty, right of approval or any other right of the Association shall be deemed to refer to the Board and not the membership of the Association unless the context expressly indicates to the contrary.

2.7   "Building" shall mean each of the common parking garage, Tower 1 and Tower 2.

2.8   "By-Laws" shall mean the By-Laws of the Association, which are the governing regulations for the administration and management of the Common and Limited Common Elements of the Condominium, a copy of

4

BK5018PG170

which document is attached hereto and made a part hereof as Schedule F, together with all future amendments and supplements thereto.

2.9 "Capital Improvement Assessment" shall mean and refer to those assessments imposed upon the Unit Owners as described in Section 8.9 of this Master Deed.

2.10 "Certificate of Incorporation" shall mean the Certificate of Incorporation of the Association, together with all future amendments and supplements thereto.

2.11 "Common Elements" shall have the same meaning as "Common Elements" pursuant to N.J.S.A. 46:8B-3d, except as same may be modified by the provisions of Article 5 of this Master Deed.

2.12 "Common Expenses" subject to the provisions of Article 8, shall mean all those expenses anticipated by N.J.S.A. 46:8B-3e, in addition to all expenses including reserves incurred or assessed by the Association, or its respective trustees, officers, agents or employees, in the lawful performance of their respective duties or powers.

2.13 "Condominium" shall mean the form of ownership of the Property as established pursuant to N.J.S.A. 46:8B-1 et seq.

2.14 "Condominium Act" shall mean the provisions of N.J.S.A. 46:8B-1 et seq. and all applicable amendments and supplements thereto; also referred to herein as "the Act".

2.15 "Eligible Mortgage Holder" shall mean and refer to the holder of a mortgage encumbering any Unit, which has requested in writing that the Association provide notice of any proposed action described in

5

DK 5018 PG 171



Article 11 of this Master Deed.

2.16 "Emergency Assessment" shall mean and refer to those assessments imposed upon Unit Owners as described in Section 8.7 of this Master Deed.

2.17 "Lease" shall mean any agreement for the leasing or rental of any Apartment or any portion of Retail Unit A.

2.18 "Limited Common Elements" shall have the same meaning as "limited common elements" pursuant to N.J.S.A. 46:8B-3k, except as same may be modified by the provisions of Article 5 of this Master Deed.

2.19 "Member" shall mean all those Unit Owners who are Members of the Association as provided in Article VI of the Certificate of Incorporation and further explained in Article II of the By-Laws.

2.20 "Member in Good Standing" shall mean and refer to any Member who has, at least ten (10) days prior to the date fixed for any meeting or other Association action, fully paid all installments due for assessments made or levied against him and his Unit by the Board, together with all interest, costs, attorneys' fees, penalties and other expenses, in any, properly chargeable to him and to his Unit.

2.21 "Owner" or "Unit Owner" shall mean any person and/or entity in whom record fee simple title to any Unit is vested, as shown in the records of the Hudson County Register's Office, including the Grantor unless the context expressly indicates otherwise, but not including mortgagees and/or trustees holding title under a deed of trust and not including any lessees or Tenants of a Unit Owner.

6

EX5018 PG 172

2.22 "Property" shall have the meaning set forth in the Preamble to this Master Deed.

2.23 "Rules and Regulations" shall mean those Rules and Regulations of the Association that may be promulgated by the Association, together with all future amendments or supplements thereto.

2.24 "Sponsor", "Developer" or "Grantor" shall mean and refer to Portside Apartments Urban Renewal Company, L.L.C., a limited liability company of the State of New Jersey, its successors and assigns.

2.25 "Tenant" shall mean the lessee or occupant of an Apartment located within Residential Unit Tower 1 or Residential Unit Tower 2 or any lessee or occupant of any space within Retail Unit A.

2.26 "Unit" shall mean any of the three Units within the Property, namely (i) Residential Unit Tower 1; (ii) Residential Unit Tower 2; and (iii) Retail Unit A, all as more specifically described in Article 4 of this Master Deed. A Unit shall not be deemed to include any part of the Common Elements or Limited Common Elements situated within or appurtenant to a Unit.

2.27 "Tower 2" shall mean the building located on Warren and Dudley Streets and having an address of 100/150 Warren Street, Jersey City, New Jersey and consisting of a 19 story tower and a four story wing.

2.28 "Tower 1" shall mean the 25 story building to be constructed on the Property near the intersection of Washington and Dudley Streets and having an address of 155 Washington Street, Jersey

7



City, New Jersey.

ARTICLE 3. General Description of the Property.

3.1 The Property will consist of 5.36 acres +/-situated along Washington Avenue and Warren and Dudley Streets in the City of Jersey City, Hudson County, on which have been or will be built three (3) Buildings. One Building shall be a common area parking garage and shall be attached to the remaining two Buildings. The remaining two Buildings, Tower 1 and Tower 2, shall be residential high-rise towers each of which will house separate residential Apartments, which Apartments will be leased to Tenants. Residential Unit Tower 1 shall consist of the entire Tower 1, shall contain 295 residential Apartments, and will be constructed after the recording of this Master Deed. Residential Unit Tower 2 shall consist of the entire Tower 2 excluding Retail Unit A and shall contain 232 residential Apartments. Retail Unit A shall be located on the first two floors of the four story wing of Tower 2 and shall contain 32,000 square feet of leaseable space to be used for retail, office or other commercial uses. The common parking garage shall provide 542 parking spaces for use by Unit Owners or their designees. Both Tower 2 and the parking garage have been constructed prior to the recording of this Master Deed. Each of the three (3) Units shall be more particularly described in Article 4 of this Master Deed and shall be as depicted on Schedules C and D attached hereto.

8

BK5018PG174



ARTICLE 4.    Unit Descriptions.

The dimensions, areas, names and locations of Units within the Condominium are shown on drawings in Schedules C and D of this Master Deed.  There are three (3) Units within the Condominium.  Each Unit is intended to contain all of the space, excluding Common and Limited Common Elements, within the boundaries and limits defined for each as follows:

4.1(a)        "Residential Unit Tower 1" shall consist of the entire enclosed structure (to be built) as identified on the Key Map on Schedules C and D, as "Tower 1" including the structural improvements appurtenant thereto as follows:

4.1(a)(i)        Bottom:  The bottom of Residential Unit Tower 1 is an imaginary horizontal plane through the lowest point of the interior surface of the lowest subfloor or concrete slab, if any, within the Unit and extending in every direction to the point where it closes with the sides of such Unit.

4.1(a)(ii)        SIDES:  Each side of Residential Unit Tower 1 is an imaginary vertical plane, irregular in shape, along and coincident with the exterior most surface of the perimeter walls and decks of the Building.  Where no wall exists, the side is an imaginary vertical plane along and coincident with the exterior surface of the windows and/or doors located on the perimeter of such Unit.  The sides of the Unit are bounded by the bottom and top of the Unit.

4.1(a)(iii)        TOP:  The top of Residential Unit Tower 1 is an imaginary horizontal plane along and coincident with the upper most

9



surface of the material which forms the uppermost roof of the Building comprising the Unit, and extending in every direction to the point where it closes with every side of such Unit.

4.1(b)     Residential Unit Tower 1 includes 295 residential Apartments for rent to Tenants and also includes a lobby, community room, elevators and the items set forth in Section 4.4 of this Master Deed.

4.2(a)     "Residential Unit Tower 2" shall consist of the entire enclosed structure as identified on the Key Map on Schedules C and D as "Tower 2", including the structural improvements appurtenant thereto, except for the Retail Unit A, as follows:

4.2(a)(i)     BOTTOM: The bottom of Residential Unit Tower 2 is an imaginary horizontal plane through the lowest point of the interior surface of the lowest subfloor or concrete slab, if any, within the Unit and extending in every direction to the point where it closes with the sides of such Unit.

4.2(a)(ii)     SIDES: Each side of Residential Unit Tower 2 is an imaginary plane, irregular in shape, along and coincident with the exterior most surface of the perimeter walls and decks of the Building. Where no wall exists, the side is an imaginary plane along and coincident with the exterior surface of the windows and/or doors located on the perimeter of such Unit. The sides of the Unit are bounded by the bottom and top of the Unit.

4.2(a)(iii)     TOP: The top of Residential Unit Tower 2 is

10

BK 5018 PG 176

an imaginary plane along and coincident with the upper most surface of the material which forms the uppermost roof of the Building comprising the Unit and extends in all directions to the points where it closes with every side of such Unit.

4.2(b)    Residential Unit Tower 2 includes 232 residential Apartments for rent to Tenants, the health club located at the southwesterly corner of the first floor of the Unit, the lobby, children's play area, management office, storage/locker area, elevators, and the items set forth in Section 4.4 of this Master Deed.

4.3(a)  ·  "Retail Unit A " shall consist of the entire enclosed space as identified on Schedule D as "Retail Unit" at the northwesterly corner of Tower 2 (consisting of two floors within Tower 2 inclusive of the elevator at the northwesterly corner of the Unit serving the Unit) bounded by the interior surface of its perimeter walls and its lowermost floor and its uppermost ceiling as follows:

4.3(a)(i)    BOTTOM:  The bottom of Retail Unit A is an imaginary horizontal plane through the lowest point of the interior surface of the lowest subfloor or concrete slab, if any, within the Unit and extending in every direction to the point where it closes with the sides of such Unit.

4.3(a)(ii)    SIDES:  Each side of Retail Unit A shall be an imaginary vertical plane along and coincident with the innermost surface of the studding of the perimeter walls.  Where no wall exists, the side is an imaginary vertical plane along and coincident with the

11

BK5018PG177

exterior surface of the windows and/or doors located on the perimeter of such Unit. The sides of the Unit are bounded by the bottom and top of the Unit.

4.3(a)(iii)     TOP:  The top of Retail Unit A is an imaginary horizontal plane along and coincident with the upper most surface of the gypsum board or other material which forms the uppermost ceiling of the second floor of the Unit and extending in every direction to the point where it closes with every side of such Unit.

4.4     Items included in Unit.  Each Unit, regardless of type, also includes all appliances; fixtures; doors, door frames and hardware; window frames; panes; hardware and systems; and all other improvements which are located within the boundaries of the Unit, or which are exclusively appurtenant to a Unit, although all or part of the improvement may not be located within the Unit, and shall include but not be limited to the following individual appurtenances to the extent that they serve an individual Unit only and not any other Unit or any portion of the Common Elements:

4.4(a)     So much of the common heating, ventilating and air conditioning system as serves only one (1) Unit, whether or not located within the interior air space of the Unit (including but not limited to the compressors and other equipment and machinery which may be located on concrete pads on the Common Elements; and

4.4(b)     So much of the water plumbing system as serves only one (1) Unit, whether or not located within the interior air space

12

BK5018PG178

of the Unit up to the water company's meter.  (To clarify, the Unit Owner is responsible for water pipes which connect to the two-inch main up to the curb stop at the street and the water company is responsible for mains and appurtenances from the curb stop and beyond); and

4.4(c)          So much of the sewer plumbing system which serves only one (1) Unit, whether or not located within the interior air space of the Unit; and

4.4(d)          All electrical wires which serve only one (1) Unit, whether or not located within the interior air space of the Unit; and

4.4(e)          All master antenna or cable television wiring which serves only one (1) Unit, whether or not located within the interior air space of the Unit; and

4.4(f)          All telephone wires which serve only one (1) Unit, whether or not located within the interior air space of the Unit.

4.5          Common Elements.  A Unit includes the proportionate undivided interest in the Common Elements and in any Limited Common Elements assigned thereto in this Master Deed or any amendments thereof.

ARTICLE 5.  Description of Common and Limited Common Elements.

5.1          Common Elements:  The Common Elements are graphically shown on Schedules B and C attached hereto.  The Common

13

ЗК5018PG179

Elements shall also include by way of description, but not by way of limitation, all of the following to the extent included within the area referenced in Article 1 of this Master Deed:

5.1(a)        All lands submitted to the Condominium Act under Article 1 of this Master Deed; and

5.1(b)        The common drives, sidewalks not owned by the City of Jersey City, and parking garage located on the lands shown on Schedules B and C subject to the Rules and Regulations of the Association; and

5.1(c)        Lawns and other landscaped areas and all shrubbery, trees and other plantings; and

5.1(d)        The tennis courts, fences and exterior child care play area; and

5.1(e)        Utility lines, water courses and drainageways and facilities, including bulk heads, dams and conduits, sewer laterals except such utility lines and facilities that serve only one (1) Unit, and underground or other sprinkler systems; and

5.1(f)        Improvements to be installed by the Developer which specifically will include sanitary sewer lines, a storm water drainage system and potable water lines not owned by the public utilities providing such service and serving more than one (1) Unit; and

5.1(g)        The electrical and telephone wiring network throughout the Property not owned by the public utilities providing such service and serving more than one (1) Unit; and

14

BK5018PG180

5.1(h)            Closed circuit television system; and

5.1(i)            Public connections and meters for gas, electricity, sewerage, telephone, cable television and water not owned by the public utility or other agency providing such services and serving more than one (1) Unit; and

5.1(j)            Site lighting and other facilities necessary to the upkeep and safety of the buildings and grounds; and

5.1(k)            Any facilities or elements of improvement within the exterior of the Property for use by all Unit Owners and/or for the management, maintenance and operation of the Condominium; and

5.1(l)            Any easement or other right appurtenant to the lands described in Article 1 of this Master Deed, and any easement or other rights hereinafter granted for the benefit of the Unit Owners, their Tenants, the Association and/or others for access to or use of the Common Elements.

5.2            Limited Common Elements.    Limited Common Elements shall be as defined pursuant to N.J.S.A. 46:8B-3k.

5.2(a)            Each Unit Owner's right to use the Limited Common Elements appurtenant to his Unit or Building may not be transferred apart from the conveyance of title to the Unit.

5.2(b)            The Association will maintain all Common Elements. A Unit Owner whose Unit has Limited Common Elements shall be responsible for the cleanliness, maintenance and repairs of all Limited Common Elements in accordance with the Association's standards and

15

3K5018PG181

regulations. If no specific Association standard exists for a particular item of work, the work shall be done in a manner that is compatible with the general scheme, design and decor of the Condominium. Matching colors should be utilized.

5.2(c) All plumbing, electrical, heating and other systems serving more than one (1) Unit within a Building shall be deemed to be Limited Common Elements for the benefit of those Units so served and shall be maintained as Limited Common Elements by the Association.

5.3 Reserving Common Elements. The Board shall have the power in its discretion to: (a) grant rights to use the Common Elements on a reserved basis for a specific limited time period to the Association and/or to any Tenants or less than all of the Unit Owners; and (b) establish a reasonable fee to be charged to the reserving party for the use and maintenance of the Common Element being reserved. The designation by the Board of a Common Element as "Reserved" shall not be construed as a sale or disposition of that Common Element. The Board shall also have the power to specially assign parking spaces to each Unit Owner.

16

ARTICLE 6.    Percentage Interests in the Common Elements and Common Expenses; Voting Rights of Unit Owners.

6.1    Estate Acquired.    The Owner or Owners of a Unit shall have such an estate therein as may be acquired by grant, by purchase or by operation of law, including an estate in fee simple, and shall acquire as an appurtenance to such Unit, an undivided percentage interest in the Common Elements as set forth in Schedule E attached hereto and made a part hereof, which shall not be divisible from the Unit to which it appertains.

6.2    No Partition.    Subject to the provisions of this Master Deed, the Association's Certificate of Incorporation and its By-Laws and the Condominium Act, the Common Elements shall remain undivided and no Unit Owner(s) shall bring any action for partition or division thereof.    In addition, the undivided percentage interest in the Common Elements shall not be separated from the Unit to which it appertains and shall be deemed conveyed or encumbered with the Unit, even though such interest is not expressly mentioned or described in the conveyance or other instrument.

No Common Elements such as the parking garage, landscaped areas, private driveways, sidewalks or other like items shall be eliminated or their use substantially curtailed by the Board of Trustees unless the Association Members have approved of such action at a special meeting called pursuant to the provisions of the By-Laws.

6.3    Percentage Interest of Common Elements and

17

BK5018PG183

Common Expenses.

6.3(a)    Each Unit Owner's appurtenant undivided percentage interest in the Common Elements shall be as set forth in Schedule E, "Schedule of Percentage Interest of Common Elements and Budget Association Plan".

6.3(b)    Percentage interests in Common Elements shall be used to allocate the division of proceeds, if any, resulting from any casualty loss, any eminent domain proceeding, any common surplus or from any other disposition of the Condominium Property.

6.4(a)    Common Expenses.  In computing Annual Common Expense Assessments assessable against each Unit, the Association's Board of Trustees shall utilize the following procedure and effect the following allocations:  The total dollar amount of the proposed annual budget will be divided by the percentage of budget allocation allocated to each Unit as identified on the attached Schedule E.  The percentage of budget allocation differs from the percentage interest of Common Elements for each Unit because Retail Unit A utilizes certain services identified in the annual budget disproportionately from the two remaining Units.

6.4(b)    Special Assessments.  Special Assessments shall be paid in the same percentage allocation as Common Expenses are assessed.

6.5    Voting Rights of Unit Owners.

6.5(a)    Each Member in Good Standing shall be entitled

18

BK5018PG184

to select one (1) trustee for each Unit to which he holds title in all selections of Trustees. In all other questions requiring a vote, each Member in Good Standing shall be entitled to cast one (1) vote for each Unit to which he holds title, which vote shall be equal in weight to the percentage of interest in the Common Elements appurtenant to the Unit for which it is cast. The Grantor shall be entitled to cast all votes for Units owned by it, including any votes held by it for unsold Units.

ARTICLE 7. Association and Administration.

7.1     Membership in the Association. Upon acceptance of a Deed to a Unit, each Unit Owner shall automatically become a Member of the Association, and shall be a Member for so long as he shall hold legal title to his Unit subject to all provisions of the Condominium Act, this Master Deed, the Certificate of Incorporation of the Association, the By-Laws and the Rules and Regulations promulgated from time to time by the Association, and any other documents, amendments and supplements thereto. The Grantor shall be a Member of the Association with respect to all Units covered by the Master Deed and not yet conveyed to others.

7.2     Compliance by Owners and their Tenants. Each Owner of a Unit and its Tenants shall comply with, and shall assume ownership or occupancy subject to all laws, Rules and Regulations of governmental authorities having jurisdiction over the Condominium, the provisions of this Master Deed, the Certificate of Incorporation, the By-

19

BK5018 PG185

Laws, the Rules and Regulations of the Association and with any other documents, amendments and supplements to the foregoing. Failure to comply with any of the foregoing shall be grounds for commencement of an action for the recovery of damages or for obtaining injunctive relief, or both, as well as the receipt of reasonable attorneys' fees by the Grantor, the Association and any other Unit Owner, in any court or administrative tribunal having jurisdiction, against any person violating or circumventing any of the aforesaid, and against any Unit Owner to enforce any lien created by this Master Deed and its covenants. Failure by the Grantor, the Association or any Unit Owner to enforce any covenant herein contained for any period of time shall in no event be deemed a waiver or estoppel of the right to thereafter enforce same.

7.3        Administration. The administration of the Common and Limited Common Elements of the Condominium shall be by the Association, in accordance with the provisions of the Condominium Act, this Master Deed, the Association's Certificate of Incorporation, the Association's By-Laws and any other documents, amendments or supplements to the foregoing which may subsequently be adopted by the Board of Trustees or required by any Eligible Mortgage Holder or by any governmental agency having regulatory jurisdiction over the Condominium.

The Association shall contract with a management company for the purpose of management and overall operation of the Condominium.

20

BK5018PG186

ARTICLE 8.   Maintenance and Capital Improvement Assessments; Lien for Unpaid Assessments; Maintenance Responsibilities.

8.1            Every Unit Owner, by acceptance of a Deed or other conveyance for a Unit, whether or not it shall be so expressed in any such Deed or other conveyance, shall be deemed to covenant and agree to pay to the Association all assessments and other charges contemplated herein or in the By-Laws.

8.2            Liability for Assessments.  No Unit Owner may waive or otherwise avoid liability for Common Expenses by non-use of the Common Elements.  Each assessment and other charges shall be a continuing lien upon the Unit against which it was made and shall also be the joint and several personal obligations of the Owner(s) of such Unit at the time when the assessment, fine or other charge came due, and the joint and several personal obligation(s) of each subsequent record Owner of such Unit, except as otherwise set forth in Article 11 of this Master Deed or N.J.S.A. 46:8B-21.  In addition, interest at the rate of fifteen percent per annum and the costs of collection including reasonable attorney's fees will be due on such outstanding obligations and shall also be a continuing lien upon the Unit against which it was made.

Liens  for  unpaid  assessments,  and  other charges levied by the Association may be foreclosed by a suit brought by the Association in the same manner as a mortgage foreclosure on real property.

8.3            Annual Common Expense Assessment.  The Board

21

BK 5018 PG 187

shall have the obligation to determine and set the Annual Common Expense Assessment in an amount at least sufficient to maintain and operate the Common Elements as required by the Act and described in this Master Deed and By-Laws. The amount of monies needed and the use to which such monies shall be put are matters within the sole discretion of the Board.

8.4 Annual Common Expense Assessment Not Made. If an Annual Common Expense Assessment is not made as required for an ensuing year, an assessment shall be made automatically without Board action in the amount of the last prior year's assessment, increased by five percent (5%) and any installments of such annual assessment shall be due upon each installment payment date until a new Annual Common Expense Assessment is made.

8.5 Notice of Annual Common Expense Assessment. Unit Owners shall be made aware of the amount of each new Common Expense Assessment annually in the manner set forth in Article 7, Section 7.8 of the By-Laws.

8.6 Due Dates of Common Expense Assessment. Annual Common Expense Assessments shall be made for a yearly period to be determined by the Board and shall be payable in advance in monthly installments or in such other installments as may be established by the Board.

When title to a Unit is conveyed to a new Unit Owner, the portion of the then current Annual Common Expense Assessment payable by the Unit Owner shall be apportioned on the basis of the number

22

DK 5018 PG 188

of months remaining in the assessment year. Such first monthly assessment or its pro rata portion shall be due immediately upon the new Owner's taking title. The new Owner may make such payments on a monthly basis. A new Owner shall be responsible for the payment of all unpaid assessments unless the new Unit Owner receives an estoppel certificate from the Association.

8.7         Emergency Assessment. If the Annual Common Expense Assessment is insufficient for an immediate need or emergency, the budget and assessment may be amended at any time by the Board to impose an Emergency Assessment. The determination of such emergency or immediate need shall be within the sole discretion of the Board.

8.8         Special Assessments. In addition to the other assessments authorized in this Master Deed, the Board may levy a special common expense assessment in any assessment year. The purpose of such an assessment would be to defray part or all of the cost of the reconstruction, repair or replacement of existing Common Elements determined by the Board not to constitute an emergency but for which funds in reserve are insufficient, or for any other lawful purpose other than the construction or acquisition of new capital improvements. If a Special Common Expense Assessment is greater than $100,000.00 adjusted by the percentage of increase in the Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI-W) for Northeastern NJ as published in the New Jersey Law Journal and New Jersey Lawyer, since December 31, 1995, two-thirds (2/3) of the Members in Good Standing must vote to

23

approve such assessment at a meeting duly called for the purpose. Unit Owners shall receive written notice of such meeting not less than thirty (30) days prior to the meeting. Votes may be taken by mail by utilizing written ballots. The due date(s) of any special assessment or its installment dates shall be set forth in its authorizing resolution.

8.9     Capital Improvement Assessment. In addition to the other assessments authorized in this Master Deed, the Board may levy a Capital Improvement Assessment in order to acquire or construct a new capital improvement. If the cost of such acquisition or construction is greater than $100,000.00 adjusted by the percentage of increase in the Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI-W) for Northeastern NJ as published in the New Jersey Law Journal and New Jersey Lawyer, since December 31, 1995, two-thirds (2/3) of the Members in Good Standing must vote to approve such assessment at a meeting duly called for the purpose. Unit Owners shall receive written notice of such meeting not less than thirty (3) days prior to the meeting. Votes may be taken by mail by utilizing written ballots. The due date(s) of any Capital Improvement Assessment or its installment dates shall be set forth in its authorizing resolution. No Eligible Mortgage Holder shall be required to pay any Capital Improvement Assessment.

8.10    Remedial Assessments. In addition to the other assessments authorized in this Master Deed, the Board may levy a Remedial Assessment against any Unit Owner for Unit maintenance performed

24

by the Association in accordance with Article 8.12(c) of this Master Deed. Also, the Board may provide for ordinary maintenance and minor repairs and replacements to be furnished to Unit Owners by Association personnel or agents and charged as a Remedial Assessment. This may occur on an individual Unit basis or may involve some or all Units, as the case may be.

8.11   Miscellaneous Assessments. Any and all fines, late charges, costs of collection (including reasonable attorneys' fees), interest on unpaid assessments, capital contributions and/or any other monies required to be paid to the Association by a Unit Owner according to this Master Deed, the Association's Certificate of Incorporation, the Association By-Laws, the Association Rules and Regulations and any other Board resolutions shall be deemed assessments which each Unit Owner has agreed to pay and for which each Unit Owner is liable and shall be collectible by the Association as set forth in this Master Deed.

8.12   Maintenance Responsibilities.

8.12(a)   Responsibilities of Unit Owners. The Unit Owner is responsible for maintenance, repairs and replacements needed within the boundaries of its Unit. Such maintenance, repair and replacement shall be at the Unit Owner's expense and shall be made in accordance with the requirements of this Master Deed and the Rules and Regulations of the Association. The Association will maintain all Common Elements. Limited Common Elements which serve only one Unit shall be maintained and repaired by that Unit Owner in accordance with

25

BK5018PG191

Association's standards and regulation.  Limited Common Elements which serve more than one Unit shall be maintained and repaired by the Association.

8.12(b)      Responsibilities of the Association.   The Association shall be responsible for the maintenance, repair and replacement of the Common Elements, including any common plumbing, heating, air conditioning, mechanical, electrical and/or water supply systems providing common service to more than one Unit.

8.12(c)      Rights of the Association.  The Association may immediately make emergency repairs to any Unit which the Unit Owner has failed to perform if such failure will have a material adverse impact on any other portion of the Condominium or the Unit Owner.  The costs of such repair shall be the responsibility of the Unit Owner and shall be a Remedial Assessment against the Unit Owner.

8.12(d)      Responsibilities for Damage due to Negligence, Omission or Misuse.  If a Unit Owner, Tenant, a Tenant's pet, occupant or visitor damages the Common Elements or a Unit owned by another Unit Owner through negligence, omission or misuse whether authorized by the Unit Owner or not, the cost for effecting the necessary maintenance, repair and/or replacement shall be assessed against said Unit as a remedial expense along with any costs including reasonable attorney's fees arising out of such incident.

8.12(e)      Responsibilities of Grantor during construction of Tower 1.   The Grantor shall be responsible for

26

maintaining all lawn, landscaped areas, shrubbery, trees and other plantings during the construction of Tower 1.

ARTICLE 9. Restrictions.

9.1                          General Covenants and Restrictions. The Condominium is subject to all covenants, restrictions and easements of record and to the following restrictions:

9.1(a)                       Owners of Units are governed by the Land Use and Zoning Regulations of the City of Jersey City as well as the terms of an agreement entered into between the Developer and the City of Jersey City dated March 29, 1996 pursuant to N.J.S.A. 40A:20-1 et seq., the "Fox Lance Agreement".

9.1(b)                       The Common Elements shall not be obstructed in any way nor shall anything be stored thereon without the consent of the Board.  Limited Common Elements appurtenant to a Unit shall not be used for storage of any kind.  The Developer retains the right to use any portion of Units owned by it for construction, storage, administrative purposes and models.

9.1(c)                       Except for domestic household pets, no pets shall be harbored for any period of time by any Unit Owner or Tenant within or without any Unit or Apartment.  Any domestic household pets kept by any Tenant shall be kept entirely within the confines of an Apartment occupied by a Tenant and under no circumstances shall said animals be allowed to roam at large.

9.1(d)                       All Tenant's vehicles must be parked within

27

JK 5018 PG 193

identified parking spaces within the parking garage. Residential Unit Tower 1 shall be allocated 232 parking spaces, Residential Unit Tower 2 shall be allocated 295 parking spaces, and Retail Unit A shall be allocated 15 parking spaces, all of which shall be within the parking garage on the Property. The Owner of Residential Unit Tower 1 and Residential Unit Tower 2 may specifically designate individual parking spaces to each of their respective Tenants. No vehicle shall be left in an obvious state of disrepair at any location on the Property; i.e., upon a jack, et cetera.

9.1(e)      All trash or garbage shall be disposed of in designated sanitary containers within the Property for regular collection in accordance with local ordinances as same may be amended from time to time. Unit Owners shall conform with any Association rules pertaining to recycling.

9.1(f)      No exterior loudspeakers except those in portable radios or other portable audio/visual equipment shall be allowed.

Tenants and Unit Owners shall exercise reasonable care and consideration when making any noise that may offend or interrupt the enjoyment of others.

9.1(g)      Neither Unit Owners nor Tenants shall install nor have installed or erected any signs, advertisements, posters (except "For Sale" or "For Rent" signs installed by the Developer), awnings, canopies, balcony/deck/patio enclosures, fences, exterior shutters, radio

28

or television wiring, antennae or aerials, air conditioning units, flag poles or posts or like items in or upon the Common Elements or the exterior of any Building without the express written permission of the Board.

9.1(h)    The Common Elements shall be used only for providing the services and facilities for which they are reasonably intended and suited and which are incident to the use and occupancy of the Units.

9.1(i)    No Unit Owner or Tenant shall build, plant or maintain any thing or matter on, in, over or under the Common Elements without the prior written consent of the Board unless permitted by the Association's Rules and Regulations. No person shall alter any planting or other Common Element without prior written permission from the Board.

9.1(j)    To the extent that equipment, facilities and fixtures within any Unit shall be connected to similar equipment facilities or fixtures affecting or serving other Units or the Common Elements, the use thereof by Unit Owners and Tenants shall be subject to this Master Deed, the By-Laws and the Association's Rules and Regulations.

9.1(k)    Nothing that will cause or contribute to an increase in the Association's insurance rates shall be performed in or brought onto the Property.

9.1(l)    No dangerous or offensive activities shall be conducted on the Property which may be or become, wilfully or

29

negligently, an annoyance or nuisance to other Unit Owners or Tenants.

9.1(m)          No offensive or unlawful use shall be made of any Unit or part thereof. All laws, ordinances and regulations of other governing bodies having jurisdiction over the Condominium shall be observed.

9.1(n)          Each Unit Owner shall be responsible for his property taxes, special assessments and other charges imposed by any taxing authority and shall pay for his own telephone and other utilities separately billed to Unit Owners. If any utility charges are billed to the Condominium in bulk, they will be paid by the Association and apportioned to all Unit Owners through the annual assessment.

9.1(o)          The health club (which includes a swimming pool, locker rooms and exercise room) and child play area located within Residential Unit Tower 2 shall be owned and operated by the Unit Owner of Residential Unit Tower 2. The health club shall be available to all residential Tenants within the Condominium and by separate membership only, the terms of which will be established by the Residential Unit Tower 2 Owner.

The child play area located within Residential Unit Tower 2 shall also be available to all residential Tenants within the Condominium under terms to be established at the discretion of the Residential Unit Tower 2 Owner.

9.2          Restrictions on Alterations, Additions and Improvements.

30

BK5018PG196

9.2(a)    Nothing shall be done to any Unit nor on nor in the Common Elements which will impair the structural integrity of any Building.

9.3    Leasing.

9.3(a)    A Unit Owner may lease an Apartment or retail space within a Unit to Tenants. Also, a lender in possession of a Unit following a default in a mortgage, or by virtue of a foreclosure proceeding, or by any deed or other arrangement in lieu of foreclosure may lease a Unit or portion of a Unit.

All leases executed after the date of the recording of this Master Deed shall be in writing and shall be made subject to all provisions of this Master Deed, the By-Laws of the Association, its Rules and Regulations and any amendments to same that may be made from time to time. The lease must provide that any failure of the lessee/Tenant to fully comply with the terms and conditions of such documents shall constitute a material default under the lease and be grounds for termination and eviction.

In any leasing by a Unit Owner to its Tenants, for the purposes hereof, the persons occupying the Apartment or the retail space, shall all be deemed to be Tenants whether or not each individually signs the lease.

9.3(b)    If a Tenant fails to comply with the provisions of the documents set forth in 9.2(a) above, the Association shall notify the Unit Owner of such violation(s) and demand that same be

31

BK 5018 PG 197

remedied through the Unit Owner's efforts within thirty (30) calendar days of such notice. If the violation(s) is not remedied within said period, the Unit Owner shall immediately thereafter institute and diligently prosecute an eviction action against its Tenant on account of the violation. Such suit shall be at the Unit Owner's own expense. If the Unit Owner does not so proceed, the Board shall have the right but not the duty to institute and prosecute such action as attorney-in-fact for the Unit Owner at the Unit Owner's sole cost and expense including all legal fees incurred. Such expenses shall be deemed a lien on the Unit involved and shall be collected by the Board in the manner set forth above under Assessments in this Master Deed.

By acceptance of a Deed to a Unit, each and every Unit Owner does thereby automatically and irrevocably name, constitute, appoint and confirm the Board as its attorney-in-fact for the purposes described in this section.

9.4         Enforcements. The Board shall have the power to make such Rules and Regulations as may be necessary to carry out the intent of these use restrictions. Further, in the event New Jersey law should permit, the Board shall have the right to levy fines for violations of these restrictions and the rules and regulations, provided that the fine for a single violation may not exceed $500.00. Any fine so levied shall be considered the personal obligation of the Unit Owner and a lien against the Unit and collection may be enforced by the Board

32

in the same manner as the Board is entitled to enforce collection of assessments.

ARTICLE 10.  Easements, Grants and Covenants.

10.1    Easements Reserved to Unit Owners.    Every Unit Owner, its successors, assigns and Tenants shall have the following perpetual easements with respect to the Property;

10.1(a)    A non-exclusive easement in, upon, over, under, across and through the Common Elements to keep, maintain, use, operate, repair and replace its Unit or portion thereof in its original position and in every subsequent position to which it changes by reason of the gradual forces of nature and the elements; and

10.1(b)    An exclusive easement for the existence and continuance of any encroachment by its Unit upon any adjoining Unit or upon any Common Elements, now existing or which may come into existence hereafter as a result of construction, reconstruction, repair, shifting, settlement or movement of any portion of a Building or Unit or as a result of condemnation or eminent domain proceedings, so that any such encroachment may remain undisturbed as long as the Building stands; and

10.1(c)    A non-exclusive easement for ingress and egress to all Units or any portion thereof, in, upon, under, over, across and through the Common Elements;

10.1(d)    An easement in common with the Owners of all other Units to use all pipes, wires, ducts, cables, conduits, public

33

BK5018PG199



utility lines, television systems, master antenna facilities or other Common Elements located within any of the other Units or Common Elements and serving his Unit. This easement includes other easements and appurtenant rights created by the Grantor for the benefit of the Condominium or in existence at the time of the creation of the Condominium subject to regulation by the Association; and

10.1(e)  A perpetual exclusive easement to each Unit Owner for the purpose of continuing, maintaining, repairing and replacing utility lines, pipes and appurtenances serving its Unit; and

10.1(f)  .  A non-exclusive easement in, upon, through and over the drives and parking garage created by the Grantor within the confines of the Condominium for access and egress to abutting public streets for all manner of pedestrian and vehicular traffic, which easement is subject to regulation by the Association; and

10.1(g)  A perpetual and non-exclusive easement in, over and through the Common Elements to use the common facilities and recreational amenities within the Condominium subject to the right of the Board to promulgate Rules and Regulations for the use and enjoyment thereof.

10.2  Easements and Grants Reserved to the Grantor. The Grantor, its successors and assigns and/or agents shall have the following easements and rights of reservation with respect to the Property:

10.2(a)  A blanket and non-exclusive easement in, upon,

34

BK5018PG200

through, over, under and across the Common Elements for the purpose of construction, installation, maintenance and repair of any improvements to the Units or the Common Elements and for the use of all driveways and parking garage for ingress and egress.   In addition, Grantor hereby reserves the irrevocable right to enter into, upon, over and under any Unit for such purposes as may be reasonably necessary for the Grantor or its agents to service such Unit or any part of a Building; and

10.2(b)        A perpetual blanket and non-exclusive easement in, upon, over, under, across and through the Common Elements for surface water runoff and drainage caused by natural forces and elements, grading and/or the improvements located upon the Property or without the Property.   No individual Unit Owner shall interfere directly or indirectly with or alter the drainage and runoff patterns and systems within the Property; and

10.2(c)        An easement in, upon, through and over the lands comprising the Common Elements for the purpose of installation, maintenance, repair and replacement of all drainage facilities, sewer, water, electric, telephone and television pipes, lines, mains, waters, conduits, poles, transformers and any and all other equipment or machinery necessary or incidental to the proper functioning of any utility or drainage systems serving the Property or adjacent lands; and

10.2(d)        An easement to enter into, upon, over and under any Common Elements and where necessary, upon proper notice, any Unit for the purpose of complying with any governmental or court order,

35

BK5018PG201

regulation or requirement. In exercising said right, the Grantor may further carry out the requirements of such order, regulation or requirement; and

10.2(e)     A blanket and non-exclusive easement in, upon, through, under and across the Common Elements for the purpose of the completion of the construction of Units and Buildings or other improvements incorporated or intended to become incorporated into the Condominium.

10.2(f)     A reservation of the right to itself, its successors and assigns to utilize any portion of any Unit for construction and/or maintenance related purposes.

10.2(g)     A blanket non-exclusive easement in, upon, over, through, under, and across the Common Elements, for ingress and egress to all portions of the Limited Common Elements. The Developer shall have the right of ingress and egress to bring prospective Tenants to and across the Common Elements. In addition, a perpetual, blanket and non-exclusive easement is reserved to the Developer to install and maintain utility meters, lines, conduits, pipes and other facilities, necessary for the proper maintenance of any Common Elements within a Unit and/or convey ownership and responsibility to a municipal authority or private utility for the foregoing.

10.3     Easements Reserved to the Association. The Property shall also be subject to the following easements:

10.3(a)     The Association shall have a perpetual

36

BK5018PG202

exclusive easement for the maintenance of any Common Elements including those which presently or may hereafter encroach upon a Unit and for the maintenance of the Limited Common Elements and all items which the Board may elect to repair or may be required to repair; and

10.3(b)    The Association, through the Board or any manager or managing agent, their respective agents or employees shall have the perpetual and non-exclusive right of access to each Unit to:

I.    inspect same.

ii.    correct any violations of the provisions of this Master Deed, the By-Laws or any Rules and Regulations of the Association; and

iii.    perform any operations required in connection with its maintenance, repairs and replacements as set forth in Article 8 of this Master Deed.

10.4    Easements reserved to Eligible Mortgage Holders.    Any Eligible Mortgage Holder, its officers, agents and employees shall have a blanket, perpetual and non-exclusive easement to enter the Property or any part thereof to inspect the condition of the Common Elements and/or any Units or portions thereof encumbered by a mortgage owned by it.

10.5    Easements Reserved to Utilities.

10.5(a)    Those utility easements which have been recorded by the Register of Hudson County.

10.5(b)    A blanket, perpetual and non-exclusive

37

BK5018PG203

easement in, upon, over, across and through the Common Elements for the purpose of installation, maintenance, repair, service and replacement of all sewer, water, power, telephone and cable television lines, pipes, mains, conduits, waters, poles, transformers, master television antennae and any and all other equipment or machinery necessary or incidental to the proper functioning of any utility systems serving the Property, which easement shall be for the benefit of any governmental agency or utility company or other entity which requires same for the purpose of furnishing one or more of the foregoing services.

10.5(c)    A blanket, perpetual and non-exclusive right of access to each Unit or portions thereof for the purposes of reading utility meters and maintaining and/or repairing service facilities. Meter reading will be performed during normal meter reading periods. Non-emergency maintenance and repairs requiring access to Units will be arranged with Unit Owners in advance.  In cases of emergency, however, entry by utility company personnel shall be immediate.

10.6    Easements Reserved to Governmental Entities. A blanket, perpetual and non-exclusive easement of unobstructed ingress and egress in, upon, over, across and through the Common Elements to the City of Jersey City, its respective officers, agents and employees (but not the public in general) and all police, fire and ambulance personnel in the proper performance of their respective duties (including but not limited to emergencies in a Unit) and for repair and maintenance of the Common Elements including drainageways, pipes, bulk heads and appurtenant

38

BK5018PG204

facilities. Except in emergencies, the rights accompanying the easements provided for in this subsection shall be exercised only during reasonable daylight hours and then whenever practicable, only after advance notice to and with permission of the Unit Owner(s) directly affected thereby.

10.7    Miscellaneous Easements.    In addition, all easements of record affecting the Condominium Property and recorded prior to the recordation of this Master Deed are hereby incorporated herein, including but not limited to the following:

10.7(a)    Grant of Easement to New Jersey Bell Telephone Company as contained in Deed Book 4448, Page 216, recorded in the Office of the Register of Hudson County.

ARTICLE 11. Provisions for the Benefit of Eligible Mortgage Holders.

11.1    General.    The provisions of this Article are intended for the benefit of Eligible Mortgage Holders.

11.2    Notice.    Upon request, any Eligible Mortgage Holder shall be entitled to timely written notice of:

11.2(a)    Any condemnation or property loss that affects either a material portion of the Property or of the Unit securing the Eligible Mortgage Holder's mortgage.

11.2(b)    Any sixty (60) day delinquency in the payment

39

BK5018PG205

of Common Expense assessment installments or other assessments or charges owed to the Association by a Unit Owner of any Unit upon which the Eligible Mortgage Holder holds a mortgage; and

11.2(c)    A lapse, cancellation or material modification of any insurance policy or fidelity bond maintained by the Association; and

11.2(d)    Any proposed action that requires the consent of a specified percentage of Eligible Mortgage Holders.

11.3    Association Books and Records.  Any Mortgage Holder shall, upon request, (a) be permitted to inspect the books and records of the Association during normal business hours, and (b) receive an annual financial statement of the Association within ninety (90) days following the end of any fiscal year of the Association.

11.4    Partition.  No Unit in the Condominium may be legally subdivided without the prior written approval of the applicable Eligible Mortgage Holder for such Unit.

11.5    Common Expense Lien Subordinate.  Any lien the Association may have on any Unit in the Condominium for the payment of assessments assessed to that Unit is subordinate to the lien of any first mortgage on the Unit recorded prior to the date any such assessment became due.

11.6    Liability for Common Expense Assessments and Privileges of Association Membership.  Any Eligible Mortgage Holder of a first mortgage on a Unit that obtains title to a Unit as a result of

40

BK 5018 PG 206



(a) foreclosure of the first mortgage, (b) by a deed or assignment in lieu of foreclosure, or any purchaser in a foreclosure sale or their respective successors and assigns is not liable for the share of Common Expenses or other assessments by the Association pertaining to such Unit or chargeable to the former Unit Owner which became due prior to the taking of title, except as set forth in the succeeding sentence. Such unpaid share of the Common Expenses and other assessments shall be deemed to be Common Expenses collectible from all remaining Unit Owners, including an Eligible Mortgage holder who obtains title to the Unit as aforesaid and a Unit Owner who acquires title from an Eligible Mortgage Holder or by purchase in a foreclosure sale and such Unit Owner's successors and assigns.

Any Eligible Mortgage Holder or other individual or entity acquiring title at any mortgage foreclosure sale shall, upon the recording of the Sheriff's deed, become a Member of the Association and shall have all of the rights and benefits of an Owner, including voting rights, and shall have all of the duties of a Member of the Association, subject to the provisions of N.J.S.A. 46:8B-22.

ARTICLE 12. Damage or Destruction to Common Elements.

12.1 If any Common Element, or part thereof, is damaged or destroyed by fire or other casualty, the repair, restoration or ultimate disposition of same shall be as provided in N.J.S.A. 46:8B-24.

41

BK 5018 PG 207

12.2            Insurance

12.2(a)            Property Insurance.  The Board shall obtain
and continue in effect blanket property insurance in an amount equal to
one hundred percent (100%) of the current replacement value with standard
extended coverage and inflation guard endorsements, covering all of the
Common Elements (except land, foundations, slabs, excavation and other
items normally excluded from coverage), including, by way of description
but not by way of limitation, fixtures and building service equipment as
well as other common personal property and supplies belonging to the
Association.

12.2(b)            Other Insurance.  The Board shall also obtain
and keep in effect all other forms of insurance as may be required by the
provisions of the By-Laws.  These include but may not be limited to
Comprehensive General Liability insurance, Directors' and Officers'
liability coverage and flood insurance if necessary and available.

12.2(c)            Payment of Premiums.  Premiums for all such
insurance coverages obtained by the Board for the benefit of all
residents of the Condominium shall be a common expense which shall be
reflected in the Association budget and included in the Annual Common
Expense Assessment.

12.2(d)            Unit Owners.  Upon or prior to acquiring title
to a Unit, Unit Owners shall obtain property loss and liability insurance
at their own cost for their individual Units.  The property loss
insurance coverage shall be in an amount sufficient to reconstruct the

42

BK5018PG208

Unit.   The liability insurance coverage shall be in an minimum amount of $1,000,000.00/$5,000,000.00.

12.2(e)        Disposition of Insurance Proceeds.   In the event of any property loss covered by any policy required to be maintained by the Association, the Association (by its Board of Trustees) shall have the sole right and the duty to promptly settle, litigate or otherwise dispose of said loss or claim on behalf of the Association. All proceeds of any claim shall be applied by the Association to the carrying out of its duties to restore pursuant to N.J.S.A. 46:8B-24 and as detailed in the Association By-Laws.

12.2(f)        Insurance Proceeds Less than or Equal to $500,000.   If the insurance proceeds derived from such loss amount to $500,000 or less, then the Board shall contract with any licensed contractor or contractors to rebuild or repair such damaged or destroyed portions of the insured improvements in conformance with the original plans and specifications, or if adherence to such original plans and specifications is impracticable in the discretion of the Board, then in conformance with revised plans and specifications provided such repairs or rebuilding shall be of a quality and kind substantially equivalent to the original construction.   The Board shall accept bids only in specific amounts and shall not enter into any cost-plus or other sliding scale arrangement for compensation to the contractor.

12.2(g)        Insurance Proceeds Greater than $500,000.   If the insurance proceeds derived from such loss exceed $500,000, all such

43

insurance proceeds shall be paid directly to an insurance trustee designated by the Board, as trustee for all Eligible Mortgage Holders and all Unit Owners as their interests may then appear (the "Insurance Trustee"). Disbursement of such funds shall be made only upon the signatures of a majority of the members of the Board in accordance with the following:

(i) upon notification of the receipt of insurance proceeds by the Insurance Trustee or at such earlier date as may be determined by the Board, the Board shall enter into a contract for a specific dollar amount with a licensed contractor or contractors for the repair or rebuilding of all of the damaged or destroyed portions of the insured improvements, as nearly as practicable, to the original plans and specifications thereof and in accordance with all applicable building codes.

(ii) the Board shall enter into said contract with a licensed contractor or contractors which shall have provisions for periodic disbursements of funds by the Trustee. Disbursement to the contractor shall be made subject to the prior presentation of an architect's certificate and contractor's requisition containing such provisions as may be appropriate under the circumstances and deemed suitable by the Board.

(iii) the Board shall employ a licensed architect to supervise the repair and rebuilding to insure that such work, services and supplies are of proper quality and that construction

44

BK5018PG210

is completed in a workmanlike manner and according to plans and specifications.

12.2(h)    Responsibility of Unit Owner.  If the damage is only to those parts of a Unit for which the Unit Owner bears the responsibility for payment for and performance of maintenance and repair then that Owner shall be responsible to bear the costs of and perform the reconstruction and repair, but the proceeds of any insurance on the affected part(s) of the Unit that may have been obtained by the Association shall be made available for such purpose.  In all other instances the responsibility of reconstruction and repair after casualty shall be that of the Association.

12.2(i)    Insufficient Insurance Proceeds.  In the event of a property loss for which the proceeds of property insurance carried by the Association are insufficient to cover the costs, either estimated or actual, of reconstruction and/or repair as necessary, the Board shall assess all affected Unit Owners in sufficient amounts to provide funds to complete the work of repairing or reconstructing the Common Elements. Such assessments shall be in the same proportion as attributed to each Unit's percentage of common interest.

If the loss is to a vital improvement or other Common Element and it is so extensive that the insurance proceeds' shortfall is substantial, or if the damage amounts to substantially total destruction of the Property or one or more entire buildings, or if seventy-five (75%) percent of the Unit Owners affected vote (as set forth

45

BK5018PG211



in the By-Laws), not to repair or restore, then the Board shall:

I.    accumulate the insurance proceeds and any monies collected from the sale for salvage of the affected property and assign and distribute same to the appropriate Eligible Mortgage Holders as their interests may appear, with any balance then being distributed to the affected Unit Owners in proportion to their respective percentage interests in the undivided Common Elements. However, any portion of the insurance proceeds representing damage for which the responsibility of reconstruction and repair lies with an individual Unit Owner, same shall be paid to said Unit Owner, or if there is a mortgage endorsement as to such Unit, then to the Unit Owner and mortgagee, jointly.  The Board also shall:

ii.    amend the Master Deed, according to procedures provided for same in this Master Deed and in the By-Laws, to appropriately reduce the number of Units, if necessary, and share of Common Elements and voting rights; or

iii. vote to terminate the Condominium according to procedures for same provided in this Master Deed.

12.2(j)         Assignment to Eligible Mortgage Holder.  If the Association decides not to repair or restore the damaged property in accordance with N.J.S.A. 46:8B-24, any insurance proceeds payable to the Unit Owner as a result of damage or destruction to its interest in the Common Elements are hereby assigned and shall be paid to any Eligible Mortgage Holders for that Unit as their interests may appear, for

46

application to the outstanding mortgage debt and the excess, if any, shall be paid to the applicable Unit Owners.

12.2(k)    Excess Insurance Proceeds.    Any insurance proceeds in excess of the amount needed to complete reconstruction and/or repair shall be retained by the Association (if the excess is derived from a common element loss) or paid over to the Unit Owner or Owners affected (if the excess proceeds are derived from losses incurred by the Unit Owners).

### ARTICLE 13.  Total or Partial Condemnation.

13.1    General.  This Article shall be deemed to be supplemental to and not in contravention of the provisions of N.J.S.A. 46:8B-25, "Eminent Domain."  In the event of a condemnation of any or all of the Common Elements, the distribution of the proceeds shall be as per N.J.S.A. 46:8B-25.

13.2    Notice and Participation of Unit Owners.  The Board of Trustees shall advise the Unit Owners of any threatened or actual condemnation proceeding and shall keep the Unit Owners reasonably apprised of the prosecution of said proceedings.  The Association, by its Board of Trustees, shall represent the Unit Owners in any proceedings or in the negotiation of settlements and agreements with any condemning authority for the acquisition of any common element or part thereof.  The Board of Trustees is appointed the attorney-in-fact for all Unit Owners for such purposes.

47

BK5018PG213

13.3      Allocation of Awards.  In the event of a taking or acquisition of part or all of the Common Elements by a condemning authority, the award or proceeds of settlement shall be payable to the Association for distribution by the Association to the Unit Owners or to the appropriate Eligible Mortgage Holder as their interest may appear in proportion to each Unit Owner's percentage interest in the undivided Common Elements, except to the extent that the Association determines to apply the proceeds to the repair or restoration of any damage or destruction from the condemnation action.

Within thirty (30) days of receiving the proceeds of said threatened or actual condemnation action, the Board of Trustees shall advise the Unit Owners and any Eligible Mortgage Holders of the proposed distribution and/or use of the proceeds.  The determinations of the Board as to the amount of the settlement or acceptance of any judgment or any determination to appeal and the decision of the Board as to whether to replace or reconstruct or restore the facilities and/or Common Elements acquired by the condemning authority shall be binding upon all Unit Owners. However, the decision of the Board of Trustees as to any amount to be distributed to or withheld from any Unit Owner and/or his mortgagee shall not be binding upon said parties.

13.4      Reallocation After Condemnation.  If one (1) or more Units are taken in their entirety by the condemning authority, each affected Unit's entire percentage of interest in the Common Elements

48

BK 5018 PG 214



and its liability for Common Expenses automatically shall be reallocated to the remaining Units on the same basis as their respective percentage interests and Common Element liabilities were originally calculated. The Board then shall amend the Master Deed to reflect the reallocations based upon the reduced size of the Property.

If the entire Common Elements is taken by eminent domain, the proceeds of condemnation shall be paid to the Association for distribution among all Unit Owners according to their percentage of interest in the Common Elements. If the condemnation is of a substantial portion of the Common Elements but less than total, the Board shall submit the issue of whether the Condominium shall continue to a vote of the membership according to procedures set forth below in Article 16, Section 16.2.

ARTICLE 14. Amendments to this Master Deed.

14.1        Grantor's Rights to Amend. The Grantor expressly reserves for itself, its successors and assigns for as long as it owns any Unit, the right to execute any amendments to this Master Deed which it may deem appropriate to put into effect any of the changes, deletions or additions set forth below. The right to execute such amendment shall be on behalf of all contract purchasers, Unit Owners, Eligible Mortgage Holders, other lienholders and other parties claiming any legal or equitable interest in the Property or in any Unit. The amendments by Grantor may be for the following purposes:

49

14.1(a)    Amendments for Easements. Adding to or altering the location, size and/or purpose of easements and lands for governmental requirements, utilities, roads, access, egress, drainage, drainage basins, and/or financing purposes, including creating entirely new easements for these purposes.

14.1(b)    Amendments Concerning Third Parties. Permitting the users or occupants of other lands owned or controlled by the Grantor, or if directed by a governmental agency as a condition of approval, to utilize easements, roads, drainage facilities, utility lines and the like within or servicing the Property, on fair and equitable terms and conditions to be negotiated by the Board.

14.1(c)    Amendments to Modify Grantor's Rights.    To surrender or modify rights of the Grantor in favor of the Unit Owners, their respective Eligible Mortgage Holders and/or the Association.

14.1(d)    Amendments for Substitution. Substituting a new Grantor, Sponsor, or a successor-in-interest as Master Deed Grantor at any time at Grantor's own discretion without the consent of the Board or any other party.

14.1(e)    Amendments for Technicalities. Correcting, supplementing and providing technical changes to the Master Deed and any of its amendments.

14.2    Association's Rights to Amend. Except as is set forth below in Article 15 regarding limitations on amendments, an amendment of a material nature may be made to the Master Deed if at least

50

BK 5018 PG 216



ninety-five percent (95%) of the Members approve the amendment at any meeting of the Association duly held in accordance with the provisions of the By-Laws.

14.3    Any amendment of the Master Deed will become effective only upon the recording of such amendment in the Office of the Register of Hudson County. The Grantor, will, thereafter, provide copies of said amendment to each Owner and Eligible Mortgage Holder affected. The failure to provide a copy to any required party shall not affect the validity of the amendment.

ARTICLE 15.    Limitations on the Grantor and Board as to Amendments.

The rights of the Grantor and of the Board to amend the Master Deed as they are set forth in Article 14 are limited as follows:

15.1    The prior written approval of one hundred percent (100%) of the Eligible Mortgage Holders is required before the Grantor, Board or Unit Owners may decide to terminate the legal status of the Property as a Condominium for reasons other than substantial destruction or condemnation of the Property.

15.2    Amendments Requiring Approval of all Eligible Mortgage Holders. The prior written approval of one hundred percent (100%) of the Eligible Mortgage Holders, in addition to at least ninety-five percent (95%) of the Members is required for any material amendment

51

to this Master Deed or the By-Laws, or to the Certificate of Incorporation including, but not limited to, any amendment which would change any provision relating to:

15.2(a)      Voting rights;

15.2(b)      Assessments, assessment liens or the priority of assessment liens;

15.2(c)      Reallocation of interests in the Common Elements or Limited Common Elements or rights to their use;

15.2(d)      Redefinition of any Unit boundaries;

15.2(e)      Convertibility of Units into Common Elements or of Common Elements into Units;

15.2(f)      Expansion or contraction of the Condominium or the addition, annexation or withdrawal of land to or from the Condominium, including abandoning, partitioning, subdividing, encumbering, selling or transferring any part of the Common Elements. (The granting of utility or governmental easements consistent with the intended use of the Common Elements shall not be deemed a transfer within the meaning of this clause.)

15.2(g)      Restoration or repair of the Common Elements (after damage, destruction or condemnation) in a manner other than that specified in this Master Deed;

15.2(h)      Any action to terminate the legal status of the Property as a Condominium after substantial damage or condemnation occurs;

52

BK5018PG218

15.2(i)    Any provisions that expressly benefit Eligible Mortgage Holders;

15.2(j)    Any portion of Article 9, entitled "Restrictions"; or

15.2(k)    Any portion of Article 11, entitled "Provisions for Benefit of Eligible Mortgage Holders".

15.3    None of the above limitations shall be deemed to restrict the rights of the Grantor to amend as set forth in Article 14 of this Master Deed.

15.4    An addition or amendment to this Master Deed and the other constituent documents shall not be considered to be material if it is for the purpose of correcting technical errors, adding technical information or for clarification only.

15.5    Mechanisms for amending the Association By-Laws are set forth in the By-Laws annexed to this Master Deed.

15.6    If amendments described in Subsections 15.1 and 15.2 are proposed by the Board, any Unit Owner and any Eligible Mortgage Holder who receives a written request to approve the amendment to the constituent documents, which notice of request was sent Certified or Registered mail, Return Receipt Requested, who does not deliver or post to the Board a negative response within thirty (30) days of receipt of the notice, shall be deemed to have approved such request.

15.7    At no time shall the Association or the Board of Trustees impose any right of first refusal or similar restriction on

53

BK 5018 PG 210

any Units within the Condominium.  Any such imposition shall be void and of no effect.

ARTICLE 16.  General Provisions.

16.1    Power of Attorney

16.1(a)    Grantor/Developer's Power of Attorney. The Grantor hereby reserves for itself, its successors and assigns, for as long as Grantor owns a Unit, the right to execute on behalf of all contract purchasers and Unit Owners any such agreements, documents, amendments or supplements to the constituent documents (including this Master Deed, as set forth in Article 14 regarding amendments to the Master Deed), which may be required.

16.1(a)(1)    Appointment.  By acceptance of a Deed to any Unit or by the acceptance of any other legal or equitable interest in the Condominium, each and every such contract purchaser and Unit Owner, does automatically and irrevocably name, constitute, appoint and confirm the Grantor, its successors and assigns as attorney-in-fact for the purpose of executing such amendments to the Master Deed and other instruments necessary to effect the foregoing subject to the limitations set forth below.  In executing any amendment, the Grantor's execution of the amendment shall be deemed to be an execution by all Unit Owners and other holders of interests without a specific listing or enumeration of those parties.

16.1(a)(2)    Limitations.  No such agreement, document, amendment or supplement which adversely affects the value or

54

BK 5018 PG 220

substantially alters the percentage of the undivided interest in the Common Elements (except as set forth in Article 14.1 regarding Grantor's Rights to Amend) or substantially increases the financial obligations of the Unit Owners or reserves any additional or special privileges for the Grantor not previously reserved, shall be made without the prior written consent of the affected Unit Owner(s) and Eligible Mortgage Holders of such affected Unit(s). Any such agreement, document, amendment or supplement which adversely affects the priority or validity of any mortgage which encumbers a Unit shall not be made without the prior written consent of the Eligible Mortgage Holder of such mortgage.

16.1(a)(3)    Duration. The power of attorney expressed herein is expressly declared and acknowledged to be coupled with an interest in the subject matter hereof and same shall run with the title to any and all Units and be binding upon the heirs, personal representatives, successors and assigns of any of the aforementioned parties. Further, said power of attorney shall not be affected by the death or disability of any principal and is intended to deliver all right, title and interest of the principal in and to such powers. Said power of attorney shall be vested in the Grantor, its successors and assigns until the initial conveyance of all Units or the expiration of same. Thereafter, said powers of attorney shall automatically vest in the Association to be exercised by the Board.

16.1(a)(4)    The Grantor may exercise its rights to amend with or without invoking its powers of appointment.

55

BK5018PG221

16.1(b)   Association's Power of Attorney. By acceptance of a Deed to any Unit or by the acceptance of any other legal or equitable interest in the Condominium, each and every such contract purchaser and Unit Owner does automatically and irrevocably name, constitute, appoint and confirm the Association as attorney-in-fact for the following purposes:

16.1(b)(1)   To prepare, execute and record any amendments to the Master Deed required by the provisions of the Master Deed.

16.2   Termination. Despite anything to the contrary herein, an amendment, deed of revocation or other document shall be effective to terminate the Condominium upon the written approval of one hundred (100%) in interest of all Unit Owners and Eligible Mortgage Holders.

16.3   Enforcement. Enforcement of the provisions of this Master Deed shall be by any appropriate proceeding at law or in equity in any court or administrative tribunal having jurisdiction over any person or persons, firm or corporation violating or attempting to violate any covenant herein contained, either to restrain or enjoin such violation or threatened violation to recover damages; and against any Owner to enforce any lien created by this Master Deed in any covenant herein contained. Failure by the Grantor, the Association or any member thereof to enforce any covenant herein for any period of time shall not be deemed a waiver or an estoppel of the right to enforce same thereafter.

56

BK5018PG222

16.4    Validity. The invalidity of any provision of this Master Deed, By-Laws and/or Certificate of Incorporation shall not be deemed to impair or affect in any manner the validity or enforceability or to affect the remainder of this Master Deed, By-Laws or Certificate of Incorporation, and if any particular sections are found to be invalid, all of the other provisions of this Master Deed, By-Laws and Certificate of Incorporation shall continue in full force as if such invalid provisions had not been included.

16.5    Waiver. No provision of this Master Deed shall be deemed to have been waived by reason of any failure to enforce same, irrespective of the number of violations or breaches which may occur.

16.6    Gender and Number. The use of the masculine gender in this Master Deed shall be deemed to refer to the feminine gender and the use of the singular shall be deemed to refer to the plural and vice versa whenever context so requires.

16.7    Captions. The captions used within this Master Deed are for the convenience of the reader and do not constitute a material portion of the document.

16.8    Rule Against Perpetuities. If any provision of this Master Deed or the By-Laws shall be interpreted to constitute a violation of the rule against perpetuities, then such provision shall be deemed to remain in effect until the death of the last survivor of the now living descendants of Robert F. Kennedy, plus twenty-one (21) years.

57

BK5018PG223

ARTICLE 17.        Schedules Attached Hereto and Made a Part Hereof.

SCHEDULE A        Legal    Description    of    Condominium
                  Property

SCHEDULE B        Boundary Survey of Condominium Property

SCHEDULE C        Site Plan Depicting Unit Locations and
                  Common Elements

SCHEDULE D        Sectional Drawing Depicting Location of
                  Retail Unit A

SCHEDULE E        Schedule of    Percentage    Interest    of
                  Common Elements and Budget Allocation
                  Plan

SCHEDULE F        By-Laws

ARTICLE 18.        SIGNATURES.

WITNESSETH, the hands and seals of the Managing Member of the
Grantor, which have been affixed by its President and
Secretary.

PORTSIDE APARTMENTS URBAN RENEWAL
COMPANY, L.L.C.
By:  Hudson-Portside Associates,
     Managing Member
   By:   New Portside Associates, L.P.
     By:  Applied Assets, Inc.,
          General Partner

ATTEST:

_____          By:_____
Barbara Oif Stack, Secretary            JOSEPH BARRY, President


                                   By:  Roseland-Portside, L.L.C.

                                   By:_____
                                        Marshall B. Tycher

58

BK5018PG224



STATE OF NEW JERSEY)
                    ) ss:
COUNTY OF HUDSON    ).

     BE IT REMEMBERED, that on July 18, 1996, before me the subscriber, a Notary Public of the State of New Jersey, personally appeared, BARBARA OIF STACK, who, being by me duly sworn on her oath, deposes and makes proof to my satisfaction, that she is the Secretary of Applied Assets, Inc., the General Partner of New Portside Associates, L.P., which is a partner of Hudson-Portside Associates, the managing member of the Grantor named in the within Instrument; that JOSEPH BARRY is the President of said Corporation; that the execution, as well as the making of this Instrument, has been duly authorized by a proper Resolution of the Board of Directors of the said Corporation; that deponent well knows the corporate seal of said Corporation; and that the seal affixed to said Instrument is the proper corporate seal and was thereto affixed and said Instrument signed and delivered by said President as and for the voluntary act and deed of said Corporation, in the presence of the deponent, who thereupon subscribed his name thereto as attesting witness; and that the full and actual consideration paid or to be paid for the transfer of title to realty evidenced by the within Deed, as such consideration is defined in P.L. 1968, c. 49, Sec 1(c), is $1.00.

                                   _____
                                   Barbara Oif Stack

Sworn to and subscribed before me
this 18th day of July,
1996.

_____

A Notary Public of the
State of New Jersey
My commission expires:

CONNIE C. SATO
A Notary Public of New Jersey
My Commission Expires August 2, 2000

BK 5018 PG 225



STATE OF NEW JERSEY)
                          ss:
COUNTY OF HUDSON        )

        BE IT REMEMBERED, that on July 18, 1996, before me the subscriber, a Notary Public of the State of New Jersey, personally appeared, MARSHAL B. TYCHER, (who, being by me duly sworn on her oath, deposes and makes proof to) my satisfaction, that he is the Manager of Roseland-Portside, L.L.C. (the "Company"), a partner of Hudson-Portside Associates, the managing member of the Grantor named in the within Instrument and that he signed the within Instruments as a voluntary act and deed of the Company; and that the full and actual consideration paid or to be paid for the transfer of title to realty evidenced by the within Deed, (as such consideration is defined in P.L. 1968, c. 49, Sec 1(c), is $1.00.

Sworn to and subscribed before me
this // /th day of July
1996.

_____

A Notary Public of the
State of New Jersey
My commission expires:



         CONNIE C. SATO
      A Notary Public of New Jersey
   My Commission Expires August 2, 2000

BK5018PG226



L A W Y E R S     T I T L E
I N S U R A N C E     C O R P O R A T I O N

**CASE NUMBER: LT96-8389**

Schedule A
Legal Description

All the real property located in the CITY of JERSEY CITY, County of HUDSON, State of New Jersey and more particularly described as follows:

BEGINNING at a point formed by the intersection of the Westerly line of Washington Street with the Southerly line of Dudley Street, running thence;

(1) Westerly along said Southerly line of Dudley Street, North 66 degrees 45 minutes West, a distance of 400.00 feet to the Easterly line of Warren Street, thence;

(2) Southerly along said Easterly line of Warren Street, South 23 degrees 30 minutes West, a distance of 250.00 feet to the Southerly terminus of said Warren Street, thence;

(3) Westerly along said Southerly terminus of Warren Street, North 66 degrees 45 minutes West, a distance of 30.00 feet, thence;

(4) Southerly along the center line of said Warren Street produced, South 23 degrees 30 minutes West, a distance of 311.70 feet to the Northerly line of the Morris Canal Basin, thence;

(5) Easterly along said Northerly line of Morris Canal Basin, South 67 degrees 01 minutes 52 seconds East, a distance of 430.02 feet to the said Westerly line of Washington Street, thence;

(6) Northerly along said Westerly line of Washington Street, North 23 degrees 30 minutes East, a distance of 559.58 feet to the POINT OR PLACE OF BEGINNING.

ABOVE DESCRIPTION DRAWN IN ACCORDANCE WITH A SURVEY MADE BY ALBERT N. FARALDI GROUP, P.C., PROFESSIONAL LAND SURVEYORS & PLANNERS, BY ALBERT N. FARALDI, N.J.P.L.S. & N.J.P.P., DATED JULY 1, 1996.

NOTE: FOR INFORMATION ONLY: Being known as Lot 34 Block 60 as shown on the tax assessment map of the CITY of JERSEY CITY.

POOR COPY



BK5018PG227



MAP OF PROPERTY OF LOT 34, BLOCK 60
TAX MAP OF CITY OF JERSEY CITY,
HUDSON COUNTY, NEW JERSEY.

MORRIS CANAL BASIN

S. 67°-01'-52" E.
430.02'

CITY BLOCK 60
LOT 34
5.36 ACRES

311.70'
S. 23°-30'-00" W.

N. 66°-45'-00" W.
30.00'

STREET

WASHINGTON

N. 23°-30'-00" E.
559.58'

250.00'
S. 23°-30'-00" W.

WARREN ST.

400.00'
N. 66°-45'-00" W.

STREET

DUDLEY

SCHEDULE B

| Date | JULY 3, 1996 |
| Scale | 1" = 100' |
| Drawn By | MICHAEL STUPPIELLO |

Faraldi Group, inc.
PROFESSIONAL LAND
SURVEYORS & PLANNERS

854 Eighth Street, P.O. Box 1069, Suite 102
Secaucus, New Jersey 07096-1069
(201)867-8044     Fax (201)867-0984

Albert N. Faraldi, Professional Land Surveyor

BK 5018 PG 228

MORRIS CANAL

CHILD PLAY AREA

RESIDENTIAL UNIT TOWER TWO
100 WARREN STREET

SITTING AREA

TENNIS COURTS

OPEN COURTYARD

WASHINGTON STREET

SIDEWALK

RESIDENTIAL UNIT TOWER ONE
155 WASHINGTON STREET

OPEN COURTYARD

WARREN STREET

SIDEWALK

GARAGE

ENTRANCE

DRIVE

RESIDENTIAL UNIT TOWER TWO
(RETAIL UNITS AT 1st & 2nd FLOORS)

SIDEWALK

RETAIL UNIT—A
1ST AND 2ND FLOORS
SEE SCHEDULE D

DUDLEY STREET

## SCHEDULE C — SITE PLAN

PORTSIDE — SITE PLAN
JERSEY CITY, N.J.

I CERTIFY THAT THIS DRAWING CONSTITUTES
A CORRECT REPRESENTATION OF THE
THE IMPROVEMENTS AND UNITS DEPICTED.

GRUZEN SAMTON
304 PARK AVENUE SOUTH
NEW YORK, N.Y. 10010

PETER SAMTON, FAIA
N.J. LIC. No. 04730

KEY PLAN

TOWER 2

TOWER 1

TOWER 2

TOWER 2

SCALE

0"    50'    100'    200'

LEGEND

COMMON ELEMENTS

UNITS

BK5018PG229



CROSS SECTION AT DUDLEY ST. LOOKING SOUTH

CROSS SECTION AT WARREN ST. LOOKING EAST

SCHEDULE D — CROSS SECTION OF TOWER TWO

PORTSIDE — SITE PLAN
JERSEY CITY, N.J.
I CERTIFY THAT THIS DRAWING CONSTITUTES
A CORRECT REPRESENTATION OF THE
THE IMPROVEMENTS AND UNITS DEPICTED.

GRUZEN SAMTON
304 PARK AVENUE SOUTH
NEW YORK, N.Y. 10010

PETER SAMTON, FAIA
N.J. LIC. No. 04730

KEY PLAN

SCALE

0"    20'    40'        80'

LEGEND

RESIDENTIAL UNIT TOWER TWO

COMMON ELEMENTS

RETAIL UNIT A



SCHEDULE E

Schedule of Percentage Interest
of Common Elements and
Budget Allocation Plan

| Unit | Percentage Interest of Common Elements | Percentage of Budget |
|------|----------------------------------------|----------------------|
| Residential Unit Tower 1 | 47.5% | 52% |
| Residential Unit Tower 2 | 47.5% | 44% |
| Retail Unit A | 5.0% | 4% |
| TOTAL: | 100% | 100% |

BK 5018 PG 231

Schedule F
to
Master Deed

# BY-LAWS OF

## PORTSIDE CONDOMINIUM OWNERS' ASSOCIATION, INC.

BK 5018 PG 232



TABLE OF CONTENTS FOR

THE BY-LAWS OF

PORTSIDE CONDOMINIUM OWNERS' ASSOCIATION, INC.

| ARTICLE | | | PAGE |
|---|---|---|---|
| I | GENERAL INFORMATION | | |
| | 1.1 | Purpose | 1 |
| | 1.2 | Definitions | 1 |
| | 1.3 | Location | 1 |
| | 1.4 | Fiscal Year | 1 |
| II | MEMBERSHIP AND VOTING RIGHTS | | |
| | 2.1 | Members | 1 |
| | 2.2 | Member in Good Standing | 2 |
| | 2.3 | Associate Members | 2 |
| | 2.4 | Change in Membership | 3 |
| | 2.5 | Rights of Members | 3 |
| | 2.6 | Suspension of Rights | 3 |
| | 2.7 | Votes | 4 |
| III | BOARD OF TRUSTEES | | |
| | 3.1 | Qualifications | 5 |
| | 3.2 | Number | 6 |
| | 3.3 | Term of Office | 6 |



- i -

BK5018PG233



TABLE OF CONTENTS
(Continued)

| ARTICLE | | | PAGE |
|---|---|---|---|
| | 3.4 | Removal of Trustees | 6 |
| | 3.5 | Vacancies | 6 |
| IV | | MEETINGS OF MEMBERS | |
| | 4.1 | Place of Meetings | 6 |
| | 4.2 | Annual Meetings | 7 |
| | 4.3 | Special Meetings | 7 |
| | 4.4 | Notice of Meetings | 8 |
| | 4.5 | Majority, Quorum and Adjourned Meetings | 8 |
| | 4.6 | Conduct of Meetings | 9 |
| | 4.7 | Voting on Questions | 9 |
| | 4.8 | Voting by Mail | 10 |
| | 4.9 | Proxies | 10 |
| | 4.10 | Examiners | 11 |
| | 4.11 | Order of Business | 11 |
| V | | TRANSACTION OF BUSINESS BY THE BOARD OF TRUSTEES | |
| | 5.1 | Provisions on Behalf of the Developer/Sponsor | 12 |
| | 5.2 | Meetings of the Board; Notices; Waiver of Notice | 12 |
| | 5.3 | Quorum and Adjourned Meetings | 15 |
| | 5.4 | Non-Waiver | 15 |
| | 5.5 | Consent in Lieu of Meeting and Vote | 15 |

- ii -

BK5018PG234



TABLE OF CONTENTS
(Continued)

| ARTICLE | | | PAGE |
|---|---|---|---|
| VI | POWERS AND DUTIES OF THE BOARD OF TRUSTEES | | |
| | 6.1 | General Powers and Privileges | 15 |
| | 6.2 | Duties and Responsibilities | 18 |
| VII | FISCAL MANAGEMENT | | |
| | 7.1 | Association Budget | 24 |
| | 7.2 | Common Expense Assessment | 24 |
| | 7.3 | Determination of Annual Common Expense | 25 |
| | 7.4 | Disbursements | 25 |
| | 7.5 | Depositories | 25 |
| | 7.6 | Types of Accounts | 25 |
| | 7.7 | Reserve Funds | 27 |
| | 7.8 | Notice; Automatic Budget Increase; Emergencies | 28 |
| | 7.9 | Enforcement of Maintenance Fee Payments and Penalties for Late Payment | 29 |
| | 7.10 | Interest and Counsel Fees | 31 |
| | 7.11 | Annual Audit | 32 |
| | 7.12 | Availability of Constituent Documents and Examination of Books | 33 |
| VII | OFFICERS | | |
| | 8.1 | Designation | 33 |
| | 8.2 | Election of Officers | 33 |
| | 8.3 | Removal of Officers | 34 |

- iii -

BK 5018 PG 235



TABLE OF CONTENTS
(Continued)

| ARTICLE | | | PAGE |
|---|---|---|---|
| | 8.4 | Duties and Responsibilities of Officers | 34 |
| | 8.5 | Other Duties and Powers | 35 |
| IX | COMPENSATION, INDEMNIFICATION AND EXCULPATION | | |
| | 9.1 | Compensation | 35 |
| | 9.2 | Indemnification | 36 |
| | 9.3 | Exculpation | 36 |
| X | JUDICIARY COMMITTEE | | |
| | 10.1 | Powers | 37 |
| | 10.2 | Procedures | 37 |
| XI | ENFORCEMENT | | |
| | 11.1 | Methods and Procedures | 39 |
| | 11.2 | Waiver | 39 |
| XII | AMENDMENTS TO BY-LAWS | | |
| | 12.1 | Amendment by Board | 40 |
| | 12.2 | Amendment by Members | 40 |
| XIII | CONFLICT; INVALIDITY | | |
| | 13.1 | Conflict | 40 |
| | 13.2 | Invalidity | 41 |
| XIV | STATUTORY COMPLIANCE | | 41 |
| XV | CORPORATE SEAL | | 41 |

- iv -

BK 5018 PG 236



BY-LAWS OF

PORTSIDE CONDOMINIUM OWNERS' ASSOCIATION, INC.

ARTICLE I

GENERAL INFORMATION

1.1   Purpose.   These By-Laws are intended to govern the administration of Portside Condominium Owners' Association, Inc. (also referred to hereinafter as "the Association"), a non-profit corporation organized under Title 15A of the New Jersey Statutes, and to provide for the management, administration, use and maintenance of the Common Elements and Limited Common Elements described in the Master Deed for Portside, A Condominium, dated as of July __, 1996 (as amended or modified, the "Master Deed").

1.2   Definitions.   Unless context clearly indicates otherwise, all definitions set forth in the Master Deed or otherwise in N.J.S.A. 46:8B-3 are incorporated herein by reference.

1.3   Location.   The principal office of the Association is or will be located at 5 Marine View Plaza, Suite 500, Hoboken, New Jersey 07030.

1.4   Fiscal Year.   The fiscal year of the Association shall be determined by the Board of Trustees; however, initially the fiscal year shall be the calendar year.

1

BK5018PG237

## ARTICLE II

### MEMBERSHIP AND VOTING RIGHTS

2.1  Members.  Every person or entity which is a record owner or co-owner of the fee title to any Unit in the Condominium shall automatically be a Member of the Association, unless that person or entity holds such title merely as a security interest for the performance of an obligation (included but not limited to mortgagees).

The provisions of these By-Laws shall be applicable to and binding upon all Owners of Units within the Condominium. Unit Owners in the Condominium, and all future Unit Owners upon resale, shall be subject to the regulations set forth in these By-Laws.

2.2  Member in Good Standing.  A Member shall be deemed to be in good standing if, and only if, at least ten (10) days prior to the date fixed for a meeting or other Association action, he shall have fully paid all installments due for assessments made or levied against him and his Unit by the Board as hereinafter provided, together with all interest, costs, attorney's fees and other expenses if any, properly chargeable to him and to his Unit.  Any date set forth in these By-Laws for determining good standing for voting purposes shall be deemed supplemental to and not in place of the record date provisions of N.J.S.A. 15A:5-7.

2.3  Associate Members.  Every person who is entitled to possession and occupancy of an Apartment as a Tenant or lessee of a Unit Owner pursuant to Article 9 of the Master Deed shall be an Associate Member of the Association but shall not be entitled to any vote with respect to

2

BK5018PG238

Association matters. All Associate Members shall be subject to the Association's Articles of Incorporation, the Master Deed, By-Laws and any Rules and Regulations promulgated by the Board (collectively the "Condominium Documents").

2.4 **Change in Membership**. Membership in the Association is appurtenant to the ownership of a Unit or Units. Therefore, upon recording with the Hudson County Register of a deed or other instrument establishing a new record title to a Unit, and the delivery to the secretary of the Association of notice of the new record title, a change in membership shall be made in the records of the Association and the membership of the prior Unit Owner shall be terminated thereby.

2.5 **Rights of Members**. Every Member in Good Standing, including Associate Members in the Association, pursuant to the provisions of the Certificate of Incorporation, the Master Deed and these By-Laws, shall have the privileges of use and enjoyment of the Common Elements subject to the rights of the Association to:

> A. Promulgate Rules and Regulations governing such use and enjoyment; and
>
> B. Suspend the use and enjoyment of the Common Elements as provided in Section 2.6 of this Article II.

2.6 **Suspension of Rights**. The membership and voting rights of any Member may be suspended by the Board for any period during which any type of assessment against the Unit to which his membership is appurtenant

3

BK5018PG239

remains unpaid, but upon payment of such assessments and any interest accrued thereon, the Member's rights and privileges shall be restored immediately and automatically.

Further, the membership of any Associate Member may be suspended by the Board for any period for violations of the Condominium Documents. If Rules and Regulations governing the use of the Common Elements and the conduct of persons thereon have been established as authorized in the By-Laws, the rights and privileges of any person in violation thereof or in violation of any non-monetary covenant of the Master Deed may be suspended at the discretion of the Board for a period not to exceed thirty (30) days for any single violation and if the violation is of a continuing nature, such rights and privileges may be suspended indefinitely until such time as the violation is corrected or stopped. Such action shall not be taken by the Board until the Unit Owner is given an opportunity for a hearing regarding the violation.

2.7 **Votes.** Each Member in Good Standing shall be entitled to such vote for each Unit to which he holds title as is provided in Article VI of the Master Deed. When more than one person holds title, the vote for each Unit shall be exercised as the co-owners decide among themselves. When one or more co-owners signs a proxy or purports to vote for his or her co-owner, such vote shall be counted unless one or more of the other co-owners is present and objects to such vote or submits a separate proxy or an objection in writing delivered to the secretary of the Association before the vote is taken. If the co-owners cannot agree on the nature

4

BK 5018 PG 240

of the vote appurtenant to their Unit, such vote cannot be counted for the given election.

ARTICLE III

BOARD OF TRUSTEES

3.1 Qualifications. The following are criteria for the nomination, appointment or election to a Trusteeship:

A. Membership in Good Standing. This shall be a qualification for any Member to designate a nominee or appointee to a Trusteeship and for continued service on the Board.

B. Representation. Partnerships, limited liability companies, corporations, fiduciaries or co-owners holding memberships in good standing may designate individuals for appointment as Trustees according to the following guidelines:

1. Partnership or limited liability company designees shall be partners, members, employees or agents of the partnership or limited liability company;

2. Corporate designees shall be officers, stockholders, employees or agents of the corporation;

3. Fiduciary designees shall be fiduciaries, officers or employees of the fiduciary; and

4. Individual co-owners must designate any one of them who is a Member in Good Standing to be eligible for nomination, appointment or election.

5

BK5018PG244

C. Disqualification of Trustees. Any Trustee appointed by a Member whose membership is not in good standing for thirty (30) consecutive days shall automatically be disqualified as a Trustee upon expiration of said thirty (30) day period and a replacement shall be appointed by the Board within thirty (30) days thereafter to serve for the remainder of the term.

3.2 Number. The Board of Trustees shall consist of three (3) persons, one selected by each Unit Owner. The names and addresses of the initial Board of Trustees are set forth in the Certificate of Incorporation.

3.3 Term of Office. Each Trustee shall serve a term of one year and until their successors have been qualified and selected by particular Unit Owners.

3.4 Removal of Trustees. Trustees may be removed and replaced by the Unit Owner that designated the particular Trustee at any time.

3.5 Vacancies. Vacancies on the Board of Trustees for any reason shall be filled by the Unit Owner who originally designated the vacant Trustee position.

6

BK5018PG242

## ARTICLE IV

### MEETINGS OF MEMBERS

4.1 **Place of Meetings.** Meetings of the Association Members shall be held at the Condominium or neighboring municipality, or such other suitable place convenient to the Owners as may be designated by the Board of Trustees.

4.2 **Annual Meetings.** All annual meetings of the Members of the Association shall be held on the month and day of the year to be established by the Board. At each annual meeting the designation of a Trustee by each Member shall take place.

4.3 **Special Meetings.** Special meetings of Members may be called by the president of the Association whenever he determines such a meeting is advisable, or it may be called by the secretary upon the direction of the Board, or it may be called upon the written request of any Member in Good Standing. Such request shall state the purpose(s) of such meeting and the matter(s) proposed to be acted upon.

No business shall be transacted at a special meeting except as stated in the notice unless by consent of two-thirds (2/3rds) of the votes entitled to be cast in person or by proxy.

4.4 **Notice of Meetings.** Notice for annual or special meetings of Members shall be in writing and mailed or delivered personally to all Members of record entitled to vote not less than ten (10) days nor more than thirty (30) days prior to the date on which the meeting is to be held. The notices shall be delivered to Members at

7

BK5018PG243

their last known addresses and shall state the time, place and purpose(s) of the meeting. Notice of any adjourned meeting shall not be required to be given if the time and place of the adjournment is announced at the meeting which was adjourned and if no business other than that originally scheduled is to be conducted. If no new time and place is set at the meeting which is adjourned, then the original requirements of notice set forth above must be met.

If a Member attends a meeting although for any reason he has not received proper notice and he does not protest the lack of such notice, his attendance at such meeting without protest shall constitute a waiver of the notice requirement.

4.5  Majority, Quorum and Adjourned Meetings. The Members entitled to cast sixty-seven (67%) percent of the votes, including absentee ballots, at a meeting shall constitute a quorum at the meeting.

If any meeting of Owners cannot be conducted because a quorum has not attended, a majority of the votes present may adjourn the meeting to a time not less than seventy-two (72) hours from the time of the original meeting and from such time to time until a quorum shall be present or represented. At any such adjourned meeting at which a quorum is assembled, any business may be transacted which might have been transacted at the meeting originally called.

4.6  Conduct of Meetings. At all membership meetings, the president, or in his absence, the vice-president, or in the absence of both of them, a person chosen by a majority vote of the Members in Good

8

Standing present shall act as chairperson, and the secretary, or in his absence, a person appointed by the chairperson, shall act as secretary of the meeting and perform the functions of those officers as detailed in Article 8 herein.

4.7  Voting on Questions.  Only Members determined to be in Good Standing shall be entitled to vote on questions.  As the term is defined in Section 4.5, and unless the Master Deed or these By-Laws specifically require a different percentage, a majority of votes cast shall be sufficient on questions submitted to a vote of the membership. The vote on any question at a meeting need not be taken by ballot unless (i) the chairperson of the meeting determines a ballot to be advisable, or (ii) a majority in interest of the votes present at the meeting determine that the vote on the question submitted shall be taken by ballot.

4.8  Voting by Mail.  The Board, in lieu of calling a membership meeting, may submit any question or election to a vote of the membership by a ballot by mail.  Only Members in Good Standing may vote by mail.  Mailed ballots must bear the valid signature of the Member submitting same.

To conduct a vote by mail for a question submitted to the membership, the Board shall serve a notice upon all Members which shall:

A.    State specifically in a motion or motions the questions upon which the vote is to be taken;

B.    State the date by which ballots must be returned and the

9

BK5018PG245



person and address to which they are to be sent;

    C.    Provide an official ballot for the vote;

    D.    State the date upon which the action contemplated by the motion shall be effective, which date shall be not less than ten (10) days after the date ballots must be received.

    4.9   Proxies. To vote by proxy means that the Member entitled to vote appoints another person to participate in a meeting and vote in his place and stead. (The instrument granting the authority described herein is also called a proxy.) Proxies to be used by Members for voting on Association matters must be in writing, in a form prescribed by the Board, signed by the Member and delivered to the secretary or other person appointed by the president prior to the opening of the polls at the meeting at which ballots are to be cast. A proxy shall be valid for a period of no more than eleven (11) months from its date. A proxy may be revoked at any time prior to the opening of the polls at a given meeting.

    4.10  Order of Business. The order of business at the annual meeting of Members and at any special meetings, insofar as reasonable and practical, shall be:

    A.    Calling the roll, certifying of proxies and absentee ballots and establishment of a quorum.

    B.    Proof of notice of meeting and waiver of notice.

    C.    Reading and disposal of any unapproved minutes.

10

BK5018PG246

D.    Selection of Trustees, if appropriate.

E.    Vote on questions, if appropriate.

F.    Reports of officers.

G.    Reports of committees.

H.    Old business.

I.    New business.

J.    Adjournment.

ARTICLE V

TRANSACTION OF BUSINESS BY THE BOARD OF TRUSTEES

5.1    Meetings of the Board; Notices; Waiver of Notice.

A.    ORGANIZATIONAL MEETING

The first annual meeting of the Board of Trustees shall be held within ten (10) days after the first annual meeting of the Association Members, at such time and place as shall be decided by a majority of the Board.  Thereafter, regular meetings of the Board shall be held at such times and places as shall be determined from time to time by a majority of the Trustees, but at least two (2) meetings shall be held during each fiscal year.

B.    OPEN MEETINGS OF THE BOARD OF TRUSTEES

(1)    OPEN MEETINGS

All meetings of the Board of Trustees, except conference or working sessions at which no binding votes are to be taken, shall be open to attendance by all Unit Owners.  All Unit Owners in attendance shall be permitted to participate at the board meeting, only upon the opening of the meeting to the public.

11

BK5018PG247



(2)  RESTRICTIONS TO OPEN MEETINGS

Despite (1) above, the Board of Trustees may exclude Unit Owners or restrict attendance at board meetings or portions of board meetings dealing with one or more of the following matters:

(a)  Any matter which if disclosed would constitute an unwarranted invasion of individual privacy;

(b)  Any pending or anticipated litigation or contract negotiations;

(c)  Any matters falling within the attorney-client privilege, to the extent that confidentiality is required in order for the attorney to exercise his/her ethical duties as a lawyer; or

(d)  Any matter involving the employment, promotion, discipline, or dismissal of a specific employee of the Association.

(3)  MINUTES OF OPEN MEETINGS

(a)  At each meeting required to be open to all Unit Owners, minutes of the proceedings shall be taken, and copies of those minutes shall be made available to all Unit Owners before the next open meeting. To receive a copy of the minutes, a Unit Owner must make a written request for same to the managing agent and must enclose a self-addressed stamped envelope.

(b)  The Board of Trustees shall cause there to be kept reasonably comprehensive minutes of all its meetings showing the time and place, the board members present, the subjects considered, the actions taken, the vote of each board member, and any other information required to be shown in the minutes by the By-Laws.

C.  NOTICE REQUIREMENTS FOR OPEN MEETINGS

(1)  NOTICE

Adequate notice of any open meeting shall be

12

BK 5018 PG 248

given to all Unit Owners.

(2)  ADEQUATE NOTICE

Adequate notice means written notice of at least 48 hours, giving the date, time, location and, to the extent known, the agenda of any regular, special or rescheduled meeting. Such notice shall accurately state whether formal action may or may not be taken. This notice shall be filed with the Association secretary, administrative officer, or professional manager responsible for administering the Association business office.

D.    EMERGENCY MEETINGS

In the event that a Board of Trustees meeting is required to deal with such matters of urgency and importance that delay, for the purpose of providing 48 hours advance notice would result in substantial harm to the interests of the Association, the notice shall be deemed adequate if it is provided as soon as possible following the calling of the meeting.

5.2  Quorum and Adjourned Meetings. At all meetings of the Board, a majority of the Trustees shall constitute a quorum for the transaction of business and the votes of the majority of the Trustees present and voting at a meeting at which a quorum is present shall constitute a valid decision. If, at any meeting of the Board, there be less than a quorum present, the majority of those present shall adjourn the meeting from time to time. At any such adjourned meeting at which a quorum is present, any business which may have been transacted at the meeting originally called may be transacted without further notice.

13

BK5018PG249

5.3    Non-waiver.  The failure of the Board to effect any right or remedy established by these By-Laws shall not preclude the Board from doing so at some future point in time.

5.4    Consent in Lieu of Meeting and Vote.  Despite the prescriptions for action by the Board set forth herein or in the Certificate of Incorporation or the Master Deed, the entire Board of Trustees shall have the power to act on any matter on which it is authorized to act without a formal meeting and vote if the entire Board of all the Trustees empowered to act at a given time shall consent in writing to an action.

## ARTICLE VI

## POWERS AND DUTIES OF THE BOARD OF TRUSTEES

6.1    General Powers and Privileges.  The Board of Trustees shall have the powers and privileges necessary for the administration of the affairs, business and property of the Association.  The Board may do all those acts and things which are granted to it in the Certificate of Incorporation, the Master Deed, these By-Laws and the law.

More particularly, the Board shall have the following powers, including but not limited to:

A.    Employing a professional management agent or manager by contract to perform such duties, services and responsibilities of the Board for the Association as the Board shall authorize at a compensation established or agreed upon by the Board; and

B.    Fixing, assessing and collecting of assessments from the

14

BK5018PG250

Owners;

C.    Designating and dismissing of the personnel necessary for the maintenance and operation of the Condominium, the Common Elements and facilities, and the Limited Common Elements and facilities in accordance with Article 5 of the Master Deed; and

D.    Seek/obtain advice from and employ persons, firms or corporations such as, but not limited to, landscapers, architects, engineers, lawyers and accountants; and

E.    Adopt, amend as necessary and publish Rules and Regulations covering the details of the operation and use of the Common Elements and/or Units therein for the Owners, Tenants, occupants and users of the Condominium properties and facilities; and

F.    Secure full performance by Unit Owners, Tenants or occupants of all items of maintenance for which they are responsible; and

G.    Enforce other obligations of Unit Owners and Tenants, including the terms, conditions and restrictions contained in the Master Deed, these By-Laws and the Rules and Regulations promulgated; and

H.    Borrow and repay monies, give notes, and pledge accounts as security upon such term or terms as it deems necessary; and

I.    Invest and reinvest monies, pay taxes, make and enter into contracts and leases; and

J.    Transfer, grant and obtain easements, licenses and other property rights with respect to the Common Elements in a manner consistent with the rights of Unit Owners; and

15

BK5018PG251

K. Bring and defend actions by or against one or more Unit Owners which are pertinent to the operation of the Condominium, the health, safety and general welfare of the Unit Owners or any other legal action to which the Unit Owners may consent in accordance with these By-Laws and specifically Article 4.7(c); and

L. Be responsible for the disposition of all insurance proceeds unless the Board chooses to appoint an insurance director who shall not be a Member of the Association, an employee of the Developer/Sponsor or the manager; and

M. Create, appoint members to and disband committees as shall, from time to time, be deemed appropriate or necessary to assist the Board in the discharge of its duties, functions and powers; and

6.2 Duties and Responsibilities. It shall be the affirmative and perpetual obligation and duty of the Board to perform the following:

A. To cause the Common Elements and Limited Common Elements to be maintained according to accepted standards and as set forth in the Master Deed, including, but not limited to such maintenance, painting, replacement and repair work as may be necessary, lawn and landscaping maintenance and snow removal as the Board may deem appropriate, as well as the maintenance of surveillance and security of the Condominium. All repairs and replacements shall be substantially similar to the original application and installation; and

B. To cause a complete record of all its acts and affairs to be kept and to present a summary report thereof to the Members at the

16

BK5018PG252



annual meeting or at any special meeting when requested in writing at least twenty-one (21) days in advance by members entitled to cast at least fifty (50%) percent of the total votes of the Association; and

C. To allocate common surplus or make repairs, additions, improvements to or restoration of the Common Elements in accordance with the provisions of these By-laws and the Master Deed after damage or destruction by fire or other casualty, or as a result of condemnation or eminent domain proceedings; and

D. To take such action as may be necessary to comply promptly with any and all orders or requirements affecting the premises maintained by the Association placed thereon by federal, state, county or municipal authority having jurisdiction thereover, and any order of the Board of Fire Underwriters or other similar bodies; and

E. To manage the fiscal affairs of the Association as hereinafter provided in Article VII; and

F. To place and keep in force all insurance coverages required to be maintained by the Association, applicable to its Property and Members including but not limited to:

    1. Property Insurance: To the extent available in the normal commercial marketplace, broad form or blanket insurance against loss by fire, lightning, storm and other risks normally included within all-risk extended coverage, including vandalism and malicious mischief, insuring all Common Elements together with all service

17

machinery appurtenant thereto, and covering the interest of the Association, the Board, the Sponsor, and all Unit Owners and any Eligible Mortgage Holder who has requested the Association, in writing, to be named as a loss payee, as their respective interests may appear, in an amount equal to the full replacement value of the Common Elements (exclusive of foundations and footings) without deduction for depreciation. Each policy shall contain a standard mortgagee clause in favor of each applicable Eligible Mortgage Holder which shall provide that the loss, if any, thereunder shall be payable to each applicable Eligible Mortgage Holder as its interest may appear, subject to the loss payment provisions of Article 12 of the Master Deed.

The amount of any deductible shall be determined by the Board in its sole discretion and the responsibility for payment of same shall be the Board's.

If available, an "Inflation Guard Endorsement" shall be obtained. Further, if the Uniform Construction Code of the State of New Jersey requires or should require in the future, that changes be made to undamaged portions of a Building because of damage to other portions of a Building as a condition of granting a permit for reconstruc-

18

tion, a "Construction Code Endorsement" shall be obtained and maintained.

2. Public Liability Insurance: To the extent obtainable in the normal commercial marketplace, public liability insurance for personal injury and death from accidents occurring within the Common Elements and the defense of any actions brought by injury or death to a person or damage to property occurring within such Common Elements. Said insurance shall be in limits that the Board may, from time to time, determine covering each member of the Board, the managing agent or manager, and each member, and shall also cover cross-liability claims of one insured against another.

Coverage shall be in amounts generally required for private institutional mortgage lenders for projects similar in construction, location and use. Until the first meeting of the Board following the first annual meeting, such public liability coverage shall be for a single limit of at least one million ($1,000,000.00) dollars. The Board shall review such limits once a year.

3. Trustees' and Officers' Liability Insurance: Insurance indemnifying those persons who serve and have served as Trustees and/or Officers of the Association

19

BK 5018 PG 255

(including Sponsor-designated or appointed Trustees) against liability for errors and omissions occurring in connection with the performance of their duties in an amount of at least one million ($1,000,000.00) dollars, with any deductible to be in the sole discretion of the Board.

4. Workers' Compensation Insurance: Workers' compensation and New Jersey disability benefits insurance as required by law.

5. Vehicular Liability Insurance: To the extent obtainable in the normal commercial marketplace, vehicular liability insurance to cover all motor vehicles owned or operated by the Association.

6. Flood Insurance: Flood hazard insurance if any of the insurable Common Elements existing at the time of the initial conveyance are located within a federally designated flood hazard area. The policy shall be in a form which meets the criteria set forth in the most current guidelines on the subject issued by the Federal Insurance Administration.

7. Boiler Insurance: To the extent obtainable in the normal commercial marketplace, boiler explosion liability insurance, if applicable for the Association.

8. Other Insurance: Such other insurance as the Board

20

BK5018PG256



may deem appropriate.

All policies shall:

(A) provide that adjustment of loss be made by the Board of Trustees and that the net proceeds thereof be payable to the Board;

(B) require that the proceeds of physical damage insurance be applied to the restoration of such Common Elements and structural portions and service machinery as is required by the Master Deed and these By-laws;

(C) to the extent obtainable, contain agreed amount and inflation guard endorsements;

(D) provide that the insurance will not be prejudiced by any act or omission of individual members not under the control of the Association;

(E) to the extent obtainable contain waivers of subrogation and waivers of any defense based on co-insurance or of invalidity arising from any acts of the insured;

(F) provide that such policies may not be cancelled without at least thirty (30) days prior written notice to all of the named insured, including all Unit Owners and Eligible Mortgage Holders.

Any insurance maintained by the Board may provide for such deductible amount as the Board may determine.

Despite any other provisions of this subparagraph, the Association shall not be required to provide any type or amount of insurance not commonly available in the normal commercial marketplace.

21

BK5018PG257

Unit Owners shall not be prohibited from carrying insurance for their own benefit provided that all such policies contain waivers of subrogation; and further provided that the liability of the carriers issuing insurance obtained by the Board shall not be affected or diminished by reason of any such additional insurance carried by any Unit Owners.

ARTICLE VII

FISCAL MANAGEMENT

7.1   Association Budget.   Prior to making an annual assessment, the Board of Trustees shall prepare and adopt an operating budget which shall provide for any and all expenses to be incurred during each fiscal year as well as adequate reserves for maintenance, repair and replacement of the Common Elements and facilities.   The budget shall include, without limitation, such sums as the Board deems necessary to meet all Association expenses incident to the repair, maintenance, improvement and replacement of the Common Elements of the Condominium, and all other expenses reasonably incident to the operation, enjoyment and furtherance of the Condominium and its Association.   The Common Expenses shall include premiums for all types of insurance required by the Master Deed and these By-Laws.

Following the establishment and promulgation of the budget for the next succeeding fiscal year, the Board shall determine an appropriate annual assessment for each Unit.   The annual assessment for each Unit shall be based upon the Unit's budget allocation/proportionate

22

BK5018PG258

responsibility for Common Expenses which is set forth on Schedule E of the Master Deed.

7.2   Common Expense Assessment.  The Board shall have the duty to collect from each Unit Owner as Annual Common Expense Assessments the proportionate part of the Annual Common Expense payable by such Unit Owner as provided in the Master Deed, the Certificate of Incorporation, these By-Laws and in accordance with applicable laws.

7.3   Determination of Annual Common Expenses.  The amount of monies for annual Common Expenses deemed necessary by the Board and the manner of expenditure thereof, including but not limited to, the allocation thereof, shall be in the sole discretion of the Board.

7.4   Disbursements.  The Board shall take and hold the funds as collected and shall disburse same for the purposes in the manner set forth herein and as required by the Master Deed, the Certificate of Incorporation and applicable law.

7.5   Depositories.  The depository of the Association shall be such bank or banks as shall be designated from time to time by the Board and in which the monies of the Association shall be deposited. Withdrawal of monies from such accounts shall be only by checks signed by such parties as are authorized by the Board, provided that a management agreement may include among its provisions authority for a manager to sign checks on behalf of the Association for payment of obligations of the Association, if the proper fidelity bond is furnished to the Association.

23

BK5018PG259

7.6   Types of Accounts.  The receipts of the Association shall be Common Expense Assessments and such other funds which the Association may earn.  The expenditures of the Association shall be Common Expenses. Each shall be credited and charged respectively to the accounts under the following classifications as the Board shall deem appropriate:

A.   Current expenses, which shall include expenditures within the year for which the budget is made, including reasonable allowances for contingencies and working funds.  Current expenses shall not include expenditures chargeable to reserves.  At the end of each year, any unexpended amount remaining in this account shall be used to reduce the assessments for current expenses for the succeeding year.

B.   Reserve for maintenance, repair and replacement which shall include funds for maintenance items that occur less frequently than annually and funds for repair or replacement of the Common Elements or those portions of the Common Elements for which repair or replacement is required because of damage, depreciation or obsolescence.  The amounts in this account shall be allocated among each of the separate categories of maintenance and replacement items.

C.   A fund for capital improvements, which shall include the funds to be used for capital expenditures or for acquisition of additional personal property that will be part of the Common Elements. This fund shall be derived from Capital Improvement Assessments, Emergency Assessments and any other sources as the Trustees deem appropriate.

24

D.    Operations, which shall include all funds from the use of the Common Elements or from any other sources.    Only the additional direct expense required by any revenue producing operation will be charged to this account, and any surplus from any operation or otherwise shall be used to reduce the assessments for current expenses for the year during the one in which the surplus is realized, or at the discretion of the Board, in the year following the one in which the surplus is realized.

The Board shall not be required to physically segregate the funds held in the above accounts but may, in its sole discretion, maintain the funds in one or more consolidated accounts.    As to each consolidated account, the division into the various accounts set forth above need be made only on the Association's records.

7.7    Reserve Funds.    As referred to in Section 7.6B above, the Board shall establish and maintain a maintenance, repair and replacement reserve fund.    The fund shall be maintained in an interest-bearing savings account or certificate of deposit and shall not be used for any purpose other than those provided in Section 7.6B.    No withdrawal from any reserve fund account shall be made without the affirmative vote of a majority of the Board of Trustees.

This reserve fund shall be derived from any sources that the Trustees deem appropriate, including but not limited to, a specific portion of the Annual Common Expense Assessments for the then current year, proceeds of income-earning activities, and unexpended Annual Common

25

BK5018PG261

Expense Assessments from prior years.

Said reserve funds, however, are not intended to provide for major repairs or replacement of any item having a life expectancy in excess of twenty-five (25) years, such as sewer lines and other utility lines (to the extent that they are owned by the Association) which shall be paid from the capital improvement fund referred to in Section 7.6c.

The Board of Trustees may maintain such other reserve funds as the Board deems appropriate and may supplement either reserve fund from time to time.

7.8 **Notice; Automatic Budget Increase; Emergencies.** The Board shall give written notice to each Unit Owner and, upon request to an Eligible Mortgage Holder, of the amount estimated by the Board for Common Expenses for the management and operation of the Association for the next ensuing budget period, directed to the Unit Owner at his last known address by ordinary mail or by hand delivery. Said notice shall be conclusively presumed to have been delivered five (5) days after deposit in the United States mails.

If the Annual Common Expense Assessment proves to be insufficient, the budget and assessment may be amended at any time by the Board provided that nothing herein shall serve to prohibit or prevent the Board from imposing an Emergency Assessment in the case of any immediate need or emergency which cannot be met by funds earmarked for such contingency.

26

BK5018PG262

7.9 Enforcement of Maintenance Fee Payments and Penalties for Late Payment. The Annual Common Expense Assessment shall be due in advance for the entire fiscal year on the date set and published by the Board. Any other assessments added during the course of a calendar year shall be due on the first day of the month next succeeding the establishment of the assessment, as set forth in the Master Deed. However, Unit Owners may pay the Annual Common Expense Assessment and other assessments in equal monthly installments so that the sum total of the Annual Common Expense Assessment and any others is paid in full by the end of each fiscal year. Said right to pay Annual Common Expense Assessments in monthly installments may be terminated by the Board of Trustees in the event that any monthly payment is not made during the calendar month in which it is due and thereafter remains unpaid for ten (10) days after written notice thereof from the Board of Trustees to the applicable Unit Owner..

In the event an Owner's right to make installment payments of the Annual Common Expense Assessment terminates due to the Owner's failure to make the payment during the month which it is due, the Board of Trustees, may, by resolution, declare the entire Annual Common Expense Assessment and any existing other assessments to be due and owing. The Board also, in its discretion, may permit the resumption of installment payments and may make arrangements with delinquent Owners for restoring their accounts to a current status. The Board may, for good cause, waive any portion of any late payment fees established by this Article 7.9 as

27

set forth below.

All monthly installments of Annual Common Expense Assessments are due in advance on the first (1st) day of each and every month during the year or other applicable period such Annual Common Expense Assessment is in effect. In the event that a monthly payment is made between the first and the tenth (10th) day of the month, there will be no interest payment due or owing. If the monthly payment is made between the eleventh (11th) day of the month and the last day of the month, there shall be due to the Association interest for all past due amounts equal to fifteen percent per annum. In the event New Jersey law should authorize the imposition of a late fee, then the Board may impose a reasonable late fee amount in lieu of interest.

When an Owner remits payment of the maintenance fee following any month when payment was not received, such payment will be used first to set off any interest charges; thereafter, the balance will be used to pay off the past-due installment of Annual Common Expense Assessments; thereafter, any balance will be applied to the current month's installment of Annual Common Expense Assessments. If the remaining balance applied to the current month's installment of Annual Common Expense Assessments is insufficient to pay the entire monthly payment, then unless the full amount is received prior to the eleventh (11th) day of the month, there shall be due to the Association interest at the rate of fifteen percent per annum.

Each additional failure to remit an installment of Annual

28

Common Expense Assessments in timely fashion will be regarded separately from other maintenance fees which are/were due and owing, and interest charges will be assessed in accordance with that which is stated immediately above.

At the discretion of the Board, if a Unit Owner shall be in default less than thirty (30) days in the payment of an installment of any type of assessment, the Board may notify the delinquent Unit Owner that the remaining installments of the assessment will be accelerated if the delinquent installment has not been paid by a date stated in the notice, which date shall not be less than five (5) days after personal delivery of the notice to the unit owner or less than ten (10) days after the mailing of such notice to him by registered or certified mail, as applicable.

If default continues following the time for payment prescribed in the notice, then the Board may accelerate the remaining installments of the assessment and notify the delinquent Unit Owner that a lien for the accelerated amount shall be filed on a date certain stated in the notice if the accelerated balance has not then been paid. The lien for such accelerated assessment as permitted by law shall then be filed if the delinquent assessment has not been theretofore paid and the Board may also notify any holder of a mortgage encumbering the Unit affected by such default or publish the appropriate notice of such delinquency to the membership of the Association. If said default continues for a period of ninety (90) days, then the Board shall foreclose the foregoing lien

29

pursuant to law and/or commence an independent suit against the appropriate parties to collect the assessment.

7.10 <u>Interest and Counsel Fees</u>. The Board at its option shall have the right in connection with the collection of any type of assessment, or other charge, to impose a late charge of any reasonable amount and/or interest at the legal maximum rate permitted by law for the payment of delinquent assessments or other charges, if such payment is made after a date certain stated in such notice. In the event that the Board shall effectuate collection of said assessments or charges by resort to counsel and/or filing of a lien, the Board may add to the aforesaid assessments or charges the actual counsel fees charged to the Association for said collection, plus the reasonable costs for preparation, filing and discharge of the lien in addition to such other costs as may be allowed by law. All of these charges shall also act as a lien against the Unit in default.

7.11 <u>Annual Financial Statement</u>. The Board shall arrange for an annual review of the books and records of the Association by an independent certified public accountant who shall review same and render a report in writing to the Board and in summary form to the Members and such Eligible Mortgage Holders and others who may be entitled to same and who request a copy of the review.

Further, the Trustees shall provide, upon written request, any holder, insurer or guarantor of a mortgage with a copy of the financial statement for the Association for the immediately preceding fiscal year.

30

BK5018PG266

There shall be no charge for the providing of a copy of such report. The Trustees shall provide said financial report within a reasonable time following the making of such written request.

7.12 _Availability of Constituent Documents and Examination of Books_. The Board of Trustees shall make available to Members of the Association and Eligible Mortgage Holders, insurers or guarantors, current copies of the Master Deed, By-Laws and any other Rules and Regulations enacted by the Board concerning the project.

Further, the Board shall make available the books of account, records, and financial statements of the Association by appointment during normal business hours in the offices of the Association or at such other suitable place as may be designated by the Board upon receipt by the Board of Trustees of reasonable notice (at least five business days) of the request to make such examination.

## ARTICLE VIII

### OFFICERS

8.1 _Designation_. The principal officers of the Association shall be a president, a vice-president, a secretary and a treasurer, all of whom shall be elected by and from the Board of Trustees. The Board may appoint an Assistant Treasurer and an Assistant Secretary and such other officers as in their judgment may be necessary. Such additional officers need not be Board members. One person may hold more than one office, except that of president and vice-president.

8.2 _Election of Officers_. The officers of the Association

31

BK5018PG267

shall be elected annually by the Board at the organization meeting of each new Board which shall be its first meeting following the annual meeting of Members and such officers shall hold office at the pleasure of the Board. At any Board meeting, the Trustees may elect replacements for officers who leave the Board for reasons other than removal.

8.3 <u>Removal of Officers</u>. Upon an affirmative vote of a majority of the entire Board, any officer may be removed, either with or without cause, after opportunity for a hearing, and his successor elected at any regular meeting of the Board or at any special meeting of the Board called for such purpose.

8.4 <u>Duties and Responsibilities of Officers</u>.

A. <u>President</u>: The president shall be the chief executive officer of the Association. He shall preside at all meetings of the Association and of the Board of Trustees. He shall have all the general powers and duties which are usually vested in the office of president of an association, including but not limited to, the power to appoint committees from among the owners from time to time as he may in his discretion decide is appropriate to assist in the conduct of the affairs of the Association.

B. <u>Vice-President</u>: The vice-president shall take the place of the president and perform his duties whenever the president shall be absent or unable to act. If neither the president nor the vice-president is able to act, the Board shall appoint some other Trustee to so do on an interim basis. The vice-president shall also perform such other

32

BK5018PG268

duties as shall from time to time be imposed upon him by the Board.

C.    Secretary:   The secretary shall keep the minutes of all meetings of the Board of Trustees and the minutes of all meetings of the Association; he shall have charge of such books and papers as the Board of Trustees may direct; and he shall, in general, perform all the duties incident to the office of Secretary.

D.    Treasurer:  The treasurer shall have responsibility for Association funds and securities and shall be responsible for keeping full and accurate accounts of all receipts and disbursements in books belonging to the Association. He shall be responsible for the deposit of all monies and other valuable effects in the name, and to the credit of the Association in such depositories as may from time to time be authorized by the Board.

The Treasurer shall provide the Board with reports monthly with respect to all expenditures and receipts.

8.5    Other Duties and Powers.   The officers shall have such other duties, powers and responsibilities as shall, from time to time, be authorized by the Board.

### ARTICLE IX

### COMPENSATION, INDEMNIFICATION AND EXCULPATION

9.1    Compensation.   No compensation shall be paid to any Trustee, officer or committee member of the Association.   However, Trustees, officers and committee members and other Association members who may from time to time perform services for the Board and/or

33

BK 5018 PG 269

Association shall be reimbursed for out-of-pocket expenses incurred in the performance of services for or on behalf of the Board or the Association, provided such expenses have been authorized in advance by the Board.

9.2    Indemnification.  The Association shall provide a defense of all claims brought against officers, Trustees and duly-appointed committee members and will indemnify and hold harmless said persons with respect to any claims or suits brought against them by any party (including the Association and its Members) to the maximum amount permitted by law (except for judgments based upon fraud, willful misconduct, breach of fiduciary duty or gross negligence).

The indemnification shall cover the actual amount of net loss including counsel fees reasonably incurred by or imposed upon any present or former officers, trustees or committee members performing their proper duties for the Association.  If there is a settlement in such case, the indemnification shall extend only to such matters covered by the settlement as it involves the officer, Trustee or committee member, assuming the absence of gross negligence or willful misconduct.

9.3    Exculpation.  Except as a result of its gross negligence or willful misconduct or bad faith, neither the Board as a body nor any Trustee, officer or committee member shall be personally liable to any Unit Owner in any respect for any action or lack of action arising out of the execution of his office.  Each Unit Owner shall be bound by the good faith actions of the Board, officers and committee members in the

34

BK5018PG270

execution of their duties.

## ARTICLE X

### ENFORCEMENT

10.1 Methods and Procedures. The Board shall have the power, at its sole option, to enforce the terms of the governing documents of the Condominium including the Master Deed and its amendments, as well as the Certificate of Incorporation and its amendments and this instrument and its amendments, in addition to any Rule or Regulation adopted pursuant thereto by any or all of the following:

A.    Self-help;

B.    Sending notice to the offending party to cause certain things to be performed, not performed or to stop the performance of certain acts or things;

C.    Making the Association whole and charging the offending party or parties with all or part of the cost therefor;

D.    Complaining to the appropriate governmental authorities;

E.    Taking any action including instituting suit in any court of competent jurisdiction. The costs of such litigation, including reasonable counsel fees, shall be borne by the parties in such manner as the trial court deems equitable.

10.2 Waiver. The Board shall not be deemed to have waived its rights of enforcement as set forth by reason of its not having exercised such rights in any given circumstance or instance.

35

BK5018PG271



## ARTICLE XI

### AMENDMENTS TO BY-LAWS

11.1 Amendment by Board. These By-Laws may be amended by the Board of Trustees with regard to ministerial or administrative matters of the Association which do not impact Members materially. Such amendments may be made at any regular meeting duly held or at any special meeting called for that purpose. Two-thirds (2/3rds) of the total number of Board members must vote in favor of the amendment to ensure its passage.

11.2 Amendment by Members. Any one or more of the By-Laws may be amended or repealed and new By-Laws may be created at any meeting of the Members of the Association held for such purpose.

Prior to a meeting at which one or more of the By-Laws may be amended or repealed or new By-Laws created, written notice containing the exact language of the proposed amendment to the By-Laws shall have been sent to all Unit Owners. The amendment shall be approved if voted upon in accordance with Articles 14 and 15 of the Master Deed.

## ARTICLE XII

### CONFLICT; INVALIDITY

12.1 Conflict. If any provision(s) of these By-Laws is found to be in conflict with or in contradiction of the Master Deed, the Certificate of Incorporation or with the requirements of any applicable law, then the Master Deed, Certificate of Incorporation and/or law shall govern.

36

BK5018PG272



12.2  Invalidity.  If any one or more provision(s) of these By-Laws shall be found to be invalid, it/they shall not affect the validity and enforceability of the remaining provisions hereof.

### ARTICLE XIII

#### STATUTORY COMPLIANCE

These By-Laws are intended to comply with the requirements of N.J.S.A. 46:8B-1 through 30, as amended as well as with the requirements of Title 15A, "Corporations, Non-profit".

### ARTICLE XIV

#### CORPORATE SEAL

The Association shall have a seal in circular form having within its circumference the words "Portside Condominium Owners' Association, Inc.".

Prepared by:

_____

Richard L. Oller, Esquire



37

BK5018PG278



BK5018PG274