**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **THE TOWERS AT PORTSIDE URBAN RENEWAL COMPANY, LLC and EQUITY RESIDENTIAL MANAGEMENT LLC,**<br>***Plaintiffs*,**<br>**v.**<br>**THE CITY OF JERSEY CITY, THE CITY OF JERSEY CITY RENT LEVELING BOARD, and THE CITY OF JERSEY CITY BUREAU OF RENT LEVELING,**<br>***Defendants*,**<br>**- and –**<br>**PORTSIDE TOWERS EAST TENANT ASSOCIATION, PORTSIDE TOWERS WEST TENANT ASSOCIATION, KEVIN WELLER, JESSICA BRANN, JOEL ROTHFUS, and MICHELE HIRSCH**<br>***Intervenor-Defendants.*** | **Civil Action No. 23-22291**<br>**OPINION** |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of Plaintiffs'[1] Motion for Partial Summary Judgment. See ECF No. 171 ("Motion"); ECF No. 171.1 ("Memorandum of Law" or

[1] Plaintiffs are The Towers at Portside Urban Renewal Company, LLC ("Portside") and Equity Residential Management, LLC ("ERM", and collectively with Portside, "Plaintiffs").

"MOL"). Defendants[2] oppose the Motion. See ECF No. 173 ("Opposition"). Plaintiffs filed a reply in further support of the Motion. See ECF No. 174 ("Reply").[3]

Plaintiffs seek summary judgment on their claim in lieu of prerogative writ challenging the Jersey City Rent Leveling Board's determination that the Portside Towers Apartments did not qualify for a rent-control exemption under state law and are subject to Jersey City's rent-control ordinance. The principal issue is whether N.J.S.A. § 2A:42-84.4 makes the timely filing of a notice statement a condition precedent to obtain the state law rent-control exemption. For the reasons set forth below, the Court concludes that this provision imposes a mandatory notice obligation but does not establish a substantive precondition to qualify for the exemption. The Court further finds the Portside Towers Apartments satisfied the required criteria to obtain a rent-control exemption. Accordingly, Plaintiffs' Motion is **GRANTED**.

## I. FACTUAL BACKGROUND[4]

### A. Establishment of the Rent-Control Exemption

In 1987, the New Jersey Legislature enacted the Newly Constructed Multiple Dwellings Law (the "Exemption Statute"). See N.J.S.A. § 2A:42-84.1 et seq.; PSUMF ¶ 1. The Exemption

---

[2] Defendants are the City of Jersey City, the City of Jersey City Rent Leveling Board, and the City of Jersey City Bureau of Rent Leveling. Intervenor-Defendants are Portside Towers East Tenant Association, Portside Towers West Tenant Association, Kevin Weller, Jessica Brann, Joel Rothfus, and Michele Hirsch (collectively, the "Tenants"). This Opinion refers to the Defendants and Tenants collectively as "Defendants."

[3] Defendants seek leave to file a sur-reply in opposition to the Motion. See ECF No. 175 ("Sur-Reply Motion"); ECF No. 175.2 ("Sur-Reply"). Plaintiffs "take[] no position" on the Sur-Reply Motion, and if the Court grants leave to file the Sur-Reply, ask that the Court consider their response. See ECF No. 176 ("Sur-Reply Response"). The Court grants the Sur-Reply Motion and considers both the Sur-Reply and Sur-Reply Response in its resolution of the Motion.

[4] The Court draws the following facts from the Parties' statements of undisputed material facts. See ECF No. 171.2 ("PSUMF"); ECF No. 173.11 ("DSUMF"). Where facts in a party's statement are supported by evidence in the record and denied by an opposing party without citation or conflicting evidence, the Court has deemed those facts undisputed. See Fed. R. Civ. P. 56(e)(2); L. Civ. R. 56.1(a); see Carita v. Mon Cheri Bridals, LLC, No. 10-2517, 2012 WL 2401985, at *3 (D.N.J. June 25, 2012). Uncontested facts based on hearsay have been considered where the Court has determined that the statements are "capable of being admissible at trial." Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993).

Statute exempts new residential apartment buildings (defined as buildings with at least four rental units) built after June 25, 1987 from municipal rent control for thirty years. See N.J.S.A. § 2A:42-84.2; PSUMF ¶ 2.[5] The exemption was initially intended to only apply to apartment buildings built in the five-year period following the Exemption Statute's adoption, but subsequent amendments made the exemption permanent. See N.J.S.A. § 2A:42-84.5(b). It was adopted "to increase the supply of newly constructed rental housing to meet the need for such housing in New Jersey." Id.; PSUMF ¶ 3.

The Exemption Statute establishes two notice requirements associated with the exemption. First, the owner of an apartment building subject to a rent-control exemption is required to file a written statement of its claim of exemption with the municipal construction official at least thirty days before the issuance of a certificate of occupancy for the building. See N.J.S.A. § 2A:42-84.4; PSUMF ¶ 8. Second, the owner must provide any prospective tenant with written notice of the exemption. See N.J.S.A. § 2A:42-84.3; PSUMF ¶ 7.

In 1986, Jersey City (the "City") adopted a rent-control ordinance capping any rent increase at the lesser of four-percent or the percentage change in the consumer price index over a set period of time. See Jersey City, N.J., Code § 260-3(A) ("Rent-Control Ordinance"); PSUMF ¶¶ 9–10. In 1989, following the adoption of the Exemption Statute, the Rent-Control Ordinance was amended to account for the newly established rent-control exemption. See Jersey City, N.J. Ordinance C-944 (Apr. 27, 1989). Relevant here, the amended Rent-Control Ordinance states that the Exemption Statute's exemption "applies only where an owner complied with all requirements

---

[5] More specifically, the Exemption Statute defines the exemption period as the lesser of either "the period of amortization of any initial mortgage loan obtained for the multiple dwelling, or for 30 years." N.J.S.A. § 2A:42-84.2(a). The record contains no evidence of an initial mortgage loan; therefore, here, the thirty-year exemption period represents the applicable time frame.

contained in N.J.S.A. [§] 2A:42-84.1 et seq., including the filing with the municipal construction official required by N.J.S.A. [§] 2A:42-84.4 and the service of a written statement upon the tenant required by N.J.S.A. [§] 2A:42-84.3." See Jersey City, N.J., Code § 260-6(C); PSUMF ¶¶ 11–12.

**B. The Portside Towers Claim the Rent-Control Exemption**

This dispute centers on the Portside Towers Apartments, a residential apartment complex along Jersey City's waterfront consisting of two high-rise apartment buildings located on 100 Warren Street ("Tower 1") and 155 Washington Street ("Tower 2," and collectively with Tower 1, the "Portside Towers" or "Towers"). See PSUMF ¶¶ 13–14. The Towers are physically connected and operate as a single apartment community. See id. ¶ 14. Each Tower offers more than four units for rent. See id. ¶ 15.

Development on the Portside Towers began in the 1980s. See id. ¶¶ 18–19. The original owner and developer, DeMatteis/Waterview Associates ("DWA"), intended to develop a condominium project. See id. ¶¶ 16–17. It obtained approval to construct two towers containing 525 residential units on the same tax lot, Block 60, Lot 34. Id. ¶ 18. It planned to proceed with construction in two phases, beginning first with Tower 1 and then transitioning upon its completion to Tower 2. See id. ¶¶ 19–21.

In 1989, DWA obtained the requisite construction permit to begin work. See ECF No. 171.4, PSUMF, Ex. 2 (noting certificate of occupancy was issued pursuant to construction permit number 89-0504). In July 1992, construction was completed on Tower 1. See PSUMF ¶ 21. The following month, on August 25, 1992, a certificate of occupancy was issued for Tower 1. See id. ¶¶ 22–23. However, due to unfavorable economic conditions, Tower 1 remained vacant for the next several years. See id. ¶¶ 24–25, 28; ECF No. 171.6, PSUMF, Ex. 4-A at 3. DWA ultimately defaulted on its mortgage with its lender and the property was foreclosed upon. See PSUMF, Ex. 4-A at 3; PSUMF ¶ 25.

At a sheriff's sale held on November 23, 1994, Portside's predecessor, Portside Apartment Urban Renewal Company ("Portside's Predecessor"), purchased the property. See PSUMF ¶ 25. Portside's Predecessor planned to abandon the prior condominium plan and convert the two high-rise buildings into rental properties. See id. ¶ 26. Therefore, on the same day it purchased the property, Portside's Predecessor sent a letter to Jersey City Construction Code Official ("CCO") Michael Regan. The letter stated:

> [Portside's Predecessor] is the owner of [Tower 1], which is a newly constructed multiple dwelling containing 229 rental dwelling units. We are hereby claiming exemption from rent controls under Article XX (Multiple Dwelling Rent Controls) of the Jersey City Code and any form of future rent control pursuant to N.J.S.A 2A:42-84.1 et seq. The period for which exemption is claimed for the 229 units in this building shall commence on the anticipated date of initial occupancy, January 1, 1995.
>
> This written statement is being made pursuant to the requirements of N.J.S.A. 2A:42-84.4. Please feel free to call with any questions.

Id. ¶ 27. On December 6, 1994, CCO Regan responded that he had received the letter but advised that his office had "no jurisdiction over rent controls" and recommended that Portside's Predecessor contact the "proper agency charged with that responsibility." Id. ¶ 29. Nearly two months later, on January 24, 1995, CCO Regan's office issued a certificate of continued occupancy for Tower 1. See id. ¶ 30; DSUMF ¶ 1. Thereafter, Portside's Predecessor began renting units to tenants in Tower 1. See PSUMF ¶ 39.

In July 1996, construction commenced on Tower 2. See PSUMF, Ex. 4-A at 26–27; ECF No. 171.7, PSUMF, Ex. 4-B at 3. Following the completion of construction, on December 31, 1997, a certificate of occupancy was issued for Tower 2. See id. ¶¶ 36–37. Portside's Predecessor then began renting units to tenants in Tower 2. See id. ¶ 39. Several months after construction on Tower 2 was completed, in March 1998, Plaintiffs entered an agreement with Portside's

Predecessor to purchase the Portside Towers. See id. ¶ 38; see also ECF No. 171.31, Decl. of Paul Habibi, Ex. A at 10 n.14. The transaction closed in June 1998. See PSUMF ¶ 38.

From each Tower's initial occupancy until 2023, the Portside Towers operated as exempt from rent control. See id. ¶ 39. In each Tenant's lease agreement, Plaintiffs provided an addendum that stated the Portside Towers were not subject to rent control. See id. ¶ 40. Plaintiffs charged market rate for all units in the Portside Towers. See id. ¶ 44. Pursuant to a payment in lieu of taxes ("PILOT") program, they paid fees to the City "based on the revenues that the Portside Towers generated by charging market rents." Id. ¶ 44. In other words, the City received more income from the Portside Towers because of the exemption. In connection with the PILOT program, Plaintiffs also submitted financial statements and rent rolls to the City indicating that they were charging market rates for rent. See id. [6]

### C. Dispute Arises Over the Portside Towers' Rent-Control Exemption

In July 2022, tenants residing at the Portside Towers began sending illegal rent petitions to Jersey City's Bureau of Rent Leveling (the "Bureau"). See PSUMF ¶ 47. They argued that the Portside Towers did not qualify for a rent-control exemption under the Rent-Control Ordinance or, alternatively, that the property's owners had failed to properly avail themselves of the exemption. See id. ¶¶ 48–50. The Bureau disagreed and found that the Portside Towers were

[6] Defendants dispute that the Portside Towers have operated as exempt from rent control since the late 1990s. They argue that two deeds and two mortgages that were executed for the property in 1996 and 1998 designate it as a "Condominium" subject to management by a Condominium Owner's Association. See DSUMF ¶¶ 3–4, 6–8. However, the 1996 Master Deed broadly defines "Condominium" as a term that encompassed both the Portside Towers and a commercial retail unit intended to be built on the property. See ECF No. 173.12, DSUMF, Ex. A at 5. It more specifically defines the Portside Towers as "residential apartments" that will be "leased to Tenants" and that include units "for rent to tenants." See id. at 11 (§ 3.1), 13–14 (§§ 4.1(b), 4.2(b)). The two 1996 mortgage agreements and 1998 deed each then incorporate the terms of the 1996 Master Deed by reference. See ECF No. 173.13, DSUMF, Ex. B at 24; ECF No. 173.14, DSUMF, Ex. C at 59; ECF No. 173.15, DSUMF, Ex. D at 7. Thus, these agreements make clear that the Portside Towers were understood as residential apartment buildings since the mid-1990s. And it is undisputed that they functioned as rental properties that were not subject to rent control from this point until 2023. See PSUMF ¶¶ 39–40, 44.

exempt from rent control. See ECF No. 171.15, PSUMF, Ex. 12 ("Tower 1 Decision"); ECF No. 171.16, PSUMF, Ex. 13 ("Tower 2 Decision").

Relevant here, the Bureau first construed the Rent-Control Ordinance to require compliance with the requirements established in Sections 2A:42-84.3 and 2A:42-84.4 in order for a property to qualify for the exemption. See Tower 1 Decision at 3–4; Tower 2 Decision at 3–4. It then proceeded to evaluate compliance with each requirement. It first found that it was "undisputed" that the rent-control addendum provided to all tenants in their lease agreements satisfied Section 2A:42-84.3 for both Towers. Tower 1 Decision at 4; Tower 2 Decision at 4.

It then evaluated compliance with Section 2A:42-84.4. Regarding Tower 1, the Bureau determined that the November 23, 1994 letter provided by Portside's Predecessor to CCO Regan claiming the rent-control exemption satisfied this provision because the statement was provided "more than 30 days before initial occupancy" and included all enumerated statutory criteria. Tower 1 Decision at 4–5. Regarding Tower 2, it determined that although there was no evidence that a statement claiming the exemption was sent to CCO Regan, certain circumstances made it likely that a statement claiming the exemption was sent. See Tower 2 Decision at 5. In any event, it determined that because: (1) the Portside Towers have functioned as a single, uniform lot and a statement of exemption was sent regarding Tower 1; and (2) other forms have been submitted to the City during the relevant time period indicating that Tower 2 was exempt from rent control, the City was on adequate notice that Tower 2 was not subject to rent control and the purpose behind Section 2A:42-84.4 had therefore been satisfied. See id. at 5–6.

After determining that the Portside Towers were exempt from rent control, the Bureau defined the applicable exemption period for each Tower. It concluded the exemption for Tower 1 began with the issuance of the certificate of occupancy on August 25, 1992 and terminated on

August 24, 2022. See Tower 1 Decision at 5. It determined that the exemption for Tower 2 began with the issuance of the certificate of occupancy on December 31, 1997 and will run until December 30, 2027. See Tower 2 Decision at 6.

The tenants appealed the Bureau's decision to Jersey City's Rent Leveling Board (the "Board"). See PSUMF ¶ 63. On November 3, 2023, the Board issued its written decision reversing the Bureau and finding that the Portside Towers were subject to the Rent-Control Ordinance. See id. ¶ 72; ECF No. 171.3, PSUMF, Ex. 1 ("Board Decision").

The Board's analysis focused on whether Section 2A:42-84.4's notice requirement constituted a statutory prerequisite to obtain the rent-control exemption. Board Decision at 7. It determined that this "requirement is a mandatory condition precedent to receipt of this rent-control exemption requiring strict compliance with its terms." Id. at 9. It then found that Portside's Predecessor had failed to comply with this requirement for either Tower.

The Board first explained that the November 23, 1994 letter sent in relation to Tower 1 was insufficient because it was not sent thirty days before "the certificate of occupancy for the 'new construction' at [Tower 1]" was issued in August 1992. Id. at 8. It then determined that the November 23, 1994 letter (or any other "speculation and conjecture") could not serve as a substitute for the lack of any notice statement provided in relation to Tower 2. Id. at 8–9. Accordingly, the Board concluded that both Towers "have been for the duration of their occupancies subject to rent control." Id. Any conclusion to the contrary, per the Board, "would render the notice provision[] voluntary or mere surplusage." Id. at 10.[7]

[7] Based on this conclusion, the Board declined "to rule on the sufficiency of the notices to tenants and allegedly misfiled or inaccurate rent registration statements filed with the Bureau." Id. at 9.

The Board then determined the tenants were owed rental refunds. See id. Per Board policy, it applied a "'lookback window of six years" and instructed the Bureau to recalculate rents dating back to the date the first illegal rent petitions were filed by tenants in each Tower (i.e., dating back to June 25, 2016 for Tower 1 and July 27, 2016 for Tower 2). Id. In August 2024, the Bureau issued its rent recalculations. See PSUMF ¶ 80.

## II. PROCEDURAL HISTORY

Following the Board's decision, on November 10, 2023, Plaintiffs initiated this action. See ECF No. 1. Shortly thereafter, in December 2023, a subset of the Tenants initiated a proceeding in state court challenging the Board's decision to limit the lookback period six years via a claim in lieu of prerogative writ. See Portside Towers W. Tenant Ass'n v. Jersey City Rent Leveling Bd., No. HUD-L-4447-23 (N.J. Super. Ct.). In July 2024, this Court permitted the Tenants to intervene in this action. See ECF Nos. 29, 54. The Tenants subsequently dismissed their state law action and brought their claim in lieu of prerogative writ against the Board—as well as additional claims against the City, Bureau, Board, and Plaintiffs—as crossclaims and counterclaims here. See ECF No. 72.

On September 3, 2024, Plaintiffs filed the operative Amended Complaint. See ECF No. 65 ("AC"). Defendants filed Answers to the Amended Complaint. See ECF Nos. 72, 84. The Complaint asserts seven claims, including claims for violations of the Takings, Due Process, and Contracts Clauses of the federal and New Jersey Constitutions and for violations of several state statutes. See generally AC. Relevant here, it brings a claim in lieu of prerogative writ challenging the Board's decision that the Portside Towers were subject to the Rent-Control Ordinance as arbitrary, capricious, and wrong as a matter of law. See id. ¶¶ 164–68.

The Parties began discovery in August 2024, which they agreed to limit in scope to their competing prerogative writ claims. See ECF No. 56. Discovery closed one year later, and the instant Motion followed. See ECF No. 171.

## III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), the Court will grant a motion for summary judgment if the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Scanlan v. Am. Airlines Grp., 102 F.4th 164, 170 (3d Cir. 2024). A factual dispute is "genuine" when the "'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 618 (3d Cir. 2020) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if 'it might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson, 477 U.S. at 248). At the summary judgment stage, the Court's role is not to weigh the evidence or determine the ultimate truth of the allegations, but to instead determine whether there is a genuine fact issue for trial. See Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019). It construes all facts and draws all inferences in the light most favorable to the non-moving party. See Scanlan, 102 F.4th at 170.

Plaintiffs seek summary judgment on their claim in lieu of prerogative writ. This claim is a creature of state law and provides a vehicle for parties to seek review of actions taken by municipal agencies. See OM 309-311 6th Street, LLC v. City of Union City, No. 21-12051, 2022 WL 855769, at *16 (D.N.J. Mar. 23, 2022). "Although such actions are usually brought in New Jersey Superior Court," federal courts may hear such claims pursuant to supplemental jurisdiction under 28 U.S.C. § 1367. See id.; see also Nat'l Amusements, Inc. v. Borough of Palmyra, 843 F.

Supp. 2d 538, 546–47 (D.N.J. 2012), aff'd, 716 F.3d 57 (3d Cir. 2013).[8] Pursuant to this claim, a court may "set aside a municipal board decision if it is shown to be arbitrary, capricious or unreasonable, not supported in the evidence, or otherwise contrary to law." Rivkin v. Dover Twp. Rent Leveling Bd., 671 A.2d 567, 581 (N.J. 1996). The Board's factual determinations are entitled to deference if supported by substantial evidence and may only be overturned if arbitrary, capricious, or unreasonable. See Willoughby v. Planning Bd. of Twp. of Deptford, 703 A.2d 668, 671 (N.J. Super. Ct. App. Div. 1997). The Board's "legal determinations are not entitled to a presumption of validity and are subject to de novo review." Wilson v. Brick Twp. Zoning Bd. of Adjustment, 963 A.2d 1208, 1213 (N.J. Super. Ct. App. Div. 2009).

Resolving Plaintiffs' claim in lieu of prerogative writ requires analyzing a state law, the Exemption Statute. To promote principles of federalism, federal courts are "significant[ly] constrain[ed]" in how they may interpret issues of state law. Crystallex Int'l Corp. v. Petróleos De Venez., S.A., 879 F.3d 79, 84 (3d Cir. 2018) (quotation marks omitted). They are "bound to follow state law as announced by the highest state court." Id. (quotation marks omitted). If the highest state court has not ruled on the issue, then they must "predict[] how that court would resolve the issue." Id. (quotation marks omitted). As part of that assessment, "due deference" is owed "to the intermediate state courts' rulings." Id. (quotation marks omitted). However, if the court finds an intermediate appellate court's opinion "is unsupported, [it] should not reflexively follow it." Gov't Emps. Ins. Co. v. Mt. Prospect Chiropractic Ctr., P.A., 98 F.4th 463, 467 n.2 (3d Cir. 2024); see also In re Makowka, 754 F.3d 143, 148–52 (3d Cir. 2014) (declining to follow precedential state appellate decision because federal courts are "not, in fact, bound by [such] a

[8] The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Amended Complaint raises questions of federal constitutional law. See AC ¶¶ 97–148 (raising claims under the Takings, Due Process, and Contracts Clauses of the federal Constitution).

decision[,]" and "the decision's sparse reasoning and internal inconsistency" would not persuade the state's highest court).

## IV. DISCUSSION

This Motion presents two key issues. First, does N.J.S.A. § 2A:42-84.4 ("Section 84.4") constitute a condition precedent that must be fulfilled in order to qualify for the rent-control exemption? Second, if the answer to question one is yes, did the Portside Towers comply with this requirement? If the answer to question one is no, do the Portside Towers nonetheless qualify for the rent-control exemption? The Court analyzes each question in turn.

### A. Section 84.4's Notice Requirement is Not a Condition Precedent to Obtain the Rent-Control Exemption.

Plaintiffs first contend that even if the Portside Towers did not comply with any notice requirement, the Board was preempted from removing Portside's exemption under the Exemption Statute. See MOL at 16–20. Separately, they argue that the Board's decision erroneously concluded that Section 84.4 was a mandatory condition precedent to obtain the exemption and that notice had to be sent prior to the August 1992 certificate of occupancy's issuance. See id. at 20–26. Defendants counter that Plaintiffs have positioned the issues in reverse. Plaintiffs' preemption argument, Defendants contend, hinges on whether an exemption has been "afforded" in the first place. See Opp. at 21. Thus, if Section 84.4 is a condition precedent to obtaining the exemption that has not been fulfilled—as Defendants argue—the Board was not preempted from acting, and instead correctly recognized, that the Portside Towers were never entitled to rent-control exemptions. See id. at 13–26. The Court agrees with Defendants that Plaintiffs' position rests on the threshold issue of whether Section 84.4 is a condition precedent to obtain the rent-control exemption. But it agrees with Plaintiffs that that Section 84.4 is not a condition precedent. The Board erred as a matter of law finding otherwise.

Like federal courts, New Jersey courts adhere to "familiar canons of statutory interpretation." Linden Democratic Comm. v. City of Linden, 277 A.3d 1047, 1053 (N.J. 2022). They approach statutory interpretation by beginning with a law's plain language, which is analyzed according to its "ordinary meaning" and "in the context of related provisions so as to give sense to the legislation as a whole." DeSimone v. Springpoint Senior Living, Inc., 306 A.3d 1276, 1282 (N.J. 2024) (quotation marks omitted). The goal is to interpret this language in a way that "determine[s] and effectuate[s] the Legislature's intent." Id. (quotation marks omitted). "[G]enerally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 874 A.2d 1039, 1048 (N.J. 2005). However, if the language is unclear or ambiguous, courts will consult "extrinsic evidence, including legislative history, committee reports, and contemporaneous construction." DeSimone, 306 A.3d at 1282 (quotation marks omitted).

Here, Section 2A:42-84.2 ("Section 84.2") of the Exemption Statute sets forth the criteria to obtain a rent-control exemption. It uses unconditional, operative language that states the exemption attaches by force of law once its terms are met. The provision reads, in relevant part:

> In any municipality which has enacted or which hereafter enacts a rent control or rent leveling ordinance . . . those provisions of the ordinance which limit the periodic or regular increase in base rentals of dwelling units shall not apply to multiple dwellings constructed after the effective date of this act, for a period of time not to exceed . . . 30 years following completion of construction[.]

N.J.S.A. § 2A:42-84.2(a). Per these terms, a rent-control exemption attaches and begins to run for thirty years if: (1) the building is a "multiple dwelling"; (2) the building was "constructed after the effective date of th[e] act"; and (3) the building has reached the "completion of construction."

Although courts typically interpret a statute's language according to its plain meaning, "[w]hen a statute includes an explicit definition, [courts] must follow that definition, even if it varies from a term's ordinary meaning." Digital Realty Trust, Inc. v. Somers, 583 U.S. 149, 160 (2018) (quotation marks omitted); see also U.S. Bank Nat' Ass'n v. Guillaume, 38 A.3d 570, 583

(N.J. 2012). Here, the Exemption Statute defines each of the relevant terms. "Constructed after effective date of th[e] act" means "constructed pursuant to a construction permit issued on or after" June 25, 1987. N.J.S.A. § 2A:42-84.1(c); Block 268, LLC v. City of Hoboken Rent Leveling & Stabilization Bd., 952 A.2d 473, 476 (N.J. Super. Ct. App. Div. 2008). "Constructed" means any building that is "constructed, erected, or converted." N.J.S.A. § 2A:42-84.1(b). "Multiple dwelling" means "any building or structure . . . containing four or more dwelling units . . . rented or offered for rent." Id. § 2A:42-84.1(e). "Completion of construction" means the "issuance of a certificate of occupancy pursuant to section 15 of the 'State Uniform Construction Code Act [("SUCCA")],' P.L. 1975 c. 217 (C. 52:27D-133)." Id. § 2A:42-84.1(a). And a certificate of occupancy is issued pursuant to Section 15 of SUCCA "when all of the work covered by a construction permit shall have been completed" and after the municipality certifies that the building was "constructed in accordance with the provisions of the construction permit, the code, and other applicable laws and ordinances." Id. § 52:27D-133.

In other words, after June 25, 1987, any building that: (1) is constructed as, erected as, or converted into a rental property that offers four or more units; and (2) has obtained a Section 15 certificate of occupancy, is entitled to a 30-year rent-control exemption that begins on the date the Section 15 certificate of occupancy is issued. Per the terms of Section 84.2, no other provision in the Exemption Statute—including Section 84.4—is necessary to create an effective exemption period.

Section 84.4 does impose a mandatory notice requirement on building owners. It reads, in relevant part:

> The owner of any multiple dwelling claiming an exemption from a rent control or rent leveling ordinance pursuant to this act shall file with the municipal construction official, at least 30 days prior to the issuance of a certificate of occupancy for the newly constructed multiple dwelling, a written statement of the owner's claim of

> exemption from an ordinance under this act, including therein a statement of the date upon which the exemption period so claimed shall commence, such information as may be necessary to effectively locate and identify the multiple dwelling for which the exemption is claimed, and a statement of the number of rental dwelling units in the multiple dwelling for which the exemption is claimed.

N.J.S.A. § 2A:42-84.4. The provision's use of "shall" creates an obligation by which owners must abide. See, e.g., O'Shea v. Twp. of West Milford, 982 A.2d 459, 466 (N.J. Super. Ct. App. Div. 2009) ("The word 'shall' is generally considered to connote mandatoriness."). But the dispositive question is not whether this provision is mandatory; it is whether non-compliance with it defeats an exemption obtained by complying with Section 84.2. The text of Section 84.4 indicates that the answer to that question is no. The provision does not state that the exemption enumerated in Section 84.2 will not attach to a building that fails to provide the required notice statement. It does not state that a failure to file this statement bars the construction official from issuing a certificate of occupancy, which is the triggering event that begins the thirty-year exemption period in Section 84.2. And it does not state that a failure to comply with its terms results in any consequence (including rendering the property ineligible for the exemption, delaying the exemption, or allowing a municipality to retroactively revoke an otherwise valid exemption). By its plain terms, Section 84.4 does not create a condition precedent to obtain this exemption.

This reading is confirmed by statutory history. "Statutory history is an important part of [the] context" in which courts interpret a statute's text. United States v. Hansen, 599 U.S. 762, 775–78 (2023) (analyzing a statutory provision's amendment history to ascertain its meaning); see also TAC Assocs. v. N.J. Dep't of Env't Prot., 998 A.2d 450, 455 (N.J. 2010) (explaining that "amendments carry great weight in determining the intention of the original statute" (quotation marks omitted)). Relevant here, the Exemption Statute was amended in 1999. Around this time, to finance new construction, builders began using Real Estate Investment Trusts ("REITs") instead of initial mortgage loans, and there was "confusion as to whether" multiple dwellings financed

through REITs "were intended to be eligible for the exemption." See Statement, N.J. L. 1999, c. 291 (Dec. 23, 1999). The amendment was intended to "clarify the original intent of the Legislature to provide an exemption . . . for all new rental multiple dwelling unit construction, regardless of whether or not there was an initial mortgage loan to finance the construction." Id. It therefore adopted Section 84.2(b), which states that in the event that there is no initial mortgage financing, the period of exemption shall be thirty years after the completion of construction. See N.J.S.A. § 2A:42-84.2(b).

Notably, though, Section 3 of the amendment specified that the exemption would only apply retroactively to apartment buildings financed by REITs "provided that the owner of the multiple dwelling[] has fully complied with the requirements of section [84.4]." N.J. L. 1999, c. 291, § 3. If Section 84.4 had already established a condition precedent to obtain any rent-control exemption, then explicitly conditioning the retroactive application of this amendment upon compliance with this provision would be unnecessary surplusage. See Linden, 277 A.3d at 1053 (explaining courts "must read related statutory provisions in context—giving each part meaning and rendering no part superfluous"). Instead, the Legislature's decision to explicitly condition the amendment's retroactive applicability upon compliance with Section 84.4 reveals the Legislature did not already view that provision as establishing a condition precedent to obtain the exemption. Accord In re S.O., 341 A.3d 1229, 1241 (N.J. Super. Ct. App. Div. 2025) (explaining that New Jersey courts "view the Legislature's choice of words and phrases as deliberate").[9]

[9] Defendants argue that the 1999 amendment states that it is a "clarif[ication]" of "current law" and confirms that compliance with Section 84.4 was a condition precedent in the original Exemption Statute. Opp. at 16–17. But Defendants selectively quote from the legislative history and fail to account for the amendment's full text. First, the legislative history confirms that the amendment was "intended to clarify" that the exemption was to apply to all apartment buildings "regardless of whether or not there was an initial mortgage loan to finance construction." It does not describe the "intent" of the amendment as being related to Section 84.4. Moreover, the amendment states that it will apply retroactively to all buildings "completed prior to the effective date of this act." If "this act" was a reference

This reading is also confirmed by comparing Section 84.4 with other New Jersey statutory provisions establishing conditions precedent. To aid in interpretation, courts also analyze statutes based on "[t]he record of statutory usage," or how similar terms and provisions are drafted across the statutory code. Peter v. Nantkwest, Inc., 589 U.S. 23, 31–32 (2019). Here, that analysis indicates that when the Legislature intends for a notice requirement to serve as a condition precedent, it explicitly says so. For example, pursuant to New Jersey's Unsatisfied Claim and Judgment Fund Law ("UCJFL"), a claimant seeking to apply for payment from a fund established to compensate hit-and-run victims must "as a condition precedent to the right thereafter to apply for payment from the fund, give notice to the association" managing the fund "of his intention to make a claim." See N.J.S.A. § 39:6-65. Failure to do so bars the claimant from bringing a claim in court and obtaining a judgment against the association. See id. § 39:6-78(a). Unsurprisingly, New Jersey courts have recognized this as a valid condition precedent to obtain the right created by the UCJFL. See O'Connell v. N.J. Mfrs. Ins. Co., 703 A.2d 360, 363–64 (N.J. Super. Ct. App. Div. 1997) (explaining a claimant is not entitled to pursue uninsured motorist claims unless he "prove[s] he . . . satisfied the statutory prerequisites" enumerated in Section 39:6-78, which includes the notice requirement established in Section 39:6-65).

By contrast, certain provisions of New Jersey's tax code create an exemption from property taxes for properties used for specified purposes and require owners of the exempt properties to file a triennial statement affirming that there have been no changes in the property's use that would defeat the exemption. See N.J.S.A. §§ 54:4-3.6 (delineating tax exemption), 54:4-4.4 (establishing

---

to the original Exemption Statute and its "effective date," then the amendment would be making buildings built before June 25, 1987 eligible for exemptions from rent control. That would collide with Section 84.2's terms. Thus, the reference to "this act" in Section 3 of the amendment must be a reference to the 1999 amendment, not the Exemption Statute, and makes Section 84.4 a specific condition precedent for buildings financed with REITs and built between 1987 and 1999 to retroactively claim the rent-control exemption. It does nothing more.

triennial notice requirement). Nothing in the triennial notice requirement, however, conditions the maintenance of the exemption on compliance with its terms. Thus, New Jersey courts have rejected arguments that the requirement represents a condition precedent to obtain the tax exemption right created by the act. See W. Orange Twp. v. Joseph Kushner Hebrew Acad., 13 N.J. Tax 48, 54 (Tax Ct. 1993) (holding that the argument that a failure to comply with the triennial notice requirement barred a claim to an exemption was "without merit" because it "is not a condition precedent to [obtain the] exemption").

Here, the Exemption Statute falls in this latter category, as Section 84.4 is devoid of language stating its requirement is a condition precedent to obtain the rent-control exemption. In fact, the 1999 amendment shows the Legislature knew how to use conditional language to make this provision a condition precedent to obtain the exemption when it intended to do so. See N.J. L. 1999, c.291, § 3 (stating REIT-financed buildings were entitled to a retroactive application of the exemption "provided that" the owner had provided the statement contemplated in Section 84.4).[10]

Importantly, this interpretation does not make Section 84.4 a dead letter or superfluous.[11] Municipalities may still seek to penalize non-compliance with Section 84.4 through monetary

---

[10] Defendants contend that Section 84.4 uses language indicating it is a condition precedent because it requires the notice statement to be filed by any owner "claiming an exemption." Opp. at 15–16. But this phrase is not a subordinating conjunction or infinitive phrase, which are the ordinary linguistic tools used to establish a condition precedent (such as "provided that," "unless," "as long as," "in order to," etc.). As used in Section 84.4, the phrase is an adjective describing the type of owner that must file a notice statement. And it describes the state of the owner as "claiming the exemption" because the provision requires the notice statement to be filed thirty days before a certificate of occupancy is issued (which triggers the beginning of the exemption period). In other words, it is an adjective describing the state of the owner before the exemption has been obtained.

[11] Section 84.4 still has a purpose. By mandating that owners file notices claiming an exemption, the provision uses an administrative filing requirement to create a central record for the municipality identifying all buildings exempt from their rent-control ordinances. Indeed, the legislative history confirms Section 84.4 was intended to serve this record-keeping function. See Statement, N.J. Assembly Bill. No. 3238 (Oct. 2, 1986) (explaining Section 84.4's

penalties imposed pursuant to N.J.S.A. § 40:49-5. Municipalities that are intent on ensuring compliance with Section 84.4 may also do so by tying their issuance of any required certificate of occupancy with the receipt of timely notice from any building intending to claim an exemption from their rent-control ordinances. By refusing to issue a certificate of occupancy, the building cannot be used by the owner for its intended purpose. See N.J.S.A. § 52:27D-133 ("No building or structure hereafter constructed shall be used or occupied in whole or in part until a certificate of occupancy shall have been issued by the enforcing agency.").

Municipalities cannot, however, penalize failure to comply with Section 84.4 by stripping an otherwise valid rent-control exemption. That is because once an exemption period is triggered pursuant to the terms of Section 84.2, the protections established by Sections 2A:42-84.5 ("Section 84.5") and 2A:42-84.6 ("Section 84.6") kick in. Section 84.6 emphasizes that it is the "public policy" of the State that "exemptions granted under th[e] [Exemption Statute] shall not be limited, diminished, altered[,] or impaired during the period of exemption afforded." Id. § 2A:42-84.6. And to the extent this was not clear, Section 84.5 explicitly states that "[n]o municipality, county, or other political subdivision of the State, or agency or instrumentality thereof, shall adopt any ordinance, resolution, or rule or regulation, or take any other action, to limit, diminish, alter[,] or impair any exemption afforded" under the Exemption Statute. Id. § 2A:42-84.5(a). In reliance on

---

statement was intended to provide "notice" to the municipality of "the information necessary to identify the building and establish the date upon which the exemptions begins" (emphasis added)); see also Lucca v. Wells Fargo Bank, N.A., 117 A.3d 1267, 1271 (N.J. Super. Ct. App. Div. 2015) (explaining that New Jersey Courts view "[a] legislative committee's statement of the purpose of a proposed bill, including the nature and effect of the measure," as "a highly persuasive indication of legislative intent"). Jersey City's response to the notice statement in this case supports this understanding. CCO Regan acknowledged receipt of the notice but responded that his office had "no jurisdiction over rent controls" and directed Portside's Predecessor elsewhere. See PSUMF ¶ 29. He did not purport to evaluate, approve, deny, or otherwise adjudicate the claimed exemption. That response is consistent with Section 84.4's operation as a ministerial filing provision that gives the municipality notice of a claimed exemption, rather than a substantive prerequisite to the exemption itself.

these provisions, New Jersey courts have consistently held that municipalities are preempted from revoking an otherwise valid rent-control exemption. See Block 268, 952 A.2d at 478; see also ECF No. 171.21, Decl. of Derek D. Reed ("Reed Decl."), Ex. A, Order Granting Summary Judgment, Avalon Hoboken, LLC v. City of Hoboken, et al., No. HUD-L-348-24 (N.J. Super. Ct. Aug. 7, 2025); Reed Decl., Ex. B, Order Granting Summary Judgment, LPF 1200 Clinton Equity LLC v. Rent Leveling & Stabilization Bd. of the City of Hoboken, No. HUD-L-261-25 (N.J. Super. Ct. Sept. 11, 2025); Reed Decl., Ex. C, Hr'g Tr., LPF 1200, No. HUD-L-261-25, at 49:18–54:16 (N.J. Super. Ct. Aug. 15, 2025).[12]

Simply put, there is nothing in the plain language of Sections 84.2 or 84.4 establishing the latter as a condition precedent to obtain the exemption enumerated in the former. The Court cannot "write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment or engage in conjecture or surmise which will circumvent the plain meaning of the act. [Its] duty is to construe and apply the statute as enacted." DiProspero, 874 A.2d at 1048 (quotation marks and internal citations omitted). Here, that requires recognizing that Section 84.4's notice requirement is not a condition precedent to obtain a rent-control exemption.[13] The Board decision was therefore "contrary to law." Rivkin, 671 A.2d at 581.

---

[12] The Court is not required to follow Willow Ridge Apartments, LLC v. Union City Rent Stabilization Bd., No. A-3578-20, 2022 WL 2525243, at*6–8 (N.J. Super. Ct. App. Div. July 7, 2022), which is an unpublished, non-binding opinion of an intermediate state appellate court. See N.J. R. 1:36-3. But the Court also finds Willow Ridge unpersuasive. Accord Makowka, 754 F.3d at 148–52. The opinion failed to scrutinize the text of Section 84.2 (the provision that establishes the criteria creating the right to the rent-control exemption) or Section 84.4 (the notice provision lacking any language linking it to Section 84.2 as a condition precedent). It also did not consider the 1999 amendment. And it rested on a surplusage concern that, for the reasons explained above, the Court does not agree exists.

[13] The Rent-Control Ordinance's imposition of Section 84.4 as a mandatory prerequisite to obtain the rent-control exemption therefore conflicts with the Exemption Statute and is preempted. See Jersey City, N.J., Code § 260-6(C); Inst. for Evaluation & Planning, Inc. v. Bd. of Adjustment, 637 A.2d 235, 237 (N.J. Super. Ct. Law Div. 1993) ("When the provisions of a municipal ordinance conflict with State law, the State law controls" (citing Dome Realty, Inc. v. City of Paterson, 416 A.2d 334, 345 (N.J. 1980).).

### B. Applying the Rent-Control Exemption to the Portside Towers[14]

Although the Court concludes that Section 84.4 does not represent a condition precedent to obtain the rent-control exemption, it still must determine whether the Portside Towers: (1) qualify for a rent-control exemption; and (2) if yes, when the exemption period began. It concludes that both Towers qualified for the rent-control exemption.

#### 1. Tower 1 was Exempt from Rent Control from 1995 until 2025.

As previously explained, a rent-control exemption begins to run for thirty years if: (1) a building is a "multiple dwelling"; (2) the building was "constructed after the effective date of th[e] act"; and (3) the building has reached the "completion of construction." See supra at 13; N.J.S.A. § 2A:42-84.2(a). As to Tower 1, the Court finds each of these requirements satisfied.

Tower 1 offers more than four units for rent; it is therefore a "multiple dwelling." See PSUMF ¶ 15; N.J.S.A. § 2A:42-84.1(e). It was constructed pursuant to a construction permit issued in 1989 and was "converted" into a "multiple dwelling" in the mid-1990s—both of which fall after June 25, 1987; therefore, it was "constructed after the effective date of th[e] act." See PSUMF ¶¶ 26–27; PSUMF, Ex. 2; DSUMF, Ex. A; N.J.S.A. § 2A:42-84.1(c). And it reached the "completion of construction" upon the issuance of the certificate of continued occupancy on January 24, 1995, which, as explained infra, constitutes a Section 15 certificate of occupancy for statutory purposes. See PSUMF ¶ 30; DSUMF ¶ 1; N.J.S.A. § 2A:42-84.1(a). Thus, Tower 1 satisfied all the statutory requirements triggering the exemption on January 24, 1995, and the rent-control exemption ran until January 23, 2025. See PSUMF ¶ 30.

---

[14] Because the Court concludes that compliance with Section 84.4 was not a condition precedent to qualify for the rent-control exemption, it does not address whether the November 23, 1994 letter was sufficient to satisfy Section 84.4 or analyze Plaintiffs' other arguments in support of summary judgment. It proceeds to address whether legally the Portside Towers each qualify for the rent-control exemption because the facts necessary to address this issue are undisputed.

Defendants press two arguments against this conclusion. First, they argue that Tower 1 is not entitled to any rent-control exemption because it was originally developed as a condominium project, not a rental property, and therefore falls outside of the scope of the Exemption Statute. Second, they argue that even if Tower 1 qualified for the rent-control exemption, the exemption began to run from the date of the issuance of the initial certificate of occupancy in August 1992. The Court finds neither argument persuasive.

**a. Tower 1 Falls Within the Scope of the Exemption Statute's Definition of "Constructed."**

Defendants argue that the text and purpose of the Exemption Statute reveal that it was not intended to apply to buildings "converted" from condominiums to rental properties and is instead is limited to conversions from a non-residential to a residential use. See Opp. at 26–30. Plaintiffs counter that the Exemption Statute's text and purpose do not support this type of limitation, and instead broadly cover any conversion that increases the supply of rental properties in the State. See Reply at 8–9. The Court agrees with Plaintiffs' reading of the law.

The Court reiterates the key principles of statutory interpretation. The overarching goal is to interpret a statute's language in a way that "determine[s] and effectuate[s] the Legislature's intent." DeSimone, 306 A.2d at 1282 (quotation marks omitted). "[T]he best indicator of that intent is the statutory language." DiProspero, 874 A.2d at 1048. When a statute explicitly defines a term, the Court adheres to that definition. E.g., Digital Realty, 583 U.S. at 160. When the statute uses undefined terms, the Court interprets them based on their "ordinary meaning" and "in the context of related provisions." DeSimone, 306 A.2d at 1282 (quotation marks omitted).

The Parties' disagreement as to whether Tower 1 qualifies for a rent-control exemption centers on the term "converted" used in the Exemption Statute's definition of "[c]onstructed." "Constructed" is defined, in relevant part, to mean any building:

> constructed, erected[,] or converted but excludes rehabilitation of premises rented previously for residential purposes without an intervening use for other purposes for a period of at least two years prior to conversion. Mere vacancy shall not be considered an intervening use.

Id. § 2A:42-84.1(b) (emphasis added). The statute does not define converted; the Court therefore defines it according to its ordinary meaning and in the context of the definition of "[c]onstructed."

Converted is used in "[c]onstructed" as a verb. To convert means "to change from one form or function to another." "Convert (v.)," Merriam-Webster's Dictionary (12th ed. 2025); see also "Conversion," Black's Law Dictionary (12th ed. 2024) ("The act of changing from one form to another"); United States v. Geiser, 527 F.3d 288, 294 (3d Cir. 2008) (explaining courts "refer to standard reference works such as legal and general dictionaries in order to ascertain the ordinary meaning of words"). The shift in Tower 1's residential purpose falls within the scope of this definition. In 1994, following the acquisition by Portside's Predecessor, Tower 1's "form" was changed from a condominium property to a rental property. See PSUMF ¶ 26. Put another way, the function of the units in Tower 1 changed from condominium units for sale to rental units for lease. This conversion occurred after June 25, 1987. See PSUMF ¶¶ 26–27; N.J.S.A. § 2A:42-84.1(c). The conversion also transformed Tower 1 into a building offering at least four units for rent. See PSUMF ¶ 15; DSUMF, Ex. A at 11, 13–14; N.J.S.A. § 2A:42-84.1(e). Therefore, Tower 1 constitutes a "multiple dwelling constructed [i.e., converted] after the effective date of th[e] act." N.J.S.A. § 2A:42-84.2(a).

Defendants argue that the definition of "converted" is narrower. They contend, by pointing to the Exemption Statute's requirement that buildings are only entitled to a rent-control exemption upon reaching the "completion of construction," that "converted" must be read in the context of the law to be limited to changes to any building that require a certificate of occupancy as defined in Section 15 of SUCCA. See Opp. at 21–22. This means the type of conversion contemplated

by the Exemption Statute is limited to situations in which buildings are converted from a non-residential to a residential use. See id. at 22–23. The Court disagrees with Defendants' construction for three reasons.

First, the definition of "[c]onstructed" does not support this narrow reading. It specifically exempts one form of conversion: "rehabilitation of premises rented previously for residential purposes without an intervening use for other purposes for a period of at least two years" (with the qualification that "mere vacancy" does not constitute an intervening use). N.J.S.A. § 2A:42-84.1(b). Under the doctrine of expressio unius est exclusio alterius, when the legislature "provides exceptions in a statute . . . [t]he proper inference . . . is that [the legislature] considered the issue of exceptions and, in the end, limited the statute to the ones set forth." United States v. Johnson, 529 U.S. 53, 58 (2000); see also Cyktor v. Aspen Manor Condo. Ass'n, 820 A.2d 129, 138 (N.J. Super Ct. App. Div. 2003). Here, the New Jersey Legislature specifically enumerated one exception: a rental property cannot "convert" itself back into a rental property after any period of vacancy without some change of use (e.g., to commercial use) for at least two years.[15] That exception does not apply here, as Tower 1 was not "rented previously for residential purposes." N.J.S.A. § 2A:42-84.1(b) (emphasis added). And under principles of statutory interpretation, its explicit inclusion in the definition of "[c]onstructed" supports reading "converted" broadly to capture all other circumstances falling within its plain meaning. Johnson, 529 U.S. at 58.

Second, the purpose of the statute supports interpreting "converted" broadly. The Exemption Statute's own text states its purpose: "to increase the supply of newly constructed

---

[15] The Exemption Statute's purpose was to increase the supply of rental housing in New Jersey. See N.J.S.A. § 2A:42-84.5(b). This exception was intended to ensure that owners of rental properties in existence at the time the Exemption Statute was passed could not flout this purpose by simply closing their doors for a period of time and then re-opening their buildings to claim the rent-control exemption. To obtain the exemption, an owner must be adding to the supply of rental housing. Converting a condominium building into a rental property does exactly that.

rental housing to meet the need for such housing in New Jersey." N.J.S.A. § 2A:42-84.5(b); cf. DiProspero, 874 A.2d at 1048 (noting that the "best indicator of [legislative] intent is the statutory language"). Converting a building either previously intended to be (or functioning as) condominium units for sale into rental units available for lease "increase[s] the supply of new[] . . . rental housing" in the State. Id. The reference to "newly constructed" housing in this provision also does not defeat this reading, because the Exemption Statute itself defines "[c]onstructed" to include "converted" buildings. Id. § 2A:42-84.1(b).

Third, Defendants' interpretation of "converted" is based on their effort to draw a distinction between a "certificate of occupancy" and a "certificate of continued occupancy" that the Court does not find legally supported. Defendants argue that the Exemption Statute's terms establish that the rent-control exemption is triggered by the issuance "of a certificate of occupancy pursuant to Section 15 of" SUCCA. Opp. at 28. The term "conversion," therefore, can only include changes that require a certificate of occupancy issued under Section 15. See id. And, according to Defendants, that is limited to either situations involving "new construction or a genuine change of use." Id. Neither situation applied to Tower 1 because the change from condominiums to rental units did not involve any new construction and the building's use designation remained residential. See id. It therefore only required the issuance of a certificate of continued occupancy, which Defendants contend is distinct from a Section 15 certificate of occupancy, and which reveals Tower 1 is not the type of apartment building the Legislature intended to qualify for the rent-control exemption. See id.

A certificate of continued occupancy, however, is not legally distinct from a Section 15 certificate of occupancy; it falls within the umbrella of a Section 15 certificate of occupancy. SUCCA directs the Commissioner of the Department of Community Affairs to adopt a State

Uniform Construction Code ("Construction Code"). See id. § 52:27D-123(a). SUCCA also grants the Commissioner "all powers necessary and convenient to effectuate" its purposes, including the power to adopt all necessary and appropriate rules and regulations to administer and enforce the statute. N.J.S.A. § 52:27D-124(a). These purposes include ensuring "adequate maintenance of buildings and structures throughout the State to adequately protect the health, safety[,] and welfare of the people" while also eliminating "unnecessary duplication of effort and fees in the review of construction plans and the inspection of construction." Id. § 52:27D-120(e)–(f).

Pursuant to this authority and to balance these competing purposes, the Commissioner adopted regulations in the Construction Code to enforce Section 15's certificate of occupancy requirements. Section 15 requires obtaining certificates of occupancy to use or occupy a building and requires that the building be certified, upon inspection, to have been "constructed in accordance with the provisions of the construction permit, the code, and other applicable laws and ordinances." N.J.S.A. § 52:27D-133. The Construction Code further explicates the contours of this requirement as it applies to different types of construction or use. It states that a certificate of occupancy must be obtained for any newly constructed buildings, any reconstructed buildings, any extended buildings, or any buildings that are subject to a "change of use" (i.e., a change in use designation as enumerated in the Construction Code). See N.J.A.C. § 5:23-2.23(a), (c), (d), (f).[16]

[16] Under the Construction Code, buildings are divided into ten "Occupancy Classifications": Assembly, Business, Educational, Factory and Industrial, High Hazard, Institutional, Mercantile, Residential, Storage, Utility, and Miscellaneous. See N.J. Int'l Bldg. Code § 302.1 (2021 ed.); N.J.A.C. §5:23-3.14(a) (adopting N.J. International Building Code). Each of these Occupancy Classifications are subdivided into different "Use Designation" groups. See N.J. Int'l Bldg. Code § 302.2. For example, the "Mercantile" Occupancy Classification consists of one "Use Designation" group, Group M, whereas the "Residential" Occupancy Classification consists of four Use Designation groups, Groups R-1, R-2, R-3, and R-4. See id. §§ 309, 310. A "change of use" means a change between Use Designation Groups across Occupancy Classifications or within an Occupancy Classification. See N.J.A.C §§ 5:23-1.4, 5:23-2.6, 5:23-6.1(g), 5:23-6.31.

And it states that a certificate of continued occupancy must be obtained for existing buildings that are not subject to any construction, extension, or change of use. See id. § 5:23-2.23(e).

This distinction is designed to ensure buildings remain safe while preventing "unnecessary duplication . . . in the inspection of construction." N.J.S.A. § 52:27D-120(e)–(f). Where construction or extension work is performed, or where a change of use shifts the building into a new use designation subject to different construction requirements, the building is subject to a more extensive inspection ensuring compliance with construction permits, laws, and regulations. See generally N.J.A.C. § 5:23-2.24. But where no construction or extension work is completed and the use designation remains the same—such as following a change of tenancy or ownership, or occupancy following a period of vacancy—a more limited inspection that ensures: (1) no new construction permit was required; (2) construction was previously completed pursuant to a valid construction permit; and (3) the building is not unsafe, unsanitary, and has accessible egress, is all that is necessary. See id. §§ 5:23-2.14; 5:23-2.23(e); 5:23-2.32(a). In other words, certificates of occupancy and certificates of continued occupancy, as defined by the applicable regulations, establish different inspection requirements to obtain the necessary approval to use or occupy a building under Section 15 of SUCCA.

This interpretation is buttressed by how Jersey City operated in this case. Under a 1988 Jersey City ordinance, "[i]f any residential . . . building or structure remains vacant or boarded for more than six months," an owner that wants to reoccupy the building must take certain "corrective measures" to "abate this condition," including "obtaining a certificate of occupancy." Jersey City, N.J., Code § 254-21(B)(1) (emphasis added); Jersey City, N.J., Ordinance C-807 (Sept. 8, 1988). Tower 1 was a residential building that ultimately remained vacant for more than two years. See PSUMF ¶¶ 24–25, 28. Therefore, in order to reoccupy it, Portside's Predecessor was required to

obtain a "certificate of occupancy" under the applicable ordinance. Jersey City, N.J., Code § 254-21(B)(1). However, here Jersey City issued a certificate of continued occupancy. See PSUMF ¶ 30; DSUMF ¶ 1; ECF No. 171.12, PSUMF, Ex. 9. The City's conflation of the two certificates is unsurprising, though, when it is recognized that certificates of continued occupancy are subsets of certificates of occupancy used to ensure compliance with Section 15 of SUCCA where full inspection is unnecessary. That was the case for Tower 1 because no new construction work or change in the building's use designation occurred.[17]

Statutes "are to be read sensibly rather than literally." Roig v. Kelsey, 641 A.2d 248, 256 (N.J. 1994) (quotation marks omitted). To hold that certificates of occupancy and certificates of continued occupancy are distinct legal devices, and that the former are the only certificate sufficient to trigger the rent-control exemption, would create a limitation on the term "converted" in the definition "[c]onstructed" that runs contrary to the definition's text. It would carve out a series of "converted" properties from the scope of the rent-control exemption in a way that would run contrary to the Exemption Statute's purpose. See, e.g., State ex rel. Comm'r of Transp. v. Trap Rock Indus., Inc., 751 A.2d 633, 639 (N.J. Super. Ct. App. Div. 2000) (explaining courts do not "interpret a statute in such a way that would frustrate the legislative purpose and intent underlying that statute"). And it would fail to interpret the use of certificates of occupancy in their greater statutory and regulatory context. See Linden, 277 A.3d at 1053 (noting that courts "must read statutory provisions in context" to "give sense to the whole of a legislative scheme"); accord Mellouli v. Lynch, 575 U.S. 798, 809 (2015) ("Statutes should be interpreted as a symmetrical and

[17] Residential Group R-2 is defined as a building for occupancy "containing . . . more than two dwelling units where the occupants are primarily permanent," and includes "apartment houses." See N.J. Int'l Building Code, §§ 310.3 (2021 ed.); N.J.A.C. §5:23-3.14(a) (adopting N.J. International Building Code). Tower 1 therefore fell within this Use Designation group when it was intended to be a condominium property and remained within this Use Designation group when it was converted to an apartment property.

coherent regulatory scheme" (quotation marks omitted).). The Court declines to do that and holds that the issuance of a certificate of continued occupancy falls within the scope of the Exemption Statute's definition of "completion of construction."

**b. Tower 1's Rent-Control Exemption Began January 24, 1995.**

Defendants separately argue that if Tower 1 qualifies for a rent-control exemption under the Exemption Statute, the exemption began running on August 25, 1992, following the issuance of the initial certificate of occupancy. See Opp. at 30; Sur-Reply at 2–4. Plaintiffs respond that Tower 1's rent-control exemption began running on January 24, 1995, following the issuance of the certificate of continued occupancy. See Reply at 9; Resp. to Sur-Reply at 2. The Court again agrees with Plaintiffs.

Defendants' contention is based on a narrow reading of the defined term "completion of construction" and of Section 15 of SUCCA, and the Court has rejected that reading. A certificate of continued occupancy falls within the scope of a certificate of occupancy as that term is used in Section 15 and is enforced through the relevant regulatory provisions. See supra at 25–28.

In fact, the implication of Defendants' reading reveals the illogic in interpreting certificates of occupancy and certificates of continued occupancy as separate legal devices that are not both covered under the scope of Section 15. Although the statute's plain language extends rent-control exemptions to new apartment buildings converted from condominiums into rental units, see supra at 23–24, if the conversion requires no new construction and no change in the building's use designation, the rent-control exemption would begin to run years before the building is considered a "multiple dwelling" offering units for rent. The rent-control exemption was intended to incentivize the creation of new rental housing. See N.J.S.A § 2A:42-84.5(b) (explaining the rent-control exemption is intended to "promote" the creation of new rental properties and ensure local rent-control ordinances do not "deter" said creation). Interpreting the statute in a way that means

the rent-control exemption begins before it can be enjoyed runs entirely contrary to this purpose. See Trap Rock Indus., Inc., 751 A.2d at 639 (explaining courts do not interpret statutes in ways that frustrate the legislative intent); State v. Williams, 95 A.3d 721, 727 (N.J. 2014) (explaining courts do "not interpret a statute in a way that leads to an absurd result" (quotation marks omitted)).

Based on the Court's interpretation of Section 15 of SUCCA, the issuance of the certificate of continued occupancy on January 24, 1995 marked the "completion of construction" and triggered the beginning of the rent-control exemption. See PSUMF ¶ 30; DSUMF ¶ 1; N.J.S.A. § 2A:42-84.1(a). Accordingly, the rent-control exemption ran until January 23, 2025.

### 2. Tower 2 Is Exempt From Rent Control Until 2027

The Parties do not dispute that the Exemption Statute is generally applicable to Tower 2. Here, the Court concludes that Tower 2 qualified for a rent-control exemption.

Like Tower 1, Tower 2 offers more than four units for rent; it is therefore a "multiple dwelling." See PSUMF ¶ 15; N.J.S.A. § 2A:42-84.1(e). It was constructed pursuant to a construction permit issued in 1989 and was constructed to be a "multiple dwelling" following Portside's Predecessor's purchase of the property in the mid-1990s; it therefore was "constructed after the effective date of th[e] act." See PSUMF ¶¶ 26, 35; PSUMF, Ex 4-A at 26–27; PSUMF, Ex. 4-B at 3; ECF No. 171.13, PSUMF, Ex. 10; N.J.S.A. § 2A:42-84.1(c). And it reached the "completion of construction" upon the issuance of a certificate of occupancy on December 31, 1997. See PSUMF ¶¶ 36–37; PSUMF, Ex. 10; N.J.S.A. § 2A:42-84.1(a). The requirements triggering the rent-control exemption were thus all satisfied on December 31, 1997, and the rent-control exemption will run until December 30, 2027. See PSUMF ¶ 36.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion, ECF No. 171, is **GRANTED**. The only preconditions to qualify for a rent-control exemption are enumerated in Section 84.2. The Portside

Towers each satisfied those requirements. Tower 1 was entitled to the rent-control exemption through January 23, 2025, and Tower 2 remains entitled to the exemption through December 30, 2027. The Board legally erred by concluding that Section 84.4 represented a condition precedent to obtain the rent-control exemption under the Exemption Statute and that the Towers did not qualify for any rent-control exemption. Plaintiffs are therefore entitled to summary judgment on Count VI, their claim in lieu of prerogative writ.

An appropriate Order will follow the entry of this Opinion.

**Date: September 28, 2026**

***s/ Madeline Cox Arleo***
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**